# Exhibit B

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA  :  NO. 391 CRIMINAL 2008
                         :
       vs.                :
                         :
CHARLES RAY HICKS,        :
        Defendant     :  JURY TRIAL

## ORIGINAL

### TRANSCRIPT OF PROCEEDINGS

BEFORE:  Margherita Patti-Worthington,
          President Judge

DATE:    November 18, 2014
          9:00 o'clock a.m.

PLACE:   Courtroom No. 1
          Monroe County Courthouse
          Stroudsburg, Pennsylvania

APPEARANCES:

2015 FEB 23 AM 9 52
MONROE COUNTY, PA
CLERK OF COURTS

RECORD FILED IN
SUPREME COURT
MAR 19 2015
EASTERN
DISTRICT

        Michael Mancuso, Esquire
        -- On behalf of the Commonwealth

        Robin A. Spishock, Esquire
          - and -
        Jason LaBar, Esquire
        -- On behalf of the Defendant

      Proceedings stenographically recorded by
         Eva M. Rulapaugh, RPR



158

16

1          TIPSTAFF:  Tell the Court your name.

2          THE WITNESS:  I'm Carol Armstrong.

3    Thereupon:

4                    **CAROL ARMSTRONG, PH.D**

5          having been first duly sworn, was examined and

6               testified upon her oath as follows:

7                    **DIRECT EXAMINATION**

8    BY MS. SPISHOCK:

9          Q.    Morning, Dr. Armstrong.  What is your current

10   employment?

11         A.    I'm a neuropsychologist at the Children's Hospital

12   of Philadelphia, associated with the University of

13   Pennsylvania, and I have a private practice.

14         Q.    And like I said to Dr. Weiss, I'm not very familiar

15   with medical terminology.  Could you explain to me a little bit

16   in layman's terms what a neuropsychologist is.

17         A.    A neuropsychologist is a psychologist who has

18   specialized in brain functioning.  A neurologist is someone who

19   is an expert on the sensory and motor systems of the brain, and

20   a neuropsychologist is an expert on the cognitive systems of

21   the brain.

22               But because we're psychologists, we use psychometric

23   methods so that we can measure these cognitive brain functions.

24   So we bring together some neurological knowledge and

25   psychometric knowledge to be the best at measuring brain

17

1   functions.

2       Q.    And what do brain functions tell you about people?

3       A.    They can tell us how we process normally, how --

4   what happens when different areas of the brain are injured and

5   how that might affect function.  It can tell us how we develop.

6   I'm not quite sure more specifically what you mean, but

7   cognitive functions, how we adapt and learn.

8       Q.    Based on actually what's in the brain, not

9   necessarily what's in your thought process -- correct? --

10  something actually physically in the brain?

11      A.    Yes.  Neuropsychologists are one of those

12  professions that think that everything we think is in the

13  brain.  It's not really a difference.

14      Q.    Okay.  Can you give me a little educational

15  background of yourself.

16      A.    I have a bachelor's degree in psychology from Vassar

17  College.  A Ph.D in psychology from the Wright Institute in

18  Berkeley, California.  I have two postdoctoral fellowships in

19  neuropsychology, and now practice as a board-certified

20  neuropsychologist.

21      Q.    I have your curriculum vitae here, and it's very

22  lengthy.  Obviously your most recent employment is as you just

23  stated.  And you've had several publications as well; is that

24  correct?

25      A.    Well, I have a good number of publications.  I also

18

1   have a book on medical neuropsychology.  That's more recent.

2   I'm a fellow of the American Psychological Association in the

3   division of neuropsychology.  I'm a fellow of the National

4   Academy of Neuropsychology.  All I have done for the past

5   30-plus years is neuropsychology.

6        Q.   I was just going to ask you how long have you been

7   in the field.  Thirty-plus years?

8        A.   I don't do therapy.  I just do neuropsychology.  I

9   do research, as well as evaluations.

10        Q.   Okay.  And just explain to me briefly, when you say

11   I don't do evaluations, I do neuropsychology, what do you mean

12   by that?

13        A.   I don't do therapy.

14        Q.   Therapy.  I'm sorry.  You do neuropsychology.  What

15   do you mean by that?

16        A.   I just do the cognitive testing of individuals to

17   understand their brain-associated cognitive functions.  These

18   are all tests that have research behind them, that have been

19   designed to measure brain functions.  So they're not like IQ

20   tests.  They're a little different than that.

21             And I don't do therapy anymore.  I don't just read

22   records.  I only do neuropsychological evaluations or I do

23   research, which can mean other things as well.

24        Q.   And have you ever been admitted as an expert in the

25   field of neuropsychology in any court in the Commonwealth of

19

1  Pennsylvania?

2      A.    Yes, I have been in many of the Court of Common

3  Pleas, as well as other states and federal court.

4      Q.    Have you been in Monroe County yet?

5      A.    I think that I might have, but I would have to look

6  at my records to see.  I don't recall being in this building

7  before.

8          MS. SPISHOCK:  Your Honor, I'd offer Dr. Armstrong

9      as an expert in neuropsychiatry.

10         THE WITNESS:  Neuropsychology.

11         MS. SPISHOCK:  Psychology.  I knew I was going to

12     get that wrong.

13         THE COURT:  Any voir dire, Mr. Mancuso?

14         MR. MANCUSO:  Welcome to Monroe County, ma'am.

15         No questions.

16         THE COURT:  Dr. Armstrong is qualified to testify

17     as an expert in the field of neuropsychology.

18         (Defendant's Exhibit No. 2 was marked for

19     identification.)

20  BY MS. SPISHOCK:

21     Q.    I'm going to show you what I've had marked as

22  Defendant's Exhibit No. 2, and ask you if that's your

23  curriculum vitae?

24     A.    Yes, it is.

25     Q.    And is that the most current curriculum vitae you

20

1  have?

2      A.    Yes.

3            MS. SPISHOCK:  I'd just move for the admission of

4      that.

5            MR. MANCUSO:  No objection.

6            THE COURT:  It's admitted.

7            (Defendant's Exhibit No. 2 was admitted into

8      evidence.)

9  BY MS. SPISHOCK:

10     Q.    Dr. Armstrong, were you contacted by attorneys for

11 Mr. Hicks to perform various neuropsychological testings?  We

12 had a psychiatrist yesterday; so I'm getting all messed up.

13     A.    Yes.

14     Q.    To perform those on Mr. Hicks?

15     A.    Yes.

16     Q.    Okay.  And could you tell the jury which tests you

17 performed and what the purpose of those tests are.

18     A.    Well, since there were about 45 tests, I won't name

19 all the tests.  I'll just give a summary of the tests.

20     Q.    Absolutely.

21     A.    Okay.  So the tests' battery is designed to sample,

22 that is, do some measurement of all the regions of the brain,

23 cortical, as well as subcortical, and all the important

24 cognitive systems.  It's meant to break things down into

25 specifics.

21

1          So, for example, when I measure memory, I'm not just

2    measuring one memory type of process.   I'm measuring both

3    verbal and visual memory processes.   I'm measuring working

4    memory and coding, resistance to interference, retrieval from

5    long-term memory consolidation.

6          I know these are technical terms, but I'm making the

7    point that there are different ways that we use our memory.

8    They indicate different things about how the brain is

9    organized.   Different systems are associated with different

10   regions, and so an example of how neuropsychologists try to

11   break cognitive processes down to be very specific

12       Q.    Is this a battery of tests that you would do on

13   everybody to determine their different cognitive processing?

14       A.    Yes, I test both children and adults.   And this is

15   the same battery -- it's the same structure of battery that I

16   use for all the children and the adults.   It's the same battery

17   I use for all the adults.

18       Q.    And you conducted this battery of testing on Mr.

19   Hicks, correct?

20       A.    Yes.

21       Q.    Okay.   And did you have any results of any interest?

22   In other words, did they show you anything?

23       A.    So I guess the question is, did Mr. Hicks have any

24   neuropsychological impairments with testing?

25       Q.    Impairment or deficiencies, yes.

22

1      A.      Yes, he did have some impairments.

2      Q.      Okay.  And what specifically did you note as

3  impairments?

4      A.      So I guess I should say one more thing.  The way

5  that -- may I give another explanation of neuropsychological

6  evaluations?

7      Q.      Absolutely.

8      A.      So IQ tests are -- people are familiar with IQ tests

9  and what they do.  IQ tests are normed by giving them to large

10  groups of people who represent a whole country.  Everyone's

11  included.  But neuropsychological tests are not normed that

12  way.  They're only given to the healthy and typically

13  developing.  People are screened before given those tests.

14          So to answer your question, it's not how smart we

15  are, which is what IQ tests are for, but how likely is

16  something neurologically wrong or not.  That's the purpose of

17  neuropsychological testing.  That's why they're used in

18  neurological diagnosis, medical diagnosis, psychiatric

19  diagnosis, and so on.

20          And so how do we know that?  Well, we know that by

21  giving them to the healthy and typically developing and then

22  looking to see -- when we have an individual whom we suspect

23  has an impairment, we look to see how likely is it that his

24  score or her score is different from that of healthy

25  individuals.  That's what psychometric testing does.

1          So his scores -- I used a kind of a standard that's

2   a common one, which is that if a test falls one standard

3   deviation below the means -- standard deviation is the average

4   amount of variability within a group.  If he falls below

5   average of the amount of variability, it's mildly impaired.

6          If it's one-and-a-half variation, it's moderately

7   impaired.  If it's two variations -- so two variations below

8   the means, means that less than 2 percent of healthy typically

9   developing people will respond that way.

10         So that's, again, just to give an idea of how we're

11   trying to use statistics and the probability of whether

12   something's normal or not to understand the findings.

13      Q.   So your healthy typically developed people are your

14   baseline?

15      A.   Yes.

16      Q.   Essentially for -- okay.

17      A.   Yes.

18      Q.   Just to be clear, did you do this testing with any

19   information or was this blind testing going in?

20      A.   I do my testing generally blind, in the sense that

21   what's important to me is not to go in with any biases about a

22   person and to just do testing.

23         This testing is considered objective.  If the

24   testing conditions are right, if they're screened for -- if

25   they're monitored for any kind of manipulation or exaggeration

24

1    deficit, you can achieve those standards.

2            If a person is comfortable, they get the idea that

3    there is supposed to -- the best they can do if you can achieve

4    those testing conditions and administer the test in standard

5    ways so that you're just asking for certain kinds of

6    information, then you can say that the results are objective.

7            So neuropsychological testing is considered to be

8    objective.  So I'm looking to see what's wrong.  I don't need

9    to know why it's wrong.  I'm just looking to see what is

10   wrong.

11       Q.    If anything, correct?

12       A.    When I go in to evaluate an individual, yes, that's

13   right, if any.

14       Q.    Right.

15       A.    People don't always have impairments.

16       Q.    I wouldn't want to see mine.

17            What, if anything, of note did you find in the

18   results from Mr. Hicks?

19       A.    So compared to people of his age and education, his

20   impairments were in something called "manual praxis," which

21   is -- this is an example of one of the tests that are given.

22   Just simple asymmetric hand movement.

23            That's the key.  As soon as we move our limbs in an

24   asymmetric way, it requires higher brain control.  Even a

25   simple task like that.  So he had some impairment in that task.

1   He wasn't able to keep -- he wasn't able to maintain the motor

2   plan that he had been instructed in and had begun doing.

3          He had a number of problems with taking in

4   information that he hears, beginning at the level of selective

5   attention, auditory selective attention.  That means a

6   preconscious attention to what is important in the environment.

7          An example is that you're sleeping at night and

8   you've learned to ignore the trash cans and the dogs barking,

9   but if your baby cries, you wake up immediately.  Your brain,

10  even when you're sleeping, is evaluating what's important.  It

11  can do that cognitive processes but you're not conscious.

12     Q.    Right.

13     A.    So it's a way of testing this preconscious ability

14  to take in what we hear.

15         Also, his auditory divided attention.  So being able

16  to kind of multiply think things -- it's kind of multitasking,

17  the idea being able to switch very readily from one thought to

18  another.

19         Auditory sentence comprehension.  So being able to

20  understand the full meaning of what he hears.  Errors were made

21  because of a certain type of linguistic.  It's a linguistic

22  test.  It's about language.  Can you understand all the

23  language that you're hearing.  So he was impaired in that.

24         He also had one verbal memory impairment out of a

25  good number, and he had two visual memory impairments having to

1   do with -- both of them had to do with getting things into

2   permanent memory.  But the visual one was more involved, and he

3   had more trouble retrieving it from memory as well.

4           He also had an impairment in problem solving, a

5   basic trial and error task he was given to do, and in a measure

6   of cognitive flexibility, which is the ability to not keep

7   doing the same wrong thing when you're given negative feedback,

8   things that's wrong.  So we measure how many times we keep

9   doing the wrong thing, even when they're told that's wrong,

10  that's wrong during the problem solving test.

11      Q.     And so what do all these impairments mean?

12      A.     Well, they go beyond -- you know, I've done a lot of

13  research; so I actually have a lot of normal data across the

14  life span, and I've looked at it many times, and I know that

15  people don't -- this is not a normal pattern.

16          You know, an attorney is very busy and may think

17  that he or she has impairment, but you probably don't.  Because

18  I've actually tested some people to show them, no, you don't

19  have impairment.

20          So this kind of impairment does not occur in healthy

21  individuals, healthy typical.  It's not probable at all.  None

22  of the normal healthies have this kind of impairment.

23          I can say with, at least, reasonable certainty that

24  he has neuropsychological impairment that indicates brain

25  dysfunction.

27

1      Q.    And that brain dysfunction would affect various

2  aspects of his life, decision-making, problem solving, as you

3  indicated, things of that nature; is that correct?

4      A.    Yes.

5      Q.    Would it also affect his ability to make good

6  judgments?

7      A.    Very possibly.

8      Q.    Okay.

9            MS. SPISHOCK:  If I can just have a minute.

10           Excuse me, Doctor.

11           (Brief pause.)

12  BY MS. SPISHOCK:

13     Q.    Doctor, even though he exhibits these deficiencies,

14  it is possible for him to make good decisions, correct?

15     A.    Yes.

16     Q.    His judgment isn't always poor, correct?

17     A.    That's correct.  There were many cognitive functions

18  he had in which his score was somewhere in the typical range,

19  the average range.

20     Q.    And are you aware -- I know you made a report and

21  you listed a lot of background information.  That was

22  information you received subsequent to the testing; is that

23  correct?

24     A.    Yes.

25     Q.    Okay.  And in the information you received, did you

1    also receive information regarding how he is conducting himself

2    in the jail at this point?

3         A.    Let me think.  I don't remember what was in what

4    report, but I don't believe I have any prison reports,

5    though.

6         Q.    Okay.  That's fair enough.  But if he's conducting

7    himself well in the jail over the past six years, that's an

8    indication of what you just said, he is capable and can make

9    the right decisions -- correct? -- despite these impairments

10   and deficiencies?

11        A.    Yes.  I mean, prison's a very structured place.

12   And, yes, he's able to function.  It doesn't surprise me if

13   those records say that he's able to function in an adequate way

14   in that environment.

15        Q.    No, he's not just functioning in an adequate way.

16   He's thriving apparently.  Nothing further.  Thank you.

17             THE COURT:  Mr. Mancuso?

18             MR. MANCUSO:  I have a couple questions.

19             THE COURT:  Okay.

20                         **CROSS-EXAMINATION**

21   BY MR. MANCUSO:

22        Q.    Ma'am, my name is Mike Mancuso.  Good morning.  Nice

23   to see you.  The questions I have are going to kind of track

24   your report, which I got the other day.  So just bear with me.

25             The Defendant -- he completed high school, correct?

1      A.    I want to review for a second.  I think he went into

2   vo-tech.  Yes.

3      Q.    You have education, 12th grade on the top.

4      A.    Yes, that's correct.

5      Q.    All right.  And then he also completed technical

6   training.

7      A.    Yes.

8      Q.    And you noted he has a history of skilled

9   employment.

10     A.    Yes.

11     Q.    And that's important for you to know, at least at

12  some point in the evaluation, correct?

13     A.    Yes.

14     Q.    And, oh, by the way, he is a righty, right-handed?

15     A.    Yes.

16     Q.    All right.  And then for the testing that -- a

17  couple I have some questions about.  You had indicated in the

18  testing results that he had a very high rate of perceptual

19  matching; is that correct?

20     A.    A high rate of error in perceptual matching, yes.

21     Q.    And what is that?

22     A.    So at the top -- I have to describe it a little bit.

23  At the top of a page there are little simple shapes, like a

24  curve one way, a curve another way, a straight line, little

25  simple shapes, and below them are numbers.

30

1          One directs the individual to notice that they're

2   paired together, and then they get a practice, and after the

3   practice you see how many -- they're given just the shapes, and

4   they have to orally tell you what is the number that went with

5   the shape.

6          They're still looking at the key and they're doing

7   it.  They have a minute and a half.  His score is compared to

8   people of his age and education, and he made an unusually high

9   rate of errors.  He picked out the wrong one.  He made an error

10  in matching the shape of the number.

11      Q.    Oh, because you have it down as a very high rate of

12  perceptual matching.  Does that mean --

13      A.    A very high rate of errors, though, correct.

14      Q.    I didn't see that.  If you could point that out.  I

15  want to make sure I'm reading this right.

16      A.    Pardon me.  What page are you on?

17      Q.    I believe it's page 2.

18      A.    Right.

19      Q.    Yes.

20      A.    Under process and speed, correct?

21      Q.    Yes.

22      A.    It's the second one.  I've called -- these are

23  little -- my descriptions of what the test was meant to

24  measure.  It's called visuospatial tracking and transcoding,

25  coding from one symbol to another.

31

1    Q.    That's it.

2    A.    His score was average.  It's a speeded test.  He

3   made a very high rate of perceptual matching errors.

4    Q.    Oh, okay.  I see.  All right.

5    A.    Yeah.

6    Q.    So the overall result was average, but there was a

7   high rate of these matching errors?

8    A.    Yes, because his speed was good.

9    Q.    Okay.  The next one I wanted to ask about was verbal

10  fluency.  You had him as above average on that.  It's under

11  language.

12   A.    Yes.

13   Q.    93rd percentile?

14   A.    Yes.

15   Q.    The next one I wanted to ask you about was a high

16  average reading, word recognition.

17   A.    Yes.

18   Q.    You have him as greater than a 12.9 grade

19  equivalent.

20   A.    Yes.

21   Q.    So he's a good reader?

22   A.    Yes.  Word reader, yes.

23   Q.    Okay.

24   A.    It's not sentences or paragraphs.  It's just

25  words.

32

1     Q.    Sure.  Then you have facial perception, 97th

2  percentile.  What is that, ma'am?

3     A.    On that test, photographs are used.  The person is

4  shown at the top of a page a photograph of one person and below

5  that are six photographs of people, and they have to pick out

6  the one that is of the same person.

7         In the beginning, the items are easier and it's

8  exactly the same photo.  As the items get harder, their shading

9  changes, you have less and less information, and the person may

10  not always be posed the same way.  They may be turned.  So it's

11  perception and discrimination within perception.  So it's being

12  able to match faces.

13     Q.    Some people remember faces better than others?

14     A.    Well, no, this isn't memory.  It's just perceiving

15  faces.

16     Q.    Okay.  His perception, how he perceives faces --

17     A.    Yes.

18     Q.    -- was above average?

19     A.    Yes.

20     Q.    Okay.  I wasn't sure what that meant.

21         Then you have visuospatial working memory, 88th

22  percentile; is that correct?

23     A.    Yes.

24     Q.    What does that measure?

25     A.    So that's a simple task in which there are eight

33

1    squares.  They look kind of -- little half-inch, colored

2    squares of the squares of the same color distributed kind of

3    randomly on a page.  And I, the examiner, touch them.  We start

4    with the short sequences.  We get to longer sequences.

5           I touch them in a certain order and then the

6    other -- the person being tested has to touch them in the same

7    order immediately.  So you have to remember what you saw.  It's

8    a visual, but it's also spatial.  You have to get the right

9    configuration.

10    Q.     And he did well in that apparently?

11    A.     Yes.

12    Q.     Okay.  The next one -- I might be on page 3, ma'am.

13    Delayed recall of figures, 91st percentile.  It's the top of

14    page 3.  Do you see that?  The delayed recall figure is 91st

15    percentile, above average.  What does that measure?

16    A.     Yes, that test is being shown a design for ten

17    seconds.  I make the person study it for ten seconds, take it

18    away, and they draw it immediately from memory.

19           The first item is kind of harder -- I mean is easy.

20    There are five altogether.  The last one is quite hard.  There

21    is a range of difficulty.  They're just geometric, non nameable

22    pictures.

23           When he did it the first time, his score was low,

24    around 27th percentile.  The delayed recall shows that he was

25    able to retain the information in memory over time.  So he did

34

1  a very good job at retaining what he had drawn the first

2  time.

3       Q.    Okay.  The next one I wanted to ask you about -- you

4  have also on page 3 complex visual memory, above average

5  absolute recall, 97th percentile.  Do you see that?

6       A.    Yes.  So that is another design that's geometric,

7  not nameable, that he had previously copied.  So he had as much

8  time as he wanted to copy it.  And he had 65th percentile in

9  that.  That's average.  And then there's a minimal delay.  Then

10  I asked him to recall it from memory, and he recalled most of

11  it and got the 97th percentile.

12       Q.    I guess that design is more complex than the other

13  ones?

14       A.    Yes, but this is one where he got to copy it first;

15  so it's different.

16       Q.    And then the next one on that same list you have

17  long-term visual memory consolidation, above average recall

18  after delay, 97th percentile.  What does that measure?

19       A.    So that's how well -- really, the next item average

20  retention over time, 36th percentile -- time is the more

21  sensitive score.  That's how much he was able to retain over

22  time.  Basically he was average in that.

23       Q.    Okay.  And then still going through the report,

24  reasoning and executive functions.  You see that section also

25  on page 3?

1    A.    Yes.

2    Q.    You have the fund of general knowledge high, around

3    75th percentile.  What is the fund of general knowledge?

4    A.    That is from the IQ battery.  It's a simple question

5    and answer test about school-based knowledge.

6    Q.    And he did well on that?

7    A.    Yes.

8    Q.    If you go down that list, you have -- I think the

9    sixth one down -- inferential reasoning, above average, 84th

10   percentile.

11   A.    Yes.

12   Q.    What is inferential reasoning?

13   A.    So it's the ability to make a general inference from

14   something that one knows personally.  So it's a series of

15   questions that no one knows the exact answer to, such as how

16   many seeds are there in a watermelon.

17        Most people have eaten a piece of watermelon and

18   they can make a guess.  Now you're asking how many seeds are

19   in a whole watermelon.  This was normed, given to typically

20   healthy adults, and then taking their scores that fell between

21   the 5th and the 95th percentile and accepting that.

22        His scores -- most of his scores fell within the

23   95th percentile.  What does it mean?  It means he's able to

24   make a generalization based on his personal knowledge.  And

25   that's really what making inferences is about, going from what

36

1    you know to something more.

2        Q.    So you have to figure one slice of watermelon I

3    might get ten pits, and then try to figure out how many slices

4    in a whole?  That kind of processing?

5        A.    Yes.  How far can --

6        Q.    Okay.

7        A.    -- a horse pull a farm cart in -- I forget what it

8    was -- an hour, or something like that.  Things you don't know

9    and you make a good guess.

10       Q.    Okay.  Now, you have the next section of the report

11   you've entitled "mood," and you noted that Mr. Hicks reported

12   he does not currently feel depressed; is that accurate?

13       A.    That's what he said, yes, when I asked him directly

14   are you depressed.

15       Q.    Right.  Down further in that second paragraph under

16   "mood" he reported he does not suffer with anxiety currently.

17   Is that what he told you?

18       A.    Yes.

19       Q.    Okay.  And he seemed calm in his demeanor throughout

20   the process and the testing, correct?

21       A.    Yes.

22       Q.    But then you go into a history.  I guess it's under

23   background information.  So as Attorney Spishock said, after

24   the battery of testing is completed, you ask him questions

25   about his background; is that correct or not?

37

1     A.     It starts -- it's not after testing.   Before testing

2  there's a neurodiagnostic interview which is not open-ended

3  questioning.   It's a large set of questions about things in

4  life that can cause brain dysfunction.   So it's a way of

5  screening out problems, as well as trying to identify possible

6  problems.

7     Q.     So you had that information from that questionnaire

8  before the testing started?

9     A.     Not a questionnaire.   An interview.

10    Q.     An interview?

11    A.     Yes.   It's face-to-face.   It's the first thing I do,

12 go through an interview.   It might take an hour, and then do

13 the testing.

14    Q.     So prior to that interview, did you have any

15 background information about the Defendant from the mitigation

16 expert or the attorneys?   Anything like that?

17    A.     No.

18    Q.     Okay.

19    A.     I knew what his crime was.

20    Q.     From what source?

21    A.     I mean -- oh, from their initial contact with me to

22 ask me to do it.

23    Q.     Okay.

24    A.     We have this case, are you able to evaluate him.

25    Q.     I see.   So when you wrote up the section in the

38

1   report called "background information," and you say information

2   gathered from interviewing with Mr. Hicks and from the

3   mitigation history, from Wanda Lynn Taylor, Ph.D, when did you

4   get that information?

5       A.    What's written there is what I had when I wrote this

6   report.

7       Q.    Yeah, when did you get that in conjunction with the

8   testing?

9       A.    Well, after, but I don't recall how long after.

10      Q.    No, I --

11      A.    Yes, after the testing.

12      Q.    And what was that information?  Did it contain the

13  police reports about the crimes alleged against the

14  Defendant?

15      A.    No, it was the result of her, I believe,

16  interviewing --

17      Q.    Okay.

18      A.    -- or her compilation of records.

19      Q.    Because I note under medical and psychiatric history

20  at the bottom of page 5 of your report he had attempted suicide

21  in 2002, 2006, 2007, and 2008.  Do you see that at the very

22  last sentence?

23      A.    Yes.

24      Q.    Where did you get that information from?

25      A.    A combination of his report to me and that history

39

1   report.

2       Q.    Okay.   In this case, there was evidence of the

3   Defendant's violence toward women.   Certain women came up here

4   and testified in the guilt phase about being assaulted by the

5   Defendant.   Did you have any of that information?

6       A.    I don't think so.

7       Q.    That information, that violence toward women, would

8   that have been helpful to you in rendering your report, when

9   you get all those pieces together and you analyze it as a

10  whole?

11      A.    Well, my main purpose was to do neuropsychological

12  testing.   That's my main contribution.   That's what I'm an

13  expert in.

14      Q.    I understand.

15      A.    And so the neuropsychological results are my purpose

16  for doing the evaluation.   I mean, that's -- and those don't

17  depend on any other information.   I can know nothing about a

18  person and still write a report on them if I have to.

19      Q.    Okay.

20      A.    In other words, I wouldn't be able to do some sort

21  of differential diagnosis, but -- you know, and I try to look

22  for some of those factors in the interview; but nevertheless

23  the results stand, even if we don't know what caused them.

24      Q.    Oh, I'm not challenging the results in any way.

25  Just the three or four pages of background information -- would

40

1   you agree that it would be more complete if it had contained

2   more of that assault history?

3       A.    It depends -- what I'm looking for -- as I said,

4   it's neurodiagnostic.  It's not a psychiatric I do.  It's a

5   neurodiagnostic one.  If the information reflected on his

6   neurological status, then it would be relevant to a

7   neuropsychological evaluation.

8           If it reflects on behaviors of his that don't have

9   to do with his neurological -- I mean, I don't know.  I'm just

10  saying that what's important to know is information that

11  reflects on his medical, psychiatric, and neurological history

12  that can cause brain dysfunction.

13      Q.    Right.

14      A.    So, like I said, my questions are not open-ended.

15  They're specific.  Did you have this?  Did you have that?  What

16  is the nature of this?  What is it that you perceived?  And so

17  on.

18      Q.    Okay.  So basically you don't know whether it would

19  be helpful or not because you don't know what that information

20  is?  In other words, whether it would bear upon his cognitive

21  function?

22      A.    Yes.  I can't know unless -- yes, that's correct.

23      Q.    Thank you, ma'am.  I have no further questions.

24          THE COURT:  Attorney Spishock?

25          MS. SPISHOCK:  I have no redirect.

41

1          THE COURT:  Thank you, Dr. Armstrong.  You may

2     step down, and you're excused.

3          THE WITNESS:  Okay.  Thank you.

4          THE COURT:  Mr. Johnson.

5          MS. SPISHOCK:  Can you hear us, Mr. Johnson?

6          THE WITNESS:  (Nods head.)

7          MS. SPISHOCK:  We can't hear you, though.

8          THE WITNESS:  Morning, Your Honor.

9          THE COURT:  Good morning, Mr. Johnson.  You are

10    appearing via videoconferencing in the case of

11    Commonwealth vs. Charles Ray Hicks.  And this is the

12    time set for your testimony; so will you please stand

13    and raise your right hand to be sworn.

14          (Witness sworn.)

15          TIPSTAFF:  Tell the Court your name again.

16          THE WITNESS:  My name is Jerel Jermaine Johnson.

17          THE COURT:  Would you spell that, Mr. Johnson,

18    your first name.

19          THE WITNESS:  Sure.  It's J-e-r-e-l.  Last name

20    Johnson.

21          THE COURT:  Okay.  And, Mr. Johnson, if at

22    any time you cannot hear a question, please say so, so

23    that it can be repeated.  All right?

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  Thank you.