# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____
                                        :
CHARLES HICKS,                          :
              Petitioner,               :        No. 1:17-CV-1969
                                        :
        v.                              :        (Chief Judge Conner)
                                        :
JOHN E. WETZEL, Secretary,              :        THIS IS A CAPITAL CASE
Pennsylvania Department of Corrections; :
ROBERT GILMORE, Superintendent of       :
the State Correctional Institution at Greene; :
and MARK GARMAN, Superintendent of      :
the State Correctional Institution at   :
Rockview,                               :
              Respondents.              :
_____        :

## PETITION FOR A WRIT OF HABEAS CORPUS

KELLY D. MILLER, ESQUIRE
Asst. Federal Public Defender
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
Kelly_miller@fd.org

Dated: February 1, 2019

# TABLE OF CONTENTS

Table of Contents ............................................................................... i

PRELIMINARY STATEMENT .................................................................1

THE PARTIES .......................................................................................2

PROCEDURAL HISTORY .......................................................................2

PRIOR COUNSEL ..................................................................................4

Part I.      Introductory Statement on Exhaustion ...................................4

Part II.     Applicable Legal Standards ...................................................5

    A.   Eighth and Fourteenth Amendment Capital Requirements....................5

    B.   Due Process Standards and Trial Rights. ...............................8

    C.   Prosecutorial Misconduct. .......................................10

    D.   *Brady/Napue* Due Process Standards. ...................................11

    E.   Ineffective Assistance of Counsel. ...................................13

    F.   Constitutional Requirements for a Fair and Impartial Jury...................16

    G.   Cumulative Constitutional Error. ...................................19

Part III.    Grounds/Claims for Relief...................................................21

Claim 1.    COUNSEL'S PERFORMANCE WAS SO DEFICIENT THROUGHOUT THE PRETRIAL, TRIAL, PENALTY, AND APPELLATE PROCEEDINGS THAT MR. HICKS WAS DEPRIVED OF HIS RIGHT TO COUNSEL. ...............................21

Claim 2.    COUNSEL'S FAILURE TO MOVE TO DISMISS THE CHARGES DUE TO THE COMMONWEALTH'S VIOLATION OF PA. R. CRIM. PROC. 600 AND MR. HICKS' STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO A SPEEDY TRIAL VIOLATED THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS AND ART. I, SECS. 1, 9, 13, 25, 26 OF THE PENNSYLVANIA CONSTITUTION. ..........................................................................................28

    A.   The Law. ...............................................................29

    B.   The Commonwealth Failed to Bring Mr. Hicks to Trial Within the Required Time-Period. .......................................30

C.      Counsel Were Ineffective. .....................................................30

Claim 3.   THE EIGHTH AMENDMENT PROHIBITS THE EXECUTION OF SOMEONE
           WHO, LIKE MR. HICKS, IS SEVERELY MENTALLY ILL. ...........................32

A.      Mr. Hicks is Severely Mentally Ill. .......................................32

B.      Evolving Standards of Decency Prohibit the Execution of the Severely
        Mentally Ill. .......................................................................41

    1. There is a developing national consensus against the execution of
       defendants with severe mental illness...........................................41

    2. It is unconstitutional to impose the death penalty on the severely
       mentally ill because of their diminished personal culpability. .......47

C.      Relief is Required. ..............................................................58

CLAIM 4.   MR. HICKS WAS DEPRIVED OF A FAIR AND RELIABLE CAPITAL TRIAL
           BECAUSE MEMBERS OF THE JURY WERE EXPOSED TO ADVERSE
           COMMUNITY SENTIMENT AND PREJUDICIAL PRETRIAL PUBLICITY IN
           VIOLATION THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. ......59

A.      The Legal Standard.................................................................59

B.      A Change of Venue or Venire was Required in Mr. Hicks' Case. .......60

C.      Ineffective Assistance of Counsel. ...........................................75

Claim 5.   THE COURT'S DENIAL OF COUNSEL'S REQUEST TO VOIR DIRE USING THE
           EVIDENTIARY PHOTOGRAPHS VIOLATED THE SIXTH, EIGHTH AND
           FOURTEENTH AMENDMENTS...................................................................77

A.      Photographic and Video Images Presented to Mr. Hicks' Jury were
        Irrelevant, Gruesome, Inflammatory, and Unduly Prejudicial..............77

B.      The Court Precluded Defense Counsel from Questioning Prospective
        Jurors Using the Evidentiary Photographs. ...........................................80

C.      Mr. Hicks Was Entitled to *Voir Dire* to Identify Unqualified Jurors....80

D.      Counsel were Ineffective.............................................................82

Claim 6.   THE FAILURE TO PROVIDE A FAIR CROSS-SECTION OF THE COMMUNITY
           IN DEVELOPING THE JURY PANEL VIOLATED THE SIXTH, EIGHTH AND
           FOURTEENTH AMENDMENTS...................................................................86

A.      The Constitutional Standard. ..................................................86

B.    Mr. Hicks' Venire was Not Representative of the Monroe County Community. ........................................................................88

    1. African Americans and Latinos are a Distinctive Group. ...............88

    2. African Americans and Latinos were Not Fairly or Reasonably Represented in the Venire. ..............................................88

C.    African Americans and Latinos were Systematically Excluded from the Jury Selection Process. ............................................90

D.    Counsel Were Ineffective. ....................................................91

Claim 7.    JURORS WHO HELD IMPROPER BIASES WERE PERMITTED TO SIT ON MR. HICKS' JURY AND QUALIFIED JURORS WERE IMPROPERLY STRUCK IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. ...92

A.    The Law. ...........................................................................93

B.    The Court's Restrictions on Voir Dire Precluded Adequate, Fact-Specific Questioning to Determine Whether Jurors Could be Fair and Impartial. ...........................................................................94

C.    As a Result of Counsel's Ineffectiveness and Court Error, Several Venirepersons Were Not Properly Life-Qualified, While Others Who Expressed Concern About the Death Penalty Were Improperly Excluded. ...........................................................................96

    1. Failure to Life Qualify and Improper Seating of Automatic Death Jurors. ..........................................................................96

    2. Failure to Excuse Two Venirepersons for Cause During the Selection of Alternates. ..............................................................106

    3. Improper Excusal of Qualified Venirepersons and Failure to Rehabilitate. ..................................................................108

D.    Racial Bias. ......................................................................112

E.    Failure to Excuse Jurors Who Held Actual and Implied Biases Against Mr. Hicks. .......................................................................113

F.    Counsel Were Ineffective. ...................................................115

Claim 8.    THE COMMONWEALTH USED ITS STRIKES IN A DISCRIMINATORY MANNER, DEPRIVING MR. HICKS OF HIS RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. ...........................117

A.    Introduction. .....................................................................118

B.    The Law. ..........................................................................118

C.     The Prosecution's Strikes Demonstrate Discriminatory Intent...........120

D.     Counsel Were Ineffective. ....................................................................121

Claim 9.   THE EXCLUSION OF A LARGE NUMBER OF JURORS BECAUSE OF THEIR VIEWS ON CAPITAL PUNISHMENT FORCED MR. HICKS TO BE TRIED BY A JURY THAT WAS UNCOMMONLY PRONE TO CONVICT, INCAPABLE OF EXPRESSING THE CONTEMPORARY VALUES OF THE COMMUNITY ON THE APPROPRIATENESS OF SENTENCING HIM TO DEATH, AND DENIED HIM AN IMPARTIAL JURY OF THE VICINAGE IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS AND ART. I, SECTIONS 1,9,13,25 AND 26 OF THE PENNSYLVANIA CONSTITUTION. ...........................................122

A.     Mr. Hicks was Denied an Impartial Jury of the Vicinage Capable of Expressing the Contemporary Values of the Community, in Violation of the State and Federal Constitutions. ...................................................122

B.     The Seated Jury was Uncommonly Prone to Convict and Impose Death. ...............................................................................................................125

C.     Counsel were Ineffective. ....................................................................127

Claim 10.   AS A RESULT OF COUNSEL'S INEFFECTIVENESS, PROSECUTORIAL MISCONDUCT AND COURT ERROR, THE ADMISSION OF EXTENSIVE, GRAPHIC PHOTOGRAPHS AND REPLICAS OF BODY PARTS VIOLATED THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. ...............................130

A.     The Prosecution Presented Irrelevant, Graphic, Gruesome Evidence that was Unduly Prejudicial. ......................................................................130

B.     Exposing the Jury to the Patently Irrelevant, Graphic Photographs, Video, "Fake Hands," and Testimony Violated Pennsylvania Law and the Sixth, Eighth, and Fourteenth Amendments. ..................................137

C.     Counsel were Ineffective. ....................................................................139

Claim 11.   THE ADMISSION OF OTHER CRIMES EVIDENCE VIOLATED THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. ...........................................141

A.     Introduction. .........................................................................................141

B.     The Other Crimes/Bad Acts Evidence. ................................................145

      1. Other bad acts evidence the prosecution noticed. .........................145

      2. Other crimes/bad acts evidence admitted without objection, court determination, or limiting instruction. ..........................................149

iv

C.  The Admission of Other Crimes/Bad Acts Evidence Violated the Sixth, Eighth and Fourteenth Amendments. .................................................150

D.  Counsel's Failure to Request and the Court's Failure to Provide Immediate, Proper Instructions Appropriately Limiting the Jury's Consideration of the Other Crimes/Bad Acts Evidence. .....................153

E.  Counsel were Ineffective. ..................................................................157

Claim 12.  MR. HICKS' TRIAL COUNSEL PERFORMED INEFFECTIVELY DURING PLEA NEGOTIATIONS IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. ......................................................................................158

A.  Failure to Competently Advise Mr. Hicks About the Plea Offer........158

Claim 13.  AS A RESULT OF COUNSEL'S INEFFECTIVENESS, PROSECUTORIAL MISCONDUCT, AND COURT ERROR THE JURY CONSIDERED EVIDENCE SEIZED FROM MR. HICKS' CAR AND HOME IN VIOLATION OF THE FOURTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AND ART. I, SECS. 1, 8, 13, 25, 26. ...........................................................................163

A.  The Searches .....................................................................................164

B.  The Suppression Motion and Hearing. ..............................................165

C.  Counsel were Ineffective ...................................................................169

D.  Appellate Counsel Was Ineffective ...................................................169

Claim 14.  AS A RESULT OF COUNSEL'S INEFFECTIVENESS AND COURT ERROR, THE PROSECUTION WAS PERMITTED TO ADMIT STATEMENTS ELICITED BY THE POLICE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. ......................................................................................170

A.  The Law. ............................................................................................171

B.  The Admission of Mr. Hicks' March 7, 2008 Statement at the Barracks Violated the Fifth and Fourteenth Amendments. ................................174

1. The circumstances of the interrogation. ........................................174

2. Admission of the Statement Violated the Fifth and Fourteenth Amendments ...................................................................................177

3. Counsel were Ineffective ................................................................179

C.  The Admission of Mr. Hicks' Statements to PSP at the Hotel Violated the Fifth and Fourteenth Amendments. ...............................................180

1. The circumstances of the interrogation. ........................................180

2. Admission of the Statement Violated the Fifth and Fourteenth Amendments................................................................................181

3. Counsel were Ineffective..............................................................182

D. The Admission of Mr. Hicks' Statements to PSP in Transport Violated the Fifth, Sixth, and Fourteenth Amendments. ...................................183

1. The circumstances of the interrogation. ........................................183

2. Admission of the Statement Violated the Fifth and Fourteenth Amendments................................................................................184

3. Admission of the Statement Violated the Sixth Amendment. .......185

4. Counsel were Ineffective..............................................................185

E. Counsel's Failure to Present Evidence Challenging the Voluntariness of the Statements at Trial Violated the Sixth, Eighth, and Fourteenth Amendments. ...................................................................................186

F. Appellate Counsel was Ineffective .......................................................188

Claim 15. COUNSEL'S FAILURE TO INVESTIGATE, DEVELOP, AND PRESENT EVIDENCE SUPPORTING THE CHOSEN DEFENSE AND CHALLENGING THE PROSECUTION'S THEORY VIOLATED THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. ............................................................188

A. Inadequate expert presentation that included presenting affirmatively harmful expert opinions.........................................................................190

1. What counsel knew pretrial...........................................................190

2. Counsel's failure to present evidence supporting his own expert's conclusions. ..................................................................................194

3. Counsel's presentation of affirmatively harmful expert testimony. 202

4. Counsel's failure to adequately prepare and present Dr. Shane's testimony. .....................................................................................205

B. Evidence disputing the prosecution's intent/malice theory.................210

C. Counsel's failure to challenge the prosecution's forensic pathology expert testimony. .................................................................................215

D. Counsel's failure to object to the multiple instances of improper opinion, speculation, hearsay and patently irrelevant testimony designed to inflame the passion of the jury. .........................................................218

1. Improper opinion/speculation testimony. ....................................218

        2. Improper hearsay/irrelevant testimony. ........................................220

        3. Counsel were ineffective................................................................222

E.    Failure to challenge flawed police investigation................................222

F.    Failure to provide the jury with a cohesive theory/argument.............224

G.    Failure to request proper instructions.................................................228

H.    Cumulative Error ...............................................................................229

Claim 16.   THE PROSECUTION'S FAILURE TO DISCLOSE MATERIALLY EXCULPATORY EVIDENCE VIOLATED THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. ......................................................................................230

A.    The failure to disclose prior testimony of critical prosecution witnesses. ................................................................................................230

B.    The failure to disclose materials arising from the Commonwealth's cooperative investigation with various law enforcement agencies. ....232

        1. The failure to disclose materials developed by the FBI................233

        2. The failure to disclose materials arising from the Commonwealth's cooperative investigation with the Texas Rangers.......................234

        3. The failure to disclose exculpatory evidence generated by the PSP's cooperative efforts with other Texas law enforcement agencies. .235

        4. The failure to disclose exculpatory evidence generated by the PSP's cooperative efforts with Williamsport, Pennsylvania law enforcement. ..................................................................................236

        5. The failure to disclose exculpatory evidence generated by the PSP's cooperative efforts with other Pennsylvania law enforcement agencies. ....................................................................................237

        6. The failure to disclose exculpatory evidence generated by the PSP's cooperative efforts with Hampton, Virginia law enforcement agencies. ....................................................................................238

C.    The failure to disclose other exculpatory evidence.............................239

D.    Viewed cumulatively, the prosecution's suppression of material exculpatory evidence violated the Sixth, Eighth and Fourteenth Amendments. ......................................................................................239

E.    To the extent counsel could have discovered the above-described evidence, their failure to do so was ineffective...................................240

Claim 17.  AS A RESULT OF COUNSEL'S INEFFECTIVENESS, COURT ERROR, AND
PROSECUTORIAL MISCONDUCT, THE JURY CONSIDERED AND FOUND AN
INVALID AGGRAVATING CIRCUMSTANCE IN VIOLATION OF THE SIXTH,
EIGHTH, AND FOURTEENTH AMENDMENTS. ..........................................240

    A.  Counsel's failure to challenge the prosecution's aggravation evidence
and argument. ......................................................................................242

    B.  The Instructions Relieved the Prosecution of Its Burden of Proof,
Essentially Directed a Verdict, and Failed to Adequately Channel the
Jury's Discretion in Violation of the Sixth, Eighth and Fourteenth
Amendments. ......................................................................................244

        1. The Court's Instruction. ...............................................................246

        2. Defining torture as "the infliction of . . . needless mutilation on the
victim" violated the Sixth, Eighth and Fourteenth Amendment rights.
248

        3. The court's vague, overbroad and ambiguous instruction that
included misstatements of law violated the Sixth, Eighth and
Fourteenth Amendments. ...............................................................252

        4. Prejudice. .....................................................................................256

        5. Counsel Were Ineffective ..............................................................257

Claim 18.  THE JURY'S FAILURE TO FIND AND WEIGH MITIGATING CIRCUMSTANCES
THAT WERE CONCEDED BY THE PROSECUTION VIOLATED THE SIXTH,
EIGHTH, AND FOURTEENTH AMENDMENTS. ..........................................258

    A.  Counsel were ineffective ....................................................................261

Claim 19.  AS A RESULT OF PROSECUTORIAL MISCONDUCT, COUNSEL'S
INEFFECTIVENESS AND COURT ERROR, THE JURY WAS PERMITTED TO
CONSIDER NON-STATUTORY AGGRAVATION IN VIOLATION OF THE
SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. ...............................262

    A.  The Non-Statutory Evidence and Argument. ......................................263

    B.  Counsel were Ineffective. ...................................................................266

Claim 20.  COUNSEL'S FAILURE TO INVESTIGATE, DEVELOP, AND PRESENT READILY
AVAILABLE MITIGATING EVIDENCE VIOLATED THE SIXTH, EIGHTH, AND
FOURTEENTH AMENDMENTS. ............................................................268

    A.  Introduction. ......................................................................................268

B.    Counsel's Deficient Presentation at Trial...........................268

C.    Readily-Available Record and Lay Witness Evidence. ......................272

    1. The Environment...............................................273

    2. The Hicks Family ..............................................275

    3. The Dixon Family .............................................282

    4. Charles and His Parents .......................................286

D.    Readily-Available Expert Testimony ...............................310

E.    Failure to request jury instructions on all applicable mitigating circumstances.........................................................313

F.    Counsel Were Ineffective ......................................314

G.    Mr. Hicks Was Prejudiced.....................................318

Claim 21.    THE COURT'S PENALTY PHASE INSTRUCTIONS VIOLATED THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS...........................320

A.    The Court's Failure to Instruct the Jury that It Could Not Consider Non-Statutory Aggravation Evidence and Argument. .................................321

B.    The Court's Instruction Regarding the Possibility of Commutation Invited Speculation, Injected Improper Considerations in the Sentencing Determination and Was Materially Misleading. .................................322

C.    The Court Failed to Properly Instruct the Jury on the Presumption of Life. ........................................................328

    1. The Court's Instructions Gave Death Primacy Over Life. ...........328

    2. Capital Sentencing Requires a Presumption of Life....................330

    3. The Instructions Shifted the Burden from the Commonwealth to the Defendant and Violated the Presumption of Life. ........................332

D.    Counsel Were Ineffective .......................................336

Claim 22.    NUMEROUS INSTANCES OF PROSECUTORIAL MISCONDUCT INDIVIDUALLY AND COLLECTIVELY, VIOLATED THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. ....................................337

A.    The Commonwealth Told the Jury that Mr. Hicks Had Committed More Acts of Violence Against Women Than Just the Incidents They Would Hear About at Trial.............................................338

B.    The Commonwealth Improperly Used Mr. Hicks' Invocation of His Rights to Silence and to Counsel Against Him While Shifting the Burden

ix

of Proof to Mr. Hicks to Explain Why Ms. Null's Hands Were in His Wall.................................................................................339

C.   The Commonwealth Used Improper Evidence and Argument to Portray Mr. Hicks as a Predatory Animal and Strike Fear in the Hearts of the Jurors.................................................................................342

D.   The Cumulative Impact Requires Relief. ...........................................346

E.   Counsel Were Ineffective. ...................................................................348

Claim 23.   BECAUSE NO RECORD EXISTS OF SIGNIFICANT PORTIONS OF THE TRIAL PROCEEDINGS, MR. HICKS WAS DENIED HIS SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND ARTICLE I, SECTIONS 1, 7, 9, 11, 13, 25 AND 26 OF THE PENNSYLVANIA CONSTITUTION. .........................349

A.   There is No Record of Significant and Critical Portions of the Trial Proceedings.........................................................................................349

B.   The Failure to Transcribe and/or Preserve Critical Portions of the Record Violated Mr. Hicks' State and Federal Constitutional Rights.............351

C.   Counsel were ineffective. ....................................................................358

Claim 24.   IRRECONCILABLE DIFFERENCES, APPELLATE COUNSEL'S CONFLICT, AND FAILURE TO RAISE AND LITIGATE ALL AVAILABLE ISSUES ON APPEAL VIOLATED THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. .......359

A.   Mr. Hicks is Entitled to Relief Due to Appellate Counsel's Conflict and Irreconcilable Differences with Mr. Hicks..........................................359

B.   Judicial Bias in Interlocutory Appeal. ................................................363

C.   Mr. Hicks is Entitled to Relief Because Appellate Counsel Failed to Raise All Potentially Meritorious Issues. ...........................................366

D.   Conclusion ...........................................................................................369

Claim 25.   PENNSYLVANIA'S CAPITAL SENTENCING STRUCTURE HAS FAILED AND VIOLATES ARTICLE I, SECTION 13 OF THE PENNSYLVANIA CONSTITUTION AND THE EIGHTH AND FOURTEENTH AMENDMENTS. ...........................370

A.   The JSGC Report's Recommendations and Conclusions Identify Significant Systemic Flaws that Render Pennsylvania's Capital Sentencing Scheme Unconstitutional.................................................372

1. Geographical Bias. .......................................................................372

2. Racial Bias....................................................................................373

3. Juror Bias.........................................................................373

4. Inadequate Resources/Standards for Defense Counsel................374

5. Unfettered Prosecutorial Discretion.............................................375

6. Flawed Statutory Aggravating Factor Scheme. ...........................376

7. Restrictive Mitigating Circumstances...........................................376

8. Inadequate Jury Instructions. .....................................................377

9. Unacceptable Risk of Inclusion of Persons with Intellectual Disability and Serious Mental Illness. ..........................................377

10. The Unacceptable Risk of Executing the Innocent...................378

11. The Extraordinarily Large Number of Reversals.....................379

12. Flawed Proportionality Review ..............................................380

B. As Applied, Pennsylvania's Capital Sentencing Scheme Violates the Pennsylvania and Federal Constitutions.............................................380

1. Federal Constitutional Standards. ...............................................381

2. Pennsylvania Constitutional Standards........................................382

3. The Report Demonstrates that Pennsylvania's Capital Sentencing Scheme Violates the Pennsylvania and Federal Constitutions. ....382

C. Conclusion. .......................................................................394

Claim 26. THE CUMULATIVE IMPACT OF THE CONSTITUTIONAL ERRORS VIOLATED THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. ........................394

REQUEST FOR RELIEF .............................................................396

## PRELIMINARY STATEMENT

The Pennsylvania Supreme Court has generated two substantive opinions in this case. One interlocutory appeal opinion addressing a pretrial decision, *Commonwealth v. Hicks*, 91 A.3d 47 (Pa. 2014) ("*Hicks*"), and the direct appeal decision, *Commonwealth v. Hicks*, 156 A.3d 1114 (Pa. 2017) ("*Hicks-1*"), *cert. denied*, *Hicks v. Pennsylvania*, No. 16-9657, *Order* (U.S. Oct. 2, 2017). The transcripts of the proceedings are cited as NT followed by appropriate date and page number.

All other citations are either self-explanatory or will be explained.

All emphasis in this petition is supplied unless otherwise indicated.

As in other capital habeas corpus cases in this District and Circuit, Petitioner shall brief procedural issues and issues relating to the habeas statute in his memorandum of law.

## THE PARTIES

1.      Petitioner is incarcerated by the Pennsylvania Department of Corrections and is currently confined in the State Correctional Institution at Greene under a sentence of death.

2.      Respondent John E. Wetzel is Secretary of the Pennsylvania Department of Corrections.

3.      Respondent Robert Gilmore is Superintendent of the State Correctional Institution at Greene and currently maintains custody of Petitioner.

4.      Respondent Mark Garman is Superintendent of the State Correctional Institution at Rockview and is responsible for supervising executions in the Commonwealth of Pennsylvania.

## PROCEDURAL HISTORY

5.      On November 14, 2014, following a jury trial in the Monroe County Court of Common Pleas, Petitioner was convicted of one count of first-degree murder and related charges.  *Commonwealth v. Hicks*, CP-45-CR-0000391-2008 (Monroe C.P.).  On November 18, 2014, the jury entered a death verdict.  On January 6, 2015, the court formally imposed sentence.  The Pennsylvania Supreme Court affirmed Petitioner's convictions and sentence of death on March 28, 2017. *Commonwealth v. Hicks*, 156 A.3d 1114 (Pa. 2017).  Petitioner timely filed a petition

for writ of certiorari in the United States Supreme Court, which that court denied on

October 2, 2017.  *Hicks v. Pennsylvania*, No. 16-9657, Order (U.S. Oct. 2, 2017).

6.     On November 30, 2017, this Court granted Mr. Hicks' motion for leave

to proceed *in forma pauperis*, appointed the Capital Habeas Unit of the Federal

Public Defender Office for the Middle District of Pennsylvania to represent Mr.

Hicks in proceedings challenging his convictions and sentence of death under

Section 2254, and ordered counsel to file a status report apprising the Court of the

procedural posture of Mr. Hicks' state court proceedings and any other pertinent

matters on or before May 29, 2018 and every 45 days thereafter.  Doc. 3.

7.     On July 20, 2018, this Court issued an Order directing Mr. Hicks to file

his Habeas Petition on or before October 2, 2018.  Doc. 8.  After the DOC

implemented new legal mail and legal visit document exchange policies in

September 2018 that prevented counsel from engaging in privileged

communications/consultations with Mr. Hicks (*see* Doc. 16), this Court stayed the

proceedings (Doc. 21). After discussions with counsel for the DOC, undersigned

counsel was able to provide Mr. Hicks with documents during her December 10,

2018 legal visit.  Doc. 23 at 5.  Counsel's request for leave to file Mr. Hicks' Habeas

Petition on February 1, 2019 was granted on December 18, 2018.  Doc. 24.

### PRIOR COUNSEL

8.      Petitioner was represented by William K. Sayer, Esquire, Jason LaBar, Esquire and Robin A. Spishock, Esquire of the Monroe County Public Defender at the preliminary hearing, pretrial, trial and appellate proceedings.  He was represented by Louis M. Natali, Esquire on his Petition for a Writ of Certiorari in the United States Supreme Court.

### PART I.      INTRODUCTORY STATEMENT ON EXHAUSTION

9.      Petitioner makes this Introductory Statement on Exhaustion Pursuant to Civil Local Rule 83.32.2(B).

10.     This petition contains claims that are exhausted because their legal and factual bases were expressly presented to the state courts on direct appeal.

11.     Counsel have identified additional claims that were not presented to the state courts and additional factual and legal bases for some claims that were presented. It is undersigned counsel's belief that these claims are substantial and meritorious, and that review of these federal claims is available in state court litigation under Pennsylvania's Post-Conviction Relief Act. Consequently, undersigned counsel has advised Petitioner to pursue state court remedies and will be filing a motion that these federal proceedings be stayed or in the alternative dismissed without prejudice to permit exhaustion of state remedies.

PART II.    APPLICABLE LEGAL STANDARDS

12.    Petitioner sets forth the general legal standards arising from the allegations contained in the claims below.

A.    Eighth and Fourteenth Amendment Capital Requirements.

13.    The very nature of a capital case demands heightened scrutiny.  "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.  Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *Gregg v. Georgia*, 428 U.S. 153, 189 (1976); *Lesko v. Lehman*, 925 F.2d 1527, 1541 (3d Cir. 1991). This proposition, which applies equally to the guilt and penalty phases of a capital trial, *see, e.g., Beck v. Alabama*, 447 U.S. 625, 637-38 (1980) (guilt); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (penalty), is one of the most clearly established principles of Eighth Amendment law.  *See also Gardner v. Florida*, 430 U.S. 349, 357-58 (1977) (plurality opinion); *id.* at 363-64 (White, J., concurring); *Lockett*, 438 U.S. at 604; *Godfrey v. Georgia*, 446 U.S. 420, 427-28 (1980); *Beck*, 447 U.S. at 637-38; *Zant v. Stephens*, 462 U.S. 862, 884-85 (1983); *California v. Ramos*, 463 U.S. 992, 998-99 & n.9 (1983); *Ake v. Oklahoma*, 470 U.S. 68, 78 (1985); *id.* at 87 (1985) (Burger, C.J., concurring); *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985); *Turner v. Murray*, 476 U.S.

28, 36-37 (1986); *Ford v. Wainwright*, 477 U.S. 399, 411 (1986); *Mills v. Maryland*, 486 U.S. 367, 383-84 (1988); *Johnson v. Mississippi*, 486 U.S. 578, 584-85 (1988). As described more fully below, where, as in this case, Petitioner raises allegations supporting his innocence; about the presentation of material misleading and false evidence in support of his invalid convictions; his ineligibility for the death penalty; and numerous instances of court error and prosecutorial misconduct at both stages of this trial, the application of the heightened procedural safeguards requires relief.

14.    Similarly, because of the requirement of individualized sentencing, the State may not limit presentation or impair consideration of "compassionate or mitigating factors," *Woodson*, 428 U.S. at 304, regarding the individual defendant's character, background, or record, or the circumstances of the offense that "would humanize [him] or allow the [jury] to accurately gauge his moral culpability," *Porter v. McCollum*, 130 S. Ct. 447, 454 (2009). *See also Lockett*, 438 U.S. at 601-05; *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982); *Penry v. Johnson*, 532 U.S. 782, 797 (2001) ("*Penry II*"); *Tennard v. Dretke*, 542 U.S. 274, 285 (2004); *Brewer v. Quarterman*, 550 U.S. 286, 288-89 (2007); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246-48 (2007); *Smith v. Texas*, 543 U.S. 37, 38, 43-49 (2004); *McKoy v. North Carolina*, 494 U.S. 433, 442 (1990); *Penry v. Lynaugh*, 492 U.S. 302, 307, 319 (1989) ("*Penry I*"); *Mills*, 486 U. S. at 374-75; *Dugger*, 481 U.S. at 394; *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986).

15.     "[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to *consider and give effect to that evidence* in imposing sentence." *Penry I*, 492 U.S. at 319. *See also Kansas v. Carr*, 136 S. Ct. 633, 642 (2016); *Smith v. Spisak*, 558 U.S. 139, 144 (2010) (referring to "well-established principle" that the "sentencing judge or jury 'may not refuse to *consider* or be precluded from *considering* "any relevant mitigating evidence'"); *Abdul-Kabir*, 550 U.S. at 246 (It is "firmly established that sentencing juries must be able to give *meaningful consideration and effect* to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual[.]"); *Penry II,* 532 U.S. at 788; *Eddings*, 455 U.S. at 114; *Lockett*, 438 U.S. at 602-08 (plurality opinion).

16.     Likewise, to ensure that only the most morally culpable defendants are subject to capital sanctions, State criteria for determining "eligibility" for the death penalty must "genuinely narrow" the class of defendants upon whom the penalty may be imposed and must provide a principled, objective basis for distinguishing between those defendants who should live and those who may be sentenced to die. *Godfrey*, 446 U.S. at 428-29.  The death penalty is to be sparingly, and prudently, applied.  *See Roper v. Simmons*, 543 U.S. 551, 568 (2005) ("Capital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of

execution"); *see also Atkins v. Virginia*, 536 U.S. 304, 319 (2002) (pursuant to narrowing principles, mentally retarded offenders not eligible for the death penalty).

### B.    Due Process Standards and Trial Rights.

17.    Due Process requires that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof – defined as evidence necessary to convince a trier of fact beyond reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *see also In re Winship*, 397 U.S. 358, 364 (1970); *Francis v. Franklin*, 471 U.S. 307, 313 (1965).

18.    Due process also affords a criminal defendant the "right to a verdict based solely upon the evidence and the relevant law." *Chandler v. Florida*, 449 U.S. 560, 574 (1981). That right is protected not just by due process, but by the Sixth Amendment. When a defendant is afforded a jury trial, "the jury's constitutional responsibility is not merely to determine the facts, but to apply the law to those facts and draw the ultimate conclusion." *United States v. Gaudin*, 515 U.S. 506, 514 (1995). And when a defendant is on trial for his life, the Eighth Amendment requires the State to "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). Because the State "has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death

8

penalty," *id.*, a death sentence that is based on the consideration of extraneous evidence or arguments that are outside the scope of the applicable law is unconstitutionally arbitrary and capricious.

19.    An accused has a constitutional right to "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U. S. 479, 485 (1984); *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).  That right is grounded in the Due Process, Compulsory Process, and Confrontation Clauses.  *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *Holmes*, 547 U.S. at 324; *see also In re Oliver*, 333 U. S. 257, 273 (1948); *Washington v. Texas*, 388 U.S. 14, 23 (1967); *Davis v. Alaska*, 415 U.S. 308 (1974); *United States v. Cronic*, 466 U.S. 648, 656 (1984); *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Rock v. Arkansas*, 483 U.S. 44, 51 (1987).

20.    When a State mandates certain trial, capital sentencing, and appellate procedures, it creates Fourteenth Amendment life and liberty interests in those procedures.  *Evitts v. Lucey*, 469 U.S. 387, 393 (1985); *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980); *Ford*, 477 U.S. at 428-29.  Although the right to the particular procedure is established by state law, the violation of the life and liberty interest it creates is governed by federal constitutional law.  *Hicks*, 447 U.S. at 346; *Ford*, 447 U.S. at 428-29; *Evitts*, 469 U.S. at 393.

9

C.    **Prosecutorial Misconduct.**

21.    The prosecution's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . . It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935).

22.    Because of the prosecutor's prominent role as representative of the Commonwealth – and the mantle of respect and authority this role creates in the eyes of the jury – jurors are predisposed to give great deference to the prosecutor's words, and improper prosecutorial arguments "are apt to carry much weight against the accused, when they should properly carry none." *Berger*, 295 U.S. at 88; *accord Drake v. Kemp*, 762 F.2d 1449, 1459 (11th Cir. 1985) (citing *Berger*). "For this reason, misconduct by the prosecutor . . . must be scrutinized carefully." *Drake*, 762 F.2d at 1459; *see also United States v. Young*, 470 U.S. 1, 7-8 (1985). Prosecutors have a "heightened duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices," *Lesko*, 925 F.2d at 1541. This duty and the court's scrutiny are even greater in capital proceedings.

23.    When the prosecutor's argument infects the trial with unfairness, due process is violated. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  When a prosecutor's misconduct implicates specific provisions of the Bill of Rights,

10

however, a petitioner need not demonstrate that the misconduct rendered his sentencing fundamentally unfair. Instead, proof that the error was not harmless is all that is required. *Gaudin*, 515 U.S. at 526; *see also Donnelly*, 416 U.S. at 643.

### D.   *Brady/Napue* Due Process Standards.

24.   Due Process also requires a prosecutor to disclose favorable evidence to the accused that is material to either guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 153-56 (1972); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). A prosecutor's duty to disclose is especially important in a capital case. *Kyles*, 514 U.S. at 422. The duty to disclose continues past a defendant's arrest, conviction and sentencing. *Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976).

25.   "Favorable evidence" under *Brady* includes evidence that impeaches the prosecution's theory or witnesses. *Bagley*, 473 U.S. at 676; *Napue*, 360 U.S. at 269 ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence"); *see also Wilson v. Beard*, 589 F.3d 651, 662 (3d Cir. 2009); *Simmons v. Beard*, 590 F.3d 223, 235 (3d Cir. 2009); *Breakiron v. Horn*, 642 F.3d 126, 133-34 (3d Cir. 2011).

26.   Favorable evidence is material, and its non-disclosure prejudicial, "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449,

469-70 (2009).  This "does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'"  *Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (quoting *Kyles*, 514 U.S. at 434). When there is a reasonable probability that the withheld evidence, if presented, could have provided a "reasonable doubt" about Petitioner's guilt, he is entitled to relief. *Kyles*, 514 U.S. at 434; *Trombetta*, 467 U.S. at 485.

27.     Further, in assessing materiality, the Court must consider "any adverse effect" the prosecution's suppression of evidence had on the defendant's ability to prepare for trial or present a defense.  *Bagley*, 473 U.S. at 683; *United States v. Perdomo*, 929 F.2d 967, 972 (3d Cir. 1991).

28.     Likewise, the presentation of false, inaccurate, or misleading testimony or argument deprives a defendant of a fair trial if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury."  *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *Giglio*, 405 U.S. at 153-54.  Where the prosecution's suppression of evidence is compounded by the prosecution's use of, or failure to correct, false evidence, the materiality standard is lowered.  "[I]n those cases the Court has applied a strict standard of materiality, not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process."  *United States v. Agurs*, 427 U.S.

97, 103-04 (1976) holding modified by *United States v. Bagley*, 473 U.S. 667 (1985). Thus, where the prosecution provides, or fails to correct, false evidence, that evidence is material where there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.  See also Napue*, 360 U.S. at 271; *Giglio*, 405 U.S. 150; *Carter v. Rafferty*, 826 F.2d 1299 (3d Cir. 1987).

### E.    Ineffective Assistance of Counsel.

29.    Ineffective assistance of counsel claims under the Sixth and Fourteenth Amendments are evaluated under the two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984).  Petitioner must show: (A) counsel's deficient performance, i.e., that his attorney's performance fell below "an objective standard of reasonableness," *id.* at 688; and (B) prejudice, i.e., that confidence in the result of the original proceeding is undermined as a result of counsel's deficiencies, *id.* at 694; *see also Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005).

30.    Counsel has "a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process." *Strickland*, 466 U.S. at 688.  This can be done only if counsel actually investigates, *id.* at 691; ABA STANDARDS FOR CRIMINAL JUSTICE, 4-4.1(a) (3d ed. 1993) ("Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the

13

event of conviction.").  The duty to investigate is especially exacting in a capital case, where "counsel's duty to investigate all reasonable lines of defense is strictly observed." *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997); *see also* ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, Guideline 10.7, Investigation (rev. ed. 2003); ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, Guideline 11.4.1, Investigation (1st ed. 1989).

31.     Prejudice is present whenever "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Williams*, 529 U.S. at 371; *Wiggins*, 539 U.S. at 534; *Rompilla*, 545 U.S. at 390.  The Supreme Court has stressed that "the adjective is important."  *Kyles*, 514 U.S. at 434. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Id.; see also Strickland*, 466 U.S. at 693.

32.     To show prejudice in the context of counsel's failure to present or the jury's failure to credit mitigating evidence, a Petitioner must show "a 'reasonable probability' that at least one juror would have been moved to spare [his] life had he

14

heard the mitigation evidence developed at the habeas hearing that was not presented at the trial." *Williams*, 529 U.S. at 394-95.

33.     The general standards of *Strickland* also apply to claims of appellate ineffectiveness.  *See, e.g., Roe v. Flores-Ortega*, 528 U.S. 420 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness); *United States v. Mannino*, 212 F.3d 835 (3d Cir. 2000).  The ABA Guidelines "in circulation at the time of [Petitioner's direct appeal] describe[ ] the obligation in terms no one could misunderstand in the circumstances of a case like this one," *Rompilla*, 545 U.S. at 387: "[a]ppellate counsel should seek, when perfecting an appeal, to present all arguably meritorious issues."   ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, Guideline 11.9.2.(D), Duties of Appellate Counsel (1989 ed.).  Recognizing the unique nature of a capital appeal, the Commentary to Guideline 11.9.2. (D) advises against raising "only the best of several potential issues," noting that "[w]hen a client will be killed if the case is lost, counsel (and the courts) should not let any possible ground for relief go unexplored or unexploited.   *See also* ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, Guideline 10.15.1.(C), Duties of Post-Conviction Counsel (2003 rev. ed.) (appellate "counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious"); *id.* Comment, Direct Appeal ("[I]t is of critical

15

importance that counsel on direct appeal proceed . . . in a manner that maximizes the client's ultimate chances of success. . . . When a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited.").

34.     Where there is a "reasonable probability that the neglected claim[s] would have succeeded on appeal, [] counsel's failure to raise the claim [falls] outside the range of reasonably competent assistance." *Showers v. Beard*, 635 F.3d 625, 634 (3d Cir. 2011); *Claudio v. Scully*, 982 F.2d 798, 799 (2d Cir. 1992); *see also Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (petitioner may establish appellate counsel ineffectiveness "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker.").

### F.     Constitutional Requirements for a Fair and Impartial Jury.

35.     It is well settled that the Sixth and Fourteenth Amendments "guarantee a defendant on trial for his life the right to an impartial jury." *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).   A juror is considered partial if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Gray v. Mississippi*, 481 U.S. 648, 657 (1987) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).   In capital cases, the Sixth Amendment right to an impartial jury

16

is also violated whenever a jury is empaneled that is "uncommonly willing to condemn a man to die." *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968).

36.   Similarly, clearly established federal due process law has long required that the jury's "verdict must be based upon the evidence developed at the trial," as opposed to any outside influences. *Irvin*, 366 U.S. at 722. *See also Turner v. Louisiana*, 379 U.S. 466, 472 (1965).

37.   A significant part of the guarantee of these rights "is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 730 (1992). *See also Dennis v. United States*, 339 U.S. 162, 171-172 (1950); *Morford v. United States*, 339 U.S. 258, 259 (1950); *Turner v. Murray*, 476 U.S. at 36-37 (voir dire on racial prejudice required); *Ristaino v. Ross*, 424 U.S. 589, 596 (1976) (same); *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (White, J., plurality opinion) ("Voir dire plays a critical function in assuring the criminal defendant that [the] right to an impartial jury will be honored"); *id.* (without adequate voir dire, the court cannot fulfill its "responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence").

38.   Adequate voir dire takes on even greater importance in a capital case, because of the "the qualitative difference of death from all other punishments," *California v. Ramos*, 463 U.S. 992, 998-99 (1983), and because capital juries are

required to make a "highly subjective 'unique individualized judgment regarding the punishment that a particular person deserves,'" *Caldwell*, 472 U.S. at 340-41 n.7.

39.     "[T]here is nothing talismanic about juror exclusion" in capital cases. *Wainwright v. Witt*, 469 U.S. 412, 423 (1985).  Instead, "as with any other trial situation . . . it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality."  *Id.* at 423-24.  Where the proponent of a strike seeks to excuse a juror for cause, the question for the trial court is simply, "did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestations of impartiality have been believed."  *Patton v. Yount*, 467 U.S. 1025, 1036 (1984).

40.     Juror partiality frequently arises in capital sentencing when the state seeks to exclude jurors whose anti-death penalty views would prevent or substantially impair them from returning a death sentence, *see*, *e.g.*, *Adams*, 448 U.S. at 45; *Witt*, 469 U.S. at 424; *Gray*, 481 U.S. at 657, or when the court fails to exclude jurors whose pro-death penalty views prevent or substantially impair them from returning a life sentence, *see, e.g., Morgan,* 504 U.S. at 729; *Ross*, 487 U.S. at 85. "[I]t is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to *consider and give effect to that evidence* in imposing sentence."  *Penry*, 492 U.S. at 319; *see also* Section II.A.

41.     Although the scope of voir dire is generally in the discretion of the trial court, the latitude allowed in voir dire must be considered in light of the factual circumstances of the particular criminal case. *Commonwealth v. Christian*, 389 A.2d 545, 547 (1978).  Any suggestion that a juror may disregard otherwise mitigating evidence based upon the facts of the homicide or the presence of a particular aggravating circumstance would be to permit a mandatory death sentence on the aggravating facts of a given case, in violation of the Eighth Amendment prohibition on mandatory death sentences. *See Woodson*, 428 U.S. at 303-04; *Roberts (Stanislaus) v. Louisiana*, 428 U.S. 325 (1976); *Roberts (Harry) v. Louisiana*, 431 U.S. 633 (1977); *Sumner v Shuman*, 483 U.S. 66 (1987).

### G.      Cumulative Constitutional Error.

42.     Courts have long recognized that constitutional claims of error are to be considered cumulatively as well as individually, and that cumulative error or prejudice may provide a basis for relief whether or not the effect of individual errors warrants relief.   *See, e.g., Williams*, 529 U.S. at 397-98 (court must consider cumulative effect of all mitigating evidence); *Kyles*, 514 U.S. at 437-38 (cumulative prejudice from state's failure to reveal multiple pieces of exculpatory evidence undermined fairness of trial and entitled defendant to relief); *Taylor v. Kentucky*, 436 U.S. 478, 487-88 & n.15 (1978) (cumulative effect of potentially damaging instructions and prosecution argument violated due process guarantee of

fundamental fairness, necessitating relief); *Donnelly*, 416 U.S. at 639 (considering totality of prosecutorial misconduct in context of entire trial to decide if misconduct was sufficiently prejudicial to violate defendant's due process rights). In assessing *Brady* materiality, courts are to consider the cumulative, or collective, effect of all of the relevant undisclosed evidence. *Kyles*, 514 U.S. at 436.

43.    The standard to be applied in determining whether due process has been violated by a collection of constitutional errors is the standard for harmless constitutional error set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 632 n.7 (1993) – the errors cumulatively considered must have a "substantial and injurious effect or influence in determining the jury's verdict."

44.    Petitioner need not prove any single error (or in this case a series of errors) prejudicial.  Rather, a court's doubt concerning the harmlessness of any error (or errors) must be resolved in favor of the petitioner.  *Brecht*, 507 U.S. at 640-41 (Stevens, J. concurring); *O'Neal v. McAnnich*, 513 U.S. 432, 437 (1995). If the Court finds itself in equipoise as to the effect of these cumulative errors, such that it "merely ha[s] 'grave doubt' as to the existence of prejudice," relief must be granted. *Glenn v. Tate*, 71 F.3d 1204, 1211 (6th Cir. 1995) (quoting *O'Neal*, 513 U.S. at 437).

## PART III.   GROUNDS/CLAIMS FOR RELIEF

45.     By this Petition for a Writ of Habeas Corpus, Petitioner submits that his convictions and sentences violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

46.     The rulings and decisions of the state courts, including the Pennsylvania Supreme Court, in this case were contrary to, and/or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; and/or were based on an unreasonable determination of the facts in like of the evidence presented in the state court proceedings.

**CLAIM 1.   COUNSEL'S PERFORMANCE WAS SO DEFICIENT THROUGHOUT THE PRETRIAL, TRIAL, PENALTY, AND APPELLATE PROCEEDINGS THAT MR. HICKS WAS DEPRIVED OF HIS RIGHT TO COUNSEL.**

47.     The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

48.     In *United States v. Cronic*. 466 U.S. 648 (1984), the Supreme Court ruled that prejudice is presumed "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, . . . mak[ing] the adversary process itself presumptively unreliable." *Id*. at 659.   In such cases, the Court held, "the performance of counsel may be so inadequate that, in effect, no assistance of counsel is provided." *Id*. at 654 & n. 11.

49.    Mr. Hicks' case provides precisely such a denial.  Indeed, as described below and throughout this *Petition*, counsel's preparation for and representation of Mr. Hicks throughout the pretrial, trial, penalty and appellate proceedings "[a]mounted in every respect to no representation at all."  *Claubourne v. Lewis*, 64 F.3d 1373, 1387 (9th Cir. 1995) (*quoting Blake v. Kemp*, 758 F.2d 523, 533 (11th Cir. 1985)).  Counsel's performance was so deficient "that counsel was not merely incompetent but inert."  *Childress v. Johnson*, 103 F.3d 1221, 1228 (5th Cir. 1997). Under these circumstances, "the likelihood that counsel could have performed as an effective adversary was so remote as to have made the trial inherently unfair." *Cronic*, 466 U.S. at 660-61.  Thus, prejudice is presumed and relief is warranted.

50.    Mr. Hicks will demonstrate at a hearing that his guilt and penalty phase counsel never worked together to develop a cohesive trial strategy, thereby squandering any opportunity to answer the biggest question the jury must have had at both guilt and penalty – how Mr. Hicks could have dismembered a human body. The case, the client, and his family would be abandoned at critical moments, most notably during periods when a non-trial disposition would have been possible had counsel been actively working toward settlement.

51.    From the beginning, the Commonwealth was willing to resolve this case for a sentence of life imprisonment without parole in change for a guilty plea to first degree murder in Ms. Null's death.  The Commonwealth was still willing to

resolve the case for life even after the jury returned its guilt phase verdict, in exchange for information from Mr. Hicks about this case and homicides in Texas. As described in Claim 12, reasonably competent counsel should have anticipated that a global resolution of the instant case and cases in other jurisdictions was a possible negotiated outcome for Mr. Hicks and should have been investigating and preparing their client for that possibility. Counsel wholly failed to do so, provided Mr. Hicks' inadequate representation and counsel, and the deal fell through.

52.    As described in Claims 7-9, counsel failed to advocate for their client during voir dire. Counsel did not ask a single voir dire question of two seated jurors; failed to ensure adequate voir dire other jurors; accepted automatic death jurors; allowed the Commonwealth to strike (without any objection or attempt at rehabilitation) qualified jurors; repeatedly misstated the law of mitigation and aggravation in a manner that increased the defense burden; accepted jurors with bias against Mr. Hicks, including one juror whose daughter died of a drug overdose after voir dire, but before the beginning of evidence; failed to lodge a single objection to the Commonwealth's systemic exclusion of women and minorities from the venire; failed to ensure voir dire on racial bias in this interracial homicide; and failed to ensure that an adequate record of voir dire was preserved in the appellate record.

53.    Despite recognizing that the evidence collection and autopsy photographs were gruesome and prejudicial to Mr. Hicks' ability to receive a fair

trial, counsel failed to adequately voir dire about the photographs and, as a result, eleven of the sixteen jurors chosen to serve were not asked a single question about their ability to view the photographs. *See* Claim 5. Counsel also failed to lodge a single objection to these photographs as they were admitted at trial. *See* Claim 10.

54.     As described in Claim 15, counsel intended to pursue a trial theory of death by accidental overdose, but did little to fully develop and present evidence supporting that theory. Counsel failed to develop readily available record and witness evidence demonstrating the nature and extent of Ms. Null's addiction, that included accidental overdoses. Counsel failed to marshal the readily available evidence demonstrating that the injuries found during the autopsy for which the timing was ambiguous could have been the result of violent encounters Ms. Null had with others in the days and weeks leading up to her death. Counsel failed to investigate and develop the available record, mental health and witness evidence disputing the prosecution's intent theory. Counsel failed to adequately develop and present forensic evidence both supporting the accidental overdose and "drug dumping" theory and disputing the police investigation and the prosecution's inherently unreliable forensic pathology testimony. Counsel failed to object and/or move in limine to prevent the prosecution from presenting rank hearsay, improper opinion evidence and improper other crimes evidence.

55.     Counsel also presented affirmatively harmful evidence throughout the guilt-phase of the trial – eliciting even more other crimes/bad acts evidence and electing to present Dr. Mihalakis despite counsel's knowledge from the pretrial reports that he would provide testimony that not only did not dispute the prosecution's theory but actually supported it.

56.     Having failed to develop and present a cohesive theory of accidental death, although there was substantial evidence supporting that theory, counsel also failed to provide the jury with a cohesive closing argument that highlighted the flaws in the prosecution's case and the readily available evidence supporting the defense theory that, as it was equally likely that Ms. Null died of an accidental overdose, the prosecution had not met its burden of proof.

57.     Counsel also failed to ensure that the jury was timely and properly instructed on the limited use of the other crimes/bad acts evidence offered by the prosecution; failed to request that the jury be instructed on the basic principle that if the evidence can be viewed as equally supporting innocence (i.e., accidental overdose) as it does guilt, then the jury must acquit; and failed to object to the prosecution's improper argument and/or request appropriate curative instructions.

58.     Counsel's preparation for and performance at the penalty hearing was as deficient, if not more so, than that at the guilt phase.  *See* Claim 20.  Although there were six and one-half years from arrest to trial, the work necessary to develop

25

a competent case in mitigation did not begin promptly and was done in fits and starts. The case did not have a mitigation specialist until approximately one and one-half years after Mr. Hicks was arrested. The investigation was then put on hold from July 2011 until May 2014, as counsel litigated the Commonwealth's interlocutory appeal regarding other crimes evidence.

59.    The composition of the team was not stable. Mr. Hicks' first guilt-phase counsel retired in December 2012. Mr. Hicks' first Texas-based mitigation specialist quit the team in frustration in April 2014. Mr. Hicks' local, New-Jersey-based mitigation specialist had to stop work on the case in Fall 2014 due to family illness. As a result, at the time of trial, Mr. Hicks had one, new Texas-based mitigation specialist who had only been on his case since April 2014.

60.    Effective team communication and leadership were scarce. Throughout the preparation of this case, the team members were physically scattered. The team failed to regularly meet either in person or on the phone. During many long stretches, the team simply never met or talked as a team at all. As a result, the team did not function as a unified whole and important tasks such as selection and development of mental health experts were delegated to the mitigation specialists with little to no attorney supervision.

61.    When the Pennsylvania Supreme Court issued its opinion on the Commonwealth's interlocutory appeal in May 2014, there was still a monumental

amount of work to be done.  Despite lack of preparation and loss of critical team members holding vast institutional knowledge of the case, counsel did not seek a continuance.  Counsel instead scrambled to prepare their mitigation amid chaos.

62.     At the penalty hearing, counsel repeatedly made factual errors about, or demonstrated a lack of knowledge of, basic information about Mr. Hicks, his family, and their background.  Counsel failed to present a wealth of readily available mitigating evidence, some of which was known by, and could have been elicited from, witnesses who testified.  Counsel also failed to introduce a single page from Mr. Hicks' voluminous mental health records, even though those records documented in painstaking detail his long, established history of severe mental illness (including historical diagnoses of bipolar disorder and major depression with psychotic features); how the symptoms of that severe mental illness significantly impaired Mr. Hicks' ability to function on a day-to-day basis; and how Mr. Hicks' crack-cocaine use was an attempt to self-medicate.

63.     Moreover, despite the fact that initial guilt-phase counsel had Mr. Hicks evaluated by psychiatrist Ilan Levinson shortly after his arrest, and Dr. Levinson opined in a written report that Mr. Hicks suffered schizoaffective disorder *and met the criteria for a plea of guilty but mentally ill*, counsel failed to present Dr. Levinson as a witness or otherwise place this evidence before the jury.  And, despite having presented *some* mental health evidence, counsel failed to request the jury be

instructed on either of the mental health statutory mitigating circumstances under 42 Pa. C.S. § 9711(e)(2) & (3).  Having failed to develop and present all readily available mitigation, in penalty phase closing argument defense counsel then *invited the jury to consider non-statutory aggravation of future dangerous*.

64.   Finally, counsel raised only one issue on direct appeal, failing to raise several other potentially meritorious issues that had been preserved.  Claim 24.

65.   For all of these reasons and those stated throughout this petition, Mr. Hicks' counsel failed to subject the Commonwealth's case to meaningful adversarial testing, making the process presumptively unreliable.  Relief is required.

**CLAIM 2.    COUNSEL'S FAILURE TO MOVE TO DISMISS THE CHARGES DUE TO THE COMMONWEALTH'S VIOLATION OF PA. R. CRIM. PROC. 600 AND MR. HICKS' STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO A SPEEDY TRIAL VIOLATED THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS AND ART. I, SECS. 1, 9, 13, 25, 26 OF THE PENNSYLVANIA CONSTITUTION.**

66.   The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

67.   In Pennsylvania, the Commonwealth must bring a criminal defendant to trial within 365 days of the date upon which the criminal complaint was filed.  Mr. Hicks was tried 2,423 days after the filing of the criminal complaint.  The Commonwealth's failure to try Mr. Hicks within 365 days violated Rule 600 of Pennsylvania's Rules of Criminal Procedure, the Sixth, Eighth and Fourteenth Amendments, and Article 1, Sections 1, 9, 13, 25, 26.  Counsel's failure to move for

dismissal pursuant to Rule 600 and the violation of Mr. Hicks' state and federal constitutional speedy trial rights constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments.

### A. The Law.

68.   Pa. R. Crim. Proc. 600 requires that "[t]rial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed." Pa.R.Crim. Proc. 600(A)(2)(a). Every defendant, even those charged with homicide, must be brought to trial within this time-period. *Commonwealth v. Solano*, 906 A.2d 1180 (Pa. 2006).  When the prosecution fails to try a defendant within the required time, "the charges be dismissed with prejudice." Pa. R. Crim. Proc. 600(D)(1).

69.   Pennsylvania adopted this rule "in response to the United States Supreme Court's decision in *Barker v. Wingo*, 407 U.S. 514, 530 (1972)," and promulgated in order "to protect defendants' constitutional rights to a speedy trial under the Sixth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution." *Commonwealth v. Bradford*, 46 A.3d 693, 700 (Pa. 2012), citing *Commonwealth v. Meadius*, 870 A.2d 802, 804 n.1 (Pa. 2005).

70.   When a state mandates certain trial, capital sentencing, and appellate procedures, it creates Fourteenth Amendment life and liberty interests in those procedures. *Evitts v. Lucey*, 469 U.S. 387, 393 (1985); *Hicks v. Oklahoma*, 447 U.S.

29

343, 346 (1980); *Ford*, 477 U.S. at 428-29.  Although the right to the particular procedure is established by state law, the violation of the life and liberty interest it creates is governed by federal constitutional law.  *Hicks*, 447 U.S. at 346; *Ford*, 447 U.S. at 428-29; *Evitts*, 469 U.S. at 393.  Moreover, as this is a capital case, heightened procedural safeguards are required under the Eighth and Fourteenth Amendments.  *See* Section II.A.

> **B.  The Commonwealth Failed to Bring Mr. Hicks to Trial Within the Required Time-Period.**

71.     Mr. Hicks was arrested, and the original criminal complaint was filed, on March 8, 2008.  The Commonwealth was required to bring Mr. Hicks to trial no later than March 8, 2009.  Mr. Hicks' trial did not commence until October 26, 2014, 2,423 days after the filing of the Complaint.

72.     The Commonwealth's failure to bring Mr. Hicks to trial within the mandated time-period violated Rule 600 and Mr. Hicks' Sixth, Eighth and Fourteenth Amendment rights.

> **C.  Counsel Were Ineffective.**

73.     Counsel's failure to move pretrial for dismissal pursuant to Rule 600 constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments.  Counsel had an obligation to protect their client's fundamental constitutional rights and to enforce his right under Pennsylvania law to be tried within 365 days from the time of his indictment.  Counsel can have no

reasonable strategic basis for failing to raise and litigate a claim that would have required dismissal of all charges. Counsel's failure to do so was deficient.

74.     Under Rule 600, dismissal with prejudice is the appropriate remedy for the Commonwealth's failure to timely try a defendant. As there is a reasonable probability that, had counsel moved for dismissal under Rule 600, that motion would have been granted, prejudice is demonstrated and relief is required.

75.     Appellate counsel was precluded from raising claims arising from trial counsel's ineffectiveness on direct appeal. *See Commonwealth v. Grant*, 813 A.2d 726, 738 (Pa. 2002). *See also* NT 02/17/15 (trial court ruling that Mr. Hicks would not be permitted to litigate this issue as part of his direct appeal); *Hicks*, 45-CR-391-2008, Pro Se Petition to Appoint Alternate Counsel Due to Egregiously Unconstitutional Deprivations of Due Process, Effective Representation and Other Rights, 12/18/2014 (Mr. Hicks' post-verdict submission to the trial court, seeking to litigate trial counsel's failure to move to dismiss the charges based on the speedy trial / Rule 600 violations described herein). To the extent counsel could have raised the above-described errors on appeal under controlling precedent and procedure, their failure to do so constitutes prejudicially deficient performance in violation of the Sixth, Eighth, and Fourteenth Amendments.

████████████████████████████████████████████

████████████████████████████

**CLAIM 4.   MR. HICKS WAS DEPRIVED OF A FAIR AND RELIABLE CAPITAL TRIAL BECAUSE MEMBERS OF THE JURY WERE EXPOSED TO ADVERSE COMMUNITY SENTIMENT AND PREJUDICIAL PRETRIAL PUBLICITY IN VIOLATION THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

137.    The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

### A.    The Legal Standard.

138.    An accused has the right to an impartial jury that decides the case based on the evidence, free from the influence of pretrial publicity or adverse community sentiment. Part II.F.  Where pretrial publicity is pervasive, a change of venire or venue is required in order to preserve that right. *Irvin v. Dowd*, 366 U.S. 717 (1961); *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963); *Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966); *Murphy v. Florida*, 421 U.S. 794, 798-99 (1975).

139.    The need for a change of venire or venue is especially acute in cases such as Mr. Hicks', where the publicity and community sentiment created a hostile atmosphere and exposed the jurors to improper, extraneous influences.  *Mattox v. United States*, 146 U.S. 140, 150 (1892); *Frank v. Mangum*, 237 U.S. 309, 332 (1915); *Remmer v. United States*, 347 U.S. 227, 229 (1954). The need for a change of venue or venire under such circumstances is especially strong in a capital case,

because "the range of discretion entrusted to a jury in a capital sentencing hearing" creates "a unique opportunity for . . . prejudice to operate." *Turner*, 476 U.S. at 35.

### B.   A Change of Venue or Venire was Required in Mr. Hicks' Case.

140.   Extensive press made it impossible for Mr. Hicks to receive a fair trial.

### 1. Extensive Press Coverage.

141.   The discovery of Ms. Null's body, the investigation into her death, and the identification of Mr. Hicks as the alleged perpetrator received extensive press coverage.  This case, described with words like "gruesome," "grizzly," "heinous," "the most horrific," "monster," "butchered," and "highway hacker," was a notorious "top story," frequently featured by local newspapers on the front page and by television news in the opening segment. *See generally* Exhs. 2; 3; 4.  This story was so popular that the article "Body parts, head found along interstates 80 and 380 (with videos)" was the Pocono Record Online's sixth most viewed story of 2008.  Exh. 5.  And, the story was so salacious that even Nancy Grace covered it, describing the case as a "real-life Dexter seemingly at work in the Poconos."  Exh. 6. *See also* Exh. 7 (Channel 69 news describing the case "as an unsolved mystery with a plot straight from a Hollywood horror flick").

142.   Speculation began early that this would be a death penalty case.  *See*, *e.g.*, *Mom says son did not kill dismembered woman*, Daily Review, 3/11/08 ("People across the region pontificated the murder Monday, and many talked about

the death penalty"). The was just not the type of thing that happened in the Poconos, but was more commonly what one would expect in the big city. *See*, *e.g.*, Exhs. 2 & 3 (*Suspect arrested in dismemberment case*, Daily Review, 3/9/08 (quoting a man who was relocating from Brooklyn to Coolbaugh Township: "I'm leaving the city to raise my daughters in safe place where trees are higher than buildings. I'm coming here to leave that behind and now I think that it is following me."); *Mom says son did not kill dismembered woman*, Daily Review, 3/11/08 (quoting a neighbor: "It's like the stuff you see on TV but it's in front of you.")); Exh. 8 (TV person-on-the-street interviews in Stroudsburg: it's "scary" and the Poconos are supposed to be "quiet").

143.   It was even speculated that this could be a national security breach when it was learned that Mr. Hicks worked at the Tobyhanna Army Depot. *E.g.*, *Tobyhanna to review security policies after suspect's arrest*, Associated Press, 3/12/08; WNEP, 3/11/08 (noting Hicks' "extensive criminal record" and statement issued by Tobyhanna Depot that it would be reviewing background check procedures); *Murder case puts Depot on the spot*, Pocono Record, 3/12/08 (explaining that Tobyhanna Depot contractors worked on "sensitive communication devices headed to U.S. soldiers in Iraq").

144.   Investigating authorities *wanted* this story in the press, first as they sought tips to identify Ms. Null's remains, and later as they sought tips on her last

61

known whereabouts and how she died.  *See*, *e.g.*, *Body scattered along highways*, The Morning Call, 1/30/08, pg. A1 (police soliciting leads); Exh. 9 (police soliciting leads in press briefings). Ms. Null's death was also widely-publicized as Monroe County Crime Stoppers' "Crime of the Week" for February 7, 2008.  *See*, *e.g., Crime Stoppers is offering a reward in body parts case*, Pocono Record, 2/7/08.

145.  The case was so notorious that police decided it was necessary to provide extra security at Mr. Hicks' preliminary hearing.  Press reports indicate that "deputies wanted to make sure that everyone involved stayed safe" because "the gruesome murder and dismemberment story has received so much attention." Exh. 10 (WBRE Report, 3/14/08).  *See also Hicks to face trial in Deanna Null dismemberment case*, Pocono Record, 3/14/08 (noting "heavy police presence" and that attendees had to pass through a metal detector).

146.  The extensive coverage prejudiced Mr. Hicks' ability to receive a fair trial from the start, when authorities and reporters assumed that this case was a homicide before the autopsy results were even known.  *See*, *e.g.*, Exh. 8 (interview with Deputy Coroner Cindy Skrzypek, Blue Ridge Channel 13).

147.  Once the autopsy had been conducted, representations of the autopsy results exceeded what the autopsy report actually said.  It was repeatedly reported, sourced to both the coroner's office and PSP, that the decedent suffered "multiple violent injuries, any of which caused her death."  *See*, *e.g.*, Exhs. 11 & 12; *Autopsy*

*fills in a few blanks on body parts found on highway*, Pocono Record, 1/31/08; *Body parts search goes on; Autopsy shows death a homicide*, The Express-Times, 1/31/08; *Dumped body parts still unidentified*, The Morning Call, 1/31/08, A1; *Pa. highways scoured for more body parts*, UPI, 1/31/08; *Homicide ruling in body-parts case*, The York Dispatch, 1/31/08; *Police scour Poconos for clues in death*, The Morning Call, 2/1/08, B3; *Police mum on search of interstates for body parts with video*, The News-Item (Shamokin), 2/1/08; *Search for clues continues in missing woman case*, The Morning Call, 2/2/08, B3; *Woman's remains identified*, The Times Leader, 2/5/08.

148.   These misrepresentations of what the autopsy report showed continued when Mr. Hicks was arrested.   *See, e.g., Null homicide case timeline*, timesleader.com, 3/9/08 (according to an affidavit: "Jan. 30 – Autopsy revealed the victim suffered several blunt force and sharp force trauma injuries any of which could have caused her death.").

149.   The extensive press coverage also exposed the juror pool to myriad factual allegations and speculation about Mr. Hicks' criminality that was not admissible (and not admitted) at Mr. Hicks' trial.   As soon as Mr. Hicks was arrested, the press began reporting on other bad acts evidence and included detailed descriptions of bad act evidence that ultimately was either excluded or the Commonwealth chose not to attempt to present.

150.   Under the front-page headline "Did he cut her up?" (featuring a photograph of Mr. Hicks in handcuffs and waist chain being led by police from his arraignment), the Pocono Record reported: "Charles Ray Hicks came from Texas to work at Tobyhanna Army Depot, but police say his baggage includes violent crime and addiction to cocaine and booze."  Later, the article informed readers that Mr. Hicks had been charged with: assault in 2002 in Texas; sexual assault in 2003 in Texas; robbery in 2006 in Texas; and assault and drug possession in 2006 in Virginia.  *Did he cut her up?*, Pocono Record, 3/9/08.  *See also Body parts case ARREST: Tobyhanna man killed, cut up woman, police say*, Pocono Record, 3/8/08 (noting Hicks' "several run ins with police" in Texas and Virginia); *Friends of Hicks stunned by arrest, murder charges*, Pocono Record, 3/11/08 (reporting on Hicks' arrest history in context of friends' surprise at his arrest); *Man charged with Pa. body parts killing*, UPI, 3/9/08 (noting Hicks history of arrests for assault in Texas and Virginia); *Man charged in dismember case*, The Times Leader, 3/9/08 (recounting arrests: 2002 TX assault causing bodily injury; 2003 TX aggravated sexual assault; 2007 TX aggravated robbery; 2006 VA assault and battery and possession of controlled substance); *Suspect arrested in dismemberment case*, Daily Review, 3/9/08 (same); *Arrest made in highway body parts case*, The Morning Call, A1, 3/9/08 (describing Hicks' "pattern of violence"); *"It's not my brother"; Sister says Charles Hicks did not kill, dismember woman*, Pocono Record, 3/10/08 (describing

64

previous Texas arrests for assaults in 2002 and 2003 and aggravated robbery in 2007); *Mom says son did not kill dismembered woman*, Daily Review, 3/11/08 (TX and VA arrest history); WNEP, 3/11/08 (Hicks has "extensive criminal record"); *From staff reports*, Standard-Speaker (Hazelton), 3/29/08 (noting:  Hicks had been charged twice in Virginia with assault and battery of his wife, Sheinina Hicks and pled guilty to one charge in exchange for dismissal of the other; Hicks went to trial and was acquitted of a drug charge in Virginia in April 2007; and Hicks was charged with assault of Blanca Huertas in Texas in 2002, but the charges were dropped).

151.   Prior bad act evidence was highlighted again when the press reported on the Commonwealth's interlocutory appeal.  The press reported that Judge Vican "denied the prosecution's request to have four women testify about their encounters with Hicks. . . . One of the women told investigators he held a knife to her throat; another claimed Hicks grabbed her neck and threatened her"; that the "prosecution sought to highlight Hicks' 'history of violence against women'"; and that Judge Vican "permitted three other women to testify," one of whom "claimed Hicks choked her and tried to sexually assault her; another woman related to investigators she lost consciousness after Hicks choked her."  *Case against Charles Ray Hicks remains mired in courts*, The Citizen's Voice, April 29, 2012; *The case against Charles Ray Hicks remains mired in the courts*, The Times-Tribune, April 30, 2012.

152.   When the Commonwealth's appeal moved to the Supreme Court, the press again reported on the Commonwealth's desire to have seven women testify about previous acts of violence allegedly committed against them by Mr. Hicks.  For example, in October 2013, the Pocono Record reported on the appeal and speculated that "[i]f Hicks is convicted, the women's testimony could be crucial in the jury's decision between execution or life without parole." *Prosecutor seeks key testimony in murder-dismemberment case*, Pocono Record, 10/3/13.  This article recounted the potential testimony of Karen Lovell (who did not ultimately testify) in great detail:

> Hicks pulled Lovell into a motel room and locked and chained the door. He then grabbed Lovell by the hair and told her "I just want someone to hug me and tell me it's OK."
>
> He then took a razor blade from his pocket and told her "If you scream, I'm going to cut you and kill you."
>
> Hicks then threw a crack pipe and some crack cocaine onto the bed. Holding Lovell's hair with one hand, Hicks had her take her clothes off, removed her shirt and bra with his other hand and then pushed her nude onto the bed.
>
> He then pulled down his pants, made her smoke some of the crack and then tried having sex with her. By this time, Lovell's screams had brought the motel manager knocking on the door.
>
> Hicks grabbed Lovell by the hair, pulled her behind the door and opened it slightly. When he did so, Lovell managed to break free, pushed her way through the door and ran nude into the parking lot, screaming for help.

The Pocono Record then quoted from the Commonwealth's appellate brief that:

> [t]he manner of assault (on Lovell and the six other women) consisted primarily of choking and beating with the hands, similar to the blunt

66

force trauma suffered by Deanna Null. . . . Many of the other victims were prostitutes like Deanna. Many of the circumstances of the crimes against these women involved the use of illegal narcotics such as crack cocaine. The sexual issues appear to be part of the motive for the assaults on women.

*Prosecutor seeks key testimony in murder-dismemberment case*, Pocono Record, 10/3/13. *See also Murder-dismemberment trial postponed*, The Citizen's Voice, 10/3/13 (reporting on the Commonweath's appeal of Judge Vican's ruling preventing four of seven prostitutes from testifying who alleged Hicks had assaulted them; noting one "claimed Hicks choked her and tried to sexually assault her; another said she lost consciousness after Hicks choked her"); *Assault testimony sought in 2008 Pa. murder case*, AP State & Local Wire, 10/3/13; *Without prostitute testimony dismemberment trial on hold*, The Times-Tribune, 10/4/13.

153. There was yet another flurry of press about the prior bad act testimony when the Supreme Court issued its opinion and a trial date was set in May 2014. *See State Supreme Court sides with Monroe County DA in body dismemberment case*, Pocono Record, 5/2/14 (noting that the jury could consider the women's testimony "also in determining whether Hicks, if convicted, should be sentenced to execution or life in prison without parole"); *Ruling overturned, witnesses allowed in murder-dismemberment trial*, Pocono Record, 5/3/14 (noting that the jury could consider the women's testimony "also in determining whether Hicks, if convicted, should be sentenced to execution or life in prison without parole"); *Coolbaugh body parts*

*murder trial to start in November*, Pocono Record, 5/28/14; *Fall trial set in woman's killing, dismemberment*, AP State & Local, 5/28/14; *Trial for man charged with killing prostitute in 2008 set*, The Citizen's Voice, 5/28/14; *Trial for man charged with killing prostitute in 2008 set*, The Times-Tribune, 5/28/14.

154.   Coverage during trial continued to refer to the pretrial litigation regarding the prior bad act testimony.   *E.g.*, *Jury being picked in Coolbaugh murder/dismemberment case*, Pocono Record, 10/27/14 ("Police said they found Hicks has a history, stretching back to 2001, of assaulting women, some of whom may or may not testify at trial.").

155.   The news also reported that Mr. Hicks may have committed other homicides.  For example, on March 10, 2008, WNEP reported police were looking into whether there was a connection between Mr. Hicks and any other murders across the country, both in Texas and in his "route of travel to Pennsylvania." *Troopers: Is Murder Suspect Connect to Other Killings*, WNEP Online, 3/10/08. The fact that police initially would not say whether the severed hands found in the home Mr. Hicks was renting belonged to Ms. Null helped fuel this speculation.  *See*, *e.g.*, *Man charged with killing dismembered woman found along highways*, AP, 3/8/08; *Arrest made in highway body parts case*, The Morning Call, A1, 3/9/08.

156.   In September 2008, television stations WBRE and WYOU reported that police were heading to Texas to determine if Ms. Null's death was connected to a

death that occurred in Texas.  Inewsnetwork Transcripts (WBRE), Sept. 25 & 26, 2008; Inewsnetwork Transcript (WYOU), 9/26/08.  This story, which was based on District Attorney Christine's statements that Pennsylvania state troopers were looking into a death in Texas, was also covered by the Pocono Record, the Express-Times, local radio, and picked up by the Associated Press.  *Probe of eastern Pa. killing reaches other states*, AP State & Local Wire, 9/26/08; *Texas link to local murder investigated*, Pocono Record, 9/26/08; Exhs. 13 & 14.

157.  Several news outlets engaged in rank speculation on motive and portrayed Mr. Hicks as a serial killer.  The Pocono Record presented the opinions of retired FBI agent and criminal profiler Gregg McCrary.  *Profiler: Killer probably likes infamy*, Pocono Record, 2/1/08.  In a front page article, Agent McCrary explained that a person who would murder, dismember, and discard a body on the highway was "[s]omeone with a need to shock and offend people. . . . This is someone who is not afraid to have the victim discovered."  Agent McCrary speculated that the suspect was likely watching the news coverage of the investigation: "He might enjoy the infamy while at the same time trying to avoid taking responsibility.  Maybe he wanted to display the body where it would get public attention."  Agent McCray would have been "surprised if it was the first time he killed.  It takes time to get comfortable around a body.  This is not an entry-level sort of crime."  In his expert opinion, "[t]o drive along and drop off body parts, at

the very least, he didn't care. Perhaps he considers the victim to be nothing but trash and wanted to show the world what a piece of trash this person was." He explained: "Sometimes we see caring for the victim. ... In this case, that is totally absent. I'd be surprised if he were guilt-ridden about this. It takes some effort to dismember a body." *Profiler: Killer probably likes infamy*, Pocono Record, 2/1/08.

158.  Not to be outdone, The Morning Call published the opinions of two more experts:  the speculation of Dr. Louis Schlesinger, professor of forensic psychology at John Jay College of Criminal Justice, that there was a good chance this was the result of a domestic dispute; and the speculation of DeSales University professor Katherine Ramsland, "author and authority on serial killers," regarding what the discarding of the body parts may have meant.  *Poconos body parts case is no 'CSI' episode*, The Morning Call, A1, 2/3/08.

159.  Following Mr. Hicks' arrest, the Pocono Record published the opinion of Dr. Robert Morrow, chief of psychiatry at Pocono Medical Center, that: "This is most likely the work of a sociopath. It takes a lot of emotional investment to do something like that." *Friends of Hicks stunned by arrest, murder charges*, Pocono Record, 3/11/08.

160.  And, under the headline "A chilling profile: Crime fits pattern, expert says," the Wilkes-Barre Times Leader presented the "theory" of "criminal personality expert" Judith Sgarzi that "a dismembering killer fits the psychological

profile of a serial killer – a sexual sadist who has no remorse and commits crimes for pleasure."  The paper reported that Professor Sgarzi "also suspects the body of a previous victim is somewhere out there"; "believes a nationwide search for similarities into other unsolved dismemberment crimes may be under way";  that the location of the body parts was "a sign of the profile of a disorganized serial killer"; that "it is possible whoever killed Null led a double life as a serial killer who is a sexual sadist"; that serial killers who are sexual sadists have "a secret life that took root in childhood fantasies"; that their "behaviors escalate over time"; that "no matter how vicious [the crime], the fantasy is far worse"; that police descriptions of Hicks' calm demeanor are consistent with a "dismembering killer" because "the most famous of serial killers, they are all calm and show little emotion, because they have no guilt"; that Hicks' arrest history in Texas and Virginia "shows a pattern of violence and anger"; that "all assault cases are about anger, . . . but more important, about displaying power over a victim"; and that the evidence "would stand up in trial." *A chilling profile: Crime fits pattern, expert says*, The Times Leader, 4/6/08.

161.   Television news juxtaposed Mr. Hicks' picture against archived news footage of Ms. Null playing with her young children in 2002.  *See* Exhs. 15 & 16. Meanwhile, newspapers relayed the wishes of Mr. Null's family, reporting that the case "remains mired in behind-the-scenes arguments playing out in reams of court documents" and quoting Ms. Null's sister, Angela Kimble, that "[t]hey just need to

proceed. Let's get on with it.  Let's give him what he deserves. [] That's my sister and I can never get her back."  C*ase against Charles Ray Hicks remains mired in courts*, The Citizen's Voice, April 29, 2012; *The case against Charles Ray Hicks remains mired in the courts*, The Times-Tribune, 4/30/12.

162.   Finally, the press coverage invited improper speculation about Mr. Hicks' exercise of his right to silence.  After Mr. Hicks was arrested, First Assistant District Attorney Mancuso told the Times Leader that Mr. Hicks would have an opportunity to testify at his preliminary hearing, but: "As far as I know, he's not trying to say anything. He's not providing any other information."  The paper further reported that "[a]uthorities spoke with Hicks in jail this week, Mancuso said, adding that Hicks did not offer any knowledge of how the body parts ended up in the house." *Dismember suspect to face hearing*, The Times Leader, 3/14/08.  *See also Body parts case is sent to court; Coolbaugh man says he can explain why woman's hands were found in his home*, The Morning Call, B1, 3/15/08 (recounting Trooper Sebastianelli's preliminary hearing testimony that Mr. Hicks told him that he could explain why the hands were in the wall, but that he wanted to talk to a lawyer first); *Suspect faces trial in Deanna Null slaying*, Pocono Record, 3/15/08 ("On his way to Monroe County Correctional Facility after being arrested March 8, Hicks told police he would meet with his attorney and then tell how the severed hands came to be in his home, State Trooper Robert Sebastianelli testified. Sayer after Friday's hearing

declined to comment on this."); Exh. 8 (he would explain the hands in his wall after he talked to a lawyer).

163. On November 10, 2014, during trial, WNEP reported that "Hicks' attorney says their client wants to take the stand in his own defense but they are advising him not to do so." *Jury Listens to Alleged Murderer's Interrogation*, ABC-16 WNEP, 11/10/14. The following day, the Pocono Record reported: "It remains to be seen if Hicks himself will testify. Defense attorney Jason LaBar said Hicks wants to do so, though LaBar has advised him against it. Defendants are free to follow or not follow their attorneys' advice. The judge instructs the jury not to regard the defendant exercising his/her right not to testify as evidence against the defendant." *Prosecution rests its case against Hicks*, Pocono Record, 11/11/14. *See also Defense rests in Monroe County murder trial, The Times-Tribune*, 11/13/14; *Expert witnesses disagree on cause of death at murder trial*, The Times-Tribune, 11/13/14; *Defense Rests In Monroe County Murder Trial; Closing Arguments Today*, The Times-Tribune, 11/14/14.

164. This saturation of press coverage was further exacerbated by the additional press coverage of the September 12, 2014 shootings of Corporal Dickson and Trooper Douglas of the Pennsylvania State Police and the subsequent manhunt for Eric Frein in the areas of Pike County and Monroe County. Frein was captured in an abandoned airstrip hanger in Pocono Township on October 30, 2014, three

days after jury selection in Mr. Hicks' trial began.  Exh. 17 (*Suspected state police killer Frein caught near abandoned airpark*, Pocono Record, 10/31/14).  Between the date of the shooting and his arrest, news reports described the terror that Monroe County residents experienced during the the manhunt. *Id.* (*Eric Matthew Frein, 31, wanted in Blooming Grove shooting, police say*, Pocono Record, 9/16/14); *id.* (*The hunt for Eric Frein*, Pocono Record, 9/28/14 ("Schools, libraries and some businesses in Pike and Monroe counties are closed for public safety")); *id.* ("Many Barrett Township residents are unable to reach their homes until nearly 10 p.m.").

165.    In the months leading up to Mr. Hicks' trial, there was also substantial press coverage of ISIS kidnappings and beheadings.  Exh. 18 (*ISIS video shows beheading of American journalist Steven Sotloff*, CNN, 9/9/14); *id.* (*New ISIS video shows beheading of American hostage Peter Kassig*, Fox News, 11/16/14); *id.* (*The Horror Before the Beheadings*, NY Times, 10/25/14); *id.* (*French hostage Herve Gourdel beheaded in Algeria*, BBC News, 9/24/14).

## 2.    The Jury Was Polluted.

166.   Following full discovery and a hearing, Mr. Hicks will demonstrate that the jury pool was polluted by the extensive press coverage and a change of venue or venire was necessary to protect Mr. Hicks' constitutional rights.

### C.  Ineffective Assistance of Counsel.

167.   In his Omnibus Pretrial Motion, Attorney Sayer moved for a change of venue, citing the "much more than usual local media coverage" of this case that "would have reached virtually every household in Monroe County."  Omnibus Motion at 2-3, Oct. 27, 2008, *Commonwealth v. Hicks*, 391 CR 2008.  Counsel further noted "a high level of passion against the defendant" and "a widespread presumption of guilt" reflected in comments on the Pocono Record's website; that the coverage included statements from the Commonwealth about investigation of other offenses Mr. Hicks may have been involved in and prejudicial comments from community members; and that Monroe County residents, in general, held increasing animosity toward African-American males moving to the county from out-of-state, whom they perceived to be responsible for an increase in violent crime.  *Id.* at 3.

168.   At the hearing on the Omnibus Motion, counsel presented (by stipulation) copies of media coverage, NT 01/13/09 at 10-11, and was given permission to supplement the record with subscriber data.  *Id.* at 11-12.  Counsel failed to do so, *see* Opinion at 14 n.2, June 5, 2009, *Commonwealth v. Hicks*, even though counsel had the data and had provided it to the prosecution.  *See* Exh. 19.

169.   The trial court denied the request for a change of venue, noting that defense counsel would have an opportunity to voir dire prospective jurors on pretrial

publicity at the time of trial.  Opinion at 16.  Attorneys Labar and Spishock[15] then failed to conduct an adequate voir dire to determine whether members of the venire held prejudices against people like Mr. Hicks (African-Americans from out-of-town) or had been exposed to negative community sentiment or media coverage.  Counsel failed to renew the motion for change of venue during voir dire and failed to even ensure that the complete record of voir dire (the juror questionnaires) was preserved for appellate and post-conviction review.  Nor, in light of the press coverage at the time of trial on the Frein case and ISIS beheadings, did counsel move for a continuance in order to facilitate a cooling off period to reduce the prejudice.

170.   Counsel's performance fell below federal constitutional standards, *see* Part II.E., *supra*, when they failed to develop adequate voir dire; failed to renew their motion for change of venue; failed to preserve the record; and failed to request a continuance. There can be no reasonable strategic basis for failing to ensure that Mr. Hicks was tried before a fair and impartial jury, in accordance with federal constitutional standards. There is a reasonable probability that Mr. Hicks would have received a more favorable outcome at either the guilt or penalty phases of his trial had he been tried before an impartial jury that had not been exposed to the media coverage described above.

---

[15] Attorney Sayer had retired by the time of trial.

171.   As these claims arise under the rubric of trial counsel's ineffectiveness, appellate counsel was precluded from raising these claims on direct appeal.  *See Grant*, 813 A.2d at 738. To the extent counsel could have or should have raised these claims, counsel was ineffective. *See* Part II.E.

**CLAIM 5.   THE COURT'S DENIAL OF COUNSEL'S REQUEST TO VOIR DIRE USING THE EVIDENTIARY PHOTOGRAPHS VIOLATED THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

172.   The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

### A. Photographic and Video Images Presented to Mr. Hicks' Jury were Irrelevant, Gruesome, Inflammatory, and Unduly Prejudicial.

173.   This was a dismemberment case. Ms. Null's body was found in multiple severed parts, in multiple locations.  Some of her body parts suffered additional damage, beyond dismemberment, from being run over on the interstate or from animal activity.  During trial, the prosecution presented *hundreds* of color, larger-than-actual-size, photographs of Ms. Null's body parts both as they were collected and at autopsy, and a video of the body part collection.  The Commonwealth also projected photos of body parts during most of its closing argument.  *See* Claim 10.

174.   Numerous scientific and sociological studies have quantified the powerful effect that graphic photographs or videotapes can have on particular jurors. *See*, *e.g.*, Susan A. Bandes & Jessica M. Salerno, *Emotion, Proof and Prejudice: The Cognitive Science of Gruesome Photos and Victim Impact Evidence*, 46 Ariz. St. L.J.

1003 (2014) (collecting research).  For example, mock jurors who were shown autopsy photographs were twice as likely to convict as those mock jurors who were not shown the photographs. Kevin Douglas, et al., *The Impact of Graphic Photographic Evidence on Mock Juror's Decisions in a Murder Trial: Probative or Prejudicial?*, 21 Law & Human Behav. 485 (1997).[16] Another study demonstrated that juries who were shown a videotape of a homicide crime scene actually required lower standards of proof to convict. Saul M. Kassin & David A. Garfield, *Blood and Guts: General and Trial-Specific Effects of Videotaped Crime Scenes on Mock Jurors*, 21 J. Applied Social Psychology 1459 (1991).

175.   Likewise, in *Gruesome Evidence and Emotion: Anger, Blame, and Jury Decision Making*, 30 Law & Human Behav. 183 (2006), authors David Bright and Jane Goodman-Delahunty conducted a number of mock jury trials to examine the effect of gruesome photographic evidence and gruesome verbal evidence on a jury's decision-making process. Mock jurors who saw gruesome photographs reported experiencing significantly more intense emotional responses, including great anger at the defendant. These mock jurors convicted the defendants at a significantly higher rate than those who were not shown gruesome photographs. However, mock

---

[16] The same mock jurors who were shown the photographs reported emotional distress and physical reactions not reported by those who did not see the photos. The group that was shown the photos also did not feel those photographs actually influenced their verdicts; all participants believed they acted fairly and impartially.

78

jurors who were presented with only gruesome verbal evidence did not have increased emotional responses and the gruesome verbal evidence had no impact on the conviction rate. Thus, this study confirmed the earlier findings that gruesome, visual evidence can have a great impact on jurors and can cause them to have significant emotional responses toward a defendant, resulting in convictions in far greater number than would occur in the absence of such gruesome visual evidence.

176.   Actual jurors have reported that viewing gruesome pictures of homicide victims or viewing videotape of the actual crime at the guilt-phase of a capital trial led them to make up their mind about punishment *simultaneously* with their decision to convict. *See* Bowers, Sandys & Steiner, *Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Attitudes and Premature Decision-Making*, 83 Cornell L. Rev. 1476, 1498 (1988). Thus, photographs of the decedent offered as relevant to guilt convinced jurors that the defendant deserved death even before hearing or weighing any of the mitigation presented at the penalty phase.

177.   There is no question that the actual jurors in Mr. Hicks' case were affected by the photographs and video in exactly the manner predicted by the social science research.  *See* Claim 10; *see also Gruesome photos shown on Day 1 of murder/dismemberment trial*, Pocono Record, Nov. 7, 2014.

**B.     The Court Precluded Defense Counsel from Questioning Prospective Jurors Using the Evidentiary Photographs.**

178.   Anticipating that the photographs would be a prominent part of the Commonwealth's case and would have an unduly prejudicial effect on the jurors, counsel filed a pretrial motion requesting permission to use the photographs during voir dire.  *See* Motion and Memorandum of Law in Support of the Use of Crime Scene Photos During Voir Dire of Prospective Jurors, June 24, 2014.  The trial court denied the motion. Opinion on Motions in Limine, Oct. 9, 2014.

**C.     Mr. Hicks Was Entitled to *Voir Dire* to Identify Unqualified Jurors.**

179.   As described in Part II.F., both the Sixth Amendment and Article I, Section 9 "guarantee[s] a defendant on trial for his life the right to an impartial jury." *Ross*, 487 U.S. at 85; *Irvin*, 366 U.S. at 722; *Commonwealth v. Ellison*, 902 A.2d 419 (2006).  This right is violated when a jury is empaneled that is "uncommonly willing to condemn a man to die." *Witherspoon*, 391 U.S. at 521.

180.   Thus, a defendant may excuse for cause those jurors whose beliefs in favor of capital punishment substantially impair their ability to follow the law and the court's instructions, such as those who would vote automatically to impose the death penalty in every case or to impose death without considering and giving effect to relevant mitigating evidence. Part II.F.

181.   Critical to preserving these rights is adequate voir dire.  Part II.F.  Since the defendant has the right to excuse for cause jurors who hold such views, yet also

has the burden to demonstrate the juror lacks impartiality, the voir dire process must be adequate to uncover such bias. *Id.  See also Commonwealth v. Davis*, 422 A.2d 671 (Pa. Super. 1980); *Commonwealth v. Lopinson*, 234 A.2d 552 (1967).

182.   It is not enough simply to ask jurors if they could be fair and follow the law. *Morgan*, 504 U.S. at 734-36.  The defendant must be able to ascertain whether the prospective jurors find mitigating evidence irrelevant or not worth their consideration. *Id*. at 735. Thus, during voir dire, defense counsel has the right to question prospective jurors on whether or not they would properly consider and weigh any mitigating evidence presented at trial. *See Commonwealth v. Barley*, 576 Pa. 611 (2003); *Commonwealth v. Keaton*, 729 A.2d 529 (1999). *See also* Part II.A. (discussing the Eighth and Fourteenth Amendment requirements that jurors be able to consider and give effect to mitigation evidence).

183.   Although the scope of voir dire is generally in the discretion of the trial court, the latitude allowed in voir dire must be considered in light of the factual circumstances of the particular case. *See* Part II.F.  Thus, Mr. Hicks was entitled to ask the prospective jurors whether, having seen the images at issue, they would still be able to hold the Commonwealth to its burden of proof at both the guilt and penalty phases; consider a life sentence without parole; and give effect to any mitigating evidence presented. If seeing the images would cause them to view death as the only appropriate punishment, these jurors are not qualified to sit as capital jurors.

81

184.   Showing the images at issue, rather than merely describing them, was essential to obtaining a fair and impartial jury.  As the social science demonstrates, the possible prejudice is intrinsic to the images themselves.  Although a prospective juror could be asked whether or not viewing images of Ms. Null's dismembered body would unduly prejudice or bias that juror, such question is of no value.  On a theoretical level, the concept of viewing a dismembered body might not strike a potential juror as particularly difficult or emotional.  But, as all the scientific studies cited above make clear, verbal descriptions, even detailed, gruesome ones, do not adequately convey the impact of the actual visual presentation. This is exactly what happened here, as Pocono Record Reporter Scott's description of the seated jurors' reaction shows.  Mr. Hicks needed to know, and had the right to know, if the emotional resonance of the images, distinct from any probative value they may have held, was going to thrust the jurors into an emotional state in which they could not fulfill their duty to be fair and impartial.

### D.   Counsel were Ineffective.

#### 1.  Trial Counsel.

185.   To the extent that trial counsel's pretrial motion may have been insufficient to raise and preserve this issue on all available factual and legal grounds, trial counsel were ineffective.  *See* Part II.E.  It was clearly counsel's strategy to show the potential jurors the gruesome images that they were about to view to

determine whether they could be fair and impartial.  There can be no strategic reason for failing to present all available factual and legal arguments in support of a chosen strategy.  As there was a reasonable probability of a different outcome had counsel presented all available legal and factual bases, relief is required.

### 2.    Appellate Counsel.

186.    Appellate counsel was ineffective for failing to raise and litigate this issue on direct appeal.  *See* Part II.E.  As demonstrated above, this issue has arguable merit.  In recent years, several justices of the Pennsylvania Supreme Court have expressed serious concerns with the unfettered use of gruesome photographs in capital homicide trials.  *See Commonwealth v. Knight*, 156 A.3d 239, 430-34 (Pa. 2016) (opinion of Saylor, C.J., Dougherty, J., Donohue, J.) *Commonwealth v. Woodard*, 129 A.3d 480, 510 (Pa. 2015) (Saylor, C.J., dissenting).

187.    The trial court's opinion denying voir dire using the photographs relied heavily on *People v. Whisenhunt*, 186 P.3d 496 (Cal. 2008).  *See* Opinion at 29.  The *Whisenhunt* Court relied on the fact that: the trial court indicated that it "would personally voir dire prospective jurors" to determine if exposure to the photos would cause difficulties for the jurors; the court excluded two jurors for cause when they answered the court's questions in the affirmative; and the court permitted counsel to ask "the prospective jurors whether seeing 'graphic or gruesome photographs' of a

deceased child" would cause them to presume guilt and/or feel someone should pay for the crime regardless of the evidence." *Whisenhunt*, 186 P.3d at 513.

188.   None of the protections in *Whisenhunt* happened here.   Upon information and belief, the juror questionnaire employed in this case did not ask the prospective jurors anything about gruesome images or evidence. The court did not question prospective jurors on any matter, let alone the photographs.  Only a very few prospective jurors were asked *any* questions about the photographs at all.  When counsel did ask about the photographs, the voir dire was incomplete and failed to ascertain whether that juror believed they would be able to view gruesome images and subsequently hold the Commonwealth to its burden at both guilt and penalty; give meaningful consideration to mitigating evidence; and consider a life sentence. *See* Claim 7 (counsel's ineffectiveness for failing to ensure adequate voir dire).

189.   Eleven of the sixteen jurors chosen to serve in this case were not asked about the photographs during voir dire at all.  NT 10/27/14 at 143-52 (Seated Juror 1); *id*. at 164-82 (Seated Juror 2, volunteered that she "would say also death penalty" with "body parts or plastic bags," but no one asked her about her ability to view the photographs of those body parts); NT 10/28/14 at 34-43 (Seated Juror 3); *id.* at 99-111 (Seated Juror 4); *id.* at 114-25 (Seated Juror 5); *id.* at 139-49 (Seated Juror 6); NT 10/29/14 at 169-76 (Seated Juror 9); *id*. at 231-44 (Seated Juror 11); NT 10/31/14 at 57-65 (Alternate Juror 1, who would replace Seated Juror 2 due to medical

84

reasons); *id*. at 113-23 (Alternate Juror 2, who would replace Seated Juror 7 due to medical reasons; upon information and belief, Alternate Juror 2 indicated in her questionnaire that pictures could make her sick); *id*. at 164-71 (Alternate Juror 4).

190.   Even more prejudicial, two jurors who openly expressed concerns about the graphic nature of this case and their ability to view gruesome evidence were permitted to sit on Mr. Hicks' jury.  NT 10/29/14 at 190-200 (Seated Juror 10 indicated in her questionnaire that she did not want to serve because the case was too gruesome; reiterated that belief during in-court voir dire; stated "I cannot answer" and "I don't know how I would respond" when asked whether she would be overwhelmed by gruesome evidence; and was never asked how viewing the photographs would impact her ability to be fair at penalty.); NT 10/28/14 at 150-62 (Seated Juror 7, Lauren Lane-Herman, indicated in her questionnaire that "when I read about the case it was pretty graphic with the details"; questioned only on her ability to set aside any preformed beliefs, not on her ability to be fair and impartial after viewing graphic images.).

191.   As there is a reasonable probability of a different outcome on appeal had this issue been raised, relief is required.

CLAIM 6.    THE FAILURE TO PROVIDE A FAIR CROSS-SECTION OF THE COMMUNITY IN DEVELOPING THE JURY PANEL VIOLATED THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

192.   The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

193.   At the time of Mr. Hicks' trial, at least 13.2% of Monroe County's population identified as Black or African-American alone, 2.9% identified as bi-racial,  and 13.1% identified as Latino.[17]  Mr. Hicks does not currently have access to the jury questionnaires, which contain the information necessary to establish the racial composition of  his venire.   Following full discovery and an evidentiary hearing, Mr. Hicks, an African-American man convicted of the murder of a white woman, expects to demonstrate that he was denied a jury pool representing a fair cross section of his community and a chance of a fair and impartial jury of his peers in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments.

### A. The Constitutional Standard.

194.   The right of a defendant to a jury chosen from a representative cross section of the community is "an essential component of the Sixth Amendment right

---

[17] These statistics are taken from the U.S. Census Bureau, Census 2010. Mr. Hicks' trial was held in 2014.  Given the demographic trends in Monroe County, Mr. Hicks expects to demonstrate at an evidentiary hearing, following full discovery, that the county's minority population increased from 2010 to 2014.  *See* Monroe County has third highest minority count, Pocono Record, May 19, 2009 (noting consistent trend of increasing minority population in Monroe County).

to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). The fair-cross-section guarantee protects the defendant's right to a fair chance to secure a representative jury, and the perception of fairness in the jury selection system. *See*, *e.g., Williams v. Florida*, 399 U.S. 78, 100 (1970) (noting juries must be selected in a way that provides "a fair possibility for obtaining a representative cross-section"); *see also* Detre, *Note*, *A Proposal for Measuring Underrepresentation in the Composition of the Jury Wheel*, 103 Yale L.J. 1913, 1927 (1994); Bueker, *Note, Jury Source Lists: Does Supplementation Really Work?*, 82 Cornell L. Rev. 390, 399 (1997).

195.   The Supreme Court has long recognized that the jury selection process "must always accord with the fact that the proper functioning of the jury system, and indeed, our democracy itself, requires that the jury be a body truly representative of the community." *Glasser v. United States*, 315 U.S. 60, 85-86 (1942). The Sixth Amendment requires representative jury pools and panels, but it does not, however, guarantee the "right to be tried by a particular jury which is itself a fair cross-section of the community." *United States v. Lewis*, 472 F.2d 252, 255 (3d Cir. 1973).

196.   To establish a prima facie "fair cross-section violation" under the Sixth Amendment, a defendant must show that (1) the relevant community contains a distinctive group; (2) that the representation of the distinctive group in the venire or jury pool is not fair and reasonable in relation to the population of the group in the community; and (3) that this under representation resulted from systematic exclusion

of the group from the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979). Discriminatory intent is not part of this analysis. *Id.* at 368 n.26.

197.    Once a defendant makes out a prima facie case, the burden shifts to the Commonwealth to rebut the inference of the Sixth Amendment violation. To meet its burden, the Commonwealth must proffer a significant state interest that is manifestly and primarily advanced by those aspects of the jury selection process that result in the disproportionate exclusion of the distinctive group. *Id.* at 367-68.

### B.    Mr. Hicks' Venire was Not Representative of the Monroe County Community.

#### 1.  African Americans and Latinos are a Distinctive Group.

198.    At the time of Mr. Hicks' 2014 trial, at least 13.2% of Monroe County's population identified as Black or African-American alone, 2.9% identified as bi-racial, and 13.1% identified as Latino. African Americans and Latinos are clearly a distinctive group in the community. *See United States v. Weaver*, 267 F.3d 231, 240 (2001), quoting *Castaneda v. Partida*, 430 U.S. 482, 495 (1977); *Ramseur v. Beyer*, 983 F.2d 1215, 1230 (3d Cir. 1993).

#### 2.    African Americans and Latinos were Not Fairly or Reasonably Represented in the Venire.

199.    Mr. Hicks does not currently have access to the jury questionnaires, which contain the information necessary to establish the racial composition of his venire.  Following full discovery and an evidentiary hearing, Mr. Hicks expects to demonstrate that African Americans and Latinos were under-represented on the jury

pool. While the touchstone of the under-representation prong of the prima facie test is clearly a comparison between the percentage of the distinctive group in the community and the percentage of the group on the jury pool, the Supreme Court has neither articulated a statistical test by which the comparison is to be done, nor set numerical benchmarks. *See, e.g., Duren*, 439 U.S. at 364-367.[18]

200.   Courts have used a variety of statistical tests to measure under-representation. *See People v. Smith*, 615 N.W.2d 1, 2-3 (2000) (surveying the development of fair cross-section challenges after *Duren*). All of them have been criticized. *Id.*; *See also* Detre, 103 YALE L.J. at 1927-34. Absolute disparity,[19] the test that courts most commonly rely upon, is widely criticized because it "produces questionable results" in cases where "the members of the distinctive group comprise a small percentage of those eligible for jury service." *Smith*, 615 N.W.2d at 2-3.

201.   Courts compensate for this weakness in absolute disparity by looking at other tests – such as comparative disparity[20] – to balance out the picture. *See*, *e.g.*,

---

[18] In *Duren*, the Court simply eyeballed the statistics – women comprised 54% of the population, but only 26.7% of those called for jury duty were women – and found that the prong of under-representation was met. 439 U.S. at 367.

[19] Absolute disparity is calculated by subtracting the percentage of a distinctive group on the jury wheel from the percentage of that group in the community. Detre, 103 YALE L.J. at 1917.

[20] Comparative disparity is calculated by dividing the absolute disparity by the population percentage of the group in the community and multiplying by 100%. Detre, 103 Yale L.J. at 1918-19; *see also Ramseur*, 983 F.2d at 1231.

*Ramseur*, 983 F.2d at 1234. The comparative disparity test "imagines how many members of the group in question would be on the wheel if there were full representation, and then calculates the percentage decrease from this figure due to the underrepresentation;" or, put another way, it marks "the percentage decrease in the probability that someone in the underrepresented group will be selected for the jury wheel due to the underrepresentation." Detre, 103 YALE L.J. at 1919.

202.   Following full discovery and an evidentiary hearing, Mr. Hicks expects to demonstrate, using the above statistical analyses, that neither African Americans nor Latinos were fairly or reasonably represented on the venire.

## C.   African Americans and Latinos were Systematically Excluded from the Jury Selection Process.

203.   The systematic underrepresentation prong is met when the under-representation is "inherent in the particular jury-selection process utilized." *Id.* at 366. Thus, exclusion that results from the system used establishes the third prong, regardless of intent. *Accord Thomas v. Borg*, 159 F.3d 1147, 1150 (9th Cir. 1998); *United States v. Perez-Hernandez*, 672 F.2d 1380, 1384 n.5 (11th Cir. 1982); *see also LaRoche v. Perrin*, 718 F.2d 500, 503 (1st Cir. 1983), *overruled on other grounds by Barber v. Ponte*, 772 F.2d 982 (1st Cir. 1985).

204.   Following full discovery and an evidentiary hearing, Mr. Hicks will show that the exclusion of African Americans and Latinos from the venire in his case was not unique, but rather is the norm.  At the time of Mr. Hicks' trial, Monroe

County drew its master list for jury pools from only two of the seven sources used in Pennsylvania: voter registration and driver's license lists. Following full discovery and a hearing, Mr. Hicks expects to demonstrate that this method does not result in constitutionally representative venire panels, resulting in a jury that excluded the African-American and Latino communities, thus failing to represent a fair cross-section of Monroe County and violating Mr. Hicks' constitutional rights.

### D. Counsel Were Ineffective.

205.   Mr. Hicks was deprived of his constitutional right to a jury chosen from a fair cross-section of the community, and he is entitled to a new trial. Trial counsel were ineffective for failing to raise a fair cross-section objection to his jury pool. Reasonably competent counsel would have been familiar with the fair cross-section requirement and the readily-available data demonstrating that Monroe County's procedures were reasonably likely to result in under-representation of minorities.

206.   Counsel could have no reasonable basis for failing to object to the unrepresentative composition of Mr. Hicks' venire. Because constitutional error at voir dire is a structural error entitling habeas petitioners to a new trial, prejudice is demonstrated and relief is required.

207.   Direct appeal counsel was precluded from raising the above-described claims of ineffective assistance of counsel on direct appeal. *See Grant*. To the extent that counsel could have and should have raised the above-described errors on direct

appeal under controlling precedent and procedure, counsel's failure to do so constitutes ineffective assistance of counsel. Because there is a reasonably probability that the results of the appeal would have been different had counsel raised the denial of his right to a jury composed of a fair cross-section of the community, prejudice is demonstrated, and relief is required.

CLAIM 7.    JURORS WHO HELD IMPROPER BIASES WERE PERMITTED TO SIT ON MR. HICKS' JURY AND QUALIFIED JURORS WERE IMPROPERLY STRUCK IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

208.    The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

209.    Counsel failed to ensure that voir dire was sufficient to protect their client's constitutional right to an impartial jury. Counsel also failed to rehabilitate jurors who should not have been excused for cause and failed to conduct an adequate inquiry into juror bias against their client. As a result of counsel's ineffectiveness and court error, Mr. Hicks was denied his right to a fair and impartial jury.

210.    Mr. Hicks does not currently have access to the extensive juror questionnaires that were used in his case. As it is impossible for current counsel to fully evaluate the sufficiency of the voir dire, the effectiveness of counsel, or the suitableness of the jurors without access to the questionnaires, Mr. Hicks expressly reserves the right to supplement and amend this claim if he obtains access to the questionnaires. If he does not obtain access to the questionnaires, he is entitled to a

new trial due to the failure to ensure an adequate record for appellate and post-conviction review.  *See* Claim 23.

### A. The Law.

211.   The right to a fair and impartial jury is required by the Sixth and Fourteenth Amendments and critical to preserving that right is the grant of adequate voir dire that identifies unqualified jurors. *See* Part II.F. Adequate voir dire is particularly important in capital cases where the jurors are required to make highly subjective, individualized sentencing determinations of life or death. *Id.* Relief is required whenever the court improperly death-qualifies the jury and excludes a qualified juror, *Gray v. Mississippi*, 481 U.S. 648, 659 (1987); when the court denies the defense the opportunity to life-qualify the jury, *Morgan*, *supra*; or when the court seats a juror who is partial to the state at sentencing, *Ross*, *supra*.

212.   In addition, when a juror has a close relationship with a participant or the issues in the trial, there exists a "conclusive presumption of implied bias." *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J. concurring); *Leonard v. United States*, 378 U.S. 544 (1964) (per curiam) (disqualification required where prospective jurors heard the defendant's guilty verdict in another trial); *Taylor v. Louisiana*, 379 U.S. 466, 473-74 (1965) (juror's association with deputy sheriffs who were also key prosecution witnesses); *see also Tumey v. Ohio*, 273 U.S. 510,

523 (1927) (mayor who received benefit of fines and costs disqualified from determining defendant's guilt in trial for unlawfully possessing intoxicating liquors).

213.   As described below, as a result of trial court error and counsel's deficient performance Mr. Hicks was denied his rights to a fair and impartial jury in violation of the Sixth, Eighth, and Fourteenth Amendments.

## B.   The Court's Restrictions on Voir Dire Precluded Adequate, Fact-Specific Questioning to Determine Whether Jurors Could be Fair and Impartial.

214.   No matter the facts of the homicide or the aggravating circumstance(s), a capital defendant is entitled to a jury that can consider and give effect to mitigation and can consider a life sentence.  The only way for the court and counsel to determine whether a prospective juror can do so is to question them using facts from the case.

215.   There was no doubt the jury would hear and view gruesome evidence of the type seldom seen by first responders, police officers, and others in the criminal legal system, let alone by members of the general public.  This case was, as the press coverage indicated, something out of a horror movie.  Unlike a horror movie, which the viewer knows is fiction, these jurors were about to hear about and see, in graphic detail, the real life dismemberment of a person who had been a real, live human being.  Mr. Hicks was entitled to a jury that could hear about and view that evidence but still give meaningful consideration to his mitigation and a life sentence.

216.   Despite that, voir dire was conducted in a vacuum in which the facts of this case did not exist and jurors were asked only about sterile elements.  The record is unclear on the exact parameters that were established for voir dire or the rules under which counsel believed they were acting.  However, the totality of the court's rulings appears to have prohibited counsel from asking about the facts of this case (actual facts, stipulated facts, or hypothetical facts) except as it related to a prospective juror's exposure to pretrial publicity that caused them to form an opinion about the case.

217.   The court precluded necessary fact-based voir dire, first when it denied the defense request to voir dire the jurors using the evidentiary photographs.  *See* Claim 5.  In so doing, the court relied on case law prohibiting hypothetical stake out questions.  *See* Opinion at 29.  The court's rulings during voir dire of the second prospective juror also seemed to confirm that fact-based questioning would be allowed only as it related to testing exposure to pretrial publicity.  *See* NT 10/27/14 at 59-70, 75-76.  To the extent the court's rulings did not foreclose all fact-based questioning, counsel were ineffective for failing to conduct an adequate voir dire.

218.   As a result of the court's ruling and counsel's ineffectiveness, none of the prospective jurors were adequately voir dired to determine whether they could be fair and impartial *in this case after hearing and viewing this case's uniquely gruesome and inflammatory evidence*.  Mr. Hicks agrees that he was not entitled to

stake out the jurors and have them commit to finding specific mitigation or actually imposing a life sentence in this case. However, he was entitled to sufficient fact-based voir dire to determine whether the prospective jurors would be able to even give meaningful consideration to mitigation and a life sentence or if they would see the evidence in this case and automatically, always impose death. Relief is required.

## C. As a Result of Counsel's Ineffectiveness and Court Error, Several Venirepersons Were Not Properly Life-Qualified, While Others Who Expressed Concern About the Death Penalty Were Improperly Excluded.

### 1. Failure to Life Qualify and Improper Seating of Automatic Death Jurors.

219. The defense has a constitutional right to challenge for cause any potential juror whose pro-capital punishment views would "prevent or substantially impair" him or her from voting for a life sentence in an appropriate case. *See* Part II.F; *Stroud v. United States*, 251 U.S. 380 (1920). When it came to jurors who had scruples *against* the death penalty, the trial court appeared to apply a standard that ambiguity or contradictions in the juror's answers supported a for-cause challenge. *See* NT 10/31/14 at 89. Because that standard was applied in favor of the prosecution, it should have also been applied in favor of the defense.

### a. Jurors who Endorsed an Incorrect Weighing Standard

220. Thirteen of the sixteen seated jurors were voir dired using an incorrect statement of the law regarding the weighing of aggravating circumstances and mitigating factors. The court stated the wrong standard when it told the venire that

96

"you'd go into a balancing test and make a decision whether the mitigating circumstance that even one person finds by a preponderance of the evidence outweighs one aggravating circumstance…." NT 10/27/14 at 13-14. This is an incorrect statement of Pennsylvania law, which requires a life sentence both when mitigation outweighs aggravation, but also when mitigation and aggravation weigh equally. 42 Pa. C.S. §9711(c)(iv).

221. During voir dire, the parties repeated this incorrect standard, asking the jurors if they could impose death when aggravation outweighed mitigation, and if they could impose life when mitigation outweighed aggravation. *See* NT 10/27/14 at 147 (Seated Juror 1); *id.* at 170-71, 178 (Seated Juror 2); NT 10/28/14 at 106 (Seated Juror 4);[21] *id.* at 143-44 (Seated Juror 6); *id*. at 156 (Seated Juror 7); NT 10/29/14 at 88-89 (Seated Juror 8); *id*. at 175 (Seated Juror 9); *id*. at 200 (Seated Juror 10); *id*. at 237 (Seated Juror 11); NT 10/31/14 at 39 (Seated Juror 12); *id*. at 64 (Alternate 1); *id*. at 119-20 (Alternate 2); *id*. at 144 (Alternate 3). Thus, the voir dire failed to establish that these jurors could follow the law and impose a life sentence if they found the aggravation and mitigation weighed equally.

_____

[21] The only reason Seated Juror 3 is not in this list is because he was only asked about what he would do when aggravation outweighed mitigation. No one even attempted to ask him the converse question. *See generally* NT 10/28/14 at 34-45. In fact, only two seated jurors were voir dired using the correct standard. NT 10/28/14 at 125 (Juror Five); NT 10/31/14 at 169 (Alternate Juror 4).

### b. Seated Juror 1, Anne Kasaba

222.   Ms. Kasaba was not life-qualified.   Defense counsel explained the penalty phase process to Ms. Kasaba and asked her whether she could "apply that standard," which she indicated she could.   NT 10/27/14 at 147.   No one asked Ms. Kasaba whether she could, in fact, give meaningful consideration to mitigation evidence.   It is clear that a juror could "apply that standard" without so doing.

223.   The subsequent voir dire did nothing to elucidate whether Ms. Kasaba's views on capital punishment substantially impaired her ability to be a fair and impartial juror in this case.   Ms. Kasaba indicated that "there are times when [the death penalty is] appropriate" "[w]hen either the defendant admits guilt or if there's a preponderance of the evidence that shows that there is no other answer."   NT 10/27/4 at 147.   Ms. Kasaba provided essentially the same answer when asked about life without parole: "It would depend on what the evidence was and whether or not it was beyond a shadow of a doubt. If the evidence showed that the person, the defendant, beyond a reasonable doubt did whatever the crime was, that's when I would find it appropriate."   *Id.* at 149.

### c. Seated Juror 2, Debra Orlicki

224.   Ms. Orlicki was not life-qualified.   After explaining the penalty phase process, the prosecutor asked if she could impose a death sentence if she found that the aggravation outweighed the mitigation.   NT 10/27/14 at 171.   She indicated that

she could.  *Id.*   While Ms. Orlicki repeatedly answered affirmatively to the prosecutor's questions that she *understood* how the process worked regarding considering mitigation and a life sentence, he never asked her whether she could, in fact, consider mitigating evidence or a life sentence.  *See id.* at 168-71.

225.   In response to defense questioning, Ms. Orlicki said: "I believe that if . . . as a real heinous crime, you know, took a life intentionally, and also with children involved, then, yes, I believe they should get a death penalty."  NT 10/27/14 at 174. While she did not "have problems" with life without parole: "A lot of times I think, you know, taxpayers – we're paying for them. If, really, they did a crime that they deserve the death penalty, I think, you know, why have the taxpayers pay for this person to live in prison.  But, yeah, it can be done and it should be done."  *Id.* at 175.

226.   Ms. Orlicki interrupted defense counsel's question "What if you don't find that it was a planned murder?" to volunteer her opinions on Mr. Hicks' case (from media exposure): "You know, I really don't know much about the case except what I read in the newspaper when it first happened. I don't know what the outcome was or who was it or anything. From what I hear now, body parts or plastic bags. Yeah, then I would say also the death penalty, you know. . . .  Supposedly, allegedly, you know, had body parts in different areas."  *Id.* at 176-77.  Juror Orlicki elaborated that "that alone" wouldn't be enough to impose the death penalty, but that "You have to prove all the evidence."  *Id.* at 177.  Defense counsel tried to ask Ms. Orlicki what

she meant by "all the evidence," but Ms. Orlicki again interrupted counsel and cut her off, so no one actually ascertained what she meant. *See id.* It appears, however, that Ms. Orlicki would impose a death sentence if the prosecution proved Mr. Hicks dismembered Ms. Null and left her body parts in bags on the highway, which the defense was about to concede in opening statement that he did.

227.   While counsel ultimately asked Ms. Orlicki if she could weigh mitigation and aggravation in the abstract, counsel did not ask if she could consider and find mitigation in all cases including this case (a necessary pre-requisite to any weighing), nor did counsel ask if she could, in fact, consider a life sentence in this case.  This was crucial since all of her previous answers indicated that she could not.

### d.  Seated Juror 3, Kenneth Sehn

228.   Following full discovery and an evidentiary hearing, Mr. Hicks expects to demonstrate that Mr. Sehn's answers regarding the death penalty during voir dire, *see, e.g.,* NT 10/28/14 at 39-40, contradicted the answers he provided in his questionnaire.  Upon information and belief, Mr. Sehn's questionnaire answers were consistent with those of a juror would automatically impose death in all cases of intentional murder.  Neither counsel nor the court confronted Mr. Sehn with these discrepancies during voir dire.

### e.  Seated Juror 4, Lynda Messerschmidt

229.   Ms. Messerschmidt was an automatic death juror.  She stated that her views on the death penalty were "a little mixed."  She elaborated: "Well, if it's something really horrible and terrible and it's premeditated, I don't have a problem with the death penalty." NT 10/28/14 at 100.  Her only concern seemed to be in cases of actual innocence. *Id.* at 100-01.   When counsel confronted her with her questionnaire response that she would vote for the death penalty when a murder is planned or extremely heinous, she said: "That's exactly how I feel." *Id.* at 101.  She further explained: "[i]f it's proven that the person is guilty, yes" she would always vote for the death penalty for planned or extremely heinous murders. *Id.* She continued with her consistent answers that she would "feel the same way" "if it was premeditated and the evidence does point to that." *Id.* at 102.  When "everybody's decided, yeah, he's guilty and then the penalty phase comes in and they vote for the death penalty, if it's deserving, I would vote yes." *Id.*  For her, "deserving" means "Well, that he would – if he was – if he was guilty and the evidence shows that he did – or the Defendant did what he did, and if that was the penalty, yes." *Id.*

230.   Although Ms. Messerschmidt said that she would be willing to consider mitigating circumstances (*id.* at 104), she elaborated that she would consider mitigation as aggravation: "Well, not everybody in their life, if they were brought up in a bad environment – I mean, people have their own mind to do their own things.

If they had a terrible childhood and there was abuse, things like that, that doesn't necessarily mean that the person as an adult would turn around and be a horrible person. They would turn out to be a perfectly normal person without any kind of trouble." *Id*. at 105.

231.   Ms. Messerschmidt never indicated that she would be willing to consider a life sentence in this case (or any first degree intentional murder case), and her above answers indicate the exact opposite – that she would not.

> *f.   Seated Juror 5, Darryl Betz (penalty phase foreperson)*

232.   After the prosecutor explained the process, Mr. Betz indicated that he did not have any strongly held personal beliefs that conflicted with the process and that he would be able to put the court's instructions first and any personal beliefs second and follow the court's instructions.  NT 10/28/14 at 119-20.

233.   On his questionnaire, Mr. Betz had indicated that the death penalty "was generally appropriate with very few exceptions." *Id.* at 122.  When asked by defense counsel to explain what he would consider an exception, Juror Betz stated, essentially, cases of innocence or reasonable doubt:

> I don't know if I have a specific thing in mind. I think it is all based off what you would hear in that trial. I mean, they obviously have all this information to give you. I think if I could come up with one thought process I might have there -- I know we have a lot of physical evidence, DNA, things of that nature. Those type evidences are pretty solid.
>
> Eyewitnesses. You know, maybe it's all based on a lot of eyewitnesses with how good was your view. So there might be some sketchiness to

102

> it. They might not be guilty based off that, but if you choose to believe the witnesses – I might find a little bit of heartache. It's, like, yeah, they sound honest to me, they sound believable, I agree with it, but there just might be that one little bit in the back of your head that says is that worth the death penalty.

*Id.* at 122-23.  A juror who believes the death penalty is appropriate except when the defendant is innocent is substantially impaired.

### g.  Seated Juror 7, Lauren Lane-Herman

234.   Ms. Lane-Herman was not life-qualified.  She *volunteered* concerns about the graphic nature of the case, yet no one questioned her about whether the graphic and gruesome nature of the evidence would impair her ability to hold the Commonwealth to its burden of proof at guilt or penalty; to consider mitigation; or to consider a life sentence.  *See* NT 10/28/14 at 150-62.

### h.  Seated Juror 9, Jennifer Straub

235.   Following brief questioning from the prosecution that provided nothing more than a superficial description of the decision-making process, the defense asked no questions of Ms. Straub about her ability to give meaningful effect to mitigation evidence, or anything else, and accepted Ms. Straub.  NT 10/29/14 at 176.

### i.  Seated Juror 10, Delores Tyndale

236.   Ms. Tyndale indicated in her questionnaire that she did not want to serve because this case was too gruesome.  NT 10/29/14 at 190.  She reiterated that belief during in-court voir dire and stated "I cannot answer" and "I don't know how I would respond" when asked whether she would be overwhelmed by gruesome

evidence.  She was never asked how viewing the photographs would impact her ability to be fair at penalty.  *Id.* at 190-200.  In fact, the prosecutor (who questioned Ms. Tyndale first) did not ask her about the death penalty at all.  *Id*. at 188-92.

237.   In response to defense questioning, Ms. Tyndale stated that she would vote for a life sentence "In order to keep from having a tied jury, yes, I would go with life imprisonment" when the jurors did not unanimously find the aggravator. *Id*. at 197.   When asked if she would consider mitigating factors, such as past substance abuse or no prior criminal history, Ms. Tyndale stated "I believe that that is part of making a judgment, isn't it?"  *Id*. at 199.   Her rhetorical question in response to the defense question was not an affirmative yes.  Moreover, while she indicated that she *understood* that "if those mitigating factors in your opinion outweigh the aggravating factors, again, that's when you would ask for life without parole," *id*. at 200, she never said (and was never asked) if she would in fact consider a life sentence in this case.  A juror who would only consider a life sentence to avoid a tied jury is substantially impaired.

### j.   Seated Juror 12, Patricia DeGennaro

238.   Defense counsel barely questioned Ms. DeGennaro, asking her only two things – whether she understood that Mr. Hicks had not yet been convicted and whether she would be swayed by others.  NT 10/31/14 at 41-42.

### k. Alternate Juror 1, Angela Storm

239.   Ms. Storm was initially chosen as an Alternate, but replaced Juror 2 at the start of trial when she was excused for medical reasons. NT 11/05/14 at 5. Counsel did not ask Ms. Storm a single question during voir dire. *Id*. at 65.

### l. Alternate Juror 2, Rebecca Bear

240.   Ms. Bear was initially chosen as an Alternate, but replaced Juror 7, who was excused for medical reasons during the guilt phase of trial. NT 11/10/14 at 5.

241.   Ms. Bear was not life qualified.   Ms. Bear answered on her questionnaire that: "I believe if a person has remorse, they should suffer and think about it every single, solitary day of their life the way that the person that they hurt and their family suffers every day.  If they have no remorse, get rid of them."  NT 10/31/14 at 120.  She stated that she "would try" to put her personal beliefs aside and follow the law, and that "I would hope I can do that."  *Id*. at 120-21.  However, when asked if she could return a death sentence if the aggravating circumstances outweighed the mitigating factors, she answered: "It depends on the heinous nature what the Defense – or, you know, the Prosecution proves whether he did it or not and how violent it really was will determine how I feel about it in the end. . . .  You know, if it really happened, then probably I could say kill him."  *Id*. at 121-22.

242.   As there was no life-qualification voir dire for most of the seated jurors, as the law requires, and seated jurors were substantially impaired in their ability to give meaningful consideration to mitigation and a life sentence, relief is required.

### 2.   Failure to Excuse Two Venirepersons for Cause During the Selection of Alternates.

243.   During selection of alternates, each side was afforded two peremptory strikes.  NT 10/31/14 at 45.  The defense used its first peremptory strike on Wayne Folmar and its second on Guy Marotta.  Both men were substantially impaired in their ability to serve but counsel failed to make a for-cause motion for their removal, nor did the court *sua sponte* remove them for cause.

244.   In response to defense questioning, Mr. Folmar stated he believed in an eye for an eye, that if someone takes a life, their life should be taken, *id*. at 49, and that he could not set that belief aside and follow the law.  *Id*. at 54.  In response to prosecution questioning, Mr. Folmar indicated that he could set aside his beliefs and follow the law because "I guess I would have to. If he is found guilty for what he has done . . . he deserves some kind of punishment. If it's not the death penalty, then life parole. I could understand that." *Id*. at 56.  Mr. Folmar was confused by the prosecutor's questions and appeared to believe that, if he were on a jury and 11 jurors wanted life without parole and he wanted the death penalty, that somehow the defendant would not get punished at all.  *See id*. at 55-56.  A person who believed in an eye for an eye, but who could vote for life so that the defendant did not escape

106

punishment is substantially impaired in his ability to give meaningful consideration to mitigation and a life sentence and should have been excused for cause.  Yet, defense counsel failed to move for his excusal for cause, instead immediately choosing to exercise a peremptory challenge.  *Id*. at 57.

245.   Venireperson Guy Marotta indicated on his questionnaire that the death penalty was not used enough.   *Id*. at 101.   When asked by defense counsel to elaborate, he responded: "Felony criminal cases of course. . . . Cases of robbery or murder or stuff like that."  *Id*. at 101-02.  Mr. Marotta further indicated that he would impose the death penalty in every first degree murder case where an aggravating circumstance was found.  *Id*. at 105-06.  Although Mr. Marotta eventually agreed he would consider mitigating circumstances, *id*. at 106-07, it was clear from his candid, but contradictory answers, that he was substantially impaired.  Yet, defense counsel failed to move for his excusal for cause, instead immediately choosing to exercise their second (and last) peremptory challenge.  *Id*. at 108.

246.   As a result, counsel ran out of peremptory challenges before the second alternate (who would ultimately become part of the deliberating jury) was empaneled.  As demonstrated above, Alternate 2, Ms. Bear, if not excludable for cause herself, was certainly not an impartial juror.  She believed "if they have no remorse, get rid of them" and "if it really happened, then probably I could say kill him."  Defense counsel knew that they were about to contest guilt of the homicide

(a fact that jurors often find inconsistent with remorse); that they had no direct evidence of remorse to present at the penalty phase (on the contrary, their mental health expert would testify to statements by Mr. Hicks contesting guilt of the homicide); and that once they got to the penalty phase, the jury would have decided "it really happened."   Had they had a peremptory strike available, reasonably competent counsel would have used it to excuse Ms. Bear.   However, because counsel and the court failed to remove Mr. Folmar and Mr. Marotta, both of whom were substantially impaired, for cause, counsel had no peremptory strikes left to use.

### 3.   Improper Excusal of Qualified Venirepersons and Failure to Rehabilitate.

247.   The court improperly disqualified jurors who were, at best, equivocal about their ability to follow the law in light of their views on the death penalty. Counsel failed in their obligation to try to rehabilitate jurors who had scruples against the death penalty.

*a. Improper Excusal of Lana Krajewski & Johnnie Mae Knights.*

248.   Venireperson Lana Krajewski gave equivocal answers regarding the death penalty.   In response to prosecution questioning whether she could follow the law and return a death verdict if the aggravator outweighed the mitigators, she stated "I don't know if I can follow that, to tell you the truth."   NT 10/31/14 at 83-84.   She continued: "It's a toss-up, because I feel that there could be something missing. Once you probably gave the death penalty to someone, that there could be something

108

missing that we might have forgot. That's the way I feel." *Id*. at 84.  The prosecutor further explained the process to her, and asked again if she could impose the death penalty.  She responded "I don't think so. I don't think I could." *Id*. at 85.

249.  However, Ms. Krajewski had indicated in her questionnaire that she believed the death penalty was appropriate in most but not all cases.  *Id*. at 88.  She told defense counsel that she still held that belief. *Id*. And, when defense counsel explained the penalty hearing process to her, indicated that "yes, I think I could" set aside her beliefs and follow the court's instructions.  *Id*. at 88-89.  The Commonwealth moved for cause because Ms. Krajewski gave "candid" but "contradictory" answers.  *Id*.  The court granted the cause strike. *Id*.

250.  Ms. Krajewski was not required to commit to voting for a death sentence to qualify for jury service.   All she had to do was indicate she could set aside her beliefs and follow the law, which she did in response to defense questioning.   Indeed, her concerns regarding the death penalty seemed to mirror exactly the concerns of other jurors that the prosecution accepted.  *See*, *e.g.*, Seated Juror 5, Juror Betz, discussed *supra*, who expressed concerns of actual innocence.

251.  Like Ms. Krajewski, venireperson Knights gave conflicting answers during voir dire.  She first told defense counsel that her "religious background is that the Lord is the judge and the jury. I don't have a right to judge anyone."  However, she then indicated that it "would be hard" for her to impose a death sentence, but

that she could do it "[i]n a setting of a jury listening to the evidence, yeah."  NT 10/27/14 at 108-09.  Ms. Knights subsequently told the prosecutor that "[m]y first thought is no because my religion is never put aside. I carry that with me." *Id*. at 116.  This was true – Ms. Knights' first thought during voir dire was her religion, but she then clearly stated that in a jury setting she could impose a death sentence. Counsel did not object to the Commonwealth's motion for cause.

252.   The prosecution failed to meet its burden of proving that Ms. Krajewski and Ms. Knight's personal beliefs constituted a substantial impairment in their ability to follow the court's instructions and the law. Where even a single juror is improperly excluded under *Witherspoon* and *Adams*, "any subsequently imposed death penalty cannot stand." *Davis v. Georgia*, 429 U.S. 122, 122 (1976) (per curiam); *see also Gray*, 481 U.S. at 659. The court's exclusion of Ms. Krajewski and Ms. Knight the Sixth, Eighth, and Fourteenth Amendments.  Relief is required.

### b.  Failure to Rehabilitate

253.   Capital defense counsel has a duty to rehabilitate jurors whose scruples against the death penalty would not substantially impair their ability to follow the law.  2003 ABA Guidelines, Guideline10.10.2, Voir Dire and Jury Selection.

254.   Eight of the jurors excused for cause because of anti-death penalty scruples were excused without the defense asking a single question of the prospective juror.  Cesar Rosa, NT 10/27/14 at 52-55; Trevor Smith, *id*. at 117-23;

Sonia Cruz, *id*. at 155-57; Jasmin William, NT 10/28/14 at 29-33; Tina Magarelli, *id*. at 163-68; Suzanne Newhard, *id.* at 175-80; Candace McCoy, NT 10/29/14 at 76-80; Andrew Srisch, NT 10/31/14 at 94-98.   Following full discovery and an evidentiary hearing, Mr. Hicks expects to demonstrate that, had counsel voir dired these jurors, they could have rehabilitated at least one.

255.   A ninth venireperson, Christopher Hartzler, stated that he held personal beliefs against the death penalty during defense voir dire.  *See* NT 10/31/14 at 30. Instead of asking questions to determine if there were situations in which Mr. Hartzler could consider a death sentence (all that the law requires), defense counsel moved for his excusal, which was granted.  *Id*.  Following full discovery and an evidentiary hearing, Mr. Hicks expects to demonstrate that, had counsel effectively voir dired this juror, they could have rehabilitated at him.

256.   Counsel was the first (and only) to question prospective juror Carol Urban.  Ms. Urban indicated "I would say probably yes" that her personal belief against the death penalty would conflict with the court's instructions.  NT 10/27/14 at 125.  Instead of explaining the process (with all of its safeguards) or asking Ms. Urban about situations in which she might be willing to impose the death penalty, counsel asked her the leading question that would ensure she would not serve: "And I guess the question would be could you never vote for the death penalty, I guess?"

*Id.* Ms. Urban answered that she could never vote for the death penalty, the defense ended its questioning, and the Commonwealth moved for cause with no objection.

257. Finally, Ms. Zito was also removed for cause. NT 10/28/14 at 10. Upon information and belief, Mr. Hicks expects to demonstrate that Ms. Zito indicated in her questionnaire that she was against the death penalty with few exceptions, and counsel were ineffective for failing to elicit those exceptions during voir dire.

### D.    Racial Bias.

258. Upon information and belief, the juror questionnaire in this case did not even attempt to explore issues of racial bias, despite the fact that Mr. Hicks is Black and Ms. Null was white. Mr. Hicks was ultimately tried and sentenced to death by an all-white jury. The only person of color selected serve, Ms. Lane-Herman, was excused mid-trial for illness.

259. "Because of the range of discretion entrusted to a jury in a capital sentencing hearing" and the corresponding "unique opportunity for racial prejudice to operate but remain undetected," the Supreme Court has long recognized the necessity of voir dire to reveal "[m]ore subtle, less consciously held racial attitudes [that] could also influence a juror's decision." *Turner*, 476 U.S. at 35. *See also id.* (recognizing that "Fear of blacks, which could easily be stirred up by the violent facts of petitioner's crime, might incline a juror to favor the death penalty").

112

260.   When a juror relies on racial bias or stereotypes to convict, it is reversible error.  *Peña-Rodriguez v. Colorado*, 137 S.Ct. 855 (2017).  There is no question that race was an aspect of Mr. Hicks' trial and that there existed a strong likelihood that one or more jurors might be influenced by even the most subtle racial attitude to find death on less than the requisite standard of proof.  *See*, *e.g.*, *United States v. Robinson*, 485 F.2d 1157, 1160 (3d Cir. 1973) (reversible error to preclude racial bias voir dire because "[a]ssuming that a given juror believed all black witnesses to be less credible than white witnesses, that prejudice operated in the juror's evaluation of [defendant's] testimony . . . [defendant] was entitled to have his testimony evaluated free from the taint of such prejudice.").

261.   Nevertheless, counsel did not request, and the court did not ask, any questions even touching the surface of this issue, let alone sufficiently probe the venire's potential biases in order to ensure a fair and impartial jury. The failure to do so denied Mr. Hicks his state and federal constitutional rights.

### E.   Failure to Excuse Jurors Who Held Actual and Implied Biases Against Mr. Hicks.

262.   Several of the seated jurors had life experience with facts and circumstances similar to this case such that bias must be presumed.  While they should have been removed for cause, counsel failed to make any motion to do so.

263.   Juror 10, Ms. Tyndale, was nervous during voir dire and indicated that she did not want to serve because the case was too gruesome.  NT 10/29/14 at 193.

Ms. Tyndale had previously been excused from a capital homicide trial in a domestic violence case because she had two abusive husbands in her life: "My first husband held me down and strangled me, and the other husband knocked me off the back porch into the snow where I was out for a while." *Id*. at 191. She obtained a restraining order against the second husband. *Id*. Despite Ms. Tyndale's belief that the "situations were different" so she could be fair to both sides in this case, *id*. at 191-92, the law is clear that she could not. Upon information and belief, Mr. Hicks also expects to demonstrate that Ms. Tyndale had a younger brother who committed suicide due to cocaine use and depression, another circumstance too similar to the instant case for her to serve without implied bias.

264. Mr. Hicks expects to demonstrate that Alternate Juror 1, Ms. Storm, who became part of the deliberating jury when another juror fell ill, had a niece who was a kidnapping victim. This circumstance was too similar to the instant case for her to serve without implied bias.

265. Juror 4, Ms. Messerschmidt, had a daughter who was addicted to prescription pain medicine and died of a drug overdose. *See Governor seeks addiction solutions in Pocono discussion, Pocono Record*, May 13, 2016; Exh. 14-1, *Combatting Drug Addiction*. This circumstance was too similar to the instant case for her to serve without implied bias.

114

266.   Upon information and belief, Mr. Hicks expects to demonstrate that Juror 1, Ms. Kasaba had a son who was in prison for a sex crime against his four-year-old daughter (her granddaughter). This circumstance was too similar to the instant case for her to serve without implied bias.

267.   These jurors' experiences involving facts and circumstances notably similar to this case demonstrates a "conclusive presumption of implied bias." *Smith*, 455 U.S. at 222 (O'Connor, J. concurring). *See Hunley v. Godinez*, 975 F. 2d 316, 320 (7th Cir. 1992) (bias presumed where sequestered jurors were victims of burglary during murder and burglary trial); *Burton v. Johnson*, 948 F.2d 1150, 1159 (11th Cir. 1991) (juror who failed to disclose during voir dire that she was involved in an abusive family situation where the defense was battered spouse syndrome constituted implied bias); *Jackson v. United States*, 395 F. 3d 615, 617-18 (D.C. Cir. 1968) (implied bias where juror involved in "love-triangle" similar to one at issue at trial); *United States ex rel. DeVita v. McCorkle*, 248 F. 2d 1, 8 (3d Cir. 1957) (en banc) (implied bias where juror was victim of robbery prior to trial in robbery case). Seating these jurors violated the Sixth, Eighth and Fourteenth Amendments.

## F.   Counsel Were Ineffective.

268.   Trial counsel were ineffective. *See* Part II.E.  Their failure to conduct a thorough, fact-based voir dire to ensure the jurors could be fair given the uniquely inflammatory facts of this case; failure life-qualify jurors; failure to challenge

115

automatic death jurors for cause; failure to request additional voir dire and rehabilitate jurors with scruples against the death penalty; failure to object to the improper excusal of qualified jurors; and failure to challenge the jurors with implied biases was objectively unreasonable. In addition, should this Court find excusal for cause was not required (but it was), counsel were ineffective for failing to exercise their peremptory strikes against these jurors. Counsel used only 14 of their 20 available peremptory strikes (*see* Pa. R. Crim. Pro. 634(A)(3)) during the seating of the first 12 jurors, while allowing clearly biased jurors to serve.

269. Counsel could have no reasonable strategic basis for failing to ensure that Mr. Hicks' fate was decided by a fair and impartial jury capable of following all of the court's instructions. The prevailing professional norms mandated that capital counsel be familiar with the legal precedents requiring full and adequate voir dire for both life and death qualification. ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES, Guideline 10.10.2(B) (2003). In addition, counsel "should be familiar with techniques" for uncovering automatic-death jurors; for uncovering jurors who cannot consider mitigating evidence; and "for rehabilitating potential jurors whose initial indications of opposition to the death penalty make them potentially excludable." *Id.*

270. Prejudice is demonstrated because there is a reasonable probability that, but for counsel's failures, the result of jury selection would have been different – a

different, impartial jury would have been empaneled that would have been able to hold the Commonwealth to its burden of proof at the guilt and penalty phases and to consider Mr. Hicks' mitigating evidence and a life sentence. Moreover, denial of an impartial jury is structural error. Relief is required.

271.   To the extent the above errors were the result of trial court error preserved in the record, appellate counsel was ineffective for failing to raise them on direct appeal.  *See* Part II.F.  There can be no strategic basis for counsel's failure to challenge, on direct appeal, the court's erroneous excusal of Ms. Krajewski, when the record indicates she was improperly removed and acceptable to the defense at trial.  *See* NT 10/31/14 at 89.  Nor can there be a strategic reason for counsel's failure to challenge the court's restrictions on voir dire on direct appeal, when it was clearly counsel's desired strategy (precluded by the court's rulings) to voir dire the jurors using the facts of this case to ensure a fair and impartial jury.  As there is a reasonable probability that Mr. Hicks would have prevailed on appeal, relief is required.

**CLAIM 8.    THE COMMONWEALTH USED ITS STRIKES IN A DISCRIMINATORY MANNER, DEPRIVING MR. HICKS OF HIS RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

272.   The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

117

## A. Introduction.

273.   Mr. Hicks is entitled to a new trial and sentencing because the Commonwealth discriminatorily exercised at least nine of its fourteen peremptory challenges against women and minorities.[22]  In addition, as described in detail in Claims 5, 7, and 9, as a result of the trial court's restrictions on voir dire; the trial court's improper excusal of qualified venirepersons; and counsel's ineffectiveness for failing to conduct adequate (or in some cases any) voir dire to death-qualify prospective jurors, the Commonwealth was permitted to exercise cause challenges in the same unfettered manner, to remove at least an additional thirteen women and minorities from the venire.

## B.   The Law.

274.   The Equal Protection Clause of the Fourteenth Amendment prohibits the use of peremptory challenges to strike prospective jurors on the basis of their race, ethnicity, and/or gender.  *Batson v. Kentucky*, 476 U.S. 79, 89 (1986); *see also Miller-El v. Cockrell*, 537 U.S. 322, 328-29 (2003); *Georgia v. McCollum*, 505 U.S. 42, 44 (1992); *J.E.B. v. Alabama*, 511 U.S. 127, 145-46 (1994) (gender). A new trial is required when the prosecution improperly excludes even a single juror on such

---

[22] Because Mr. Hicks does not have access to the juror questionnaires, the proffers of the race/ethnicity of some of the venirepersons are based on the limited information counsel have been able to ascertain from the jurors' in-court voir dire and publicly available information.

improper grounds. *J.E.B.*, 511 U.S. at 141 n.13; *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008); *Harrison v. Ryan*, 909 F.2d 84, 88 (3d Cir.1990).

275.  *Batson* sets forth a three-part test.  First, the petitioner must establish a prima facie case of discrimination. *Batson*, 476 U.S. at 96-98; *J.E.B.,* 511 U.S. at 144-45.  In order to do so, the movant need only show there is "some reason to believe that discrimination might be at work."  *Johnson v. Love*, 40 F.3d 658, 663 (3d Cir. 1994). *See also Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

276.  Second, the prosecution must supply a race- or gender-neutral reason for excluding each prospective juror.  *Batson*, 476 U.S. at 98; *J.E.B.*, 511 U.S. at 145.  A prosecutor who intentionally discriminates against a prospective juror on the basis of race or gender is not excused for having accepted other venirepersons of that race or gender.  *Holloway v. Horn*, 355 F.3d 707, 720 (3d Cir. 2004).  Once the prosecution has tendered its reasons, the burden returns to the defendant to show that the reasons given are pretextual.  The petitioner must show that "it is more likely than not that the Commonwealth struck at least one juror because of race" or gender. *Bond v. Beard*, 539 F.3d 256, 264 (3d Cir. 2008).

277.  Third, the court must determine whether the offered reasons are race/gender-neutral as opposed to pretextual. *Batson*, 476 U.S. at 97-98. In reaching that determination, the Court must consider "all of the circumstances that bear upon

the issue of racial animosity" (*Snyder*, 552 U.S. at 478), and evaluate "all evidence introduced by each side (including all evidence introduced in the first and second steps) that tends to show that race [or gender] or was not the real reason" for each strike. *Riley v. Taylor*, 277 F.3d 261, 286 (3d Cir. 2001) (en banc)).

278.   Pretext can be established by comparing the prosecution's treatment of similarly situated white and/or male prospective jurors.[23] This includes a comparison of the state's strikes against similarly situated white and/or male jurors as well as the nature and extent of its questioning of those prospective jurors. *Miller-El*, 545 U.S. 231, 240-66; *Riley*, 277 F.3d 261, 282; *Jones v. Ryan*, 987 F.2d 960 (3d Cir. 1993).

## C.   The Prosecution's Strikes Demonstrate Discriminatory Intent.

279.   Upon information and belief, the prosecution exercised at least nine of twelve peremptory strikes against the following venirepersons who are women and/or minorities:  Tina Deller (NT 10/27/14 at 183-95); Raylene Kinyon (*id.* at 196-204); Leslie Lynette Armstrong (African-American) (NT 10/28/14 at 181-93); Martha Lucid (*id.* at 197-08); Angela Maria Hernandez-Mercado (Latina) (*id.* at 223-38); Ashley Kaps (NT 10/29/14 at 50-63); Brittany Jones (African-American) (*id.* at 112-30); Angela Melo (Latina) (*id.* at 135-49); and Barbara Arroyo (NT 10/31/14 at 68-76).

---

[23] Mr. Hicks cannot make this comparison without access to the jury questionnaires.

280.   In addition, as a result of the trial court's restrictions on voir dire; the trial court's improper excusal of qualified venirepersons; and counsel's ineffectiveness for failing to conduct adequate (or in some cases any) voir dire to death-qualify prospective jurors (*see* Claims 5, 7, 9), the Commonwealth was permitted to exercise cause challenges in the same unfettered manner, to remove at least an additional thirteen women and/or minorities from the venire: Cesar Rosa (Latino) (NT 10/27/14 at 52-55); Johnnie Mae Knights (African-American) (*id.* at 107-16); Carol Urban (*id.* at 124-26); Trevor Smith (Latino) (*id.* at 116-23); Sonia Cruz (Latina) (*id.* at 155-57); Deborah Zito (NT 10/28/14 at 6-10); Victoria Arrington (*id.* at 25-28); Jasmin Williams (Latina) (*id.* at 29-34); Tina Magarelli (*id.* at 163-69); Suzanne Newhard (*id.* at 175-81); Candace McCoy (African-American) (NT 10/29/14 at 76-80); Cynthia Konrath (*id.* at 179-88); and Lana Krajewski (NT 10/31/14 at 77-89).

281.   The "totality of the relevant facts" regarding these twenty-two strikes demonstrate discriminatory intent. *Miller-El*, 545 U.S. at 239 (quoting *Batson*, 476 U.S. at 94, 96); *see also Lark*, 495 F. Supp. 2d at 500.

### D.   Counsel Were Ineffective.

282.   Despite this clear pattern of race and gender discrimination by the Commonwealth in the use of its challenges, counsel failed to object.   Competent counsel would have recognized that the Commonwealth was, one by one, picking

off women and minorities from the venire. Moreover, competent counsel would not have *facilitated* that discrimination by failing to conduct adequate voir dire. *See* Claim 7. There was no strategic reason for counsel to allow the Commonwealth to engage in discriminatory strikes during voir dire. Mr. Hicks was prejudiced by counsel's failure to conduct adequate voir dire and to object to the Commonwealth's discriminatory use of its strikes because he would have prevailed had counsel performed effectively. Appellate counsel was precluded from raising this claim of gender discrimination on appeal. *Grant*, 813 A. 2d at 738.

CLAIM 9. THE EXCLUSION OF A LARGE NUMBER OF JURORS BECAUSE OF THEIR VIEWS ON CAPITAL PUNISHMENT FORCED MR. HICKS TO BE TRIED BY A JURY THAT WAS UNCOMMONLY PRONE TO CONVICT, INCAPABLE OF EXPRESSING THE CONTEMPORARY VALUES OF THE COMMUNITY ON THE APPROPRIATENESS OF SENTENCING HIM TO DEATH, AND DENIED HIM AN IMPARTIAL JURY OF THE VICINAGE IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS AND ART. I, SECTIONS 1,9,13,25 AND 26 OF THE PENNSYLVANIA CONSTITUTION.

283. The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

### A. Mr. Hicks was Denied an Impartial Jury of the Vicinage Capable of Expressing the Contemporary Values of the Community, in Violation of the State and Federal Constitutions.

284. The Pennsylvania Constitution guarantees a capital defendant the "inherent and indefeasible rights . . . of enjoying and defending life and liberty" and of a trial "by an impartial jury of the vicinage." Pa. Const. Art. I, §§ 1 & 9. This can

only occur if the mechanism by which that jury is selected allows for the empaneling of a jury that is capable of expressing the contemporary values of the community.

285.   Likewise, the death penalty comports with the Eighth Amendment only if the sentence imposed is consistent with the contemporary values of the community. *E.g.*, *Thompson v. Oklahoma*, 487 U.S. 815, 821 (1988) (to satisfy Eighth Amendment, death sentence must comport with "the evolving standards of decency that mark the progress of a maturing society" (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958))); *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  Because the jury is so directly involved in capital sentencing, it plays a vital institutional role in this Eighth Amendment requirement. *Gregg*, 428 U.S. at 181; *Thompson*, 487 U.S. at 822.  Indeed, "one of the most important functions any jury can perform in making . . . a selection (between life imprisonment and death for capital defendants) is to maintain a link between contemporary community values and the penal system – without which the determination of punishment could hardly reflect 'the evolving standards.'" *Witherspoon*, 391 U.S. at 519 n.15; *see also Gregg*, 428 U.S. at 181.

286.   That link is severed, however, and the Eighth Amendment and Article I, Section 9 violated when the composition of the jury is so skewed that it is incapable of reflecting the contemporary standards of decency of the community. In this case, fifteen prospective jurors – thirteen of whom were women and minorities – were

excused from the venire because of their beliefs against capital punishment.[24]  At the same time, only one juror was excused for cause because of his views in favor of capital punishment, NT 10/28/14 at 127-39 (Nicholas Starner). That means that twenty percent of otherwise eligible jurors were removed from jury service because the death penalty offended their standards of decency.

287.   Eliminating one-fifth of all jurors from the mandated expression of community values on the question of life or death expressly because of their views on one side of that issue grossly skews the venire.  With the for-cause excusals based upon views against death, the remnants of the eligible venire could not possibly reflect the contemporary views of the community. Adding to that the exclusion of Blacks, Latinos and women, *see* Claim 8, the venire had no hope of expressing community values. The exclusion of these critical voices from the venire violated the Eighth Amendment and Article I, Section 13.

288.   This jury was not – and could not be – a jury of the vicinage, as envisioned in Article I, Section 9, nor can it constitute a fair cross section under the

---

[24] They were: Cesar Rosa (Latino) (NT 10/27/14 at 52-55); Johnnie Mae Knights (African-American) (*id.* at 107-16); Carol Urban (*id.* at 124-26); Trevor Smith (Latino) (*id.* at 116-23); Sonia Cruz (Latina) (*id.* at 155-57); Deborah Zito (NT 10/28/14 at 6-10); Victoria Arrington (*id.* at 25-28); Jasmin Williams (Latina) (*id.* at 29-34); Tina Magarelli (*id.* at 163-69); Suzanne Newhard (*id.* at 175-81); Candace McCoy (African-American) (NT 10/29/14 at 76-80); Cynthia Konrath (*id.* at 179-88); Christopher Hartzler (NT 10/31/14 at 22-30); Lana Krajewski (*id.* at 77-89); and Andrew Srsich (*id.* at 94-98).

Sixth Amendment. And the most sacred right enshrined in the Pennsylvania Constitution, the Article I, Section 1 right to defend life and liberty is rendered meaningless if two of every five jurors are excused for the very reason that they *will* defend life.

289.   Mr. Hicks' capital jury was improperly empaneled in violation of the Sixth and Eighth Amendments and Article I, Sections 1, 9, and 13.

## B.   The Seated Jury was Uncommonly Prone to Convict and Impose Death.

290.   The process of death qualification also violated Mr. Hicks' right to a fair and impartial jury as guaranteed by Article I, Sections 6, 9 and 13 of the Pennsylvania Constitution and the Sixth, Eighth and Fourteenth Amendments.

291.   The overwhelming weight of social science research demonstrates that the death qualification process tends to create juries more inclined to convict, less likely to consider mitigation evidence, and more inclined to impose death.  *E.g.*, Rozelle, *The Principled Executioner: Capital Juries' Bias and the Benefits of True Bifurcation*, 38 Ariz. S.L.J. 769, 772–793, 807 (2006) (summarizing research and concluding that "[f]or over fifty years, empirical investigation has demonstrated that death qualification skews juries toward guilt and death."); Bowers & Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness From Capital Sentencing*, 39 Crim. Law. Bulletin 51, 56 (2003) (death qualification improperly over-excludes impartial jurors and under-excludes partial jurors); Allen, Mabry, and

125

McKelton, *Impact of Juror Attitudes about the Death Penalty on Juror Evaluations of Guilt and Punishment: A Meta-Analysis*, Law & Hum. Behav., vol. 22, no. 6 (1998); National Jury Project, Jurywork: Systematic Techniques 23.01[4] n.3 (Beth Bonora eds., 2d ed.) (1998); Craig Haney et al., *'Modern' Death Qualification: New Data On Its Biasing Effects*, 18 Law & Hum. Behav. 619 (1994); Moran and Comfort, *Neither 'Tentative' nor 'Fragmentary': Verdict Preference of Impaneled Felony Jurors as a Function of Attitude Toward Capital Punishment*, 71 J. of Applied Psych (1986) ("[J]urors from undifferentiated felony trials who more strongly favor capital punishment are significantly more likely to favor conviction."); Craig Haney, *Examining Death Qualification: Further Analysis of the Process Effect*, 8 Law & Hum. Behav. 133, 134-35 (1984); Craig Haney, *On the Selection of Capital Juries: The Biasing Effects of the Death-Qualification Process*, 8 Law & Hum. Behav. 121, 128-32 (1984).

292.   Moreover, the fact that *eighty-seven percent* (13 of 15) of the jurors removed for cause due to principles against the death penalty were women and/or minorities is consistent with social science data showing that African Americans and other racial minorities, women, persons of certain religions, and members of other cognizable groups will be less likely to survive the death qualification process. *See* Acker, et al. *The Empire State Strikes Back* at 69 ("The death- and life-qualification process causes a greater than 50 percent reduction in the proportion of non-whites

126

eligible for capital jury service."); Samuel R. Gross, *Update: American Public Opinion on the Death Penalty – It's Getting Personal*, 83 Cornell L. Rev. 1448, 1451 (1998) ("Race and sex, the two major demographic predictors of death penalty attitudes, continue to be influential on every survey."); William J. Bowers et al., *A New Look at Public Opinion on Capital Punishment: What Citizens and Legislators Prefer*, 22 Am. J. Crim. L. 77, 128-30 (1994) (1991 poll reveals that race and gender are "statistically significant predictors" for support for capital punishment in New York State); Fitzgerald & Ellsworth, *Due Process vs. Crime Control* at 46 (African Americans and women disproportionately excluded).

293.   Indeed, a Pew Research Center poll conducted in March 2015, only months after Mr. Hicks' trial, indicated that, nationwide, a mere 34% of African Americans supported the death penalty. *Less Support for Death Penalty, Especially Among Democrats*, Pew Research Center, Apr. 16, 2015, available: http://www.people-press.org/2015/04/16/less-support-for-death-penalty-especially-among-democrats/.

### C.     Counsel were Ineffective.

294. In his Omnibus Motion, defense counsel moved to preclude the Commonwealth from seeking the death penalty because it would deprive Mr. Hicks of an impartial jury under the state and federal constitutions. Omnibus Motion at 9-10. At the hearing on the omnibus motion, defense counsel (by stipulation) offered

social science studies showing how the current death penalty system causes jurors to be more likely to convict and impose death.  NT 01/13/09 at 12.  *See also* Brief in Support of First Omnibus Motion, March 17, 2009 at 19-23.  The trial court denied the defense motion.  Opinion at 20-21 (June 5, 2009).

295.   To the extent that counsel's allegations in the Omnibus Motion failed to fully present the denial of Mr. Hicks' state and federal constitutional right to a jury of the vicinage, as demonstrated above, trial counsel were ineffective.  Trial counsel provided ineffective assistance in acquiescing in the selection of a jury panel that systematically excluded those jurors most likely to express the community sentiment that death was not appropriate in this case. This issue has arguable merit: as discussed above, nearly twenty percent of the otherwise eligible venire was barred from serving in this case because of their views against the death penalty, while only one was excused because of his beliefs in favor of the death penalty. This so skewed the composition of the jury on the critical issue of defending Mr. Hicks' life that the jury was not an impartial jury of the vicinage and was incapable of performing its required Eighth Amendment function of reflecting and expressing the contemporary views of society on the appropriateness of subjecting Mr. Hicks to the death penalty.

296.   The "evolving standards" doctrine is one of the most firmly established principles of Eighth Amendment law. *Thompson*, 487 U.S. at 822 n.4 ("That Eighth Amendment jurisprudence must reflect 'evolving standards of decency' was settled

128

early [last] century in the case of *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910).").   *See also Trop v. Dulles*, 356 U.S. 86, 101 (1958); *Roper v. Simmons*, 543 U.S. 551, 561 (2005); *Atkins v. Virginia*, 536 U.S. 304, 311-12 (2002); *Penry v. Lynaugh*, 492 U.S. 302, 330-31 (1989); *Ford v. Wainwright*, 477 U.S. 399, 406 (1986); *Enmund v. Florida*, 458 U.S. 782, 813 (1982); *Witherspoon*, 391 U.S. at 519 n.15.   Counsel could not reasonably have been unaware of this principle, for "the lesson history teaches is that the jury – and in particular jury sentencing – has played a critical role in ensuring that capital punishment is imposed in a manner consistent with evolving standards of decency," *Spaziano v. Florida*, 468 U.S. 447, 485 (1984) (Stevens, J., concurring & dissenting).   Nor could counsel have reasonably been unaware of the indefeasible right to defend life and liberty and the jury guarantees contained in the Pennsylvania Constitution.

297.   There can be no strategic reason for permitting the systematic exclusion from the venire of jurors whose views were indispensable to determining the contemporary values of the community. Counsel's failure to raise this issue constituted deficient performance.

298.   The jury selection practices in this case constituted structural error, as to which prejudice is presumed. But even if this were not so, as there is a reasonable probability that, but for counsel's failure, the composition of the jury would have been very different; the jury's deliberations would have been very different; and that

at least one juror would have voted to spare Mr. Hicks' life, prejudice is demonstrated and relief is warranted.

299.   To the extent that the above constitutional errors were preserved for appellate review, appellate counsel was ineffective for failing to raise this issue on direct appeal.  *See* Part II.E.  As demonstrated in Claim 24, appellate counsel raised just one issue on direct appeal, despite the fact that numerous potentially meritorious issues were preserved in the trial court.  There is a reasonable probability that, had appellate counsel performed effectively and litigated all potentially meritorious claims on direct appeal, including this claim, that the results of the appeal would have been different.  Relief is required.

## CLAIM 10.   AS A RESULT OF COUNSEL'S INEFFECTIVENESS, PROSECUTORIAL MISCONDUCT AND COURT ERROR, THE ADMISSION OF EXTENSIVE, GRAPHIC PHOTOGRAPHS AND REPLICAS OF BODY PARTS VIOLATED THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

300.   The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

### A. The Prosecution Presented Irrelevant, Graphic, Gruesome Evidence that was Unduly Prejudicial.

301.   This was a dismemberment case, in which Ms. Null's body was found in multiple severed parts, in multiple locations.  Some of her body parts suffered additional damage, beyond dismemberment, from being run over on the interstate or from animal activity.  *E.g.*, NT 11/05/14 at 194 (Trooper Doran testimony that the

lower portion of her torso appeared to have come into contact with a moving vehicle); NT 11/07/14 at 170 (Trooper Corrigan testimony that either a chipmunk or a mouse chewed her right hand).

302.   During their investigation, the Pennsylvania State Police took hundreds of photographs of the recovery of Ms. Null's body parts and hundreds of photographs at autopsy, of the individual parts, the parts re-assembled, and of various autopsy procedures.  These photographs were provided in pretrial discovery, and defense counsel were well-aware that the photographs would have a severe, prejudicial impact on the jurors.  *See* Motion and Memorandum of Law in Support of the Use Crime Scene Photos During Voir Dire of Prospective Jurors, 6/24/14.

303.   At the end of the first day of voir dire, the prosecution provided defense counsel with thumbnail photograph sheets of the photographs it planned to use at trial.  NT 10/27/14 at 205.  When defense counsel brought the photographs to the court's attention, the court suggested the parties speak to each other about what photographs would be used.  *Id.*

304.   At the conclusion of voir dire, the court inquired of the parties' conversation.  NT 10/31/14 at 176.  Defense counsel told the court he had been concerned because there were "40-plus pictures of just the head. . . . There were 40-plus pictures of each body part" in the thumbnail sheets.  *Id.* at 176-77.  Defense counsel's only objection was to the cumulativeness of this, and he stated that "three

131

pictures of each [body part] and then possibly pictures additionally as far as individual wounds is acceptable." *Id.* at 177.  Defense counsel did not explain to the court why they chose three, as opposed to none, one, two, or any other arbitrary number of photographs. Finding that cumulativeness was a question to be resolved during trial, the court encouraged the parties to continue talking to each other about the issue because "[if] they're not all individually relevant for some different issue, you may want to try and pare that down." *Id*. at 177-78.

305.   During trial, the defense conceded in opening statement that Mr. Hicks dismembered Ms. Null after her death.  *See* NT 11/05/14 at 61-62.  Despite this concession, the prosecution presented *hundreds* of photographs of Ms. Null's body parts as they were collected and at autopsy, a video of the evidence collection, and a life sized "model hand," through six different Commonwealth witnesses.  The Commonwealth also projected photographs of Ms. Null's body parts during most of closing argument.  The photographs were displayed, in color, larger than actual size, on a projector screen.  *Cf.* NT 11/05/14 at 85 (prosecution noting the need to "set up the screen" prior to Trooper Radziewicz's testimony).  The prosecution repeatedly blew up areas of the (already enlarged) photographs for the jury's view.  *E.g.*, NT 11/05/14 at 120, 193; NT 11/06/14 at 35-36.

306.   The first witness to present body part photographs to the jury was PSP Trooper Jody Radziewicz, who recovered body-part evidence from the highway and

attended the autopsy.  Trooper Radziewicz testified in detail, describing where each body part was recovered along the highway.  NT 11/05/14 at 91-94.  The court then admitted[25] CW Tr. Exhs. 1 & 1A, a CD containing one-hundred and one (101) photographs taken at the highway collection site and autopsy and a printed thumbnail sheet of the photographs on the CD.  NT 11/05/14 at 94-98.

307.   The Commonwealth then walked Trooper Radziewicz back through the testimony he had already given, describing where each body part was recovered while projecting photographs of the body parts on the big screen and displaying the garbage bags in which the body parts had been found.  Trooper Radziewicz described (and the jury saw) multiple photographs of each garbage bag and body part on the roadway; the actual bag collected as evidence; and then multiple pictures of each body part at autopsy.  *Id.* at 98-107, 112-73.

308.   The Commonwealth then took Trooper Radziewicz through the same testimony for a *third* time, using CW Tr. Exh. 22, raw video footage taken by television news station WBRE.  NT 11/05/14 at 175. As the Commonwealth played the highway video footage for the jury, Radziewicz narrated (sometimes pausing the video for emphasis), showing the location of the body parts yet again.  *Id.* at 175-77.

---

[25] The court told defense counsel if they had any objections to an individual photograph, they should object at the time the prosecution tried to introduce/present that particular photo, before it was put up on the projector screen for the jury to see. *Id.* at 97.  As discussed below, counsel failed to lodge a single objection.

309.   The Commonwealth's next witness was Trooper Sean Doran, who testified that he collected human tissue samples from the roadway and that he observed a portion of a female torso and a garbage bag with apparent human intestines.  NT 11/05/14 at 184-86.  The prosecution then admitted CW Tr. Exhs. 23 & 23A, containing nineteen (19) additional photos from the highway evidence collection.  *Id.* at 186-87.  The prosecutor then walked Trooper Doran back through the substance of his prior testimony, this time with color photographs displayed on the projector screen, including four photographs of the torso, lying in dirty snow on the side of the road, after it had been hit by a moving vehicle.  *Id.* at 187-94.  The photos added nothing to the Trooper's testimony, as even he conceded that one was "just another angle" of the torso that the jury had already seen.  *Id.* at 191-92.

310.   The prosecution closed out the first day by admitting CW Tr. Exh. 24, which was an entire CD of autopsy photographs. *Id.* at 197-98.

311.   The Commonwealth's gruesome evidentiary presentation continued on Day 2.  Forensic Pathologist Wayne Ross testified using yet another set of autopsy photographs that were admitted as CW Tr. Exhs. 36 & 36A.  NT 11/06/14 at 21-22. During Dr. Ross's testimony, the prosecution presented an additional seventy-three (73) photographs of Ms. Null's body parts at autopsy.  *See id.* (CD containing 101 photographs, 73 of which are of body parts).  Throughout Dr. Ross's presentation, the prosecutor exacerbated the prejudicial nature of the photographs by injecting

134

gratuitous commentary, such as prefacing a question with the phrase "in this unfortunate photograph." *Id.* at 33.

312.   During the third day of trial, Trooper Corrigan testified about the collection of evidence at Mr. Hicks' home, including the discovery of Ms. Null's hands in a plumbing chase.  Trooper Corrigan brought a demonstrative exhibit to court, CW Tr. Exh. 57, which was a model hand wrapped in the same manner they found Ms. Null's hands.  Using the model, Corrigan stepped down from the witness stand to show what it was like when the police found the hands, unwrapping them layer by layer until the hand was revealed. NT 11/07/14 at 154-68.

313.   Following this demonstration, Trooper Corrigan repeated the exact same facts, this time explaining how the hands were wrapped while the prosecution projected several color photographs of the actual hands and their wrappings for the jury.  *Id*. at 169-78; CW Tr. Exh. 49 & 49A.  And then (exactly as he did with Trooper Radziewicz and the highway evidence), the prosecutor walked Corrigan through the same testimony about the collection of the hands *for a third time*, this time showing the jury CW Tr. Exh. 49B, which contained a photograph of the plumbing chase; individual photographs of each hand as it was originally wrapped; individual photographs of each hand unwrapped; and individual photographs of the newspaper in which the hands had been wrapped.  NT 11/07/14 at 179-82.

314.    Finally, PSP Trooper VanLouvender testified about many of the same things to which the prior witnesses testified, except from the perspective of the investigating detective, as opposed to the crime scene investigator.  Through Trooper VanLouvender, the prosecution introduced even more photographs of Ms. Null's body parts.  *See* CW Tr. Exh. 96 & 96A; NT 11/10/14 at 92-93 (containing additional photographs of Ms. Null's head in the snow by the highway and her body being pieced back together at autopsy).

315.    The prosecution then repeatedly projected the gruesome photographs in closing argument.  *E.g.*, NT 11/14/17 at 60-63 (projecting photographs of Ms. Null's reconstructed body from CW Tr. Exh. 96A); *id.* at 63-64 (projecting photograph 155 from CW Tr. Exh. 1A, a photograph of her severed feet); *id.* at 64 (projecting photograph of part of her arm, presumably photograph 188 from CW Tr. Exh. 1A); *id.* at 64 (projecting photograph of part of her leg, 3052); *id.* at 64 (projecting two photographs of her arm, 170 and 172); *id.* at 65 (projecting photographs 172 and 184, part of her arm and part of her leg); *id.* at 72-73 (projecting photographs of her hands); *id.* at 86 (projecting autopsy photograph of Ms. Null's head); *id.* at 87-88 (projecting autopsy photograph of her head and skull); *id.* at 89-90 (projecting photograph of her upper torso, which he describes as "a horrible photo, but I have to show it to you"); *id.* at 91 (projecting photograph of her left flank).

**B.** **Exposing the Jury to the Patently Irrelevant, Graphic Photographs, Video, "Fake Hands," and Testimony Violated Pennsylvania Law and the Sixth, Eighth, and Fourteenth Amendments.**

316. Clearly established federal due process and Sixth Amendment law require that a jury verdict be based on credible, relevant evidence and when a defendant is on trial for his life, the Eighth Amendment requires the Commonwealth to channel the jury's discretion by clear and objective standards. Part II.A.; Part II.B. A death sentence that is based on extraneous evidence or arguments that are outside the scope of applicable law is arbitrary and capricious. *Id.* Moreover, Mr. Hicks had a clearly established state and federal constitutional right to a fair and impartial jury that could hold the prosecution to its burden of proof at both the guilt and penalty phases and that could and would give meaningful consideration to the defense mitigation evidence and a life verdict. *See* Part II.F.; Claims 5, 10.

317. The sole purpose of this evidence was to provoke a first degree murder verdict and death sentence on the basis of the jury's revulsion as opposed to competent, reliable evidence. As described in Claim 5.A., scientific and sociological studies have quantified the powerful effect that graphic photographs or videotapes can have on particular jurors. The studies indicated that mock jurors exposed to graphic photographs were twice as likely to convict; likely to hold the prosecution to a lesser burden of proof; and experienced significantly more intense emotional responses, including great anger at the defendant. *Id.* The studies also indicated that

actual jurors exposed to graphic photographs or videos were inclined to make up their mind about punishment *simultaneously* with their decision to convict. *Id.*

318.   The photographs and videos had precisely the effect on Mr. Hicks' jurors that the studies predicted.  After the first day of trial, when the prosecution's gruesome evidentiary presentation had only just begun, the Pocono Record published a story titled: *Gruesome photos shown on Day 1 of murder/dismemberment trial*, Pocono Record, Nov. 7, 2014.  Reporter Scott noted: "Those in the courtroom had been warned in advance about the grisly pictures taken of a Scranton mother's dismembered remains, which were found dumped in drawstring trash bags scattered along interstates 380 and 80 one morning in January 2008. *Yet, despite the warning, the five male and 11 female jurors could barely contain their horror behind neutral facades when viewing a projected slide show of these pictures* Wednesday, the first day of trial for Charles Hicks Jr. . . ."

319.   As there is no question that flooding the jury with graphic photos/videos of body parts, police reconstructions, and police simulations directly impacted the jury's ability to render a fair and impartial verdict on the basis of competent, reliable evidence as opposed to emotion, passion and prejudice in violation of the Sixth, Eighth and Fourteenth Amendments, relief is warranted.

## C.     Counsel were Ineffective.

320.   Counsel's failure to raise, litigate, or even make a complete record of the unconstitutional admission of this evidence constituted prejudicially deficient performance.  *See* Part II.E.  Counsel were well-aware that the photographs would be a defining issue in this case.  *See* Motion and Memorandum of Law in Support of the Use Crime Scene Photos During Voir Dire of Prospective Jurors, June 24, 2014. In fact, the court *invited* counsel to object under Rule 403 for undue prejudice in its order denying the defense request to use the photographs during voir dire.  *See* Opinion, October 9, 2014 at 30.  Yet, counsel wholly failed to advocate for keeping the photographs out.

321.   Counsel failed to lodge a single objection to the prosecution's admission and presentation of photographs, video, and demonstrative exhibit during trial -- not to the size, not to the color, not to the method of presentation, not to the duration of presentation, not to the sheer number of pictures that were displayed, not to the relevance, not to the undue prejudice, and not to the cumulative repetitiveness of the displays.  As the defense conceded abuse of a corpse (the only issue relevant to the post-mortem dismemberment), the overwhelming majority of the photographs presented were simply irrelevant to any disputed issue before the jury.

322.   Nor did defense counsel object when the prosecution used the photographs during closing argument. Nor did they object to numerous photographs going back to the jury during its deliberations. *See* NT 11/14/14 at 135.

323.   Nor did counsel ensure an adequate record about the photographs' use for appellate or post-conviction review.  Although the record is relatively clear about when each photograph was first put on display, the record is silent about when the projected photographs were removed from the jury's view.  Upon information and belief, Mr. Hicks expects to demonstrate that there were instances where photographs were permitted to stay visible on the screen even after the witness had moved on to a different area of testimony.

324.   No one disputed that Ms. Null was dismembered.  In fact, the defense conceded abuse of a corpse.  The prosecution could have easily presented its case without the use of these photographs through descriptive testimony.  The prosecution practically conceded as much when it first walked its witnesses through their descriptive testimony without any demonstrative aids at all.  To the extent any photographs may have been, in fact, deemed admissible by the court after considering all available defense objections and argument, the prosecution could have been limited to using only black and white photographs and/or photographs that were appropriately cropped to show only the admissible portions to protect Mr. Hicks' state and federal constitutional rights.  Mr. Hicks was prejudiced.  Although

counsel failed to make any record regarding the jury's reaction to this gruesome evidence, the Pocono Record did.  *See* ¶ 321.

325.   Counsel's failure to fully and adequately raise and preserve the constitutional errors arising from the admission of this evidence constitutes deficient performance.  As there is a reasonable probability that had counsel performed effectively the evidence would have been excluded, prejudice is demonstrated.

326.   As these claims arise under the rubric of trial counsel's ineffectiveness, appellate counsel was precluded from raising the above-described claims on direct appeal.  *See Grant*, 813 A.2d at 738. To the extent counsel could have or should have raised these claims on direct appeal, counsel was ineffective. *See* Part II.E.

## CLAIM 11.   THE ADMISSION OF OTHER CRIMES EVIDENCE VIOLATED THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

327.   The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

### A. Introduction.

328.   Because of the recognized risk that a jury will consider such evidence as a basis for concluding that an accused is a person of bad character and, at the time of the offense for which he is on trial, acted in conformity with that bad character, "other crimes" evidence is generally inadmissible except in limited circumstances.

329.   Under Pennsylvania's Rules of Evidence 404(b)(1), other crimes or bad acts character evidence is not admissible to show the accused "acted in accordance

with the character."  Such evidence is only admissible for the limited purpose of showing: "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Pa.R.E. 404(b)(2).  Notice of intent to admit other crimes evidence is required (Pa.R.E. 404(b)(3)), and once the court deems such evidence admissible, the accused is entitled to "an immediate and complete cautionary or limiting instruction to the jury explicitly instructing the jury as to the limited purposes for which the evidence was deemed admissible." *Commonwealth v. Billa*, 555 A.3d 835, 841-42 (Pa. 1989); *see also* Pa.R.E. 404, comment ("When evidence is admitted for this purpose, the party against whom it is offered is entitled, upon request, to a limiting instruction").

330.    Indeed, Due Process requires that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof – defined as evidence necessary to convince a trier of fact beyond reasonable doubt of the existence of every element of the offense." *Jackson*, 443 U.S. at 316; *see also* Part II.B.

331.    That right is also protected by the Sixth Amendment right to a jury determination of the facts and application of the law to those facts in reaching its verdict.  *See* Part II.B.  Similarly, the Eighth Amendment requires the State to channel the sentencer's discretion by clear and objective standards.  *See* Part II.A.

332.    "A concomitant of the presumption of innocence is that a defendant must be tried for what he did, not for who he is." *United States v. Myers*, 550 F.2d

1036, 1044 (5th Cir. 1977). *See also Shaffner v. Commonwealth*, 70 Pa. 60, 65 (1872) ("It is not proper to raise a presumption of guilt, on the ground, that having committed one crime, the depravity it exhibits makes it likely he would commit another. Logically, the commission of an independent offence is not proof, in itself, of the commission of another crime"). "Recognition to the prejudicial effect of prior-convictions evidence has traditionally been related to the requirement of our criminal law that the State prove beyond a reasonable doubt the commission of a specific criminal act." *Spencer v. Texas*, 385 U.S. 554, 576 (1967) (Warren, C.J., dissenting). *See also Estelle v. McGuire*, 502 U.S. 62, 76 (1991) (O'Connor, J., concurring in part, dissenting in part) (would have held that jury instruction involving evidence of prior crimes was error because it "may have relieved the State of its burden of proving the identity of [the] murderer beyond a reasonable doubt").

333. "The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime." *Michelson v. United States*, 335 US 469, 475-76 (1948). Fundamental fairness prohibits the admission of "extrinsic acts that might adversely reflect on the actor's character, unless that evidence bears upon a relevant issue in the case such as motive, opportunity or knowledge." *Huddleston v. United States*, 485 U.S. 681, 685 (1988).

334.   "The concern is with any pronounced tendency of evidence to lead the jury, often for emotional reasons, to desire to convict a defendant for reasons other than the defendant's guilt." *United States v. Lachman*, 48 F.3d 586 (1st Cir. 1995). Once the jury has heard evidence of prior crimes, "it is most difficult, if not impossible, to assume continued integrity of the presumption of innocence. A drop of ink cannot be removed from a glass of milk." *Gov't of the Virgin Islands v. Toto*, 529 F.2d 278, 283 (3d Cir. 1976). "The naive assumption that prejudicial effects can be overcome by instructions to the jury, . . . all practicing lawyers know to be unmitigated fiction." *Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring) (citations omitted). Indeed,

> [o]nce prior bad acts of the accused are introduced in evidence and handed over to the jury for review, the realistic prosecutor, defense counsel, and trial judge know that the jury will use that bad character evidence to reason that the accused is a person of bad character or predisposition, and ought to be convicted of the present offense because of his prior history. The usual limiting instruction certainly makes the cold-type record look better to a reviewing court, but the efficacy of such an instruction has been questioned by professors and judges for decades. . . .

Reed, *Admitting the Accused's Criminal History: The Trouble With Rule 404(b)*, 78 Temp. L.Rev. 201, 250 (2005) (footnote omitted). *See also* Greene & Dodge, *The influence of prior record evidence on juror decision making*, 19 Law & Hum. Behav. 67-78 (1995); Wissler & Saks, *On the Inefficacy of Limiting Instructions: When*

*Jurors Use Prior Conviction Evidence to Decide on Guilt*, 9 Law & Hum. Behav. 37 (1985).

335.   The prosecution admitted a plethora of "other crimes" evidence:  some with the permission of the court, some not; some with a limiting instruction, some not; and some that the prosecution asked the jury to consider as a basis for concluding that Mr. Hicks acted in conformity with the prior bad acts or for other improper purposes in violation of the Sixth, Eighth and Fourteenth Amendments.

### B.   The Other Crimes/Bad Acts Evidence.

#### 1.  Other bad acts evidence the prosecution noticed.

336.   Prior to trial, the prosecution noticed its intent to introduce testimony from women whom Mr. Hicks had allegedly assaulted in the past.  *Hicks-1*, 156 A.3d at 1119.  Mr. Hicks filed a Motion to Exclude and, following the prosecution's proffer of the testimony, the court ruled the Commonwealth could present testimony from three women, Kim Alston, Karen Lovell, and Misty Chavez, but excluded testimony from four others, Cheryl Phillips, Lakisha Muhammad a/k/a Lakisha Washington, Sheinina Hicks, and Suzanna Downing as cumulative.  *Hicks-1*, 156 A.3d at 1119.  The prosecution filed an interlocutory appeal and Mr. Hicks cross-appealed.  Ultimately, the Pennsylvania Supreme Court held that it was premature to exclude evidence pretrial based on cumulativeness.  *Hicks*, 91 A.3d at 55.

337.   On remand, Mr. Hicks filed a new motion to exclude.  On October 9, 2014, the trial court granted the motion to exclude testimony from Downing, but concluded that the proffered testimony from Alston, Lovell, Chavez, Phillips, Washington, and Sheinina Hicks was admissible.  *Hicks-1*, 156 A.3d at 1120.

338.   At trial, the defense conceded Mr. Hicks' guilt of abuse of a corpse and tampering with evidence for dismembering and disposing of Ms. Null's body. NT 11/05/2014 at 61. Thus, the jury was left only to resolve whether Mr. Hicks caused Ms. Null's death and, if it determined that he did, the degree of homicide.  The primary factual dispute underlying the resolution of these questions was whether Ms. Null's death was caused by strangulation, head-severance, a combination of the two, or by an accidental drug overdose, after which Mr. Hicks panicked and disposed of her body.  *See* Claim 15; *see also* NT 11/06/2014 at 14-146; NT 11/12/2014 at 5-83.

339.   The prosecution presented other crimes evidence from three witnesses: Alston, Washington, and Chavez.  *Hicks-1*, 156 A.3d at 1120.  The prosecution first called Ms. Alston.  NT 11/6/14 at 184.  Although controlling precedent required the court to issue a limiting instruction at the time of the testimony (*see, e.g., Commonwealth v. Wright*, 202 A.2d 79, 82 (Pa. 1964)), the court failed to provide any instruction when Ms. Alston testified.  NT 11/6/14 at 184; NT 11/7/14 at 59-60 (noting that no limiting instruction had been provided with Alton's testimony).

146

340.   Ms. Alston testified that she was partying with Mr. Hicks in Virginia in 2006. They were using crack-cocaine and got into an argument over money that he owed her. Mr. Hicks choked her and she lost consciousness. When she came to, they were naked on the bed and Mr. Hicks had the pocketknife from her purse that he held to her throat. She was eventually able to escape. *Hicks-1*, 156 A.3d at 1121. Ms. Washington and Ms. Chavez both testified the following day, on November 7, 2014. The trial court provided limiting instructions prior to both of their testimonies, instructing the jury that the evidence of prior bad acts may only be used to infer lack of accident or intent.  NT 11/7/14 at 59-60, 88.

341.   Ms. Washington testified that one day in 2003 she was smoking crack in a Fort Worth, Texas hotel room with Mr. Hicks and another man.  She ended up alone with Mr. Hicks in the room, where they continued to smoke crack.  Ms. Washington felt sick and needed heroin, which Mr. Hicks took her to buy. After using the heroin, she was in and out of consciousness until she woke up, with Mr. Hicks, parked in his truck on someone else's property. After performing a sex act, they returned to the highway where they fought over the direction in which Mr. Hicks was driving.  Ms. Washington testified that he grabbed her by the back of the neck, said "fine, you drive," and then allowed her to drive.  Ms. Washington drove back to the hotel, where Mr. Hicks threatened to run her over if she got out of the truck. She got out anyway and police were summoned. *Hicks-1*, 156 A.3d at 1121.

147

342.   Ms. Chavez testified that she was in a relationship with Mr. Hicks sometime around 2002 or 2003 in Fort Worth.  One day, she was riding in Mr. Hicks' truck when they got into an argument over the fact that she had purchased drugs from someone else. According to Ms. Chavez, while he was driving down the highway, Mr. Hicks came across the center console at her and used both of his hands to grab her around the neck and choke her.  When she tried to escape the moving truck, he threatened to kill her, so she stayed inside. They went back to his apartment where he appeared to calm down, told her he was sorry, cleaned the blood off of her neck, and told her that he was sick and that he had done this before. She ended their relationship. About a year later, she received a call from Mr. Hicks in which he stated: "Misty, I hurt her." Ms. Chavez testified that she heard screaming in the background during the call. *Hicks-1*, 156 A.3d at 1121-22.

343.   The admission of this testimony occurred over the course of two of the three days of the prosecution's case-in-chief, interspersed between the prosecution's admission of graphic photographs of the victim's body parts.  During closing, the prosecution argued that the jury conclude that Mr. Hicks acted in conformity with the bad acts evidence in determining whether or not he was guilty of first degree murder.  *See* NT 11/14/14 at 76 (arguing that he acted the same as the incident with Ms. Chavez).  The prosecution also argued that the jury should consider the prior bad acts evidence as evidence of "ill will towards the victim in this case" (NT

11/14/14 at 111), a patently impermissible basis for considering that testimony. Counsel did not object and the court failed to provide any curative instructions.  *Id.*

### 2. Other crimes/bad acts evidence admitted without objection, court determination, or limiting instruction.

344. During Trooper VanLouvender's testimony about the police interrogation of Mr. Hicks, the prosecution elicited a variety of other crimes evidence, including assaults against women.  The prosecution specifically asked the Trooper if the police had asked Mr. Hicks whether he was violent towards women when he used crack cocaine.  NT 11/10/2014 at 143.  In response, VanLouvender indicated that the police questioned Mr. Hicks "about his criminal history," and that "[a]t that time, we only had his rap sheet which listed his arrests. We didn't have the results of the investigations that had been conducted."  *Id.*  The Trooper continued:

> He had told us that in Virginia -- or that there had been an incident with his wife where he ended up getting cut, that he had been stabbed. He said the charges were dropped in that situation. We asked him about arrests in Texas. He told us that he had been in an incident where someone tried to rob him but that person turned it around and said that they were being robbed by the Defendant. And he said that there was another incident where he was in a house and a guy and a girl had taken his wallet. And we asked him if he had ever been involved in any type of sexual assaults, and he replied -- had he ever been arrested for them, and he replied no.

*Id.  See also* CW Tr. Exh. 102 &102A.

345.   Counsel was clearly on notice pretrial that the prosecution would likely seek to admit the contents of Mr. Hicks' statements to the police.  Nevertheless,

counsel failed to move pretrial to preclude the prosecution from presenting testimony about those aspects of the statements that included other crimes/bad acts and/or request that those aspects of the statements be redacted.

346.   During his cross of Trooper Sebastianelli, counsel remarkably elicited even more bad acts evidence of drug use/possession.  NT 11/10/2014 at 188-89.

347.   Thus, the jury was informed that the police had a list of multiple arrests above and beyond the testimony provided by Ms. Chavez, Ms. Alston and Ms. Washington that spanned more than one state and involved assaults – and possibly rape – against other women.   Counsel did not object to the admission of this testimony, nor did counsel request an immediate limiting instruction.  *Id.*

### C.   The Admission of Other Crimes/Bad Acts Evidence Violated the Sixth, Eighth and Fourteenth Amendments.

348.   The admission of the bad acts evidence created the very real risk that the jury convicted Mr. Hicks – not on the basis of proof beyond a reasonable doubt that he committed the murder in this case – but instead, "because Hicks had acted violently toward three women in the past, he was therefore capable of, and would have a propensity to commit, the far more extensive, brutal and ultimately fatal acts of violence perpetrated on the victim in this case, several years later." *Hicks-1*, 156 A.3d at 1156 (Donohue, J. dissenting).

349.   The only thing demonstrated by the Commonwealth's prior bad act evidence was that Mr. Hicks had a bad character, reflected in a propensity for non-

150

fatal violence against women in situations involving drug use. There was no logical nexus between the alleged acts of non-fatal violence and the primary question of fact before the jury in this case.

350.   Each of the assaults were different from one another and different from what the prosecution alleged occurred in this case. Ms. Alston testified that in 2006, four years before the murder in this case, in Hampton Virginia, Mr. Hicks choked her until she lost consciousness; threatened her with his gun, her knife and a glass table; and that he raped her. She was not a prostitute and this was not a case of sex in exchange for drugs. NT 11/6/14 at 184–200. *See also Hicks-1*, 156 A.3d at 1155 (Donohue, J. dissenting).

351.   Ms. Washington's incident occurred in 2003 in Fort Worth, Texas. She was a prostitute and this was an isolated incident of sex in exchange for drugs in which Mr. Hicks purportedly assaulted her. There were no threats with a gun, knife or glass table; instead Mr. Hicks allegedly grabbed her by the throat while they were in his room, and by the back of the neck while they were in a car. Unlike Ms. Alston, Ms. Washington did not lose consciousness and was able to drive the car. He threatened to run her over if she left the car, but did not do so when she did. NT 11/7/14 at 60-86. *See also Hicks-1*, 156 A.3d at 1155 (Donohue, J. dissenting).

352.   Ms. Chavez was also a prostitute but contrary to the circumstances with Ms. Washington, she had been seeing Mr. Hicks a few times a week over the course

of three to five months in Arlington, Texas in 2002 or 2003.  Unlike the incidents with Ms. Washington and Ms. Alston, Mr. Hicks was not using drugs at the time of the incident with Ms. Chavez.  The specific incident occurred in the car when Mr. Hicks grabbed Ms. Chavez by the neck.  She felt faint but did not lose consciousness. He did not brandish any weapons during the purported assault and although Mr. Hicks threatened to kill her, he subsequently pulled off the road and calmed down, ultimately apologized and took her to his home to clean up.  NT 11/7/14 at 86–106. *See also Hicks-1*, 156 A.3d at 1155 (Donohue, J. dissenting).

353.   Thus, the incidents were not temporally or geographically similar to each other or the murder in this case, and involved circumstances that contained more differences than similarities.  Indeed, as Justice Donohue concluded in dissent, the testimony was "indicative of nothing more than a pattern of violent behavior," *Hicks-1*, 156 A.3d at 1156, precisely the type of propensity evidence that is prohibited by clearly established federal due process law.

354.   The same constitutional flaws exist with regard to the other bad acts testimony elicited during Troopers VanLouvender's and Sebastianelli's testimony. There were no detailed proffers provided indicating any similarity to the circumstances of the murder in this case justifying admission under Rule 404 and the constitutional standards.  The combination of the improper testimony by Ms.

Alston, Ms. Washington and Ms. Chavez and this testimony suggesting the existence of other assaults against women violated clearly established federal due process.

355.   Nor can the admission of this evidence be deemed non-prejudicial. There were no witnesses to Ms. Null's death and, other than the forensically flawed testimony regarding the nature of the injuries suffered by the victim (*see* Claim 15), very little to dispute the defense theory that Ms. Null died as a result of an accidental overdose.  The prosecution used the improper bad acts testimony to fill the gaps in the prosecution's case.  NT 11/14/14 at 76, 111.  As there is a reasonable probability that the jury would have acquitted Mr. Hicks had it not been exposed to this constitutionally prohibited evidence, prejudice is demonstrated and relief is required.

### D. Counsel's Failure to Request and the Court's Failure to Provide Immediate, Proper Instructions Appropriately Limiting the Jury's Consideration of the Other Crimes/Bad Acts Evidence.

356.   Under Pennsylvania law, the court is required, upon request, to "give an immediate and complete cautionary or limiting instruction to the jury explicitly instructing the jury as to the limited purposes for which the evidence [of other crimes/bad acts] was deemed admissible."  *Billa*, 555 A.2d at 841-842; *see also Wright*, 202 A.2d at 82; *Commonwealth v. Claypool*, 495 A.2d 176 (Pa. 1985) (because of "the potential for misunderstanding on the part of the jury" when other crimes evidence is admitted, "such evidence must be accompanied by a cautionary

instruction which fully and carefully explains to the jury the limited purpose for which that evidence has been admitted").

357.   The failure to timely and properly instruct on other crimes/bad acts evidence also violates the clearly established federal due process "right to a verdict based solely upon the evidence and the relevant law," *Chandler*, 449 U.S. at 574; Sixth Amendment right to a jury determination of the applicable facts and law, *Gaudin*, 515 U.S. at 514; Eighth Amendment requirement that the state channel the sentencer's discretion by clear and objective standards in capital cases, *Godfrey*, 446 U.S. at 428; and Fourteenth Amendment life and liberty interest in procedures established by state law, *Hicks*, 447 U.S. at 346; *Evitts*, 469 U.S. at 393.

358.   The court both failed to issue immediate cautionary instructions at the time evidence of other crimes/bad acts was admitted and provided an inadequate instruction at the close of the evidence that failed to sufficiently narrow the jury's consideration of the evidence.  Counsel both failed to request immediate instructions and failed to object to the court's inadequate instructions.

359.   Although the court allowed the prosecutor to include references to the other crimes/bad acts evidence in his opening (over defense objection), it failed to provide an immediate cautionary instruction to the jury as to the limited use for this evidence.  *See* NT 11/5/14 at 54-55.  Nor did the court issue an immediate cautionary instruction at the time of Ms. Alston's testimony, NT 11/6/14 at 184, or the testimony

of Troopers VanLouvender, NT 11/10/14 at 143, and Sebastianelli, NT 11/10/14 at 188-89. As a result, the jury was left with the impression that it was free to consider this as evidence of Mr. Hicks' character in order to establish that he acted in conformity with that character on the date of the offense in direct violation of Rule 404(b) and clearly established federal constitutional law.

360.   The day after Ms. Alston testified, the prosecution presented Ms. Washington and Ms. Chavez. NT 11/7/14 at 60 (Washington); 88 (Chavez). Prior to Ms. Washington's testimony, the court did give a limiting instruction indicating that as to Ms. Alston's and Ms. Washington's testimony, this evidence "can be used only to prove an absence of accident or mistake on this occasion in this case and as evidence of Mr. Hicks' intent and motive" (NT 11/7/14 at 59), but "may not and must not use this evidence to infer that Mr. Hicks is a person of bad character or criminal propensity from which you might infer guilt," *id.* at 60, but did not mention either Ms. Chavez or the police testimony describing additional other crimes/bad acts evidence. Having instructed as to the limiting effect of some of the testimony but not all of the evidence, the court left the jury with the clear impression that it could consider the other testimony as propensity character evidence.

361.   In its closing charge, the court gave an other crimes/bad acts instruction but specified that it was applicable to the testimony of Ms. Alston, Ms. Washington, and Ms. Chavez and did not mention the police testimony describing additional other

155

crimes/bad acts.  NT 11/14/14 at 111.  Once again, having been told the limitation applied to only some of the testimony, there is more than a reasonable probability that the jury understood that to mean it did not apply to the rest of the evidence.

362.  In addition, in its final charge, the court told the jury that it could consider the testimony as evidence of "ill will towards the victim in this case."  *Id.* There is no provision in the rule allowing the jury to apply other crimes/bad acts testimony as evidence of the accused's "ill will towards the victim."  *See* Pa.R.Evid. 404(b)(2).  While common law precedent allowed for such an exception, that exception was designed for, and consistently applied, only in instances where there is a prior history of violence (or threats or attempts) between the defendant and *the victim in that case*.  *See Com. v. Ulatoski*, 371 A.2d 186, 190-91 (Pa. 1977); *Com. v. Martin*, 387 A.2d 835, 837-38 (Pa. 1978); *Com. v. Glass*, 405 A.2d 1236, 1240-41 (Pa. 1979); *Com. v. Stallworth*, 781 A.2d 110, 118 (Pa. 2001); *Com. v. Chamberlain*, 30 A.3d 381, 419-20 (Pa. 2011); *Com. v. Johnson*, 42 A.3d 1017, 1027 (Pa. 2012).

363.  General ill will directed toward people other than the victim is nothing more than character and criminal propensity evidence – the precise thing Rule 404(b) intends to prevent.  If not limited to the particular victim, "ill will" would serve as an amorphously broad exception that would swallow the non-propensity/non-character rule.  Here, there was no history of violence between Mr. Hicks and Ms. Null.  Erroneously instructing the jury that they could infer "ill will" served only to

confuse the issues, misapply the law, and imply, without any supporting evidence, that an abusive or violent relationship had existed between Mr. Hicks and Ms. Null.

364.   The instructions were untimely, confusing, contrary to controlling precedent and violated the Sixth, Eighth and Fourteenth Amendments.  As there is a reasonable probability that the jury applied the instructions in a manner that determined guilt on the basis of propensity evidence, relief is required.

### E.   Counsel were Ineffective.

365.   Counsel's failure to move pretrial to preclude the prosecution from presenting aspects of Mr. Hicks' statement that involved other crimes/bad acts, their failure to raise and litigate each of the reasons described above as bases to preclude the testimony of Ms. Alston, Ms. Washington and Ms. Chavez at trial and on appeal; their failure to request immediate and adequate limiting instructions; and their failure to object to the admission of the additional bad acts evidence constitutes prejudicially deficient performance.  As it was counsel's defense theory to preclude this evidence, counsel can have no reasonable strategic basis for failing to fully and adequately raise and litigate all legal reasons to exclude the evidence at trial and on appeal.  As described above, as the jury was permitted to consider propensity evidence as a basis for concluding that Mr. Hicks acted in conformity with that bad acts evidence, prejudice is demonstrated and relief is required.

366.   Direct appeal counsel was precluded from raising the above-described claims of ineffective assistance of counsel on direct appeal. *See Grant*, 813 A.2d at 738. To the extent that counsel could have raised the above-described errors on direct appeal under controlling precedent and procedure, counsel's failure to do so constitutes ineffective assistance in violation of the Sixth, Eighth and Fourteenth Amendments.  Because there is a reasonable probability that the results of Mr. Hicks' appeal would have been different had counsel raised the palpable denial of his constitutional rights, prejudice is demonstrated and relief is required.

## CLAIM 12.   MR. HICKS' TRIAL COUNSEL PERFORMED INEFFECTIVELY DURING PLEA NEGOTIATIONS IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

367.   The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

### A. Failure to Competently Advise Mr. Hicks About the Plea Offer.

368.   "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it.  If that right is denied, prejudice can be shown if loss of the plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence." *Lafler v. Cooper*, 132 S.Ct. 1376, 1387 (2012).

369.   Counsel in a capital case has a duty to "make every appropriate effort to establish a relationship of trust with the client" and to effectively communicate

with his client "concerning all matters that might reasonably be expected to have a material impact on the case, such as . . . potential agreed-upon dispositions of the case." 2003 ABA GUIDELINES, *Guideline 10.5 – Relationship With The Client*, 31 HOFSTRA L. REV. 913, 1005-06. The *Commentary* to the Guidelines spotlights a key obstacle to this of which capital counsel must be aware: "[m]any capital defendants are . . . severely impaired in ways that make effective communication difficult: they may have mental illnesses or personality disorders that make them highly distrustful or impair their reasoning and perception of reality; . . . or they may be in complete denial in the face of overwhelming evidence." *Id.*, *Commentary, The Problem*, at 1007. "Establishing a relationship of trust with the client is essential . . . to ensure that the client will listen to counsel's advice on important matters such as whether to testify and the advisability of a plea. . . . [A] client will not – with good reason – trust a lawyer who visits only a few times before trial . . .. It is also essential to develop a relationship of trust with the client's family or others on whom the client relies for support and advice." *Id.*, *Commentary*, *Counsel's Duty*, at 1008. To "[o]vercom[e] barriers to communication and establish [the] rapport with the client . . . critical to effective representation," the Guidelines stress "the need to obtain vital information" about the client. *Id.* at 1009.

370. Capital defense counsel's duty to seek a plea agreement beneficial to their client, (*id.*, *Guideline 10.9.1 – The Duty to Seek an Agreed Upon Disposition*,

at 1035), also includes a duty to "fully explain . . . the legal, factual, and contextual considerations that bear upon the decision" of whether to accept a plea offer. *Id.*, *Guideline 10.9.1(B)*. The *Commentary* notes "counsel does need to have thoroughly examined the quality of the prosecution's case and investigated possible first-phase defenses and mitigation"[26] and that "[i]n some cases, where there is a viable first-phase defense, it may be possible to negotiate a plea to a lesser charge." *Id.* at 1041.

371.   The *Commentary* explicitly recognizes the interplay between counsel's duty to seek a plea and his duty to establish a relationship of trust with his client: "In addition to persuading the prosecution to negotiate a resolution to the case, counsel must often persuade the client as well. As discussed in the commentary to Guidelines 10.5 and 10.9.2, a relationship of trust with the client is essential to accomplishing this. The entire defense team must work from the outset of the case with the client

---

[26] *See also* ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION, Standard 4-5.1(a) Advising the Accused, *in* ABA Standards for Criminal Justice: Prosecution and Defense Function (3d ed. 1993) ("After informing himself or herself fully on the facts and the law, defense counsel should advise the accused with complete candor concerning all aspects of the case . . .."); ABA STANDARDS FOR CRIMINAL JUSTICE: PLEAS OF GUILTY, Standard 14-3.2(b) (3d ed. 1999) ("Responsibilities of Defense Counsel") ("To aid the defendant in reaching a decision, defense counsel, after appropriate investigation, should advise the defendant of the alternatives available and address considerations deemed important by defense counsel or the defendant in reaching a decision. Defense counsel should not recommend . . . acceptance of a plea unless appropriate investigation and study of the case has been completed.").

and others close to him to lay the groundwork for acceptance of a reasonable resolution." *Id.* at 1042-43.

372.   The Guidelines also explicitly state that the principles apply to negotiated resolutions that impact criminal legal liability in other jurisdictions *Id.*, *Guideline 10.9.1(B)(8)(h) & (9)(h).*   Finally, they specify that, "[e]xcept in unusual circumstances, all agreements that are made should be formally documented between the parties concerned . . .." *Id.* at 1042.

373.   Upon information and belief, Mr. Hicks expects to demonstrate at a hearing that, from the beginning, the Commonwealth offered to resolve this case for a sentence of life imprisonment without parole in exchange for a guilty plea to first degree murder in Ms. Null's death.   *See* NT 11/17/14 at 125.

374.   After the jury found Mr. Hicks guilty of first-degree murder, the possibility of an agreed upon disposition for a life sentence remained on the table. *See* NT 11/17/14 at 124-25.   Following the first day of evidence at the penalty hearing, Mr. Hicks met with investigating authorities from Texas and Pennsylvania. *See Jury sentences Hicks to death*, Pocono Record, Nov. 19. 2014; *Prosecutors offered Hicks a deal to avoid death penalty*, Times-Tribune, Nov. 20, 2014.   Upon information and belief, the prosecutors in this case and the Texas Rangers had agreed not to pursue the death penalty against Mr. Hicks in exchange for information about Ms. Null's homicide and homicides in Texas.   Upon information and belief, the deal

did not come to fruition when the prosecution and/or Texas Rangers determined that they were not satisfied with the information Mr. Hicks provided in his proffer.

375.   Despite the fact that everyone concerned was well-aware, from shortly after Mr. Hicks' arrest, that Texas authorities were investigating Mr. Hicks and despite the fact that Texas law enforcement had attempted to talk to Mr. Hicks several times prior to his November 2014 trial, the defense team was completely unprepared to represent their client in these negotiations either pretrial or during trial.  Reasonably competent counsel should have anticipated that a global resolution of the instant case and cases in other jurisdictions was a possible negotiated outcome for Mr. Hicks and should have been investigating and preparing their client for that possibility.  Having not done so, when the possibility of a global resolution was offered by the prosecutor and Texas law enforcement, reasonably competent counsel would have requested a continuance so that they would have the time to adequately investigate and counsel their client on the pros and cons of such a resolution.  Counsel failed to do so, and what happened next fell below all objective standards of representing a criminal defendant in plea negotiations and/or a proffer.

376.   Following full discovery and an evidentiary hearing, Mr. Hicks expects to demonstrate counsel were ineffective when they:  failed to secure any agreement from Texas *prosecutors*, instead relying on non-binding assurances of the Texas Rangers detectives; failed to secure any agreement in writing (with either Texas or

Pennsylvania) that would define the parameters of Mr. Hicks' proffer or the expected concessions from the government; failed to request any discovery regarding the offenses in other jurisdictions that would have been necessary to competently investigate, assess the prosecution's case, and advise their client; failed to secure the assistance of a Texas *lawyer* to advise their client about the ramifications in Texas of this proffer; failed to fully advise their client about the rights he was potentially giving up; and failed to fully advise their client of collateral consequences.

377.   Counsel's failure to take these steps prevented them from providing reasonably competent representation and would have prevented any reasonable client from being able to trust that they were advocating for him or protecting his interests.   Such a relationship of trust is necessary to reach any agreed upon resolution.   Counsel were ineffective and the plea offer should be reinstated.

**CLAIM 13.   AS A RESULT OF COUNSEL'S INEFFECTIVENESS, PROSECUTORIAL MISCONDUCT, AND COURT ERROR THE JURY CONSIDERED EVIDENCE SEIZED FROM MR. HICKS' CAR AND HOME IN VIOLATION OF THE FOURTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AND ART. I, SECS. 1, 8, 13, 25, 26.**

378.   The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

379.   Prior to trial, counsel moved to suppress evidence seized during a search of Mr. Hicks' car and a second, separate search of his home.   *See* Defendant's Second Omnibus Motion, filed May 24, 2010, at 1-4; Defendant's Brief in Support

of Second Omnibus Motion, filed Aug. 27, 2010, at 1-11.  Following a suppression

hearing on June 29, 2010, the trial court denied Mr. Hicks' motion to suppress.

Opinion, filed Dec. 16, 2010, at 13-16.

380.   Despite his desire to suppress evidence seized from Mr. Hicks' car and

home, counsel failed to marshal all available evidence and argument directly

disputing police testimony in support of the affidavits of probable case and that the

search did not occur until after the warrant was obtained.  Counsel's failure to do so

constitutes prejudicially deficient performance in violation of the Sixth, Eighth and

Fourteenth Amendments and Art. I, Secs. 1, 8, 13, 25, 26.

### A. The Searches

381.   On March 6, 2008 at 1:30 p.m., Troopers VanLouvender and

Sebastianelli obtained a warrant to search Mr. Hicks' car.  Exh. 20.  The affidavit of

probable cause in support of the car search relied primarily on witness descriptions

of the person and vehicle with whom Ms. Null was last seen alive. *Id.* at 4. The

warrant was executed on March 7, 2008.  *Id.* at 7.  During the search, police found a

work boot in the trunk of the car, with a stain that tested presumptively positive as

blood.  NT 11/10/14 at 18; 63-64.

382.   While the State Police had custody of, and were searching, the car (Mr.

Hicks' only mode of transportation), Troopers VanLouvender and Sebastianelli took

Mr. Hicks to the police barracks and interrogated him.  As demonstrated in Claim

14, Mr. Hicks' waiver of his rights prior to that interrogation and subsequent statements to police were constitutionally infirm.  Although the interrogation ended at 12:38 p.m., NT 06/29/10 at 3, troopers held Mr. Hicks at the barracks for several more hours, under the guise of offering him a ride to a hotel.  Troopers did not drop Mr. Hicks off at that hotel until approximately 3:07 p.m.  *Id*. at 18.

383.   On March 7, 2008 at 3:00 p.m., several PSP troopers arrived at Mr. Hicks' home and began their search.  Exhs. 21; 22 at 7.  At 3:30 p.m., Troopers VanLouvender and Sebastianelli obtained a second warrant to search Mr. Hicks' home.  Exh. 22.  The affidavit of probable cause for the second warrant relied on information in the first warrant, supplemented with information obtained during the March 7, 2008 car search (the boot) and interrogation (Mr. Hicks' admissions that he knew and smoked crack with Ms. Null).  *Id.* at 5.  During the search of the house, police found several items of incriminating evidence, the most damning of which was the fact that Ms. Null's hands were inside a wall in the home.  *Id.* at 9.

### B.    The Suppression Motion and Hearing.

384.   At the suppression hearing, counsel established that the police – either deliberately or with reckless disregard for the truth – included factually incorrect inculpatory information in the probable cause affidavits.  *See Franks v. Delaware*, 438 U.S. 154, 155 (1978); *Commonwealth v. Clark*, 602 A.2d 1323, 1325 (1992).

385.  Specifically, counsel challenged three critical representations as intentionally or recklessly incorrect.  First, the affidavits represented that witnesses last saw Ms. Null with a black male who was 5'9" tall, 6' tall, or 6'2" tall and that Trooper Hilbert had "verified" that Mr. Hicks was "6 feet tall."  Exh. 20 at 4 - 5.  However, counsel demonstrated that Mr. Hicks was, in fact, only 5'3 ¾" tall.  Motion to Supplement Record, filed July 2, 2010; Order, filed July 7, 2010 (adding Affidavit of Pamela Wilson, LPN, to the record).

386.   At the suppression hearing, Trooper Sebastianelli explained that he and Trooper VanLouvender "included in there a verification that Trooper Miller [sic] had contacted the Arlington Police Department and verified that the vehicle was registered to Charles Ray Hicks at an address in Burleson on County Line Road in Burleson, Texas and that he was approximately, he was 6 feet tall and approximately 180 to 200 lbs and the height and weight were approximate."  NT 06/29/10 at 35.  VanLouvender further explained: "I believe Trooper Hilbert saw him getting in and out of his car but I believe if you read Trooper Hilbert's report it was hard to determine anything because it was raining that day. The car window in his car and Mr. Hicks' car were foggy." *Id*. at 42.  VanLouvender volunteered:  You will even see in Mr. Hicks' criminal history that he goes anywhere from 5 feet 5, 5 feet 9 inches tall. And there is information that Mr. Hicks most likely would give the processing

officer as he did when Trooper Hilbert processed him at Swiftwater and he told Trooper Hilbert that he was 5 feet 5 inches tall." *Id.* at 42-43.

387.   Second, counsel challenged the fact that the affidavit omitted exculpatory information.   The affidavit included only statements from witnesses who had last seen Ms. Null alive the weekend of January 18, 2008 with the black man in the blue car, but failed to include the statement from Anthony Bullock, an ex-boyfriend of Null's who stated he last saw her alive on January 25, 2008.   *See* NT 06/29/10 at 35-36.   Sebastianelli testified that he did not include Bullock's information because they "had already confirmed it was not correct" through interview and polygraph of Russell Cummings.   *Id*. at 36.

388.   Finally, counsel challenged the procedures that police used to obtain witness identifications of Mr. Hicks and his car and overstated the certainty of the witnesses' identifications.   Specifically, police obtained those identifications by showing the witnesses single photographs of Mr. Hicks and his car, rather than using photographic arrays. *See* NT 06/29/10 at 40-41.   These procedures were inherently unreliable.   *See United States v. Wade*, 388 U.S. 218, 228 (1967); *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977); *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972); *Perry v. New Hampshire*, 132 S. Ct. 716, 721-22 (2012).

389.   Regarding the house search, counsel argued that, as fruit of the poisonous tree of both the illegal car search and the unconstitutionally obtained

statements, the evidence seized from the illegal car search and interrogation could not be used to establish probable cause for the house search warrant. *Wong Sun v. United States*, 371 U.S. 71 (1963).

390.   Counsel also relied on Trooper Corrigan's testimony at the pretrial hearing to show that the police actually began their search of Mr. Hicks' home at 3:00 p.m., 30 minutes prior to when the warrant was signed by the judge.  *See* NT 03/14/08 at 52 (Corrigan was called to assist in the execution of a search warrant at Mr. Hicks' home "at approximately 1500 hours").  Likewise, the Inventory of Seized Property indicated that the "Time of Search" was "1500" hours.  Exh. 22 at 7.

391.   Trooper Corrigan's and Sebastianelli's representations that troopers first conducted a "preliminary survey of the scene" and did not go inside the house itself until 1535 hours, *see* Exh. 21; NT 06/29/10 at 44-46, make no difference.  As the United States Supreme Court has recognized,

> when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's "very core" stands "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window

> We therefore regard the area "immediately surrounding and associated with the home"—what our cases call the curtilage—as "part of the home itself for Fourth Amendment purposes." *Oliver*, *supra*, at 180, 104 S.Ct. 1735

*Florida v. Jardines*, 569 U.S. 1, 6 (2013).  Thus, the evidence should have been suppressed under the Fourth Amendment and Mr. Hicks' separate and distinct rights under Article 1, Section 8

### C.    Counsel were Ineffective

392.   Following full discovery and an evidentiary hearing, Mr. Hicks will demonstrate that trial counsel failed to investigate, develop, and present all readily-available evidence to challenge the search warrants.  For example, Mr. Hicks will demonstrate that, at the time Trooper Hilbert "verified" Mr. Hicks' height through a foggy car window, he already had in his possession reliable, law enforcement documents demonstrating that Mr. Hicks was 5'5" tall.  Exh. 23.  Moreover, counsel failed to conduct an any independent investigation regarding the police execution of the search warrant at Mr. Hicks' home.

393.   Finally, as demonstrated in Claim 14, counsel failed to marshal all readily-available evidence and argument to demonstrate the unconstitutionality of the statements that were used in support of the house search warrant.

### D.    Appellate Counsel Was Ineffective

394.   To the extent these suppression issues were fully preserved in the trial record, appellate counsel was ineffective for failing to raise and litigate them on direct appeal.  As demonstrated in Claim 24, capital appellate counsel can have no strategic reason for failing to raise all potentially meritorious issues on direct appeal.

This issue is of obvious merit, and one that counsel should have been aware of, particularly given that States Supreme Court issued its opinion in *Jardines, supra*, just one year before Mr. Hicks' trial. There is a reasonable probability that Mr. Hicks would have prevailed had counsel effectively litigated this issue.

**CLAIM 14.**      **AS A RESULT OF COUNSEL'S INEFFECTIVENESS AND COURT ERROR, THE PROSECUTION WAS PERMITTED TO ADMIT STATEMENTS ELICITED BY THE POLICE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

395.   The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

396.   Prior to trial, counsel moved to suppress three statements made by Mr. Hicks to Pennsylvania State Police: at the police barracks; at the Super 8 motel; and in the police vehicle on the way to the jail after Mr. Hicks' arraignment. Defendant's Second Omnibus Motion, filed May 24, 2010, at 4-6; Defendant's Brief in Support of Second Omnibus Motion, filed Aug. 27, 2010, at 11-17. Following a suppression hearing held on June 29, 2010, the trial court denied Mr. Hicks' motion to suppress. Opinion, filed Dec. 16, 2010, at 16-24.

397.   Counsel made no objection to the constitutionality of the admission of Mr. Hicks' statements at trial. NT 11/10/14 at 154 (admission of recorded statement at police barracks); *id.* at 132-156-57, 177-79 (extensive testimony regarding content of statements at barracks); *id*. at 180-82 (testimony regarding hotel statement); *id*. at 183-88 (testimony regarding transport statement). Counsel also failed to: develop

170

and present all readily-available evidence to the trial court and jury demonstrating the statements were involuntary; argue to the jury that the statements were involuntary; and ensure that the jury was appropriately instructed. To the extent these issues were preserved, counsel also failed to raise and litigate them on appeal.

### A. The Law.

398. *Miranda v. Arizona* held that the Fifth and Fourteenth Amendments require that certain procedural safeguards be afforded individuals subjected to the inherently coercive nature of custodial interrogation. 384 U.S. 436 (1966). Any statement taken in the absence of these safeguards is involuntary. The prosecution cannot make use of involuntary statements either in its case-in-chief or for impeachment purposes. *Mincey v. Arizona*, 437 U.S. 385 (1978).

399. All relevant factors, both external and internal to the defendant, must be considered in concert in determining whether the defendant's statement was voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Thus, the environment of the interrogation, the behavior of law enforcement, the mental state of the defendant, and all other relevant factors may, in combination, be such that the defendant's will was overborn, and his statement involuntary.

400. Once formal charges are filed, the Sixth Amendment right to counsel attaches. *See Brewer v. Williams*, 430 U.S. 387, 398 (1977) (the Sixth Amendment right to counsel attaches "at or after the time that judicial proceedings have been

initiated against him 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment'") (citing *Kirby v. Illinois*, 406 U.S. 682, 689 (1972)).  Once the Sixth Amendment right to counsel attaches, the State must refrain from any interrogation, absent a knowing, intelligent and voluntary waiver. *E.g.*, *Maine v. Moulton*, 474 U.S. 159, 170-71 (1985).

401.   To be constitutionally valid, a waiver of counsel must be voluntary and "also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'"  *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)); *McMahon v. Fulcomer*, 821 F.2d 934, 944 (3d Cir. 1987) ("the Court has been scrupulous in requiring that the waiver of the Sixth Amendment right to assistance of counsel be voluntary and be 'knowing and intelligent'") (citing *Edwards* and *Johnson*).

402.   Moreover, both clearly established federal due process law and Pennsylvania law preclude the jury from considering an involuntary confession in reaching its verdict.  *Jackson v. Denno*, 378 U.S. 368, 376 (1964) (it is "axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, . . . ."); *Commonwealth v. Cunningham*, 370

A.2d 1172 (Pa. 1977); PA. R. CRIM. PROC. 323(j); PA. STD JURY INST. 3.04A.  Even if the jury finds a defendant's statements were voluntary, it still must assess the statement for its credibility and probative value.  *Jackson*, 378 U.S. at 386 ("evidence surrounding the making of a confession bears on its credibility" in addition to its voluntariness).  Nor does a pretrial determination regarding voluntariness "undercut the defendant's traditional prerogative to challenge the confession's reliability during the course of the trial."  *Crane v. Kentucky*, 476 U.S. 683, 688 (1986).

403.   At trial, the prosecution admitted three separate statements given by Mr. Hicks to State Troopers:  1) statements at the police barracks on March 7, 2008; 2) statements at the Super 8 motel on March 7, 2008; and 3) statements in the police cruiser on the way to the jail from Mr. Hicks' arraignment on March 8, 2008.  All three statements were admitted in violation of the Fifth and Fourteenth Amendments as each involved custodial interrogation in which Mr. Hicks either did not waive his rights under *Miranda*, or, if he did, that waiver was constitutionally invalid.

404.   In addition, the admission of the March 8, 2008 statement violated the Sixth Amendment, as it was taken as police were driving Mr. Hicks *from* the arraignment at which counsel had been formally appointed.  The troopers' continued engagement with Mr. Hicks in the police car was the functional equivalent of interrogation, and Mr. Hicks did not waive his rights nor was any waiver or statement voluntary under the totality of the circumstances.  Even if these statements were

admissible at trial, but they were not, as a result of counsel's ineffectiveness and court error, the jury was never instructed that it must make a determination of voluntariness before considering the statements in reaching its verdict in violation of the Fifth, Sixth, and Fourteenth Amendments and Pennsylvania law.

405.   Counsel's failure to (1) present all the factual and legal bases requiring suppression of each statement; (2) challenge the voluntariness of the statements during trial; and (3) request proper instructions regarding the preconditions for the jury's consideration of those statements constituted prejudicially deficient performance in violation of the state and federal constitutions.

### B.   The Admission of Mr. Hicks' March 7, 2008 Statement at the Barracks Violated the Fifth and Fourteenth Amendments.

#### 1.   The circumstances of the interrogation.

406.   Mr. Hicks worked the night shift at the Tobyhanna Army Depot.  His employment records show that he got off work at 8:00 a.m. on Friday, March 7, 2008, having completed an 8-hour shift at the end of a full week of nights.  Exh. 24; NT 11/10/14 at 123-24, 168-69.   Troopers VanLouvender and Sebastianelli approached Mr. Hicks on March 7, 2008 at 8:45 a.m. in a K-mart parking lot.  NT 06/29/10 at 7; NT 11/10/14 at 125-26. Mr. Hicks was by himself, with his vehicle for which the troopers had a search warrant. NT 06/29/10 at 8.

407.   Trooper Sebastianelli told Mr. Hicks they had a search warrant for the car and Mr. Hicks said "okay."  NT 06/29/10 at 7; NT 11/10/14 at 126.   When

Sebastianelli told Mr. Hicks they would explain what was going on if he came with them to the barracks, Mr. Hicks said "okay, I understand."  NT 06/29/10 at 7; NT 11/10/14 at 126.  Mr. Hicks started to ask a question, but Trooper Sebastianelli cut him off because they "were not going to get into a discussion of the status of a homicide investigation in the parking lot of a K-mart." NT 06/29/10 at 8.  Although Sebastianelli told Mr. Hicks he did not need to come with them if he did not want to (*id*.; NT 11/10/14 at 126), Mr. Hicks now had no mode of transportation, had not been informed why police seized his car, and agreed to go to the barracks.  NT 06/29/10 at 8; NT 11/10/14 at 126.  After taking Mr. Hicks' keys and leaving them with a trooper on the scene, Troopers VanLouvender, Sebastianelli, and Wagner transported Mr. Hicks to the police barracks in an unmarked police vehicle.  *Id*.

408.   Trooper Wagner brought Mr. Hicks into the barracks' lobby, where he sat "unmonitored and uncuffed."  NT 06/29/10 at 9; NT 11/10/14 at 127.  At 9:04 a.m., Trooper Sebastianelli gave Mr. Hicks a guest badge and signed him into the visitors' log.  NT 06/29/10 at 9; NT 11/10/14 at 127-28.  Troopers then brought him into the interview room.  NT 06/29/10 at 9; NT 11/10/14 at 128.

409.   Inside the interview room, troopers told Mr. Hicks that they "were conducting a homicide investigation and were requesting his help."  NT 06/29/10 at 9; NT 11/10/14 at 128.  After Sebastianelli read Mr. Hicks his *Miranda* rights, Mr.

Hicks indicated that he understood them and signed a waiver.  NT 06/29/10 at 9, 19; NT 11/10/14 at 128-29, 131; CW Tr. Exh. 98 (Mr. Hicks' signed *Miranda* waiver).

410.   The troopers then interrogated Mr. Hicks.  Mr. Hicks told them about his history of mental health issues, suicide, and hospitalizations; that he was a crack addict; that he had been previously prescribed psychiatric medication (Abilify, Seroquel, Risperdal, and Zoloft), but that he was not taking any medication now because of side effects; and that he was tired, having just gotten off a night shift. Mr. Hicks provided statements that would be used as circumstantial evidence of his involvement in Ms. Null's death:  that he had an arrest history in Virginia and Texas; that he knew Ms. Null and had come into contact with her on two occasions; that he had smoked crack with Ms. Null; that he last saw her when he dropped her off in Scranton after their second encounter; that he did not know how the blood (found during the car search) got on his boots; and that he did not kill Ms. Null.  NT 06/29/10 at 9-12, 14-17, 22; NT 11/10/14 at 132-33, 137-39, 141-49, 152-54, 156-57, 177-79; CW Tr. Exhs. 102 & 102A (recorded statement and transcript).

411.   Trooper VanLouvender described Mr. Hicks' demeanor during the interrogation:  "Very calm. Answered our questions. Didn't raise his voice, become agitated. Sat calm and answered the questions."  NT 06/29/10 at 17; *see also* NT 11/10/14 at 127 (at-trial testimony describing Mr. Hicks' calm demeanor in the Kmart parking lot); *id*. at 129, 133 (describing demeanor during interrogation).

176

412.   The interrogation lasted approximately three hours, ending at 12:38 p.m. when Trooper Sebastianelli entered the interview room and told Mr. Hicks the police had a search warrant for his house.  NT 06/29/10 at 13, 18; NT 11/10/14 at 130-31, 157.  Mr. Hicks then waited several more hours for the police to take him to a Super 8 motel (because he could not go home); the troopers dropped him off at approximately 3:07 p.m.  NT 06/29/10 at 18; NT 11/10/14 at 157.

### 2.   Admission of the Statement Violated the Fifth and Fourteenth Amendments.

413.   The totality of the circumstances demonstrates that Mr. Hicks' waiver of his *Miranda* rights was not knowing, intelligent, or voluntary.

414.   Mr. Hicks was subjected to coercive, custodial conditions leading up to interrogation that were clearly designed to break his will.  The troopers approached Mr. Hicks while he was alone in a commercial parking lot, seized his only mode of transportation without telling him the basis of that seizure, and promised to tell him what was going on only if he went with them to the barracks.

415.   Although the troopers testified that they told Mr. Hicks he did not have to come with them to the barracks (and, later, that he was free to leave the barracks), this choice was a fiction.  While police testified that Mr. Hicks did not *have* to go with them, he also clearly could not stay in the Kmart parking lot and lacked the manner and means to go anywhere else, as demonstrated by the fact that he waited

several hours for officers to transport him to a hotel after the interrogation (as opposed to securing his own transportation).

416.   Moreover, by their own admission, the police were not going to let him go anywhere on his own.  Towards the end of the interrogation, Mr. Hicks repeatedly asked whether he would get his car back so he could have a means of transportation, to which Trooper VanLouvender responded "like I told you, when we are done here today, we'll take you wherever you need to go."  CW Tr. Exh. 102A at 26.

417.   Troopers   VanLouvender   and   Sebastianelli   employed   coercive interrogation tactics at the barracks designed to destroy Mr. Hicks' will. This is demonstrated by the absence of Mr. Hicks' relatives, legal counsel, or friends; the three-hour interrogation in an interview room with two officers asking questions in a "trade-off" style; and the line of questioning employed.  Troopers Sebastianelli and VanLouvender alternated with one another in asking questions throughout the interrogation, a technique designed to weaken the subject's will by interrogating steadily and relentlessly, leaving the subject with no prospect of closure. *Miranda*, 384 U.S. at 451. This tactic was successfully used to obtain circumstantial evidence that led to the troopers obtaining a search warrant for Mr. Hicks' home.

418.   Moreover, Mr. Hicks' cognitive, emotional, and psychological deficits rendered him incapable of knowingly, intelligently, or voluntarily waiving his rights. As demonstrated in Claim 20, Mr. Hicks had an extensive, well-documented history

178

of psychiatric illness that impaired his ability to function in the world.  The troopers *knew* Mr. Hicks had mental health impairments because Mr. Hicks told them that he had been psychiatrically hospitalized three times for harming himself; that he was prescribed a number of medications including Abilify, Seroquel, Risperdal, and Zoloft; and that he had stopped taking his medication due to side effects. The troopers also knew that Mr. Hicks was sleep-deprived (which would only exacerbate his mental illness) as they were interrogating Mr. Hicks a mere hour after he completed an 8-hour shift and after having worked a full week of nights.

419.   Under the totality of these circumstances, the admission of his statement at the barracks violated his Fifth and Fourteenth Amendment rights.

### 3.   Counsel were Ineffective.

420.   To the extent trial counsel failed to muster all readily-available evidence in support of the suppression of the barracks statement, in particular the wealth of evidence contained in Claims 3 and 20 demonstrating Mr. Hicks' mental health impairments, counsel were ineffective.  There can be no strategic reason for failing to present all readily-available evidence in support of a chosen strategy.  Mr. Hicks was prejudiced by counsel's deficient performance.  There is a reasonable probability that, had all readily-available evidence been presented, the court would have suppressed this statement.  The unconstitutional barracks statement was used as support for the Commonwealth's search warrant for Mr. Hicks' home (during

which several items of incriminating evidence, including Ms. Null's hands, were found), *see* Exh. 22, and was also used at trial to establish modus operendi, motive, and intent. *See* NT 11/14/14 at 68-78.  There is a reasonable probability that, without this evidence, the outcome of Mr. Hicks' case would have been different.

### C.   The Admission of Mr. Hicks' Statements to PSP at the Hotel Violated the Fifth and Fourteenth Amendments.

#### 1.   The circumstances of the interrogation.

421.   At 7:20 p.m. on the night of March 7, Troopers Sebastianelli and VanLouvender, along with District Attorney's Detective Snell, went to the Super 8 Motel to speak with Mr. Hicks.  NT 06/29/10 at 30; NT 11/10/14 at 157-58, 179-80. They told Mr. Hicks that they needed to talk to him about what they found at his house.  When they told Mr. Hicks that his same rights applied as he had in the morning at the barracks, Mr. Hicks said "okay" and asked them what they found at the house.  NT 06/29/10 at 30-31; NT 11/10/14 at 180-81.  When Sebastianelli told him they found garbage bags in the attic, Mr. Hicks indicated that he did not have any garbage bags in the attic. NT 06/29/10 at 31; NT 11/10/14 at 181.   In response to additional requests by the trooper to come down to the barracks and an offer that they would allow Mr. Hicks to take a polygraph, Mr. Hicks repeatedly stated that he did not know what the troopers were talking about and he did not understand what they were telling him.  NT 06/29/10 at 32; NT 11/10/14 at 181-82.  Mr. Hicks

ultimately said "I think I better call somebody about this" and the troopers left.  NT 06/29/10 at 30-32; NT 11/10/14 at 182.

### 2. Admission of the Statement Violated the Fifth and Fourteenth Amendments.

422.   As demonstrated throughout this Petition, *see* Claims 3, 20, Mr. Hicks' mental health impairments rendered him incapable of knowingly, intelligently, or voluntarily waiving his rights.

423.   Moreover, the investigators' tactics were coercive.  This was the second time in the same day that police approached Mr. Hicks about a murder investigation and refused to give details unless he agreed to be "interviewed" alone in a controlled, police-dominated environment.  The presence and sense of urgency of the very same officers who had interrogated Mr. Hicks that same day rendered Mr. Hicks exceedingly vulnerable to coercion.

424.   Mr. Hicks' statements were made in response to probing questions initiated by law enforcement who, only hours before, successfully elicited incriminating statements.  For example, after Mr. Hicks repeatedly asked what was found, Trooper Sebastianelli finally responded that garbage bags were found and that "we know you have had the keys to that house since January 27th."  NT 06/29/10 at 31.  The words "we know," often used by police to portray a sense of certainty to elicit incriminating responses from suspects, did just that. Mr. Hicks responded saying that he actually had the keys at least since January 23, but that he still did not

understand what Trooper Sebastianelli was trying to tell him. *Id.* The discrepancy between Mr. Hicks' voiced misunderstanding of what was taking place and the statement he made impulsively regarding the keys to the residence where evidence had been found shows that Mr. Hicks' ability to make sound decisions and capacity for self-determination had been impaired. Therefore, the statements made at the motel were involuntary.

### 3.   Counsel were Ineffective.

425.  To the extent trial counsel failed to muster all readily-available evidence in support of the suppression of the motel statement, in particular the wealth of evidence contained in Claims 3 and 20 demonstrating Mr. Hicks' mental health impairments, counsel were ineffective.  There can be no strategic reason for failing to present all readily-available evidence in support of a chosen strategy.  Mr. Hicks was prejudiced by counsel's deficient performance.  There is a reasonable probability that, had all readily-available evidence been presented, the court would have suppressed this statement.  The unconstitutional motel statement was used at trial to establish modus operandi, motive, and intent. *See* NT 11/14/14 at 68-78. There is a reasonable probability that, without this evidence, the outcome of Mr. Hicks' case would have been different.

**D.** **The Admission of Mr. Hicks' Statements to PSP in Transport Violated the Fifth, Sixth, and Fourteenth Amendments.**

**1. The circumstances of the interrogation.**

426.   The troopers arrested Mr. Hicks on March 8 at 9:15 a.m.  NT 06/29/10 at 25, 28.  They read him his *Miranda* rights and Mr. Hicks indicated he did not want to talk to them and that he had contacted an attorney. NT 06/29/10 at 28; NT 11/10/14 at 183.

427.   Mr. Hicks was arraigned later that day, around 2:00 or 2:30 p.m.  NT 06/29/10 at 28; NT 11/10/14 at 183.  The magistrate judge read him his rights, *id.*, and counsel was appointed.  Exh. 25.  Troopers Sebastianelli, VanLouvender, and Hilbert then transported Mr. Hicks to the county jail.  *See* NT 06/29/10 at 29; NT 11/10/14 at 183-84.

428.   Trooper VanLouvender testified that, "within a couple of minutes of [them] leaving the magistrate's office," Mr. Hicks began asking the three troopers what they found in his house.   NT 06/29/10 at 28-29; NT 11/10/14 at 184. VanLouvender described the encounter as follows:

> [Mr. Hicks] had asked us about what did you find in my house? We told him go ahead and read your papers. He said well, I got the papers right here and you can tell me what is in there.
>
> Trooper Sebastianelli told him we found her hands at your house. He said, you didn't find a lot of blood. Trooper Sebastianelli said there was blood there.
>
> He said, but you didn't find a lot. And I believe it was Hilbert that told him we found a lot of evidence there.

Mr. Hicks then asked how long had we been doing this for. We told him 15 years. He said well, you got the wrong guy. Trooper Sebastianelli told him no, we don't, Charles. You killed her.

He then said, he asked us, have you ever fought for your life before? Nobody said anything. He goes well, I have on two occasions with my bare hands, he says.

Don't you think if she to fight for her life I would be all scratched up? Trooper Hilbert told him not if you hit her over the head from behind and ended the conversation.

As we were getting ready to pull into the jailyard he told us, when I get with my lawyer I am going to tell you guys why those hands are in my house. And we never heard anything afterwards.

NT 06/29/10 at 26-27; *see also* NT 11/10/14 at 184-85.   At trial, Trooper Sebastianelli testified that, during this car ride, Mr. Hicks also stated that "it's obvious someone murdered and dismembered her."  NT 11/10/14 at 184, 187.  No one read Mr. Hicks his *Miranda* rights in the patrol car.  NT 06/29/10 at 27.  Trooper Sebastianelli described Mr. Hicks' demeanor in the car as "matter of fact" and "confident," in contrast to the "confused" reaction they had gotten the night before at the hotel.  NT 11/10/14 at 187-88.

## 2.   Admission of the Statement Violated the Fifth and Fourteenth Amendments.

429.  Mr. Hicks' mental health impairments rendered him incapable of knowingly, intelligently, or voluntarily waiving his rights.  *See* Claims 3, 20.  This was compounded by the fact that none of the three officers in the car with Mr. Hicks even informed him that his *Miranda* rights remained in-tact during this time.

430.   Moreover, the statements were a direct result of the coercive environment (in a police car with three officers) and interrogation.  While troopers claim to have never asked Mr. Hicks a question, their statements in the car were the functional equivalent of interrogation.  Trooper Sebastianelli presented Mr. Hicks with damning evidence immediately after Mr. Hicks asked what was found in his home. This technique is one that is inherent in police coercion and is used by police to state a subject's guilt as a posit of fact in order to elicit incriminating information from the subject. *Miranda*, 384 U.S. at 450.  The admission of Mr. Hicks' statement was a violation of his Fifth and Fourteenth Amendment rights.

### 3.   Admission of the Statement Violated the Sixth Amendment.

431.   By March 8, 2008, Mr. Hicks' Sixth Amendment right to counsel had attached. He had been formally charged; attended an arraignment hearing; stated upon arrest that he did not wish to speak to the officers and that he had contacted an attorney; and had been formally appointed counsel. The initiation of interrogation under these circumstances violated Mr. Hicks' Sixth Amendment right to counsel.

### 4.   Counsel were Ineffective.

432.   To the extent counsel failed to muster all readily-available evidence in support of the suppression of the car statement, in particular the wealth of evidence contained in Claims 3 and 20 demonstrating Mr. Hicks' mental health impairments, counsel were ineffective.  There can be no strategic reason for failing to present all

available evidence in support of a chosen strategy.  As there is a reasonable probability that, had all readily-available evidence been presented, the court would have suppressed this statement, prejudice is demonstrated.  The unconstitutional car statement was used at trial to establish modus operandi, motive, and intent. *See* NT 11/14/14 at 68-78.  There is a reasonable probability that, without this evidence, the outcome of Mr. Hicks' case would have been different.

### E. Counsel's Failure to Present Evidence Challenging the Voluntariness of the Statements at Trial Violated the Sixth, Eighth, and Fourteenth Amendments.

433.  As described above, both clearly established federal due process law and Pennsylvania law require the jury to determine whether or not an accused's statement was voluntary and assess the statement for its credibility and probative value before relying on that statement in reaching its verdict.  Counsel failed to marshal all the available evidence demonstrating that each of these statements were constitutionally involuntary.

434.  As described in Claim 20, Mr. Hicks suffered from myriad mental health impairments.  Trial counsel knew about many of these impairments, but failed to present any mental health evidence to the jury at the guilt phase of Mr. Hicks' trial.  At an evidentiary hearing, Mr. Hicks will demonstrate that these impairments, both standing alone and combined with the fact that he was intoxicated at the time of Ms. Null's death and sleep-deprived at the time he talked to police, impaired his

ability to encode memories, recall memories, and relate memories. Mr. Hicks will also demonstrate that Mr. Hicks' mental health impairments, intoxication at the time of Ms. Null's death, and sleep deprivation at the time of his encounters with police made him uniquely vulnerable to coercive and suggestive interrogation tactics.

435.   Moreover, counsel failed to request proper instructions guiding the jury's assessment of voluntariness and reliability, although Mr. Hicks was absolutely entitled to such an instruction. *See* PA. STD JURY INST. 3.04; 3.05.

436.   Had counsel performed effectively, the jury would have learned of substantial evidence demonstrating that: the conditions of the interrogation were inherently coercive (*see* PA. STD JURY INST. 3.04B.2; id. 3.04B.3; *id*. 3.04C.2); Mr. Hicks' capacity to waive was cognitively, psychologically, and emotionally impaired (*see id*. 3.04C.2); the statements were elicited in violation of *Miranda v. Arizona* (*see id*. 3.04D); the statements were not the product of free will and choice (*see id*. 3.04B); and that the circumstances demonstrate that the jury should apply no weight to the statements in reaching its verdict (*see id*. 3.05). The prosecution relied on the statements to establish both modus operendi, motive, and intent, *see* NT 11/14/14 at 68-78. As there is a reasonable probability that, had counsel performed effectively, the jury would have rejected the statements altogether as well as the prosecution's attempts to tie those statements to modus operendi, motive, and intent and reached a different verdict, relief is required.

### F.   Appellate Counsel was Ineffective

437.   To the extent that these claims of constitutional error rely on facts and legal argument not presented in the trial court, appellate counsel was precluded from raising this issue on direct appeal.  *See Grant*, 813 A.2d at 738.  To the extent that these constitutional claims were preserved for appellate review by counsel's pretrial suppression motion, counsel was ineffective for failing to raise and litigate these arguably meritorious issues on direct appeal.  As there is a reasonable probability of a more favorable outcome had appellate counsel litigated this issue, relief is required.

**CLAIM 15.   COUNSEL'S FAILURE TO INVESTIGATE, DEVELOP, AND PRESENT EVIDENCE SUPPORTING THE CHOSEN DEFENSE AND CHALLENGING THE PROSECUTION'S THEORY VIOLATED THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

438.   The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

439.   It was the prosecution's theory that Mr. Hicks intentionally murdered Ms. Null and then dismembered her body for purposes of evading discovery and to retain a "trophy."  NT 11/5/2014 at 22-23; 11/14/2014 at 77-78.  Counsel pursued a theory that accidental overdose could not be ruled out as the cause of death and that the post-mortem dismemberment was a matter of "drug dumping."  NT 11/5/2014 at 66-69.  Having reached a determination to present this defense theory, counsel was constitutionally obligated to conduct a fully adequate investigation and develop all lay, forensic and expert evidence supporting the defense and challenging those

aspects of the prosecution's theory that contradicted the defense.  *See Jacobs v. Horn*, 395 F.3d 92, 104 (3d Cir. 2005) (counsel's failure to investigate "and discover evidence to support the defense he pursued" objectively unreasonable); Section E.

440.   As described below, counsel limited their evidentiary presentation to forensic expert testimony and cross-examination of prosecution witnesses.  Counsel failed to develop and present:  the history of Ms. Null's drug addiction, including prior overdoses; evidence that Ms. Null had suffered injuries from sources other than Mr. Hicks shortly before her death; and evidence that Mr. Hicks' conduct after Ms. Null's death was driven by his own psychological impairments as opposed to any nefarious motive.  Nor did counsel challenge extensive police and lay witness testimony that included improper "expert" opinions and speculation.  While counsel did present two (competing) forensic pathology experts, they did so after having only conducted a rudimentary review, evaluation and preparation of those experts.  Nor did counsel challenge the prosecution's forensic expert evidence that injected highly inflammatory testimony; relied on flawed science; and injected rank speculation.  As a result, the jury heard contradictory, confusing, affirmatively harmful and forensically flawed testimony from both the prosecution and defense experts.

441.  Having conducted a constitutionally inadequate investigation and presentation, counsel also failed to provide a coherent understanding of the nature

of the defense to the jury, including where the burden rested, nor did counsel request proper instructions to guide the jury's determination.

442.   Individually and cumulatively, these errors constituted prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments.

## A. Inadequate expert presentation that included presenting affirmatively harmful expert opinions.

443.   As it was their plan to rely exclusively on expert testimony to support the defense theory, counsel were obligated to conduct the necessary investigation to provide their expert with facts relevant to, and corroborating, those opinions and challenging the prosecution's forensic testimony indicating intentional murder and present a coherent argument to the jury that explained how the evidence demonstrated that the Commonwealth failed to meet its burden of proof as to cause of death.  *See* ABA Guideline 1.1, Commentary ("Counsel must be experienced in the utilization of expert witnesses and evidence, such as psychiatric and forensic evidence, and must be able to challenge zealously the prosecution's evidence"); Guideline 5.1.B.2.e; Guideline 10.7.  Counsel failed in all respects.

### 1.  What counsel knew pretrial.

444.   There were a number of challenges to determining an accurate cause of death.  The body was not discovered until at least 4-5 days after Ms. Null died. *See* CW Tr. Exh. 35 at 4 (indicating Dr. Funke (the pathologist who conducted the autopsy) was unable to withdraw vitreous fluid from either eye); Exh. 26 at 4 (Dr.

Funke informing PSP that the absence of vitreous fluid indicates that the time of death was at least 4-5 days before the autopsy).  The body was compromised as a result of decomposition (CW Tr. Exh. 35 at 1 (noting early onset decomposition)), dismemberment (CW Tr. Exh. 35 at 1), and exposure to environmental elements. *See* NT 11/5/2014 at 184-94; CW Tr. Exh. 35 at 9 (noting partial freezing).

445.    In her autopsy report, Dr. Funke identified numerous fractures, bruising and trauma, but deemed a great deal of those injuries "ambiguous" as to whether they occurred before or after death.  *See, e.g.,* CW Tr. Exh. 35 at 7 (determining pre-versus post-death ambiguous); *id.* at 15 (incisions on neck ambiguous); *id.* (injuries on chest are "ambiguous").  And, she determined that a number of the injuries were postmortem.  *Id.* at 5 (head injuries); *id.* at 11 (postmortem skin abrasion); *id.* (amputation site of right arm is postmortem); *id.* at 14 (noting postmortem incisions); *id.* at 16-18 (indicating various postmortem tissue injuries).  Dr. Funke noted a number of cuts/incisions, but characterized those, including the neck incision, as "amputation" sites without noting whether they were pre- or postmortem.  *Id.* at 3.

446.    After receiving the autopsy report, counsel retained Dr. Shane, who provided a report on July 30, 2008, indicating that the toxicology of purge fluid indicated a .19% alcohol level, "344 ng per M.L. cocaine; 188 ng per M. L. of cocaethylene; and 613 ng per M.L. of benzoylecgonine."  CW Tr. Exh. 108A at 2. He concluded that, "even with the variations of a purge fluid specimen and the

191

postmortem changes," these levels indicated that Ms. Null "consumed large quantities of alcohol and cocaine." *Id.* Dr. Shane also found the trauma, including the head trauma, was likely incident to postmortem dismemberment and rough handling. *Id.* at 2-3.

447.  The prosecution provided counsel with a January 8, 2009 letter from Dr. Mihalakis disagreeing with Dr. Shane's conclusion that death could have been the result of cocaine/alcohol abuse and finding, instead, that a number of injuries to the body, including the head, face, hypopharnx and chest were premortem. Exh. 27 at 1-2.

448.  On February 11, 2009, Dr. Shane provided a letter to trial counsel outlining how Dr. Mihalakis' conclusions regarding premortem trauma were flawed; explaining how Dr. Mihalakis' conclusion that Ms. Null's bitten tongue indicated her death was not the result of an overdose was directly contradicted by the scientific community; and explaining how the bruising typically associated with the premortem trauma Dr. Mihalakis claimed occurred would have been at least ten times greater than that found on the body. CW Tr. Exh. 109 at 1-2. Dr. Shane also took issue with Dr. Mihalakis' statement that Dr. Shane had concluded that the cause of death was an overdose and explained that his original opinion had been that the cause of death was undetermined and that an overdose cannot be ruled out. *Id.* at 1.

449. On June 1, 2009, Dr. Shane viewed the pathology slides collected by Dr. Funke. *See* Exh. 28. Based on his review, Dr. Shane concluded that "the microscopic findings confirm the absence of any antemortem trauma." *Id.* at 2. He further recommended that if the prosecution intended to use photomicrographs at trial, the defense team should consider preparing their own. *Id.*

450. Subsequently, the prosecution provided the defense with Dr. Ross' May 13, 2014 letter/report. *See* Exh. 29. Dr. Ross indicated that he had reviewed the tissue slides from the autopsy and conducted immunohistochemical stains of tissue blocks from the hypopharynx, the hyoid bone and the Adams apple area. NT 11/6/2014 at 72. Dr. Ross concluded that the bruises to the scalp "indicate[d] repeated blunt force impacts" that were "consistent with traumatic brain injury"; "cyanosis to the face and hemorrhage to the neck muscles with petechial hemorrhages to the neck mucosa" were "compatible with strangulation"; the slide stains he conducted of the hypopharynx and spine were consistent with "sharp force trauma and dismemberment while she was alive"; and the "traumatic findings to the head/neck complex rule out cocaine as a competent cause of death." Exh. 29 at 2.

451. On June 13, 2014, Dr. Shane provided trial counsel with a letter responding to Dr. Ross' letter report. Exh. 30. First, Dr. Shane criticized Dr. Ross for his reliance on immunoperoxidase stains because the tissue samples were "extensively autolyzed" rendering the results "ambiguous" at best. *Id.* at 1. Dr.

Shane also criticized Dr. Ross' conclusion that cyanosis was present where Dr. Funke did not. *Id.* Dr. Shane further explained how each of Dr. Ross' conclusions regarding the timing and extent of other injuries were directly contradicted by Dr. Funke's findings, the individual who had actually conducted the autopsy. *Id.* Finally, Dr. Shane criticized Dr. Ross for disregarding the amount of alcohol and cocaethylene found in the decedent's system.

452.   Thus, prior to trial, counsel was aware that:  both Dr. Ross and Dr. Mihalakis had rejected the possibility that the cause of death was the result of an overdose; both found antemortem traumatic injury; Dr. Ross found evidence of antemortem strangulation and Dr. Mihalakis did not rule that out; and Dr. Ross also found indicia that Ms. Null's throat was cut antemortem.  Counsel was also aware that a number of Dr. Ross' conclusions regarding the nature of various injuries (that conflicted with Dr. Funke's conclusions) were based on his reliance on immunoperoxidase stains of decomposed tissue.

453.   Counsel's response to the obvious (but not insurmountable) obstacles to the defense theory contained in these reports was constitutionally inadequate.

> **2.   Counsel's failure to present evidence supporting his own expert's conclusions.**
>
> *a. Evidence supporting accidental overdose.*

██████████████████████████████████████████████

██████████████████████████████████████████████

> b. *Evidence that Ms. Null suffered recent injuries not attributed to Mr. Hicks.*

464.   Although he agreed with Dr. Shane that some injuries found during the autopsy were postmortem,[28] Dr. Ross claimed that a number of traumatic injuries occurred prior to death.  His testimony regarding the timing of various injuries he deemed antemortem was, at best, ambiguous, indicating various injuries could have occurred anywhere from minutes, to hours to *much longer* before death.  *E.g.*, NT 11/6/14 at 34 (injuries could have occurred "at least minutes" before death but "could be longer"); *id.* at 40 (indicating that injuries could have occurred "5 to 15, 20, 30 minutes or more. It could even be more than that as well"); *id.* at 44 (indicating that frontal head injuries could have occurred "minutes [before death], but it could be much longer than that, half an hour, an hour, even longer than that"); *id.* at 47 (indicating bruising on the left side of the torso but that "there's an element of repair occurring"); *id.* at 55 (noting that "buckle type" injury "could be postmortem"); *id.* at 57 (noting postmortem incision); *id.* at 58 (same).  Dr. Mihalakis likewise testified that the timing was ambiguous.  *E.g.*, NT 11/12/2014 at 76 ("Yes, this 15, 20 minutes, it takes that long to appear. However, somebody seeing it an hour later, two hours later, it will still be there, so it could be much longer").

---

[28] *See* NT 11/6/2014 at 27; 47-48 (noting postmortem incision); *id.* at 55 (nothing that "buckle type" injury "could be postmortem"); *id.* at 57 (noting postmortem incision); *id.* at 58 (same)

465.   Counsel was aware from the pretrial discovery that Ms. Null was the victim of numerous assaults at the hands of others.  For example, Fred Fox, a former bartender at the Sun Hotel, told police that Ms. Null frequented the bar with an individual he knew as Chef Joe.  Mr. Fox told the police that Chef Joe was known to be violent towards Ms. Null and that three weeks before her death, he saw Chef Joe "drag [Ms. Null] out of the Sun Hotel by her hair."  Exh. 46.  The reports provided to counsel include other interviews indicating that in the year leading up to her death, Ms. Null was involved with other abusive men.  *See*, *e.g.*, Exh. 41 (Cummins statement indicating that when he and Ms. Null were together, there were fights in which he hit and kicked her on various occasions); Exh. 47 (Macaluso statement indicating that Ms. Null's boyfriend gave her a black eye in August 2007); Exh. 48 (police summary indicating that Robert Kendricks had assaulted Ms. Null in 2006 and James Mack in July 2007).

466.   After full discovery and an evidentiary hearing, Mr. Hicks expects to present the above and additional witness and record evidence demonstrating that Ms. Null suffered multiple injuries from sources other than Mr. Hicks shortly before her death.  Counsel's failure to develop and present this evidence supporting the defense and disputing the prosecution's theory that injuries occurred as a result of an assault by Mr. Hicks constitutes prejudicially deficient performance.  Counsel had no reasonable strategic basis for failing to develop this evidence.  Had the jury learned

of this evidence, there is a reasonable probability that it would have rejected the prosecution's cause of death theory and reached a different verdict.

### 3. Counsel's presentation of affirmatively harmful expert testimony.

467. As noted above, counsel was aware pretrial that Dr. Mihalakis disagreed with Dr. Shane's conclusions regarding postmortem injuries and that accidental overdose was a potential cause of death. Nevertheless, counsel called Dr. Mihalakis, presumably to dispute Dr. Ross' conclusions that Ms. Null's neck was cut antemortem and that there was evidence of strangulation.

468. Rather than supporting Dr. Shane's conclusions, Dr. Mihalakis' testimony essentially became a second prosecution expert. When counsel asked Dr. Mihalakis if he had determined whether the cuts on Ms. Null's neck were antemortem, he testified that he "did not have any slides to review from any cuts of the neck," NT 11/12/2014 at 63, obviously indicating that his failure to reach that conclusion was due to the unavailability of the slides as opposed to any disagreement with Dr. Ross.

469. When counsel asked if his report failed to indicate that there was evidence of strangulation, Dr. Mihalakis responded: "I have not used the word strangulation. I have used the word hemorrhage in the neck, but I did not use the word strangulation," *id.* at 64, obviously inferring that he had found evidence of strangulation.

470.   When counsel asked Dr. Mihalakis about Dr. Ross' reliance on immunohistochemical stains of tissue blocks as a basis for concluding that certain injuries were antemortem, Dr. Mihalakis did not dispute the application of immunohistochemistry on decomposed tissue.  Instead, he testified that "if [he has] blood and inflammation in the normal staining and procedure, [he] really [does not] need anything else."  *Id*. at 66-67.

471.   On cross-examination, Dr. Mihalakis agreed with a number of Dr. Ross' conclusions.  He testified that there was soft tissue hemorrhaging in the neck around the thyroid and hyoid, albeit "not an impressive amount" indicating that the neck was either punched or severed.   *Id.* at 70.   He agreed that there was hemorrhaging in the hypopharynx, the hyoid region, and the perithyroidal cartilage, supporting Dr. Ross' strangulation theory.   *Id.* at 71.   He agreed that Ms. Null suffered blunt force trauma to her face, the back of her head and torso antemortem.  *Id.* at 73-75.  He agreed that the injury to the back of the head was the result of use of a weapon, although he suggested a bat or table leg as opposed to Dr. Ross' pipe theory.  *Id.* at 75.[29]  He testified that his conclusion that Ms. Null died as a result of "multiple traumatic injuries" was consistent with Dr. Funke's conclusion that the cause of death was homicidal violence.  *Id.* at 76.  He testified that Ms. Null also

---

[29] Although he testified that it could also have been "a fall against something which has an edge" *id.* at 75, counsel did not follow up on redirect.

suffered premortem injuries to her knees and shins indicating "[e]ither that the person attempted to fight back or she was incapacitated and somebody continued to strike her." *Id.* at 77.

472.   While on redirect, Dr. Mihalakis did acknowledge that bruising can occur postmortem; that he did not see any white blood cells (indicia of antemortem bruising), *id.* at 78; and that edema would occur if the individual died face-down, *id.* at 80, when counsel asked if the conclusion of homicidal violence involved cause of death or manner of death, Dr. Mihalakis testified that it meant both. *Id.* at 80.  His testimony ended with his response to the prosecutor that he did not believe that Ms. Null died as a result of an overdose. *Id.* at 83.

473.   Thus, Dr. Mihalakis' testimony supported virtually all of Dr. Ross' conclusions and directly disputed the critical aspects of Dr. Shane's conclusions. Counsel can have no reasonable strategic basis for calling a witness who would directly contradict the only evidence presented in support of the defense.  By electing to do so, counsel effectively functioned as a second prosecutor, "mak[ing] the adversary process itself presumptively unreliable." *Cronic*, 466 U.S. at 659.  Even if prejudice is required, counsel's presentation of affirmatively harmful testimony directly contradicting each of Dr. Shane's conclusions and supporting the prosecution's theory demonstrates prejudice.

### 4.   Counsel's failure to adequately prepare and present Dr. Shane's testimony.

474.   Although counsel has a duty to fully consult with experts and prepare experts for their testimony, the record belies any conclusion that this occurred in Dr. Shane's case.   As a result, Dr. Shane was open to unnecessary attacks by the prosecution that, had counsel acted reasonably, would not have occurred.   Likewise, counsel failed to fully consult with Dr. Shane prior to his testimony, resulting in a disorganized, fractured presentation that allowed the prosecution to easily attack the reliability of his opinions.   When combined with counsel's presentation of another forensic pathologist who directly contradicted all material aspects of Dr. Shane's opinions, counsel's deficient performance is even more stark.

475.   As noted previously, Dr. Shane prepared an initial report followed by three letters after Dr. Shane was presented with additional information, one involving Dr. Shane's response to Dr. Mihalakis' report (CW Tr. Exh. 109 at 1-2); one involving Dr. Shane's review of the slides obtained during the autopsy (Exh. 28); and a letter responding to Dr. Ross' report (Exh. 30).   While the defense disclosed Dr. Shane's original report and his response to Dr. Mihalakis' report, counsel failed to provide to the prosecution Dr. Shane's report on his review of the slides or his response to Dr. Ross' report.   NT 11/12/2014 at 47.   Nor did counsel mention, let alone, admit these supplemental letters into evidence during his direct examination of Dr. Shane.

476.   During cross-examination, counsel's failure to disclose these reports was raised by the prosecutor in the presence of the jury.  NT 11/12/2014 at 47.  Once the prosecution received the two reports, he asked to approach and there was a six transcript-page long sidebar discussion followed by a 15-minute recess.  *Id.* at 48-56.  When they returned from the recess, Dr. Mihalakis took the stand.  *Id.* at 61. Dr. Shane did not return to testify until the next day.  The only information the court provided to the jury when Dr. Mihalakis took the stand was that they were "going to switch gears for the rest of the day."  NT 11/12/2014 at 60.

477.   With that ominous break, Dr. Shane resumed the stand the next day. NT 11/13/2014 at 4.  After initially going over Dr. Shane's supplemental report addressing Dr. Mihalakis' report, *id.* at 6, the prosecutor then went through a litany of other cases in which Dr. Shane provided a supplemental letter, some dating back as much as 25 years before, intimating nefarious motives.  *Id.* at 9-36.  While counsel did bring out on redirect that the reason these supplemental letters were issued was because he learned new information, *id.* at 36-39, he did so only in the context of the other cases raised by the prosecutor and never mentioned the situation in this case.

478.   Counsel could have easily short-circuited the prosecution's attack by (1) disclosing the supplemental letters to the prosecution pretrial, and (2) having Dr. Shane explain during direct examination the substance of those letters and that they were provided because he learned new information.  They did not and counsel's

failure to do so in combination with the auspicious circumstances surrounding interrupting Dr. Shane's testimony for 24 hours created a very clear picture to the jury that Dr. Shane should not be believed because he engages in questionable tactics that are actually attributable to counsel's failures.

479.   Moreover, having failed to disclose the reports and creating a situation in which the prosecutor could make a speaking objection alluding to nefarious motives on Dr. Shane's part, counsel was obligated to ensure that the jury was instructed that it should not hold those circumstances against Dr. Shane.  Yet, even with an overnight break, counsel failed to do so.  While the court did ultimately instruct the jury that it should not concern itself with the sidebars, etc., where, as here, the discovery was through Dr. Shane's testimony, his testimony was immediately interrupted and the theme of the prosecutor's cross-examination involved multiple prior cases in which Dr. Shane submitted supplemental letters, a contemporaneous instruction that the jury should not hold the interruption of Dr. Shane's testimony against him was required.

480.   Similarly, counsel either failed to understand Dr. Shane's opinions regarding the autopsy report conclusion that Ms. Null died as a result of homicidal violence or failed to appreciate the need to either clearly explain those opinions to the jury or seek different expert assistance.

481.   This subject was a prevailing theme of the prosecutor's challenge of Dr. Shane's opinions.   He cross-examined Dr. Shane about the autopsy report conclusions.  NT 11/12/2014 at 41-45.  As a result, Dr. Shane and the prosecutor got into a back and forth about the difference between "descriptive" findings and "actual" findings.  *Id.*  The exchange was confusing and offered nothing to the jury explaining why Dr. Shane could conclude that you cannot rule out accidental overdose but still claim to agree with Dr. Funke's conclusion.  The prosecutor was able to use this line of questioning during his cross-examination of the defense's other expert, Dr. Mihalakis, and elicit testimony that homicidal violence means intentional murder.  *Id.* at 80-81.  At best, Dr. Shane was depicted as splitting hairs. At worst, the implication is that Dr. Shane actually agreed that Ms. Null died as a result of an intentional killing as opposed to an accidental overdose.

482.   Counsel should have known that this issue would come up during Dr. Shane's testimony.  Dr. Funke clearly concludes in her report that Ms. Null's death "should be descriptively certified as homicidal violence and that therefore manner of death should be classified as homicide."  CW Tr. Exh. 35 at 2.  Common sense dictates that a potential cause of death of accidental overdose conflicts with that conclusion.  Dr. Shane did not mention homicidal violence in his initial report, although he articulated a number of instances in which he agreed with Dr. Funke's other conclusions.  Knowing what Dr. Funke concluded as to manner of death,

counsel was obligated to discuss this discrepancy between her report conclusion and Dr. Shane's opinions.

483.   If the problem was that Dr. Shane, a colleague of Dr. Funke, was incapable of disagreeing with this conclusion, despite his opinion that accidental overdose cannot be ruled out as a potential cause of death, counsel was obliged to seek other expert assistance.  Mr. Hicks expects to present evidence at an evidentiary hearing demonstrating that such assistance was available to counsel as an alternative. Counsel's failure to do so constitutes prejudicially deficient performance.

484.   If the problem was that Dr. Shane had simply never been asked about this issue, but would have been able to explain that, if Dr. Funke meant that the cause/manner of death was intentional homicide, he did not agree with that conclusion, counsel's failure to elicit that testimony on direct examination or clarify on redirect constitutes prejudicially deficient performance.

485.   Dr. Shane was the sole witness supporting the defense theory. Counsel's failure to adequately prepare and present his testimony constitutes deficient performance.   As there is a reasonable probability that, had counsel performed effectively, the jury would have credited Dr. Shane's conclusions and reached a different verdict, prejudice is demonstrated.

**B.**     **Evidence disputing the prosecution's intent/malice theory**

486.   The prosecution had no direct evidence establishing specific intent or malice.  The prosecution was not able to specify when Ms. Null died, where she died, or produce any eyewitnesses to her death.  Nor could the prosecution produce any witnesses who could establish any animosity between Ms. Null and Mr. Hicks or any other direct evidence of a motive.  Other than the other incidents that were admitted in violation of Mr. Hicks' clearly established federal constitutional rights (*see* Claim 11), the prosecution relied on two factors to establish intent and/or malice:   the dismemberment and Mr. Hicks' statements and affect during interrogations.

487.  As a result, the prosecutor presented graphic details of the dismemberment via color photographs displayed on a projector screen and models of the severed hands.  *See*, *e.g.,* NT 11/05/14 at 91-94 (Trooper Radziewicz's testimony); NT 11/05/14 at 184-87 (Trooper Doran); NT 11/05/14 at 197-98 (Trooper Sebastianelli): NT 11/06/14 at 21-22 (Dr. Ross); NT 11/07/14 at 154-78 (Trooper Corrigan); NT 11/10/14 at 92-93 (Trooper VanLouvender).

488.  Throughout his closing, the prosecutor repeatedly connected the dismemberment to intent and malice.  *See* NT 11/14/2014 at 60 ("You can see what was in someone's heart and mind by the way they treated her"); *id.* (arguing that the reason the defense did not explain why Mr. Hicks dismembered the body was

because it was done with malice); *id.* at 61 (arguing that the purported mutilation was evidence of malice): *id.* at 62 ("This unfortunately was a human being who would now have become by her photograph reassembled evidence of intent to kill and malice"); *id.* at 63 ("There's no reason for [cutting up the torso] other than hate and malice"); *id.* at 65 ("You don't do this to somebody without that kind of evil in your heart"); *id.* (But [dismembering the body] only allows for one conclusion, and that's the malice that was in his heart."); *id.* at 67 ("What does [dumping the body parts on the highway] say about his intent?").   As he argued the purported connection, the prosecutor projected various graphic depictions of the body parts on the large screen for long periods of time as he argued how the dismemberment demonstrated intent.  *E.g.*, NT 11/14/2014 at 60-63 (displaying a color photo of the severed body while discussing intent for three transcript pages); *id.* at 66-68 (displaying a photograph of the reassembled body while arguing for two transcript pages); 70-72 (redisplaying the photograph of the reassembled body while arguing for almost two transcript pages).  *See also* Claim 10.

489.   The prosecutor also elicited testimony from police witnesses (far exceeding their expertise, *see* § D.1. *infra*) purporting to show Mr. Hicks' "matter of fact" demeanor and flat affect during the interrogations as evidence of intent.  *See* NT 11/7/2014 (Trooper Corrigan testifying that in the investigators' opinion the hands were a "keepsake" or "souvenir"); NT 11/10/2014 at 132-33 (Trooper

Vanlouvender testimony about Mr. Hicks' demeanor and motive during questioning); *id.* at 157 (Trooper Vanlouvender describing flat affect during another part of the interrogation); *id.* at 187-88 (Trooper Sebastianelli describing Mr. Hicks as "matter of fact" and "confident"). He then argued the connection between Mr. Hicks' demeanor and intent/malice in closing. *See* NT 11/14/2014 at 68 (arguing that the statement "You shouldn't find anything" about the search of his home followed by "You didn't find a lot of blood did you?" after the police told him they found Ms. Null's hands was indicia of intent); *id.* at 70 (characterizing Mr. Hicks' statement as "bravado" proving malice); *id.* at 75 ("What does [putting the hands in the wall] say about his malice? That bitch is mine").

490.   As part of their trial theory, counsel chose to concede that Mr. Hicks dismembered the body. Having elected to make that concession, counsel was obligated to investigate and develop all potential evidence that would mitigate the obvious impact that would have on the jury and explain to the jury how that conduct was not relevant to the jury's intent/malice consideration.

491.   Counsel was well-aware of the importance of explaining the dismemberment to the jury. Indeed, Mr. Labar argued in opening that Mr. Hicks' actions were the result of "drug dumping," i.e., he panicked after finding the victim dead from an overdose and dismembered the body to hide it and avoid detection. NT 11/5/2014 at 68-69. Yet, counsel presented no actual evidence about "drug

dumping." Instead, counsel attempted to elicit testimony from the *prosecution's* forensics expert, Dr. Ross, who acknowledged there were cases where addicts hid overdose victims, but went on to testify that he had never heard of any case in which an addict dismembered the body. NT 11/6/2014 at 126-127. Dr. Ross also testified that when he hears a body is dismembered, his first thought is homicide. *Id.* at 128.

492. Thus, counsel not only failed to present any evidence supporting his "drug dumping" theory, he actually elicited uncontested expert testimony directly disputing that theory. As a result, the prosecution capitalized on counsel's failure to present any evidence supporting the defense theory and argued that the absence of this evidence corroborated the prosecution theory that the dismemberment demonstrated intent and malice. *See* NT 11/14/2014 at 60, 71-72.

493. Nor did counsel offer any evidence, expert or otherwise, demonstrating that Mr. Hicks' demeanor, flat affect and statements were not related to intent/malice but, instead, the result of Mr. Hicks' emotional impairments, including his own overwhelming crack cocaine addiction. As a result, the prosecution was able to argue these factors demonstrated evidence of intent/malice on the basis of the uncontested police testimony.

494. As described elsewhere, *see* Claim 20, and as Mr. Hicks expects to demonstrate following full discovery and an evidentiary hearing, Mr. Hicks' emotional and psychological impairments spanned years, including multiple

213

hospitalizations. These impairments were exacerbated by Mr. Hicks' pervasive cocaine addiction. *See* Claim 20.

495. Mr. Hicks expects to demonstrate through lay and expert witness testimony as well as institutional records that the combination of his pre-existing impairments and drug use resulted in stark personality changes that are directly connected to his conduct after Ms. Null's death, including the dismemberment. Mr. Hicks also expects to demonstrate after full discovery and an evidentiary hearing expert and lay testimony as well as institutional records demonstrating that Mr. Hicks' affect and demeanor during his statements to the police and others – as well as the contents of those statements – were directly connected to the combined impact of his psychological impairments and cocaine addiction. *See also* Claim 20.

496. Counsel's failure to investigate and develop this evidence constitutes prejudicially deficient performance. Evidence that would have provided the jury with a reason other than intent/malice for the dismemberment and Mr. Hicks' demeanor/affect and statements was clearly relevant in light of the prosecution's evidence and argument. As counsel was well-aware that it was necessary to provide the jury with alternative reasons, they could have no reasonable strategic basis for failing to develop and present that evidence.

497. Anyone viewing photographs of human body parts would have had a difficult time disregarding those photographs in determining intent/malice. The

prosecution's parading the photographs on a digital projector screen throughout the evidentiary presentation and closing rendered that task impossible. It was up to defense counsel to provide the jury with factual and legal reasons why the jury should disregard the dismemberment in reaching its verdict just as it was counsel's obligation to provide the jury with factual and legal reasons why the jury should disregard the allegations of demeanor/affect. As there is a reasonable probability that, had counsel presented evidence disputing the prosecution's attempt to connect the dismemberment and demeanor speculation testimony to intent/malice the jury would have reached a different verdict, prejudice is demonstrated.

### C.    Counsel's failure to challenge the prosecution's forensic pathology expert testimony.

498.    Throughout his testimony, Dr. Ross used the term "conservatively" as he provided his findings regarding the number or nature of injuries, intimating that there were many more. NT 11/6/2014 at 29 (decedent was hit in one area "at least six times conservatively"); *id.* ("Now, there's much more injury than that there, but that's a conservative estimate"); *id.* at 43-44 ("conservatively represent four separate strikes"); *id.* at 44 ("The right side of the scalp has three bruises, one, two, three conservatively"); *id.* at 56 ("Well, I'm trying to be conservative [indicating whether the injuries were antemortem] . . . It could be while she's alive, too"). Counsel made no objection, nor did counsel challenge Dr. Ross' repeated invitations to the jury to speculate that the injuries were greater and that more injuries occurred before death.

499.  Dr. Ross also offered his own speculations, cloaked in his role as an expert.  For example, he speculated that the absence of blood in the hair on the back of the head was because it had been "cleaned up" without any evidence of that having happened.  NT 11/6/2014 at 36.  Of course it is equally consistent that the absence of blood was because the injury occurred after death.  He speculated that lacerations on the decedent's breast were the result of "sexual mutilation" despite the absence of any evidence indicating that.  There are other explanations that the jury did not hear provided by the Commonwealth's own experts.  For example, Forensic Anthropologist, Conrad Quintyn, told the police those lacerations were likely "false starts" during the course of the dismemberment.  *See* Exh. 26.  Dr. Ross also speculated that the cuts on the neck were the result of an "assailant doing the cutting" from "behind her and cutting from front to back, her front to back, and from a left to right side."  NT 11/6/2014 at 81.  Once again, there's no evidence supporting that speculation and there is another equally possible scenario, i.e., that the cuts occurred after death during the dismemberment.  Counsel did not object to Dr. Ross' speculative testimony, challenge the veracity of those speculations on cross-examination or present readily available evidence demonstrating that Dr. Ross' conclusions were forensically flawed.

500.  In addition, Dr. Ross utilized immunohistochemical stains of tissue blocks.  Dr. Ross acknowledged that this process is "typically used in the other field

in our medical field for looking at tumors, leukemias, cancers" and "other natural diseases."  NT 11/6/2014 at 71.  Nevertheless, Dr. Ross concluded that the stains showed antemortem trauma that neither Dr. Funke nor Dr. Shane had observed, including evidence supporting his theory that Ms. Null's neck had been cut antemortem.  The prosecution relied on these conclusions as support for both intent to kill and the torture aggravator.  *See* NT 11/14/2014 at 79-80, 89-90; Claim 17.

501.  Counsel were on notice this procedure had been done from Dr. Ross' May 13, 2014 report.  *See* Exh. 29. Yet it does not appear counsel asked Dr. Shane to view the new slides of Dr. Ross' immunohistochemical stains.  Nor did counsel develop or present any testimony, expert or otherwise, demonstrating the limits to using this method on decomposing tissue to determine the presence of trauma.

502.  After full discovery and an evidentiary hearing, counsel expects to demonstrate that the conclusions and speculations drawn by Dr. Ross regarding the nature and timing of the injuries are not supported by the physical evidence; that the method, application and interpretation of the stains conducted by Dr. Ross were forensically flawed; and that Dr. Ross' testimony far exceeded a forensically accurate reflection of the available evidence.  As these flaws involved a critical aspect of the defense theory:  cause and manner of death, counsel could have no reasonable strategic basis for failing challenge this testimony.  As there is a

reasonable probability that the jury relied on the forensically flawed testimony, speculations and conjectures in reaching its verdict, prejudice is demonstrated.

> **D.    Counsel's failure to object to the multiple instances of improper opinion, speculation, hearsay and patently irrelevant testimony designed to inflame the passion of the jury.**

503.    Throughout his evidentiary presentation, the prosecution elicited improper opinion testimony from police officers who were not qualified as experts or testified far beyond the nature of their expertise; police speculation on various aspects of the evidence collected; hearsay testimony of purported witnesses who were available to testify; and patently irrelevant testimony all of which was designed to inflame the passion of the jury.   Counsel failed to object or, in the limited circumstances in which counsel did object, counsel failed to move for a mistrial although the pervasive nature of the error warranted relief.

> **1.  Improper opinion/speculation testimony.**

504.    Trooper Radziewicz, who had training in crime scene processing and collection and fingerprinting, was never offered as an expert in that area or any other. *See* NT 11/5/2014 at 87-88.   Nevertheless, the prosecution elicited "opinion" testimony that amounted to nothing more than speculation.  *E.g.*, NT 11/5/2014 at 119 (offering an opinion regarding the small amount of decomposition in the body parts discovered); *id.* at 121 (opinion on nature of the cuts on the body parts); *id.* at 127 (speculating on how body parts were damaged); *id.* at 128 (speculating about

what caused marks on arms); *id.* at 131 (speculating how a bag was torn); *id.* at 144 (offering opinion on type of cut on body); *id.* at 147 (speculating on how the bag was deposited on the highway): *id.* at 158 (offering an opinion on nature of the cuts). Counsel failed to object to any of this testimony.

505.   Trooper Corrigan was offered as an expert in crime scene processing and evidence collection.  NT 11/7/2014 at 122-123.  Although he was never qualified as an expert in social science or psychology,[30] he was allowed, without objection, to offer his speculative opinion that the reason the hands were "wrapped in this meticulous manner" was because it was a "souvenir."  *Id.* at 181.  He was also allowed to speculate about how the hands were damaged.  *Id.* at 170.  Trooper Barletto was qualified as an expert in crime scene reconstruction, fingerprinting and latent blood analysis (NT 11/10/2014 at 11), but was permitted to offer a biomechanics opinion regarding the amount of scrubbing force necessary for skin to be on the hair on the brush recovered.  NT 11/10/2014 at 52.

506.   In addition to testifying about the nature of the injuries and cause of death, *id.* at 98, Trooper Vanlouvender, in response to a direct question by the prosecution, offered his opinion on the veracity of Mr. Hicks' statement to the police

---

[30] Other than a two-day training in "Criminal Behavior Assessment," there was nothing in his resume to reflect any expertise in psychology or personality diagnosis. CW Tr. Exh. 48.

that led the Trooper to offer the following opinion and argument as to Mr. Hicks'

culpability:

> We determined it to be incorrect because obviously the hands are found
> in the house. The garbage bags are found at the house. He knows
> exactly what's going on. He's intimately involved. He murdered the
> victim. He's got her hands there.

*Id.* at 151.  Thus, the jury heard from a police "expert" that, in his opinion, Mr. Hicks

was lying and because the hands were in his home, he must be guilty of murder.

Counsel objected, but did not ask for a mistrial or a curative instruction.

### 2.    Improper hearsay/irrelevant testimony.

507.   Rank hearsay through various witnesses was offered by the prosecution

without objection by the defense.  *See* NT 11/7/2014 at 39 (Ms. Mercado testifying

about what Mr. Slashinski told her regarding the date he gave keys to the home to

Mr. Hicks); NT 11/10/2014 at 120-121 (Double hearsay offered indicating that Mr.

Hicks' neighbor was "too afraid" to call the police); NT 11/10/2014 at 95 (Trooper

Vanluovender testifying to what Mr. Hartman told him); NT 11/10/2014 at 166

(Trooper testifying about what Ms. Whipple told the police regarding when she last

saw Hicks and Null together); NT11/10/2014 at 167-68 (Trooper testifying about

what multiple individuals who knew Ms. Null from the streets told the police about

what they observed in the weeks leading up to her disappearance).

508.   Similarly, the prosecution injected patently irrelevant and inadmissible

testimony, all of which was intended to taint the jury's determination.  For example,

police witnesses testified about Mr. Hicks' prior arrests although that testimony constituted improper prior bad acts evidence.  NT 11/10/2014 at 143, 188.  As noted above, Trooper Vanlouvender testified about what Mr. Hartman told him.  He followed that with his efforts to verify that information and ultimately testified that the leads went nowhere.  NT 11/10/2014 at 95.  Since the leads were not productive, the sole basis for presenting this testimony was to leave the jury with the impression that the police followed every lead available meaning their ultimate arrest of Mr. Hicks must mean that he is guilty.

509.  Also as noted above, police hearsay testimony indicated that the neighbor was "too afraid" to contact the police.  NT 11/10/2014 at 120-121.  As there was no defense challenge to the timing of her report to the police, why she did not call the police earlier was completely irrelevant.  It also, however, left the jury with the clear impression (on the basis of nothing more than speculation) that the neighbor was afraid because Mr. Hicks was guilty.

510.  Similarly, during Trooper Vanlouvender's testimony, the prosecution elicited hearsay testimony regarding information the Trooper purportedly learned from Dr. Funke during the autopsy that was not indicated in Dr. Funke's autopsy report.  NT 11/10/2014 at 102-04.  Although counsel objected, he failed to request a mistrial or curative instruction, nor did counsel raise or litigate the improper admission of this testimony on appeal.

221

### 3.   Counsel were ineffective

511.   Counsel's failure to object to the multiple instances in which the prosecution injected improper hearsay, speculation, irrelevant and inflammatory evidence, move for a mistrial and/or request a curative instruction constitutes prejudicially deficient performance.

### E. Failure to challenge flawed police investigation.

512.   Although it was their defense theory to challenge the prosecution's theory that the death of Ms. Null was the result of intentional conduct as opposed to accidental overdose, counsel failed to develop or present forensic expert evidence demonstrating the flaws in the police investigation.

513.   After full discovery and an evidentiary hearing, Mr. Hicks expects to present expert and other evidence demonstrating that the police investigation was forensically flawed and unreliable for a number of reasons, including testimony that the police failed to follow up on investigatory leads in order to determine the location of Ms. Null's death in order to corroborate or dispute Mr. Hicks' version of events. For example, one possible location based on Mr. Hicks' statements was the Garden Hill Motel.  NT 11/10/2014 at 172.  The police made contact with the motel management, but aborted that aspect of the investigation when they encountered a "language barrier."  *Id.* at 170.  Mr. Hicks expects to present evidence demonstrating that a competent police investigator would have obtained interpretive services to

overcome the "language barrier" and obtain the necessary information to determine whether Mr. Hicks and Ms. Null had been in a room at the motel.  Armed with this information, the police would have been able to conduct a forensic evaluation of that room to determine the presence or absence of evidence supporting or disputing Mr. Hicks' version of events.

514.   Similarly, the trial testimony indicated that the police conducted luminol testing of Mr. Hicks' car and generated police reports of the results of that testing.  *See* NT 11/10/2014 at 53-54.  While the police testified at trial that luminol testing was also conducted on the basement of Mr. Hicks' home, NT 11/10/2014 at 54, there was no testimony of any results, positive or negative, nor was the defense provided with any police reports indicating that the testing was conducted, let alone any results.  Mr. Hicks expects to present evidence demonstrating that a competent police investigation would have included conducting a full luminol test of the basement area and generating reports of the results of those tests, whether those results were positive or negative.

515.   Essentially, the record demonstrates that the police stopped investigating once they discovered the hands inside the wall of Mr. Hicks' home.  Mr. Hicks expects to present expert testimony indicating that a competent police investigator would have continued to follow leads in order to determine the location of Ms. Null's death, particularly where there were no eyewitnesses to her death who

could have either supported or disputed Mr. Hicks' version of events and where the forensic pathology evidence at the time the police ended their investigation was, at best, ambiguous as to cause of death.

516.   Counsel's failure to develop and present this evidence constitutes prejudicially deficient performance.

### F.   Failure to provide the jury with a cohesive theory/argument.

517.   Counsel's argument is critical to effective representation. *Herring v. New York*, 422 U.S. 853, 862 (1975).  Mr. Hicks was denied the assistance of counsel during argument, a time at which "counsel's absence might derogate from the accused right to a fair trial," *United States v. Wade*, 388 U.S. at 226-27, and, therefore, plainly a "critical stage[] of trial." *E.g.*, *Herring*, 422 U.S. at 862 (defense closing statement in a criminal trial is a critical stage).

518.   As described previously, it was the defense theory that Ms. Null died as a result of a cocaine/alcohol overdose and that the dismemberment was a result of "drug dumping."  During his opening, counsel made the remarkable claim that he did not "believe any expert will rule out entirely the possibility of a drug overdose," NT 11/5/2014 at 67, despite the fact that he had two prosecution pathologist reports specifically rejecting this as a cause of death.  As noted above, *see* §1.B., counsel also argued during his opening statement that the dismemberment

was the result of a "drug dumping" panic as opposed to any intent to kill, although counsel knew he would not be presenting any evidence supporting this theory.

519.   Counsel's closing reflected the inadequate investigation, preparation and presentation. Having failed to present any evidence about "drug dumping" he had nothing to point to the jury that supported that theory.   Having elicited affirmatively harmful testimony from Dr. Mihalakis – directly disputing overdose as a potential cause of death and supporting death by multiple traumatic injuries – counsel was not able to corroborate his own promise in opening.

520.   Moreover, throughout his opening and closing, counsel characterized the issue of cause of death as something that the jury must determine after considering competing expert testimony, as opposed to something that the Commonwealth must prove beyond a reasonable doubt. NT 11/5/2014 at 64 (opening: "ultimately the decision is in your hands as to the cause of death"); 11/14/2014 at 5-6 (closing:  "Your duty, your main thing in this case, is to determine basically the cause of death of Deanna Null and whether specifically Charles caused the death of Deanna Null").

521.   Thus, counsel encouraged the jury hold the defense to a burden of proving death by accidental overdose as opposed to holding the Commonwealth to its burden of proving cause of death beyond a reasonable doubt.   But the Commonwealth's burden is not altered or reduced by the presentation of defense

evidence. Instead, it remains the Commonwealth's burden to prove each element of each offense beyond a reasonable doubt even if the jury specifically rejects the defense testimony. *See In re Winship*, 397 U.S. at 364; *Commonwealth v. Bonomo*, 151 A.2d 441, 445-46 (Pa. 1959) ("It is because of this never-shifting burden upon the Commonwealth . . . that it cannot logically be said that the Commonwealth has the burden to prove the presence of such element while the defendant, at the same time, has the burden of proving its absence").

522.   Counsel's invitation to the jury to shift the burden was an essential focus in his closing argument. Rather than emphasizing the absence of credible forensic evidence establishing that the cause of death was the result of trauma, strangulation and/or a slit throat as Dr. Ross speculated, counsel engaged in what can only be described as a discussion of semantics about what Dr. Funke meant by "homicidal violence" in her report conclusion. *See* NT 11/14/2014 at 26.

523.   Counsel's journey down this rabbit hole was directly related to his failure to fully prepare Dr. Shane or fully appreciate the full extent of Dr. Mihalakis' report and opinions. As noted above, during cross-examination, Dr. Shane testified that Dr. Funke used the term "homicidal violence" as a "descriptive" versus "actual" cause of death. *See* § A.4. Had counsel adequately prepared his expert, he would have elicited readily available testimony that, regardless of how Dr. Funke characterized the cause of death, the conclusions with regard to each of the injuries

she observed did not definitively establish antemortem trauma/strangulation/cut throat as the cause of death nor did they rule out accidental overdose. This was exacerbated when counsel called a second expert, Dr. Mihalakis, who actually agreed with the prosecution theory on cause of death.

524.   Although counsel's defense actually centered on the concept that cause of death was at least equally consistent with accidental overdose as homicidal violence, that was not the message conveyed to the jury through either the evidentiary presentation or argument. What Dr. Funke meant by homicidal violence in her report conclusion was not the point. Instead, it was clear that Dr. Funke – the person who actually conducted the autopsy – had concluded that most, if not all of the injuries relied on by Dr. Ross as indicia of premortem trauma and cutting were, instead, ambiguous as to timing. When the evidence is equally consistent with innocence (accidental overdose) as it is with guilt (homicidal violence), the Commonwealth has not met its burden. *In the Interest of J.B.*, 189 A.3d 390, 415 (Pa. 2018); *Commonwealth v. Woong Knee New*, 47 A.2d 450, 455 (Pa. 1946) ("An accused is entitled to an acquittal if his guilt of the crime charged is not the only reasonable interpretation of which the facts adduced against him are susceptible"). Had counsel focused both his expert presentation and argument on those factors, there is more than a reasonable probability of a different result.

## G.     Failure to request proper instructions.

525.    Counsel's failure to request proper instructions and appellate counsel's failure to raise these claims on appeal constitutes prejudicially deficient performance in violation of the Sixth and Fourteenth Amendments. *See* Section II.E.

526.    In addition to failing to adequately prepare and argue the defense theory, counsel failed to request appropriate instructions that would have ensured that the jury held the Commonwealth to its burden of proving all elements – including cause of death – beyond a reasonable doubt.

527.    As described above, even if defense evidence is rejected by the jury, that does not relieve the Commonwealth of its burden of proving cause of death beyond a reasonable doubt.  Counsel failed to request instructions explaining this to the jury. *See Winship*, 397 U.S. at 364; *Bonomo*, 151 A.2d at 445-46.  The failure to ensure that the jury is properly instructed constitutes deficient performance. *Everett*, 290 F.3d at 514.  Had the jury been properly instructed, there is a reasonable probability that it would have reached a different verdict.

528.    Similarly, counsel failed to request instructions informing the jury that, where the evidence is equally consistent with innocence as it is with guilt, the Commonwealth has not met its burden of proof beyond a reasonable doubt. *See In the Interest of J.B.*, 189 A.3d  at  415; *Woong Knee New*, 47 A.2d at 455.  As described above, the forensic pathology testimony was imprecise and ambiguous as

228

to timing and cause of various injuries and conflicting regarding whether injuries occurred pre- or post-mortem. The failure to properly instruct the jury that the Commonwealth had not met its burden if it found the evidence in equipoise as to the critical issue of cause of death violated clearly established due process and Sixth Amendment law. *In re Winship*, 397 U.S. at 364; *Chandler*, 449 U.S. at 574; *Gaudin*, 515 U.S. at 510; *Apprendi*, 530 U.S. at 477.

529.   As it was the defense theory that it was equally likely that the cause of death was by accidental overdose, counsel could have no reasonable strategic basis for failing to request proper instructions. As there is a reasonable probability that the jury would have reached a different verdict had it been properly instructed, prejudice is demonstrated and relief is required.

### H.   Cumulative Error

530.   Each of the constitutional errors described above individually entitles Mr. Hicks to relief. Even if this Court finds that Mr. Hicks is not entitled to relief based on any particular error, he is nevertheless entitled to relief because the cumulative effect of these errors denied him a fair trial and the heightened procedural safeguards constitutionally required in capital cases. Individually and cumulatively, these errors provide compelling bases for doubting the reliability of the verdict.

**CLAIM 16.   THE PROSECUTION'S FAILURE TO DISCLOSE MATERIALLY EXCULPATORY EVIDENCE VIOLATED THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

531.   The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

532.   As described below, the prosecution failed to disclose a plethora of material exculpatory evidence in violation of the Sixth, Eighth and Fourteenth Amendments.  *See* Part II.D.

### A. The failure to disclose prior testimony of critical prosecution witnesses.

533.   On February 19, 2008, PSP Corporal McAndrew asked First Assistant District Attorney Mancuso to present this case to the Monroe County Investigative Grand Jury and Mr. Mancuso agreed (*see* Exh. 49).  As a result, Corporal McAndrew submitted a memorandum to the District Attorney listing the witnesses he recommended that the prosecution present.  Exh. 49 at 2-5.

534.   Police records indicate that the prosecution presented this case to the grand jury on February 27, 2008.  Police records also indicate that Corporal McAndrew, Troopers Vanlouvender and Sebastianelli, and James McAllister, all witnesses called by the prosecution in this case, were expected to be witnesses before the grand jury.  *See* Exh. 49.  At that time, it was the PSP's theory that one explanation for Ms. Null's death may have been her involvement in drugs.  Exh. 49.

535.   Evidence that impeaches the prosecution's theory or witnesses falls squarely within the prosecution's Due Process obligations under *Brady* and its progeny.  *See* Part II. D.  Due process also "guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" including the ability to meaningfully investigate and determine strategy, and to prepare and present witnesses.  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *see also* Part II. D.  When that investigation identifies potential favorable witnesses, the Compulsory Process clause provides a defendant the right to compel witness testimony.  When the prosecution presents evidence and witnesses against a defendant, the Sixth Amendment and Article I, Section 9 provide him a right to confrontation, *Davis v. Alaska*, 415 U.S. 308, 318 (1974); *Alford v. United States*, 282 U.S. 687 (1931), including the right to meaningful and "effective cross examination," *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam).  And at its core, due process guarantees an accused the right to a "fair trial in a fair tribunal." *Bracy v. Gramley*, 520 U.S. 899, 904 05 (1997); *United States v. Martinez Salazar*, 528 U.S. 304, 313 (2000).

536.   Based on the information provided to current counsel, it appears that the prosecution failed to disclose any grand jury testimony in this case.  Also based on the information known to current counsel, there is a reasonable likelihood that grand jury testimony contains impeachment and/or other exculpatory information.

231

As there is a reasonable probability that, had the jury learned of the inconsistent and/or contradictory testimony, it would have reached a different verdict, materiality is demonstrated. The failure to disclose this evidence violated the Sixth, Eighth and Fourteenth Amendments.

**B.    The failure to disclose materials arising from the Commonwealth's cooperative investigation with various law enforcement agencies.**

537.    The Pennsylvania State Police reached out to a number of other law enforcement agencies for assistance that included obtaining records, conducting interviews, and developing various reports. The prosecution's failure to disclose all material exculpatory evidence developed as a result of the joint investigations with these agencies violated the Sixth, Eighth and Fourteenth Amendments. *See* Section D; *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (finding that for *Brady* purposes, prosecution is charged with knowledge of "evidence known to others acting on the government's behalf in this case"); *United States v. Risha*, 445 F.3d 298, 304 (3d Cir. 2006) (finding constructive knowledge where the individuals are acting on the Government's behalf or under the control of the Government; are involved in a joint investigation; and have joint access to the evidence).

538.    Failure to disclose the material exculpatory information developed through joint investigation with other law enforcement entities also violated Mr. Hicks' state and federal constitutional rights to present a defense, to compulsory process, to confront the witnesses against him, the Pennsylvania constitutional right

to defend life and liberty, and the heightened procedural safeguards required in capital cases.  *See* Part II.D.; ¶ 538, *supra*.

539.   The Commonwealth violated all of these rights, and the indefeasible Pennsylvania constitutional right to defend life and liberty, when it failed to disclose to the defense exculpatory and/or impeachment information, without which counsel could not adequately prepare Mr. Hicks' defense or respond to the Commonwealth's case.  The resulting one-sided access to the evidence in this case was fundamentally unfair and unreliable, resulting in arbitrary and capricious capital proceedings that denied Mr. Hicks the heightened procedural safeguards the Eighth Amendment requires. There is a reasonable probability that, had the prosecution met its state and federal obligations, the jury would have reached a different verdict; relief is required.

### 1.  The failure to disclose materials developed by the FBI.

540.   During its investigation, the PSP reached out to the FBI's Violent Criminal Apprehension Program (ViCAP) for assistance.  As a result, ViCAP conducted its own document collection and investigation in concert with the PSP. *See*, *e.g.,* Exh. 50 (3/18/08 letter from ViCAP indicating that the "office is currently assisting the Pennsylvania State Police with an investigation involving . . . Charles Ray Hicks" and requesting the Department of Navy provide that department with Mr. Hicks' military records); Exh. 51 (6/24/08 letter from PSP to the Department of Navy indicating that ViCAP had provided the PSP with "a summary of Hicks' Navy

assignments" and requesting the full military records); Exh. 52 (1/30/08 report indicating that PSP had requested assistance in the investigation).

541.   While the prosecution did disclose the ViCAP report generated by the FBI, it did not disclose other investigative materials.  In light of the correspondence indicating that the FBI ViCAP was affirmatively seeking and obtaining records and characterized its involvement as assistance, Mr. Hicks submits upon information and belief that the FBI developed statements, records and other materials that reasonably likely contain exculpatory evidence.  As the agencies were working in concert on the investigation in this case, the failure to disclose these materials violated the Sixth, Eighth and Fourteenth Amendments.

   **2.  The failure to disclose materials arising from the Commonwealth's cooperative investigation with the Texas Rangers.**

542.   On or about March 9, 2008, the PSP requested assistance from the Texas Rangers in this investigation that included obtaining records and conducting interviews with Mr. Hicks' family and others who knew Mr. Hicks, including but not limited to Tracy Driskill and Misty Chavez.  *See* Exh. 53.  While some reports of these contacts were provided pretrial, upon information and belief, Petitioner avers that there exist additional materials, including impeachment and other exculpatory materials not disclosed to the defense.

543.   As the agencies were working in concert on the investigation in this case, the failure to disclose these materials violated the Sixth, Eighth and Fourteenth Amendments.

### 3. The failure to disclose exculpatory evidence generated by the PSP's cooperative efforts with other Texas law enforcement agencies.

544.   Records and press reports indicate that the PSP consulted with, and obtained assistance from a number of other Texas law enforcement agencies during its investigation yet failed to produce investigative materials provided by those agencies.  These include: Fort Worth, Texas Police Department (Exh. 54); Arlington, Texas Police Department (Exh. 55); Mansfield, Texas Police Department; and Burleson, Texas Police Department.

545.   Upon information and belief based on the limited paperwork provided about these agencies, Mr. Hicks avers that the PSP requested and received investigative assistance from these agencies that resulted in reports and/or materials containing impeachment and/or other exculpatory information that should have been disclosed pretrial.  The prosecution's failure to do so violated the Sixth, Eighth and Fourteenth Amendments.

### 4. The failure to disclose exculpatory evidence generated by the PSP's cooperative efforts with Williamsport, Pennsylvania law enforcement.

546.   Records indicate that the PSP worked closely with the Williamsport Police Department to obtain background information on Ms. Nul.   Exh. 56. Although some incident reports were provided to the defense pretrial, Mr. Hicks avers that the PSP collected additional records that were not disclosed, including records that provided evidence of Ms. Null's addiction and her involvement in risky conduct in order to support her addiction.  For example, a press report from the time of trial indicates a drive-by shooting occurred at Ms. Null's home in 2002.  Exh. 57. That report indicates that the PSP obtained police reports about the shooting, yet none were provided to the defense.

547.   In addition, as described in Claim 15.A.2.a., while one page of a Williamsport Police report about an incident involving Ms. Null was disclosed, the second page was not.  Exh. 34.  Reports indicate that further court involvement occurred after that incident, *see* Exh. 34, but the prosecution failed to provide those records.   Upon information and belief, Mr. Hicks avers that the PSP obtained additional records from Williamsport Police and/or other Lycoming County agencies describing the nature and extent of Ms. Null's drug addiction and related involvement in risky conduct which the prosecution failed to disclose pretrial.

548.   Had the jury learned of this evidence supporting the defense theory that Ms. Null died as a result of an accidental overdose as opposed to intentional murder, there is a reasonable probability that it would have reached a different verdict.   The prosecution's failure to disclose this evidence violated the Sixth, Eighth and Fourteenth Amendments.

### 5. The failure to disclose exculpatory evidence generated by the PSP's cooperative efforts with other Pennsylvania law enforcement agencies.

549.   Records and press reports indicate that the PSP was working in concert with a number of other Pennsylvania law enforcement agencies during its investigation yet the prosecution failed to produce investigative materials provided to the PSP by those agencies.  *See* Exhs. 58 & 59.  In addition, media reports include at least one interview with the Scranton Police Chief in which he indicates that his department was working closely with the PSP, including determining Ms. Null's lifestyle and activities in the Scranton area.  Other than a few reports on witness McAllister, the prosecution failed to disclose any other documents, reports or materials generated by the Scranton police.

550.   In addition, the PSP knew that Ms. Null had been prosecuted by the Pennsylvania Attorney General's Bureau of Narcotics Investigation.  *See* Exh. 35. Upon information and belief, Mr. Hicks avers that the PSP obtained materials from

the BNI that included information on the nature of Ms. Null's addiction and risky lifestyle arising from that addiction that the prosecution failed to disclose pretrial.

551.   Had the jury learned of this evidence supporting the defense theory that Ms. Null died as a result of an accidental overdose as opposed to intentional murder, there is a reasonable probability that it would have reached a different verdict.  The prosecution's failure to disclose this evidence violated the Sixth, Eighth and Fourteenth Amendments.

### 6. The failure to disclose exculpatory evidence generated by the PSP's cooperative efforts with Hampton, Virginia law enforcement agencies.

552.   Records indicate that the PSP was working closely with the Hampton, Virginia Police Department to obtain background information on Mr. Hicks.  Exh. 60.  While some information was provided to counsel pretrial, upon information and belief, Mr. Hicks avers that the PSP obtained additional records and other materials describing the nature and extent of Mr. Hicks' drug abuse/addiction and mental health impairments that would have supported the guilt-phase defense and provided the jurors with additional mitigation evidence during the penalty hearing.

553.   Had the jury learned of this evidence supporting the defense theory at trial and the penalty hearing, there is a reasonable probability that it would have reached a different verdict.  The failure to disclose this evidence violated the Sixth, Eighth and Fourteenth Amendments.

C.     The failure to disclose other exculpatory evidence.

554.   After full discovery and an evidentiary hearing, Mr. Hicks expects to demonstrate that the prosecution failed to provide additional material exculpatory evidence surrounding the police investigation, the forensic investigation and the reliability of lay and expert witnesses presented by the prosecution at trial.

555.   The prosecution's failure to disclose these materials violated the Sixth, Eighth and Fourteenth Amendments.

D.     Viewed cumulatively, the prosecution's suppression of material exculpatory evidence violated the Sixth, Eighth and Fourteenth Amendments.

556.   "[T]the state's obligation under *Brady* [], to disclose evidence favorable to the defense, turns on the cumulative effect of all such evidence suppressed by the government." *Kyles*, 514 U.S. at 421.  As such, it is improper to isolate all instances of the Commonwealth's *Brady* violations and treat them as distinct and separate claims.  Rather, all the information the Commonwealth failed to produce must be considered together and contrasted to that presented at trial in order to determine whether relief is warranted.

557.   Each of the constitutional errors described above individually entitles Mr. Hicks to relief.  However, even if this Court finds that Mr. Hicks is not entitled to relief based on any particular error, he is nevertheless entitled to relief because the cumulative effect denied him a fair trial and the heightened procedural

safeguards required in capital cases. These errors, individually and cumulatively, provide compelling bases for doubting the reliability of the jury's verdict.

### E.   To the extent counsel could have discovered the above-described evidence, their failure to do so was ineffective.

558.   To the extent counsel could have obtained these materials pretrial, their failure to do so constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments.

559.   Counsel is constitutionally obliged to conduct a full investigation into all available defenses. *See* Part II. E. This includes obtaining all reports, documents and transcripts that would challenge the prosecution's theory and support the chosen defense theory. As noted above, the undisclosed materials involve evidence that would likely impeach prosecution witnesses; raise questions about the propriety of the police investigation; call into question the prosecution's forensic expert testimony; and provide evidence supporting the defense trial theory. As there is a reasonable probability that, had counsel performed effectively, the jury would have reached a different verdict, prejudice is demonstrated and relief is required.

### CLAIM 17.   AS A RESULT OF COUNSEL'S INEFFECTIVENESS, COURT ERROR, AND PROSECUTORIAL MISCONDUCT, THE JURY CONSIDERED AND FOUND AN INVALID AGGRAVATING CIRCUMSTANCE IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

560.   The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

240

561.   The sole aggravating factor relied on by the jury in reaching its sentencing determination was that the murder "was committed by means of torture." 42 Pa. C.S. § 9711(d)(8).  *See* Exh. 61.  Prior to trial, counsel raised the issue of the Commonwealth's inability to meet its burden of proof as to each element required to establish the torture aggravating factor.  *See Hicks*, 45-CR-391-2008, Omnibus Mot., Mot. to Quash & Brief In Support, 10/27/08 & 3/17/09.  Yet, at trial, counsel failed to challenge the prosecution's argument and evidence regarding the nature of the decedent's injuries, including opinion evidence that relied on speculation, flawed science and materially misleading forensic testimony.  Counsel's failure to challenge the prosecution's testimony and argument, or present readily available evidence disputing that testimony and argument constituted prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments.

562.   The court's instructions further exacerbated the constitutional errors. The instructions misstated the law, relieved the Commonwealth of its burden of proving beyond a reasonable doubt each and every element required to establish the aggravating factor and effectively directed a verdict.  The instructions were also unconstitutionally vague and overbroad.  The instructional errors and counsel's failure to object or request proper instructions at trial or litigate these issues on appeal violated the Sixth, Eighth and Fourteenth Amendments.  Individually and cumulatively, these constitutional errors warrant relief.

241

## A. Counsel's failure to challenge the prosecution's aggravation evidence and argument.

563.   As noted elsewhere, the prosecution's evidence during the guilt-phase surrounding the cause and manner of death was forensically flawed and inherently unreliable.  *See* Claim 15.  The prosecution did not present any additional evidence during the penalty hearing and, instead, relied on the flawed and inherently unreliable trial testimony.

564.   For a number of reasons, the forensic expert testimony was flawed and inherently unreliable.  First, the prosecution expert's testimony was, at best, ambiguous as to the timing of various wounds found on the victim.  Dr. Ross either qualified each of his timing conclusions with spans of minutes to hours and beyond, *see* NT 11/6/2014 at 34 (swelling on face "consistent with minutes" but it "could be longer."); *id.* at 40 (trauma to the back of the head "could be 5 to 15, 20, 30 minutes or more. It could even be more than that as well"); *id.*  44 (trauma to the sides of the head occurred "conservatively minutes, but it could be much longer than that, half an hour, an hour, even longer than that"); or provided no timing at all, *see id.* at 54-55 (describing trauma to the torso without providing any conclusion as to timing); *id.* at 56-57 (same for knee injuries); *id.* at 58-59 (same for arms/elbows); *id.* at 58 (same for bruises on the foot).  As described in Claim 15, there existed readily available evidence demonstrating that at least some of the injuries suffered by Ms. Null occurred before the date of her death and at the hands of someone other than

242

Mr. Hicks.  Dr. Ross's inability to provide any specificity as to timing rendered the testimony nothing more than speculation; hardly proof beyond a reasonable doubt.

565.   While Dr. Ross described multiple potential causes of death (trauma, strangulation, slit throat), he did not provide any conclusion as to which occurred first, although it was clear that at least two of the proffered causes would have resulted in a quick death or loss of consciousness.  *See* NT 11/6/2014 at 60 (indicating that strangulation would have rendered the victim "out" as quickly as seconds); *id.* at 84 (indicating that a victim of the slit throat would have died within a minute or minutes and certainly be dead once the spine was severed).

566.   In short, "there was no testimony or evidence regarding the order of injuries," nor did the expert provide any "evidence as to when . . . the victim lost consciousness or died."  *Commonwealth v. Spell*, 28 A.3d 1274, 1283 (Pa. 2011). Absent speculation and conjecture, the best that the expert testimony established is that the murder may have been committed by means of torture.   But the Commonwealth "cannot prevail by proving what might have happened – it always has the burden to provide the existence of an aggravating circumstance beyond a reasonable doubt."  *Spell*, 28 A.3d at 1282.

567.   After full discovery and an evidentiary hearing, Mr. Hicks expects to present forensic expert evidence demonstrating that Dr. Ross' conclusions,

speculations and conjectures were forensically flawed and failed to demonstrate the requisite elements of the torture aggravating factor.

568.   Counsel's failure to develop and present the evidence challenging the prosecution's torture theory and their failure to raise these issues on appeal constitutes prejudicially deficient performance.  As noted above, counsel sought to challenge the torture aggravator pretrial but failed to offer any evidence or argument at trial or on appeal that the prosecution failed to meet its burden.  Counsel can have no reasonable strategic basis for failing to develop evidence consistent with their own defense.  *See Jacobs*, 395 F.3d at 104 (counsel's failure to investigate "and discover evidence to support the defense he pursued" objectively unreasonable); Part II. E. As there is a reasonable probability that had counsel performed effectively, the jury would have either rejected the sole aggravating factor or applied less weight and reached a different verdict, relief is required.

**B.     The Instructions Relieved the Prosecution of Its Burden of Proof, Essentially Directed a Verdict, and Failed to Adequately Channel the Jury's Discretion in Violation of the Sixth, Eighth and Fourteenth Amendments.**

569.   The Eighth Amendment requires the State – whether by statute or jury instructions – to "channel the [capital] sentencer's discretion by clear and objective standards that provide specific and detailed guidance and that make rationally reviewable the process for imposing a sentence of death." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). When the State fails to do so, a death sentence is

244

unconstitutionally arbitrary and capricious. *Id.* at 428-29 (1980); *Maynard v. Cartwright*, 486 U.S. 356, 363-64 (1988); *Walton v. Arizona*, 497 U.S. 639, 654 (1990).

570.    Similarly, due process is violated where a criminal statute is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015) (citing *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983)). "These principles apply not only to statutes defining elements of crimes, but also to statutes fixing sentences." *Id.* 135 S. Ct. at 2557 (citing *United States v. Batchelder*, 442 U.S. 114 (1979)).

571.    Pennsylvania's capital sentencing statute, 42 Pa. C.S. § 9711(c)(1)(iii), requires the prosecution prove each element of aggravating factors beyond a reasonable doubt.  42 Pa. C.S. § 9711(c)(1)(iii); *Ring v. Arizona*, 536 U.S. 584 (2002).  This is part of the constitutionally mandated narrowing process that renders the Pennsylvania sentencing scheme constitutional.  *Blystone v. Pennsylvania*, 494 U.S. 299, 308 (1990); *Zant v. Stephens*, 462 U.S. 862, 897 (1983).  This requirement also vests in capital defendants a liberty interest in such proof at sentencing, *Hicks*, 447 U.S. at 346; *Rust v. Hopkins*, 984 F.2d 1486, 1493 (8th Cir. 1993), as well as other due process and Eighth Amendment rights to proof of every element of an aggravator beyond a reasonable doubt. *Sandstrom v. Montana*, 442 U.S. 510, 520

(1979) (due process clause places on the State the burden of proving every element of a criminal offense beyond a reasonable doubt); *In re Winship*, 397 U.S. at 364.

572.   In addition, the Sixth Amendment right to a jury trial "would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death." *Ring*, 536 U.S. at 609.  *See also Sattazahn v. Pennsylvania*, 537 U.S. 101, 111 (2003) (capital sentencing determination constitutes distinct offense "for purposes of the Sixth Amendment's jury-trial guarantee"); *Walton*, 497 U.S. at 709 (Sixth Amendment requires "jury determination of facts that must be established before the death penalty may be imposed") (Stevens, J., dissenting), quoted favorably in *Ring*, 536 U.S. at 600.

### 1. The Court's Instruction.

573.   Section 9711(d)(8) requires that the Commonwealth prove that the murder "was committed by means of torture."  42 Pa. C.S. § 9711(d)(8).  As nothing in the statutory section itself defines torture, that task falls to the court's instructions. *See*, *e.g.*, *Pursell v. Horn*, 187 F. Supp. 2d 260, 398-90 (W.D. Pa. 2002).

574.   The court's opening charge in the penalty hearing included the following instruction on torture:

> In murder of the first degree, when there's torture involved as an aggravator -- what that means is that the Commonwealth has to prove beyond a reasonable doubt that the Defendant, in this case Mr. Hicks, intended to inflict unnecessary pain and suffering *or* must do the killing

in a manner or by means that are heinous, atrocious, or cruel and show exceptional depravity.

NT 11/17/14 at 6.

575.   In its closing charge, the court defined torture as follows:

So what is the one aggravating circumstance in this case? You know it is torture. Let me give you a definition of what torture means under the law.

Anytime a person is killed it's natural to assume that pain, even substantial pain accompanies the act. The Legislature, in providing that killing by means of torture is an aggravating circumstance, contemplated something more than the usual expected pain which accompanies a homicidal act.

For a person to commit first-degree murder by means of torture, the person must intend to do more than kill his victim. He must intend to inflict unnecessary pain or suffering, and he must do so in a manner or by means that are heinous, atrocious, or cruel and show exceptional depravity.

Torture may be defined as an act of inflicting excruciating pain, especially from extreme cruelty or in hatred, revenge or the like.

For torture to be an aggravating circumstance, the pain must be sadistically applied and must be of some substantial duration.

Torture is the infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity or conscious hatred or ill will. *It is the infliction of gratuitous violence on the victim or needless mutilation on the victim.*

Whether the facts in this case constitute torture is a matter for your determination.

NT 11/18/14 at 77-78.

576.   The instructions obviously failed to adequately define torture for the jury, as reflected by their request for "a printed legal definition of torture" that would define "the legal term of torture word for word."  NT 11/18/14 at 93.  The court's response was to merely restate the same instruction it had provided in the closing charge.  *Id*. at 93-94.  As described below, these instructions violated the Sixth, Eighth and Fourteenth Amendments.

### 2. Defining torture as "the infliction of . . . needless mutilation on the victim" violated the Sixth, Eighth and Fourteenth Amendment rights.

577.   As described more fully below, the vast majority of the court's instruction attempting to define torture was so broad and vague that it rendered the application of this aggravating factor in violation of the Sixth, Eighth and Fourteenth Amendments.  The only area of specificity was the court's injection of language indicating that torture exists where there has been "needless mutilation on the victim."   There is no corresponding language in the Pennsylvania Standard Suggested Criminal Jury Instructions (*see* Pa. Standard Crim. Jury Ins. 15.2502G(2)), nor is there any Pennsylvania Supreme Court decision indicating that this language should be included in the definition of torture.

578.   Nor did the court explain to the jury that mutilation alone is not sufficient.  Under Pennsylvania law, at minimum, a torture finding requires "the infliction of pain that is unnecessarily heinous, atrocious or cruel, with the [separate]

intent to cause pain and suffering in addition to the intent to kill." *Rompilla*, 721 A.2d at 792.  Thus, the prosecution must show that the defendant "intended to inflict pain beyond that which accompanied the intentional killing." *Com. v. Auker*, 681 A.2d 1305, 1321 (Pa. 1996); *Com. v. Chester*, 587 A.2d 1367, 1381 (Pa. 1991).

579.  Whether the victim was alive and conscious are critical factors for determining whether or not the prosecution has met its burden of proof.  *See Spell*, 28 A.3d 1274, 1282-84 (Pa. 2011) (lack of evidence as to victim's consciousness and as to when victim died were critical factors in court's finding of insufficient evidence of torture); *id.* at 1282 (quoting *Com. v. Montalvo*, 986 A.2d 84, 109-10 (Pa. 2009)) (location and sequence of injuries, victim's (un)consciousness, and duration of episode are factors to consider).  After all, a defendant cannot "inflict[] *pain* that is unnecessarily heinous, atrocious or cruel" on a dead person, nor can a defendant "inten[d] to cause pain and suffering in addition to the intent to kill" on a person who is already dead.  *Cf. Rompilla*, 721 A.2d at 792.  And when it is ambiguous as to whether the victim was conscious or alive, without more, the evidence is insufficient to establish torture.  *See Spell*, 28 A.2d at 1282-84.

580.  In this case, the evidence clearly established, and counsel plainly conceded, that Mr. Hicks had mutilated the victim's body *post-mortem*.  NT 11/5/14 at 61-62 (counsel concedes in guilt phase opening that Mr. Hicks committed abuse of corpse).  The prosecution's expert even defined "mutilation" as a *post-mortem*

phenomenon: "When [the face, breast, or pelvis area] are cut and severed in a postmortem event, they're being mutilated."  NT 11/6/14 at 47-48.

581.   The court failed to include this distinction (pre- versus post-mortem conduct) in its instructions and, instead, invited the jurors to find this aggravator on the basis of post-mortem mutilation.  NT 11/18/14 at 77-78, 93-94.  When the jury asked for clarification, the court gave the same instruction, with the same "mutilation" clause in the penultimate sentence.  *Id.*

582.   By failing to instruct the jury that the prosecution must prove that the "mutilation" occurred pre-mortem beyond a reasonable doubt, the court relieved the prosecution of its burden of proof in violation of the Fourteenth Amendment.  *See, e.g., Francis*, 471 U.S. at 313; *Carella v. California*, 491 U.S. 263, 264 (1989).

583.   In addition, by removing the element of whether the mutilation occurred pre- or post-mortem from the jury's consideration, the court "'invad[ed] the fact finding function' which in a criminal case the law assigns solely to the jury." *Sandstrom*, 442 U.S. at 523.  *See also Singer v. Court of Common Pleas*, 870 F.2d 1203, 1205-06 (3d Cir. 1984); *United States v. Stansfield*, 101 F.3d 909, 920 (3d Cir. 1996).  It also violated Mr. Hicks' Sixth Amendment right to a jury determination of each element of each aggravator beyond a reasonable doubt and to a jury verdict based upon aggravation proven beyond a reasonable doubt.  Conclusive presumptions that relieve the state of its obligation to prove any element of an

offense violate the Fourteenth Amendment. *Francis*, 471 U.S. at 314; *Sandstrom*, 442 U.S. at 520-24; *see also United States v. Gypsum Co.*, 438 U.S. 422 (1978); *Morissette v. United States*, 342 U.S. 246 (1952).

584.   Likewise, as the court never explained to the jury that the prosecution must prove that the mutilation occurred pre-mortem, there is an unacceptable risk that the jury relied upon materially untrue assumptions in reaching its sentencing determination in violation of federal Due Process. *Townsend*, 334 U.S. at 741; *Tucker*, 404 U.S. at 447. The application of an impermissibly expanded aggravator to Mr. Hicks' case also violated the Eighth and Fourteenth Amendment requirements that the state provide genuine and principled narrowing in capital cases.

585.   As the instructions "allowed the jury to impose death in a way that was . . . at odds with the definition of torture . . . and contrary to the United States Constitution," prejudice is demonstrated and relief is required. *Pursell*, 187 F. Supp. 2d at 398; *see also Mills*, 486 U.S. at 376-77; *Bachellar v. Maryland*, 397 U.S. 564, 570-71 (1970) (where it is equally likely that verdict rested on constitutional ground as well as *unconstitutional* ground, verdict must be set aside); *United States v. Thayer*, 201 F.3d 214, 222 (3d Cir. 1999).

### 3. The court's vague, overbroad and ambiguous instruction that included misstatements of law violated the Sixth, Eighth and Fourteenth Amendments.

586.    As the statute fails to provide any guidance on the definition of torture, the instructions were critical to ensure that the jury's decision-making was properly channeled to avoid an arbitrary and capricious sentencing determination. *See Walton,* 490 U.S. at 653-54 (an otherwise vague statutory aggravating factor can be cured through limiting jury instructions).  For a number of reasons, the instruction in this case failed and violated the Sixth, Eighth and Fourteenth Amendments.

587.    First, ignoring decades of controlling precedent requiring the "heinous, atrocious, and cruel" clause to be conjunctively joined or dependent to the "pain and suffering" clause, *see, e.g.*, *Com. v. Rompilla*, 721 A.2d 786, 792 (Pa. 1998) (torture aggravator not unconstitutionally vague because "heinous, atrocious, or cruel" clause is tied to "intent to cause pain and suffering in addition to the intent to kill"), the court initially instructed in a manner in which the two clauses were disjunctive or independent.  The court told the jury that torture exists if the defendant *either* "intended to inflict unnecessary pain and suffering" *or* committed the murder "in a manner or by means that are heinous, atrocious, or cruel and show exceptional depravity."  NT 11/17/14 at 6.  Thus, at the outset, jurors were provided the wrong standard for determining the presence of torture in violation of the Sixth, Eighth and Fourteenth Amendments.

252

588.   The closing charge did not correct the improper instructions in the opening charge and only exacerbated the constitutional errors.  The charge hinged on two separate and equally unconstitutional elements. First, the defendant must "intend to inflict a considerable amount of pain and suffering on the victim." Second, the manner in which that pain and suffering is inflicted must be "unnecessarily heinous, atrocious, cruel, manifesting exceptional depravity." The manner in which the court defined an intention of inflicting pain did not meaningfully distinguish the case from most other murders and is therefore vague and overbroad.  In addition, the use of the concepts "heinous, atrocious, or cruel" or "manifesting depravity" have repeatedly been found unconstitutionally vague and overbroad by the United States Supreme Court. The modification of these standardless terms with words like "unnecessary" or "exceptional" does nothing to remedy that problem.

> a. *"Unnecessarily Heinous, Atrocious, Cruel, Manifesting Exceptional Depravity" Is An Unconstitutionally Vague Definition of the Aggravating Circumstance.*

589.   The United States Supreme Court has repeatedly held that the words "heinous, atrocious, or cruel" are too vague to meaningfully channel a sentencer's discretion. In *Maynard v. Cartwright*, 486 U.S. 356, 363-64 (1988), a unanimous Supreme Court, applying *Godfrey*, held that the phrase "especially heinous, atrocious or cruel" is unconstitutionally vague in defining an aggravating circumstance. *See also Pursell v. Horn*, 187 F.Supp.2d 260, 390 (W.D. Pa. 2002)

("the words 'especially heinous, atrocious, or cruel' are too vague to meaningfully channel a sentencer's discretion").

590.   The only difference between the vague "especially heinous, atrocious, or cruel" language found unconstitutional by the *Maynard* Court and the instructions given in this case is that Mr. Hicks' jury was told that torture involved conduct that was "unnecessarily heinous."   But it is a difference without a distinction. As *Maynard* makes clear, to say that something is "unnecessarily heinous" still "merely suggests that the individual jurors should determine that the murder is more than just 'heinous' whatever that means." *Maynard*, 486 U.S. at 363-64.[31]

591.   Nor does the vague, "manifesting exceptional depravity" language meaningfully distinguish this case from *Godfrey* or *Maynard*.  Indeed, it "actually exacerbate[s] the constitutional problem." *Pursell*, 187 F. Supp. 2d at 391.  As the *Pursell* Court noted, the Supreme Court "has held that the use of the 'depravity,' even when accompanied by the words "especially heinous [or] cruel," is unconstitutionally vague." *Id.* (citing *Walton*, 497 U.S. at 654, and *Richmond v. Lewis*, 506 U.S. 40, 47 (1992)).  The Court also noted that because depravity is often

---

[31] *See also Espinosa v. Florida*, 505 U.S. 1079, 1081 (1992) (per curiam) ("especially wicked, evil, atrocious, or cruel" instruction no less vague than instructions found lacking in *Shell*, *Maynard*, and *Godfrey*); *Stringer v. Black*, 503 U.S. 222, 228-29 (1992) (*Godfrey* compels conclusion that "especially heinous or cruel" instruction violates Eighth Amendment).

used to define malice for first degree murder, "the term itself could 'fairly characterize almost every murder.'" *Pursell*, 187 F. Supp. 2d at 391 (citing *Godfrey*, 446 U.S. at 428). [32]  As a result, the trial court "took a vague instruction and made it overly broad as well." *Id.*

> b. *The Intention to Inflict Considerable Pain and Suffering is an Unconstitutionally Vague Definition of the Aggravating Circumstance.*

592.  Even if the "unnecessarily heinous, atrocious, cruel, manifesting exceptional depravity" portion of the torture instruction did not already render the instruction unconstitutional (and it does), the requirement that the defendant "must intend to inflict a considerable amount of pain and suffering on the victim" does. This instruction allowed the jury to find the aggravator if the defendant simply intended to cause pain or suffering as part of the intent to kill.  But both Pennsylvania and federal constitutional law demand an intent to cause pain above and beyond whatever was necessary to kill the victim.

593.  Intent to cause pain, even considerable pain – as opposed to the intent to cause unnecessary pain for its own sake – is constitutionally inadequate to "provide a meaningful basis for distinguishing the few cases in which [the penalty]

---

[32] *See also Com. v. Moore*, 488 Pa. 361, 365, 412 A.2d 549 (1980); *Com. v. Davis*, 363 Pa. Super. 562, 578-79, 526 A.2d 1205 (1987); *Com. v. Cargill*, 357 Pa. 510, 512-13, 55 A.2d 73 (1947). Consequently, "depravity" exists in every murder case under Pennsylvania law.

is imposed from the many cases in which it is not." *Godfrey*, 446 U.S. at 428. Murder is a violent act. "A person of ordinary sensibility could fairly characterize almost every murder" as intending to cause considerable pain to the victim. *Id*. at 428-29; *see also Com. v. Auker*, 681 A.2d 1305, 1321 (Pa. 1996); *Com. v. Ockenhouse*, 758 A.2d 1130, 1136 (Pa. 2000) ("In virtually all cases of murder the perpetrator inflicts terrible pain and suffering on the victim and by definition, the person who inflicts the killing upon another does so with specific intent.").

594.   Because the court's instruction that torture involves "the intent to cause considerable pain and suffering to the victim" provided no basis for the jury to meaningfully distinguish the circumstances in this case from most other murders, it failed to "channel the sentencer's discretion by clear and objective standards," as required by the Eighth and Fourteenth Amendments.  *Godfrey*, 466 U.S. at 428.

### 4. Prejudice.

595.   As demonstrated above, "nothing limited the absolute discretion of the jury" in determining what is or is not torture.  *Pursell*, 187 F. Supp. 2d at 395.  As there is a reasonable probability that, had the jury been properly instructed, the jury would have either rejected the sole aggravating factor or given it less weight and reached a different verdict, relief is required.

256

### 5. Counsel Were Ineffective

596.   The authority described above was readily available to counsel at the time of trial.  Counsel is charged with knowing the "state of the applicable law." *Everett*, 290 F.3d at 509; *see also Blystone v. Horn*, 664 F.3d 397, 422 (3d Cir. 2011). It was counsel's theory to challenge the applicability of this aggravator and they did so in pretrial motions.  Nevertheless, counsel failed to object to the instructions, nor did counsel raise and litigate the obvious constitutional errors arising from the improper instructions on appeal.  Counsel's failure to ensure that the jury was properly instructed constitutes deficient performance.  *See Breakiron*, 642 F.3d at 137; *Carpenter v. Vaughn*, 296 F. 3d 138, 158-50; *Everett*, 290 F.3d at 513.

597.   As torture was the sole aggravating factor, there is a reasonable probability that, had the jury been properly instructed, one or more jurors would have rejected the aggravator and reached a different sentencing determination. Similarly, had counsel preserved and raised these claims on appeal, there is a reasonable probability that the results of the appeal would have been different. Accordingly, prejudice is demonstrated and relief is warranted.

598.   Appellate counsel was precluded from raising the claims of ineffective assistance of counsel on direct appeal. *See Grant*, 813 A.2d at 738. To the extent counsel could have raised the above-described errors on direct appeal under controlling precedent and procedure, counsel's failure to do so constitutes

ineffective assistance of counsel in violation of the Sixth, Eighth and Fourteenth Amendments. Because there is a reasonably probability that the results of the appeal would have been different, prejudice is demonstrated and relief is required.

## CLAIM 18. THE JURY'S FAILURE TO FIND AND WEIGH MITIGATING CIRCUMSTANCES THAT WERE CONCEDED BY THE PROSECUTION VIOLATED THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

599.   The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

600.   During the penalty hearing, counsel presented evidence of non-statutory mitigating circumstances, including Mr. Hicks' "active religious practices" and his "positive adjustment to prison life."  Exh. 61 at 4.  The prosecutor did not challenge the evidence presented by the defense in support of those mitigating circumstances and, during closing, told the jury that "the religion, the practice of religion, the positive adjustment to prison life, that's all well established" and that it was up to the jurors to provide "whatever weight you think is appropriate" in reaching its sentencing determination.  NT 11/18/2014 at 59.

601.   Nevertheless, the jury failed to find these mitigating circumstances, let alone consider them during the weighing process.  Exh. 61 at 4.  The jury's failure to consider and weigh mitigation that the prosecution conceded as proven rendered the death verdict invalid for a number of reasons.

602.   First, it violated the hallmark Eighth and Fourteenth Amendment requirement that the jury must fully consider and give effect to all relevant mitigating evidence. *Eddings*, 455 U.S. at 113-14; *see also Lockett*, 438 U.S. at 605; *Skipper*, 476 U.S. at 4; *Hitchcock v. Dugger*, 481 U.S. 393, 394 (1987) *Penry*, 492 U.S. at 319.   While the jury "may determine the weight to be given relevant mitigating evidence" it "may not give it no weight by excluding such evidence from their consideration." *Eddings*, 455 U.S. at 114-15.   Here, the jury failed to consider relevant mitigation evidence that the prosecution conceded had been proven.  Having failed to do so, the jury's sentencing determination violated the Eighth and Fourteenth Amendments.

603.   It also violated Pennsylvania's capital sentencing statute requirement that the jury "find the existence of any mitigating circumstances that have been proven by a preponderance of the evidence." *Commonwealth v. Rizzuto*, 777 A.2d 1069, 1089 (Pa. 2001) (citing *Commonwealth v. Cox*, 728 A. 2d 923 (Pa. 1999)). "When [the mitigating circumstance] is undisputed, the jury has no discretion but to find the objective circumstance, and specifically include it in any weighing of aggravators and mitigators." *Commonwealth v. Knight*, 156 A.3d 239, 248 (Pa. 2016).   Here, the two mitigating circumstances were not merely "undisputed."  The prosecutor conceded that they were proven and told the jury it must weigh them in reaching its sentencing determination.  The jury's failure to do so violated Mr. Hicks'

due process life and liberty interests in having his punishment fixed by a jury in accordance with Pennsylvania's capital sentencing statute. *Evitts*, 469 U.S. at 393; *Hicks*, 447 U.S. at 346; *Ford*, 447 U.S. at 427-31 (O'Connor, J., concurring).

604.   The jury's failure to find, consider and weigh the two conceded mitigating circumstances also rendered the sentencing verdict arbitrary and capricious in violation of 42 Pa. C.S. § 9711(h)(3)(i) and the Eighth and Fourteenth Amendments.   Permitting the jury "discretion to ignore" mitigating circumstances the prosecution concedes "would be granting the right to arrive at a sentencing verdict in an arbitrary and capricious fashion. Such a conclusion would undercut the very purpose of the death penalty sentencing scheme as developed by our General Assembly." *Rizzuto*, 777 A.2d at 1089.   The United States Supreme Court found Pennsylvania's capital sentencing statute conformed with the Eighth and Fourteenth Amendment requirements, in part, because the statutory framework allowed the jury to "consider and give effect to all relevant mitigating evidence." *Blystone*, 494 U.S. at 305.   Injecting jury discretion to reject mitigation proven and conceded by the prosecution would render the statute arbitrary and capricious in violation of the Eighth and Fourteenth Amendments.

605.   Although each of these principles were clearly established at the time of Mr. Hicks' trial, and "[t]he parties and the trial court [had] a corresponding responsibility to ensure the statutory construct is honored and the process is not

compromised by an arbitrary factor," *Knight*, 156 A.3d at 248, the jury was never told that because the two mitigating factors were proven, it must find, consider and weigh those mitigating circumstances in reaching its sentencing determination. Indeed, both the instructions and the Sentencing Verdict Slip gave the jury the opposite message – lumping these mitigating circumstances with those that the jury was instructed to determine whether or not the defense had proven by a preponderance of the evidence. As Pennsylvania law vested in Mr. Hicks a right to proper jury instructions on these matters, the failure to provide those instructions violated federal due process. *Evitts*, 469 U.S. 387 (1985); *Hicks*, 447 U.S. at 346.

606. For these reasons, the sentencing verdict violated the Sixth, Eighth and Fourteenth Amendments and Pennsylvania's capital sentencing statute. As there is a reasonable probability that, had the jury been properly instructed that it must consider and weigh these two additional mitigating circumstances against the sole aggravating factor found, it would have reached a different verdict, relief is required.

### A. Counsel were ineffective

607. Counsel were well aware that the prosecution had conceded these two mitigating circumstances were "well established" and that the jury must weigh those circumstances in reaching its sentencing determination. Nevertheless, counsel failed to request an accurate Sentencing Verdict Slip reflecting that these mitigating circumstances were proven, nor did counsel request proper instructions telling the

jury that it must weigh those mitigating circumstances in reaching its verdict. Counsel's failure to do so constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments. *Everett*, 290 F.3d at 513, 514; *Carpenter*, 296 F.3d at 158-50. As there is a reasonable probability that had the jury been properly instructed, it would have reached a different sentencing determination, prejudice is demonstrated and relief is required.

608.   Similarly, counsel's failure to raise and litigate the jury's failure to find, consider and weigh conceded mitigation post-trial and on direct appeal constitutes prejudicially deficient performance. As described above, the jury's failure to do so violated the Sixth, Eighth and Fourteenth Amendments as well as Pennsylvania's capital sentencing statute. In addition, counsel's failure to raise these issues skewed the Pennsylvania Supreme Court's mandatory review as required by 42 Pa. C.S. § 9711(h). As there is a reasonable probability that, had counsel performed effectively, the results of the appeal would have been different, relief is required.

**CLAIM 19.   AS A RESULT OF PROSECUTORIAL MISCONDUCT, COUNSEL'S INEFFECTIVENESS AND COURT ERROR, THE JURY WAS PERMITTED TO CONSIDER NON-STATUTORY AGGRAVATION IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

609.   The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

610.   Pennsylvania's capital sentencing statute explicitly limits consideration of only those aggravating factors specifically articulated in 42 Pa. C.S. § 9711(d).

*See* 42 Pa. C.S. § 9711(a)(2) ("[e]vidence of aggravating circumstances shall be limited to those circumstances specified in subsection (d)").

611.   As a result, non-statutory evidence or argument "is not a legitimate factor on which a sentence of death can be based." *Commonwealth v. Fisher*, 681 A.2d 130, 148 (Pa. 1996). *See also Commonwealth v. Chambers*, 599 A.2d 630, 644 (Pa. 1991) (biblical argument); *Commonwealth v. Morales*, 701 A.2d 516, 528-29 (Pa. 1997) (argument for death based upon fear that "liberal judges" will parole defendant in response to "perceived failing[s] of the criminal justice system"); *Commonwealth v. Hall*, 565 A.2d 144, 152 (Pa. 1989) (future dangerousness); *Commonwealth v. Floyd*, 484 A.2d 365, 370 (Pa. 1984) (argument as to "chance that a defendant might receive parole"); *Commonwealth v. Marrero*, 687 A.2d 1102, 1108 n.19 (Pa. 1996) (future dangerousness); *Commonwealth v. LaCava*, 666 A.2d 221, 237 (Pa. 1995) ("society's victimization at the hands of drug dealers").

### A. The Non-Statutory Evidence and Argument.

612.   During the guilt-phase, the prosecution presented the testimony of prior alleged assaults through the testimony of Ms. Alston, Ms. Washington, and Ms. Chavez.   NT 11/6/14 at 184-213; NT 11/7/14 at 60-107.   Other evidence of additional purported assaults and other criminal conduct was also elicited during the testimony of Troopers VanLouvender and Sebastianelli.   NT 11/10/14 at 143; 188-89; CW Tr. Exhs. 102 & 102A.

613.   The sole statutory aggravating factor pursued by the prosecution was that the murder was committed by means of torture.  Testimony regarding other bad acts was neither relevant nor material to that aggravating factor.  Nevertheless, at the beginning of the penalty hearing, the prosecution moved to incorporate all the evidence from the guilt-phase, including the irrelevant other crimes evidence.  NT 11/17/14 at 7-8, 16.  The prosecutor also argued that the other crimes evidence demonstrated Mr. Hicks' alleged history of violence against women and weighed in favor of a death sentence: "You know, that kind of history.  That's important too.  That history of violence against women is important here."  NT 11/18/14 at 57-59.

614.   Not only did counsel fail to object to the jury's consideration of this patently inadmissible non-statutory aggravation, they actually presented additional other crimes/bad acts evidence through the testimony of Suzanne Downing, a former girlfriend.  NT 11/17/14 at 63.  In response to counsel's questions, Ms. Downing described an incident in which they were arguing and she described Mr. Hicks as "mad, but … calm" as he drove the car they were in "like a hundred miles an hour down the highway," took an exit into a residential area where "[h]e kept yelling . . . that he was going to kill [her]." *Id.* at 75.  She "thought he might actually kill [her]" and ultimately ran away and called the police. *Id.* at 76.  On cross, the prosecution emphasized Ms. Downing's testimony that she had "jumped out of the vehicle as it

was racing through the residential neighborhood" to get away; that he had threatened to kill her; and that he "seemed calm to her." *Id.* at 82-83.

615.   While it was well-settled by the time of Mr. Hicks' trial that future dangerousness is not a proper consideration under Pennsylvania's capital sentencing statute, *see Hall*, 565 A.2d at 152; *Marrero*, 687 A.2d at 1108 n.19, counsel also remarkably argued that "part of the whole process of whether or not you impose the death penalty on someone is not the nature or the heinousness of the crime but the future dangerousness of this person." NT 11/18/14 at 62. *See also id.* at 62-63 ("But if a person can adjust to prison life, if they exhibit no future dangerousness to society, then that's what this process is about").

616.   In addition to violating Pennsylvania's capital sentencing statute, the jury's consideration of this non-statutory evidence and argument in reaching its sentencing determination violated clearly established federal constitutional law for a number of reasons.  It violated Mr. Hicks' Due Process and Sixth Amendment rights to a verdict based solely on the relevant evidence and law.  *See* Part II.B.

617.   In a weighing state such as Pennsylvania, *Blystone*, 494 U.S. at 305; 42 Pa. C.S. § 9711(c)(1)(iv), where the only appropriate subjects of a capital sentencing proceeding are the aggravating and mitigating circumstances that are properly before the sentencing jury, the consideration of non-statutory aggravation also violates the Eighth Amendment.  *Sochor v. Florida*, 504 U.S. 527, 532 (1992) ("there is Eighth

Amendment error when the sentencer weighs an 'invalid' aggravating circumstance in reaching the ultimate decision to impose a death sentence"); *see also Espinosa v. Florida*, 505 U.S. 1079, 1081 (1992); *Stringer v. Black*, 503 U.S. 222, 230 (1992); *Clemons v. Mississippi*, 494 U.S. 738, 748 (1990).

618.   It violated the Eighth Amendment requirement that the State channel the jury's discretion by clear and objective standards.  *See* Part II.A; *Godfrey*, 446 U.S. at 428.  Because the State "has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty," *id*., a death sentence that is based on a consideration of evidence or arguments that are irrelevant to the particular defendant and thus outside the scope of the applicable law is unconstitutionally arbitrary and capricious.

619.   The jury's consideration of the non-statutory evidence and argument violated each of these clearly established federal constitutional principles.  As there is a reasonable probability that, had the evidence and argument been properly excluded one or more jurors would have reached a different sentencing determination, prejudice is demonstrated and relief is required.

**B.    Counsel were Ineffective.**

620.   Counsel's injection of bad acts non-statutory aggravation and future dangerousness into the jury's sentencing consideration constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments.

As noted above, the law was well-settled long before Mr. Hicks' trial that the jury was precluded from considering these factors and counsel could have no reasonable strategic basis for asking the jury to consider that which Pennsylvania's capital sentencing statute precludes it from considering. As there is a reasonable probability that, had counsel performed effectively, one or more jurors would have reached a different verdict, prejudice is demonstrated and relief is required.

621. Similarly, counsel's failure to object to the prosecution's admission of the patently improper non-statutory aggravation evidence and argument and/or to request an instruction directing the jury that it was precluded from considering that evidence and argument in reaching its sentencing determination constitutes prejudicially deficient performance. The prohibition against the jury's consideration of non-statutory aggravation was well-settled by the time of Mr. Hicks' trial. Counsel can have no reasonable strategic basis for permitting the jury to consider patently inadmissible evidence and argument. As there is a reasonable probability that, had the evidence and argument been precluded and the jury properly instructed, one or more jurors would have reached a different sentencing determination, prejudice is demonstrated and relief is required.

**CLAIM 20.  COUNSEL'S FAILURE TO INVESTIGATE, DEVELOP, AND PRESENT READILY AVAILABLE MITIGATING EVIDENCE VIOLATED THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**



**CLAIM 21.  THE COURT'S PENALTY PHASE INSTRUCTIONS VIOLATED THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

760.  The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

320

761.   The court's penalty phase instructions were incomplete, inaccurate, confusing, and violated Mr. Hicks' constitutional rights.

### A. The Court's Failure to Instruct the Jury that It Could Not Consider Non-Statutory Aggravation Evidence and Argument.

762.   As described in Claim 19, the prosecution presented improper non-statutory aggravation evidence and argument during the penalty hearing.  Although the statute and clearly established federal constitutional law precluded the jury from considering this evidence and argument in reaching its sentencing determination, the court failed to issue a limiting instruction.

763.   Indeed, the court's instructions actually encouraged the jury to consider this evidence and argument.  *See* NT 11/18/14 at 74 ("You should carefully consider what their arguments were in light of what you heard today and yesterday, and use those arguments inasmuch as they guide you and inasmuch as the evidence might support the various arguments of counsel"); *id.* at 75 ("And as I believe you understand, the Commonwealth moved their evidence in the sentencing phase the evidence from the guilt phase.  That was moved in at the beginning of the sentencing phase"); *id.* at 78 ("In deciding whether aggravating circumstances exist and whether aggravating outweigh mitigating circumstances, you should consider the evidence and arguments offered by counsel and evidence that you heard during the earlier part of the trial, to the extent that it bears upon the issues now before you").

764.   The court's failure to properly instruct the jury that it was precluded from considering this evidence and argument in reaching its sentencing determination violated Mr. Hicks' clearly established Due Process and Sixth Amendment rights to a verdict based on competent evidence and relevant law (*see* Part II.B.); the Eighth Amendment prohibition against consideration of invalid aggravation (*see Sochor*, 504 U.S. at 532; *Espinosa*, 505 U.S. at 1081; *Stringer*, 503 U.S. at 230; *Clemons*, 494 U.S. at 748); the Eighth Amendment requirement that the State channel the jury's discretion by clear and objective standards (*see* Part II.A.); and the Fourteenth Amendment life and liberty interest in a verdict that is a product of the process state law requires (*see Hicks*, 447 U.S. at 346).  *See also* Claim 19.

765.   As there is a reasonable probability that, had the jury been properly instructed, it would have reached a different sentencing determination, prejudice is demonstrated and relief is required.

**B.   The Court's Instruction Regarding the Possibility of Commutation Invited Speculation, Injected Improper Considerations in the Sentencing Determination and Was Materially Misleading.**

766.   Although the court instructed the jury that a sentence of life imprisonment means life without the eligibility for parole and that Mr. Hicks could not be released by the Parole Board, *id.* at 1470, the court added:

> The only way that a prisoner can attain release is by a commutation granted by the Governor.
>
> Pennsylvania has something called a Board of Pardons, as well as a

Parole Board. If a life prisoner can convince the Board of Pardons that his sentence should be commuted, that is, made shorter, and the Board of Pardons unanimously represents this to the Governor, then the Governor does have the power to commute the sentence.

If the Governor follows the Board of Pardons' unanimous recommendation and commutes the sentence, the prisoner may be released early or become eligible for parole in the future. I'm going to tell you, however, that the Governor and the Board of Pardons have, to date, extremely rarely ever commuted a sentence of life imprisonment. So that is, for all intents and purposes, not something that happens.

*Id.*

767.   It is settled law that a sentence of life imprisonment under 42 Pa. C.S. § 9711 is life without the possibility of parole.  That is how the Pennsylvania Courts have interpreted the statutory framework for decades.  *See Commonwealth v. Yount*, 615 A.2d 1316, 1320 (Pa. Super. 1992) *app. denied*, 631 A.2d 1007 (Pa. 1993). Studies have demonstrated it is also clear that, absent an instruction telling them that the term life imprisonment means life without parole in Pennsylvania, jurors presume that a capital defendant will be released on parole.  Wanda D. Foglia, *They Know Not What They Do: Unguided and Misguided Decision-Making in Pennsylvania Capital Cases*, 20 Justice Quarterly, No. 1, at 187-211, Table 1 (2003); Wanda D. Foglia, Nathan M. Schenker, *Arbitrary and Capricious After All These Years: Constitutional Problems With Capital Jurors' Decision Making*, 25 The Champion 26, 30 (July 2001) ("When asked how long they thought someone usually

spent in prison if not given the death penalty, the median estimate for Pennsylvania jurors was 15-19 years").

768.   It was the appreciation for the fact that jurors did not know that Pennsylvania defines life imprisonment under Section 9711 as life without parole that resulted in requests for an instruction that would accurately explain the juror's sentencing options.  Otherwise, jurors were left to speculate about the actual time a capital defendant would serve and base their sentencing determination on that speculation.  *See id.* ("In response to a question about whether they would support the death penalty if they knew the defendant would really serve a life sentence, 42% of the Pennsylvania jurors answered that they would prefer life without parole.  Most disturbing, 37% of those who voted for death said that they would have preferred life without parole if they had known that was the alternative, as it indeed is in Pennsylvania").

769.   The Pennsylvania Supreme Court's response to this concern was to sanction an instruction indicating that life imprisonment in Pennsylvania means life without the possibility of parole, but to also add to that instruction a description of the commutation process, similar to that issued in this case. *See, e.g.*, *Commonwealth v. Thomas*, 717 A.2d 468, 481 (Pa. 1998); *Commonwealth v. Trivigno*, 750 A. 2d 243, 254-55 (2000); PA. STD. CRIM. JURY INS. 15.2502F(9).

770.   The first section of the instruction – defining the sentencing option for the jury so it could make a reasoned decision based on the applicable law – resolves the speculation and misapprehension that plagued capital juries.  The second section, on the other hand, injects a different kind of speculation that creates the unacceptable risk of an arbitrary and capricious sentencing determination in violation of the Sixth, Eighth and Fourteenth Amendments.

771.  Pennsylvania's capital sentencing statute survives constitutional scrutiny because it channels the sentencer's discretion to the determination of whether the prosecution met its burden of proof for one or more aggravating factors, whether there exist mitigating circumstances, and the weight jurors deem applicable to each and prohibits the sentencer from relying on passion, prejudice or an arbitrary factor.  *Blystone*, 494 U.S. at 305; 42 Pa. C.S. § 9711(c)(1)(iv).

772.   Adding an instruction that describes what may happen (but, based on the history up to the date of Mr. Hicks' trial, would not happen),[34] undermines any curative value of the instruction defining life imprisonment and injects improper, non-statutory speculative considerations into the jury's sentencing determination in violation of Pennsylvania's capital sentencing statute (*see* Fisher, 681 A.2d at 148); the Sixth Amendment (*see Chandler*, 449 U.S. at 574; *Apprendi*, 530 U.S. at 477;

---

[34] At the time of Mr. Hicks' capital trial, no individual who had been capitally prosecuted and sentenced to life in Pennsylvania had received a commutation/parole.

325

*Gaudin*, 515 U.S. at 514); the Eighth Amendment (*see Godfrey*, 446 U.S. at 428); and the Fourteenth Amendment life and liberty interest in a verdict that is a product of the process state law requires (*see Hicks*, 447 U.S. at 346). *See also* Claim 19.

773.   What may or may not happen *after* the jury reaches its sentencing determination is not a permissible consideration under Pennsylvania's capital sentencing statute. *See Commonwealth v. Jasper*, 737 A.2d 196 (Pa. 1999) (reversing where the court instructed the jury that, if it found death, "the case will be reviewed thoroughly. And after thorough review the death penalty may be carried out"); *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985) ("it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere").

774.   Just as there is a risk that the jury may be more likely to find death on the basis of the speculative prospect that the sentence will be corrected on appeal, there is also an untenable risk that a jury would be more likely to reject life on the basis of an even more speculative prospect of a possible commutation/parole at some undetermined future date, thereby exposing Mr. Hicks to a jury that was uncommonly willing to condemn him to die. *See Morgan*, 504 U.S. at 728-29; *Adams v. Texas*, 448 U.S. 39, 40 (1980).

775.   The distinction between appellate review and commutation only further exacerbates the constitutional errors arising from the court's commutation instruction.   Appellate review is statutorily required by Pennsylvania's capital sentencing statute and that process is governed by precedent and controlling law.  42 Pa. C.S. § 9711 (h).   Commutation, on the other hand, is neither required nor likely, and the process is more political than legal.  The hope for commutation depends on who is elected to the political positions that both serve on the Board of Pardons and appoint other members of that Board.   The process is not one that relies on controlling legal precedent but, instead, involves political, societal and other policy decisions.   If injecting a guaranteed process (like the appeal) into the jury's sentencing consideration violates the Eighth and Fourteenth Amendments, surely injecting the more nebulous political commutation process into the jury's sentencing consideration also violates the Eighth and Fourteenth Amendments.

776.   For the same reasons, the constitutional violations arising from issuing a commutation instruction do not minimize or diminish the need for an instruction that life imprisonment in Pennsylvania means life without parole.  An instruction defining life imprisonment informs the jury of the legal definition of one of its sentencing options as required by Section 9711.  A commutation instruction, on the other hand, injects the speculative consideration of a political process.

777.   For each of these reasons, the court's instruction violated the Sixth, Eighth and Fourteenth Amendment.  Relief is warranted.

### C.   The Court Failed to Properly Instruct the Jury on the Presumption of Life.

778.   The   court's   instructions   violated   the   presumption   of   life constitutionally   and   statutorily   afforded   defendants   in   capital   sentencing proceedings. The court not only failed to directly inform the jury that Mr. Hicks enjoyed a presumption of life, its instructions structurally and textually suggested the opposite.  These errors shifted the penalty-phase burden of persuasion from the prosecution to the defense in violation of due process and the Eighth Amendment. The   instructions,   together   with   counsel's   failure   to   object   and   to   offer constitutionally   correct   alternatives,   rendered   the   death   sentence   arbitrary   and unreliable in violation of the Sixth, Eighth, and Fourteenth Amendments.

### 1.  The Court's Instructions Gave Death Primacy Over Life.

779.   The court did not instruct the jury that there is a presumption that the sentence   would   be   life   and   the   evidence   must   be   sufficient   to   overcome   that presumption. Instead, the court's instructions directed the jury to consider a life sentence only if they were unable to decide on death. *E.g.*, NT 11/18/14 at 83 ("Your verdict actually fixes the punishment at death or life imprisonment"); *id.* ("Your verdict, whether it is death or life imprisonment, must be unanimous"); *id.* at 86 ("If you do not agree unanimously on a death sentence and on the general finding that

would support then you have two immediate options . . .").  Thus, the instructions gave primacy to a death sentence over the presumption of life.

780.   The court's instructions also favored death in their explanation of how the jury should deliberate. The court described the aggravating circumstances and how the jury could impose death first, and then explained the mitigating circumstances. *Id.* at 71-78.

781.   Second, the court instructed the jury as to what they needed to do – i.e., make a finding that there is one aggravating circumstance that outweighs any mitigating circumstances – to return a sentence of death. *Id.* at 72-73. As such, the court's instructions directed the jury to consider and deliberate over a death sentence first, and turn to the remaining options only after determining they could not agree unanimously on a death verdict. *Id.* at 86-87. The court directed the jury to consider whether or not they could find death, not whether or not the presumption of life had been rebutted in order to consider death.   These reject-death-first instructions violated Mr. Hicks' right to a presumption of life.

782.   The penalty-phase verdict form was also structured in favor of death. The first sentencing choice, listed under Section II, subpart A, is "Death."   The choice of a "Life Imprisonment" is listed underneath.  Subpart B then presents the jury with the fill-in formula a death sentencing.  Below this option is subpart C, where options to return a life sentence are finally presented.

329

783.   By telegraphing to the jury that their primary consideration was death, with life a secondary afterthought, the court's instructions shifted the burden of proof.   Rather than requiring the prosecution to overcome the presumption of life, the instructions focused attention on, and directed the jury to, first determine whether the defense had presented sufficient evidence to overcome a presumption of death.

### 2.   Capital Sentencing Requires a Presumption of Life.

784.   The Pennsylvania death-penalty statute requires a presumption of life. *See Commonwealth v. Eichinger*, 915 A.2d 1122, 1138 (Pa. 2007); *Commonwealth v. Marinelli*, 910 A.2d 672, 682 (Pa. 2006); *Commonwealth v. Travaglia*, 467 A.2d 288, 300 (Pa. 1983). Pennsylvania's sentencing statute specifically limits the evidence that may be introduced in aggravation (*see* 42 Pa. C.S. § 9711(a)(2)); requires the prosecution to prove these circumstances beyond a reasonable doubt (42 Pa. C.S. § 9711(c)(1)(iii)); and requires that the jury unanimously agree on the existence of any aggravating circumstance before it may consider that circumstance in its sentencing decision.

785.   On the other hand, the defense may introduce any evidence in mitigation relating to the background, character, or record of the defendant or the circumstances of the offense that could provide the jury a basis to spare his or her life and the statute requires the defense to prove these circumstances only by a preponderance of the evidence. Further, the law requires individual jurors to weigh

330

in mitigation any circumstance they find to be mitigating, whether or not other jurors accept that evidence as mitigating.

786.   This disparate treatment of aggravation and mitigation forms the basis for the Pennsylvania Supreme Court's determination that the statute creates a "presumption of life." *Travaglia*, 467 A.2d at 300-01; *Eichinger*, 915 A.2d at 1138 ("[W]e recognize that life has intrinsic value and should not be taken by the state without good cause, proven to our highest standard, whereas life imprisonment remains our default punishment for capital cases").

787.   When a state mandates certain capital sentencing procedures, it creates Fourteenth Amendment life and liberty interests in those procedures. *See* Part II.B. Having chosen a capital sentencing scheme that affords a capital defendant a statutorily mandated presumption of life, Pennsylvania cannot – without violating federal due process – deny him or her a sentencing verdict imposed in conformity with these procedures. *Id.*; *see also Hicks*, 447 U.S. at 346-47.

788.   In addition, there is a constitutional presumption of life in capital cases, whether or not a state has chosen to create one statutorily. The Supreme Court has made clear that aggravating circumstances "operate as 'the functional equivalent of an element of a greater offense,'" *Ring v. Arizona*, 536 U.S. 584, 609 (2002), for purposes of the Sixth Amendment jury trial guarantee, and "'murder plus one or more aggravating circumstances' is a separate offense from 'murder' simpliciter."

331

*Sattazahn v. Pennsylvania*, 537 U.S. 101, 112 (2003). Accordingly, the Sixth and Fourteenth Amendments compel the same presumption of innocence for the distinct, greater offense of capital murder as they do for first-degree murder alone. To protect this constitutional presumption of life, the due process burden of persuasion for aggravating factors rests squarely on the prosecution.

789.    Any instructional presumption of death – such as the one that was present in this case – operates as a "burden-shifting presumption" that "conflict[s] with the overriding presumption of innocence" and violates due process. *Sandstrom*, 442 U.S. at 523; *Jackson v. Dugger*, 837 F.2d 1469, 1473-74 (11th Cir. 1988).

**3.    The Instructions Shifted the Burden from the Commonwealth to the Defendant and Violated the Presumption of Life.**

790.    The instructions erroneously suggested that any presumption in Mr. Hicks' favor had been extinguished by his conviction; exhibiting a strong structural preference for death – anathema to the presumption of life.

791.    The instructions conveyed the clear message that death is the presumptive sentence and a life sentence is an exception to be imposed only after death is rejected. Such an instruction violated 42 Pa. C.S. § 9711(c), and Mr. Hicks' due process life and liberty interest in a sentencing determination in accordance with the requirements of the Pennsylvania sentencing code. It also violated the federal

constitutional presumption of life that is attendant to the distinct offense of capital murder following *Ring*, 536 U.S. at 609, and *Sattazahn*, 537 U.S. at 112.

792.   In addition – and irrespective of the source of the right – the imbalanced and misleading pro-death instructions operated as a "burden-shifting presumption" that conflicted with the required presumption of life. As the United States Supreme Court has made clear, jury instructions that shift the burden of persuasion to the defendant or imply a presumptive conclusion violate due process. *Francis*, 471 U.S. at 318. That the presumption may be rebuttable rather than conclusive is not of constitutional moment. *Id.* at 317 (The very statement that the presumption "may be rebutted" could have indicated to a reasonable juror that the defendant bore an affirmative burden of persuasion once the State proved the underlying act giving rise to the presumption").

793.   The Pennsylvania death penalty statute places the burden of persuasion as to whether a death sentence should be imposed on the Commonwealth. 42 Pa. C.S. § 9711(c)(iv). In this case, the court's instructions both structurally and overtly required the jury to reject the death penalty before considering a life sentence, improperly shifting the burden of persuasion from the Commonwealth to the defense. At the same time, the pro-death instructions (independently and in combination with other penalty-phase instructional error) impaired the jury's

finding, as well as weighing of, mitigation in violation of the Sixth, Eighth, and Fourteenth Amendments.

794.   Moreover, this error cannot be overcome simply by providing the jury accurate instructions on the burdens of proof. Instructions on burden of proof are no substitute for an explicit instruction on the presumption of life. *See Taylor v. Kentucky*, 436 U.S. 478, 484-85 (1978) ("While the legal scholar may understand that the presumption of innocence and the prosecution's burden of proof are logically similar, the ordinary citizen well may draw significant additional guidance from an instruction on the presumption of innocence."). This is particularly so when the other instructions suggest a diametrically opposite presumption. An explicit instruction on the presumption of life is required to "convey[ ] for the jury a special and additional caution . . . particularly needed in criminal cases" to make no judgment against the defendant based upon his present legal situation. *Id.* at 485.

795.   The false presumption erected by the court's instructions also violated Mr. Hicks' right to an impartial capital sentencing jury as guaranteed by the Sixth and Fourteenth Amendments. "[T]he decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death." *Witherspoon*, 391 U.S. at 523 n.20. Deliberate or not, a juror's views that substantially impair his or her ability to follow the law and to return a life verdict render the juror partial to the Commonwealth. *Morgan*, 504 U.S. at 739; *Ross*, 487 U.S. at 85.

796.   Here, the court's instructions and verdict form misdirected the jury to consider death first and reject death before considering life. This false impression could clearly have tipped the scales toward death in contravention of the law and in violation of the Sixth Amendment right to a fair and impartial jury.

797.   In addition, the court's instructions violated Mr. Hicks' state-created liberty interest in having the jury impose death only when the Commonwealth is able to demonstrate that aggravating circumstances outweigh mitigating circumstances in order to overcome the presumption of life. Mr. Hicks' right to have a jury exercise its discretion to fix his punishment between life and death vested in him a constitutionally protected liberty interest in a sentence resulting from the exercise of that statutorily created discretion. Having statutorily mandated the means by which a capital-sentencing jury must choose between the sentences of life and death, Pennsylvania must follow the dictates of its own law. *Hicks*, 447 U.S. at 346-47. Where, as here, the court's instructions prejudicially altered the jury's perception of its sentencing obligations, due process is denied.

798.   Finally, the capital sentencer may not be precluded from giving full effect to mitigating evidence offered by the defendant as a reason to spare his life. *Mills*, 486 U.S. at 374-75 (*citing Eddings*, 455 U.S. at 110). The court's instructions prevented the jury from giving full mitigating effect to the evidence presented in this case by creating a presumption of death that the evidence must overcome. This

"barrier to the sentencer's consideration of all mitigating evidence," *Mills*, 486 U.S. at 375, violated Mr. Hicks' Eighth and Fourteenth Amendment rights.

799.   Because this court cannot rule out the possibility that the jury applied a presumption of death where statutorily there is none, and shifted the burden of persuasion from the prosecution to the defense, relief is required.

### D.    Counsel Were Ineffective

800.   As the legal principles were clearly established at the time of trial, counsel can have no reasonable strategic basis for failing to fully and adequately raise and litigate the constitutional bases described above requiring that the court provide the jury with proper instructions and a proper verdict form. Counsel's failure to properly raise and litigate these issues at trial constitutes deficient performance. *See Everett*, 290 F.3d at 513; *Carpenter*, 296 F.3d at 158-50.

801.   As there is a reasonable probability that, had the jury been properly instructed, one or more jurors would have rejected aggravation or struck a difference balance and reached a different verdict, prejudice is demonstrated and relief is required.  *Blystone*, 664 F.3d at 427; *Bond v. Beard*, 539 F.3d at 285.

802.   Direct appeal counsel was precluded from raising the above-described claims of ineffective assistance of counsel on direct appeal. To the extent that counsel could have raised these claims under controlling precedent and procedure, counsel's failure to do so constitutes ineffective assistance of counsel in violation of

336

the Sixth, Eighth and Fourteenth Amendments. Because there is a reasonably probability that the results of the appeal would have been different, prejudice is demonstrated and relief is required.

### CLAIM 22.   NUMEROUS INSTANCES OF PROSECUTORIAL MISCONDUCT INDIVIDUALLY AND COLLECTIVELY, VIOLATED THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

803.   The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

804.   The duty of the prosecutor is not to win the case, but to seek justice. *Berger*, 295 U.S. at 88; *Com. v. Anderson*, 415 A.2d 887, 888 (Pa. 1980). When the prosecutor's misconduct infects the trial with unfairness, due process is violated. *See* Part II.C. If the misconduct implicates specific provisions of the Bill of Rights, a petitioner need not demonstrate the trial was fundamentally unfair. Instead, the substantive standard for that particular constitutional violation applies. *Id.*

805.   In Mr. Hicks' case, the prosecution's misconduct throughout both phases of trial prevented the jurors from objectively deliberating on both the guilt and penalty phase verdicts. Alone and in combination, these instances of misconduct "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process," *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974), while simultaneously and independently violating the Fifth, Sixth, Eighth and Fourteenth Amendments. Relief is required.

### A. The Commonwealth Told the Jury that Mr. Hicks Had Committed More Acts of Violence Against Women Than Just the Incidents They Would Hear About at Trial.

806.   In its opening statement, the Commonwealth told the jury that there

existed additional bad acts/other crimes evidence above and beyond that which the

jury would hear that involved assaults against additional women:

> There was a criminal history obtained [on Mr. Hicks] that led to certain
> assaults being allegedly committed on women in these [other] states
> [Mr. Hicks had lived in], and the context of these and the type of women
> I'm talking about involving crack cocaine, elements of prostitution,
> violence that generated at the throat area, blunt force trauma, some
> threatening with sharp knives or other instruments, those kind of things.
> They were all obtained. *Eventually, these women were interviewed, and
> you're going to hear from **some** of them as well.*

NT 11/5/14 at 54-55.  The statement that other victims were out there, whom jurors

would not hear from, and other crimes were out there, which jurors would not hear

evidence of, violated Mr. Hicks' separate and independent Due Process, Sixth,

Eighth and Fourteenth Amendment Rights to a jury determination based on

competent evidence as opposed to speculation and innuendo.  *See* Part II.B; *see also*

Claim 11.A. (involving the admission of other crimes evidence).

807.   It also infected the trial with unfair prejudice.  "In Pennsylvania, the

law is clear that if a testimonial reference[, absent specific circumstances,] . . .

indicates to the jury the accused has been involved in prior criminal activity,

reversible error has been committed."  *Com. v. Nichols*, 400 A.2d 1281, 1282 (Pa.

1979) (quoting *Com. v. Turner*, 311 A.2d 899, 900 (Pa. 1973)).  If "the jury could

338

reasonably have inferred [the petitioner] was involved in other unrelated crimes," prejudice is demonstrated and a new trial is required. *Nichols*, 400 A.2d at 1282.

808.    Here, the prosecutor expressly stated, or at minimum reasonably implied, Mr. Hicks had committed other violent crimes, police had investigated and corroborated those crimes, and the prosecution would present just a sampling of all those other violent crimes.  These comments injected improper considerations into the jury's guilt and penalty determination and infected the trial/verdict with unfairness.  For this reason as well, relief is required.

> ### B.    The Commonwealth Improperly Used Mr. Hicks' Invocation of His Rights to Silence and to Counsel Against Him While Shifting the Burden of Proof to Mr. Hicks to Explain Why Ms. Null's Hands Were in His Wall.

809.    On direct examination, Trooper Sebastianelli testified that he, Trooper Vanlouvender, and Trooper Hilbert had a conversation with Mr. Hicks while driving him to jail after his preliminary arraignment.  NT 11/10/14 at 183-85.  During the conversation troopers informed Mr. Hicks that Ms. Null's hands were found in his house.  *Id.*  Mr. Hicks ultimately ended the conversation by invoking his right to silence and to counsel, stating, "As soon as I talk to my lawyer, I'll tell you guys why those hands were in my house." *Id*. at 185.  Trooper Sebastianelli added:

> I said, "All right, Charles, you have a talk with your lawyer. You give us a call, and we'll talk to you about why the hands were in your house."

> After that, we dropped him off at the prison, and that was the last time we ever had any kind of contact or conversation with Charles Hicks.

*Id.*

810.   This testimony unconstitutionally highlighted the language used in Mr. Hicks' post-warning invocation of his rights to silence and counsel.  *Wainwright v. Greenfield*, 474 U.S. 284, 295 (1986) ("What is impermissible is the evidentiary use of an individual's exercise of his constitutional rights after the State's assurance that the invocation of those rights will not be penalized."); *Doyle v. Ohio*, 426 U.S. 610, 619 (1976); *Com. v. Hunsberger*, 565 A.2d 152, 155 (Pa. 1989) (statements which directly bear on right to speak with lawyer are safeguarded by Fifth Amendment).

811.   The trooper's testimony also unconstitutionally highlighted the fact that Mr. Hicks never explained himself and never told police why Ms. Null's hands were in his house, even after (assumedly) discussing the matter with his lawyer. *Wainwright*, 474 U.S. at 295; *Doyle*, 426 U.S. at 619; *United States v. Canterbury*, 985 F.2d 483, 486 (10th Cir. 1993) ("when a defendant answers some questions and refuses to answer others, or in other words is 'partially silent,' this partial silence does not preclude him from claiming a violation of his due process rights under *Doyle*"); *United States v. Ghiz*, 491 F.2d 599, 600 (4th Cir. 1974).

812.   The prosecutor capitalized on this improper testimony about Mr. Hicks' invocation of his rights in closing argument, emphasizing that this conversation "was

the last" police had with Mr. Hicks, and the defense team knows he cut her up "but they're not telling you the why."  NT 11/14/14 at 63, 88.  By doing so, the prosecutor violated Mr. Hicks' Sixth and Fourteenth Amendment rights.  *See Wainwright*, 474 U.S. at 295; *Hunsberger*, 565 A.2d at 155.  *See also* Claim 14.D.

813.   The prosecutor also used this improper testimony to shift the burden of proof and reiterate the broader theme that Mr. Hicks had not adequately explained himself:  not to police at the time of arrest and not to the jury at trial.  NT 11/14/14 at 63, 88.  *See, e.g.*, *Canterbury*, 985 F.2d at 486-87 (reversal required where prosecutor used defendant's selective silence to focus on defendant's failure to present his exculpatory story at the time of arrest).  The prosecutor argued that absent a satisfactory explanation for the dismemberment, Mr. Hicks must be guilty of first degree murder:

> He cuts her.  Then he cuts her here.  Why does he cut the lower torso in half?  Why would he do that?  Is that a panic, or is that spite and malice? . . . So the defense knows.  They've conceded that he's done these things, but they're not telling you the why.  That was the only thing I didn't hear.  The why goes right back to the time he killed her.  And what was motivating him?

NT 11/14/14 at 63.

814.   By arguing Mr. Hicks must explain why he dismembered Ms. Null's body if he did not intentionally kill her, the prosecutor unconstitutionally shifted to the defense the burden of disproving Mr. Hicks had committed murder, thereby alleviating the prosecutor's burden of proving every element of the offense beyond

a reasonable doubt in violation of Mr. Hicks' separate and independent rights under the Sixth, Eighth and Fourteenth Amendments. *See* Part II.B.; *In re Winship*, 397 U.S. at 364; *Montana v. Egelhoff*, 518 U.S. 37, 54 (1996) (due process requires proof beyond a reasonable doubt of every element, and an instruction that shifts to defendant the burden of (dis)proof on a requisite element violates due process); *Bonomo*, 151 A.2d at 445-46.  Relief is required.

### C. The Commonwealth Used Improper Evidence and Argument to Portray Mr. Hicks as a Predatory Animal and Strike Fear in the Hearts of the Jurors.

815.   Throughout the guilt and penalty phases, the Commonwealth used numerous instances of irrelevant and inflammatory evidence and argument to portray Mr. Hicks as a predatory animal and strike fear in the hearts of the jurors, resulting in guilt and penalty verdicts based not on a dispassionate evaluation of the evidence, but on passion and prejudice.

816.   This theme began in the prosecutor's guilt-phase opening statement, in which he insinuated that Mr. Hicks tried to flee police when they pursued him in unmarked vehicles, NT 11/05/14 at 39, commenting on this for no other purpose but to prejudice and inflame jurors against Mr. Hicks.  (There would be no evidence of flight, as there was none.)

817.   During its case-in-chief, the Commonwealth elicited unconfronted, triple-hearsay that one of Mr. Hicks' neighbors believed he had a car that fit the

description of the suspect car *but she was too afraid of him to call the police*.  NT 11/10/14 at 120-21.

818.   The prosecutor also presented purported indicia of Mr. Hicks' predatory intent, and possible motive to rape or rob, when he elicited testimony from Trooper Vanlouvender that the lifestyle of a prostitute is very high risk; that "prostitutes are often victims of rapes, robberies," because you meet a lot of people whom you do not know and you do not know their background or what their intentions are; *and that the customers (e.g., Mr. Hicks) recognize the prostitute is vulnerable*, "they look at that person as someone who's not going to go and report to the police what happened because they're involved in prostitution themselves." NT 11/10/14 at 109.  No evidence at trial ascribed this predatory intent to Mr. Hicks, and no evidence supported any inference of robbery or rape.

819.   Likewise, the testimony about Trooper Vanlouvender's contact with the FBI Violent Criminal Apprehension Program, NT 11/10/14 at 100-04, was irrelevant, inflammatory, and prejudicial.  ViCAP did not produce any evidence, witnesses, or leads relevant to the discovery or arrest of Mr. Hicks in this case. Introducing the fact that police contacted ViCAP had only one effect:  to lead jurors to base their decisions on the police's assessment that they were dealing with a violent murderer and thus needed the assistance of ViCAP.  Moreover, introduction

of this fact furthered the prosecutor's bald assertion that Mr. Hicks had committed other violent offenses in other states of which the jury would not hear evidence.

820.    In guilt phase closing argument, the prosecutor invented evidence of sexual mutilation, despite knowing that police-evidence existed to the contrary.  The prosecutor displayed numerous gruesome, color photographs of the victim, drawing the jury's attention to two wounds in particular:  one to the right upper breast and one to the lower torso near the labia and arguing these wounds were "a symbol of her gender, and he's defacing it, and he's mutilating it," the wounds were "mutilation, [with] sexual overtones to it."  NT 11/14/14 at 61-62.

821.    Although the prosecutor argued that his "sexual mutilation" evidence was based on the testimony of Trooper Corrigan, Trooper Corrigan did not testify at all regarding any sexual mutilation or sexual deviancy.  *Id.*; NT 11/7/14 at 118-23. Moreover, the police investigation had actually attributed non-sexual reasons for these wounds.   Dr. Conrad Quintyn, a forensic anthropologist, analyzed the amputations and other incision sites/cuts on Ms. Null's body, noted that some of them were "false starts," and did not attribute any sexual connotation to any of the wounds.  Exh. 26 at 2.  And, the prosecution had conceded in his opening, and presented evidence indicating, that the lower torso looked to have been "struck by a vehicle" or dragged underneath a vehicle.  NT 11/5/14 at 17, 169-70.  Dr. Funke (who did not testify) identified this wound near the labia as a laceration, further

344

indicating the wound was not caused by an intentional cut or mutilation incision. Exh. 136 at 9.  Without any evidentiary foundation, the prosecutor's sexual intent and overtones argument had the unavoidable effect of fixing bias and hostility against Mr. Hicks such that jurors could not weigh the evidence objectively.

822.   The prosecutor also asked the jury to speculate on Mr. Hicks' thoughts, which he described as "*overall evil*."   NT 11/14/14 at 90.   Without any expert testimony to support his argument, the prosecutor asked jurors to speculate about the alleged symbolism in the fact that Ms. Null's left hand was wrapped in a local newspaper featuring an article about a death-during-exorcism in Tarrant County, Texas.  NT 11/14/14 at 77-78.  He repeatedly asked jurors (and tried to argue and explain) what Mr. Hicks was telling them, what message was Mr. Hicks sending, through his alleged actions and symbols.  NT 11/14/14 at 61, 67, 75, 78, 93.

823.   The prosecutor further speculated that: "He's giving you another message. She is garbage.  She belongs in bags"; he wanted a horrific sensation when the body was discovered; he *enjoyed* the spectacle and people's speculation about what happened; he wants to keep the hands close to him.  NT 11/14/14 at 66-67, 70, 76, 78. The prosecutor also attributed to Mr. Hicks the thought, "That bitch is mine," but nowhere in evidence did Mr. Hicks curse, use foul language, or call someone a "bitch."  NT 11/14/14 at 75.

824.   The prosecutor carried this theme to the penalty hearing, using animal imagery to evoke racial bias and fear-mongering in this cross-racial murder case when he argued in closing that: "You don't really get to see how he is in his *natural habitat* free on the streets and then see how he interacts with women," NT 11/18/14 at 58, and followed that with an invitation to consider all of the other crimes evidence presented during the guilt phase.  The message was clear:  a black man portrayed as an animal preying on the white woman victim with a history of preying on other women.

825.   Racial bias has no place in any capital sentencing proceeding.  *Peña Rodriquez v. Colorado*, 137 S. Ct. 855, 871 (2017) ("blatant racial prejudice is antithetical to the functioning of the jury system").  The prosecutor's injection of racial bias into the jury's consideration violated the Sixth Amendment right to an impartial jury; Pennsylvania's capital sentencing statute's bar against considering non-statutory aggravation; and the Eighth and Fourteenth Amendment prohibition against an arbitrary and capricious death sentence.

### D.     The Cumulative Impact Requires Relief.

826.   The prosecutor's actions in this case were not simply isolated instances of accidental prosecutorial excess, but rather were repeated and deliberate.  *See Donnelly*, 416 U.S. at 646-47.  Thus, the prosecutor was able to repeatedly inflame jurors' passions and prejudices, and hinder any possible ability of jurors to

346

objectively consider the evidence in this case.  *See Lesko*, 925 F.2d at 1541 (prosecutors have a "heightened duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices").  Individually and cumulatively, the prosecutor's improper arguments denied Mr. Hicks his rights to due process, a fair trial, and a jury determination based on the evidence—rather than one based on the conjecture, speculation, passion, prejudice, and caprice engendered by the misconduct described above.  *See Donnelly*, 416 U.S. at 643; *Berger*, 295 U.S. at 89 (reversing conviction, as prosecutor's misconduct "was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential"); *Moore v. Morton*, 255 F.3d 95, 118 (3d Cir. 2001); *Lesko*, 925 F.2d at 1541-47 (prosecutor's comments on vengeance and defendant's lack of remorse while testifying, individually, would not warrant relief, but considered cumulatively warranted habeas relief).  Relief is therefore required.

827.  The prejudice of the prosecutor's misconduct permeated into the penalty phase as well.  In addition to the improper argument comparing Mr. Hicks to an animal, the court granted the prosecutor's motion to admit into evidence in the penalty phase all of the testimony and exhibits that were admitted in the guilt phase.  The prosecutor then encouraged jurors to fully consider the guilt phase evidence and arguments, necessarily including the instances of misconduct identified above.  NT 11/17/14 at 7-8, 16; NT 11/18/14 at 59-60.  But for the prosecutor's misconduct,

347

there is a reasonable probability that at least one juror would have not found the torture aggravator or would have struck the balance differently and not voted for death in the penalty phase.

828.   The trial court's failure to correct the above errors, or to immediately provide curative measures, was itself also error, requiring reversal.

### E.   Counsel Were Ineffective.

829.   Counsel's failure to object, request limiting and/or curative instructions, or otherwise raise and preserve the Commonwealth's improper arguments denied Mr. Hicks his right to effective assistance of trial counsel, in violation of the Sixth, Eighth and Fourteenth Amendments.  Counsel's failure to properly raise and litigate these issues at trial constitutes deficient performance, and but for counsel's errors, there is a reasonable probability of a different outcome in both the guilt phase and the penalty phase.  Relief is required.

830.   Direct appeal counsel was precluded from raising claims of ineffective assistance of counsel on appeal. *See Grant*, 813 A.2d at 738. To the extent that counsel could have raised the above-described errors on appeal, counsel's failure to do so constitutes ineffective assistance of counsel in violation of the Sixth, Eighth and Fourteenth Amendments.  Because there is a reasonable probability that the results of Mr. Hicks' appeal would have been different had counsel raised this issue, prejudice is demonstrated and relief is required.

**CLAIM 23.   BECAUSE NO RECORD EXISTS OF SIGNIFICANT PORTIONS OF THE TRIAL PROCEEDINGS, MR. HICKS WAS DENIED HIS SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND ARTICLE I, SECTIONS 1, 7, 9, 11, 13, 25 AND 26 OF THE PENNSYLVANIA CONSTITUTION.**

831.   The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

## A. There is No Record of Significant and Critical Portions of the Trial Proceedings.

832.   No record exists of significant, critical portions of the trial court proceedings in Mr. Hicks' case.  Critical information about prospective and seated jurors, important court rulings, and important arguments and discussions between counsel and the court were conducted off record.

833.   First, proceedings held on 06/16/2008 (Petition); 08/20/2008 (Pretrial Conference); 09/25/2008 (Motion to Compel); 06/30/2008 (Status Conference); 09/03/2009 (Status Conference); 03/23/2010 (Status Conference); 01/10/2011 (Status Conference); 05/14/2014 (Status Conference); 08/26/2014 (Motion); and 10/14/2014 (Pretrial conference) were not transcribed, reviewed for error by direct appeal counsel, or presented to the Pennsylvania Supreme Court on appeal.

834.   Upon information and belief, Mr. Hicks asserts that these proceedings were critical portions of the trial court record, necessary for full and fair appellate and post-conviction review.  For example, according to press reports,[35]  during the

---

[35]*E.g.*, Texas link to local murder investigated, Pocono Record, Sept. 26, 2008.

September 25, 2008, hearing on the Motion to Compel, the prosecution discussed investigation to be undertaken by the PSP concerning a homicide in Texas. *See* Claim 16 (alleging failure to disclose material, exculpatory information from joint investigation with Texas authorities); Claim 12 (alleging counsel's ineffectiveness for failing to competently represent Mr. Hicks in plea negotiations).

835.   In addition, the pleadings and voir dire transcripts indicate that the parties and the court discussed voir dire procedures and parameters during the June 25, 2014 Pretrial Motions Hearing and the October 2014 Pretrial Conference, the substance of which is not memorialized anywhere else in the record. *See* NT 10/27/14 at 70. *Compare* Commonwealth's Memorandum, 8/29/14 at 6 (referencing arguments about "hearts and minds" at pretrial motions hearing; hypothetical questions) *with* NT 10/27/14 at 63-64 (Commonwealth objection during voir dire, referencing "[t]hat hearts and minds thing" and hypothetical questions, that the parties and court had clearly previously discussed).

836.   Upon information and belief, Mr. Hicks further expects to demonstrate that certain jurors were excused without voir dire during the unrecorded Pretrial Conference.

837.   Second, although prospective jurors completed extensive questionnaires and the parties clearly relied on these questionnaires to streamline voir dire, the completed questionnaires were not expressly preserved as part of the

record and may no longer exist. *See* Pa. R. Crim. P. 632.  Nor did counsel obtain and make part of the record the list of jurors who failed to show up for jury service.  *See* NT 10/27/14 at 21-22 (court instructs defense to get that list from jury management).

838.    Finally, a number of the prosecution's trial witnesses had testified at the investigative grand jury proceedings.  Those proceedings were not made available to trial counsel, *see* Claim 16, nor were they transcribed and included as part of the appellate record.

### B.    The Failure to Transcribe and/or Preserve Critical Portions of the Record Violated Mr. Hicks' State and Federal Constitutional Rights.

839.    A defendant must "be furnished a full transcript or other equivalent picture of the trial proceedings" so that his "right to appeal will not be an empty, illusory right."   *Commonwealth v. Shields*, 383 A.2d 844, 846 (Pa. 1978). "'[A]dequate and effective appellate review' is impossible without a trial transcript or adequate substitute . . . ."  *Bounds v. Smith*, 430 U.S. 817, 822 (1977); *see also Entsminger v. Iowa*, 386 U.S. 748, 752 (1967) ("there is no question but that petitioner was precluded from obtaining a complete and effective appellate review of his conviction" when counsel failed to take measures to assure review of the full transcripts of the case); *Simmons v. Beyer*, 44 F.3d 1160, 1168 (3d Cir. 1995) ("appellant cannot be denied a 'record of sufficient completeness' to permit proper consideration of his claims"), *cert. denied*, 515 U.S. 1157 (1995); *Commonwealth v.*

*Goldsmith*, 304 A.2d 478, 480 (Pa. 1973) ("meaningful appellate review is impossible absent a full transcript or an equivalent picture of trial proceedings"); *accord Commonwealth v. Anderson*, 272 A.2d 877 (Pa. 1971); *Hardy v. United States*, 375 U.S. 277 (1964); *see also Griffin v. Illinois*, 351 U.S. 12, 19 (1956); *Mayer v. City of Chicago*, 404 U.S. 189, 195 (1971).

840.   When important parts of the record are missing, subsequent counsel is faced with an impossible task; thus Mr. Hicks is precluded from determining if trial errors were committed or if the evidence supports the convictions.  "Under such circumstances, [Petitioner], through no fault of his own, has been deprived of a meaningful appeal and fairness compels the grant of a new trial."  *Andersen*, 272 A.2d at 882; *Commonwealth v. DeSimone*, 290 A.2d 93, 96 (Pa. 1972); *see also Commonwealth v. Smith*, 427 A.2d 1378, 1379 (Pa. Super. 1981) ("meaningful review is not possible without the notes of a voir dire"); *Commonwealth v. Wilson*, 649 A.2d 435, 441 n.6 (Pa. 1994) (noting that the Pennsylvania Supreme Court had ordered the trial court to transcribe and file the notes of testimony of the voir dire so that appellant in a capital case could present a voir dire claim under *Batson*); *Simmons*, 44 F.3d at 1168 (conviction vacated because, inter alia, court could not adequately review *Batson* claim where transcript of voir dire was missing); *United States v. Gregory*, 472 F.2d 484, 486 (5th Cir. 1973).  Thus, the failure to transcribe

the proceedings deprived Petitioner of his federal due process rights as well as his rights under Article I, Section 9 of the Pennsylvania Constitution.

841.   The gaps in the transcripts of proceedings also denied Petitioner his federal and state constitutional and statutory rights.  More specifically, the absence of these parts of the record violated Petitioner's rights to effective assistance of counsel on post-verdict motions and on direct appeal, and to due process.  *Bounds*, 430 U.S. at 822 ("'adequate and effective appellate review' is impossible without a trial transcript or adequate substitute"); *see Mayer*, 404 U.S. at 194 ("[i]n terms of a trial record, [due process requires] that the State must afford the indigent a record of sufficient completeness to permit proper consideration of [his or her] claims."); *Entsminger*, 386 U.S. at 752 ("there is no question but that petitioner was precluded from obtaining a complete and effective appellate review of his conviction" when counsel failed to take measures to assure review of the full transcripts of the case); Griffin v. Illinois, 351 U.S. 12 (1956) (state's failure to provide indigent defendant transcripts necessary for appeal violates due process); *Shields*, 383 A.2d at 846 ("[i]n order to assure that a defendant's right to appeal will not be an empty, illusory right, we require that he or she be furnished a full transcript or other equivalent picture of the trial proceedings"); *Anderson*, 272 A.2d at 882 (when transcripts not requested by counsel and not produced, defendant "has been deprived of a meaningful appeal and fairness compels the grant of a new trial").

842.   The absence of the record amounts to state interference with counsel's ability to subject the relevant proceedings "to meaningful adversarial testing, . . . mak[ing] the adversary process itself presumptively unreliable" and necessitating relief under the Sixth and Fourteenth Amendments.  *Cronic*, 466 U.S. at 659 & n. 25; *Penson v. Ohio*, 488 U.S. 75, 88 (1988); *Evitts*, 469 U.S. at 394.  It also violated Petitioner's "absolute right," *Commonwealth v. Wilkerson*, 416 A.2d 477, 479 (Pa. 1980), to meaningful appellate review guaranteed by Article V, Section 9 of the Pennsylvania Constitution.  *Commonwealth v. Albert*, 561 A.2d 736, 739 (1989).

843.   Further, a capital defendant is entitled to meaningful appellate review of his capital conviction and sentence as an indispensable component of the state and federal constitutional proscriptions against arbitrary and capricious capital sentencing.  *Parker v. Dugger*, 498 U.S. 308, 321 (1991); *Clemons*, 494 U.S. at 749; *Gregg*, 428 U.S. at 195.  Appellate review of a capital case without a full and accurate record of the proceedings violates the Eighth Amendment and Article I, Section 13.  *Dobbs v. Zant*, 506 U.S. 357, 358 (1993); *Gregg*, 428 U.S. at 167, 198 (complete transcript and record on appeal is important "safeguard against arbitrariness and caprice"); *Gardner v. Florida*, 430 U.S. 349, 361 (1971).

844.   The absence of these portions of the record also denied Petitioner the "opportunity to present his claims fairly" to any court, violating his right to

meaningful access to courts, *Bounds*, 430 U.S. at 822 23; and his Pennsylvania constitutional right to open and public proceedings, PA. CONST. Art. I, §§ 7, 9 & 11.

845.   Additionally, Pennsylvania law statutorily guarantees a capital defendant an "automatic" direct appeal to the Pennsylvania Supreme Court "pursuant to its rules," 42 Pa. C.S. § 9711(h)(1), which in turn mandate that in capital cases "the entire record" of the proceedings "shall be reproduced" and forwarded to the Pennsylvania Supreme Court for review.  Pa. R. App. P. 2189(a).  Similarly, the Pennsylvania Supreme Court has a statutory obligation to conduct independent appellate review of the entire record, 42 Pa. C.S. § 9711(h)(1), and the Commonwealth had a legal obligation to transcribe the entire proceedings.  *See also* Pa. R. App. Pro., Rule 2189, Reproduced Record in Cases Involving the Death Penalty ("in all cases involving the death penalty, eight copies of the entire record shall be reproduced and filed").  This independent review of the entire record is indispensable to insure the meaningful appellate review required by the Eighth Amendment, *see Gregg*, 428 U.S. at 167, and to advance Pennsylvania's overriding state interest in ensuring that the death penalty comports with the Constitution, see *Commonwealth v. McKenna*, 383 A.2d 174 (Pa. 1978).

846.   Having statutorily mandated independent Pennsylvania Supreme Court review of the full record, Pennsylvania created a due process life and liberty interest in the performance of a meaningful independent review by the Pennsylvania

Supreme Court. *Evitts*, 469 U.S. at 400 01 ("The right to appeal would be unique among state actions if it could be withdrawn without consideration of applicable due process norms."); *Hicks*, 447 U.S. at 346-47. Without any record of important parts of the trial court proceedings, the Pennsylvania Supreme Court was arbitrarily prevented from fulfilling this statutory and constitutional mandate.

847.   Petitioner need not articulate the specific claims of error that would be revealed by the missing portions of the record – without a transcript counsel is hindered from identifying errors that might have occurred below. *E.g., Smith*, 427 A.2d at 1379 (the petitioner could not "reasonably be[] expected to be more specific [since] to do so would have required his possession of a voir dire transcript" ); *United States v. Selva*, 559 F.2d 1303, 1305 (5th Cir. 1977).

848.   The Supreme Court has long recognized that capital cases demand heightened standards of reliability because of the unique severity and finality of the death penalty. *See* Part II.A. The failure to have all proceedings recorded and transcribed has deprived Petitioner of his procedural safeguards and has undermined the reliability of the verdicts delivered.

849.   Furthermore, the non-transcription of these proceedings violated the Eighth Amendment protection against arbitrary and capricious capital sentencing. A capital petitioner is entitled to meaningful appellate review of his capital conviction and sentence as an indispensable component of the state and federal constitutional

proscriptions against arbitrary and capricious capital sentencing. *Parker*, 498 U.S. at 321 ("[w]e have repeatedly emphasized the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally"); *Gregg*, 428 U.S. at 167; *see also Clemons*, 494 U.S. at 749 (citing cases). This, in turn, requires review of the full and accurate record of the proceedings in his capital case. *See Dobbs*, 506 U.S. at 358 ("[w]e have emphasized before the importance of reviewing capital sentences on a complete record."); *Gregg*, 428 U.S. at 167, 198 (transmittal of complete transcript and record on appeal is an important "safeguard against arbitrariness and caprice"); *Gardner*, 430 U.S. at 361. Appellate review of a capital case without a full and accurate record of the proceedings – indeed, here, with no review of important if not critical stages of the proceedings – violates the Eighth Amendment.

850. The failure to transcribe proceedings during the trial also violated Petitioner's separate and independent rights under Article I, Section 1 of the Pennsylvania Constitution. That section guarantees Pennsylvania citizens the "inherent and indefeasible" right to "defend[] life and liberty." PA. CONST. Art. I § 1. While Section 1 has been held to include due process principles similar to those in the federal constitution, there is no federal constitutional provision mirroring the language of Article I, Section 1. Even the due process component of this Section has been interpreted more expansively than federal due process. *See Commonwealth*

*v. Martin*, 7 A.2d 1136, 1141 42, 1999 Pa Super 29, ¶ 17 (1999), *overruled on other grounds by Commonwealth v. Mouzon*, 812 A.2d 617 (Pa. 2002).  Where, as here, Petitioner was denied transcriptions of critical portions of his trial, his state right to defend his life and liberty on appeal was clearly denied.

851.   For all of these reasons, the absence of significant portions of the state court record violates Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments and his rights under Article I, Sections 1, 7, 9, 11, and 26 of the Pennsylvania Constitution as well as Pennsylvania's capital sentencing statute.

### C.   Counsel were ineffective.

852.   Counsel had a duty to ensure a full and accurate record of their client's capital case proceedings and to ensure preservation of all possible errors for appellate and post-conviction review. Counsel failed to fulfill this duty.

853.   As described above, the failure to ensure that the full and complete record was available for direct appeal and post-conviction proceedings violated the Sixth, Eighth and Fourteenth Amendments and Article I, Sections 1, 9, 13 and 25 of the Pennsylvania Constitution.

854.   Also as described above, counsel failed to ensure that relevant, critical portions of the trial were recorded for purposes of appellate review, including:  the extensive juror questionnaires; discussions setting voir dire parameters and procedures; the excusal of certain jurors without voir dire; the Commonwealth's

representations to the court regarding investigations in other jurisdictions; and grand jury testimony of Commonwealth witnesses. Counsel can have no reasonable strategic basis for failing to ensure a full and accurate record of their client's capital case proceedings for purposes of appellate and post-conviction review. Counsel's failure to ensure the full record was available violated Mr. Hicks' his state and federal rights to meaningful appellate review. Relief is required.

### CLAIM 24. IRRECONCILABLE DIFFERENCES, APPELLATE COUNSEL'S CONFLICT, AND FAILURE TO RAISE AND LITIGATE ALL AVAILABLE ISSUES ON APPEAL VIOLATED THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

855.   The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

856.   Mr. Hicks is entitled to relief because his appellate counsel (who was conflicted) failed to raise meritorious issues that, if properly presented, would have entitled him to relief on direct appeal.

#### A. Mr. Hicks is Entitled to Relief Due to Appellate Counsel's Conflict and Irreconcilable Differences with Mr. Hicks.

857.   Mr. Hicks is entitled to relief because of appellate counsel's conflict and irreconcilable differences with Mr. Hicks. While the state and federal right to counsel does not guarantee an accused the appointment of counsel of choice, he is entitled to effective representation unfettered by any conflict of interest or irreconcilable differences. *Strickland*, 466 U. S. at 686 (right to effective assistance

of counsel); *Holloway v. Arkansas*, 435 U. S. 474, 481-82 (1978) (right to conflict free counsel); *In the Interest of Saladin*, 518 A.2d 1258, 1261 (1986) (same); *Commonwealth v. Tyler*, 360 A.2d 617 (1976) (irreconcilable differences require appointment of new counsel).

858.   Accordingly, an accused may reject assigned appointed counsel and have new counsel appointed "for good cause shown." *See Tyler*, 360 A.2d at 619; *see also Commonwealth v. Johnson*, 236 A.2d 805 (1968); *McMahon v. Fulcomer*, 821 F.2d 934 (3d Cir. 1987); *United States v. Welty*, 674 F.2d 185 (3d Cir. 1982).

859.   The determination of whether an accused has established the requisite "good cause" for change of counsel is left to the discretion of the court. *Commonwealth v. Segers*, 460 Pa. 149, 331 A.2d 462 (1975); *see Commonwealth v. Owens*, 496 Pa. 16, 436 A.2d 129 (1981); *United States v. Golden*, 102 F.3d 936 (7th Cir. 1996); *United States v. Allen*, 789 F.2d 90 (1st Cir. 1986); *United States v. Williams*, 594 F.2d 1258 (9th Cir. 1979).   Axiomatic to the exercise of that discretion, however, is that the court first engages in a careful and complete inquiry.

860.   The record demonstrates that, by the end of trial, there was a complete breakdown of the attorney-client relationship, far beyond the mere disappointment that would typically be experienced by a criminal defendant who just lost at trial.

861.   Mr. Hicks' counsel breached the basic duties of confidentiality and loyalty to his client when he told the press about incriminating statements Mr. Hicks

allegedly made during his mid-trial proffer to the Texas Rangers. *See* PA. R. PROF.

CONDUCT, Rule 1.6(a), Rule 1.8(e). After Mr. Hicks was sentenced to death, the

Pocono Record reported:

> Hicks ended up providing limited information about five cases which
> turned out to be different from the ones the Rangers were investigating,
> according to Mancuso and LaBar. Hicks said he assaulted and "might
> have" killed five women of whom, it turned out, the Rangers were
> unaware.
>
> "He said the women were in 'pretty bad shape' when he left them,"
> LaBar said.

*Poconos' murder might not have been his first*, Pocono Record, Nov. 19, 2014.

There is absolutely no scenario in which counsel's above comments were anything

other than detrimental and adverse to his client.

862.   Mr. Hicks had no confidence in his counsel, told the court counsel

"didn't do a single thing for me," NT 02/14/15 at 9, and filed several pro se pleadings

in the trial court explaining why he was dissatisfied with counsel. *See* Pro Se Petition

to Appoint Alternate Counsel Due to Egregiously Unconstitutional Deprivations of

Due Process, Effective Representation and Other Rights, filed Dec. 18, 2014;

Addendum to Pro Se Petition, filed Dec. 30, 2014; Defendant's Objection to

Counsel's Deliberate Misrepresentation of Issues Complained Of, filed Jan. 22,

2015; Second Addendum to Pro Se Petition, filed Feb. 4, 2015.

863.   In Defendant's Post-Sentence Motion, trial counsel indicated that both

counsel and Mr. Hicks were requesting appointment of new counsel because of the

conflict created by Mr. Hicks' desire to litigate his ineffectiveness claims as part of his direct appeal.  Defendant's Post Sentence Motion, filed Jan. 14, 2015, at 2.  The trial court ruled that Mr. Hicks' direct appeal be confined to preserved record-based issues and that his ineffectiveness claims should be litigated after direct appeal, in separate, sequential PCRA proceedings.  NT 2/17/15 at 6-8.  As a result, the court refused to appoint new counsel and Mr. Hicks was represented on direct appeal by one of his trial attorneys.

864.  Although the court was correct in ruling that Mr. Hicks' ineffectiveness claims should be litigated in separate, sequential PCRA proceedings, the court erred by failing to appoint Mr. Hicks new counsel for the appeal.

865.  Mr. Hicks' repeated submissions and comments to the court and counsel's readiness to withdraw should have put the trial court on notice of the breakdown of the attorney client relationship, obligating the court to conduct sufficient inquiry into the nature of the allegations and the propriety of the request in order to ensure the Sixth Amendment right to counsel. *See McMahon*, 821 F.2d at 942-43; *United States v. Welty*, 674 F.2d 185 (3d Cir. 1982).  In cases in which the counsel in question takes an adversary or antagonistic position against the defendant (which counsel here had done, in the press), the court must appoint new counsel for purposes of conducting that hearing. *See United States v. Wadsworth*,

830 F.2d 1500 (9th Cir. 1987); *United States v. Weaver*, 882 F.2d 1128, 1143 n.9 (7th Cir. 1989). No such inquiry occurred here.

866. To the extent that counsel's statements were not sufficient to trigger the court's obligation to conduct such a hearing, counsel were ineffective for failing to adequately advise the court of the breakdown in their relationship with their client. There can be no strategic basis for counsel to continue representing a client with whom counsel has an adversarial relationship after the duties of confidentiality and loyalty have been breached.

867. Although Mr. Hicks maintains that his irreconcilable differences with counsel resulted in a complete denial of counsel under *United States v. Cronic*, 466 U.S. 648 (1984), and prejudice need not be shown, Mr. Hicks was prejudiced by this denial of counsel. As demonstrated throughout this Petition, there were numerous potentially meritorious issues preserved at trial that could have been raised on direct appeal. Yet, in this capital case, counsel raised just one issue – whether the trial court abused its discretion in admitting the testimony from the three 404(b) witnesses. Direct Appeal Brief at 5, 2016 WL 11491324. Relief is required.

### B. Judicial Bias in Interlocutory Appeal.

868. Mr. Hicks is also entitled to relief because the appearance of impropriety with two justices of the Pennsylvania Supreme Court who decided his interlocutory appeal constituted structural error.

869.   Judge Vican issued a pretrial order limiting the Commonwealth's prior bad act witnesses.  Opinion, filed July 14, 2011.  The Commonwealth appealed, and the Superior Court affirmed Judge Vican's pretrial order.  *Commonwealth v. Hicks*, 53 A.3d 932 (Pa. Super. 2012) (unpublished).  The Pennsylvania Supreme Court then granted the Commonwealth's petition for discretionary review and reversed the Superior Court and Judge Vican's pretrial order, holding that issues of admissibility under Rule 403 were trial issues that could not be decided in a pretrial ruling.  *Commonwealth v. Hicks*, 91 A.3d 47 (2014).  Justice Eakin wrote the Pennsylvania Supreme Court opinion granting the Commonwealth relief on interlocutory appeal.  Justice McCaffrey was also on the court and voted with Justice Eakin to reverse the Superior Court and Judge Vican.

870.   The fact that Justices Eakin and McCaffrey had received and exchanged a plethora of offensive emails (including racially-biased emails) was well-known by the time of Mr. Hicks' direct appeal, *see Commonwealth v. Blakeney*, 753 CAP, Slip Opinion at 4-6 (Sept. 21, 2018) (Wecht, J.), yet counsel failed to raise a challenge to the denial of a fair tribunal in the interlocutory appeal during the direct appeal.

871.  Disqualification is constitutionally mandated whenever the circumstances, viewed objectively, "would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state

and the accused." *Tumey*, 273 U.S. at 532; *see also Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986); *Caperton v. A.T. Massey Coal Co., Inc.,* 556 U.S. 868, 884 (2009); *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980); *In re Murchison*, 349 U.S. 133, 136 (1955).

872.   Pennsylvania courts have not hesitated to find misconduct where judges engaged in inappropriate ex parte communications. *In Matter of Larsen*, 616 A.2d 529, 561-62 (Pa. 1992); *In re Adoption of L.J.B.*, 18 A.3d 1098, 1111 (Pa. 2011); *Judicial Inquiry and Review Bd. v. Snyder*, 523 A.2d 294, 295, 299 (Pa. 1987); *In re Trkula*, 699 A.2d 3, 10 (Pa. Ct. Jud. Disc. 1997); *In re Kelly*, 757 A.2d 456, 460 (Pa. Ct. Jud. Disc. 2000); *Factor v. Factor*, 532 A.2d 823 (Pa. Super. 1987).

873.   Judicial bias – the absence of impartiality – creates a structural defect in the case that renders the proceedings fundamentally unfair and unconstitutional. *Johnson v. United States*, 520 U.S. 461, 468-469 (1997) (citing *Tumey* for the proposition that "lack of an impartial trial judge" is structural error). As such, there is no need for a showing of prejudice. Rather, the right to an impartial tribunal, like the right to counsel, is "too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." *Glasser v. United States*, 315 U.S. 60, 76 (1942). *See also In re Murchison*, 349 U.S. at 136 ("justice must satisfy the appearance of justice," quoting Offutt v. United States, 348 U.S. 11, 14 (1954)); *In Interest of Anthony McFall*, 617 A.2d at 712 ("[i]n order for

the integrity of the judiciary to be compromised, we have held that a judge's behavior is not required to rise to a level of actual prejudice, but the appearance of impropriety is sufficient"); *Caperton*, 556 U.S. at 883. Thus, the "proper constitutional inquiry is whether sitting on the case . . . would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true." *Id.* at 2261 (quoting *Aetna Life Ins. Co.*, 475 U. S. at 825, *Ward v. Monroeville*, 409 U.S. 57, 60 (1972), and *Tumey*, 273 U.S. at 532).

874.   On its face, the sheer number of communications, 4,000 between Justices of the Supreme Court and members of the Attorney General's office creates an appearance of impropriety.

875.   Under these circumstances, it cannot be said that Mr. Hicks received the "impartial and disinterested tribunal" due process requires. *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). Mr. Hicks has amply demonstrated the "serious risk of actual bias" that requires relief. *Caperton*, 556 U.S. at 884.  Relief is required.

### C.   Mr. Hicks is Entitled to Relief Because Appellate Counsel Failed to Raise All Potentially Meritorious Issues.

*876.*   The adequacy of appellate counsel's performance is measured against an "objective standard of reasonableness," *Strickland*, 466 U.S. at 688, "under prevailing professional norms." *Id.*; *Wiggins v. Smith*, 539 U.S. at 521; *Rompilla*, 545 U.S. at 380.  *See also* Part II.E.

877.   The relevant norms in effect at the time of Mr. Hicks' appeal (*see* Part II.E.) describe in unequivocal terms appellate counsel's obligation to "litigate all issues, whether or not previously presented, that are arguably meritorious." AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN CAPITAL CASES, Guideline 10.15.1(C), Duties of Post-Conviction Counsel (2d ed. 2003).   The Commentary to this Guideline clearly explained that appellate counsel must "proceed . . . in a manner that maximizes the client's ultimate chances of success" and specifically rejected the practice of "'winnowing' issues in a capital appeal" because abandoned issues "cannot be necessarily reclaimed later" and "[w]hen a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited." *Id*. Comment, Direct Appeal.

878.   Thus, capital counsel can have no reasonable basis for failing to present a meritorious issue on direct appeal. As described below and throughout this petition, counsel's appellate performance was deficient when they failed to properly raise numerous meritorious issues that had been preserved for direct appeal or that were otherwise cognizable on appeal despite trial counsel's failure to preserve them.

879.   Prejudice is proven when there is a reasonable probability, but for counsel's errors or omissions, the outcome of the proceeding would have been different. *See* Part II.E.   Relief is required because Mr.  Hicks would have been

entitled to relief on direct appeal had appellate counsel raised the potentially meritorious claims contained in this petition.

880.   In addition, as described in Claim 25, the *Joint State Government Commission, Report from the Task Force and Advisory Commission on Capital Punishment in Pennsylvania* issued its report ("Report") on June 25, 2018 demonstrating that Pennsylvania's capital sentencing structure has failed and violates the Sixth, Eighth and Fourteenth Amendments and Article I, Sections 1,9, 13, 25 and 26 of the Pennsylvania Constitution.

881.   Counsel filed a pretrial challenge to the constitutionality of the death penalty and 42 Pa. C.S. § 9711 et. seq. raising a number of the constitutional issues presented in the Report.  *See* Defendant's Omnibus Motion, filed Oct. 27, 2008, at 11-13; Defendant's Brief in Support of First Omnibus Motion, filed Mar. 17, 2009, at 26-27.  Although the trial court denied those claim, *see* Opinion, filed June 5, 2009, at 22-24, counsel failed to raise or litigate these issues on direct appeal.

882.   Counsel can have no reasonable strategic basis for failing to raise these meritorious claims.  As there is a reasonable probability that, had counsel raised these preserved issues on direct appeal, Mr. Hicks would have received relief.

883.   Likewise, trial counsel raised and preserved, but appellate counsel failed to litigate on appeal, other structural problems endemic to Pennsylvania's system of capital punishment.  Defense counsel moved for a bifurcated jury on the

grounds that the death-qualification process results in a jury that is predisposed toward the prosecution and toward a finding of guilt. Counsel averred that this was necessary to protect Mr. Hicks' state and federal constitutional right to a fair and impartial jury at the guilt-phase. Omnibus Motion, filed Oct. 27, 2008, at 11; Defendant's Brief in Support of First Omnibus Motion, filed Mar. 17, 2009, at 23.

884. Defense counsel also challenged the adequacy of Pennsylvania's standard capital jury instructions based on a wealth of social science data showing that jurors do not understand the instructions and fail to follow and/or misapply the jury instructions. Omnibus Motion, filed Oct. 27, 2008, at 11-12; Defendant's Brief in Support of First Omnibus Motion, filed Mar. 17, 2009, at 23-26. The trial court denied the defense motions. Opinion, filed June 5, 2009, at 20-21.

885. There is a reasonable probability that, had appellate counsel raised these issues on appeal, in conjunction with the general challenge to Pennsylvania's death penalty stated above, that Mr. Hicks would have prevailed. One of the main recommendations of the Report was to allow death sentences to be challenged on statistical bases and to obtain formal, empirical feedback on jurors' understanding and application of jury instructions. Report at 31.

## D.   Conclusion

886. The failure to raise or litigate specific meritorious claims on appeal, like those presented throughout this petition and in this claim, constitutes prejudicially

369

deficient performance under federal constitutional law. But for counsel's error, there was a reasonable probability that the outcome of the appeal would have been different. Relief is required.

**CLAIM 25.  PENNSYLVANIA'S CAPITAL SENTENCING STRUCTURE HAS FAILED AND VIOLATES ARTICLE I, SECTION 13 OF THE PENNSYLVANIA CONSTITUTION AND THE EIGHTH AND FOURTEENTH AMENDMENTS.**

887.   The claims and factual allegations throughout this Petition are incorporated herein as if fully stated.

888.   Pennsylvania Senate Resolution No. 6 of 2011 directed the Joint State Government Commission ("JSGC") to establish a task force and advisory committee to conduct a study of capital punishment in Pennsylvania and to report their findings and recommendations.   *See* Exh 137 (hereinafter "Report") at 217-22.   The resolution explained that a study and report were appropriate in light of a variety of problems afflicting Pennsylvania's capital punishment system.   *Id*. at 217-18.

889.   The commission collected and analyzed data from the Administrative Office of Pennsylvania Courts, local county files including District Attorneys' files, the Pennsylvania Commission on Sentencing, the Pennsylvania State University, the Pennsylvania Department of Health, and the Department of Corrections ("DOC"), including the DOC's Bureau of Planning, Research and Statistics.   *See id*. at 7, 9, 19, 25, 28, 33, 56, 76, 82-83, 120, 124-25, 187, 190, 197, 243.   The commission also studied pre-existing research and reporting.

890.   On June 25, 2018, the commission issued its Report.   The Report included recommendations for significant legislative and judicial reforms affecting death penalty cases from pre-trial through trial, appeal, and post-conviction.

891.   The Report demonstrates that Pennsylvania's capital sentencing structure has failed and significant reform is required to meet constitutional requirements.   It demonstrates that the death penalty is imposed arbitrarily, more dependent on where the crime occurs and is prosecuted and the race of the individuals involved than the nature of the crime and offender.   Other factors indicating systemic failures to meet constitutional requirements include:   broad prosecutorial discretion; problems with defense resources and representation; the absence of state-wide supervision or standards for defense counsel; the large number of broadly interpreted aggravating circumstances; the large number of appellate and post-conviction reversals; the absence of proportionality data and review; the over-inclusion of people with intellectual disabilities and mental illness, including some who should be exempt from the death penalty; and the conviction and sentencing of those who are innocent.

892.   Regardless of whether the impairments can be remedied (and the Report makes numerous recommendations), the fact remains that the system, as implemented, fails to meet the constitutional standards.

### A. The JSGC Report's Recommendations and Conclusions Identify Significant Systemic Flaws that Render Pennsylvania's Capital Sentencing Scheme Unconstitutional.

893.    The Report describes systemic flaws in the implementation of Pennsylvania's capital sentencing scheme over a broad range of areas.

### 1. Geographical Bias.

894.    The Report found a complete absence of uniform application of the death penalty based on the county where the crime occurred, and recommended that statutory proportionality review should be adopted to address these disparities prospectively.  Report at 4-5, 30.

895.    Some counties seek and obtain the death penalty frequently, while other counties never seek it.  Indeed, Pennsylvania has the highest intrastate disparity of any state in the country.  *Id*. at 67.  In the two largest counties, Philadelphia and Allegheny, the disparity is particularly stark, as Philadelphia prosecutors have historically sought the death penalty aggressively, while Allegheny County prosecutors have sharply limited its use.  *Id*. at 67, 89.

896.    The study shows that there is no uniform standard in the application of the death penalty, and that whether the death penalty is sought and imposed is largely related to the location of the murder.  "The largest and most proximate differences were among counties in death penalty outcomes."  *Id*. at 24-25.  "In a very real sense, a given defendant's chance of having the death penalty sought, retracted or imposed,

depends upon where the defendant is prosecuted and tried." *Id*. at 90. Such geographical bias fails to serve any legitimate penological purpose and establishes an arbitrary basis for the imposition of death sentences for those persons currently on Pennsylvania's death row.

### 2. Racial Bias.

897. The report determined that "the likelihood of having the death penalty given does vary by race of victim." *Id*. at 5. The report also found that black citizens are disproportionally charged with and convicted of first degree murder compared to white citizens. *Id*. at 87. Although a lack of resources prevented the report from definitely answering the question about racial bias and the death penalty, *id*. at 59, the report endorsed an earlier report provided by the Pennsylvania Supreme Court Committee on Race and Gender Bias, which concluded that Pennsylvania's capital punishment system does "not operate on and even handed basis" and there is evidence of pervasive discrimination, particularly against African Americans. *Id*. at 65. *See also* Claim 22.

### 3. Juror Bias.

898. The Report found that "the death qualification process systematically eliminates jurors who belong to certain social and demographic groups and can also change the way in which case facts are interpreted and discussed by a jury." *Id*. at 11 (quotations omitted). Death qualification skews jury composition "in ways that

consistently disadvantage capital defendants." *Id*. at 26. The report therefore recommended "enactment of a Racial Justice Act to statutorily allow death sentences to be challenged on a statistical basis," i.e., without necessarily establishing purposeful, conscious discrimination. *Id*. at 12, 31. *See also* Claims 6, 7, 8, 22.

### 4.    Inadequate Resources/Standards for Defense Counsel.

899.    Pennsylvania lacks a standardized process for providing defense services to persons accused of capital crimes. The state provides no funding or resources. Instead, those resources are the responsibility of each individual county, each with varying degrees of financial resources to provide to that task.

900.    The report concludes that the lack of state-wide supervision, training, and support undermines those services, as borne out by the many appellate and post-conviction reversals based on the ineffectiveness of trial counsel. *Id*. at 183. Chief Justice Saylor has recognized that the quality of the defense representation provided to indigent capital defendants is a serious problem. *Id*. at 184-85.

901.    Although the Commonwealth requires minimum CLE and experience, there are no performance standards. While the ABA has published such guidelines, and they were endorsed by the report, there is no statewide system to insure that such guidelines can or will be met. *Id*. at 185-86. To address these deficiencies prospectively, the Report recommends the creation of a statewide defender office to provide representation to capital defendants at all stages of litigation. *Id*. at 31, 186.

902.   The lack of uniformity, supervision, or control among counties in the provision of defense services and resources renders Pennsylvania's capital sentencing process unconstitutional.

### 5.   Unfettered Prosecutorial Discretion.

903.   Pennsylvania prosecutors have broad discretion when it comes to the death penalty.  They decide who should be arrested, what crimes to charge, whether or not to seek the death penalty, what aggravators to charge, what plea bargains to offer, and what pleas may be acceptable.  There are no standards to guide any of this vast discretion.  As has been seen, this discretion helps to explain the differences in the use of the death penalty among Pennsylvania counties.  *Id*. at 74.  And because almost all of Pennsylvania's elected District Attorneys are white, the Report recognizes the risk that "unconscious bias" may play in the exercise of that discretion.  *Id*. at 74.  The report suggests the creation of a committee to approve capital prosecutions, such as the Capital Case Committee that the United States Attorney General's Office uses to review and approve capital prosecutions.  *Id*. at 73-74.  No such state wide committee currently exists or is required in Pennsylvania. The existence of such broad, unbridled prosecutorial discretion in the death penalty process has created an unreasonable risk of arbitrariness.

### 6.    Flawed Statutory Aggravating Factor Scheme.

904.    The Report recognizes that the number (18) and breadth of aggravating circumstances in Pennsylvania contributes to the risk of unfair and arbitrary application by failing to adequately narrow the class of persons subject to the death penalty and including aggravators that can have a disproportionate effect against racial and ethnic minorities.  *Id*. at 98.  In light of the risks and flaws in the current statute, the report recommends eliminating or narrowing twelve of the aggravating circumstances—those set forth in 42 Pa.C.S. § 9711 (d)(4), (5), (6), (7), (8), (9), (10), (11), (12), (13), (14), and (15).  *Id*. at 101-02.  Most current death row prisoners were sentenced to death based on one or more of the aggravators that the report recommends eliminating or narrowing.

905.    In short, Pennsylvania has too many aggravating circumstances and they are far too broad.  As a whole, Pennsylvania's statute has failed to adequately narrow the class of defendants subject to the death penalty, and thus, has resulted in its unconstitutional application and imposition.  *See* Claims 17, 21.

### 7.    Restrictive Mitigating Circumstances.

906.    In contrast to aggravation, Pennsylvania's mitigating circumstances are overly restrictive and thus increase the risk of precluding the jurors from considering and giving effect to relevant mitigation evidence and arbitrarily selecting the defendants who receive the death penalty.  *See also* Claims 18, 20, 21. The report

recommends amending the statute to remove qualifying language in § 9711 (e) (2), (3), and (5).  Report at 105.

### 8.    Inadequate Jury Instructions.

907.    The Report raises concerns about the ability of jurors to understand the jury instructions provided to them at a capital sentencing trial.  *Id*. at 149-51.  The Report noted that in studies jurors expressed confusion and misapprehension about what a life without parole sentence means, how to assess and find mitigating circumstances and other difficulties.  The Report reviewed the process for providing Standard Jury Instructions, noting that no follow-up or testing of accuracy of those instructions occurs.  *Id.* at 151.

908.    The Report calls for more study and the inclusion of linguists, social scientists, and psychologists to study the instructions and look for ways to better ensure that the law will be properly understood by jurors. *Id*.  At this time no such process occurs or has occurred to ensure that jurors properly understand the legal standards, resulting in the unacceptable risk that jurors applied instructions in an unconstitutional manner.  *See* Claims 17, 21.

### 9.    Unacceptable Risk of Inclusion of Persons with Intellectual Disability and Serious Mental Illness.

909.   Pennsylvania's death row is overpopulated with people with intellectual disabilities and serious mental illness.

910.   Although the Eighth Amendment bars the execution of persons with Intellectual Disability, *see Atkins v. Virginia*, 536 U.S. 304 (2002), Pennsylvania's death penalty scheme results in an unacceptable risk that persons with Intellectual Disability are sentenced to death as reflected by information provided by the DOC. *Id*. at 8.  The Report offers recommendations for changes in the process, *id.* at 30.

911.   The Report further describes DOC data indicating that mental illness is pervasive among death row prisoners.  The DOC classifies 25 percent of death row prisoners as having an "active mental disorder." *Id*. at 9.  According to the DOC, 50 percent of death row prisoners need mental health treatment.  Thus, while mental illness is meant to be a mitigating circumstance, and some inmates will have illnesses significant enough to exempt them from the death penalty, DOC statistics demonstrate that Pennsylvania's death penalty is disproportionately applied against persons with serious mental illnesses.  *Id*. at 126-27.

912.   While the Report recommends various legislative and procedural changes, *id.* at 143, the over-inclusion of people with serious mental illnesses demonstrates the unconstitutional application of Pennsylvania's capital sentencing structure up to this date.  *See also* Claims 3, 14, 20.

### 10.   The Unacceptable Risk of Executing the Innocent.

913.   No system is perfect and no system can fully protect against the conviction and execution of a person who is actually innocent.  The Report found

that, nationwide since 1973, 162 condemned prisoners have been exonerated as innocent; on average, these prisoners spent 11.3 years under sentence of death until exoneration.  *Id*.

914.   In Pennsylvania, six condemned prisoners have been exonerated as innocent, having spent an average of more than nine years under sentence of death until exoneration.   *Id*. at 16.   "The only certain way to eliminate the risk of condemning and executing a factually innocent person would be to eliminate the sentence and not execute any convict."  *Id*. at 17, 28.  The report approximates that there are currently seven innocent persons on Pennsylvania's death row.  *Id*. at 173. While concluding that "[i]t is not possible to put adequate procedural protections in place to prevent the execution of an innocent person," *id*. at 171, the report recommends changing Pennsylvania's clemency procedures to provide a more adequate safety net.  *Id*. at 15, 27, 159-60.

**11.   The Extraordinarily Large Number of Reversals.**

915.   The Report indicates that, between 1973 and 2013, 188 death sentences were overturned in Pennsylvania in appellate or post-conviction proceedings.  *Id*. at 173.  Between 1978 and 2018, 150 persons sentenced to death in Pennsylvania had their convictions or sentences overturned based on ineffective lawyering.  *Id*. at 17. In 93 of those 150 cases, state (68) or federal (25) courts concluded that defense counsel was ineffective for failing to investigate or present mitigation evidence at

the capital sentencing phase, *i.e.*, evidence justifying a life sentence was available but not presented to the jury. *See id*.

916.   Tellingly, 97 percent of defendants who have had their death sentences reversed have not had death re-imposed following the reversal.  In light of the fact that there have only been three executions during that same time period, the high appellate and post-conviction reversal rate and the low re-sentencing to death rate demonstrate that the imposition of a death sentence is a freakish and arbitrary event in Pennsylvania based not on culpability factors but on identifiable defects in the capital punishment system.

### 12.    Flawed Proportionality Review

917.   The Report found that "[t]here is no process for determining whether the crimes for which the defendants receive the death penalty differ from the crimes for which the defendants receive life imprisonment (without parole)." *Id*. at 25.  The absence of any such process leaves Pennsylvania's death penalty scheme without any safeguard to protect against the arbitrary imposition of the death penalty.

### B. As Applied, Pennsylvania's Capital Sentencing Scheme Violates the Pennsylvania and Federal Constitutions.

918.   The Task Force's findings and recommendations demonstrate that the death penalty in Pennsylvania has been routinely and pervasively imposed based on factors wholly irrelevant to an individual defendant's culpability.  The pervasive

flaws found by the Task Force demonstrate that Pennsylvania's Capital Sentencing Scheme violates the Pennsylvania and Federal Constitutions for a number of reasons.

### 1. Federal Constitutional Standards.

919.   In 1972, the Supreme Court held in *Furman v. Georgia* that the death penalty "could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg*, 428 U.S. at 188 (citing *Furman*, 408 U.S. 238, 313 (1972) (White, J., concurring)).  Since that time, the Supreme Court has made clear that the Constitution can tolerate the death penalty only if states are capable of "ensur[ing] against its arbitrary and capricious application" by confining the punishment to "the worst of crimes." *Kennedy v. Louisiana*, 554 U.S. 407, 447 (2008); *see also Gregg*, 428 U.S. at 188.

920.   This requirement flows from the Eighth Amendment's demand for proportionality and humanity.  As the Court explained, "[w]hen the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint." *Kennedy*, 554 U.S. at 420.  In order to serve legitimate penological aims, the "punishment must 'be limited to those offenders'" whose "extreme culpability makes them 'the most deserving of execution.'" *Id.* (*quoting Roper v. Simmons*, 543 U.S. 551, 568 (2005)).

### 2.      Pennsylvania Constitutional Standards.

921.   The Task Force Report demonstrates that the Capital Sentencing scheme violates a number of Petitioner's separate and independent rights under the Pennsylvania Constitution, including:  his state constitutional right to life and liberty (Art. I, § 1); his inviolate right to trial by jury (Art. I, § 6); his right of access to open courts for review of those claims (Art. I, § 11); his rights to due process and to effective assistance of counsel (Art. I, § 9); his right not to be subject to cruel punishments (Art. I, § 13); his state constitutional right to habeas corpus (Art. I, § 14); and the state constitutional prohibition against discrimination (Art. I, § 26).

922.   These provisions must be read *in pari materia* with Article I, Section 25 which provides that everything in Article I "is excepted out of the general powers of government and shall forever remain inviolate."  Pa. Const. Art. I, § 25.  *See*  Ken Gormley, ed., THE PENNSYLVANIA CONSTITUTION – A TREATISE ON RIGHTS AND LIBERTIES 53-54 (2004).  Having mandated these rights, Pennsylvania has created a Due Process life and liberty interest in those procedures.  *Evitts*, 469 U.S. at 393.

### 3.      The Report Demonstrates that Pennsylvania's Capital Sentencing Scheme Violates the Pennsylvania and Federal Constitutions.

923.   The Task Force Report demonstrates that Pennsylvania's death penalty is imposed arbitrarily and capriciously; fails to serve any legitimate penological

purpose; fails to provide the required heightened reliability in capital cases; and denies citizens of their right to defend life and liberty.

> ### a. The Report demonstrates that the death penalty is imposed arbitrarily and capriciously.

924.   In Pennsylvania, the principal determinant of whether a defendant will be sentenced to death is typically not his blameworthiness but the county in which he commits his crime.   While the death penalty nationwide is characterized by geographical disparity among the states, as of 2010, Pennsylvania had the highest intrastate disparity between population and death penalty cases of any state nationally.   Report at 67.   For instance, in a review based on the Commonwealth's 2015 inmate population, 33 out of Pennsylvania's 67 counties—about half—had not sentenced any defendants to death.   *Id*. at 261.

925.   At the same time, nearly half of the inmates on death row came from a single county: Philadelphia.   *Id*. at 67.   And while Philadelphia County alone accounted for many of the inmates on death row, only eleven death row inmates were from Allegheny County, although its population was nearly as large as Philadelphia's.   *Id*.   The same review of the 2015 inmate population found a 1:2 ratio of death sentences to life sentences in Columbia County, while neighboring Sullivan, Lycoming, and Montour Counties had no death sentences at all despite having 19 life sentences.   *Id*. at 261.

926.   Thus, "[i]n a very real sense, a given defendant's chance of having the death penalty sought, retracted, or imposed depends on where that defendant is prosecuted and tried." *Id*. at 90.  This geographical disparity is precisely the kind of "wanton[]" and "freakish[]" imposition of the death penalty that amounts to cruel and unusual punishment. *Furman*, 408 U.S. at 310 (Stewart, J., concurring).

927.   The race of the victim is also a critical factor in whether a defendant in Pennsylvania will be sentenced to death.  The report concluded that when controlling for other legally relevant variables, defendants were less likely to receive the death penalty when the victim was black than when the victim was white.  Report at 90.

928.   The type of representation a defendant receives also has a critical impact on whether he or she is sentenced to death.  For instance, "[w]hen privately-retained attorneys represented defendants, they were 4%-5% less likely to receive the death penalty, while defendants represented by public defenders were 5%-7% more likely to receive the death penalty…. On the other hand, defendants represented by public defenders in Philadelphia were much less likely to receive the death penalty than defendants represented by public defenders in the other 17 judicial districts" reviewed.  *Id*. at 89 (internal quotation marks omitted).

929.   Moreover, defendants represented by public defenders are less likely than defendants with privately-retained or court-appointed attorneys to have the death penalty filed against them.  *Id*.  Again, the role that these factors – untethered

384

to the defendant's actual culpability – plays in capital sentencing in Pennsylvania results in there being "no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman*, 408 U.S. at 313 (White, J., concurring).  This result is constitutionally untenable.

930.   The Constitution imposes two irreconcilable demands on sentencers. On one hand, it requires states to provide guidance to juries so that they impose the death penalty in a consistent and rational manner.  *Gregg*, 428 U.S. at 195 n.47 ("[W]here the ultimate punishment of death is at issue a system of standardless discretion violates the Eighth and Fourteenth Amendments.").  On the other hand, "the fundamental respect for humanity underlying the Eighth Amendment" requires that states leave juries complete discretion to decline to impose death based on a defendant's individual characteristics. *Woodson*, 428 U.S. at 304 (plurality opinion). "The latter requirement quite obviously destroys whatever rationality and predictability the former requirement was designed to achieve." *Walton*, 497 U.S. at 664-65 (Scalia, J., concurring in part and concurring in the judgment).  By granting juries unfettered discretion to grant mercy to whomever they wish, the law reintroduces into the death penalty system the very sort of arbitrariness that the "narrowing" requirement is intended to remove.

931. The problems inherent in these contradictory requirements are exacerbated in Pennsylvania, where the statutory aggravating and mitigating

circumstances fail to sufficiently channel decision-makers' discretion.  The Report concluded that Pennsylvania's statutory aggravators "are so broad and so numerous that most murders are arguably death eligible, which thwarts consistency in sentencing."   Report at 112.   The report ultimately found that twelve of Pennsylvania's eighteen statutory aggravating factors—under which hundreds of defendants have been sentenced to death—are overbroad and that six of these should be repealed altogether.  *Id*. at 101-04.

932.   These overbroad aggravating factors have failed to channel the sentencer's discretion in the manner required under Article I, section 13 and the Eighth Amendment.  *See Gregg*, 428 U.S. at 195 ("[T]he concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance.").

933.   Pennsylvania's statutory mitigating factors likewise fail to sufficiently guide sentencers' discretion such that only "the most deserving" are punished by death.  *See, e.g.*, Report at 105 (recommending that three of the statutory mitigators be amended because their current language "limit[s] the consideration of mitigating evidence"); *id*. at 133 (noting that jurors "are prone to treating mental illness as an aggravating rather than a mitigating factor, partly because they erroneously view mentally ill defendants as more dangerous than other defendants").

934.   The prevalence of inmates on Pennsylvania's death row with mental illness and intellectual disability reflects that these mitigating factors have failed to ensure that the death penalty is reserved for "the worst of the worst."  As of 2018, the DOC classified approximately 25 percent of inmates on death row as having an active mental disorder, and 14 percent of the inmates as having IQ scores of 75 or below, potentially qualifying them for a diagnosis of intellectual disability.  *Id*. at 121, 124.  All three of the inmates Pennsylvania has executed since 1962 had significant psychiatric problems, suggesting they were not among the most deserving of the death penalty.  *See id*. at 137.

935.   *Gregg* upheld the Georgia sentencing statute in part on the grounds that it provided mandatory proportionality review by the Georgia Supreme Court.  Such review, the Court held, "serves as a check against the random or arbitrary imposition of the death penalty."  *Gregg*, 428 U.S. at 206.  Yet there is no proportionality review in Pennsylvania, allowing arbitrary sentencing to remain unchecked.  Report at 91.

936.   Ultimately, the report makes clear that in the 46 years since *Furman*, Pennsylvania's system of administering the death penalty has not resolved the problems of arbitrariness and capriciousness that rendered it unconstitutional in that case.  The Commonwealth's attempts to apply the death penalty in a fair and reliable manner have failed.  Regardless of whether the Legislature should make yet another attempt to fix the death penalty by adopting the Report's recommendations, or

simply abandon it altogether, Petitioner's sentence of death imposed under the current system does not meet the standards required by either the United States Constitution or the Pennsylvania Constitution.

> b. *The Report demonstrates that the death penalty in Pennsylvania fails to serve any penological purpose.*

937.   To pass constitutional muster, any criminal penalty must serve a legitimate penological purpose: retribution, deterrence, incapacitation, or rehabilitation. *Graham v. Florida*, 560 U.S. 48, 71 (2010). "A sentence lacking any legitimate penological justification is by its nature disproportionate to the offense." *Id*.   The Constitution forbids the imposition of a sanction "so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg*, 428 U.S. at 183.

938.   The death penalty by its nature obviously precludes any possibility of rehabilitation.   *Hall v. Florida*, 134 S. Ct. 1986, 1992-93 (2014).   As for incapacitation, the death penalty is not demonstrably more effective than life in prison without the possibility of parole.   Report at 170 ("while the death penalty clearly advances the aim of incapacitation, it is little better in that regard than life imprisonment without parole."); *see Spaziano*, 468 U.S. at 461 (noting that "incapacitation has never been embraced as a sufficient justification for the death penalty"), overruled on other grounds by *Hurst v. Florida*, 136 S. Ct. 616 (2016)).

939. Thus, the death penalty must serve a retributive or deterrent function. *Atkins*, 536 U.S. at 319 (*Gregg* "identified retribution and deterrence of capital crimes by prospective offenders as the social purposes served by the death penalty" (internal quotations omitted) (*citing Gregg*, 428 U.S. at 153)). And unless the imposition of the death penalty "measurably contributes to one or both of these goals, it is nothing more than the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment." *Id*. (internal quotation marks omitted). "At the moment that [the death penalty] ceases realistically to further these purposes…its imposition would then be the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes. A penalty with such negligible returns to the State would be patently excessive and cruel and unusual." *Furman*, 408 U.S. at 312 (White, J., concurring).

940. The Report makes clear that the death penalty in Pennsylvania fails to significantly advance the Commonwealth's interests in deterrence or retribution. First, the report concludes that "there is no substantial evidence that the death penalty significantly advances the deterrence purpose," and that, moreover, "[i]n a state like Pennsylvania with a relatively large number of death sentences but almost no executions, the deterrent effect of the death penalty is attenuated, regardless of whether a more vigorously applied death penalty would have a deterrent effect." Report at 166, 168.

389

941.   The Task Force's findings in this respect mirror, at least in part, the grounds on which the death penalty has previously been struck down.  *See, e.g., Furman*, 408 U.S. at 311-13 (White, J., concurring) ("[T]he death penalty could so seldom be imposed that it would cease to be a credible deterrent or measurably to contribute to any other end of punishment in the criminal justice system….[A]s the statutes before us are now administered…the threat of execution is too attenuated to be of substantial service to criminal justice."); *id.* at 302 (Brennan, J., concurring) ("A rational person contemplating a murder or rape is confronted, not with the certainty of a speedy death, but with the slightest possibility that he will be executed in the distant future."); *Santiago*, 122 A.3d at 57-58 (finding that "capital punishment, as administered in Connecticut in the post-*Furman* era, has failed to demonstrate a sufficient deterrent effect to justify continued state imposed killing," where the state had executed only one individual since the death penalty was reinstated, and then only after he had waived his appeals); *see also Glossip v. Gross*, 135 S. Ct. 2726, 2768 (Breyer, J., dissenting) (noting that any deterrent effect of the death penalty is undermined where "an offender who is sentenced to death is two or three times more likely to find his sentence overturned or commuted than to be executed; and he has a good chance of dying from natural causes before any execution (or exoneration) can take place"); *Gomez v. Fierro*, 519 U.S. 918, 918 (1996) (Stevens, J., dissenting) ("Delay in the execution of judgments imposing the

death penalty frustrates the public interest in deterrence and eviscerates the only rational justification for that type of punishment."); *Coleman v. Balkcom*, 451 U.S. 949, 952 (1981) (Stevens, J., concurring) ("The deterrent value of any punishment is, of course, related to the promptness with which it is inflicted.").

942.   The death penalty in Pennsylvania likewise fails to measurably advance the goal of retribution more than life without parole.  Report at 165 ("The death penalty advances the purpose of retribution, but…life imprisonment without parole does this sufficiently to obviate the need for the death penalty.").  As with deterrence, the extreme infrequency with which the death penalty is carried out in Pennsylvania undermines any retributive purpose.  *See Furman*, 408 U.S. at 311-12 (White, J., concurring) ("[W]hen imposition of the [death] penalty reaches a certain degree of infrequency, it would be very doubtful that any existing general need for retribution would be measurably satisfied….Nor could it be said with confidence…that community values are measurably reinforced by authorizing a penalty so rarely invoked."); *Coleman v. Balkcom*, 451 U.S. at 960 (Rehnquist, J., dissenting) ("There can be little doubt that delay in the enforcement of capital punishment frustrates the purpose of retribution."); *Santiago*, 122 A.3d at 62-64 (the death penalty in Connecticut fails to serve a retributive purpose due in part to "interminable delays in carrying out capital sentences").

943.   Ultimately, the report concludes that "[b]ecause the severely punitive alternative of life imprisonment without parole is available,…the death penalty is unnecessary, given the many objections to its use and the effectiveness of the alternative."   Report at 175 (emphasis added).   Because the death penalty is unnecessary to fulfill any legitimate penological purpose, it is excessive and violates section 13 and the Eighth Amendment.  *See Graham*, 560 U.S. at 71 ("A sentence lacking any legitimate penological justification is by its nature disproportionate to the offense."); *Atkins*, 536 U.S. at 319 (unless the death penalty "measurably" furthers a legitimate penological goal, "it is nothing more than the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment"); *Furman*, 408 U.S. at 342 (Marshall, J., concurring) (the death penalty is unconstitutional if less severe penalties would satisfy legitimate legislative goals).

### c.  *Pennsylvania's capital sentencing scheme fails to comply with the heightened reliability requirement in capital cases*

944.   The Eighth Amendment requires heightened reliability in capital cases. *Woodson*, 428 U.S. at 305.   The Report makes clear that death sentences in Pennsylvania are anything but reliable.   About 45 percent of all death sentences imposed between 1973 and 2013 were overturned.   Report at 173-74.   Of those individuals who had their conviction or sentence overturned, 97.1 percent were resentenced to a sentence less than death.  *Id*. at 153.  In other words, for nearly half

of those sentenced to death in Pennsylvania, death was ultimately found not to be the appropriate penalty.

945.   Six individuals who were sentenced to death in Pennsylvania were later exonerated of their charges—twice the number of individuals who have had their death sentences carried out.  *Id*. at 1, 171. According to the DOC, 4.1 percent of death row inmates have an IQ score of 70 or below, and 14 percent have an IQ score of 75 or below, indicating that a substantial number of death-sentenced individuals are likely intellectually disabled and thus ineligible for the death penalty.  *Id*. at 120-21; *Atkins*, 536 U.S. at 321.  These numbers in themselves demonstrate conclusively that capital punishment as it has been administered in Pennsylvania since 1978 fails to meet the Eighth Amendment's heightened reliability requirement.

> ### d. Pennsylvania's capital sentencing scheme deprives capital defendants of their separate and independent right to defend life and liberty.

946.   The Task Force findings demonstrate that Pennsylvania's capital sentencing scheme deprived Petitioner of his separate and independent right to defend life and liberty under Article I, Section 1.

947.   The Task Force conclusions implicate the very heart of an individual's right to defend life and liberty.  Capital prosecutions are determined on the basis of geography, unfettered prosecutorial discretion, an over-inclusive aggravating factor list, and racial bias.  Capital trials are plagued by juror bias; overbroad/vague aggra-

-vating factors and restrictive mitigating circumstances; inadequate jury instructions on the complex legal standards; and inadequate defense resources and standards. While one aspect of the right to defend life and liberty includes access to the courts, the elimination of relaxed waiver and absence of proportionality review effectively slams the courtroom door.  The sheer number of reversals demonstrates that the likelihood that every capital defendant is provided his right to defend life and liberty is illusory.  While the Task Force report provides various recommendations to remedy the denial of these rights, the system in place at the time of Petitioner's trial was pervasively flawed – as demonstrated by the Claims presented in this *Petition* – in violation of Article I, Section 1.

### C. Conclusion.

948.   For each of these reasons, Pennsylvania's capital sentencing scheme violated Article I, Sections 1, 9, 13, 14, 25 and 26 and the Sixth, Eighth and Fourteenth Amendments.  To the extent the factual bases for these claims were available, counsel's failure to raise and litigate these claims pretrial, at trial and on appeal constitutes prejudicially deficient performance.  Relief is required.

### CLAIM 26.   THE CUMULATIVE IMPACT OF THE CONSTITUTIONAL ERRORS VIOLATED THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

949.   Courts have long recognized that constitutional claims of error are to be considered cumulatively as well as individually, and that cumulative error or prejudice may provide a basis for relief whether or not the effect of individual errors

warrants relief. *See*, *e.g., Williams*, 529 U.S. at 397-98 (cumulative effect of all mitigating evidence); *Kyles*, 514 U.S. at 437-38 (cumulative prejudice from state's failure to reveal multiple pieces of exculpatory evidence undermined fairness of trial and entitled defendant to relief); *Taylor v. Kentucky*, 436 U.S. 478, 487-88 & n.15 (1978) (cumulative effect of potentially damaging instructions and prosecution argument violated due process); *Donnelly*, 416 U.S. at 639 (considering totality of prosecutorial misconduct in context of entire trial to decide if misconduct was sufficiently prejudicial to violate due process).

950.   Determining whether due process has been violated by a collection of constitutional errors involves the *Brecht* standard for harmless constitutional error – the cumulative errors must have a "substantial and injurious effect or influence in determining the jury's verdict."  507 U.S. 619, 632 n.7 (1993)

951.   Mr. Hicks need not prove any single error (or in this case a series of errors) prejudicial. Rather, a court's doubt concerning the harmlessness of any error (or errors) must be resolved in favor of the petitioner. Part II.G. Moreover, if the Court finds itself in equipoise as to the effect of these cumulative errors, relief must be granted.  Part II.G.

952.   Viewing the entire picture of Mr. Hicks' capital trial, and considering both the nature of the material presented to the jury that should not have been and

the nature of the material not presented to the jury that should have been, the Court cannot have confidence in the guilt or sentencing determination.

### REQUEST FOR RELIEF

WHEREFORE, based upon the foregoing, all other proceedings and submissions, Petitioner, Charles Hicks, respectfully requests that the Court grant him the following relief:

A) That Petitioner be granted such discovery as is necessary for full and fair resolution of the claims contained in this Petition;

B) That leave to amend this Petition be granted;

C) That an evidentiary hearing be conducted on all claims involving disputed issues of fact;

D) That Respondents be Ordered to respond to this Petition; and

E) That Petitioner's convictions and sentences be vacated.

Respectfully submitted,


KELLY D. MILLER, ESQUIRE
Asst. Federal Public Defender
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
Kelly_miller@fd.org

## CERTIFICATE OF SERVICE

I, Kelly D. Miller, hereby certify that on this date I caused the foregoing document to be served on the following person at the location and in the manner indicated below, which satisfies the requirements of the Federal Rules of Civil Procedure:

VIA ECF and/or FIRST-CLASS MAIL

E. David Christine, Jr.
District Attorney
Monroe County District Attorney's Office
610 Monroe Street, Suite 126
Stroudsburg, PA 18360

/S/ KELLY D. MILLER
KELLY D. MILLER, ESQUIRE
Asst. Federal Public Defender
PA Bar #307889
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
kelly_miller@fd.org

Dated: February 1, 2019