# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____
:
CHARLES HICKS,                              :
            Petitioner,        :        No. 1:17-CV-1969
                       :
            v.                          :        (Chief Judge Conner)
                       :
JOHN E. WETZEL, Secretary,                  :        THIS IS A CAPITAL CASE
Pennsylvania Department of Corrections;     :
ROBERT GILMORE, Superintendent of           :
the State Correctional Institution at Greene; :
and MARK GARMAN, Superintendent of          :
the State Correctional Institution at       :
Rockview,                                   :
            Respondents.       :
_____
:

## APPENDIX TO PETITION FOR A WRIT OF HABEAS CORPUS

## VOLUME IV  EXHIBITS 61-137

KELLY D. MILLER, ESQUIRE
Asst. Federal Public Defender
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
Kelly_miller@fd.org

Dated: February 1, 2019

# INDEX TO EXHIBITS

| | |
|---|---|
| 1. | ███████████████████████████ (UNDER SEAL) |
| 2. | All Media Coverage from 01/29/2008 – 02/11/2008 |
| 3. | All Media Coverage from 03/07/2008 – 01/15/2015 and Undated Articles |
| 4. | All Media Coverage News Clips (ON DISC) |
| 5. | *Body Parts* (Claim 4 |
| 6. | Nancy Grace, Kareen Wynter, Rupa Mikkilinei, *Britney Hospitalized Again at Psychiatrist's Request/Body Parts Found Along Pennsylvania Highway – CNN Nancy Grace,* CNN - 01/31/2008 |
| 7. | 69 News, WMFZ TV News Clip (ON DISC) |
| 8. | Blue Ridge, Channel 16 News Clip (ON DISC) |
| 9. | Joe McDonald, *Body Scattered Along Highways*, *"There's Quite a Bit Missing," Despite Finds in Open on I-80, I-830*, The Morning Call – 01/30/2008 |
| 10. | WBRE News Clip – 03/14/2008 (ON DISC) |
| 11. | 69 News, WFMZ TV News Clip (ON DISC) |
| 12. | 69 News, WFMZ TV News Clip (ON DISC) |
| 13. | *Drug Conviction for Prison Guard Monroe Death Probe Expands*, The Express-Times – 09/27/2008 |
| 14. | 93.5/WVPO/WPLY Aired News Stories Summaries |
| 15. | 69 News FMZ TV News Clip (ON DISC) |
| 16. | 69 News WFMZ News Clip (ON DISC) |

| | |
|---|---|
| 17. | <ul><li>*Suspected State Police Killer Frein Caught Near Abandoned Airpark*, Pocono Record – 10/31/2014</li><li>*Eric Matthew Frein, 31, Wanted in Blooming Grove Shooting, Police Say*, Pocono Record – 09/16/2014</li><li>*The Hunt for Eric Frein*, Pocono Record – 09/28/2014</li></ul> |
| 18. | <ul><li>*ISIS Video Show Beheading of American Journalist Steven Sotloff*, CNN – 09/09/2014</li><li>*New ISIS Video Shows Beheading of American hostage Peter Kassig*, Fox News – 11/16/2014</li><li>*The Horror Before the Beheadings*, The New York Times – 10/25/2014</li><li>*French Hostage Herve Gourdel Beheaded in Algeria*, The New York Times – 09/24/2014</li></ul> |
| 19. | Letter from William Sayer to E. David Christine, Jr. – 01/08/2009 |
| 20. | Monroe County Search Warrant, No. N6-909468 – 03/06/2008 |
| 21. | Homicide Investigation Action Report, No. N6-909468 – 04/01/2008 |
| 22. | Monroe County Search Warrant, No. N6-909468 – 03/07/2008 |
| 23. | NLETS Report – 03/04/2008 |
| 24. | Tobyhanna Army Department Record – 03/07/2008 |
| 25. | OTN – 03/14/2008 |
| 26. | Pennsylvania State Police Report, No. N6-909468 – 04/25/2008 |
| 27. | Report of Isidore Mihalakis, M.D. – 01/08/2009 |

| | |
|---|---|
| 28. | Report of John J. Shane, M.D. – 06/01/2011 |
| 29. | Report of Wayne K. Ross, M.D., P.C. – 05/13/2014 |
| 30. | Report of John J. Shane, M.D. – 06/13/2014 |
| 31. | ██████████████████████████ (UNDER SEAL) |
| 32. | ██████████████████████████ (UNDER SEAL) |
| 33. | ████████████████████ (UNDER SEAL) |
| 34. | ████████████████████ (UNDER SEAL) |
| 35. | ██████████████████████████████████ ████████ (UNDER SEAL) |
| 36. | ██████████████ (UNDER SEAL) |
| 37. | ████████████████ (UNDER SEAL) |
| 38. | ████████████████████████ (UNDER SEAL) |
| 39. | ██████████████ (UNDER SEAL) |
| 40. | ████████████████ (UNDER SEAL) |
| 41. | ████████████████ (UNDER SEAL) |
| 42. | ██████████████ (UNDER SEAL) |
| 43. | ████████████████ (UNDER SEAL) |
| 44. | ██████████████ (UNDER SEAL) |
| 45. | ████████████████ (UNDER SEAL) |
| 46. | Interview of Fred Fox – 02/11/2008 |
| 47. | Interview of Jeffrey Michael Macaluso – 02/05/2008 |
| 48. | ██████████████████████ (UNDER SEAL) |

| | |
|---|---|
| 49. | Homicide Investigation Action Report, No. N6-909468 – 02/19/2008 and 02/27/2008 |
| 50. | Letter from Denise Minor to Terry Higy – 03/18/2008 |
| 51. | Letter from Thomas C. McAndrew to Terry Higy – 06/24/2008 |
| 52. | Homicide Investigation Action Report, No. N6-909468 – 01/30-31/2008 and 02/06/2008 |
| 53. | Texas Police Report, No. RB200800533, RB200800647, RB200800540 – 03/04/2009 |
| 54. | Homicide Investigation Action Report, No. N6-909468 – 03/10/2008 |
| 55. | Supplemental Investigation Report, No. N6-909468 – 03/17/2008 |
| 56. | ███████████████████████████████████ (UNDER SEAL) |
| 57. | Philip A. Holmes, *Murdered Woman Linked to '02 Shooting*, Williamsport Sun-Gazatte – 02/06/2008 |
| 58. | Interview of Desmond Lionel Cainion – 02/06/2008 |
| 59. | Homicide Investigation Action Report, No. N6-909468 – 02/04/2008 |
| 60. | Homicide Investigation Action Report, No. N6-909468 – 03/10/2008 |
| 61. | Sentencing Verdict Slip – 11/18/2014 |
| 62. | EPA MAPS of Teague, Burleson and Mansfield |
| 63. | Simon Ford and William C. Thomspon, *Some Reasonable doubts About DNA "Fingerprints,"* A Question of Identity |
| 64. | ███████████████████████████████ (UNDER SEAL) |
| 65. | Pauline Hicks Obituary – 04/15/1977 |
| 66. | ███████████████████████████████████ (UNDER SEAL) |
| 67. | ██████████████████████████████ (UNDER SEAL) |

| 68. | ████████████████████████████████ (UNDER SEAL) |
| 69. | ██████████████████████████ (UNDER SEAL) |
| 70. | █████████████████████████████ (UNDER SEAL) |
| 71. | ███████████████████████████████ <br><br> (UNDER SEAL) |
| 72. | ████████████████ (UNDER SEAL) |
| 73. | █████████████████████████████ (UNDER SEAL) |
| 74. | █████████████████████████████ (UNDER SEAL) |
| 75. | ████████████████████████████████ <br><br> ██████ (UNDER SEAL) |
| 76. | █████████████████████ (UNDER SEAL) |
| 77. | ███████████████ (UNDER SEAL) |
| 78. | ████████████████ (UNDER SEAL) |
| 79. | *David Hicks of Teague...Convicted Killer is Executed* – 01/27/2000 |
| 80. | ████████████████████████████ <br><br> ██████████ (UNDER SEAL) |
| 81. | █████████████████████████████ (UNDER SEAL) |
| 82. | ████████████████████████████ <br><br> ██████████ (UNDER SEAL) |
| 83. | ███████████████████████████████ (UNDER <br><br> SEAL) |
| 84. | ██████████████████████████████ <br><br> (UNDER SEAL) |

| | |
|---|---|
| 85. | ████████████████████████████ (UNDER SEAL) |
| 86. | ████████████████████████████ (UNDER SEAL) |
| 87. | ████████████████████████████ (UNDER SEAL) |
| 88. | ██████████████████████ (UNDER SEAL) |
| 89. | ██████████████████████ (UNDER SEAL) |
| 90. | ████████████ (UNDER SEAL) |
| 91. | ████████████████████ (UNDER SEAL) |
| 92. | ██████████████████████ (UNDER SEAL) |
| 93. | ██████████████████████ (UNDER SEAL) |
| 94. | ██████████████████████ (UNDER SEAL) |
| 95. | ██████████████████████ (UNDER SEAL) |
| 96. | ████████████████████ (UNDER SEAL) |
| 97. | ███████████████ (UNDER SEAL) |
| 98. | ██████████████ (UNDER SEAL) |
| 99. | ████████████████ (UNDER SEAL) |
| 100. | ███████████ (UNDER SEAL) |
| 101. | ██████████████ (UNDER SEAL) |
| 102. | ███████████████ (UNDER SEAL) |
| 103. | ████████████ (UNDER SEAL) |
| 104. | North Richland Hills Police Report, No. 006431 – 07/11/2000 |
| 105. | ███████████ (UNDER SEAL) |

| 106. | ██████████████████████ (UNDER SEAL) |
|------|-------------------------------------|
| 107. | ██████████████████████████ (UNDER SEAL) |
| 108. | ████████████████████ (UNDER SEAL) |
| 109. | Fort Worth Police Report, No. 02604169 – 08/13/2002 |
| 110. | Interview of Michael Jones – 09/30/2008 |
| 111. | Fort Worth Police Report, No. 03093388 – 08/16/2003 |
| 112. | ██████████████ (UNDER SEAL) |
| 113. | Fort Worth Police Report, No. 04008739 – 01/22/2004 |
| 114. | Fort Worth Police Report, No. 04016070 – 02/09/2004 |
| 115. | ████████████ (UNDER SEAL) |
| 116. | ████████████████████ (UNDER SEAL) |
| 117. | ████████████████████████████████ (UNDER SEAL) |
| 118. | ██████████████████████ (UNDER SEAL) |
| 119. | ██████████████████████████ (UNDER SEAL) |
| 120. | ██████████████ (UNDER SEAL) |
| 121. | ████████████████████████ (UNDER SEAL) |
| 122. | ██████████████████ (UNDER SEAL) |
| 123. | ██████████████████ (UNDER SEAL) |
| 124. | ████████████████████████ (UNDER SEAL) |
| 125. | ████████████████████ (UNDER SEAL) |
| 126. | ████████████████████████ (UNDER SEAL) |
| 127. | ██████████████████ (UNDER SEAL) |

| | |
|---|---|
| 128. | North Chicago Police Report, No. 06-034289 – 12/26/2006 |
| 129. | Arlington Police Report, No. 07-44293 – 06/21/2007 |
| 130. | Grand Prairie Police Report, No. 07-00035844 – 11/13/2007 |
| 131. | ████████████ (UNDER SEAL) |
| 132. | ████████████ (UNDER SEAL) |
| 133. | ████████████████ (UNDER SEAL) |
| 134. | Affidavit of Chantell Patterson – 09/19/2018 |
| 135. | Affidavit of Christian Gregory – 09/19/2018 |
| 136. | Autopsy Report by Saraklee Funkee, M.D.  - 01/30/2008 |
| 137. | *Capital Punishment in Pennsylvania: The Report of the Task Force and Advisory Committee*, Joint State Government Commission, General Assembly of the Commonwealth of Pennsylvania,– 06/2018 |

Exhibit 61

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA :    No. 391 Criminal 2008
                                 :
           vs.                  :
                                   :
CHARLES RAY HICKS,           :
                Defendant      :       (Death Penalty Case)

## SENTENCING VERDICT SLIP

## I. GENERAL INSTRUCTIONS

A. **READ THROUGH THE ENTIRE VERDICT SLIP BEFORE BEGINNING DELIBERATIONS.**

B. AGGRAVATING AND MITIGATING CIRCUMSTANCES PRESENTED TO THE JURY.

1. The following aggravating circumstances are submitted to the jury and must be proven by the Commonwealth *beyond a reasonable doubt*:

       **(1)** The defendant has committed a killing by means of torture.

2. The following mitigating circumstances are proven per stipulation of counsel:

       **(1)** Defendant has no significant history of prior criminal conviction

3. The following mitigating circumstances are submitted to the jury and must be proven by the defendant *by a preponderance of the evidence*:

       (1) see attachment "A"

       (2) Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of the defendant's offense.

C.   DO NOT COMPLETE THIS SENTENCING VERDICT SLIP UNTIL YOUR
DELIBERATIONS ARE CONCLUDED. THIS VERDICT SLIP IS *ONLY* TO BE USED TO
RECORD YOUR SENTENCING VERDICT AND THE FINDINGS UPON WHICH IT IS
BASED.

D.   IF, AFTER SUFFICIENT DELIBERATION, YOU CANNOT UNANIMOUSLY REACH
A SENTENCING VERDICT, DO NOT COMPLETE OR SIGN THIS SLIP, BUT RETURN IT
TO THE JUDGE.  THE JUDGE WILL DETERMINE IF FURTHER DELIBERATIONS ARE
REQUIRED; IF THEY ARE NOT, THE JUDGE WILL SENTENCE THE DEFENDANT TO
LIFE IMPRISONMENT.

## II.  SENTENCING VERDICT AND FINDINGS

If you have reached a unanimous verdict, complete this part of the form.

In Section A, indicate whether the sentencing verdict is death or life imprisonment. If the
sentence is death, indicate the basis for that verdict by completing Section B. If the sentence is
life imprisonment, indicate the basis for that verdict by completing Section C.

A. On count one of the criminal information, Murder of the 1st degree,

We, the jury, unanimously sentence the defendant to (check one):

✓ Death

_____ Life Imprisonment

B.   The findings on which the sentence of death is based are (check one):

✓ 1. At least one aggravating circumstance which outweigh(s) any mitigating
circumstances.

The aggravating circumstance unanimously found (is):

DEATH  BY  TORTURE

2

The mitigating circumstance(s) found by one or more of us (is) (are):

FAMILY DYSFUNCTION, HISTORY OF DEPRESSION, STRONG TIES WITH FAMILY AND FRIENDS, AND LACK OF SIGNIFICANT PRIOR CRIMINAL CONVICTIONS.

C. The findings on which the sentence of life imprisonment is based are (check one):

_____ No aggravating circumstance exists.

_____ The mitigating circumstance(s) (is) (are) not outweighed by the aggravating

circumstance(s).

The mitigating circumstance(s) found by one or more of us (is) (are):_____

The aggravating circumstance (is) unanimously found (is):_____

**JURORS:**

1) _[signature]_

2) _[signature]_

3) _[signature]_

4) _[signature]_

5) _[signature]_

6) _[signature]_

7) _Rebecca Bean_

8) _[signature]_

9) _[signature]_

10) _Delore C. Tyndale_

11) _[signature]_

12) _[signature]_

Date: _Nov 18, 2014_

_[signature]_
JURY FOREPERSON

3

## CHARLES RAY HICKS - MITIGATORS

1. FAMILY DYSFUNCTION
   a.   Father & paternal grandmother alcohol issues;
   b.   Aunts & Uncle on both side w/ mental health issues:
   c.   Mother suffers depression;
   d.   Family unable to give appropriate support for Charles;
   e.   Working parents left at an early age with adult responsibilities;

2. STRUGGLED IN SCHOOL
   a.   Difficulties in area of language;
   b.   Failed standardized test needed to graduate 2x;
   c.   Enrolled in ITT tech and struggled there too;
   d.   *Issues confirmed by tests given by Dr. Armstrong*

3. HISTORY OF HEAD TRAUMA

4. HISTORY OF DEPRESSION
   a.   Dr. Weiss - drug use
   b.   suicide attempts

5. GOOD WORK HISTORY

6. EXCELLED IN SPORTS AND BODY BUILDING [COMMITTED]

7. STRONG TIES WITH FAMILY AND FRIENDS [IMPACT DEATH WOULD HAVE]
   a.   Emma/Charlette/Leslie/LaDarius;
   b.   Suzannne

8. LACK OF SIGNIFICANT PRIOR CRIMINAL CONVICTIONS

9. ACTIVE RELIGIOUS PRACTICES
   a.   Leanon Travick;
   b.   Derrick Oliver

10. POSITIVE ADJUSTMENT TO PRISON LIFE
   a.   C.O. Schreck
   b.   Inmates: DeShawn King and Jerel Johnson.

Attachment "A"

Exhibit 62



**BURLESON 2014**





Exhibit 63



*Richard Bosman,* Intruder, *1982*

# A QUESTION OF IDENTITY

*Some Reasonable Doubts About DNA "Fingerprints"*

*by* SIMON FORD AND WILLIAM C. THOMPSON

EARLY LAST YEAR a jury in Freestone County, Texas, convicted a young unskilled laborer named David Hicks of raping and murdering his grandmother. The successful prosecution of the case would have been unremarkable, if it had not been for the lack of any material that might be considered conventional evidence. The police never recovered weapons or fingerprints linking Hicks to the crime; the prosecutors never found a witness who could place him in his grandmother's home at the time. As District Attorney Robert Gage conceded afterward, under most circumstances the charges would have been dropped. Unfortunately for Hicks, however, the prosecutors were able to produce one unusual piece of evidence, which prompted the jury to return a death sentence.

Before the trial of Hicks turned on a sample of Hicks's blood, the state of Texas had solicited a comparison of his DNA, or deoxyribonucleic acid, with that of semen removed from his grandmother after her death. After weeks of analysis, involving treatments with enzymes, electric fields and radioactive markers, the two DNA samples had been reduced to "fingerprints"—patterns of X-ray-like smudges that, in this case, appeared to match. Each had bands in approximately the same places. At the trial molecular biologists from the company responsible for the analysis, Lifecodes, Inc., of Valhalla, New York, testified that the odds against finding such a match at random were ninety-six million to one. In the minds of nearly everyone in the courtroom, including the jurors, the probability that Hicks had committed the crime seemed equally high. "If it hadn't been for the DNA," said District Attorney Gage, "I have no doubt that I wouldn't have been able to get a conviction."

The case against Hicks turned on a forensic procedure developed in England only five years ago, which has since been applied in several hundred criminal cases in the United States. In 1987 the first DNA fingerprints (the term itself reflects the misplaced confidence that some place in the new technique) were introduced into the American legal system, and they helped convict Tommie Lee Andrews of raping and beating Nancy Hodge in Florida.

Prosecuting lawyers have relied on the technique to obtain convictions in Wichita, Kansas; Oklahoma City, Oklahoma; Dayton, Ohio; Flint, Michigan; and other cities. Genetic evidence has also helped exonerate suspects: after reviewing several samples of DNA, prosecutors last August finally dropped all charges against Gary Dotson, the Chicago man accused of raping and kidnapping Cathleen Crowell Webb. (Webb actually had recanted her testimony against Dotson in 1985, six years after he was convicted and imprisoned.) Joseph Harris, a county judge in Albany, New York, pronounced DNA fingerprinting "the single greatest advance in the 'search for truth' and the goal of convicting the guilty and acquitting the innocent since the advent of cross-examination."

The technique is popular among prosecutors because the biological material it depends on—blood, hair, semen and the like—is more plentiful than conventional fingerprints at the scene of a crime. By the nature of many violent acts, especially rape, the perpetrators are likely to leave traces of themselves behind, and DNA, as it happens, is more resilient than the proteins, enzymes and antibodies that are the usual targets of blood and semen analyses. Gary Dotson, for example, was cleared after the analysis of ten-year-old semen in a pair of underpants; intact DNA has also been recovered from cadavers. What's more, DNA fingerprints can be far more incriminating than the thumb-and-ink variety: a suspected killer may offer an innocent explanation for his fingerprints on a victim's windshield, but he cannot so quickly explain the presence of his blood on her skirt. The prosecuting attorneys who present genetic fingerprints also know that molecular biologists can be persuasive in court. Such expert testimony seems incontrovertible to jurors, who are understandably impressed by a geneticist's estimate that the odds of a match between two unrelated DNA fingerprints may be as remote as several hundred billion, or even a trillion, to one.

Indeed, DNA fingerprinting has so excited law enforcement officers that it seems destined to become accepted in police stations and courtrooms throughout the nation. DNA fingerprints are scheduled to be introduced as evi-

dence in several hundred upcoming trials. In California and Colorado, convicted sex offenders must now submit blood samples for DNA fingerprinting before leaving prison, on the theory that any subsequent crimes they commit will be easier to solve. Virginia, Florida and other states are setting up their own DNA fingerprinting laboratories.

The Federal Bureau of Investigation, meanwhile, plans to train 120 laboratory technicians a year to work in state facilities and has established a national laboratory in Quantico, Virginia, to refine the technique. Last March, in its first official run, the FBI laboratory helped win a rape conviction in Hawaii. In April it began preparing genetic fingerprints of the New York City teenagers accused of raping and beating a jogger in Central Park, though by October, when the prints were ready, the prosecution was publicly expressing doubt about their usefulness. (Intermingled sperm from several attackers may have made determining individual genetic profiles all but impossible.) The FBI is also building a computerized data base of genetic markers, beginning with the genetic stock of several hundred recently hired agents as a basis for comparison. Such a library of DNA fingerprints will eventually be available to state and local law enforcement agencies around the nation.

One would think a forensic technique that won universal approval so quickly would be above reproach. But despite the enthusiasm of detectives, prosecutors and federal officials, a number of disquieting questions about DNA fingerprinting remain. We fear that techniques have been rushed into court and that claims for the accuracy of the test are greatly exaggerated. One concern is the difficulty of interpreting a print: forensic DNA may be so contaminated, compared with the pristine samples in a medical laboratory, that any attempts to conclusively establish a match between material from a suspect and that from the scene of a crime may be fruitless. Beyond the limitations of the laboratory, there are doubts about calculations that give astronomical odds against errors. Finally, there is good reason for concern about how this evidence is handled in court. Last August, for example, New York judge Gerald Sheindlin ruled that DNA prints could not be introduced in one case, and he recommended pretrial hearings in all cases before such evidence is presented to a jury. In November the Minnesota Supreme Court went even further, ruling that DNA prints would be inadmissible in Minnesota state courts until scientific questions about the procedure are resolved. In short, what the prosecutors in the Hicks case—as well as their legal and forensic colleagues in many other states— have embraced as one of the most promising forensic techniques of the decade may be something less than wholly scientific.

L IKE INK-PAD FINGERPRINTING, the forensic analysis of DNA is intended to detect what makes each of us unique. And—questions of accuracy, interpretation and legal procedure aside—there is no disputing that the underlying genetic composition of any person is as distinctive as the whorls and ridges of a fingertip. Every human cell contains a unique set of twenty-three pairs of crinkled chromosomes: each pair forms at the moment of conception, when one chro-



mosome from the sperm of the father joins one from the egg of the mother, and is replicated flawlessly until death. Within each pair of chromosomes this distinctive inheritance can be further subdivided into thousands of genes, which encode the information needed by the cell to manufacture proteins, as well as nongene segments of DNA, whose functions are not well understood.

The strands of DNA take the shape of a double helix, as James D. Watson and Francis H. C. Crick discovered in 1953. Each side of the twisting double helix is a sequence of bases, drawn from one of the four building blocks of DNA—adenine, cytosine, guanine and thymine, or A, C, G and T. An adenine base on one side of the helix is always paired with a thymine base on the other side, and similarly, cytosine pairs with guanine. The two sides of the double helix thus form a giant ladder connected by about 3.5 billion chemical "rungs." A few basic patterns in the genetic code have already emerged: the sections of DNA responsible for Huntington's disease, cystic fibrosis and other ailments have been located at specific places on



*Richard Bosman,* Death of a Femme Fatale, *1982*

specific chromosomes. And in the most general terms, the inherited traits of anyone—Mikhail Gorbachev, say, or George Bush—derive from the endless variety of ways the bases are written into the double helix.

Distinguishing the unique genetic elements of an individual has been complicated by the fact that long stretches of DNA are identical in all of us. As much as ninety percent of the DNA in the genes of Gorbachev is thought to match that of Bush. Evolution accounts for a large part of this phenomenon: our species evolved from primates, and seventy percent of our genetic inheritance, by some estimates, is identical with that of the chimpanzee, a close ancestor. Still greater similarities between the DNA of different people can be traced to the simple fact that all of us need the same basic body parts—a head, a heart, a nose and so forth—and thus our genetic code is identical in many places.

Finding unshared sequences in the code had therefore long seemed to call for impossibly subtle analytic methods. Molecular biologists had pursued one possible line of

investigation ever since Watson and Crick identified the double helix: spliced between the genes are short, repetitive segments of DNA. The segments are made up of fewer than ten bases of the molecule, and their function—like much of the genetic code—is unknown. But they are distributed throughout the DNA in a highly individual way. Any number of copies of the sequence of bases GGGCAGG, for example, can be clustered at one place along the helix, and there are similar clusters elsewhere, made up of other repetitive segments, that together make up a personal pattern.

In 1985 Alec J. Jeffreys, a molecular biologist at the University of Leicester in England, discovered how the clusters could be exploited for the purposes of identification. To take a hypothetical case, suppose the segment GGGCAGG is repeated ten times in one of Gorbachev's clusters but eighteen times in one of Bush's. Suppose also that DNA from Bush and from Gorbachev is snipped apart according to some rule, say wherever the sequence of bases CTCGAG is found. Only one of the fragments that result from each man's DNA would include the cluster of GGGCAGG segments, and lengths of the two fragments are not likely to match. If you could estimate the lengths of several such fragments, each including a cluster of the GGGCAGG segments, you could tell Gorbachev's DNA from Bush's without even knowing the precise sequence of base pairs surrounding the segments.

T O APPLY THIS LOGIC molecular biologists had only to use standard techniques of genetic engineering developed over the past twenty years. The DNA from any cell can be snipped into fragments with chemicals called restriction enzymes. (Such enzymes were first extracted from bacteria, where they act as a defense system for breaking up foreign intruders such as viruses.) The enzymes cut DNA at every appearance of a sequence of bases known as a restriction site—in our example, CTCGAG. This procedure leaves a million fragments of DNA—an ungainly hodgepodge.

Next the fragments are sorted via a technique developed by Linus Pauling, who had manipulated hemoglobin in a similar manner. The fragments of DNA, which are negatively charged, are suspended at one end of a slab of gelatin, and a positively charged electrode is placed at the other end. When the electrode is turned on, it attracts the charged fragments of DNA, causing them to drift through the gel. The lightest, smallest fragments travel farthest while the electrode is turned on, because they meet with only a small amount of resistance in the gel. The heavier fragments, or the longer sections of the DNA, are dragged more slowly through the gel and remain closer to their starting point. When the electrode is turned off, DNA fragments are smeared across the gel, all sorted by weight and therefore by length. The unique pattern of lengths of DNA fragments is thereby captured in the gel as a kind of spectrum. All that remains is to discern the unique part of the genetic code within the spectrum.

To develop the spectral photograph into an image that can be seen and preserved, a nylon membrane is placed over the fragments of DNA and then covered with absorbent paper towels. The procedure is called Southern blotting, after its pioneer, Edward M. Southern of Edinburgh University. The towels sop the DNA fragments



*Richard Bosman,* The Red Staircase, *1981*

directly upward by capillary action into the nylon, where they stick and preserve their distinctive pattern. The DNA-impregnated nylon is then rinsed with a solution of radioactive probes. Each probe is a small section of radioactive DNA specially prepared to be a perfect mate to a sequence of base pairs at or near a repeating segment such as GGGCAGG. (Thus GTCC would probe CAGG, because guanine always combines with cytosine and thymine with adenine.) Jeffreys's development of probes that seek out one person's unique repetitive segments of DNA was the key breakthrough that made DNA fingerprinting possible. When the nylon is exposed to X-ray film, the probes emit radiation that creates one or two dark, blurred bands on the film, representing one distinctive part of a person's DNA pattern. Additional radioactive probes are used to create more shadowy bands, until the DNA fingerprint is complete. Thus, in theory at least, part of what makes each person's genetic heritage unique can be reduced to a row of uniquely spaced bands.

IN PRACTICE, whether the techniques of DNA fingerprinting can reliably produce a series of bands as individual as an ink-based fingerprint depends on equal measures of good fortune and artful interpretation. Within the confines of the campus, where genetic typing originated, investigators know exactly whose blood they are testing; they have an ample supply of it, and they can be reasonably certain their samples are not contaminated, having been drawn by skilled nurses with sterile needles. But at every stage, creating a DNA fingerprint for a criminal trial is fraught with practical diffi-

culties. Eric S. Lander, a geneticist at the Massachusetts Institute of Technology, has testified that the laboratory methods in one case he reviewed were "so far below reasonable scientific practice in molecular biology as to be appalling."

The problem is that the pure samples virtually taken for granted in biological research will never be available to criminal investigators. For one thing, forensic material is delivered by way of the morgue or a detective, who typically hands over a swatch of bloodstained denim or dirty carpet. For another, in a criminal investigation genetic evidence is invariably contaminated at the scene of a crime. In a typical rape case, the vaginal or anal swab used to extract the attacker's semen has also absorbed significant numbers of cells from the victim; thus the victim's DNA must be passed through precisely the same gel as that of the alleged attacker. Yeast and bacteria are frequently present in such tissue as well, and they too contribute distinctive DNA to the suspect's fingerprint. If incriminating blood or semen remains undisturbed for a long interval, it can mix with additional genetic material from microorganisms and animals in the area; even dyes from clothing, such as that found in blue jeans, can mingle with a stain of semen or blood and taint the sample. And for all its resiliency, DNA is still subject to putrefaction.

All such chemical adulteration and physical deterioration can affect the slicing, the sorting and the probing of the DNA fragments as the fingerprint is prepared. Any additive may combine with the restriction enzymes, causing the DNA to be sliced in the wrong place. Such imprecise slicing can lead to too few or too many fragments of DNA.

When contaminated fragments of DNA are sorted in the gel, they may be mixed with ions that interact with the electric field. The additional electric charges can cause the fragments to travel different distances in the gel, shifting the bands on the fingerprint to an unknown degree. Sloppy laboratory practices can also cause one sample to move through the gel faster or slower than the sample with which it is being compared. Proteins from the environment can give the same effect, by attaching themselves to the DNA fragments and weighing them down. The result is that samples even from the same person can give DNA prints in which the bands do not align, though their relative positions remain the same; the phenomenon is known as band shift. Contamination can also affect the measurement of the concentration of DNA put into the gel; if too much DNA is introduced, all the fragments may travel slowly through the gel.

Finally, in the probing stage the probes may lock onto the contaminants instead of the human DNA, causing spurious bands. Or the probes may fail to lock onto human DNA because of interference from a contaminant or degradation of the sample; in these cases bands that should appear on the print do not.

The possible presence of all these sources of error at times requires that DNA fingerprints be interpreted in an extremely subjective manner. Although the forensic DNA laboratories often liken their product to the bar code on supermarket packages, a DNA print is more accurately compared to a blurred charcoal etching—a pattern of smudges whose identity is distinctive, to be sure, but

hardly indisputable. Thus, in addition to the problems of spurious, missing or shifted bands, technicians often have great difficulty seeing where faint bands lie. The need for interpretive "error correcting" multiplies the ways an expert witness can assert a match or a mismatch between two samples. In one murder case in Atlanta a technician for a commercial DNA fingerprint laboratory conceded that none of the DNA bands from the suspect aligned with the bands obtained from the crime scene but argued that the suspect had committed the deed nonetheless. The expert's reasoning: "There is, however, a consistent non-alignment of the bands throughout the test"—in short, the mismatch was attributed entirely to band shift, and not to any other cause.

With so many uncertainties built into the process, it is difficult to say how reliable DNA fingerprints are. Only one study so far has attempted to test the accuracy of the technique. In late 1987 the California Association of Crime Laboratory Directors asked three facilities to assess DNA fingerprints on a jumble of about fifty blood and semen samples. Some of the samples came from the same person, and so they matched perfectly. The largest company, Lifecodes, returned thirty-seven correct matches but was unwilling to make calls on the remaining fourth of the samples. Forensic Science Associates of Richmond, California, did better in one respect, reporting forty-four correct pairs, but reported one false positive, erroneously implying two samples had come from the same person. (Such an error could convict an innocent person.) And Cellmark Diagnostics of Germantown, Maryland, identified one false positive and failed to match another pair. (That sort of mistake could release a guilty suspect.)

To make matters worse, it now appears that the California test was not properly "blind" and may have been fraudulent. Recent testimony revealed that Cellmark submitted an initial report with at least two errors besides the two that were officially disclosed. According to the testimony, the investigators conducting the study, themselves proponents of DNA fingerprinting, met privately with a Cellmark official, discussed the results and allowed Cellmark to submit cleaned-up conclusions five weeks later. The cover-up came to light only after defense lawyers, tipped off by an anonymous informant, subpoenaed records of the testing agency. Such cases raise serious questions about the credibility and objectivity of the companies that conduct DNA fingerprinting.

GIVEN THE AMBIGUITY inherent in a forensic DNA fingerprint, the statistical statement giving the odds of an error in comparing two samples of DNA becomes extraordinarily important in court. Such a statement ideally should give a quantitative estimate—a number—summarizing all the known factors that could affect the outcome of the test. Investigators begin calculating the odds by noting how often a particular band appears in their data base, compared with bands in other DNA fingerprints prepared with the same restriction enzymes and the same radioactive probes. At that point, assessing the rarity of a whole genetic fingerprint is largely a matter of deciding how likely it will be for several bands to appear on the same print. Suppose technicians know, from previous fingerprints, that the frequency of a certain band is

one in every thousand people, and the frequency of a second band is one in every hundred. Then the odds that the two rare bands will appear together on a single DNA sample are one thousandth multiplied by one hundredth, or one in a hundred thousand. (In a coin toss, the odds of tails are one in two; the odds of two successive tails are one in four, and so on.) If the laboratory can always find a third band that appears on only one print in ten thousand, the odds that a second person will share all three bands are even more remote: one in a billion (one thousandth multiplied by one hundredth multiplied by one ten-thousandth).

One problem with this arithmetic, from the vantage of population genetics, is that the estimates of the overall frequency of any band are open to serious challenge. The most obvious inadequacy is that the number of DNA records on which the statistics are based is small. Lifecodes has only several hundred people in its records, broadly categorized by ethnic origin. Cellmark, which has comparable numbers, built part of its data base with blood samples from two hundred black people in Detroit, who may or may not be genetically representative of the black communities in Los Angeles or Birmingham. Even if the samples in the data base were truly random, it is quite likely that the frequency of a band in the sample does not reflect the real frequency of the band in the general population.

WORSE, the companies have compiled their records in a way inconsistent with their own interpretation of the evidence. In making their data bases, they have counted the bands from two samples as distinct whenever there is the slightest difference in the location of the bands. Consequently the odds against a random match for any two bands are high—perhaps one in a thousand—because the bands seldom fall in exactly the same spot. But in real criminal cases the laboratories take a different approach: they declare a match whenever two bands lie in roughly the same place. In essence, the practice has led technicians systematically to underestimate the chance of a coincidental match, as well as to underestimate the chance that two nonmatching DNA samples come from the same person. Many geneticists think it is not so improbable that a suspect's DNA might accidentally match DNA taken from the scene of a crime, and they believe that such astronomical improbabilities as one in a hundred billion may be grossly unfounded. Figuring more sensible odds will become possible only when the probabilities are recalculated according to more reliable methods, perhaps by the FBI.

Another mathematical mistake made by the DNA fingerprinting labs is more profound. Commercial facilities assume, in estimating their odds, that people reproduce randomly—that no person is likely to inherit many of the same segments of genetic material from both mother and father. Randomness implies that the bands on a DNA fingerprint are independent of one another: no band is especially associated with any other. This assumption allows forensic molecular biologists to justify multiplying the odds that successive bands can match. On the other hand, if genes do not mix randomly—if the bands on the prints tend to occur in pairs or larger patterns—then the calculated odds would be far less dramatic.

In fact, according to data from the labs themselves, the U.S. population may not be mingling as freely as once was thought. There is evidence suggesting many DNA fingerprint bands do occur together. One index of this co-occurence is the number of people who show one band instead of two for a given DNA probe, because they received the same long sequence of DNA from each parent. (The double dose of identical DNA sequence in such people gives rise to a single dark band on the DNA fingerprint instead of two lighter ones.) When a population shows a relatively large number of such dark bands, that is evidence that large numbers of genetically similar people are reproducing. In such a population one would expect to find pairs of bands or even larger patterns with higher than random frequency. Sure enough, Cellmark Diagnostics, under court order, has conceded its current data show a high number of single dark bands. Laurence D. Mueller, a population geneticist at the University of California at Irvine, has analyzed Cellmark data and found that one of the company's best-known probes—one that has been used to win convictions—gives rise to twice as many single dark bands as would be expected according to standard theory.

None of this should seem surprising, considering the numerous tightly knit religious and cultural groups, in rural and urban areas alike, that make up our society. Whether on a remote Indian reservation or in the ethnic enclaves of Chicago, many people are more likely than not to marry those who have similar genetic material. Even within a large, mobile society, such as that in the United States, there are many pockets of genetic order.

To consider the practical consequences of less than random mixing of DNA, one need only return to the case of David Hicks, who was sentenced to death in Texas. According to Hicks's defense attorney, Reed Jackson, who grew up in the region, Hicks's town, Furney-Richardson, is an isolated rural community of some 300 people who frequently intermarry. In an affidavit filed in Hicks's case, Mueller stated that certain sets of DNA bands might be much more common to people from Furney-Richardson, say, than from New York. (The Lifecodes data base relies heavily on samples from blood banks in New York.) Furthermore, the Lifecodes report indicates that several key genetic characteristics were unusually common in the community. After typing seven people from the town, the company found that more than half the bands were shared by at least two people.

IN THE AMERICAN LEGAL SYSTEM, scientific evidence usually must be presented at a so-called Frye hearing before it can be admitted in court. Frye hearings go back to a federal case argued in 1923 over the admissibility of polygraph tests. The proceeding is intended to prevent prosecutors from introducing untested scientific evidence and, equally important, to preclude the possibility that jurors might be improperly influenced by expert-sounding testimony that contradicts the standards of accepted research.

When forensic DNA fingerprinting was introduced at Frye hearings, its proponents (typically prosecutors) argued the tests were simply a new application of a widely accepted scientific procedure. At every turn this equation has been repeated: advocates of the technique, seeking to win convictions, continue to make exaggerated claims for the similarities between the forensic techniques and those of the biomedical community.

In fact, academic geneticists would not accept a so-called match based on only two DNA samples as conclusive; they would repeat their experiments and dismiss any conclusion based on a single observation. Their counterparts in the forensic world, however, may have no choice but to use all their material in the first test. Under such circumstances there is no chance to replicate the results or to check for errors. A similar contrast arises between forensic practice and the ordinary search conducted by medical science for the genetic roots of a disease. In medicine the search can be narrowed to a particular band at a well-known location on the fingerprint. When a forensic DNA fingerprint is made, however, the distinctive band and its location are utterly unknown. The determination of a match, therefore, is far more difficult in a forensic setting. In this sense, forensic conclusions can lie outside the realm of established scientific procedure.

ANOTHER PROBLEM ARISES because commercial DNA laboratories insist on keeping much of their work a trade secret. Only in court do corporate scientists allow their technicians to explain, among other things, what standard procedures they have adopted, why they are building a data base in a particular manner or exactly how they are calculating the odds of a random match. The release of such information invariably must be compelled by court order: judges in criminal cases have had to force the laboratories to open their doors to expert witnesses from the opposing side of a case.

Not surprisingly, when unfriendly molecular biologists do visit, court orders in hand, the atmosphere is anything but conducive to the unfettered exchange of knowledge. One scientist on such a visit was not allowed to venture beyond the lobby. And even when such exchanges are marginally successful, or when documents have been obtained through legal maneuvers, academic scientists are still prohibited from publishing company secrets. Even the FBI has yet to disclose its own assessment of the accuracy of its methods. Yet the labs still make the incongruous assertion that the design of their techniques and data bases, known only to a few scientists in a few companies, has somehow been considered and approved by the wider community of their outside peers.

Most troubling of all is the laboratories' collective reluctance to acknowledge reasonable concerns about their objectivity. The technicians working for Lifecodes and Cellmark Diagnostics are well aware their companies have been retained by law enforcement officials who hope that two samples will match. In case after case, the "scientific" interpretation of a hazy series of fingerprint bands is made by technicians who are also informed about the conventional forensic evidence linking a suspect to a crime. And these technicians—consciously or not—seem to adjust their testimony accordingly. When the bands of two samples make a visual match, for example, the technicians announce that the suspect is guilty; but when the bands appear marginally similar, possibly suggesting innocence, the technicians assign numbers to the bands—a practice that allows them to conveniently ren-

der a guilty verdict anyway. Such people seem anything but "blind" to the importance of certain data, and their objectivity must therefore be scrutinized. The laboratories have a vested interest in one finding—guilt—and their reports, like all other evidence, should be considered suspect.

IN SPITE OF the many difficulties we have cited, the promise of DNA fingerprinting is too great to be abandoned. Many of the problems with current methods can be solved, some remarkably easily. Making the test blind would quickly eliminate the possibility of bias. Establishing a uniform reporting format, available to both prosecution and defense, would reduce the potential for drawing conclusions unsupported by the data. Some of the problems caused by laboratory error—mislabeling, contamination of the probes and the like—would yield to standard lab procedures, which could be further enforced by routine inspections and blind, random tests. Several state agencies as well as the FBI are working to set up such standards.

The statistical issues will be more difficult to address. Until the DNA labs come up with the data needed to evaluate their own statistical assumptions, their claims will be impossible to evaluate. Additional research may well be needed on the frequency of co-occurring DNA bands within various populations. And where there is significant evidence of common ancestry in a community,

many more probes should be introduced before regarding a match as really meaningful.

Solving these problems will not change the results of cases, like Hicks's, in which the defendant has already been convicted. Last summer a number of defense lawyers, notably Peter Neufeld and Barry Scheck of New York City, called for a reexamination of the DNA evidence in cases that were closed. They argued that problems with DNA evidence only recently brought to light may have deprived defendants of a fair trial. Certainly they have a point. Particularly in cases in which the defense presented no experts to criticize the DNA evidence, jurors are likely to have taken it on faith. As one juror in Queens County, New York, said after a trial: "You can't argue with science."

The problem with this attitude is that science frequently, and appropriately, argues with itself. And until all the arguments about DNA fingerprinting are resolved, the courts would be well advised to proceed with caution. Although we all want to see criminals convicted, we risk injustice when we rush a new technology into the courtroom before it is ready. ●

*SIMON FORD is a molecular biologist at the University of California at Irvine, who has testified as an expert witness for the defense in cases involving DNA fingerprints. WILLIAM C. THOMPSON is a lawyer and associate professor of social ecology at the same university.*



*Richard Bosman, Rubbed Out, 1982*

Copyright of Sciences is the property of New York Academy of Sciences and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

Exhibit 64
(Under Seal)

Exhibit 65

Downloaded on Jul 17, 2018

No one actually had any idea who I was, or for that matter for whom I worked, but I was taken directly to launch control station "Gulf-Zero," a site having responsibility for 10 missiles, each of which carry more destructive power than was released in any war



their prescient smile". I saw a black bag with me, I said and I wondered why it had not been searched. Supposedly it contained a camera, but realistically it could have contained a gun or a bomb. If I were a terrorist, I said, I would have now penetrated the site.



# Obituaries

Blooming Grove on Wednesday to attend the funeral of Miss G. Trretove, who was the uncle of W.L. and Larry, and a brother-in-law of Mrs. Trretove.

Services were held at 2-p.m. Wednesday at Bradley Funeral Home Chapel-in Blooming Grove. Mr. Trretove was born on March 14, 1900 in Blooming Grove and resided there until the middle of 1975 when he entered a Corsicana Care Center, where he died on April 13.

Dr. Bud R. Creach of Dallas, a cousin of Mr. Trretove, officiated. Burial was in Rose Hill Cemetery in Blooming Grove.

Surviving are a sister, Mrs. Annie Armstrong of Waxahachie; and several nieces and nephews.

## Hicks funeral set Saturday

Funeral services for Mrs. Pauline Miller Hicks, 54, of Route 1, Teague, will be held Saturday at 1 p.m. in the Asia Primitive Baptist Church. The Rev. T. W. Medlock will officiate.

Mrs. Hicks was born on Dec. 21, 1922 in Freestone County. She died Tuesday in the Teague General Hospital. Burial will be buried in Asia Cemetery, under direction of Dorsey -Keatts Funeral Home.

She is survived by her husband, Daniel Hicks of Teague; four daughter, Mrs. Rose Mary Nimmon, Paula Hicks and Patricia Hicks all of Teague, and Mrs. Linda McWilliams of Fort Wort Worth; and six sons, Tracy, David, Daniel, Jr., and Leo Hicks of Teague, and Charles, Garland and Archie Hicks of Fort

Worth.

She is also survived by her father, Solomon Miller of Teague; her mother, Mrs. Onaker Hegger of Teague; one sister, Mrs. Ruby Branch of Teague; and five brothers, Willie D. Carter and Ed Roy Miller, both of Teague, Alfred Lee Carter of Houston, James Jackson of Denton, and Edward Miller of Waco; and eight grandchildren.

## Gramm says production energy key

HUGOTON, Kan. (AP) — The solution to the nation's natural gas problem is production, not conservation, says a Texas economist.

Dr. Phil Gramm, a Texas A&M professor who has testified on energy before Congress and various state legislatures, told a group of Kansas landowners over the weekend that only deregulation of natural gas prices would spur production.

"If we're going to get more energy, we've going to have to pay for it," Gramm said. "There's no free lunch. The longer we wait, the more expensive it will be."

Natural gas will have to allowed to find its own price level before private industry is encouraged to fund more exploration and drilling, he said.

Gramm made his remarks to the Southwest Royalty Owners Association, which consists of persons who lease drilling rights to natural gas on their property.

## Sheep Fe Decline S

AUSTIN—A cent decrease in of Texas sheep feed since the year has begu the Texas De Agriculture.

In spite of 128,000 head, operators are some five per animals than according to a by the Texas Livestock Repo

At the end early lamb totaled 720,000 one per cent l year.

Marketings and lambs du and February cent below the in 1976, at 110,



The barth of she their months in row wears out a ts place.

Ta
Sto
Ame

Since
City Com
co-worker
have aske



TEXAS

# Exhibit 66
# (Under Seal)

Exhibit 67
(Under Seal)

Exhibit 68
(Under Seal)

# Exhibit 69
# (Under Seal)

Exhibit 70
(Under Seal)

Exhibit 71
(Under Seal)

Exhibit 72
(Under Seal)

# Exhibit 73
# (Under Seal)

# Exhibit 74
# (Under Seal)

# Exhibit 75
# (Under Seal)

Exhibit 76
(Under Seal)

Exhibit 77
(Under Seal)

Exhibit 78
(Under Seal)

Exhibit 79

**The Progress Of Teague And Freestone County**

**50¢**

THURSDAY, JANUARY 27, 2000

ESTABLISHED IN 1906

David Hicks of Teague...

# Convicted killer is executed

It took just seven minutes from the time a lethal flow of drugs began to take the life of convicted killer David Hicks, 37, of Teague. Hicks was put to death by the State of Texas Thursday evening, January 20th, in Huntsville.

Hicks was convicted in 1988 in the death of his 87-year-old grandmother, Ocolor Hegger, who was sexually assaulted and beaten to death with a hammer in her house near the Furney-Richardson community, west of Teague. Continuing appeals kept Hicks from being put to death on three prior occasions, including February 15, 1994; November 17, 1994 and August 28, 1997.

Five of Hicks relatives and a spiritual advisor viewed the execution along with fifteen state officials and a chaplain.

Hicks' execution on Thursday, January 20th was the third this year. Four more death row inmates were scheduled to be put to death

before January 27th, making January fall just one execution short of the busiest month in the Huntsville unit's death chamber since eight executions were performed in June of 1997.

The death decree was signed last September by 87th Judicial District Judge Sam Bill Bournias. County Attorney Bob Gage prosecuted Hicks in the case in January, 1989, and was one of the first prosecutors to use DNA testing to identify an assailant.

# Plane crash claims life of Mexia attorney T.J. Biczo

Mexia attorney T.J. Biczo, Jr. tragically lost his life at approximately 5:15 p.m. Friday, January 21st, when his airplane crashed about a mile south of the Limestone County Airport.

Biczo reportedly believed that he possibly had landing gear problems and had flown over the airport for a visual inspection. He was making a final circle when his 1963 twin-engine Beechcraft Baron went down in a pasture about 1,500 yards south-east of Tamale Inn on

Transportation Safety Board are investigating the accident in an attempt to pinpoint the exact reason why the plane went down.

Biczo, 39, was returning from business in Fort Worth and was the lone occupant in the six-sea airplane. He is survived by his wi Trudy Hughes Biczo and two st children, Gerald Keith and Melo Ann Mack.

Memorial services were he Monday afternoon at the Fi

Exhibit 80
(Under Seal)

Exhibit 81
(Under Seal)

Exhibit 82
(Under Seal)

# Exhibit 83
# (Under Seal)

Exhibit 84
(Under Seal)

Exhibit 85
(Under Seal)

# Exhibit 86
# (Under Seal)

# Exhibit 87
# (Under Seal)

# Exhibit 88
# (Under Seal)

# Exhibit 89
# (Under Seal)

# Exhibit 90
# (Under Seal)

Exhibit 91
(Under Seal)

# Exhibit 92
# (Under Seal)

Exhibit 93
(Under Seal)

Exhibit 94
(Under Seal)

Exhibit 95
(Under Seal)

# Exhibit 96
# (Under Seal)

Exhibit 97
(Under Seal)

# Exhibit 98
# (Under Seal)

Exhibit 99
(Under Seal)

Exhibit 100
(Under Seal)

# Exhibit 101
# (Under Seal)

# Exhibit 102
# (Under Seal)

# Exhibit 103
# (Under Seal)

Exhibit 104

S. Blown
411

**OFFENSE REPORT**
AND MULTI-PURPOSE FORM

**NORTH RICHLAND HILLS POLICE DEPARTMENT**

| 1. OFFENSE # | 2. OFFENSE TITLE |
|---|---|
| 00 6431 | CREDIT CARD ABUSE |

| 3. CRIME CODE | 4. STATUS | 5. UCR REPORTED - ACTUAL | 6. DATE | 7. DAY OF WEEK | 8. OFC ID # |
|---|---|---|---|---|---|
| | | | 07·11·00 | TUESDAY | 407 |

| 9. LOCATION OF OFFENSE | 10. BUSINESS NAME | 11. DISTRICT |
|---|---|---|
| | SOUND WERKS AUDIO | 03/0341 |

**COMPLAINANT/VICTIM**

| 12. NAME (LAST, FIRST, MIDDLE) | 13. RACE/SEX | 14. D.O.B. | 15. PLACE OF EMPLOYMENT OR SCHOOL NAME |
|---|---|---|---|
| SHEARER, DAVE | W/M | | SOUND WERKS AUDIO |

| 16. ADDRESS (#, DIR., STREET, SUFFIX, APT #) | 17. HOME PHONE # | 18. ADDRESS |
|---|---|---|
| | | |

| 19. CITY, ST, ZIP | 20. BUSINESS PHONE # | 21. CITY, ST, ZIP |
|---|---|---|
| | 281-9381 | |

**REPORTING PERSON**

| 22. NAME (LAST, FIRST, MIDDLE) | 23. RACE/SEX | 24. D.O.B. | 25. PLACE OF EMPLOYMENT OR SCHOOL NAME |
|---|---|---|---|
| - SAA - | | | |

| 26. ADDRESS (#, DIR., STREET, SUFFIX, APT #) | 27. HOME PHONE # | 28. ADDRESS |
|---|---|---|
| | | |

| 29. CITY, ST, ZIP | 30. BUSINESS PHONE # | 31. CITY, ST, ZIP |
|---|---|---|
| | | |

**GENERAL**

| 32. DATE/TIME SECURED | | 33. DATE/TIME DISCOVERED | | 34. INV. | 35. SHIFT | |
|---|---|---|---|---|---|---|
| 05·25·00 / 1238 | | 05·25·00 / 1238 | | | D-1  K-2  M-3 | |

| 36. FAC | 37. CSSU | 38. HATE | 39. FAM. VIOL | 40. STLN PROP | 41. EVIDENCE | 42. SUSPECT | 43. ARREST | 44. WITNESS | 45. PROP SUPP |
|---|---|---|---|---|---|---|---|---|---|
| BUSINESS | Y ☞ | Y ☞ | Y ☞ | Ⓝ ☜ | Y ☜ | Ⓝ N' | Y ☜ | ☜ N | Y ☞ |

**OFFENSE - PROPERTY SUPPLEMENT**

CODES:  S = STOLEN   D = DAMAGED   C = CONFISCATED   R = RECOVERED   F = FOUND   L = LOST

**PROPERTY**

| 46. CODE | 47. QUAN. | 48. DESCRIPTION (SIZE, COLOR, MODEL, STYLE, CONDITION, AGE, ETC.) | 49. SERIAL OR O. A. NUMBER | 50. VALUE |
|---|---|---|---|---|
| S | 2 | AUDIOBAHN AW1200 (stereo equip.) $150 EA. | — | $300·· |
| S | 1 | HBX BOX | — | $65·°° |
| S | 1 | SONY CDX4000X | — | $229.95 |
| S | 1 | CADENCE a400 | — | $209·95 |
| S | 1 | CADENCE A5HC | — | $350 ·· |

**VEHICLE - SUPPLEMENT**

**VEHICLE**

| 51. YEAR | 52. MAKE | 53. MODEL | 54. STYLE | 55. LP # | 56. LP YR. | 57. LP ST. | 58. COLOR |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 60. VIN NUMBER | 61. COMMENTS / DAMAGE | 62. VALUE | 63. NCIC # |
|---|---|---|---|
| | | | |

**NARRATIVE**

ON 07·11·00 AT 0803 MRS OFC. D. DRAKE # 407 WAS DISPATCHED TO

5111 DAVIS BLVD. SOUND WERKS AUDIO, REGARDING A FORGERY

INVESTIGATION. UPON ARRIVAL DRAKE SPOKE WITH THE COMPLAINANT,

SHEARER, WHO ADVISED THE DETAILS.

PAGE NUMBER
1 OF 3

# NORTH RICHLAND HILLS POLICE DEPARTMENT

## SUPPLEMENTAL REPORT

| 1. EVIDENCE NUMBER | 2. ARREST, CITATION, OR SUMMONS NO. | 3. COMPLAINT NO. |
|---|---|---|
| | | 006471 |

**4. NAME OF COMPLAINANT, DRIVER #1, VICTIM OR ARRESTEE**
SHEARER, DAVE

**5. DATE OF THIS REPORT** 07-11-00

**6. DATE OF ORIGINAL OCCURRENCE**

**7. FORM USED AS CONTINUATION SHEET FOR CURRENT REPORT** ☒

**8. OFFENSE, CHARGE OR INCIDENT ON ORIGINAL REPORT**

**9. FORM USED TO REPORT FOLLOWUP INVESTIGATION OR SUPPLEMENTAL INFORMATION** ☐

**10. CORRECT OFFENSE OR INCIDENT CLASSIFICATION**

**CHANGED** ☐ YES

**11. KIND OF REPORT CONTINUED** ☒ OFFENSE ☐ TRAFFIC ACCIDENT ☐ ARREST ☐ VEHICLE ☐ OTHER

**12. MULTIPLE CLEARANCE** ☐ YES (LIST OTHER COMPLAINT NUMBERS IN NARRATIVE) ☐ NO

**13. INSTRUCTIONS FOR FOLLOWUP OR SUPPLEMENTAL USAGE.**

**ITEM NO.**

SUSPECT: A) W/M  LATE 20's  5'03"-5'10"  200-220 lbs  (HEAVY BUILD)

DARK, SHORT, STRAIGHT HAIR / MUSTACHE - G-TEE

GLASSES / T-SHIRT & JEANS

- GAVE NAMES: DAVID STRAND & JASON STRACHN

- POSSIBLE  PS# 304-685-3154

MODEL PS# 817-721-1090   (DRIVER)

B.) W/F  EARLY 20's  RED HAIR / VERY PALE COMPLEXION

SKINNY (THIN BUILD)

- NO FURTHER INFORMATION

(PASSENGER)

SUSPECT VEHICLE: TOYOTA CELICA  LIGHT BLUE (OLDER MODEL)

EARLY 90's  (NO LP OR FURTHER DESCRIPTION)

WITNESS: HICKS, CHARLES  B/m

PS# Hm.           CELL #        WK#

**16. REPORTING OFFICER** D. DRAKE  **NO.** 407

**2ND OFFICER** **NO.**

**17. SUPERVISOR APPROVING** S. BROWN  **NO.** 41

**18. CASE STATUS (STATUS MUST BE INDICATED FOR ALL CASES, INCLUDING NON-CRIMINAL INCIDENTS)**
☐ OPEN (PENDING) ☐ CLOSED ☐ SUSPENDED
CASE DISPOSITION (DISPOSITION OF CRIMINAL CASES MAY BE INDICATED AS APPROPRIATE)
☐ UNFOUNDED ☐ CLEARED BY ARREST ☐ CLEARED EXCEP.

### OFFICE USE ONLY

| 19. DATE/TIME TYPED NO. | 20. REPRODUCED BY NO. |
|---|---|
| 21. UNIT REFERRED TO: | 22. UCR DISPOSITION |
| 23. REVIEWER  NO. | PAGE NO. 2 OF 3 |

*Rab*
*411*

SUPPLEMENTAL REPORT # 006431
OFFENSE: CREDIT CARD ABUSE
DATE: JULY 11, 2000
OFFICER D. DRAKE #407
PAGE 3 OF 3


SHEARER STATED ON 05-25-00, AT APPROXIMATELY 1238 HOURS, THE SUSPECT (LISTED
ON PAGE TWO) MADE A TELEPHONE ORDER FOR $1154.90 WORTH OF AUDIO/ELECTRONIC
EQUIPMENT USING A CREDIT CARD WHICH HAD BEEN STOLEN. THE CREDIT CARD WAS
AN AMERICAN EXPRESS #████████████. THE SUSPECT STATED HIS NAME WAS DAVID
STRAND, AND ADVISED HE WAS OUT OF TOWN AND UNAVAILABE TO COME TO 5111
DAVIS BOULEVARD, SOUNDWERKS AUDIO, WITH THE ACTUAL CREDIT CARD.

THE TRANSACTION WAS ACTUALLY COMPLETED BY SOUNDWERKS EMPLOYEE, CHARLES
HICKS, (LISTED ON PAGE TWO). HICKS ADVISED DRAKE THAT HE "SPOKE WITH STRAND
VIA TELEPHONE TWO OR THREE TIMES PRIOR TO MAKING THE SALE." HICKS ADVISED
STRAND STATED HIS NEPHEW WOULD COME IN TO PICK UP THE AUDIO EQUIPMENT ON
05-25-00.

HICKS STATED THAT A WHITE MALE IN HIS LATE TWENTIES, GIVING THE NAME JASON
STRAGHN (DESCRIBED ON PAGE TWO), PICKED UP THE EQUIPMENT AT 1238 HOURS ON
05-25-00. HICKS ADVISED THAT HE DID NOT OBTAIN ANY IDENTIFICATION OR VEHICLE
INFORMATION OTHER THAN THE VEHICLE DESCRIPTION LISTED ON PAGE TWO.

THE COMPLAINANT, SHEARER, STATED HE RECEIVED INFORMATION REGARDING THE
CREDIT CARD FROM AMERICAN EXPRESS TRAVEL RELATED SERVICES ON 06-20-00. THE
INFORMATION REVEALED THAT THE CARD HAD BEEN STOLEN, AND ACTUALLY
BELONGED TO KARA WILSON OF FORT WORTH (SEE ATTACHED PAPERWORK AND
RECEIPTS).

CHARLES HICKS ADVISED THAT HE WOULD BE ABLE TO MAKE A VISUAL
IDENTIFICATION OF THE SUSPECT, IF NEEDED. HICKS ALSO STATED HE BELIEVED THE
SUSPECT HE SPOKE WITH ON THE TELEPHONE WAS NOT THE PERSON WHO PICKED UP
THE EQUIPMENT BECAUSE THE VOICES WERE DIFFERENT. SHEARER ADVISED THAT
HICKS IS AN EXCELLENT EMPLOYEE, AND DOES NOT SUSPECT HICKS OF BEING
INVOLVED IN THIS OFFENSE.

NO FURTHER INFORMATION AVAILABLE AT THIS TIME.

# Exhibit 105
# (Under Seal)

Exhibit 106
(Under Seal)

# Exhibit 107
# (Under Seal)

# Exhibit 108
# (Under Seal)

Exhibit 109





Logged in as Sharisse Burton (Legal)

## Offense Detail

| | |
|---|---|
| **Service Number** | 02604169 |
| **Event Start** | 08/13/2002 14:00:00 |
| **Offense** | 36050: Lost Items: Unauthorized Use/ Motor Vehicle |
| **Penal Code** | 31.07: UNAUTHORIZED USE OF A VEHICLE |
| **Premis** | 506: MOTEL |
| **Report Status** | Pending/Open |

### Radio Call Detail:

| | |
|---|---|
| **ID** | 02604169 |
| **Status** | C |
| **Call Date** | 8/13/2002 |
| **Call Taker** | D93 |
| **Signal** | 51: INVESTIGATION |
| **Priority** | 2 |
| **Time Ack.** | Aug 13 2002 2:53PM |
| **Time Enroute** | Aug 13 2002 2:53PM (Diff: 0 minutes) |
| **Time On Scene** | Aug 13 2002 2:53PM (Diff: 0 minutes) |
| **Time Completed** | Aug 13 2002 4:05PM (Diff: 72 minutes) |
| **Remarks** | |

### Associated Locations:

| ID | Address | Apt | City, State | Phone | Role | Links |
|---|---|---|---|---|---|---|
| 02604169 | ███████ | | ███████ | | Complainant's Home Address 1 | Map Persons Events Objects |
| 02604169 | ███████ | | ███████ | (817)625-7214 | Offense Address 1 | Map Persons Events Objects |
| 02604169 | ███████ | | ███████ | (817)626-8331 | Radio Call Address 1 | Map Persons Events Objects |
| 02604169 | ███████ | 13 | ███████ | | Vehicle Location 1 | Map Persons Events Objects |

| 02604169 | ■■■■■ | 13 | ■■■■ | (817)625-7214 | Witness Home Address 1 | Map Persons Events Objects |

## Associated Persons:

| ID | Name | DOB | Age | RES | Role | Links |
|---|---|---|---|---|---|---|
| 7250938 | HICKS, CHARLES R | ■■■ | 44 | B/N/M | Complainant 1 | Events Objects Locations Features |
| 6913073 | UNKNOWN, B214 UNKNOWN | ■■■ | ? | U/U/ | Radiocall Complainant 2 | Events Objects Locations Features |
| 7250940 | UNKNOWN, JOSEPHINE UNKNOWN | ■■■ | ? | W/N/F | Suspect 1 | Events Objects Locations Features |
| 7250941 | UNKNOWN, BLUE UNKNOWN | ■■■ | ? | W/N/F | Suspect 2 | Events Objects Locations Features |
| 7250939 | EOFF, MICHELLE UNKNOWN | ■■■ | 48 | W/N/F | Witness 1 | Events Objects Locations Features |

## Associated Officers:

| Name | Emp ID | Type | Years On Job | Department |
|---|---|---|---|---|
| ELIZARRARAZ, MANUEL | 3172 | ORO1 | 3 | POLICE-SOD GANG GF |
| ELIZARRARAZ, MANUEL | 3172 | ORP1 | 3 | POLICE-SOD GANG GF |
| FOWLER, VICTOR | 1728 | OINV | 23 | POLICE-VPC SCRAM GF |
| FOWLER, VICTOR | 1728 | ORP1 | 23 | POLICE-VPC SCRAM GF |

## Associated Objects:

| ID | Role | Desc | Links |
|---|---|---|---|
| ■■■ | General Vehicle | 2001 FORD ; PK (RED) Tag: ■■■ R/F QUARTER DAMAGE// | Persons Events Locations |
| ■■■ | Recovered Vehicle | 2001 FORD ; PK (RED) Tag: ■■■ R/F QUARTER DAMAGE// | Persons Events Locations |
| ■■■ | Stolen Vehicle | 2001 FORD ; PK (RED) Tag: ■■■ R/F QUARTER DAMAGE// | Persons Events Locations |

| Narrative 8/13/2002 | COMP INFO CONT'D: TDL < ■■■■■ <br> ***************************************************** <br> JOB #207169 <br>    ON 08/13/02, ABOUT 1445 HRS, OFCR M C ELIZARRARAZ 3172 WAS FLAGG-ED DOWN BY THE COMP AT 3410 DECATUR AVENUE.  AFTER PULLING OVER AT THE DIAMOND SHAMROCK, I WAS ADVISED BY THE COMP THAT HIS VEH WAS JUST STOLEN FROM THE RANCH MOTEL AT ■■■■■ .  I TRIED TO OBTAIN INFO FROM THE COMP OF THE VEH AND THE COMP ADVISED ME TO FOLLOW HIM BACK TO THE MOTEL. <br>    THE COMP AND MYSELF THEN RELOCATED BACK TO ■■■■■ WHERE I THEN OBTAINED THE FOLLOWING INFORMATION. <br>    THE COMP STATES THAT ABOUT AN HOUR PRIOR TO HIM WAVING ME DOWN, HE HAD PICKED UP S1 WHOM HE HAS KNOWN FOR A WHILE KNOWN.  COMP ADVISED THAT HE PICKED UP S1 FROM AN UNK LOCATION.  THE COMP STATED TO S1 THAT HE NEEDED TO TAKE A SHOWER TO GET CLEANED UP BECAUSE HE WAS DIRTY. |

COMP STATES THAT S1 THEN OFFERED HIM TO GO TO HER MOTEL ROOM AT ███
███, <#15>, SO THAT HE COULD GO AHEAD AND TAKE A SHOWER AND GET
CLEANED UP.  COMP STATES THAT UPON THEIR ARRIVAL AT THEIR MOTEL THAT
HE THEN ENTERED APT <15> AND BEGAN TO TAKE A SHOWER AND WHILE TAKING
A SHOWER, HE HEARD HIS GEN VEH ALARM GOING OFF.  COMP ADVISED THAT
HE THEN IMMEDIATELY EXITED THE SHOWER, RAN OUTSIDE, AND OBSERVED S1
WHO WAS DRIVING THE MISSING VEH AND S2 GET INTO THE VEH THROUGH THE
PASSENGER SIDE DOOR, THEN LEAVING THE MOTEL.  THE COMP STATES THAT HE
STARTED YELLING TO W1 TO CALL THE POLICE BECAUSE HIS VEH WAS JUST
STOLEN AND TO HELP HIM.  THE COMP THEN STATES THAT ANOTHER RESIDENT
THERE AT THE MOTEL WHO HAD A VEH, WAS ASKED BY THE COMP IF HE COULD
GIVE HIM A RIDE TO GO AND FIND HIS VEH.
    THE COMP ADVISED THAT THE VEH'S LAST KNOWN DIRECTION OF TRAVEL
WAS NORTHBOUND ON N MAIN.  THE COMP ADVISED THAT HE LOST SIGHT OF THE
VEH, THEN IMMEDIATELY ASKED HIS FRIEND TO DRIVE HIM TO THE NEAREST
POLICE STATION SO HE COULD REPORT THE MISSING VEH.
    MY OBSERVATION OF THE COMP WAS THAT THE COMP DID NOT HAVE ANY
CLOTHES ON.  THE ONLY CLOTHING ARTICLE HE HAD ON WAS JUST A TOWEL
WRAPPED AROUND HIS WAIST.  I ASKED THE COMP FOR GENERAL INFO ON THE
VEH AND THE COMP DID NOT KNOW THE LICENSE PLATE OR THE VIN OF THE VEH
TO ENTER IT INTO THE VEH AS AN ACTUAL STOLEN VEH.  ALSO THE LOCATION
OF WHERE THE INCIDENT OCCURRED IS ███████, THE RANCH MOTEL, WHICH
IS KNOWN FOR PROSTITUTION AND DRUG DEALING.
    THE COMP WAS GIVEN THE SERVICE NUMBER AND WAS ALSO GIVEN THE
NUMBER TO NOTIFY AUTO THEFT SO THAT HE COULD GO AHEAD AND SET UP AN
APPOINTMENT TO DO A DEPOSITION AND TO GIVE THEM THE VEH INFO.
CSSU NOT CALLED.
SUPV: SGT MCFARLAND


**Supplement 1 (8/15/2002):**
CALL SCREEN SUPPLEMENT-081502-1010:
    CONTACT WAS MADE WITH THE COMP WHO CALLED TO ADD HIS LICENSE
PLATE NUMBER TO HIS REPORT, ███████  IN CHECKING MVD, IT SHOWED THIS
NUMBER WAS NOT A GOOD NUMBER.  ON THE P120 WAS A REPORT ON THE SAME
VEH, 02579864, DATED 080402, INVOLVING THE SAME VEH.  THE CORRECT
PLATE AND VIN WERE TAKEN FROM THAT REPORT.
K588


**Supplement 2 (8/20/2002):**
ON 8-19-02 AT 1214 HRS DETECTIVE FOWLER CONTACTED COMP AND SET UP AN
APPOINTMENT FOR INTERVIEW AND DEPO AT 1630 HRS ON 8-20-02.
SGT MG HUKEL 2106


**Supplement 3 (8/29/2002):**
ATTN PIC ENTER LIC ██████ VIN ████████ INTO THE SYSTEM AS
UUMV, ARREST S1, ID ALL OTHERS UNLESS THEY HAVE OUTSTANDING WARRANTS *
***** UUMV ***** UUMV ***** UUMV ***** UUMV ***** UUMV ****
    ON WEDNESDAY, AUGUST 28, 2002, CP CAME TO ███████████, FWPD
AUTO THEFT UNIT & WAS INTERVIEWED & A DEPOSITION OBTAINED.  IT HAD
BEEN DETERMINED THAT THIS IS NOT THE 1ST REPORT CP HAD MADE INVOLVING
THIS VEHICLE.  CP IS ACCUMULATING A HISTORY OF LOSING OR LOANING THIS
VEHICLE OUT.  THE PREVIOUS REPORT #02579864 WHICH WAS LOCATED AT ██████
█████████  THIS REPORT SHOWS THE VEHICLE TO BE STOLEN FROM ██████
█████████  CP STATED HE HAD GONE TO S1 MOTEL ROOM TO TAKE
A SHOWER, WHILE IN THE SHOWER S1 TOOK THE KEYS LEFT THE ROOM W/O CP'S
EFFECTIVE CONSENT OR PERMISSION.  CP STATED AS HE WAS SHOWERING HE
HEARD HIS ALARM GO OFF HE JUMPS OUT OF THE SHOWER WRAPS A TOWEL AROUND
HIMSELF & RUNS OUT OF THE ROOM & OBSERVES S1 GETTING INTO THE DRIVERS
DOOR & S2 GET INTO THE PASSENGER DOOR AND DRIVES OFF WITH CP RUNNING
AFTER THEM.  CP WAS UNABLE TO CATCH SUSPECTS, HOWEVER, CP WAS ABLE TO
FLAG DOWN OFFICER ELIZARRARAZ AND TELL HIM WHAT THE SITUATION WAS WITH
HIS VEHICLE.
    RECOMMENDED STATUS:  PENDED
SGT HUKEL
COPY TO PIC

**Supplement 4 (8/29/2002):**
   ON THURSDAY, AUGUST 29, 2002, I RECEIVED SUPPLEMENTAL NARRATIVE WITH A STAMP ON IT FROM PIC ADVISING ME THE S/V HAS BEEN IMPOUNDED ON #26861.  I CALLED THE # LISTED ON THE REPORT AND LEFT A MESSAGE FOR CP TO CONTACT ME REGARDING THIS OFFENSE AND I LEFT RECOVERY INFORMATION ALSO.  I ATTEMPTED TO PULL UP THE IMPOUND SLIP BUT I WAS UNABLE TO DO SO, THIS LEAVES ME TO BELIEVE THAT CP HAS ALREADY PICKED UP THE S/R/V FROM THE AUTO POUND.
   RECOMMENDED STATUS:  PENDED
SGT HUKEL

**Supplement 5 (8/29/2002):**
ATTN PIC REMOVE LIC ███████ VIN ███████████ FROM THE SYSTEM IT HAS BEEN LOCATED & IMPOUNDED ON OFFENSE #02621185  ****************** ******************************************************************
   ON THURSDAY, AUGUST 29, 2002, IT WAS DISCOVERED THAT THIS VEHICLE COULD BE FOUND IN OUR AUTO POUND ON OFFENSE LISTED ABOVE.  I CALLED CP AND ADVISED HIM HOW TO LOCATE THE VEHICLE IN OUR POUND, HOWEVER, IT HAD AN E DIV HOLD ON IT.  I ADVISED CP HE WOULD NEED TO CONTACT E DIV TO HAVE THE HOLD REMOVED.
   RECOMMENDED STATUS:  PENDED
SGT HUKEL
COPY TO PIC

| | |
|---|---|
| **Event Start** | 08/13/2002 14:00:00 |
| **Event End** | 08/13/2002 15:00:00 |
| **Event Duration (hrs)** | 1 |
| **Resp. Div** | AUTO |
| **Offense** | 36050: Lost Items: Unauthorized Use/ Motor Vehicle |
| **Penal Code** | 31.07: UNAUTHORIZED USE OF A VEHICLE |
| **Report Status** | Pending/Open |
| **File Date** | 08/29/2002 14:11:00 |
| **Rpt Status** | P |
| **Beat** | B113 |
| **PRA** | P400 |
| **Division** | N |
| **Rpt Source** | S |
| **Operator** | 090900: FOWLER, VICTOR |
| **PIC Code** | Y |
| **Code Date** | 08/29/2002 15:57:00 |
| **Premis** | 506: MOTEL |
| **Gang_Designated** | N |

« BACK | MAIN MENU | LOG OUT

# Exhibit 110

ACTION ASSIGNED OR PURPOSE OF REPORT:
Interview of Michael JONES:

ASSIGNED TO:
Trooper Robert K. SEBASTIANELLI

ASSIGNED BY:
Self-initiated

DETAILS:
## Tuesday, September 30th, 2008 interview of Michael JONES:

On Tuesday, September 30th, 2008 at approximately 1540 hours I conducted the following interview in reference to this investigation. Michael JONES, W-N/M 29, [
]. JONES is the manger for the Soundwerks Car Audio Sales and Services [
], phone#817-281-9381. JONES related that he knew HICKS because he worked with him at Soundwerks. JONES related that he applied for the job at the Soundwerks because of HICKS and the way HICKS talked about working here. JONES related that this was back in 2001 or 2002 when he started working at the Soundwerks. JONES related that he knew HICKS because his girlfriend at the time lived in the same apartment building as HICKS. JONES related that he did hang out a couple of times with HICKS before he started working at the Soundwerks. JONES related that he knew that HICKS became involved with drugs, but he did not know anything else about that part of HICKS' life. JONES related that he knew that HICKS had a girlfriend in Arlington named Susan, but he did not know Susan well. JONES related that in the time leading up to HICKS leaving the Soundwerks he was telling JONES that he met a girl who wanted him to smoke crack. JONES related that he thought that this girls name was April and HICKS was running around with her during his downward spiral. JONES related that he knew HICKS was smoking crack because he was coming to work high but JONES related that he never did drugs with HICKS. JONES related that he knew HICKS was coming to work high because he was falling asleep on the couch at work and falling sleep in front of customers. JONES related that he did not know if HICKS was visiting prostitutes but he could have been. JONES related that he never saw HICKS become angry or upset with women or angry in general. JONES related that HICKS was always popular with girls and he presented himself as a ladies man. JONES related that he thought that HICKS had a decent relationship with Susan his girlfriend from Arlington, but he did not know what happened with that relationship. JONES related that he never really heard HICKS make any statements such as "foot on neck" but he never saw him angry. JONES related that he never knew HICKS to have any run ins with the police but he did not know him that long before meeting him at his girlfriend's apartment building. JONES related that he never knew HICKS to talk about suicide and when he knew HICKS he was into body building and a health nut. JONES related that HICKS' downward spiral occurred within about a year right before he was terminated at the Soundwerks. JONES related that HICKS stopped showing up for work and SHEARER had no choice but to let him go. JONES related that he did not know for sure if HICKS was stealing items out of customers cars or not. JONES related that it is possible that he was because of his drug habit. JONES related that he did not know anything about HICKS family life, other than the fact that HICKS had a sister. JONES had no further information at this time.

This investigation will continue.

COMPLETED BY:
Trooper Robert K. SEBASTIANELLI/ *TPR. Robt Whutl*

BADGE NO.: **7212**
DATE: 10/08/08

SUPERVISOR'S REVIEW: *8405 10/15/0v*

C.I. SECTION CO.:
OCT 16 2008

PAGE NO.: 573

DEPARTMENT HEAEDQUARTERS
3008

Exhibit 111

**IT Solutions**
**Sherlock** Search Tool



Logged in as Sarah Waters (Homicide)

# Offense Detail

| | |
|---|---|
| Service Number | 03093388 |
| Event Start | 08/16/2003 02:00:00 |
| Offense | 08411: Other Assaults: Adult Black Female, Simple Assault, PM |
| Penal Code | 22.01: ASSAULT |
| Premis | 1008: PUBLIC STREET, ALLEY |
| Report Status | Closed by Arrest |

## Radio Call Detail:

| | |
|---|---|
| ID | 03525049 |
| Status | C |
| Call Date | 8/16/2003 |
| Call Taker | 020 |
| Signal | 54: MEET |
| Priority | 2 |
| Time Ack. | Aug 16 2003 3:07AM |
| Time Enroute | Aug 16 2003 3:09AM (Diff: 2 minutes) |
| Time On Scene | Aug 16 2003 3:10AM (Diff: 1 minutes) |
| Time Completed | Aug 17 2003 4:56AM (Diff: 1546 minutes) |
| Remarks | TEXT:CP ADV SHE HAS OFCRS ON SCENE WITH A FEMALE CP AT TH/IS LOC STATING THAT HER CHILD WAS KIDNAPPED AND SHE WAS A/SSAULTED IN FW NEAR HWYF |

## Associated Locations:

| ID | Address | Apt | City, State | Phone | Role | Links |
|---|---|---|---|---|---|---|
| 03093388 | ███ | | ███ | | Arrested Persons Address 1 | Map Persons Events Objects |
| 03093388 | ███ | | ███T | (817) 446-2486 | Complainant's Home Address 1 | Map Persons Events Objects |
| 03093388 | ███ (PUBLIC | | ███ | (817) 875-6839 | Offense Address 1 | Map Persons Events Objects |

2178



| 03525049 | | | | Radio Call Address 1 | Map Persons Events Objects |
| 03525049 | | | (000) 000-0000 | Radio Call Complainant Address 1 | Map Persons Events Objects |

**Associated Persons:**

| ID | Name | Age | RES | Job | Role | Links |
|---|---|---|---|---|---|---|
| 7678344 | MUHAMMAD, LAKISHA V | 31 | B/U/F | | Complainant 1 | Events Objects Locations Features |
| 7476324 | UNKNOWN, WENDY FHL | ? | U/U/ | | Radiocall Complainant 2 | Events Objects Locations Features |
| 7251228 | HICKS, CHARLES R | 34 | B/U/M | | Arrested 1 | Events Objects Locations Features |

**Associated Officers:**

| Name | Emp ID | Type | Years On Job | Department |
|---|---|---|---|---|
| COOK SMITH, LATASHA E | 3249 | ORP1 | 3 | POLICE-SCHOOL SECURITY INIT |
| NESBITT, BRADLEY S | 2375 | OINV | 16 | POLICE-EAST DIVISION |
| NESBITT, BRADLEY S | 2375 | ORP1 | 16 | POLICE-EAST DIVISION |

**Associated Objects:**

| ID | Role | Desc | Links |
|---|---|---|---|
| No Associated Object records found | | | |

| Narrative 8/16/2003 | AP1'S SS <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> |
|---|---|

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ON 08/16/03 AT APPROX 0310 HRS I OFCR L E SMITH ID 3249 WORKING H312 WAS DISPATCHED TO [REDACTED], THE RELAX INN, ON A MEET THE OFCR. UPON ARRIVAL THIS OFCR MET WITH THE FOREST HILL POLICE DE-PARTMENT OFCRS WHO RELATED THE FOLLOWING.

OFCRS STATED THAT THEY RECEIVED A CALL AT [REDACTED] REF-ERENCE A FEMALE BEING ASSAULTED. OFCRS STATED THAT THEY ARRIVED AND WERE DIRECTED TO [REDACTED]. MANSFIELD OFCRS EXPLAINED TO THIS OFCR THAT UPON TALKING TO THE COMP THEY BECAME AWARE THAT THE OFFENSE HAPPENED IN FORT WORTH, AND FORT WORTH PD WAS NOTIFIED.

OFCR SPOKE WITH THE COMP WHO RELATED THE FOLLOWING. COMP STATED THAT ON THIS DATE AT APROX 1800 HRS SHE ASKED THE AP FOR A RIDE. COMP STATED THAT SHE WAS THE INTERSECTION OF MANSFIELD AND MILLER AT A CONOCO STATION WHEN SHE ENTERED THE AP'S VEHICLE. COMP STATED THAT THEY THEN PROCEEDED N/BOUND ON MILLER. COMP STATED THAT THE AP WAS DRIVING VERY SLOWLY AND AS IF HE DID NOT KNOW WHERE HE WAS GOING AND DID NOT UNDERSTAND THE COMP'S DIRECTIONS TO WHERE SHE WANTED TO BE DROPPED OFF. COMP SAID THAT SHE THEN ASKED THE AP IF SHE COULD DRIVE. AP THEN AGREED AND EXITED THE VEHICLE AND THE COMP ENTERED THE DRIVERS SIDE OF THE VEHICLE. COMP STATED THAT SHE THEN DROVE TO THE TOUCH OF BLUES CLUB AND GOT OUT OF THE VEHICLE AND WENT INSIDE AND GOT SOME CIGARETTES. COMP STATED THAT SHE THEN BEGAN E/BOUND ON ROSEDALE. COMP STAATED THAT THE AP THEN BEGAN EXHIBITING SUSPICIOUS BEHAVIOR, THIS OFCR IS UNCLEAR WHAT TYPE OF SUSPICIOUS BEHAVIOR AP WAS EXHIBITING.

2179

ATTACHMENT NO. ___1___ PAGE ___2___ OF ___4___

STATION

COMP STATED THAT AT SOME POINT THE AP MADE HER EXIT THE VEHICLE AND GO TO THE PASSENGER SIDE, AND HE BEGAN DRIVING AGAIN.

COMP STATED THAT THEY ENDED UP ON THE ████████ BY A PARK RIGHT OFF OF WILBARGER AND 287. COMP STATED AT THIS TIME, WHEN THE AP STOPPED AT A STOP SIGN, SHE TRIED TO JUMP OUT OF THE VE-HICLE. COMP STATED THAT AS SHE TRIED TO JUMP OUT OF THE VEHICLE, THE AP TRIED TO GRAB HER, AND THAT IS WHEN SHE RECEIVED THE SCRATCHES ON THE BACK OF HER NECK. COMP STATED WHEN SHE EXITED THE VEHICLE THE AP BEGAN MAKING THREATS TO HER AND TOLD HER TO GET BACK INSIDE OF THE VEHICLE. COMP STATED SHE TOLD THE AP SHE WOULD NOT GET BACK INSIDE THE VEHICLE UNLESS SHE COULD DRIVE THE TRUCK. AP THEN AGREED AND SCOOTED OVER TO THE PASSENGER SIDE OF THE VEHICLE. COMP STATED THAT THE THREATS THAT THE AP HAD MADE WAS THAT IF SHE DID NOT RETURN BACK TO THE TRUCK THAT HE WOULD POSSIBLY RUN OVER HER WITH THE VEHICLE OR TRY TO DO HARM TO HER. COMP THEN ENTERED BACK IN THE VEHICLE AND BEGAN DRIVING. COMP STATED THAT SHE DROVE TO 1800 MANSFIELD, THE FINA GAS STATION, WHERE SHE FLAGGED DOWN A VEHICLE. VEHICLE WAS OCCUPIED BY LAST NAME <SPSCARD> FIRST NAME <RAYMOND> MIDDLE NAME <KENNETH> BLACK MALE ████████, PHONE <817-478-4828>. COMP STATED THAT THE WITNESS THEN CAME UP TO THE VEHICLE AND TOLD THE AP TO LET THE COMP OUT OF THE VEHICLE. AP THEN COMPLIED AND PUSHED THE COMP OUT OF THE VEHICLE AND DROVE AWAY. COMP STATED THAT SHE THEN PHONED POLICE.

FOREST HILL PD STATED THAT THEY, AFTER THIS INCIDENT HAPPENED, STOPPED THE AP ON AN UNRELATED STOP REFERENCE HIS HEADLIGHT BEING OUT. FOREST HILL PD WAS INFORMED BY THEIR DISPATCH THAT HE WAS THOUGHT TO BE A SUSPECT IN AN ASSAULT, AND HELD THE AP THERE UNTIL FORT WORTH PD ARRIVED.

I ALSO SPOKE WITH AP WHO STATED THAT HE DID NOT KNOW THE COMP VERY WELL. COMP ASKED HIM FOR A RIDE. AP STATED THAT HE DID NOT KNOW THE AREA VERY WELL AND ALLOWED THE AP TO DRIVE. AP STATED THAT THE COMP RECEIVED THE SCRATCHES ON THE BACK OF HER NECK WHEN SHE MADE A STOP TO GET SOME MONEY FROM A FRIEND OF HERS, WHO TRIED TO HAVE SEX WITH HER AND THE COMP DID NOT WANT TO. AP STATED THAT THE COMP THEN RAN OUT OF THE APARTMENT, JUMPED IN THE TRUCK, AND TOLD THE AP TO DRIVE, BECAUSE SHE'D JUST TAKEN SOMEONE'S MONEY AND THAT IS WHERE SHE RECEIVED THE SCRATCHES. AP STATED THAT HE IN NO WAY DID HE HARM OR THREATEN THE COMP.

AP WAS ISSUED A CITATION, GC #G413160 FOR ASSAULT BY OFFENSIVE CONTACT FOR THE FACT THAT THE COMP STATED THAT THE COMP STATED THAT SHE WAS OFFENDED WHEN THE AP GRABBED HER AND SCRATCHED HER ON THE BACK OF THE NECK.

THIS OFCR THEN TRANSPORTED THE COMP TO <████████> TO A FRIEND'S HOUSE.

ACTING SGT/CPL LONG DID MAKE THE SCENE AND WAS ADVISED OF THE SITUATION. THIS OFCR DID OBSERVE REDNESS AND POSSIBLY SCRATCHES TO THE BACK OF THE COMP'S NECK. COMP STATED THAT SHE JUST FELT THAT IT WAS OFFENSIVE, THAT THIS CONTACT WAS OFFENSIVE.

THERE ARE NO OTHER DETAILS TO THIS REPORT. CRIME SCENE WAS NOT NOTIFIED.
ACTING SGT/CPL LONG
L164

**Supplement 1 (8/17/2003):**
ON 081703, WHILE ASSIGNED TO E-CIU, I RECEIVED THIS CASE FOR FOLLOW UP INVESTIGATION. I ASSIGNED CASE NUMBER 1556 FOR MY RECORDS.
I REVIEWED THE REPORT NOTING OFCRS ISSUED A CITATION TO THE AP1 FOR ASSAULT BY CONTACT.
I RECOMMEND THIS CASE BE CLOSED, CLEARED BY GC ARREST.
SGT CS JENKINS 2200
STATUS: CLOSED

| | |
|---|---|
| **Event Start** | 08/16/2003 02:00:00 |
| **Event End** | 08/16/2003 02:00:00 |
| **Resp. Div** | GENE |

2180

ATTACHMENT NO. __1__ PAGE __3__ OF _4_

STATION

| | |
|---|---|
| **Offense** | 08411: Other Assaults: Adult Black Female, Simple Assault, PM |
| **Penal Code** | 22.01: ASSAULT |
| **Report Status** | Closed by Arrest |
| **File Date** | 08/17/2003 11:30:00 |
| **Rpt Status** | C |
| **Beat** | H314 |
| **PRA** | E650 |
| **Division** | E |
| **Rpt Source** | S |
| **Operator** | 198660: NESBITT, BRADLEY S |
| **Code Date** | 08/17/2003 11:42:00 |
| **Premis** | 1008: PUBLIC STREET, ALLEY |

« BACK | MAIN MENU | LOG OUT

ATTACHMENT NO. ___1___ PAGE __4__ OF _4_

STATION

Exhibit 112
(Under Seal)

Exhibit 113




Logged in as Sharisse Burton (Legal)

## Offense Detail

| | |
|---|---|
| **Service Number** | 04008739 |
| **Event Start** | 01/22/2004 17:30:00 |
| **Offense** | 10070: Forgery/Counterfeiting: Signing Fictitous Sig. to Defraud |
| **Penal Code** | 32.21: FORGERY |
| **Premis** | 100: BUSINESS - RETAIL STORES |
| **Report Status** | Pending/Open |

### Radio Call Detail:

| | |
|---|---|
| **ID** | 04050028 |
| **Status** | C |
| **Call Date** | 1/22/2004 |
| **Call Taker** | 094 |
| **Signal** | 40: THEFT INVESTIGATION |
| **Priority** | 2 |
| **Time Ack.** | Jan 22 2004 3:42PM |
| **Time Enroute** | Jan 22 2004 3:44PM (Diff: 2 minutes) |
| **Time On Scene** | Jan 22 2004 3:47PM (Diff: 3 minutes) |
| **Time Completed** | Jan 22 2004 6:27PM (Diff: 160 minutes) |
| **Remarks** | TEXT:911//ACE AMERICA'S CASH CHECKING//WF POSS 21YO LONG/BLK HAIR BLK JKT ORG SHRT BLU JNS IS ATT TO CASH STOLEN C/HECK//STILL IN BUSN COMP |

### Associated Locations:

| ID | Address | Apt | City, State | Phone | Role | Links |
|---|---|---|---|---|---|---|
| 04008739 | ▮ | | ▮ | (000) 000-0000 | Arrested Persons Address 1 | Map Persons Events Objects |
| 04008739 | ▮ | | ▮ | | Complainant's Home Address 1 | Map Persons Events Objects |
| 04008739 | ▮ | | ▮ | (817) 625-9977 | Offense Address 1 | Map Persons Events Objects |



| | | (817) 625-77 | Radio Call Address 1 | Map Persons Events Objects |
|---|---|---|---|---|
| 04050028 | ST | | | |
| 04050028 | | 17) 0-00 | Radio Call Complainant Address 1 | Map Persons Events Objects |
| 04008739 | F W | 17) 625-9977 | Witness Business Address 1 | Map Persons Events Objects |

## Associated Persons:

| ID | Name | DOB | Age (Now) | RES | Role | Links |
|---|---|---|---|---|---|---|
| 7250938 | HICKS, CHARLES R | | 44 | B/N/M | Complainant 1 | Events Objects Locations Features |
| 8183079 | EMPLYE, ADELA UNKNOWN | 12 | ? | U/U/ | Radiocall Complainant 2 | Events Objects Locations Features |
| 8271556 | SAMUELS, CRYSTAL GALE | | 37 | W/H/F | Arrested 1 | Events Objects Locations Features |
| 8271555 | DOSS, ADELA UNKNOWN | | 52 | W/H/F | Witness 1 | Events Objects Locations Features |

## Associated Officers:

| Name | Emp ID | Type | Years On Job | Department |
|---|---|---|---|---|
| HECKART, JOHN E | 2692 | ORP1 | 12 | POLICE-N DIV NPD 2 |
| MATHENY, ANDREW S | 3358 | ORP2 | 2 | POLICE-N DIV NPD 2 |
| WOOD, BOBBY W | 1887 | OINV | 22 | POLICE-MAJOR CRIMES SECTION |
| WOOD, BOBBY W | 1887 | ORP1 | 22 | POLICE-MAJOR CRIMES SECTION |

## Associated Objects:

| ID | Role | Desc | Links |
|---|---|---|---|
| 04008739 | Recovered Property | PERSONAL CHECK/WELLS FARG; $0 MADE OUT TO "CRYSTAL SAMUELS" | Persons Events Locations |

| Narrative 1/22/2004 | ***EVIDENCE*** 1) WELLS FARGO PERSONAL CHK#     /ACCT<        >MADE OUT TO "CRYSTAL SAMUELS" FOR $75.00 ON THU 012204 AT 1544HRS I,OFCR JE HECKART #2692, WORKING B212 WAS DISPATCHED ON SIG 40/THEFT LOCATED AT          /ACE EXPRESS CHECK CASHING. UPON ARRIVAL AT 1547HRS I SPOKE WITH WITN. WITN RELATED THAT AP/SAMUELS PRESENTED WELLS FARGO CHK #     ON ACCT<        >FOR $75.OO SIGNED BY "CHARLES R. HICKS" DATED ON 01210 3. WITN ADVISED THAT SHE HAD CALLED CP TO VERIFY THAT CP DID SIGN AND WRITE THIS CHECK MADE OUT TO AP. CP TOLD WITN THAT THE CHECK WAS STOLE N AS WAS SEVERAL OTHER CHECKS WERE STOLEN AND THAT CP DID NOT KNOW THE CHECKS WERE MISSING UNTIL WITN CALLED CP TODAY THUR 012204. WITN THEN HELD TO AP'S TX ID AND STOLEN CHECK AND CALLED FOR POLICE. I ARRIVED |
|---|---|

AND WITN GAVE ME AP'S ███ ID AND STOLEN CHECK. I THEN ASKED AP AND SUSP <MONTANO,ANGELICA MARIE>H/F███████ TX SSN<███████>;█ ID<███████> WHO WAS TRYING TO CASH THE CHECK. AP REPLIED THAT SHE WAS ATTEMPTING T O CASH THE CHECK AND ASKED WHAT WAS THE PROBLEM. SUSP THEN INTERJECTED AND BLURTED OUT THAT THE CHECK CAME FROM SUSP'S BOYFRIEND/CP. BOTH AP AND SUSP WERE DETAINED FOR FURTHER INVESTIGATION. I THEN CALLED DET DARRACQ AT N-CID,WHO ADVISED IF AP OR SUSP WANTED TO MAKE A WRITTEN ST ATEMENT. AP AND SUSP STATED YES. I TRANSPORTED SUSP ; B221/OFCR MATHEN Y #3358 TRANSPORTED AP TO ███████ ; SUSP MAD E A WRITTEN STATEMENT BUT AP CHANGED HER MIND AND DECLINED. WHILE AT 2 ███████ ; I CALLED CP ABOUT THE STOLEN CHECK WITH PHONE NUMBER T HAT WITN GAVE ME.

CP RELATED THAT ABOUT 2-3 DAYS AGO; CP WAS VISITING HIS GIRLFRIEND/ SUSP AT SUNRISE INN AT ███████. CP ADVISED THAT HE HAD SEVERAL OF HIS PERSONAL CHECKS STOLEN FROM THE MOTEL ROOM. CP DOES NOT KNOW WH O TOOK THE CHECKS AND CP WAS NOT AWARE OF THE CHECKS BEING STOLEN UNTI L TODAY 012204 WHEN WITN CALLED CP. CP TOLD ME OVER THE PHONE THAT HE PERSONALLY KNOWS SUSP/MONTANO AND GAVE HER SOME CASH THAT DAY FOR GROC ERY BUT CP NEVER WROTE ANY CHECKS TO ANYONE. I ASKED CP IF CP KNEW AP/ SAMUELS AND IF CP GAVE ANYONE PERMISSION TO OBTAIN AND SIGN CP'S SIGNA TURE ON CP'S CHECK. CP DID NOT GIVE ANYONE PERMISSION AND THAT WHO EVE R SIGNED THE CHECK HAD FORGED CP'S SIGNATURE. I THEN REQUESTED THAT CP FAX ME A COPY OF CP'S █ DL TO N-CID. AS OF 1824HRS;CP HAS NOT FAXED ANYTHING.I THEN TRANSPORTED AP TO ███████/JAIL AND TAGGED STOLEN /REC CHK INTO PROPERTY ROOM. AP WAS CHARGED WITH FORGERY OF FINANCIAL INSTRUMENT AND 2 LOCAL TRAFFIC WARRANTS. B221 TRANSPORTED SUSP BACK TO ███████.
NO CSSU
SGT PHILLIPS
AP1 SSN <███████>█ ID <███████>

**Supplement 1 (1/23/2004):**
OFFENSE ASSIGNED DET BW WOOD ID 1887 FOR FOLLOW UP AND ENVELOPE 04-0263 ASSIGNED.
STATUS: OPEN
SGT KW DEAN
K540

**Supplement 2 (2/9/2004):**
ON 01/23/04 DET WOOD RECEIVED THIS CASE FOR FOLLOW-UP INV.
DET OBSERVED THAT AP(SAMUELS)WHO PRESENTED PHYSICAL EVIDENCE CHECK AFTER BEING READ MIRANDA WARNING AT NORTH DIVISION BY DET DARRACQ DECLINED TO MAKE WRITTEN STATEMENT.SUSPECT(MONTANO)DID COMPLETE STATEM ENT WHICH DET WOOD OBTAINED AND REVIEWED.SUSPECT ADVISED THAT COMP WROTE THE CHECK OUT AND SHE ADVISED HIM TO PUT HER SISTERS NAME ON IT BECAUSE SHE HAD IDENTIFICATION.SUSPECT RELATED COMP KNOWS SUSPECT AND WAS TRYING TO HELP HER OUT.
DET OBSERVED FROM REPORTING OFFICERS NARRATIVE THAT THE COMP/ACCOUNT HOLDER WAS CONTACTED AND VERIFIED KNOWING SUSPECT BUT NOT AP.COMP HAD ADVISED THAT CHECKS WERE STOLEN FROM MOTEL ROOM WHILE VISITING SUSPECT AND COMP DID NOT WRITE CHECKS TO ANYONE.
DET FOUND THAT AP SAMUELS WAS BOOKED IN ON FORGERY AND CLASS C WARRANTS AND SUSPECT HAD BEEN RELEASED.AP REQUESTED APPOINTED COUNSEL.
DET ATTEMPTED TO CONTACT COMP WITH NEGATIVE RESULTS.
ON 01/26/04 DET WOOD CONTACTED WELL'S FARGO CORPORATE SECURITY A CONWAY WHO ADVISED THAT COMP ACCOUNT WAS NEW ACCOUNT OPENED IN NOVEMBER 2003 AND HAD A NEGATIVE BALANCE.DET WAS ADVISED THAT CHECKS WERE NOT REPORTED STOLEN.
ON 01/26/04 DET WAS ABLE TO CONTACT COMP AND AN APPOINTMENT WAS SET FOR 01/27/04 TO MEET FOR FORGERY AFFIDAVIT.
ON 01/27/04 DET DID MEET WITH COMP WHO OBSERVED PHYSICAL EVIDENCE CHECK.COMP WAS UNSURE AS TO HIS SIGNATURE ON CHECK STATING THAT IT LOOKED CLOSE TO HIS SIGNATURE BUT THAT HE DID NOT KNOW OR MAKE CHECK OUT TO AP OR SUSPECT.DET QUESTIONED COMP IF IT WAS POSSIBLE IF HE HAD ANY SIGNED BLANK CHECKS AND COMP WAS NOT SURE.COMP DID COMPLETE FORGERY AFFIDAVIT.COMP ADVISED THAT HE RECENTLY MET SUSPECT AND HE WAS TRYING TO HELP HER OUT BUT DID NOT PROVIDE CHECKS.COMP ALSO RELATED

THAT SUSPECT HAD TAKEN HIS CAR BUT COMP HAD LOCATED IT.COMP RELATED
THAT HE DID NOT KNOW AP AND HAD NO IDEA WHO SHE WAS.
   ON 01/27/04 DET WOOD UPON FUTHER REVIEW OF REPORT CONTACTED W#1 DOSS
MANAGER ACE CHECK CASHING WHO ADVISED THAT SUSPECT COMPLETED CHECK
CASHING CARD FOR AP AND SUSPECT GAVE CHECK TO AP TO CASH.AP HAD
PROVIDED ID IN HER NAME.W#1 ADVISED THAT AP ONLY SIGNED SIGNATURE ON
FILE CARD.W#1 ADVISED THAT DL# WAS ALREADY ON CHECK(COMP'S DL#)AND
SUSPECT ADVISED WITNESS THAT THIS WAS COMP DL.(PHONE NUMBER ON CHECK
MADE BY W#1).
   DET WOOD THEN CONTACTED DET DARRACQ NORTH SIDE CID WHO ADVISED THAT
AP UPON BEING READ MIRANDA WARNING DECLINED TO MAKE A WRITTEN
STATEMENT BUT ADVISED THAT SHE OBTAINED CHECK FROM SUSPECT BUT DID
NOT KNOW CHECK WAS STOLEN.
   DET WOOD BASED ON INVESTIGATION RELEASED AP ON FORGERY CHARGE WITH
NO CASE FILED AT THIS TIME AND RECOMMENDS THAT CASE BE PENDED FOR
FUTHER INVESTIGATION.
STATUS:PENDED
SUPV:SGT K W DEAN 2598

| | |
|---|---|
| **Event Start** | 01/22/2004 17:30:00 |
| **Event End** | 01/22/2004 17:30:00 |
| **Resp. Div** | FRAU |
| **Offense** | 10070: Forgery/Counterfeiting: Signing Fictitous Sig. to Defraud |
| **Penal Code** | 32.21: FORGERY |
| **Report Status** | Pending/Open |
| **File Date** | 02/09/2004 17:37:00 |
| **Rpt Status** | P |
| **Beat** | B213 |
| **PRA** | P250 |
| **Division** | N |
| **Rpt Source** | S |
| **Operator** | 305175: WOOD, BOBBY W |
| **Code Date** | 02/09/2004 20:18:00 |
| **Premis** | 100: BUSINESS - RETAIL STORES |
| **Gang_Designated** | N |

« BACK | MAIN MENU | LOG OUT

# Exhibit 114




Logged in as Sharisse Burton (Legal)

## Offense Detail

| | |
|---|---|
| **Service Number** | 04016070 |
| **Event Start** | 02/09/2004 00:00:00 |
| **Offense** | 36050: Lost Items: Unauthorized Use/ Motor Vehicle |
| **Penal Code** | 31.07: UNAUTHORIZED USE OF A VEHICLE |
| **Premis** | 905: PARKING LOT-EATING ESTABLISHME |
| **Report Status** | Pending/Open |

### Radio Call Detail:

| | |
|---|---|
| **ID** | 04092588 |
| **Status** | C |
| **Call Date** | 2/10/2004 |
| **Call Taker** | 234 |
| **Signal** | 61: OTHERS |
| **Priority** | 3 |
| **Time Ack.** | Feb 10 2004 10:47AM |
| **Time Enroute** | Feb 10 2004 10:47AM (Diff: 0 minutes) |
| **Time On Scene** | Feb 10 2004 10:47AM (Diff: 0 minutes) |
| **Time Completed** | Feb 10 2004 5:18PM (Diff: 391 minutes) |
| **Remarks** | Z117/Z117 PD0400016070 Assigned/Z117/Z117/Z117/ |

### Associated Locations:

| ID | Address | Apt | City, State | Phone | Role | Links |
|---|---|---|---|---|---|---|
| 04016070 | 0 ULTIMATE ELECTRONICS | | ▮ | ▮ | Complainant's Business Address 1 | Map Persons Events Objects |
| 04016070 | ▮ | | ▮ , | ▮ | Complainant's Home Address 1 | Map Persons Events Objects |
| 04016070 | ▮ (MCDONALD'S) | | ▮ | | Offense Address 1 | Map Persons Events Objects |
| 04092588 | ▮ | | ▮ | | Radio Call Address 1 | Map Persons Events Objects |
| 04016070 | ▮ . | | ▮ | | Vehicle Location 1 | Map Persons Events Objects |

## Associated Persons:

| ID | Name | DOB | Age (Now) | RES | Role | Links |
|----|------|-----|-----------|-----|------|-------|
| 7251228 | HICKS, CHARLES R | ▮ | 44 | B/U/M | Complainant 1 | Events Objects Locations Features |
| 8280668 | JOHNSON, QUINCY UNKNOWN | ▮ | 42 | B/U/M | Suspect 1 | Events Objects Locations Features |
| 8280669 | UNKNOWN, UNKNOWN UNKNOWN | ▮ | ? | B/U/M | Suspect 2 | Events Objects Locations Features |

## Associated Officers:

| Name | Emp ID | Type | Years On Job | Department |
|------|--------|------|--------------|-----------|
| FOWLER, VICTOR | 1728 | OINV | 25 | POLICE-VPC SCRAM GF |
| NAVA JR, HENRY N | 3084 | ORP1 | 12 | POLICE-NORTH CRT |
| SHOSID, STEVEN S | 2320 | ORP1 | 18 | POLICE-WEST DIVISION |

## Associated Objects:

| ID | Role | Desc | Links |
|----|------|------|-------|
| 000108308 | General Vehicle | 2000 NISS MAX; 4D () Tag: MISSING VEHICLE; YEAR 2000; MAXIMA MODEL GLE; TAN INTERIOR; SUNROOF | Persons Events Locations |
| ▮ | Recovered Vehicle | 2000 NISS MAX; 4D (BLACK) Tag: ▮ 23209999M999 WEST FRWY. BEST BUDGET SUIT1100YX | Persons Events Locations |
| ▮ | Stolen Vehicle | 2000 NISS MAX; 4D (BLACK) Tag: ▮ 23209999M999 WEST FRWY. BEST BUDGET SUIT1100YX | Persons Events Locations |

**Narrative**
**2/9/2004**

ON 021004 OFCR H NAVA 3084 MADE CONTACT WITH THE COMP, WHO STATED THAT S1 AND 2 HAD TAKEN HIS CAR WITHOUT HIS PERMISSION, FROM THE MCDONALD'S PK LT LOCATED AT ▮. OFCR NAVA ASKED THE COMP HOW HE KNEW THE SUSPS. COMP STATED THAT HE HAD JUST RECENTLY MET THEM, AND JUST KNEW THEM BY THEIR NAME, AND THAT WAS ALL.

OFCR NAVA THEN ASKED THE COMP HOW THEY CAME ABOUT TO TAKING THE VEH; AND HE STATED THAT WHEN HE WENT INSIDE OF MCDONALD'S, HE LEFT THE KEYS IN THE VEH, AND S1 AND 2 TOOK THE VEH WITHOUT HIS PERMISSION. OFCR NAVA NOTED THAT THE COMP WAS NOT SURE ON THE EVENTS THAT ACTUALLY TOOK PLACE, AS IF HE WAS ATTEMPTING TO HIDE THE TRUTH AS TO WHAT ACTUALLY TOOK PLACE.

OFCR NAVA ADVISED THE COMP THAT HE WOULD MAKE A REPORT ON A MISSING VEH, AND THAT HE WOULD NEED TO RELOCATE TO ▮, AND SPEAK WITH A DETECTIVE IN REFERENCE TO GIVING A SWORN DISPOSITION.

OFCR NAVA ISSUED THE COMP A COPY OF THE REPORT NUMBER.
CRIME SCENE WAS NOT NOTIFIED.
SGT RANGEL
L142


**Supplement 1 (2/17/2004):**
*****************************************************************
ATTENTION PIC: PLEASE ENTER THE G/V INTO THE SYSTEM AS S/V. ARREST S1 ID ALL OTHERS. CONFISCATE VEHICLE, CALL COMP

*********************************************************************
ON 02/17/04 COMP CAME TO FWPD AUTO THEFT UNIT, WAS INTERVIEWED AND A
DEPOSITION OBTAINED. ACCORDING TO COMP, HIS SON WAS IN POSSESSION OF
THE UUMV, HOWEVER, THE COMP'S SON IS BI-POLAR AND ON MEDICATION AND
DID NOT HAVE ALL OF HIS MENTAL FACULTIES. ACCORDING TO COMP, HIS SON
WAS CONNED OUT OF THE UUMV. COMP STATES HE IS THE REGISTERED OWNER AND
HE GAVE S1 NO PERMISSION TO OPERATE THE UUMV, THEREFORE, THIS INCIDENT
REPORT IS BEING UPGRADED TO THE OFFENSE OF UUMV.
STATUS: PENDED
SGT TL CHEEK 2546
COPY: PIC

**Supplement 2 (2/19/2004):**
** ATTENTION PIC BOTH LICENSE PLATES WERE RECOVERED. **
ON 2-19-04 WHILE WORKING N130, I CPL. SS SHOSID #2320 AT 1100 HRS.
WAS DRIVING THROUGH THE PARKING LOT OF THE BEST BUDGET SUITES LOCATED
AT 8501 W. FRWY. I SAW A BLACK NISSAN MAXIMA 4DR PARKED ON THE EASTSI-
DE OF THE MOTEL, UNOCCUPIED. I THEN RAN A REGISTRATION CHECK ON THE
REAR LICENSE PLATE NUMBER OF ███████ WHICH RETURNED SHOWING STOLE-
N OUT OF F.W.P.D. I VERIFIED THE VIN AND CONTACTED PIC. THE RECOVERED
VEHICLE WAS CONFIRMED AS STILL OUTSTANDING STOLEN AS OF 2-9-04.
I THEN INVENTORIED THE RECOVERED VEHICLE FOR PROPERTY. THERE WERE 2
JACKETS, ASSORTED PAPERWORK, 2 CARRYING BAGS CONTAINING MISC. ITEMS,
AND 2 CHARGE PLUG CORDS. I LEFT THESE ITEMS INSIDE THE RECOVERED VEHI-
CLE, SINCE I DIDN'T KNOW IF THEY BELONG TO THE COMP. OR NOT.
I THEN HAD THE RECOVERED VEHICLE PD PULLED TO 1301 E. NORTHSIDE DR.,
IMPOUND LOT BY BUDDY'S WRECKER SERVICE. I PLACED A REQUEST ON THE
WRECKER SLIP TO HAVE THE RECOVERED VEHICLE PROCESSED BY CSSU. THE REC-
OVERED VEHICLE WAS UNLOCKED, BUT NO KEYS WERE FOUND.
END OF REPORT. SUPV., SGT. GW WILSON.

**Supplement 3 (3/2/2004):**
ON 02/27/04 AT 1245 HOURS DETECTIVE FOWLER 1728 SPOKE WITH COMP AND
ADVISED THE M/V HAD BEEN IMPOUNDED. COMP STATED HE HAD BEEN NOTIFIED
ALREADY.
STATUS; PENDED
SGT TL CHEEK 2546

| | |
|---|---|
| **Event Start** | 02/09/2004 00:00:00 |
| **Event End** | 02/09/2004 00:00:00 |
| **Resp. Div** | AUTO |
| **Offense** | 36050: Lost Items: Unauthorized Use/ Motor Vehicle |
| **Penal Code** | 31.07: UNAUTHORIZED USE OF A VEHICLE |
| **Report Status** | Pending/Open |
| **File Date** | 03/02/2004 13:42:00 |
| **Rpt Status** | P |
| **Beat** | B313 |
| **PRA** | P250 |
| **Division** | N |
| **Rpt Source** | S |
| **Operator** | 130742: HOWARD, GARMAI |
| **Code Date** | 03/02/2004 13:46:00 |
| **Premis** | 905: PARKING LOT-EATING ESTABLISHME |

BACK | MAIN MENU | LOG OUT

| Gang_Designated | N |
|---|---|

Exhibit 115
(Under Seal)

Exhibit 116
(Under Seal)

Exhibit 117
(Under Seal)

Exhibit 118
(Under Seal)

Exhibit 119
(Under Seal)

# Exhibit 120
# (Under Seal)

Exhibit 121
(Under Seal)

# Exhibit 122
# (Under Seal)

Exhibit 123
(Under Seal)

Exhibit 124
(Under Seal)

Exhibit 125
(Under Seal)

Exhibit 126
(Under Seal)

Exhibit 127
(Under Seal)

Exhibit 128

# INCIDENT REPORT
# VEHICLES INVOLVED

☐ Current Report
☑ Initial Report

| AGENCY:<br>NORTH CHICAGO POLICE DEPARTMENT | ORI #:<br>IL0491500 | Date/Time On Scene:<br>12/26/2006 10:14:43 | CASE #:<br>06-034289 |
|---|---|---|---|

| Related To: VICTIM 3 , ENTERPRISE RENTAL |
|---|

| Status<br>01 | Type<br>01   AUTO | | Year<br>2007 | Make<br>FORD | Model<br>FOCUS | Style<br>02 |
|---|---|---|---|---|---|---|

**Damage**

| Color<br>RED | License Plate<br>7282386 | Year of Plate | State of Plate<br>IL | Expires | VIN/Hull Number<br>1FAFP34N37W10; | Stored At | |
|---|---|---|---|---|---|---|---|

| Vehicle Value<br>0 | Recovery Value | Vehicle Condition | Recovered (Where, When, By Whom) | Veh.Rec. |
|---|---|---|---|---|

| Registered Owner<br>ENTERPRISE RENTAL | Address ██████ ██████ ██ |
|---|---|

| Home Phone | Insurance Co. | Towed By | Comments |
|---|---|---|---|

| Related To: |
|---|

| Status | Type | | Year | Make | Model | Style |
|---|---|---|---|---|---|---|

**Damage**

| Color | License Plate | Year of Plate | State of Plate | Expires | VIN/Hull Number | Stored At | |
|---|---|---|---|---|---|---|---|

| Vehicle Value | Recovery Value | Vehicle Condition | Recovered (Where, When, By Whom) | Veh.Rec. |
|---|---|---|---|---|

| Registered Owner | Address |
|---|---|

| Home Phone | Insurance Co. | Towed By | Comments |
|---|---|---|---|

| Related To: |
|---|

| Status | Type | | Year | Make | Model | Style |
|---|---|---|---|---|---|---|

**Damage**

| Color | License Plate | Year of Plate | State of Plate | Expires | VIN/Hull Number | Stored At | |
|---|---|---|---|---|---|---|---|

| Vehicle Value | Recovery Value | Vehicle Condition | Recovered (Where, When, By Whom) | Veh.Rec. |
|---|---|---|---|---|

| Registered Owner | Address |
|---|---|

| Home Phone | Insurance Co. | Towed By | Comments |
|---|---|---|---|

2877

1

# INCIDENT REPORT
# NARRATIVE

| AGENCY<br>NORTH CHICAGO POLICE DEPARTMENT | ORI #:<br>IL0491500 | Date/Time On Scene:<br>12/26/2006 10:14:43 | CASE #:<br>06-034289 |
|---|---|---|---|

Narrative From CAD

Complaint Type: STOLENAUTO - STOLEN AUTO
Caller Name:
Officer ID: 1398, Officer Name: CARL SAIN

| .N. CARL | 18 | | |
|---|---|---|---|
| REPORTING OFFICER | ID | APPROVING SUPERVISOR | ID |

# INCIDENT REPORT
# NARRATIVE

| AGENCY: NORTH CHICAGO POLICE DEPARTMENT | ORI #: IL0491500 | Date/Time On Scene: 12/26/2006 10:14:43 | CASE #: 06-034289 |
|---|---|---|---|

VA/VEHICLE THEFT/OFC SAIN #18

SERVICE #06-034289

ON OR ABOUT 10:14AM THE 26 DEC 06 R/O SAIN TOOK, A FRONT DESK REPORT IN REFERENCE TO A VEHICLE THEFT.

R/O SPOKE TO (COMPLAINANT)
    CHARLES R. HICKS, B/M
    DOB █████
    TX #(847) 955-8075 (WK#),
    OF ████████

HE STATED TO R/O THAT WHILE AT ████████████ ████████████ , HIS VEHICLE A 2007 FORD FOCUS WHICH WAS A RENTAL, WAS STOLEN.

HICKS FURTHER STATED THAT ON THE 24 DEL 06 AT ABOUT 2PM HE INQUIRED ABOUT AN APARTMENT FOR RENT AT THE ABOVE LOCATION ████████ ) WITH A SUBJECT KNOWN BY HIM AS CARLOS SAUNDERS. SAUNDERS HAD MADE ARRANGEMENTS WITH THE LANDLORD FOR HICKS TO SEE THIS APARTMENT ON XMAS (25 DEC 06) BETWEEN 8-9PM

ON THE 25 DEC 06. HICKS STOPPED BY A LITTLE EARLY, HAVING A FEW DRINKS AND WATCHED A FOOTBALL GAME TO PASS THE TIME. AT THAT TIME THE ONLY SUBJECTS ON LOCATION WERE CARLOS AND ANOTHER SUBJECT NAMED JAMES. EVENTUALLY THE LAND LORD ARRIVED SHOWING THE APARTMENT AND HE STAYED DUE TO BEING HUNG OVER. THE NEXT MORNING HE WAS APPROACHED BY ANOTHER UNKNOWN MALE WHO TOLD HIM HE SAW HIS VEHICLE BEING DRIVEN IN THE AREA. HICKS LOOKED FOR HIS COAT WHICH WAS PLACED IN THE KITCHEN, NOTING IT WAS MISSING AS ALONG WITH THE KEYS TO HIS VEHICLE. HE THEN LOOKED OUTSIDE NOTHING HIS VEHICLE A RED FORD FOCUS WAS GONE. HE ATTEMPTED TO CONTACT THE TOW COMPANIES, RENTAL COMPANY AND INSURANCE COMPANY TO LOCATE HIS VEHICLE TO NO AVAIL.

TAKEN WAS A
RED 2007,
4 DOOR FORD FOCUS,
LIC #7282388 IL,
VIN #1FAFP34N37W102404
REGISTERED BACK TO
    ENTERPRISE LEASING OF CHICAGO (FIRM OWNED)
    ████████ ██

R/O SPOKE TO (WITNESS)
    CARLOS L. SAUNDERS, B/M
    DOB █████
    TX #(847) 672-6738 OF
    ████████ ████

HE STATED TO R/O THAT HE AND HICKS WERE WATCHING FOOTBALL ON THE 24 DEC 06. HICKS NOTED HIS COAT AND KEYS MISSING ALONG WITH HIS VEHICLE. THE ONLY OTHER PERSON THERE WHO COULD HAVE TOOK THESE ITEMS WOULD HAVE BEEN JAMES FRY.

| SAIN CARL | 18 | | |
|---|---|---|---|
| REPORTING OFFICER | ID | APPROVING SUPERVISOR | ID |

# INCIDENT REPORT
# NARRATIVE

☐ Current Report
☑ Initia Report

| AGENCY<br>NORTH CHICAGO POLICE DEPARTMENT | ORI #:<br>IL0491500 | Date/Time On Scene:<br>12/28/2006 10:14:43 | CASE #:<br>06-034289 |
|---|---|---|---|
| VA/VOLUNTARY STATEMENT/CHARLES HICKS | | | |

VOLUNTARY STATEMENT

SERVICE #06 34289/10:14AM
DATE: 12-26-46            TIME: 10:15AM

NAME:  CHARLES R HICKS            DOB: ████            SSN: ████
ADDRESS: ████████            APT#

TELEPHONE: (847) (R#) 955-8075 (W#)

I CHARLES R HICKS, HEREBY MAKE THE FOLLOWING VOLUNTARY STATEMENT TO OFC SAIN, KNOWN TO ME AS A POLICE OFFICER, CITY OF NORTH CHICAGO POLICE DEPARTMENT, NORTH CHICAGO, IL 60064. THIS STATEMENT IS MADE FREELY WITH NO PROMISES MADE TO ME, NOR ANY THREATS AGAINST ME.

ON THE SUNDAY THE 234TH AROUND 2:00PM, INQUIRED ABOUT A APARTMENT FOR RENT W/CARLOS TO SEE IT I COULD MEET WITH THE LANDLORD. IT WAS ARRANGED ON CHRISTMAS THE LANDLORD WOULD COME IN ABOUT 8-9PM TO SHOW THE ROOM FOR REND. ON OF DECEMBER I STOPPED BY A LITTLE EARLY WITH A FEW DRINKS TO PASS TIME WHILE WATCHING FOOT BALL. THERE WAS CARLOS THE OTHER GUY SAME, AND MYSELF. AS THE NIGHT WENT ON THE LANDLORD CAME BY TO SHOW THE ROOM. I WAS DRINKING A LITTLE TO MUCH AND STAYED INSIDE BECAUSE I WAS FELLING HUNG OVER. A GUY CAME OVER THIS MORNING SAID (THIS) HE SAW THE CAR I WAS IN SO I STARTED TO CALL THE INSURANCE AND CAR RENT CAR PLACE TO FIND OUT WHAT TO DO. THEN I STARTED LOOKING FOR MY BELONGING AND NOTICED MY JACKET WAS GONE. INSIDE MY JACKET WERE KEYS TO THE FOCUS MY JACKET WAS ON THE KITCHEN TABLE WITH CHAR ON ONE OF BACK OF THE CHAIR. SAME WAS GONE. AT FIRST I THOUGHT I WAS TOWED SO I STARTED CALLING THE POUND AND THEN THE RENT-CAR-COMPANY. THEN I WALKED TO THE POLICE STATION TO MAKE A REPORT.

TYPED AS WRITTEN

| SAIN, CARL | 18 | | |
|---|---|---|---|
| REPORTING OFFICER | ID | APPROVING SUPERVISOR | ID |

# INCIDENT REPORT
# NARRATIVE

| AGENCY NORTH CHICAGO POLICE DEPARTMENT | ORI #. IL0491500 | Date/Time On Scene: 12/26/2006 10:14:43 | CASE #. 06-034289 |
|---|---|---|---|

| VA/VOLUNTARY STATEMENT/CARLOS L SAUNDER |
|---|

VOLUNTARY STATEMENT

SERVICE #06 34289/10:14AM
DATE: 12-26-46                 TIME: 10:00

NAME: CARLOS L SAUNDERS   DOB: ███████   SSN: ███████
ADDRESS: ███████          APT# BASEMENT

TELEPHONE: (847) 682-6738

I CARLOS SAUNDERS, HEREBY MAKE THE FOLLOWING VOLUNTARY STATEMENT TO OFC SAIN, KNOWN TO ME AS A POLICE OFFICER, CITY OF NORTH CHICAGO POLICE DEPARTMENT, NORTH CHICAGO, IL 60064. THIS STATEMENT IS MADE FREELY WITH NO PROMISES MADE TO ME, NOR ANY THREATS AGAINST ME.

ON 12-24-06 AFTER WATCHING FOOTBALL GAMES ON T.V. MR. CHARLES HICKS, NOTICE HIS COAT MISSING, AND IN THE COAT WAS HIS CAR KEYS, THEN GOING OUTSIDE HE NOTICE HIS CAR MISSING, THE ONLY ONE THAT COULD HAVE TAKEN HIS COAT & CAR IS "JAME FRY", JAMES FRY WAS A TENNET IN THE BUILDING WHICH IS OWNED BY HIS UNCLE MR. WALLAS HUNTER, IN WHICH TIME AFTER MR HUNTER CAME TO SHOW MR HICKS THE APPARTMENT HE INFORMED ME THAT MR. FRY DIDN'T STAY IN THE BUILDING ANYMORE. I'VE KNOWN MR HICKS FORE A WEEK TO "10",DAYS.

TYPED AS WRITTEN

| IN CARL | 18 | | |
|---|---|---|---|
| REPORTING OFFICER | ID | APPROVING SUPERVISOR | ID |

☐ Current Report
☑ Initial Report

| AGENCY·<br>NORTH CHICAGO POLICE DEPARTMENT | ORI #:<br>IL0491500 | Date/Time On Scene:<br>12/28/2006 10:14:43 | CASE #:<br>06-034289 |
|---|---|---|---|

FRY USED TO BE A TENANT IN THE BUILDING, WHICH IS OWNED BY HIS UNCLE NAMED WALLAS HUNTER. WHEN HUNTER CAME TO SHOW THE APARTMENT HE STATED THAT FRY WAS NOT SUPPOSE TO BE THERE, HE NO LONGER LIVED THERE.

R/O ASKED HICKS AND SAUNDERS TO FILE VOLUNTARY STATEMENTS, AT WHICH TIME THEY COMPLIED. (SEE ATTACHED STATEMENTS)

R/O ALSO DIRECTED HICKS TO FILE/SIGN AN ADDENDUM TO VEHICLE THEFT REPORT AT WHICH TIME HE COMPLIED. (SEE ATTACHED FORM)

R/O ALSO RAN A D/L AND WARRANTS CHECK ON HICKS THROUGH COMMUNICATIONS AT WHICH TIME THEY ADVISED HIS D.L WAS VALID AND HE HAD A WARRANT OUT OF HAMPTON, VA. FOR FTA/POSS. COCAINE. THEY WOULD NOT EXTRADITE.

R/O GAVE HICKS REPORT INFO. AND CLEARED.

| ...N. CARL | 18 | | |
|---|---|---|---|
| REPORTING OFFICER | ID | APPROVING SUPERVISOR | ID |

6

Exhibit 129

# Incident Report
# ARLINGTON, TEXAS POLICE DEPARTMENT



07-44293

Supplement No
ORIG

P.O. Box 1065

620 W. Division St.

Arlington, TX 76004-1065

817-459-5700

817-459-5682 FAX

Reported Date
06/21/2007

Nature of Call
AGASLT

Officer
BALL,E

## Administrative Information

| Agency | | | Report No | Supplement No | Reported Date | Reported Time |
|---|---|---|---|---|---|---|
| ARLINGTON, TEXAS POLICE DEPARTMENT | | | 07-44293 | ORIG | 06/21/2007 | 02:00 |

| Call Number | Status | | Nature of Call | |
|---|---|---|---|---|
| 071720088 | SIGNIFICANT OFFENSE REPORT OR SUPPLEMENT | | ASSAULT--AGGRAVATED | |

| Location | | City | ZIP Code | PRA |
|---|---|---|---|---|
| ▓▓▓▓ | | ▓▓ | ▓▓ | 0113 |

| Division | Beat | From Date | From Time | To Date | To Time |
|---|---|---|---|---|---|
| N | 270 | 06/21/2007 | 02:00 | 06/21/2007 | 02:17 |

| Officer | Assignment | 2nd Officer |
|---|---|---|
| 2379/BALL,E | NORTH MIDNIGHT SHIFT | CHAO,S |

| Assignment | Entered by | Assignment | RMS Transfer |
|---|---|---|---|
| NORTH MIDNIGHT SHIFT | 2130 | DATA ENTRY/POLICE REPORTS | Successful |

| Prop Trans Stat | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|
| Successful | 1407 | 06/21/2007 | 13:30:15 |

| LOCATION NAME |
|---|
| ▓▓▓▓ |

PROSECUTE--YES
Yes

| # Offenses | Offense | Description | Complaint Type |
|---|---|---|---|
| 1 | AGG ASSAULT | AGGRAVATED ASSAULT | I |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| VIC | VIC | 1 | WILLIAMS,MARVIN LETROY | B | M | ▓ |
| FCN | FCN | 1 | MAYFIELD,LAKESSIA ROSHE | B | F | ▓ |
| AQU | AQU | 1 | HICKS,CHARLES R | B | M | ▓ |

| # Offenses | Offense | Description | Complaint Type |
|---|---|---|---|
| 2 | AGG ASSAULT | AGGRAVATED ASSAULT | I |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| VIC | VIC | 2 | HICKS,CHARLES R | B | M | ▓ |
| FCN | FCN | 1 | MAYFIELD,LAKESSIA ROSHE | B | F | ▓ |
| AQU | AQU | 2 | WILLIAMS,MARVIN LETROY | B | M | ▓ |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| AQU | 1 | I | HICKS,CHARLES R | 2088279 | B | M | ▓ |
| AQU | 2 | I | WILLIAMS,MARVIN LETROY | 3132405 | B | M | ▓ |
| FCN | 1 | I | MAYFIELD,LAKESSIA ROSHE | 3132402 | B | F | ▓ |
| VIC | 1 | I | WILLIAMS,MARVIN LETROY | 3132406 | B | M | ▓ |
| VIC | 2 | I | HICKS,CHARLES R | 2088279 | B | M | ▓ |

## Property Summary

| Involvement | Description |
|---|---|
| EVD | ARTICLE: ELECTRONIC/AUDIO/STEREO/TV CDISC   CD with digital photos |

| Involvement |
|---|
| EVD |

Description
ARTICLE: SPORTS/EXERCISE/CAMPING/RECREATIONAL EQUIP BAT   BROWN WOODEN
T-BALL BASEBALL BAT

## Summary Narrative

Victim was physically assaulted by suspect with a deadly weapon.

| Report Officer | Printed At | |
|---|---|---|
| 2379/BALL,E | 03/10/2008 14:29 | Page 1 of 4 |

ATTACHMENT NO. 7 PAGE 1 OF 8 2155

1

# Incident Report
## ARLINGTON, TEXAS POLICE DEPARTMENT

07-44293

### SUSPECT--ACQUAINTANCE 1: HICKS,CHARLES R

| Involvement | | Invl No | Type | Name |
|---|---|---|---|---|
| SUSPECT--ACQUAINTANCE | | 1 | INDIVIDUAL | HICKS,CHARLES R |

| MNI | Race | Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color | Skin | Build |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2088279 | BLACK | MALE | | 33 | No | 5'05" | 200# | BLACK | BROWN | DARK | HEAVY |

| Hair Description | Body Clothing |
|---|---|
| FADE | CASUAL PANTS/BLACK/SHIRT |

| Type | Address | City | State |
|---|---|---|---|
| HOME | | | |

| ZIP Code |
|---|
| |

| Type | ID No | OLS |
|---|---|---|
| DRIVER LICENSE/STATE ID | 01406571 | TEXAS |

| Phone Type | Phone No |
|---|---|
| HOME | (817)295-2377 |

| PANTS DESCRIPTION | SHIRT DESCRIPTION |
|---|---|
| KHAKI PANTS | BLACK GOLF SHIRT |

### SUSPECT--ACQUAINTANCE 2: WILLIAMS,MARVIN LETROY

| Involvement | | Invl No | Type | Name |
|---|---|---|---|---|
| SUSPECT--ACQUAINTANCE | | 2 | INDIVIDUAL | WILLIAMS,MARVIN LETROY |

| MNI | Race | Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color | Skin | Build |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3132405 | BLACK | MALE | 07/30/1977 | 29 | No | 6'02" | 190# | BLACK | BROWN | DARK | THIN |

| Hair Description | Facial Features |
|---|---|
| FADE | BEARD/MUSTACHE |

| Body Clothing |
|---|
| BLUE/WHITE/SHORTS |

| Type | Address | City | State |
|---|---|---|---|
| HOME | | | |

| ZIP Code |
|---|
| |

| Type | ID No | OLS |
|---|---|---|
| DRIVER LICENSE/STATE ID | 19962032 | TEXAS |

| Phone Type | Phone No |
|---|---|
| CELL | (817)275-1825 |

| Alias Name | Race | Sex | DOB | Height | Weight | Hair Color |
|---|---|---|---|---|---|---|
| TROY | BLACK | MALE | | 6'02" | 190# | BLACK |

| Eye Color | Skin |
|---|---|
| BROWN | DARK |

| PANTS DESCRIPTION |
|---|
| BLUE/WHITE CHECKERED SHORTS |

### FIELD CONTACT 1: MAYFIELD,LAKESSIA ROSHE

| Involvement | Invl No | Type | Name | MNI | Race |
|---|---|---|---|---|---|
| FIELD CONTACT | 1 | INDIVIDUAL | MAYFIELD,LAKESSIA ROSHE | 3132402 | BLACK |

| Sex | DOB | Age | Juvenile? |
|---|---|---|---|
| FEMALE | | 31 | No |

| Type | Address | City | State |
|---|---|---|---|
| HOME | | | |

| ZIP Code |
|---|
| |

| Type | Address | City | State |
|---|---|---|---|
| WORK/BUSINESS | | | |

| Phone Type | Phone No |
|---|---|
| HOME | (817)723-8319 |

| Employer/School | Position/Grade |
|---|---|
| CHILDRENS COURTYARD | TEACHER |

### VICTIM 1: WILLIAMS,MARVIN LETROY

| Involvement | Invl No | Type | Name | MNI | Race | Sex |
|---|---|---|---|---|---|---|
| VICTIM | 1 | INDIVIDUAL | WILLIAMS,MARVIN LETROY | 3132406 | BLACK | MALE |

| DOB | Age | Juvenile? |
|---|---|---|
| | 29 | No |

| Means of Attack |
|---|
| IANDS, FIST, AND FEET (PERSONAL WEAPONS)/CLUB/NUN-CHUCK/BAT/ETC. |

| Extent of Injury | Dom Violence |
|---|---|
| LACERATION/CUTTING | NO |

| Report Officer | Printed At | |
|---|---|---|
| 2379/BALL,E | 03/10/2008 14:29 | Page 2 of 4 |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | ▮ | | ▮ | ▮ |

| ZIP Code |
|---|
| ▮ |

| Type | ID No | OLS |
|---|---|---|
| DRIVER LICENSE/STATE ID | 19962032 | TEXAS |

| Phone Type | Phone No |
|---|---|
| CELL | (817)275-1825 |

| Employer/School | Position/Grade |
|---|---|
| RESORT STAFFING | LABORER |

## VICTIM 2: HICKS,CHARLES R

| Involvement | Invl No | Type | Name | | | | MNI | Race | Sex |
|---|---|---|---|---|---|---|---|---|---|
| VICTIM | 2 | INDIVIDUAL | HICKS,CHARLES R | | | | 2088279 | BLACK | MALE |

| DOB | Age | Juvenile? | Height | Weight | Hair Color | Means of Attack | Extent of Injury | Dom Violence |
|---|---|---|---|---|---|---|---|---|
| ▮ | 33 | No | 5'05" | 200# | BLACK | KNIFE/SHANK | LACERATION/CUTTING | NO |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | ▮ | | ▮ | ▮ |

| ZIP Code |
|---|
| ▮ |

| Type | ID No | OLS |
|---|---|---|
| DRIVER LICENSE/STATE ID | 01406571 | TEXAS |

| Phone Type | Phone No |
|---|---|
| HOME | (817)295-2377 |

## Property

| Item | Involvement | In Custody? | Tag No | Item No |
|---|---|---|---|---|
| 1 | EVIDENCE | Yes | 070007283 | 2 |

| Description | | Typ |
|---|---|---|
| CD with digital photos | | A |

| Cat | Article | # Pieces |
|---|---|---|
| ELECTRONIC/AUDIO/STEREO/TV | COMPACT DISC (CD), AUDIO/LASER | 1 |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| VIC | VIC | 1 | WILLIAMS,MARVIN LETROY | B | M | ▮ |

| Item | Involvement | In Custody? | Tag No | Item No |
|---|---|---|---|---|
| 2 | EVIDENCE | Yes | 070007283 | 1 |

| Description | | Typ |
|---|---|---|
| BROWN WOODEN T-BALL BASEBALL BAT | | A |

| Cat | Article | # Pieces |
|---|---|---|
| SPORTS/EXERCISE/CAMPING/RECREATIONAL EQUIP | BASEBALL BAT | 1 |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| SUS | AQU | 2 | WILLIAMS,MARVIN LETROY | B | M | ▮ |

## Modus Operandi

| Physical Evidence | Weapon Used | Premise Type | Victim's Race |
|---|---|---|---|
| PHOTOS | BASEBALL BAT/KNIFE | APARTMENT/CONDOMINIUM/TOWNHOME | BLACK |

| Victim's Sex | Victim's Age |
|---|---|
| MALE | ADULT |

## Narrative

On 06/21/07 at approximately 0202 hours, I, Officer Ball ID 2379, Cpl. Chao ID 1530 were dispatched to ▮ reference assault in progress.

Upon arrival, I observed a black male, Marvin Williams, DOB ▮, lying in the doorway of ▮. Mr. Williams appeared as if he had been injured. During my investigation, I spoke with Lakessia Mayfield, B/F DOB ▮, who stated she was awaken by a known on the door. Ms. Mayfield opened the front door and saw Marvin Williams on the ground and observed him bleeding from his leg. Ms. Mayfield returned to the back bedroom, put some clothes on and returned to the living room area and called her mother. Ms. Mayfield stated she did not know what happened to her boyfriend and also advised that she did not leave the apartment. Mr. Williams was taken by EMS to John Peter Smith Hospital to be treated for injuries.

Upon arrival at John Peter Smith Hospital, I spoke to Mr. Williams who stated he left the apartment at approximately 2330 hours on 06/20/07 to go get a beer from the Fina gas station on the ▮ treet. Before Mr. Williams left the apartment, his girlfriend asked him to bring her something to eat. Mr. Williams stated while he was at the Fina gas station, he asked an unknown Hispanic male driving a four door 90's model Buick for a ride to Taco Bell and also stated he did advise Ms. Mayfield if he couldn't find a ride to get her

| Report Officer | Printed At | |
|---|---|---|
| 2379/BALL,E | 03/10/2008 14:29 | Page 3 of 4 |

ATTACHMENT NO. 7 PAGE 3 OF 8

2151

STATION

### Narrative

omething to eat he would stop at the Seven Eleven and buy he something to eat. Mr. Williams advised the Hispanic male took him through the drive-thru of the Taco Bell. After leaving the Taco Bell, he returned home by being dropped off by the Hispanic male and he advised that he paid the Hispanic male $6.00. Mr. Williams and Ms. Mayfield ate their food. Mr. Williams advised after Ms. Mayfield at her food, she went and took a shower. Once Ms. Mayfield got out of the shower, Mr. Williams got into the shower. Mr. Williams stated once he got out of the shower, Ms. Mayfield stated she heard a knock at the door while he was in the shower. Ms. Mayfield then asked Mr. Williams for something to drink and he replied back telling her there is some water in the refrigerator. Ms. Mayfield rejected the water and asked Mr. Williams to go to the store and get her something to drink. Before Mr. Williams left to go get Ms. Mayfield something to drink, he looked through the peep hole of the front door and did not observe anyone outside. Mr. Williams then left the apartment to go to the store and get Ms. Mayfield something to drink. As Mr. Williams walking through the apartment complex he was approached by a black male. The black male asked Mr. Williams for a ride to the store and Mr. Williams told the black male his car wasn't working and his car was out of gas. Mr. Williams stated the black male asked him to wait by the entrance of the apartment complex until he came back from his van. Mr. Williams stated he observed the black male walking towards the van and open up the back door. As the black male was walking back towards the van, Mr. Williams stated he walked half way between the van and the apartment complex entry. Mr. Williams said he couldn't see what the black male was doing at the back of the van trunk area. Mr. Williams stated the black male came charging at him with the baseball bat hitting him and knocking him out. Mr. Williams stated the black male hit him with the baseball bat repeatedly. Mr. Williams advised once the black male stopped hitting him with the baseball bat, he crawled back to ▓▓▓▓▓▓▓▓. I asked Mr. Williams how did he get the broken baseball bat and he advised he went back to the parking lot area looking for his phone and grabbed the pieces of the baseball bat. I asked Mr. Williams how did he get the black male's keys in his possession and he stated as he was getting beaten with the baseball bat the keys fell to the ground along with his cell phone and he grabbed the keys and his cell phone before he returned back to ▓▓▓▓▓▓▓. Mr. Williams stated that he claimed that Ms. Mayfield witnessed the assault when it was taken place. Mr. Williams stated that he did not know the black male. See Officer Janssen's supplement reference his statement.

A brown wooden T-ball baseball bat, which was broken into two pieces, was observed on the ground in ▓▓▓▓▓▓▓▓ ▓▓▓ and was booked into evidence, along with a CD with digital photos of Mr. Williams' injuries and Mr. Hick's injuries. An Evidence Transmittal was completed along with the report number given to Mr. Williams reference this case.

End of report.
Beat 270

| Report Officer | Printed At | |
|---|---|---|
| 2379/BALL,E | 03/10/2008 14:29 | Page 4 of 4 |

# Incident Report
# ARLINGTON, TEXAS POLICE DEPARTMENT



P.O. Box 1065

620 W. Division St.

Arlington, TX 76004-1065

817-459-5700

817-459-5682 FAX

**07-44293**

Supplement No
0001

Reported Date
06/21/2007

Nature of Call
AGASLT

Officer
JANSSEN,C

## Administrative Information

| Agency | | Report No | Supplement No | Reported Date | Reported Time |
|---|---|---|---|---|---|
| ARLINGTON, TEXAS POLICE DEPARTMENT | | 07-44293 | 0001 | 06/21/2007 | 09:15 |

| Call Number | Status | | Nature of Call | |
|---|---|---|---|---|
| 071720088 | SIGNIFICANT OFFENSE REPORT OR SUPPLEMENT | | ASSAULT--AGGRAVATED | |

| Location | | City | ZIP Code | PRA |
|---|---|---|---|---|
| | | | | 0113 |

| Division | Beat | From Date | From Time | To Date | To Time |
|---|---|---|---|---|---|
| N | 270 | 06/21/2007 | 02:00 | 06/21/2007 | 02:17 |

| Officer | Assignment | 2nd Officer |
|---|---|---|
| 2183/JANSSEN,C | NORTH MIDNIGHT SHIFT | CHAO,S |

| Assignment | Entered by | Assignment | RMS Transfer |
|---|---|---|---|
| NORTH MIDNIGHT SHIFT | 2130 | DATA ENTRY/POLICE REPORTS | Successful |

| Prop Trans Stat | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|
| Successful | 0206 | 06/21/2007 | 21:47:18 |

| # Offenses | Offense | Description | Complaint Type |
|---|---|---|---|
| 1 | AGG ASSAULT | AGGRAVATED ASSAULT | I |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| VIC | VIC | 1 | HICKS,CHARLES | B | M | |

## VICTIM 1: HICKS,CHARLES

| Involvement | Invl No | Type | Name | MNI | Race | Sex |
|---|---|---|---|---|---|---|
| VICTIM | 1 | INDIVIDUAL | HICKS,CHARLES | 206404 | BLACK | MALE |

| DOB | Age | Juvenile? | Means of Attack | Extent of Injury | Dom Violence |
|---|---|---|---|---|---|
| | 33 | No | PLIERS, VISE GRIPS | LACERATION/CUTTING | NO |

## Property

| Item | Involvement | In Custody? | Tag No | Item No | Bag Id Number |
|---|---|---|---|---|---|
| 1 | EVIDENCE | Yes | 070007282 | 2 | CJ02 |

| Description | | Typ |
|---|---|---|
| 8" kitchen knife blade no handle | | A |

| Cat | Article | # Pieces |
|---|---|---|
| HOUSEHOLD APPLIANCES/HOUSEWARES | KNIFE | 1 |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| VIC | VIC | 1 | HICKS,CHARLES | B | M | |

| Item | Involvement | In Custody? | Tag No | Item No | Bag Id Number |
|---|---|---|---|---|---|
| 2 | EVIDENCE | Yes | 070007282 | 3 | CJ03 |

| Description | | Typ |
|---|---|---|
| black/gray radio shack cordless phone | | A |

| Cat | Article | # Pieces |
|---|---|---|
| OFFICE EQUIPMENT/CELLULAR PHONES | TELEPHONE (PHONE) | 1 |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| VIC | VIC | 1 | HICKS,CHARLES | B | M | |

| Item | Involvement | In Custody? | Tag No | Item No | Bag Id Number |
|---|---|---|---|---|---|
| 3 | EVIDENCE | Yes | 070007282 | 1 | CJ01 |

| Description | | Typ |
|---|---|---|
| photos of where knife blade was recovered | | A |

| Cat | Article | # Pieces |
|---|---|---|
| ELECTRONIC/AUDIO/STEREO/TV | COMPACT DISC (CD), AUDIO/LASER | 1 |

| Link | Involvement | Invl No | Name | Race | Sex | DOB |
|---|---|---|---|---|---|---|
| VIC | VIC | 1 | HICKS,CHARLES | B | M | |

## Narrative

On 06/21/07 at 0209 hours, I, Officer Janssen ID 2183 was dispatched to assist an assault in progress at ▇▇▇▇ Call text advised black or Hispanic males were fighting in the back parking lot of the location. I ▇▇▇▇ as one of the first officers to arrive on scene. Sgt. Bloom ID 2342 was the second. Once he arrived on scene, I proceeded around to the back of the complex where the complainant stated he had seen the individuals fighting. I pulled up in the parking lot, which is going to be the east side of the building. I saw a black male standing in the

| Report Officer | Printed At | |
|---|---|---|
| 2183/JANSSEN,C | 03/10/2008 14:29 | Page 1 of 3 |

ATTACHMENT NO. 7 PAGE 5 OF 8 2159

STATION

5

**Narrative**

arking lot. He was bent over and appeared to have blood on his left arm. At that time he was the only individual I saw in the parking lot.

I approached the individual and noticed that he had approximately a four to five inch cut on his left arm. It was fairly deep and was bleeding. It appeared that I could see bone through the cut. He also had blood below his left eye. He appeared to have a small scratch and blood around his left ear. He appeared to be out of breath. It was hard for him to talk to me. I asked him to sit down and calm down. He continued to point to the north and he would say "They ran that way". I asked him who the suspects were and he stated the suspects that cut him were a black male and a black female and they ran north into the complex and went to ▇▇▇▇▇▇. He stated that he knew the black female's name was Lakessia and she had braids in her hair. She was heavy set and was wearing a black shirt and back jeans at the time. He stated that the black male, whom he knew at Troy, was the one who actually cut him. He stated that Troy was a slender black male with short haircut and tattoos.

I advised other officers about suspect information. He contacted EMS to come to the location to look at the victim. The victim was identified as Charles Hicks, B/M DOB ▇▇▇▇▇.

I asked Mr. Hicks what happened and he stated that he was helping a black male suspect fix a car at another location. He stated later they came back to ▇▇▇▇▇▇▇▇▇▇▇, where Lakessia and the black male suspect lived. He stated they went back so the suspect could get food of Lakessia. He stated they stopped at Taco bell. The victim stated that the suspect drove the van to Taco Bell and drove it back. Once they came back to ▇▇▇ with the food, the suspect took the keys out of the van and the food and told the victim that he would be right back. The suspect did not return after some time and the victim went to room ▇▇ and knocked on the door. The suspect refused to come out. The victim went back to his truck and sat down in the passenger seat once again. The suspect then came outside and began to argue with him. The victim stated that he only wanted his keys back and the suspect continued to argue with him and would not give back the keys. He just wanted to leave and go home. When the suspect continued to argue with him and not give him back his keys the victim did not state whether the suspect said "I'm not going to give back your keys". The victim stated that as the argument went on the victim stated the suspect would not return the keys, he became frustrated and went to the back of the van and got out a bat that he kept in the back. He stated that he looked at the suspect with the bat in his hands and told him if he didn't give back the keys he was going to call 911. The suspect then ran from the victim. The victim chased the suspect all the way to the northeast corner of the building just at the first staircase as you enter the center of the complex. The victim stated that both individuals were running very fast. He caught up with the suspect and pushed the suspect down. He stated they were going so fast and moving with such speed that when he pushed him down, he lost his balance and fell on top of the suspect. He stated that the bat that he was carrying broke when they both feel to the ground. He stated there was a short scuffle where the suspect eventually got up and ran in apartment ▇▇. The victim stated he did not proceed to the door, but left the bat laying on the cement where they had fallen and began to walk back to his van. The victim stated as he was walking to the van in the parking lot, the suspect came back outside and the victim stated that he noticed that the suspect was carrying a silver object in his hand, which he recognized as a knife. The suspect was also talking on a black cordless phone. He said that he could hear the suspect saying "Lakessia" and asked her to come outside. The suspect then charged at the victim. The victim stated that the suspect chased him with the knife. They ran south along the east side of the building right along the edge of the building in front of where the cars were parked. The victim stated that he tripped over a pole or air conditioning unit and fell to the ground. The suspect was then on top of him. The victim stated he managed to get his legs up and attempt to kick the suspect away, but the suspect began to stab at him with the kitchen knife. The victim stated that he could feel it hitting his legs, but he did not appear to have any injuries on his legs at this time. The suspect did manage to cut the victim's arm and possibly the top of his ear.

During the assault the victim stated that he heard the knife break and heard the metal portion of the blade of the knife fall to the ground. He stated he heard a distinct metallic sound hitting the concrete. At that time he assumed that we arrived on scene because the victim began to run away. As he looked up, he stated he noticed that Lakessia was also standing in the parking lot and he thought that Lakessia observed the entire assault. She also ran away back towards the apartment. Officers did find a suspect matching the description as well as the female matching the description at apartment ▇▇.

We did search the area and officers did find the black cordless phone as described by the victim along the east

| Report Officer | Printed At | |
|---|---|---|
| 2183/JANSSEN,C | 03/10/2008 14:29 | Page 2 of 3 |

**Narrative**

.de of the building where the assault had taken place. The blade of the knife was also recovered approximately 10 to 15 feet north of where the phone was found. Photographs were taken of the building and where the phone and knife were found. Both the knife and the phone were collected and entered at the north station as property. The blade of the knife had dried blood on the very tip of it. I did enter a black floppy disk with pictures marked as JC01, the eight inch kitchen knife blade with no handle as item CJ02, and the black and gray Radio Shack 2.4 gig cordless phone as CJ03 to the north station.

End of supplement
North side Beat 270

ATTACHMENT NO. 7 PAGE 7 OF 8

STATION

| Report Officer | Printed At | |
|---|---|---|
| 2183/JANSSEN,C | 03/10/2008 14:29 | Page 3 of 3 |

2161

# Incident Report
# ARLINGTON, TEXAS POLICE DEPARTMENT

**07-44293**

Supplement No
0002



P.O. Box 1065

620 W. Division St.

Arlington, TX 76004-1065

817-459-5700

817-459-5682 FAX

Reported Date
07/25/2007
Nature of Call
AGASLT
Officer
MCMICHAEL,D

## Administrative Information

| Agency ARLINGTON, TEXAS POLICE DEPARTMENT | | Report No 07-44293 | Supplement No 0002 | Reported Date 07/25/2007 | Reported Time 16:41 |
|---|---|---|---|---|---|
| Call Number 071720088 | Status SIGNIFICANT OFFENSE REPORT OR SUPPLEMENT | | | Nature of Call ASSAULT--AGGRAVATED | |
| Location | | | City | ZIP Code | PRA 0113 |

| Division N | Beat 270 | From Date 06/21/2007 | From Time 02:00 | To Date 06/21/2007 | To Time 02:17 | |
|---|---|---|---|---|---|---|
| Officer 1805/MCMICHAEL,D | | | | Assignment NORTH INVESTIGATIONS | | 2nd Officer CHAO,S |
| Assignment NORTH MIDNIGHT SHIFT | | Entered by 1805 | Assignment NORTH INVESTIGATIONS | | RMS Transfer Successful | |
| Approving Officer 0861 | | Approval Date 08/02/2007 | | Approval Time 14:03:56 | | |

## Narrative

Det. McMichael received the report for further investigation. Upon reading the report and talking to the officers who took the report, we all believed that there was more to the incident than what both parties were telling.

During the investigation, Marvin Williams called continuously asking about the status of the case. His story was that he was the victim and the injury he caused with the knife was in self defense. I learned that he had applied or Victim's Compensation and this appeared to be what he was interested in most.

While talking to him about the incident, he was untruthful about the knife. The first time I talked to him, he stated he had to use it in self defense. The second time he denied using a knife and said he hit the other party with a chair. Once I told him about the knife, he asked if I had his finger prints on the knife. He knew the handle was broke off and was not found by the reporting officers.

Upon making contact with Mr. Hicks, he stuck to his story that he originally told to the officers. He told me in greater detail that he had been with the other party earlier in the day and was driving him to different places in Ft .Worth and Grand Prairie while the other party was selling crack.

Hicks admitted to going after Williams with the bat and said he might have hit him a time or two but it was in self defense as well.

There were no witnesses to the incident that could give any input to the case.

At the conclusion of the investigation, Sgt. Molina and I agreed that no charges would be filed on either subject because we could not determine the truth. The only charges that could be filed, would have to be filed on both subjects and the DA's office would not accept those charges. They advised it was a mutual combat situation.

This case is closed EA.

ATTACHMENT NO. 7 PAGE 8 OF 8

STATION

| Report Officer 1805/MCMICHAEL,D | Printed At 03/10/2008 14:29 | Page 1 of 1 |
|---|---|---|

2162

Exhibit 130

| | | OCA |
|---|---|---|
| *Grand Prairie Police Department* | | *07-00035844* |
| Victim | Offense | Date / Time Reported |
| | *AGGRAVATED ASSAULT* | *Tue 11/13/2007 00:07* |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

CAD Call No: 073170468
Nature of Call: AGG ASSAULT
Arrival Date\Time: 2007-11-13 22:47
Clear Date\Time: 2007-11-14 00:57
Investigation?: Y
Case Assignment Required?: N
Remarks: 22.02F2
Assignment: FP

SUMMARY NARRATIVE:
The victim was assaulted by known suspect.

NARRATIVE:

Tarrant County:

On Tuesday November 13, 2007 at about 2243 hrs Officers K Cox #255, Sgt G Brown #134, and myself Officer S Kelly #353 were dispatched to a weapons call at ▮▮▮▮▮▮▮. The call indicated a black male had a gun and pointed it at a hispanic male arguing about some money.

Before Officers arrived the males at the location fighting had left westbound toward Doreen. Sgt Brown contacted the victim(Hicks, Charles BM ▮▮▮) who told Sgt Brown 4 males had beat and hit him and even placed a open blade of a knife to his throat. All the fighting was over a title to a vehicle and some money .

Officer Cox arrived in the area locating a black male running in a open field to the west of ▮▮▮▮▮ and eventually caught up with the male on Doreen. The male identified himself as (Ellis, Davon BM ▮▮▮) who stated he was at the complex visiting a friend and saw police and was frightened, so he ran. Ellis was transported back to the original offense location where Hicks identified Ellis as one of the males that was in the apartment when he was assaulted by known suspect("Juvy"-nickname). Hicks also described the other two parties in the room when he was assaulted was a BM named "Wood" and a WM 602 240lbs blonde hair and mustache. Juvy was described a BM with corn rolls, white shirt and white rag on head.

Hicks explained that he and a unknown friend named MJ had arrived together at the offense location at around 0600 hrs this morning to see MJs girlfriend. After hours of sitting there, MJ left in Hicks vehicle ▮▮▮▮▮▮▮ to his employment in Coppell. Hicks was aware of the location of his vehicle and MJ. Hicks continued to wait at the room when the four males walked in. Juvy arrived and shoved Hicks into the corner of the room and pulled a knife with a six inch blade and placed the flat surface to the face of Hicks. Hicks was hit multiple times with a closed right fist by Juvy. The other males stood around the location. Hicks stated the argument was over a title to the vehicle that is being sold to Juvy. Juvy wanted the title and to only make a partial payment to the vehicle.

Hicks had a very swollen right eye that did not allow to have any visible sight out the eye. Medics arrived and Hicks refused any medical treatment or transportation. A ice pack was issued to Hicks to keep the swelling down. Crime Scene Tech Smith #349 arrived and took photos of the injured eye.

Exhibit 131
(Under Seal)

# Exhibit 132
# (Under Seal)

# Exhibit 133
# (Under Seal)

Exhibit 134

**DECLARATION OF CHANTELL PATTERSON**
**PURSUANT TO 28 U.S.C. § 1746 AND 18 Pa. C.S. § 4904**

I, CHANTELL PATTERSON, pursuant to 28 U.S.C. § 1746 and 18 Pa. C.S. § 4904,
hereby swear, affirm, and state that the following is true and correct:

1.  My name is Chantell Patterson. I currently live in the Dallas / Fort Worth area in
Texas. Back in 2004, I lived in ~~Burleson~~, Texas. MANSFIELD CMP

2.  At that time, I lived pretty close to a man named Charles Hicks. Charles lived at
his parents' house in Burleson. Charles and I spent some time together and would hang out
often. Sometimes when we hung out we would smoke crack cocaine together. This went on for
a few months.

3.  Even though we hung out often, Charles seemed to think our ~~relationship~~ FRIENDSHIP CMP was
more than what it really was. He got me a shirt that said "Mrs. Hicks" on the back. I thought
that was really weird because we were ~~not that serious at the time.~~ JUST FRIENDS, CMP

4.  One night, my friend, Christian Gregory, and I met up with Charles. He took us
to a house and we met a man named Thomas Taylor. Thomas lived in Burleson and seemed to
be friends with Charles. We went there to buy some crack cocaine ~~from Thomas.~~ ABOUT $50-$70 worth. CMP

5.  We all starting smoking crack cocaine but we noticed Charles was smoking a lot.
Charles got upset at some point and said that he was leaving. It sounded like he left the house
but moments later he came into the room and hit Thomas with a hammer.

6.  When Charles came back into the room with the hammer, he looked like he was
in some sort of trance. He just had a blank stare and it looked like he was totally checked out.
The Charles that came back into that room was not the Charles that I had known for months. He
looked like he was out of his mind. I had never seen that look from Charles before and what he
did was totally unexpected.

7.     Christian and I ran to a neighbor's house and called the sheriff. We told the county sheriff what all happened at Thomas' house.

8.     I do remember hearing about Charles getting arrested for murder in Pennsylvania back in 2008. I was never contacted by Charles' attorneys. If they had, I would have been willing to talk to them.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to 28 U.S.C. § 1746 and 18 Pa. C.S. § 4904.

CHANTELL PATTERSON

9-19-18

DATE

Exhibit 135

## DECLARATION OF CHRISTIAN GREGORY
## PURSUANT TO 28 U.S.C. § 1746 AND 18 Pa. C.S. § 4904

I, CHRISTIAN GREGORY, pursuant to 28 U.S.C. § 1746 and 18 Pa. C.S. § 4904, hereby swear, affirm, and state that the following is true and correct:

1. My name is Christian Gregory. I live in Texas. In September of 2004, I lived in Burleson, Texas. Burleson is in Johnson County.

2. Back then, I was good friends with a girl named Chantell Patterson. We both knew a man named Charles Hicks. Charles also lived in Burleson.

3. Chantell was close with Charles. They ran around together for a few months.

4. One night, the three of us were together. We went to the house of man named Thomas Taylor. Thomas also lived in Burleson.

5. ~~All four of us~~ THE THREE of THEM were smoking crack cocaine. ∧I TRIED IT ONCE, fOR THE FIRST TIME IN MY LIFE. There came a time when Charles was upset. He said he was leaving. He walked out of the room but then he came back and hit Thomas with a hammer.

6. I was looking at Charles when he came back into the room with the hammer. He was completely different. Charles was in a trance; there was nothing behind his eyes. Charles was in another place and not in the room with us. It was like he was out of his mind.

7. Chantell and I ran to a neighbor's house. We called the sheriff. We told the county sheriff what all happened at Thomas' house.

8. We also called Charles. He was very calm on the phone. I asked him, what were you doing, what is wrong with you? Charles told me he did not remember what happened. I remember how he kept saying, what are you talking about, I was not even over at Thomas' house.

1

9. I remember hearing about Charles getting arrested for murder in Pennsylvania. Charles Hicks' attorneys never contacted me. I would have met with them had they contacted me and asked me to.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to 28 U.S.C. § 1746 and 18 Pa. C.S. § 4904.

CHRISTIAN GREGORY

Sept 19, 2018

DATE

2

Exhibit 136

# FORENSIC PATHOLOGY ASSOCIATES, INC. 

1210 S. Cedar Crest Blvd., Suite 3900
Allentown, PA 18103
Tel.: 610-402-8144
Fax: 610-402-5637

## AUTOPSY REPORT

received
5-28-08

Name: NULL, Deanna

Age: 36  Race: White  Sex: Female

Coroner: Mr. David Thomas

Monroe County Coroner

Pathologist: S. Funke, M.D.

Autopsy Protocol Completed: 1/30/08

Autopsy No.: C-08-62

Hospital No.: N/A

Transported to: LVH 1/30/08

Found: 1/29/08

Date of Autopsy: 1/30/08 @ 1100 hr

Autopsy ~1 Day  After Found

## ANATOMIC DIAGNOSES

**CAUSE OF DEATH**:  HOMICIDAL VIOLENCE

**FINAL PATHOLOGIC DIAGNOSES**:



I. Circumstances: trash bags containing body parts found discarded along interstate highway system:
  A. Dismembered adult female, in ten sections including head, upper torso, lower torso, right arm (excluding hand), left arm (excluding hand), right leg, right foot, left leg, left calf, left foot:
    1. Early onset decomposition
    2. Racial background Caucasian
    3. Female gender
    4. No tattoos or distinctive identifying scars
    5. Estimated body height and weight: 5 feet 7 (plus or minus 1) inches; 150 – 160 pounds
    6. Black 9 – 10 inch long hair with shorter 2 1/2 inch bangs with trace gray
    7. Dismemberment appears to involve use of sharp cutting instruments
  B. Facial abrasions and bruising with superficial eyelid lacerations and peri-orbital edema; indefinite evaluation for petechiae
  C. Occipital scalp laceration and areas of scalp hemorrhage
  D. No skull fractures; no epidural or subdural hematoma; no apparent brain injuries
  E. Hemorrhage in tongue consistent with biting
  F. Hyoid bone and larynx: no fractures
  G. Multiple blunt force trauma to upper torso and lower torso sections
  H. Contusions on leg sections, and abrasions on arm sections

II. Hands recovered separately and available to me for examination on 4/4/08 (see Addendum)

III. Toxicology testing, on chest purge fluid:
  A. Cocaine 344 ng/ml, benzoylecgonine 613 ng/ml, cocaethylene 188 ng/ml
  B. Ethanol 0.19%



COMMONWEALTH'S EXHIBIT
2
ENGAD 800-631-6989

## AUTOPSY REPORT - Continued

**Name:** NULL, Deanna          **Autopsy No.:** C-08-62          **Page:** 2

**OPINION**:

After review of the history and complete autopsy on the dismembered body of this adult Caucasian female, subsequently identified as 36-year-old Deanna Null, it is my opinion that death should be descriptively certified as homicidal violence and that therefore manner of death should be classified as homicide. Should additional information come to light, I will be available to evaluate it and my opinion may or may not change.

*Sfunke MD*

S. Funke, MD
Forensic Pathologist

SF/amr

AUTOPSY REPORT - Continued

**Name:** NULL, Deanna          **Autopsy No.:** C-08-62          **Page:** 3


## CIRCUMSTANCES:

According to information provided by the coroner's office, on January 29, 2008, a Pennsylvania Department of Transportation crew found a trash bag along Interstate 380 in the Poconos containing human body parts. Authorities were notified and subsequently additional trash bags were found at various points along the interstate highway system in Monroe and Lackawanna Counties. Some of the bags were intact on the outside and others were ripped open. None contained clothing or personal effects. All contained grossly apparent human body parts including a head, but excluding hands. The plastic bags were removed for evidence, and the body parts were transported to this facility on 1/30/08 for full forensic autopsy. (Note: Identification has subsequently been confirmed through dental X-ray comparisons as that of 36-year-old Deanna Null.)


## PRELIMINARY REMARKS:

This is a dismembered body, received in ten separate pieces or sections, as follows:

1.   Head
2.   Upper torso
3.   Lower torso
4.   Right arm (without hand)
5.   Left arm (without hand)
6.   Right leg (thigh, knee and calf)
7.   Right foot
8.   Left leg (thigh, knee)
9.   Left calf
10.  Left foot

The above parts represent a complete human body except for the fact that the hands are absent and are still being sought as of this dictation. Each part is individually X-rayed, photographed, weighed and examined. Swabs and smears are prepared from the gums, throat, external genitalia, internal genitalia, and anus. Samples of pulled scalp hair are obtained as well as pulled pubic hair. The parts are then assembled in correct anatomic position on the autopsy table and re-photographed. Diagrams are prepared. The diagrams are schematic in nature and not drawn to scale. Please refer to autopsy photographs for the exact appearance of the various parts. Internal examination is done at this point. Each of the ten parts is discussed and described below under its own heading. The edges and surfaces at the dismembered locations will be referred to as amputation sites.

## AUTOPSY REPORT - Continued

Name: NULL, Deanna          Autopsy No.: C-08-62          Page: 4

<u>HEAD</u>:

The head is that of an adult female and weighs 4770 grams (approximately 10.5 pounds). The occipital-frontal circumference is 23 inches and the inferior to superior length from chin to crown of head is 11 inches. The amputation site is across the upper neck and the maximum cross sectional diameter here is 5 3/4 inches. The amputation site appears as a non-continuous incision with relatively clean edges and several notchings or evenness. This is especially apparent on the right side and also posteriorly where there is an abrupt angulation creating a sideways V-shaped flap such that the skin edge continuing to the right is at a lower level than on the left. The exposed transected muscle and soft tissues are dark red, focally dried out and more or less even with the cut surface of the skin. The cervical spine has been divided at the level of C3 and the cut surface of the vertebral bone is flat. In addition, C2 has a laterally located superficial cut mark through its cortex. There is an identifying number accompanying the head: "7.5."

The head is fully covered by black scalp hair which is wet and focally matted in the back. There are frontal bangs which are about 2 1/2 inches long, with some gray or possibly white strands. In the back, the hair is about 9 – 10 inches long.

Facial skin has a dark dull pink-red hue, and there is facial edema, particularly in the periorbital regions, especially on the right side.

The left upper eyelid has two irregular superficial lacerations with tattered edges, measuring 1 inch and 1/2 inch. The right upper eyelid has two superficial abrasions, measuring 1/8 inch and 1/4 inch. The corneas of the eyes are clouded, and irides currently appear brown-red with indistinct pupillary edges. No vitreous is able to be withdrawn from either eye. The conjunctivae are indefinite for petechiae. Nose is midline and the nasal bridge appears swollen. No nasal or facial fractures are detected upon palpation. Upper and lower dentition is natural, with chronically absent posterior teeth and a few caries. At the end of the autopsy, the jaws are removed at the request of Dr. Dennis Asen for forensic odontology purposes. The ears are intact. Two pierce sites are identified in the right earlobe and one in the left. There are no earrings.

There are facial abrasions which appear dark red and dark brown. Some are linear and others are angular. They are located at the tip of nose, on the lips, on the left cheek, around the left eye, on the chin and in the submental region, and the abrasions extend to the amputation site anteriorly.

On the posterior head, within occipital scalp hair, there is a large laceration measuring 2 3/4 inches in horizontal length, with a vertical 1 1/4 inch extension of the laceration extending superiorly from its midline. The mid point of the wound is 3 1/2 inches above the amputation site

## AUTOPSY REPORT - Continued

at the neck. The distance between the superior aspect of the left ear and the left tip of the wound is 3 1/2 inches. The distance between the superior aspect of the right ear and the right tip of the wound is 3 1/4 inches.

Reflection of the scalp reveals subcutaneous tissue and galeal hemorrhages in the left temporal and frontal region measuring in aggregate approximately 10 x 10 cm. There is also a 3.5 cm area of hemorrhage in the left posterior parietal region and a 4.0 cm area of hemorrhage in the occipital scalp subjacent to the scalp laceration. There is background dull red hemoglobin staining throughout.

Calvarium and base of skull are free of fractures. Dura mater is intact and without epidural or subdural hematoma. The brain weighs 1230 grams and shows diffuse dull pink hemoglobin staining without localized collections or abnormalities. Sections through the brain reveal mild to moderate postmortem softening without intracerebral hematoma, space-occupying lesions or contusions. Ventricular system contains no blood or exudate. Basal ganglia, brainstem and cerebellum are without focal lesions. Circle of Willis vessels are intact.

The upper neck structures are present with the specimen, including tongue and hyoid bone with proximal fragment of epiglottis. Hyoid bone is intact and free of fractures. There appears to be dark red-black staining of the surrounding hypopharyngeal soft tissue. The epiglottic remnant measures 2.0 x 1.5 cm, and its divided edges are uneven and torn. The surface of the tongue is intact and horizontal sectioning reveals hemorrhage at the tip on the right side, measuring approximately 2 cm, consistent with biting.

As previously noted, the head specimen includes the cervical vertebrae up to C3. Aside from a superficial cortical incision laterally located on C2, no abnormalities are noted grossly. The proximal cervical spinal cord is removed. There is no epidural or subdural hematoma along this portion of the cord. The cord shows marked postmortem softening and partial liquefaction. No definitive hemorrhage is appreciated.

### UPPER TORSO:

This specimen consists of the upper torso of an adult female from upper neck to just below the umbilicus. The arms have been amputated at the shoulders. The weight of the specimen is 47.5 pounds and the specimen measures 16 inches superior to inferior and 17 inches laterally across the posterior shoulders. There is decomposition with greenish discoloration of the abdominal skin, accompanied by odor. The identifying number is ".4."

## AUTOPSY REPORT - Continued

**Name:** NULL, Deanna         **Autopsy No.:** C-08-62          **Page:** 6

The skin at the amputation site across the neck is even and mostly horizontal anteriorly. Posteriorly it is uneven and deeply notched. The abdominal skin at the distal amputation site is even and generally horizontal. On the left lower back near the edge of the amputation site, there is a separate 3 1/2 x 3/8 inch incision. The right shoulder amputation site is even, traveling circumferentially around the shoulder at the axilla. The left shoulder amputation site is irregular and deeply notched although the edges are relatively clean.

There are ratchet-like brown parallel abrasions near the right shoulder amputation site anteriorly.

The breasts show congealing of underlying adipose tissue secondary to partial freezing and as a result have uneven contours. The skin of the breasts is intact except for a horizontal 4 1/2 x 1 1/2 inch incision above the right nipple. The incision has focally abraded edges, and extends deep into yellow subcutaneous fat. In addition, inferior to the incision and paralleling its inferior edge, there is a mostly horizontal brown abrasion, measuring approximately 4 x 1 inch.

On the skin of the neck anteriorly near the amputation site there are dark red abrasions continuing over the right clavicle.

On the back, there is a 1 1/2 x 1 inch outline of a square to rectangular shape with pink edges and central blanching, resembling something on the order of a buckle. Immediately above it is a second partial rectangular imprint denoted by three thin abrasions measuring between 3/4 to 1 inch. On the right lower lateral back is a patterned abrasion, consisting of three linear abrasions in a triangle shape, measuring 1 x 1 x 1 1/2 inches.

The amputations at the shoulders are through the proximal humerii, and the cut humeral surfaces are flat. The right shoulder musculature and soft tissue has been cut through cleanly. The left shoulder musculature and soft tissue is irregularly and unevenly incised, and focally disrupted.

The amputation site across the neck has been carried down through the cervical spine at the level of C3. The cut through the vertebral bone is flat and even. There is avulsion and disruption of surrounding muscle and soft tissue.

The amputation at the lower end of the specimen is below the umbilicus at the level of the lumbar spine, through L1 – L2, and the cut through the vertebral bone is flat and even. The skin edges along the amputation site are even. Intestines and abdominal viscera hang free, and show disruption, lacerations, and decomposition.

## AUTOPSY REPORT - Continued

**Name:** NULL, Deanna          **Autopsy No.:** C-08-62          **Page:** 7

**Internal examination of upper torso**:

Note is made of decomposition-related discoloration, softening and odor throughout.

At the neck end, there is dark red staining and drying of the exposed muscles and soft tissues. The amputation is through the thyrohyoid membrane, i.e. midway between the hyoid bone (which along with the tongue and proximal epiglottis remains with the head specimen), and the thyroid cartilage. The distal epiglottis is included, having been cut through in uneven fashion approximately 1.5 – 2.0 cm above the level of the vocal folds. The thyroid cartilage is present in its entirety, and the tip of the left thyroid horn has been incised through and is absent. There is no associated unusual hemoglobin staining. The thyroid lamina and cricoid cartilage are intact. There are no penetrating defects or disruptions with the larynx, trachea or bronchi. The mucosa of the larynx and trachea shows autolysis and no specific hemorrhages are appreciated. There are no tumors, mass lesions or foreign body obstructions. The great vessels of the neck have been cleanly divided at the amputation site. They have no other defects. The amputation through the vertebral bone at the level of C3 has been noted. The cervical spine distal to this is intact.

In terms of the chest, all of the ribs on the right side are fractured, and all are fractured more than once. Some are fractured in four or five places. Pleura on the right side is disrupted and shows dark red-black staining. The fractures of the right ribs are located anteriorly, posteriorly and laterally, but are more numerous, severe and displaced posteriorly and laterally. On the left side, ribs 2 – 4 are fractured anteriorly between the sternum and midclavicular line with disruption and laceration of intercostal muscles and pleura. Ribs 10 – 12 are fractured posteriorly. Pleura in the posterior left chest is intact and is stained dark red-black. A small amount of purge fluid, approximately 50 ml, is collected from the pleural spaces. The sternum has a large, complete fracture-separation located between ribs 3 – 4 with laceration of pleura. The left clavicle is fractured twice, at its midpoint and near the acromioclavicular joint. The right clavicle appears to be intact. All of the above noted fractures are ambiguous in regards to postmortem vs. premortem etiology.

The pericardial sac is not lacerated. There is no hemopericardium. The heart weighs 280 grams and its chambers are devoid of blood. There are two cardiac lacerations. One is a 3.5 cm laceration of the inferior aspect of the right ventricle, with penetration into the right ventricular lumen. The other is located posterior to this and measures 3.5 cm. It also penetrates into the right ventricular lumen. In addition, the inferior vena cava is transected as it enters the right atrium. The heart shows usual four-chamber anatomy. Cardiac valves are thin and leafy. There are no valvular vegetations. Endocardium shows deep red-black hemoglobin staining and is without mural thrombi. Great vessels enter and leave the heart in usual fashion and both coronary ostia are normally positioned. There is a right coronary artery dominance. Serial sectioning of the coronary arteries reveals them to be thin walled and patent throughout.

## AUTOPSY REPORT - Continued

**Name:** NULL, Deanna          **Autopsy No.:** C-08-62          **Page:** 8

Both mainstem bronchi are intact and patent. The right lung weighs 697 grams and the left lung weighs 558 grams. Both lungs are dark red-black and background pleural anthracotic staining is appreciated. The upper and middle lobes of the right lung have several deep ragged lacerations and the lower lobe has a deep ragged laceration. The left lung is not lacerated. Pulmonary parenchyma bilaterally shows diffuse congestion and autolysis. There are no tumors or mass lesions. There are no pulmonary thromboemboli.

The right hemidiaphragm is lacerated and avulsed, with shredded edges. The left hemidiaphragm is intact.

The liver is massively lacerated and fragmented, with extensive crush effect. Its remnants weigh 662 grams, have a pale tan appearance with autolysis, and show no nodularity or gross evidence of cirrhosis. Gallbladder is partially avulsed from its fossa but intact, and 8 ml of bile are collected. There are no calculi. The inferior vena cava is transected at its entry into the liver as well as at its diaphragmatic exit.

The esophagus is intact throughout. GE junction is intact as is the stomach which holds 18 ml bloody brown fluid. No food or pill fragments are noted. Gastric mucosa is autolyzed and gastric wall is intact. There are no tumors or mass lesions. Antrum and gastroduodenal junction are intact. There is a large laceration through the duodenum as it approaches the ligament of Treitz, and the small intestine is transected distally with absence of the distal jejunum, ileum and cecum. Shredded portions of intestines that were collected at the scene are present separately. A definitive cecum and appendix are not identified. The ascending colon, transverse colon, and descending colon are present, although focally avulsed from their mesenteric attachments. The distal amputation site is through the descending colon/rectum. Opening the intestines reveals no mass lesions.

The spleen is extensively lacerated. It weighs 318 grams.

The pancreas weighs approximately 100 grams and is lacerated in head/neck region. Its parenchyma is tan-brown, free of grossly identifiable tumors, and markedly autolyzed.

The right kidney is avulsed from its fossa and nearly free floating. Its weighs 149 grams and has no lacerations. The left kidney is in its usual anatomic location, weighs 160 grams, and is intact. Both kidneys have smooth, pale brown intact surfaces. Sections show autolysis, pallor and no mass lesions or areas of hemorrhage. Ureters arise normally and are transected distally, at the amputation site. Urinary bladder is absent, but is present within the lower torso segment (see next section).

**AUTOPSY REPORT - Continued**

Name: NULL, Deanna          Autopsy No.: C-08-62          Page: 9

The right adrenal gland is lacerated and the left is intact. Both are autolyzed.

The thoracic aorta is intact as is the upper abdominal aorta. The transection site distally occurs about 3.5 cm below the renal artery ostia. The inferior vena cava is transected at this level as well.

The spinal column present with the specimen is from the level of C3 to L1 – L2. There is no malalignment and the vertebral bodies themselves appear to be intact. The lower amputation site is through the lumbar spine at the level of L1 – L2.

**LOWER TORSO:**

The specimen consists of an adult female lower torso from below the level of the umbilicus to the genitals and the proximal-most portions of the thighs near the groin creases. The configuration is grossly distorted secondary to extensive bony fracturing and partial freezing. The specimen weighs 40.5 pounds and measures approximately 20.5 x 14 x 5 inches. As the autopsy proceeds, thawing occurs and the specimen becomes more pliant, facilitating examination. The identifying number is "14.5."

The skin edge along the proximal amputation site is even, with slight notching anteriorly, and otherwise mostly horizontal. The amputation has been carried down through the lumbar spine at L1 – L2 where there is a generally horizontal cut through the vertebral bone, with focal splintering and unevenness of the posterior elements. The skin edges at the thigh amputation sites are even but not horizontal, being more oblique and in the direction of the groin creases. The right femur at the amputation site is obliquely cut and focally splintered. The left femur at the amputation site is relatively flat with slight unevenness at the cortical edges.

On the skin near the proximal amputation site there are three large anteriorly located lacerations measuring 5 1/2 x 2 inches, 1 1/2 inches and 2 inches. These are avulsive lacerations with undermining that communicate with the interior exposed pelvic bones and viscera. Paralleling the right labium, there is a superficial 6 inch laceration, extending in depth to subcutaneous tissue. At the medial right inguinal crease there is a 4 inch laceration communicating with the interior of the pelvis. Posteriorly, there are five irregular lacerations, some having pelvic bone protruding through them, measuring 5 x 2 3/4 inches, 3 1/2 x 1 1/2 inches, 2 x 3 inches, 1 x 2 inches, and 1 1/2 x 3 1/2 inches. Posteriorly, the specimen includes a greater portion of the left buttock than the right buttock. The distance from the inferior posterior edge at the left buttock to the proximal amputation site is 21 inches. The same measurement on the right side is 19 1/2 inches.

## AUTOPSY REPORT - Continued

**Name:** NULL, Deanna          **Autopsy No.:** C-08-62          **Page:** 10

### Internal examination of lower torso:

There is massive displaced fracturing of the entire pelvis. The bilateral ilia are disarticulated at the SI joints. The symphysis pubis is fractured with gaping separation. The bilateral superior and inferior pubic rami show comminuted fracturing. The right ilium is markedly displaced and twisted within torn muscle, nerve and fascia. The acetabula bilaterally are fractured. The sacrum is fractured. The spinal column within the specimen is from L1 – L2 to coccyx, and is nearly avulsed and free floating.

Uterus, tubes and ovaries are present and have a combined weight of 183 grams. They are partially frozen and also avulsed, with disruption of supporting ligaments and muscle, and disruptive laceration of the left ovary. The uterus by itself weighs 152 grams and is symmetrical, without endometrial or myometrial lesions. Ovaries have relatively smooth surfaces and there is a unilateral corpus luteum.

Urinary bladder is lacerated and empty.

Rectum and anus are present. There are no separate penetrating lacerations of these structures.

A transected abdominal aorta is present with iliac arteries which show proximal avulsive lacerations. The intima of the aorta shows focal pink hemoglobin staining and fatty streaking with early, simple atheromatous plaque formation.

There is short dark pubic hair. Vagina has no appreciable lacerations and its mucosa is dark red. Anus is patulous and no lacerations are appreciated. Its mucosa is dark red. The muscles and soft tissues surrounding these structures are disrupted and filled with blood-tinged ice and bits of frozen fat.

### RIGHT ARM:

The specimen weighs 2200 grams and consists of the upper arm, elbow and forearm to about wrist level. The distance from the olecranon to the proximal amputation site is 8 inches, and the circumference here is 13 1/8 inches. The distance from the olecranon to the distal amputation site is 7 3/4 inches, and the circumference here is 7 1/2 inches. The overall length measured ventrally is 14 inches, and when measured posteriorly is 13 inches, the difference due to the obliqueness of the cut at the proximal amputation site. The identifying number accompanying this specimen is "5.2."

## AUTOPSY REPORT - Continued

**Name:** NULL, Deanna      **Autopsy No.:** C-08-62      **Page:** 11

The proximal amputation site is oblique and the skin edges are even. The exposed subcutaneous fat and muscle have a flat cut surface. The humerus has been cut relatively flat, although shows focal fragmentation. At the distal amputation site, the skin edges are relatively even, but the subcutaneous tissue and muscle have an uneven, somewhat avulsed or torn appearance. The exposed radius and ulna are focally fragmented.

The skin at and around the olecranon has a 3/4 inch dark red abrasion and several thin linear parallel abrasions. The antecubital fossa is blanched and surrounding skin is pale pink.

Near the posterior edge of the proximal amputation site there is a round postmortem skin defect measuring 3/4 inch, extending to subcutaneous tissue.

Near the distal amputation site there is an oblique postmortem 2 inch incision extending into subcutaneous tissue.

### LEFT ARM:

The specimen weighs 2185 grams and consists of the upper arm, elbow and forearm to about wrist level. The distance from the elbow to the proximal amputation site is 7 1/4 inches and the circumference here is 13 3/4 inches. The distance from the elbow to the distal amputation site is 7 7/8 inches and the circumference here is 7 3/4 inches. The identifying number accompanying this specimen is "306.6 W80."

Both proximal and distal amputation sites are horizontal and have even edges. The exposed subcutaneous fat and muscle have flat cut surfaces with ground-in black grease or dirt in some areas. Also, small bits of stone are focally adherent to cut edges. Exposed surfaces of the humerus, radius and ulna are flat and parallel with the skin edges. There is slight splintering of the cut surface of the ulna.

There are rounded red small abrasions and contusions at and near the olecranon and there is nearby dirt or grease staining. The antecubital fossa is blanched and the surrounding skin is pink.

### RIGHT LEG (THIGH, KNEE, CALF):

The specimen weighs 21 pounds and consists of the right thigh from near the groin to the distal lower leg. The overall length is 22 inches. The proximal circumference is 26 inches and the distal circumference is 12 1/2 inches. Striae are noted proximally. The identifying number is "294.8."

## AUTOPSY REPORT - Continued

**Name:** NULL, Deanna          **Autopsy No.:** C-08-62          **Page:** 12

The skin edge at the proximal amputation site is horizontal and focally, minimally uneven with orangish abrasion. The exposed muscle is somewhat torn and uneven. The cut surface of the femur is generally flat, although its posterior aspect is obliquely fractured. The distal amputation site has extensive ground-in black dirt or grease and small bits of gravel. The muscle here is torn and the tibia and fibula are splintered and uneven.

Proximal to the knee joint, there is a horizontal 2 inch yellow superficial incision with yellow abraded edges. On the anterior lower leg, there is a horizontal thin brown scratch abrasion measuring 2 1/2 inches. Distal to this are two oblique brown scratch abrasions measuring 2 – 3 inches. The skin near the distal amputation site has a 3 inch cuff of brown or gray discoloration with thin linear brown scratch abrasions. On the mid anterior thigh, there is a 1/2 inch yellow abrasion. On the posterior calf, there are two small orange abrasions measuring 1/2 and 1/4 inch.

On the anterior knee, medial knee, and anterior proximal lower leg, there are approximately 12 generally rounded pink contusions measuring between 1/2 – 1 1/2 inches. On the posterior knee there are two small round pink contusions measuring 1/2 and 1/4 inch.

### RIGHT FOOT:

The specimen weighs 1130 grams and consists of the entire right foot with ankle and distal aspect of the lower leg. The foot measures 9 1/8 inches from heel to first toe, and 3 1/2 inches across the widest part at the metatarsals. The distance from the heel to the amputation or dismemberment site is 5 1/2 inches. Early onset decomposition in the form of marbling is present. The identifying number with this specimen is "4.1."

The amputation site is horizontal with evenly incised skin edges. The skin and exposed yellow subcutaneous tissue have retracted somewhat from the exposed cut surface of surrounding pink-red muscle and tibia and fibula. Both bones show flat cut surfaces which are horizontal with the skin edges. There is no appreciable splintering or fracturing.

There is a parallel incision located below the amputation site measuring 2 1/4 x 1/2 inch. It has even edges and is anterior in location. The exposed soft tissue shows no appreciable hemorrhage. The depth is to bone and there is a shallow cortical incision on the tibia in the depths of the wound.

On the lateral malleolus there is an orange 3/4 x 1/2 inch abrasion. There are small abrasions on the dorsum of the third and fourth toes. The sole is clean. The medial aspect of the first metatarsal bone is focally callused and cornified.

**AUTOPSY REPORT - Continued**

**Name:** NULL, Deanna    **Autopsy No.:** C-08-62    **Page:** 13

**LEFT LEG (THIGH, KNEE):**

The specimen weighs 3840 grams and measures 19 inches superior to inferior. The proximal circumference is 27 inches and the distal circumference is 12 inches. The specimen is comprised of the left thigh at and near the groin to just below the knee joint. There is focal early decomposition in the form of marbling, especially at the proximal end. Striae are noted. The identifying number is "5.6."

The skin edges at both proximal and distal amputation sites are alternately even and irregular, especially the posterior aspect of the distal amputation site which is comparatively markedly uneven and torn. There is associated shredding of subcutaneous fat and muscle in this location. The exposed cut surfaces of the tibia and fibula are flat and even. The skin at the proximal end is cut obliquely in a direction generally parallel to the inguinal crease, and shows notching both anteriorly and posteriorly. The femur has been cut through obliquely, and the cut surface is flat with focal fragmentation medially.

Near the proximal amputation site, there is a large, 22 inch semi-circumferential incision, mostly posterior in location, extending fairly evenly through skin, subcutaneous tissue and muscle to the femur. The cortical surface of the femur has a shallow cut through it located laterally, measuring about 2.5 cm in length.

There is pink-red contusion along the medial edge of the proximal amputation site in an area measuring 2 1/4 x 1/2 inch. There is a round 1 1/2 inch pink contusion inferiorly and medially, above the knee joint.

Over the patella, there is a 2 inch round orange abrasion.

Posteriorly, near the proximal amputation site, there are a series of parallel linear thin brown superficial abrasions measuring between 2 – 2 1/2 inches each.

**LEFT CALF:**

The specimen weighs 2200 grams and measures 9 inches superior to inferior. The proximal circumference is 15 1/4 inches and the distal circumference is 14 1/4 inches. The identifying number with the specimen is "4.1."

Along the proximal amputation site, the anterior skin edge is horizontal and even, but posteriorly and laterally it is uneven secondary and markedly irregular. The skin edge at the distal amputation site is horizontal and even.

## AUTOPSY REPORT - Continued

**Name:** NULL, Deanna          **Autopsy No.:** C-08-62          **Page:** 14

The exposed cut surfaces of the tibia and fibula at both ends are flat and even. The subcutaneous tissue cut surfaces are also relatively flat and even. The muscle at both ends appears somewhat avulsed and uneven.

Four small pink contusions are present anteriorly and proximally, ranging in size from 1/4 – 1 inch. Posteriorly, there are three small 1/8 inch pink contusions.

## LEFT FOOT:

The specimen weighs 1250 grams and consists of the entire left foot with ankle and distal aspect of the lower leg. The foot measures 9 inches from heel to first toe, and 3 1/2 inches across the widest part at the metatarsals. The distance from the heel to the amputation or dismemberment site is 7 inches. Early onset decomposition in the form of marbling is present. There is an identifying number with the specimen: "4.1."

The amputation site is horizontal and has evenly incised skin edges. The exposed subcutaneous tissue is yellow and exposed muscle is light pink-red. There are no localized areas of hemorrhage or staining. There is mild retraction such that the tibia and fibula project somewhat further than the subcutaneous fat and muscle. The cut surfaces of the tibia and fibula are relatively flat and horizontal with respect to the skin edges, but there is focal splintering of the posterior lateral edge of the tibia and focal oblique fracturing of the fibula. On the skin near the amputation site, there are two shallow postmortem incisions, parallel to one another. They are located anteriorly and laterally and extend obliquely and inferiorly towards the medial malleolus. The superior measures 2 1/2 inches and inferior measures 3 1/2 inches. There is no hemorrhage within the exposed fat. The lateral edge of the third toenail is slightly torn at the cuticle. On the dorsum of the foot, over the area of the third metatarsal bone, there is a 1/2 inch pink contusion. On the medial malleolus, there is a 3/8 inch pink contusion, and a smaller contusion inferior to this. The sole is clean. The medial aspect of the first metatarsal joint is focally callused and cornified.

## Summary:

The body is that of an adult female, of Caucasian racial background, estimated to be in her late 20's to early 30's at this dictation. Overall body length is approximately 5 feet 7 inches and estimated body weight is approximately 150 – 160 pounds. (Note: The combined weight of the ten body parts is 147 pounds. Allowance in estimation of the body weight is made for the missing hands, and loss of portions of viscera and blood.) The dismemberment or amputation sites are generally even and appear to have been accomplished by the use of a sharp cutting instrument on the order of a knife (or knives), in conjunction with a bone cutting instrument, for example a saw, capable of producing flat cut sections through the bones. Some of the cuts of the skin are composite cuts or multiple partly superimposed incisions. Some of the cuts of the bones,

# AUTOPSY REPORT - Continued

**Name:** NULL, Deanna          **Autopsy No.:** C-08-62          **Page:** 15

especially the smaller bones, have produced a focal splintering effect. Most of the cuts at the amputation or dismemberment sites appear to be postmortem. However, the incisions producing the amputation of the head are ambiguous, and a pre-mortem injury or injuries in this area (for instance stab wounds or incised wounds) cannot be ruled out. Asphyxia cannot be ruled out. Also, the injuries within the chest are ambiguous and premortem trauma cannot be ruled out.

## MISCELLANEOUS:

Present at the autopsy in addition to this prosector are: Corporal David Andreuzzi, Corporal Shawn N. Williams, Corporal Robert Sebastianelli, Trooper John Corrigan, Trooper Craig VanLouvender from the Pennsylvania State Police; Monroe County Coroner David Thomas; Forensic Autopsy Assistant Donald Riley. Also present for a portion of the autopsy: Dr. Dennis Asen, forensic odontologist.

Photographs have been obtained by the police, this office and Dr. Asen.

X-rays are obtained prior to the start of the autopsy.

Remanded to the custody of the police are: swabs and smears of the gums, throat, external genitalia, internal genitalia and anus; samples of pulled scalp hair and pulled pubic hair; one purple-top tube of chest purge fluid; a DNA card using hemolyzed spleen blood; one fragment of a rib.

Collected and saved for toxicology are: bile; chest purge fluid; gastric contents; portions of liver, kidney and brain.

Representative sections are saved in formalin and selected sections are submitted for microscopic examination.

The jaws are removed for examination by Dr. Asen.

## AUTOPSY REPORT - Continued

**Name:** NULL, Deanna          **Autopsy No.:** C-08-62          **Page:** 16

## MICROSCOPIC EXAMINATION:

### SUMMARY OF SLIDES:

| | |
|---|---|
| 1-3: | Soft tissue of hypopharynx |
| 4: | Tongue |
| 5-6: | Cervical spine |
| 7-9: | Left thigh |
| A-E: | Lungs |
| F: | Spleen, aorta with soft tissue |
| G-H: | Heart |
| I: | Kidneys, pancreas |
| J: | Adrenal gland; tongue |
| K-M: | Brain |
| N-O: | Soft tissue around hyoid |
| P: | Soft tissue around strap muscles |
| Q: | Paratracheal soft tissue |
| R: | Soft tissue around thyroid cartilage |
| S: | Soft tissue around hyoid |

### SOFT TISSUE OF HYPOPHARYNX:

Moderate to advanced postmortem autolytic changes are present. Small foci of interstitial hemorrhage are identified. These consist of outlines of red blood cells in extra-vascular locations.

### SOFT TISSUE AROUND HYOID:

Moderate to severe postmortem autolytic changes are present. Small foci of hemorrhage are seen.

### SOFT TISSUE AROUND THYROID CARTILAGE:

Moderate to advanced postmortem autolysis. Small foci of hemorrhage are seen.

### PARATRACHEAL SOFT TISSUE:

Advanced postmortem autolysis renders evaluation for hemorrhage ambiguous.

### SOFT TISSUE AROUND STRAP MUSCLES:

Advanced postmortem autolysis renders evaluation for hemorrhage ambiguous.

## AUTOPSY REPORT - Continued

**Name:** NULL, Deanna          **Autopsy No.:** C-08-62          **Page:** 17

TONGUE:

Present/absence of hemorrhage is ambiguous secondary to postmortem autolysis.

LEFT THIGH:

Small, focal hemorrhage is seen on slide 8.

LUNGS:

Advanced postmortem autolysis is present.

HEART:

Advanced postmortem autolysis.

SPLEEN:

Advanced postmortem autolysis.

AORTA WITH SOFT TISSUE:

Advanced postmortem autolysis.

KIDNEYS:

Moderate to advanced postmortem autolysis. Scattered microcalcifications are present.

PANCREAS:

Advanced postmortem autolysis.

ADRENAL GLAND:

Advanced postmortem autolysis.

**AUTOPSY REPORT - Continued**

**Name:** NULL, Deanna          **Autopsy No.:** C-08-62          **Page:** 18

CERVICAL SPINE:

There is moderate postmortem autolysis and disruption of architecture.

BRAIN:

There is mild to moderate autolysis without identifiable inflammation or hemorrhage.

# AUTOPSY REPORT - Continued

**Name:** NULL, Deanna          **Autopsy No.:** C-08-62          **Page:** 19

## ADDENDUM:

On 4/4/08, two human hands were brought to me for examination by the Pennsylvania State Police. I was informed that they had been recovered at a residence in Monroe County and, after processing by the state police, including clipping and/or removal of fingernails and the left thumb for fingerprinting, were frozen and have been kept frozen since.

The hands are currently nearly thawed and show decomposition-related changes with mummification. All the fingernails of the left hand have been previously clipped, except for the third fingernail which has previously been completely removed. The fingernails on the right hand have been previously removed. The right thumb has previously been cut from the hand and is present separately. The finger "pads" of the right third and fifth fingers are missing. On the dorsal aspect of the right hand, near the amputation site across the wrist, there is a 3/4 inch round discrete softened area of skin slippage. Two similar areas are noted on the dorsal aspect of the left hand. Also on the left hand is a small 1 x 1/2 inch incision which, I am informed, was made by the state police. X-rays of the hands are obtained by this office. After completion of the external examination, the epidermis of both hands is incised anteriorly and posteriorly by myself, and reflected to allow for examination of the underlying soft tissue and musculature. No discrete areas of hemorrhage or discoloration are noted. The amputation sites across both wrists are relatively even except for slight notching at the ventral aspect of the right wrist. The bilateral ulnar and radial bones have generally flat cut ends. These are removed by myself via oscillating saw at the request of the forensic anthropologist. Please refer to his report for further evaluation. Bits of newspaper, dated 2/4/08, are adherent to the hands initially. I am informed by the state police that, when first found, there had been additional paper around the hands which they have removed for evidence.

Present during my examination of the hands are Detective Bob Snell and First Assistant District Attorney Mike Mancuso from Monroe County; Corporal Lynn Courtright, Trooper Craig VanLouvender, Trooper Robert Sebastianelli, Trooper John Corrigan and Trooper Devon Brutosky from the Pennsylvania State Police; anthropologist Dr. Conrad Quentin from Bloomsburg University.





C0862



CO8-62



Lower Torso
"14.5"
40.5 #
20½ x 14 x 5"
partly frozen
sup. edge sl. notches

C08-62

# Arms



**Right Arm**
"5,2"

R. 2200 g

R. elbow to UPPR amp sik 8"

R. elbow to distal amp sik 7¾"
overall vertal = 14"
overall post 13"
prox. obliqu 15" cut

7½" circumf

⊕ marbling circing 13⅜"

13¾" circing

7¾" circum

R. Radius & ulna
somewhat fragmented
cut surfaces

**Left arm**  "3066  w80"

L. 2185 g
L. elbow to prox amp = 7¼"
L. elbow to distal amp = 7⅞"
overall = 14½"
L. hum cut flat
L. ulna sl fragmd
but gen. flat
L. rad. flat
rad. have grind-in
dirt/grease

3¾" ab

5 linear
1" aby
parallel

rad. & ulna
1" defect
¾"
to sq E
tendon
abt

2" pm
cut
sa

Bourie
1/30/08

CO 8-62



Right Leg
(thigh, knee, prox lower leg)
"294.8'
21 pounds
22" entire length
26" prox. circumf
12½" dist. "
R. Femur – post. lat oblique
Fx
R. tib/fib- splintued
grnd-in Blade dirt

st-shallow st-abr

Yellow Abr
rn½"

2" shallow Pmat
& yellower edge
1¼" shallow, yellow cut ¼"

3¼" brown abr

2-3" brown abr

cuff of gray brown
dirt
brown scath
3"

~12 pink
cont
1½- ½"

↓↓↓↓ dirt, gravel
@ amp. site

@ skin

½
¼ pink

orange
¼-½"

C08-62



Left Calf
2200 g.
9" sup. to inf.
15¼" sup. circumf
14¼" inf. "

tib/fib sup./inf =
flat/even

C08-62



Left leg (Thigh & Knee)
'5,6"

3840 g.
19" sup to inf
prox circumf 27"
distal circumf 12"
Striae - upper portion

Femur: obliquely cut Focal
mid. fragmen.

C08-62



1/4 x 1/2"
amp inc.
to bone
Amp
Amp
2 1/2" pm inc
3 1/2" pm inc
1/2" pink
Abr
3rd toe nail - lat. edge
cuticle torn

clean     clean

focal callus
inner asp.
B/L 1st MTPs

R. Foot
1130 g.
9 1/8" heel to 1st toe
3 1/2" across MTP's
5 1/2" heel to amp edge

R. tib. cut flat
R. fib  "    "

Feet
"4.1"

L. Foot
1250 g.          early marbling B/L
9" heel to 1st toe
3 1/2" across MTP's
4" heel to amp edge

L. tib - cut flat except frag'd
        lat post edge
L. fib - obliq, frag'd.



pink 3/8"

pm
oranged abr
3/4 x 1/2"



Brandu 1/30/08



Exhibit 137

# JOINT STATE GOVERNMENT COMMISSION

**General Assembly of the Commonwealth of Pennsylvania**

CAPITAL PUNISHMENT IN PENNSYLVANIA:

*The Report of the Task Force
and Advisory Committee*

**June 2018**



| JOINT STATE GOVERNMENT COMMISSION | |
|---|---|
| Room 108 Finance Building<br>613 North Street<br>Harrisburg, PA  17120-0108 | **Telephone:**  717-787-4397<br>**Fax:**  717-783-9380<br>**E-mail:**  jntst02@legis.state.pa.us<br>**Website:**  http://jsg.legis.state.pa.us |

The Joint State Government Commission was created in 1937 as the primary and central non-partisan, bicameral research and policy development agency for the General Assembly of Pennsylvania.[1]

A fourteen-member Executive Committee comprised of the leadership of both the House of Representatives and the Senate oversees the Commission.  The seven Executive Committee members from the House of Representatives are the Speaker, the Majority and Minority Leaders, the Majority and Minority Whips, and the Majority and Minority Caucus Chairs.  The seven Executive Committee members from the Senate are the President Pro Tempore, the Majority and Minority Leaders, the Majority and Minority Whips, and the Majority and Minority Caucus Chairs.  By statute, the Executive Committee selects a chairman of the Commission from among the members of the General Assembly.  Historically, the Executive Committee has also selected a Vice-Chair or Treasurer, or both, for the Commission.

The studies conducted by the Commission are authorized by statute or by a simple or joint resolution.  In general, the Commission has the power to conduct investigations, study issues, and gather information as directed by the General Assembly.  The Commission provides in-depth research on a variety of topics, crafts recommendations to improve public policy and statutory law, and works closely with legislators and their staff.

A Commission study may involve the appointment of a legislative task force, composed of a specified number of legislators from the House of Representatives or the Senate, or both, as set forth in the enabling statute or resolution.  In addition to following the progress of a particular study, the principal role of a task force is to determine whether to authorize the publication of any report resulting from the study and the introduction of any proposed legislation contained in the report.  However, task force authorization does not necessarily reflect endorsement of all the findings and recommendations contained in a report.

Some studies involve an appointed advisory committee of professionals or interested parties from across the Commonwealth with expertise in a particular topic; others are managed exclusively by Commission staff with the informal involvement of representatives of those entities that can provide insight and information regarding the particular topic.  When a study involves an advisory committee, the Commission seeks consensus among the members.[2]  Although an advisory committee member may represent a particular department, agency, association, or group, such representation does not necessarily reflect the endorsement of the department, agency, association, or group of all the findings and recommendations contained in a study report.

---

[1] Act of July 1, 1937 (P.L.2460, No.459); 46 P.S. §§ 65-69.

[2] Consensus does not necessarily reflect unanimity among the advisory committee members on each individual policy or legislative recommendation.  At a minimum, it reflects the views of a substantial majority of the advisory committee, gained after lengthy review and discussion.

Over the years, nearly one thousand individuals from across the Commonwealth have served as members of the Commission's numerous advisory committees or have assisted the Commission with its studies. Members of advisory committees bring a wide range of knowledge and experience to deliberations involving a particular study. Individuals from countless backgrounds have contributed to the work of the Commission, such as attorneys, judges, professors and other educators, state and local officials, physicians and other health care professionals, business and community leaders, service providers, administrators and other professionals, law enforcement personnel, and concerned citizens. In addition, members of advisory committees donate their time to serve the public good; they are not compensated for their service as members. Consequently, the Commonwealth of Pennsylvania receives the financial benefit of such volunteerism, along with their shared expertise in developing statutory language and public policy recommendations to improve the law in Pennsylvania.

The Commission periodically reports its findings and recommendations, along with any proposed legislation, to the General Assembly. Certain studies have specific timelines for the publication of a report, as in the case of a discrete or timely topic; other studies, given their complex or considerable nature, are ongoing and involve the publication of periodic reports. Completion of a study, or a particular aspect of an ongoing study, generally results in the publication of a report setting forth background material, policy recommendations, and proposed legislation. However, the release of a report by the Commission does not necessarily reflect the endorsement by the members of the Executive Committee, or the Chair or Vice-Chair of the Commission, of all the findings, recommendations, or conclusions contained in the report. A report containing proposed legislation may also contain official comments, which may be consulted to construe or apply a statute.[3]

Since its inception, the Commission has published almost 400 reports on a sweeping range of topics, including administrative law and procedure; agriculture; athletics and sports; banks and banking; commerce and trade; the commercial code; crimes and offenses; decedents, estates, and fiduciaries; detectives and private police; domestic relations; education; elections; eminent domain; environmental resources; escheats; fish; forests, waters, and state parks; game; health and safety; historical sites and museums; insolvency and assignments; insurance; the judiciary and judicial procedure; labor; law and justice; the legislature; liquor; mechanics' liens; mental health; military affairs; mines and mining; municipalities; prisons and parole; procurement; state-licensed professions and occupations; public utilities; public welfare; real and personal property; state government; taxation and fiscal affairs; transportation; vehicles; and workers' compensation.

Following the completion of a report, subsequent action on the part of the Commission may be required, and, as necessary, the Commission will draft legislation and statutory amendments, update research, track legislation through the legislative process, attend hearings, and answer questions from legislators, legislative staff, interest groups, and constituents.

---

[3] 1 Pa.C.S. § 1939.

Senator Lisa M. Boscola

Senator Stewart J. Greenleaf

Senator Daylin B. Leach

Senator John C. Rafferty, Jr.

# ADVISORY COMMITTEE MEMBERS

| Member | Affiliation |
|---|---|
| Jean M. Bickmire<br>Criminal Justice Specialist | Justice & Mercy, Inc. |
| Scott L. Bohn<br>Chief of Police | West Chester Police Department |
| Dana Cook, MSW<br>Co-Director | Atlantic Center for Capital Representation |
| Charles A. Cunningham, Esq.<br>James McHugh, Esq.<br>   First Assistant Defender | Defender Association of Philadelphia |
| Harry R. Dammer, Ph.D.<br>Professor and Chair | The University of Scranton |
| Marshall Dayan, Esq.<br>Assistant Federal Public Defender | Capital Habeas Unit Western District of Pennsylvania |
| Daniel M. Filler, Esq.<br>Dean, Professor of Law | Drexel University Kline School of Law |
| Rev. Donald B. Green, D.Min.<br>Executive Director | Christian Associates of Southwest Pennsylvania |
| Pamela Grosh<br>Program Director | Victim Witness Services Office of the District Attorney Lancaster County |
| Robert Jolley<br>Chief of Police | Dallas Township Police |
| Spero T. Lappas, Esq. | Serratelli Schiffman and Brown, PC |
| Carol L. Lavery<br>(former) Victim Advocate | Office of the Victim Advocate Commonwealth of Pennsylvania |
| Hon. Mary Hannah Leavitt<br>President Judge | Commonwealth Court of Pennsylvania Pennsylvania Judicial Center |
| Hon. Jason J. Legg<br>President Judge* | 34th Judicial District of Pennsylvania Court of Common Pleas |
| Hon. Richard A. Lewis<br>President Judge | 12th Judicial District of Pennsylvania Court of Common Pleas |
| Matthew Mangino, Esq. | Luxenberg, Garbett, Kelly and George, P.C. |

| Member | Affiliation |
|---|---|
| Hon. Edward M. Marsico Jr.* | 12th Judicial District of Pennsylvania<br>Court of Common Pleas |
| Lisette M. McCormick, Esq.<br>Executive Director | Interbranch Commission for Gender, Racial and Ethnic Fairness |
| John Kramer, Ph.D.<br>Jeffery Ulmer, Ph.D.<br>Gary Zajac, Ph.D. | Penn State U. Department of Sociology & Criminology<br>Penn State U. Department of Sociology & Criminology<br>Justice Center for Research |
| Vicki Schieber | |
| John S. Shaffer, Ph.D. | Executive Deputy Secretary (Ret.)<br>Pennsylvania Department of Corrections |
| Reginald T. Shuford, Esq.<br>Executive Director | ACLU of Pennsylvania |
| Hon. Carolyn Engel Temin** | 1st Judicial District of Pennsylvania<br>Court of Common Pleas  (Ret.) |
| Hon. Seth Williams***<br>District Attorney | City of Philadelphia |
| Bradley A. Winnick, Esq.<br>Chief Public Defender | Dauphin County Public Defender's Office |
| Hon. Stephen A. Zappala, Jr. | Allegheny County District Attorney's Office |

* When originally appointed, these judges were district attorneys.

** Resigned from the committee in January 2018.

*** During his term in office, he originally participated, but mostly was represented on the committee by a subordinate.  Subsequently, the interim district attorney and elected successor each later had a subordinate either attend a conference or participate in a teleconference.

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ................................................................................................. 1
   Summaries of the 17 Subjects from Senate Resolution No. 6 ................................ 3
   Conclusions ............................................................................................................. 24
   Recommendations ................................................................................................... 30

**INTRODUCTION** ........................................................................................................... 33

**SUBJECTS** ..................................................................................................................... 35
   **Cost** ........................................................................................................................ 35
      *Cost Analyses from Elsewhere* ........................................................................... 36
         California ........................................................................................................... 36
         Colorado ............................................................................................................ 39
         Connecticut ........................................................................................................ 40
         Idaho .................................................................................................................. 41
         Kansas ................................................................................................................ 42
         Maryland ............................................................................................................ 43
         Nebraska ............................................................................................................ 45
         Nevada ............................................................................................................... 46
         New Jersey ......................................................................................................... 48
         North Carolina ................................................................................................... 48
         Oklahoma ........................................................................................................... 50
         Oregon ............................................................................................................... 50
         Tennessee ........................................................................................................... 51
         Washington ........................................................................................................ 52
      *Cost Analyses for Pennsylvania* .......................................................................... 54
         Pretrial phase ..................................................................................................... 54
         Trial phase ......................................................................................................... 54
         Penalty phase ..................................................................................................... 55
         Postconviction phase ......................................................................................... 55
         Extra costs ......................................................................................................... 55
         Guilty pleas ........................................................................................................ 56
         Department of Corrections ................................................................................ 56
         Supplemental sample of costs from 1st Judicial District ......................... 57
         Conclusion ......................................................................................................... 58
   **Bias and Unfairness** .............................................................................................. 58
      *Racial bias* .......................................................................................................... 62
      *Pennsylvania Supreme Court Bias Committee Report* ........................................ 65
      *Geographical bias* ............................................................................................... 67
      *Sexual bias* .......................................................................................................... 68
      *Bias in the death penalty process* ....................................................................... 68

*Prosecutorial discretion* ............................................................................................. 72
*Unfairness of the legal system* ................................................................................. 75
*Legal representation* ................................................................................................. 75
*Death qualification* ................................................................................................... 75
*Justice Center for Research* ..................................................................................... 75
      Response to *Furman v. Ga.* ..................................................................................... 77
      Focal concerns theory ................................................................................. 78
      Prior studies ................................................................................................ 78
      Murder of the first degree ........................................................................... 79
      Pennsylvania data ....................................................................................... 82
      Recommendation ........................................................................................ 90
**Proportionality** .......................................................................................................... 90
      Federal law .................................................................................................. 91
      Pennsylvania statutory law ......................................................................... 92
      Constitutional requirements ........................................................................ 92
      Aggravating Circumstances ........................................................................ 98
      Aggravating Circumstances in Plea Bargaining ............................................. 101
      Suggested Reform to Pa. Aggravating Circumstances ................................... 101
      Mitigation ................................................................................................... 104
      Moral desert ................................................................................................ 105
      Residual doubt ............................................................................................ 106
      Specific and Comparative Proportionality Review .......................................... 107
      Evaluation of Proportionality Review ........................................................... 111
**Impact on and Services for Family Members** .............................................................. 113
*Services* ................................................................................................................... 113
*Cost of services* ....................................................................................................... 114
      Victims of Crime Act of 1984 (VOCA) ....................................................... 115
      Rights and Services Act (RASA) ................................................................. 118
      Victims of Juvenile Offenders (VOJO) ....................................................... 118
**Mental Retardation** .................................................................................................... 119
      Recommendation ........................................................................................ 123
**Mental Illness** ............................................................................................................ 123
      Mentally disabled and juveniles .................................................................. 127
      Severe mental illness .................................................................................. 129
      American Bar Association Proposal
        to Exempt the Seriously Mentally Ill from the Death Penalty ....................... 130
      Defenses based on mental illness ................................................................ 133
      The Insanity Defense and Guilty but Mentally Ill ........................................... 134
      Diminished capacity .................................................................................... 136
      Mitigation ................................................................................................... 136
      Proposed Procedure under the American Bar Association's Resolution .......... 137
      Competency to waive appeals....................................................................... 137
      Competency to assist defense ....................................................................... 137
      Competency to be executed ........................................................................ 138
      Recommendation ........................................................................................ 143

**Juries** ............................................................................... 143
      Recommendation ....................................................... 149
      Recommendation ....................................................... 152
**State Appeals and Postconviction** ........................... 152
    61 Pa.C.S. § 4302 ..................................................... 156
      Recommendation ....................................................... 158
**Clemency** .......................................................................... 158
**Penological Intent** ......................................................... 160
  *Uniqueness of the Death Penalty* ............................. 161
  *Retribution* .................................................................. 162
  *Deterrence* ................................................................... 166
  *Incapacitation and Public Safety* ............................. 169
**Innocence** ........................................................................ 171
**Alternatives** ................................................................... 174
  *Constitutional Standard for Conditions of Incarceration* ........ 175
  *Life Imprisonment without Parole* ........................... 176
  *Prison Conditions in the U.S.* ................................... 178
  *Prison Conditions in Pennsylvania* .......................... 179
    *General Population* ................................................... 179
  *Death in Prison* .......................................................... 181
**Counsel** ............................................................................ 183
      Recommendation ....................................................... 186
**Secondary Trauma** ....................................................... 186
  *Judges, prosecutors, public defenders*
    *& victim advocates* ................................................... 186
  *Correctional officers, victim family members*
    *& inmate loved ones* ................................................. 187
**Length and Conditions of Confinement on Death Row** ........ 189
  *Length of Confinement on Death Row* ..................... 190
  *Conditions of Confinement on Death Row* ............... 192
  *Constitutional requirements* ..................................... 192
  *Standards of International Law* ................................. 193
  *International Perspective: Conditions on Death Row* ........ 195
  *Prison Conditions in Pennsylvania* .......................... 197
    *Capital Case Unit* ..................................................... 197
**Lethal Injection** ............................................................ 199
      Recommendation ....................................................... 203
**Public Opinion** .............................................................. 203
  *National Polls* ............................................................ 204
  *State Polls* .................................................................. 206
  *Conclusions* ............................................................... 210
  *A Sample of Religious Positions*
    *on the Death Penalty* ................................................ 212

**APPENDICES** ............................................................................................................ 215

    **Appendix A:**
      Senate Resolution No. 6 .............................................................................. 217

    **Appendix B:**
      State-By-State Survey of Aggravating Circumstances for Capital Punishment .......... 223

    **Appendix C:**
      State-By-State Survey of Mitigating Circumstances for Capital Punishment ............. 227

    **Appendix D:**
      State-By-State Survey of State Clemency Process
        in Death Penalty Sentences ..................................................................... 229

    **Appendix E:**
      State-By-State Survey of Clemency Actions – Commutation
        in Capital Cases During The Time Period 1977-2018 ............................................ 235

    **Appendix F:**
      Pennsylvania Capital Cases ....................................................................... 237

    **Appendix G:**
      State-By-State Survey of Prohibition Against Capital Punishment
        for Defendants With Intellectual Disabilities ........................................... 239

    **Appendix H:**
      Zajac and Winger Report ........................................................................... 243

    **Appendix I:**
      Profile of Pa. Inmates Under Death Sentence ........................................... 255

    **Appendix J:**
      Amounts Appropriated to Supplement the Sum Appropriated
        for Pa. Commission on Crime & Delinquency ....................................... 257

    **Appendix K:**
      Ratio of Execution to Life Sentences by Pa. County ................................... 261

    **Appendix L:**
      Timeline of Capital Punishment Study by Justice Center for Research ...................... 263

    **Appendix M:**
      Pa. Sup. Ct. Comm. on Racial & Gender Bias
        in the Justice Systems, Selected Recommendations ................................. 265

In the fall of 1607, a blacksmith named James Read was sentenced to hang for striking a representative of King James I in the Jamestown colony in Virginia.  But at the top of the ladder that led to the gallows, he offered up details about a supposed mutiny in the making.  Shortly thereafter, he was back at work and George Kendall, the putative leader of the plot, was tried, convicted, placed before a firing squad and shot.  He was shot rather than hanged because of his higher social standing.

With that, Kendall became the first person executed after a legal proceeding in what would become the United States of America, and we've been wrestling with the practice ever since—including the fundamental questions of whether there is ever any justification for taking another life, and if so, how to do the deed.[4]

"Capital punishment is currently authorized in 31 states, by the federal government and the U.S. military."[5]  The Commonwealth is one of these 31 states.[6]  During the last 56 years, the Commonwealth executed three condemnees even though it has had a death penalty for approximately 50 of those years.[7]  These three condemnees, who had psychiatric problems, waived

---

[4] L.A. Times Ed. Bd., *Execution Is Inhumane, No Matter What Method States Use*, L.A. Times (Mar. 16, 2018), http://www.latimes.com/opinion/editorials/la-ed-oklahoma-executions-nitrogen-lethal-injection-20180315-story.html.

[5] Nat'l Conf. of State Legiss., States & Capital Punishment (June 1, 2018), http://www.ncsl.org/research/civil-and-criminal-justice/death-penalty.aspx.

[6] 42 Pa.C.S. § 9711.

[7] Keith Zettlemoyer & Leon Moser were executed in 1995; Gary Heidnik was executed in 1999.  Pa. Dep't of Corrections, Execution Warrants/Notices Issued by Governor (1985 to Present), http://www.cor.pa.gov/Initiatives/Documents/Death%20Penalty/Warrants.pdf (last updated Apr. 5, 2018).  The death penalty was ruled unconstitutional in 1972 & reenacted by the Commw. in 1978.

their appeals,[8] which dates the last involuntary execution in the Commonwealth back to 1962.[9] Since 1985, at least 466 warrants of execution were issued in the Commonwealth, which resulted in those three executions.[10] Since 1987, approximately 35 inmates died while on death row while still under a sentence of execution (but not from being executed).[11] Since the death penalty was reinstated in 1978, the subsequent judicial dispositions of the Commonwealth's condemnees' convictions and sentences resulted in more than 97% of them being resentenced to life imprisonment or less.[12] Also since 1978, the number of the Commonwealth's inmates under a sentence of death peaked at 243 in 2002.[13] As of June 2018, the number of the Commonwealth's inmates under a sentence of death had been reduced to 150.[14] Finally, during that same time frame, six condemnees were fully exonerated of the crime(s) for which they were convicted and sentenced to death.[15]

---

[8] "Zettlemoyer was taking an anti-depressant/anti-psychotic drug when he testified before the district court and when he wrote a letter on March 28, 1995, indicating that he wanted no further appeals. . . . . [T]he record is clear that Zettlemoyer voluntarily took the medication as part of a course of treatment for his medical problems. He testified before the district court that 'I have a number of health problems, and the psychiatrist and the psychologist at the SCI Pittsburgh Institution have recommended a variety of medications for me to take. . . . . [S]o I always take it.'" *In re Zettlemoyer*, 53 F.3d 24, 28-29 (3d Cir. 1995). "Throughout the proceedings, Leon Moser maintained that he wanted to die. From all indications, he still does. . . . . Moser had been hospitalized . . . for depression . . .; and . . . takes a common anti-depressant, Imipramine." *In re Moser*, 69 F.3d 691, 693-94 (3d Cir. 1995) (Nygaard, J., dissenting). "Moser . . . underwent psychiatric treatment while in prison". Associated Press, *Killer of His Ex-Wife & 2 Daughters Is Executed, N.Y. Times (Aug. 17, 1995)*, https://www.nytimes.com/1995/08/17/us/killer-of-his-ex-wife-and-2-daughters-is-executed.html. "Dr. Bernstein stated that it was his opinion within a reasonable degree of medical certainty that Heidnik suffered from paranoid schizophrenia, and described him as a seriously disturbed, cognitively impaired, psychotic individual. . . . . Dr. McKenzie opined with a reasonable degree of medical certainty that Heidnik suffers from schizophrenia, is actively psychotic, and is not in contact with reality. . . . . Heidnik indicated in response to questioning . . . that he did not wish the attorneys to appeal. . . . . The court stated that Heidnik's paranoid schizophrenia does not substantially affect his capacity to appreciate his position and make a rational choice with respect to continuing or abandoning habeas corpus proceedings in federal court." *In re Heidnik*, 720 A.2d, 1016, 1024-26 (Pa. 1998).

[9] This was Elmo Smith. Associated Press, *Pa. Execution 1st Since '62*, N.Y. Times (May 3, 1995), https://www.nytimes.com/1995/05/03/us/pennsylvania-execution-first-since-62.html.

[10] Pa. Dep't of Corrections, *supra* note 7. From these warrants, this amounts to an execution rate of .006%.

[11] E-mail from Kristofer B. Bucklen, Ph.D., Dir. of Research & Statistics, Pa. Dep't of Corrections (May 8, 2018) (on file with Pa. J. State Gov't Comm'n). The average number of condemnees dying but before being executed during this 31-year period is 1.13/year.

[12] Robert Brett Dunham, Pa. Capital Post-conviction Reversals & Subsequent Dispositions (Death Penalty Information Ctr. 2018).

[13] Appdx. I, *infra* p. 255.

[14] Pa. Dep't of Corrections, Persons Sentenced to Execution in Pa. as of June 1, 2018, http://www.cor.pa.gov/Initiatives/Documents/Death%20Penalty/Current%20Execution%20list.pdf. Later in May 2018, a man was condemned, making him the 150th. Myles Snyder, York Cnty. Gets Death Sentence in 2016 Double-murder, abc 27 News (May 24, 2018), http://www.abc27.com/news/local/york/york-county-gets-death-sentence-in-2016-double-murder/1197032992.

[15] *Infra* p. 171.

Some of the deficiencies identified and recommendations contained in this study are not new and remain a concern. Several earlier reports have found our system to be deficient in some of the same areas and addressed them as well, notably: Final Report of the Supreme Court Committee on Racial and Gender Bias in the Justice System;[16] The Pennsylvania Death Penalty Assessment Report published by American Bar Association in 2007,[17] which evaluated fairness and accuracy by analyzing Pennsylvania's laws, procedures and practices; Report of the Advisory Committee on Wrongful Convictions;[18] and, Report of the Task Force and Advisory Committee on Services to Indigent Criminal Defendants.[19]

"[W]e can start with the obvious—the current state of Pennsylvania's capital jurisprudence is impaired. . . . . [T]he question arises: Just what is wrong?"[20]

### Summaries of the 17 subjects from Senate Resolution No. 6[21]

(1) **Cost:** Whether there is a significant difference between the cost of the death penalty from indictment to execution and the cost of life in prison without parole; in considering the overall cost of the death penalty in Pennsylvania, the cost of all the capital trials that result in life sentences as well as death sentences that are reversed on appeal must be factored into the equation;[22]

There is a significant difference between the cost of the death penalty compared to life in prison without parole,[23] primarily because of more extensive litigation and higher correctional cost for those sentenced to execution; however, Department of Corrections is changing its housing of condemned inmates and it is premature to calculate if higher correctional costs will persist for condemnees. An example of a systematic cost difference at trial between capital and non-capital cases is the penalty trial, which does not occur in non-capital cases. "It is a simple fact that seeking the death penalty is more expensive. There is not one credible study . . . that presents evidence to the contrary."[24]

---

[16] Pa. Sup. Ct. Comm. on Racial & Gender Bias in the Just. Sys., *Final Rep.* (2003), http://www.pa-interbranchcommission.com/_pdfs/FinalReport.pdf.

[17] Am. Bar Ass'n, Evaluating Fairness & Accuracy in State Death Penalty Syss.: The Pa. Death Penalty Assessment Rep. (2007), https://www.americanbar.org/content/dam/aba/migrated/moratorium/assessmentproject/pennsylvania/finalreport.authcheckdam.pdf.

[18] Pa. J. State Gov't Comm'n, Rep. of the Advisory Comm. on Wrongful Convictions (2011), http://jsg.legis.state.pa.us/resources/documents/ftp/publications/2011-212-9-15-11%20rpt%20-%20Wrongful%20Convictions.pdf.

[19] *Id.*, *A Constitutional Default: Servs. to Indigent Crim. Defendants in Pa.* (2011), http://jsg.legis.state.pa.us/resources/documents/ftp/publications/2011-265-Indigent%20Defense.pdf.

[20] Thomas G. Saylor, *Death-Penalty Stewardship & the Current State of Pa. Capital Jurisprudence*, 23 Widener L.J. 1 (2013).

[21] (Sess. of 2011), appdx. A, *infra* pp. 217-22. Material for this rep. was developed by the subcomms., *infra* p. 33.

[22] *Infra* pp. 35-58.

[23] "Extant literature on the costs of capital punishment unambiguously finds that capital cases are more expensive to prosecute from beginning to end than non-capital cases." John Roman *et al.*, The Cost of the Death Penalty in Md. 29 (2008), *available at* https://www.urban.org/sites/default/files/publication/31526/411625-The-Cost-of-the-Death-Penalty-in-Maryland.PDF.

[24] Okla. Death Penalty Rev. Comm'n, Rep. 234 (2017), *available at* https://drive.google.com/file/d/0B-Vtm7xVJVWONmdNMmM5bzk3Qnc/view.

The studies from other jurisdictions used a combination of actual cost data, actual resource data and estimates of both to compare cumulative and partial costs of the death penalty with sentences of life imprisonment without parole among the different stages of the process that result in either sentence. As is true elsewhere, no reliable data exists to comprehensively and accurately assess this difference in Pennsylvania. The process includes different levels and branches of government which are independently budgeted. It involves fixed and variable costs, and the budgeting would neither typically nor uniformly reflect different projections and allowances to pursue these two penalties among others. To try to assess whether there are significantly different costs between these two penalties, surveys were electronically distributed to judges, prosecutors, public defenders and victim advocates in nine Pennsylvania judicial districts of varying population sizes and caseloads that had past or current capital murder cases.

> (2) **Bias and unfairness:** Whether the selection of defendants for capital trials in Pennsylvania is arbitrary, unfair or discriminatory in any way and whether there is unfair, arbitrary or discriminatory variability at any stage in the process including in the sentencing phase;[25]

The subcommittee on policy could not answer the question relating to the selection of defendants for capital trials because the only recent study was limited to examining cases resultant in convictions for murder of the first degree. This limitation means that the influence of race or ethnicity on the decision of charging the homicide or on "whether to retract the motion to seek the death penalty in any case that did not result in a first-degree murder conviction" was not studied.[26] The Pennsylvania State University researchers spent approximately eight years[27] developing, researching, accessing and collecting data, and drafting a report in which it found disparate variability within those cases based on the race of the victim, the type of the defendant's legal representation, and the variation among counties in the selection of those defendants for the death penalty.[28] The largest and most prominent differences were those "among counties in death penalty outcomes and the effects of other variables on death penalty outcomes".[29] Contrasting with the Baldus and other literature, "Black defendants with White victims were not at greater risk to receive the death penalty".[30] The notable differences based upon the race of the victim were "*not* in combination with the race/ethnicity of defendant."[31] The likelihood of seeking the death penalty was more when there was a Hispanic victim and there was less likelihood for receiving the death penalty when the victim was Black than when the victim was White, which differences were

---

[25] *Infra* pp. 58-90.

[26] John Kramer *et al.*, *Capital Punishment Decisions in Pa.: 2000-2010*, at 39 (2017), *available at* http://justicecenter.psu.edu/research/projects/files/the-administration-of-the-death-penalty-in-pennsylvania-pdf. The study was also limited to the "18 counties that had ten or more first-degree murder convictions" which "was more than 80% of all first-degree murder convictions in the Commonwealth in" the study's "time frame." *Id.*

[27] Appdx. L, *infra* p. 263.

[28] The advisory committee is grateful to have had the opportunity to collaborate with both the university's Justice Center for Research and Pennsylvania Interbranch Commission on Gender, Racial and Ethnic Fairness and will summarize the center's research, *infra* pp. 75-90.

[29] Kramer *et al.*, *supra* note 26, at 121. *E.g.*, "prosecutors in Allegheny County and Philadelphia were less likely to seek the death penalty against defendants represented by public defenders than" in the other 16 counties in the field study. *Id.* at 120-21.

[30] *Id.* at 122.

[31] *Id.* at 121. Regardless of the defendant's race or ethnicity, cases with White victims were 8% more likely to receive the death penalty; conversely, cases with Black victims were 6% less likely to receive the death penalty. *Id.*

not "attributed to the many factors" measured by the control variables used in the study.[32] "[D]ifferences among counties in death penalty outcomes, and the effects of other variables on death penalty outcomes, were the largest and most prominent differences found in" the study.[33]

> *In a very real sense, a given defendant's chance of having the death penalty sought, retracted, or imposed depends on where that defendant is prosecuted and tried.* In many counties of Pennsylvania, the death penalty is simply not utilized at all. In others, it is sought frequently. If uniform prosecution and application of the death penalty under a common statewide framework of criminal law is a goal of Pennsylvania's criminal justice system, these findings raise questions about the administration of the death penalty in the Commonwealth.[34]

To the extent convictions were studied *via* multivariate analyses, the impact found based upon race was on victims rather than on defendants.

> When we control for a wide variety of factors that could impact the decisions, we find that the likelihood of having the death penalty filed, retracted, or given does not differ by race of defendant, but the likelihood of having the death sentence given does vary by race of victim. And, we didn't find disparity specific to black defendants with white victims, but rather, disparity connected to race of victim regardless of race of defendant.[35]

However, there was no examination of possible bias associated with any other stage of the process, including arrest, charging and plea bargaining.[36] Regarding unfairness in general and racial or ethnic bias in particular, the subcommittee on policy supports including a recommendation that Pennsylvania consider replicating what other states have done in this area to statutorily provide for proportionality review, which would routinely and systematically collect relevant data for review.

> (3) **Proportionality:** Whether there is a significant difference in the crimes of those selected for the punishment of death as opposed to those who receive life in prison and whether there is an adequate process for determining when death sentences are excessive or out of line with sentences imposed in other cases where a sentence other than death was imposed;[37]

---

[32] *Id.* at 123.

[33] *Id.* at 124. Compared to defendants represented by public defenders, those represented by privately-retained counsel were "significantly less likely to receive the death penalty", but defendants represented by public defenders were "less likely to have the death penalty filed against them than other defendants". *Id.* n.33.

[34] *Id.* at 125. Appdx. K, *infra* p. 261, shows the ratio of execution to life sentences by county based on the inmate population in 2015.

[35] E-mail from Jeffery T. Ulmer, Ph.D., Prof. & Assoc. Head, Dep't of Sociology & Criminology. Pa. State U. (June 12, 2018) (on file with Pa. J. State Gov't Comm'n).

[36] Kramer *et al.*, *supra* note 26, at ii, 114. Just. Ctr. for Research plans to follow its study with one focusing on possible bias in the pre-trial stages of prosecution in potential capital cases.

[37] *Infra* pp. 90-112.

The subcommittee on policy could not answer the question relating to selection because there is no process for determining whether the crimes for which defendants receive the death penalty differ from the crimes for which defendants receive life imprisonment (without parole). The statute lists aggravating circumstances, which would allow the death penalty for one convicted of murder of the first degree, but charging and plea bargaining are done at the county level. The Commonwealth's large number (18) of statutory aggravating circumstances[38] is at the high end of that count nationally,[39] and this numerosity, along with the numerosity of Pennsylvania's 67 counties, can easily result in significant differences in proportionality. The only available recent data is from the study detailed under the issue of bias and unfairness, which was limited to those cases that had convictions for first-degree murder. Justice Center for Research is seeking funding to follow that study with one to directly address this inquiry, but it will take years to accomplish.

The Pennsylvania statutory provision that mandated a process to determine if the death sentence is comparatively and (dis)proportionately excessive was repealed in 1997.[40] To reduce differences in the crimes selected for the punishment of death would require the reduction of aggravating circumstances. To determine if death sentences are comparatively and (dis)proportionately excessive would require reinstatement of the former statutory mandate or a comparable one to routinely and systematically collect useful data on the circumstances of individual murder cases.

(4) **Impact on and services for family members:** The impact of the death penalty on family members and loved ones of murder victims and the availability and cost of services currently being provided in Pennsylvania for family members and loved ones of murder victims and whether these services are sufficient to meet the needs of surviving families;[41]

Services for family members and loved ones of murder victims in this Commonwealth are provided on a county-by-county basis. Predominantly, those services are provided within the county's Office of District Attorney.[42] Some counties have one or more private, not-for-profit victims' support offices that operate in conjunction with or in lieu of a victim's witness advocate working for a district attorney. These services are funded through a mix of public and private sources. The services are generally but not precisely uniformly available throughout the counties. When staff from Joint State Government Commission spoke with staff from various advocacy offices to determine the sufficiency of the services provided, there was a wide range of responses. One third of the providers said that the services were insufficient. Conversely, almost half of the advocates felt that the services were sufficient, although this group of responders often acknowledged that the loss of a family member or loved one through homicide left a hole that could never be fully filled.

---

[38] 42 Pa.C.S. § 9711(d).

[39] Appdx. B, *infra* pp. 223-26.

[40] The provision directed Pa. Supreme Court to vacate a sentence of death if "excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant." Former 42 Pa.C.S. § 9711(h)(3)(iii).

[41] *Infra* pp. 113-19.

[42] Prosecutors have statutory responsibilities to some victims. Act of Nov. 24, 1998 (P.L.882, No.111), § 213; 18 P.S. § 11.213. "A family member of a homicide victim" is a victim. *Id.* § 103; 18 P.S. § 11.103.

The cost of services that are provided to family members and loved ones of murder victims can only be provided as part of the larger picture of state and federal funding for victims within this Commonwealth.[43]  In other words, at the service provider level, the grants are not typically broken down by type of victim[44] so that family members and loved ones of murder victims receive support services as part of a larger group of victims of violent crimes within this Commonwealth.[45]  Staff from Joint State Government Commission questioned staff from various offices of victims' witness advocates to get their opinion about the cost of these services, specifically how they were reflected in homicide cases rather than other crimes with which the office dealt.  As a follow up to the original questions, they were then asked if the costs were "more, less or about the same as those services that you provide to victims of other crimes."  The responses could be categorized into two distinct approaches of calculating or envisioning service cost.  The first type of responses indicated that the services provided for family members and loved ones of murder victims cost more than the services that the office provided for other types of crime.  In the second category of responses, the advocates indicated that they believed that the services cost the same amount as they would for the victim of a different sort of crime, because they viewed the fixed operating costs of the office and the fixed costs of the salaries to be the same regardless of the service provided.

     (5)  **Mental retardation:** Whether, in light of the Supreme Court ruling in *Atkins v. Virginia*, there are adequate procedural protections in place to assure that people with mental retardation are not in fact being sentenced to death and executed;[46]

The subcommittee on procedure[47] sought to reply to this factual inquiry by obtaining readily available data, which was the intelligence quotient (IQ) scores supplied by Department of Corrections for the inmates on death row and those serving life imprisonment for first-degree murder.  Notwithstanding a recognition of the standard error of measurement,[48] some states statutorily prescribed a score for the IQ and the Commonwealth would argue that the intellectual disability is below 70.[49]  For this reason, data obtained from Department of Corrections was initially analyzed using a score of 70 or below as an imperfect proxy for intellectual disability.  Since IQ is relatively static, whether the scores closely replicated scores before age 18 is unknown but presumed.  Information on substantially deficient adaptive functioning also remains unknown,

---

[43] Appdx. J, *infra* pp. 257-59.

[44] Pa. Comm'n on Crime & Delinquency recently awarded requested grants totaling $2,346,175 for four recipients in Phila. to serve survivors of homicide victims.  McMahon, *infra* note 799.

[45] Beginning in 2016, VOCA recipients have been required to keep confidential records on each crime victim that receives services to report as Victim Assistance Program Performance Measures.  Pt. of this data includes the total no. of survivors of homicide victims served during the reporting period, but this data is too new to develop numbers for this report.

[46] *Infra* pp. 119-23; appdcs. G, H, *infra* pp. 239-53.

[47] The data was collected and analyzed for the subcomm. by Dr. Gary Zajac & Laura Winger from The Pa. State U. Just. Ctr. for Research.  Appdx. H, *infra* p. 243.

[48] "Reporting the range within which the person's true score falls, rather than only a score, underlies both the appropriate use of intellectual and adaptive behavior assessment instruments and best diagnostic practices in the field of" intellectual disability.  Kevin S. McGrew, Ph.D., APPLIED PSYCHOMETRICS 101, 1 (2009), http://www.iapsych.com/iapap101/iapap1015.pdf.  An IQ of 70 is roughly two standard deviations below the norm, the definition for intellectual disability (formerly "mental retardation") employed by the American Association on Intellectual and Developmental Disabilities ("AAIDD") and the American Psychological Association ("APA").

[49] *E.g.*, *Commw. v. Sanchez*, 36 A.3d 24, 51 (Pa. 2011).

which is why using a score for IQ alone is unreliable to determine intellectual disability. When an IQ score of 70 or below was used as the classification for intellectual disability, "4.1% of the death row inmates" fell within that classification as compared to 8.7% of those serving life imprisonment for first-degree murder.[50]  Although it was partially reassuring that the percentage of potentially intellectually disabled inmates[51] was lower for condemnees than for those imprisoned for life, judicial rulings after this analysis was done subsequently clarified that using a score of 70 or below for this possible classification is too low, based on the standard error or measurement.[52]  Aside from that, it still meant that as many as approximately 4% of the death row inmates were under an unconstitutional sentence if they are in fact intellectually disabled, due to the application of the other two components of the diagnosis.[53]

With further clarification from these judicial rulings, the same data was re-analyzed using the score of 75 instead of 70.[54]  The higher score more than tripled the percentage of death row inmates from 4.1% to 14%, and almost doubled the percentage for those serving life imprisonment for murder of the first degree, from 8.7% to 15%.[55]  The troubling revelation from this inquiry is that as many as 14% of the Commonwealth's condemnees could be constitutionally ineligible for this sentence.[56]  As a result, the subcommittee on procedure could not conclude that procedural protections are adequate to ensure that people with intellectual disability are neither being nor have been sentenced to death.  As a comparison with the general population, it appears that an IQ score of 75 or below represents the bottom 5% of the population,[57] but is approximately triple that percentage for inmates on death row or serving life imprisonment for murder of the first degree.

The subcommittee recommends that the Rules of Criminal Procedure be amended to require a judge to determine mental retardation at the pre-trial stage instead of the jury determining it post-trial.  It would resolve the issue early in the process; if the defendant is determined to be intellectually disabled pre-trial, it would save a significant amount of money and many days of court time because the case would not proceed capitally.

(6)  **Mental illness:**  Whether persons suffering from mental illness constitute a disproportionate number of those on death row, what criteria should be used in judging the level of mental illness involved and whether people with mental illness who are convicted of murder should be executed;[58]

---

[50] Appdx. H, *infra* p. 245.

[51] The scores can only indicate potential mental retardation because the other two diagnostic criteria of early onset & deficient, adaptive functioning were neither available nor obtained.

[52] *E.g.*, *Hall v. Florida*, 134 S.Ct. 1986 (U.S. 2014).

[53] Adaptive deficits and onset prior to age 18.

[54] Appdx. H, *infra* p. 246.

[55] *Id.*

[56] The most recent data obtained places almost 13% of the death row prisoners and 12% inmates serving life imprisonment for murder of the first degree at an IQ score of 75 or below.  Bucklen, *supra* note 11 (Apr. 26, 2018).

[57] Edublox Online Tutor, IQ Test Scores:  The Basics of IQ Score Interpretation, https://www.edubloxtutor.com/iq-test-scores/ (last visited Apr. 15, 2018).

[58] *Infra* pp. 123-43.

The subcommittee on policy[59] sought to reply to this factual inquiry of disproportionality by obtaining readily available data, which was the mental health status supplied by Department of Corrections for the inmates on death row and those serving life imprisonment for first-degree murder. Inmates' mental health was assessed and classified into four categories, two of which reflected either no current mental health issues or need to be medicated, and two of which reflected a current need for active treatment or close psychiatric monitoring for serious mental health issues. Since mental health is more dynamic than IQ, this data and classification would be expected to be more variable than IQ scores. It is understood that Department of Corrections used *Diagnostic and Statistical Manual of Mental Disorders*, a *"*handbook used by health care professionals in the United States . . . as the authoritative guide to the diagnosis of mental disorders" that "has been periodically reviewed and revised since it was first published in 1952."[60] In 2013, Department of Corrections classified almost 10% of those on death row with an active mental disorder and double that proportion for those serving life imprisonment for first-degree murder.[61] When this data was updated in 2018, the department classified approximately one quarter of the inmates on death row and a similar (albeit slightly higher) percentage of those serving life imprisonment with an active mental disorder.[62] A smaller difference in this data between those years is that more than half of death row inmates had a recent (albeit not current) need for mental health treatment, while less than a third of the life prisoners for first-degree murder had a recent (albeit not current) need for mental health treatment when checked in 2013.[63] When checked in 2018, the recent (albeit not current) need for mental health treatment, was below half for death row inmates and almost the same 30% for the life prisoners for first-degree murder.[64] This begs the question of how the inmates in these two groups compare to the overall human population with respect to prevalence of mental disorder. As of 2016, 4.2% of U.S. adults were seriously mentally ill and 18.3% had some type of mental illness.[65] The subcommittee agreed that the proportion of inmates on death row suffering from some type of mental illness is likely much greater than in the general population.

Because the question regarding the criteria to judge mental illness also requires a certain level of psychiatric expertise to answer, the subcommittee cannot authoritatively comment on the requested criteria. However, the subcommittee determined that the current standard that is

---

[59] The data was collected and analyzed for the subcomm. by Dr. Gary Zajac & Laura Winger from The Pa. State U. Just. Ctr. for Research. Appdx. H, *infra* pp. 243-53.

[60] Am. Psychiatric Ass'n, *DSM–5*: Frequently Asked Questions, https://www.psychiatry.org/psychiatrists/practice/dsm/feedback-and-questions/frequently-asked-questions (2018).

[61] Appdx H, *infra* p. 246.

[62] Buklen, *supra* note 11 (Apr. 26, 2018). The difference between the percentages from 2013 to 2018 is approximately 150% higher for the inmates on death row now classified with an active mental disorder, compared to five years earlier & approximately 25% higher for those serving life imprisonment for first-degree murder, now classified with an active mental disorder than five years earlier.

[63] Appdx. H, *infra* p. 246.

[64] Bucklen, *supra* note 11 (June 13, 2018).

[65] Nat'l Inst. of Mental Health, Mental Illness, http://www.nimh.nih.gov/health/statistics/prevalence/serious-mental-illness-smi-among-us-adults.shtml (last updated 2017). Citing a study from 2004, Ctrs. for Disease Control & Prevention publishes an estimated 25% of adult Americans "reported having a mental illness within the previous" yr.. Ctrs. for Disease Control & Prevention, CDC Mental Illness Surveillance, https://www.cdc.gov/mentalhealthsurveillance/faqs.html (last reviewed 2013).

commonly used by practitioners to diagnose the level of mental illness is Diagnostic and Statistical Manual of Mental Disorders (DSM—5) from American Psychiatric Association.[66]

The subcommittee noted that the inquiry on executing a mentally ill inmate has been partially judicially resolved. A sentence of death may not be carried out "upon a prisoner who is insane."[67] A defendant who was legally insane at the time of the crime may use that as a valid defense to the charge.[68] If the defendant was not legally insane at the time of the crime but becomes unable "to comprehend the nature of the penalty" and "the reasons for" it "or its implications", he cannot then be executed.[69] In their study detailed in this report under the section on bias and unfairness, The Pennsylvania State University researchers found that in 35 cases in which defendants presented evidence of a serious mental illness at trial, the jury accepted only 11 of these arguments. Even if a defendant is not legally insane, the subcommittee recommends extending a version of guilty but mentally ill as a bar to imposition of the death penalty for the same reasons that legal insanity would excuse a crime, or because the defendant's severe mental disorder significantly impaired his exercise of rational judgment or conformance to legal requirements. This would allow a severely mentally ill murderer to be punished in the same way that an intellectually disabled murderer is, rather than subject the former to condemnation but not the latter.[70]

> (7) **Juries:** The impact on the reliability and fairness of capital trials of death qualifying jurors and the impact of this practice on the ability of women, people of color and people of faith to serve on capital juries; whether there are adequate procedural protections and remedies in place to make sure that women and African Americans are not excluded from serving as jurors in capital cases; and whether there are adequate procedural protections in place to assure that jurors are able to understand and apply instructions in determining guilt or innocence and the appropriate punishment in a capital case;[71]

Assuming that social science studies "are both methodologically valid and adequate to establish that 'death qualification' in fact produces juries somewhat more 'conviction-prone' than 'non-death-qualified' juries", U.S. Supreme Court ruled "that the Constitution does not prohibit the States from 'death qualifying' juries in capital cases."[72] The concern raised in the question was the same raised in these cases, namely "that the death qualification process potentially results

---

[66] This "authoritative volume . . . defines and classifies mental disorders in order to improve diagnoses, treatment, and research." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* (*DSM–5*), https://www.psychiatry.org/psychiatrists/practice/dsm (2018).

[67] *Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986).

[68] 18 Pa.C.S. § 315. To be excused for the crime due to legal insanity, it would mean that at the time of the offense, the defendant did not "know the nature and quality of the act he was doing or, if the actor did know the quality of the act, that he did not know that what he was doing was wrong." *Id.*

[69] *Ford*, 477 U.S. at 417.

[70] All three condemnees who were executed in Pa. since 1962 voluntarily dropped their resistance to execution by relinquishing their appeals and all three had psychiatric problem, *supra* pp. 1-2 notes 7, 8.

[71] *Infra* pp. 143-52.

[72] *Lockhart v. McCree*, 476 U.S. 162, 173 (1986). This assumption was made after the Court pointed out "several serious flaws in the evidence" introduced *via* the social science studies. *Id.* at 168-73.

in biased juries"[73] because of the resultant composition. There is no limitation to challenging jurors for cause, but peremptory challenges "[i]n trials involving a capital felony . . . when there is only one defendant" are limited to 20 *per* side.[74] A challenge for cause occurs when a juror demonstrates bias in his responses to questioning or when he says something that indicates that he will not follow instructions or be impartial. A peremptory challenge is used to exclude a juror because of a suspected or presumed bias, instead of an expressed one.[75] Peremptory challenges are restricted to race because "the Equal Protection Clause forbids a party to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."[76] It was subsequently ruled that in the exercise of peremptory challenges, "gender, like race, is an unconstitutional proxy for juror competence and impartiality."[77] "Research examining the effects of death qualification on jury composition suggests that death qualification often results in juries that are biased in ways that consistently disadvantage capital defendants."[78] Because of General Social Survey and other social science research, "research suggests that death qualification is more likely to eliminate members of some groups than others."[79] Systematic exclusion of specific social groups could occur because some groups might be "consistently more in favor of the death penalty than another", who then could be excluded by "prosecutors who know such statistics".[80] As noted elsewhere in the report, some religions have official stances on the death penalty which might impact "jury selection practices".[81] In short, "findings support the idea that the death qualification process systematically eliminates jurors who belong to certain social and demographic groups" and "can also change the way in which case facts are interpreted and discussed by a jury."[82] To exclude potential jurors, attorneys, who know statistical research on demographics and attitudes, might rely on that knowledge to "exclude potential jurors . . . to increase the possibility of creating a jury that will decide in their favor."[83] Maybe more often, "attorneys are likely to base their exclusions on intuitions related to certain attitudes and beliefs associated with individuals and their group statuses."[84] The concern "related to death-qualified jurors is that the death qualification process itself influences jurors such that jurors who experience the death qualification process hold more pro-prosecution or anti-defendant perceptions of the trial information than jurors who do not experience death qualification."[85] Repeatedly asking jurors "whether they are able to give the death penalty, *assuming* the defendant is *guilty* . . . reiterates the statement that the defendant is

---

[73] Logan A. Yelderman *et al.*, *Capital-izing Jurors: How Death Qualification Relates to Jury Composition, Jurors' Perceptions, & Trial Outcomes, in* Advances in Psychology & Law: Vol. 2, 27, 32 (B.H. Bornstein & M.K. Miller eds. 2016).

[74] Pa. R. Crim. P. 634(A)(3). For alternate jurors, each side has one peremptory challenge for every two alternate jurors selected. *Id.* 633(B).

[75] Yelderman *et al.*, *supra* note 73, at 32.

[76] *Batson v. Ky.*, 476 U.S. 79, 89 (1986).

[77] *J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 129 (1994). "[T]he Equal Protection Clause forbids peremptory challenges on the basis of gender as well as on the basis of race." *Id.* at 130.

[78] Yelderman *et al.*, *supra* note 73, at 33 (citation omitted).

[79] *Id.* at 35-36.

[80] *Id.* at 35.

[81] *Id.* at 36. A sample of some religious stances appears *infra* pp. 212-13

[82] Yelderman *et al.*, *supra* note 73, at 36.

[83] *Id.* at 43.

[84] *Id.* "Specifically, attorneys might try to identify and exclude jurors who would vote against their side." *Id.*

[85] *Id.* at 43-44.

guilty."[86]  If "specific social groups and individuals with shared attitudes or beliefs that are thought of as prejudicial" are excluded, the "death-qualified juries . . . might actually be more susceptible to systemic biases".[87]  Effects of death qualification "on juries and trial outcomes . . . should continue to be studied", especially because of "findings that demonstrate that the death qualification process produces conviction prone juries".[88]

In 2003, Joint State Government Commission published *Minority Representation in the Jury Selection Process in Pennsylvania.*[89]  The data gathered for this report did not reveal counties excluding large, distinctive groups from the jury pool in unconstitutional proportions but showed that "some counties could stand to improve their representation of minorities on juries."[90]  This analysis was not limited to juries in capital cases.  Since this report was published, Pennsylvania law was amended to add exemptions from jury duty,[91] authorize expansion of the master list of prospective jurors[92] and establish a statewide jury information system.[93]  This report has not been updated so that it is unknown whether and how much the statutory amendments have impacted the representation of minorities on juries, capital or otherwise.  One of the recommendations in the report is for "[t]he judicial system" to

> voluntarily, routinely monitor itself to determine if it is fulfilling its constitutional obligation to draw jurors from a cross section of the community.  . . . . As the constitutional obligation to draw jurors from a representative cross section of the community is an essential component of a right to a jury trial, it would seem that the judicial system itself could and should make it easier for parties to learn relevant numerical information specifying demographic data about whom courts summon rather than leave it up to aggrieved individuals or classes to try to calculate information the court could easily collect.[94]

One remedy supported by the subcommittee on procedure would be enactment of a Racial Justice Act to statutorily allow death sentences to be challenged on a statistical basis instead of on the basis of purposeful discrimination.

"Prior research has repeatedly revealed that jurors (1) base their decisions on erroneous assumptions about the early release of those who are not sentenced to death, (2) prematurely decide the punishment before hearing sentencing evidence and instructions, and (3) fail to understand sentencing instructions."[95]  The Commonwealth "is one of only two states with life" imprisonment "without parole . . . that does not require that juries be told in every capital case that there is no

---

[86] *Id.* at 44.  If so, "death-qualified jurors enter the trial with a *biased* presumption of innocence instead of a complete presumption of innocence."  *Id.* at 46.
[87] *Id.*
[88] *Id.*
[89] http://jsg.legis.state.pa.us/resources/documents/ftp/publications/2003-52-JURY.PDF.
[90] *Id.* at 3, 81, 87.
[91] 42 Pa.C.S. § 4503(a)(5)-(8).
[92] *Id.* § 4521(a)(3)(v).
[93] *Id.* § 4521.1.
[94] *Id.* at 3, 87.  Presumably, this would be done by court administrators.  *Id.*
[95] Wanda D. Foglia, *They Know Not What They Do:  Unguided & Misguided Discretion in Pa. Capital Cases*, 20 Just. Q. 187, 188 (2003).

possibility of parole".[96] This research has been partially updated since then, both in Pennsylvania and elsewhere; however, because the researcher who was updating this died, it might not be completed. Nonetheless, "the percentages getting things wrong was remarkably similar to what" was "found in the original study. . . . . The only improvement was that the median estimate for how long someone usually spends in prison if they don't get death went from 15 years to 25 years, but 25 years is still underestimating the reality."[97] The membership of the subcommittee writing these suggested standard criminal jury instructions is comprised of attorneys and judges. Linguists, social scientists and psychologists have not been employed to revise these standard suggested instructions. It would seem to the subcommittee that if the Commonwealth decides to assure that jurors are able to understand and apply instructions in determining guilt or innocence and the appropriate punishment in a capital case, there would need to be formal, empirical feedback on a routine basis. If jurors are unable to understand and apply these instructions as research discussed above indicates, the subcommittee on procedure advocates that suggested standard instructions be rewritten by attorneys and judges with the assistance of linguists, social scientists and psychologists, as well as the data disclosing the misunderstanding and misapplication. Even with routine, empirical feedback and additional professional assistance drafting these standard instructions, they would still be suggested rather than mandated.

(8) **State appeals and postconviction:** Whether there are adequate procedures in place to assure that serious error in capital cases is identified and corrected and to what extent procedural doctrines, such as waiver or forfeiture, operate to prevent judicial review of serious constitutional claims on the merits;[98]

There are both adequate and inadequate procedures to assure that serious error in capital cases is identified and corrected, and procedural doctrines sometimes prevent, but perhaps more often, delay judicial review of serious constitutional claims on their merits. The procedures and procedural doctrines that are probably intended to limit judicial review for systematic efficiency and effectiveness of the death penalty likely more often generate systematic inefficiency and ineffectiveness of the death penalty. This is borne out by the fact that the Commonwealth has executed three condemnees during the last 56 years, and all three of them relinquished their appeals.[99] There are other data showing that less than 3% of condemnees who had their original death sentences judicially vacated and subsequently disposed of since 1995 were resentenced to death.[100]

The subcommittee on procedure advocates reinstating the practice of relaxed waiver on direct capital appeals as it was employed in the 1980s and 1990s, in which Pennsylvania's Supreme Court would have a "duty to transcend procedural rules" in capital cases, [101] and to "address and, if possible from the record, resolve all significant issues perceived by this Court or raised by the

---

[96] *Id.*
[97] E-mail from Wanda D. Foglia, Professor of L. & Just. Studies, Rowan U. (Aug. 2, 2015) (on file with Pa. J. State Gov't Comm'n).
[98] *Infra* pp. 152-58.
[99] *Supra* pp. 1-2, notes 7, 8.
[100] *Supra* p. 2.
[101] *Commw v. McKenna*, 383 A.2d 174, 181 (Pa. 1978).

parties" irrespective of waiver.[102] Generally, "on capital direct appeals, claims that were not properly raised and preserved in the trial court are waived and unreviewable" but "may be pursued under the" Post Conviction Relief Act "as claims sounding in trial counsel's ineffectiveness or, if applicable, a statutory exception to the" act's "waiver provision."[103] Delaying review of a potentially dispositive issue until the petitioner reaches post-conviction proceedings, when that issue could have been resolved on the record on direct appeal, is inefficient for the judiciary and everyone else involved in proceedings.[104] When Pennsylvania's Supreme Court dropped relaxed waiver, it did "not foreclose the possibility that a capital appellant may be able to describe why a particular waived claim is of such primary constitutional magnitude that it should be reached on appeal."[105] By dropping the relaxed waiver rule to rely on a self-contradictory Post Conviction Relief Act, one does not arrive at judicial efficiency. Moreover, the Court's justification for abrogating relaxed waiver overlooks the statutory authority it has "to correct errors at trial" regardless of waiver, when it automatically reviews death sentences.[106] It also completely overlooks the practical reality that more than 97% of post-conviction reversals disposing of death sentences in Pennsylvania since 1978 have subsequently resulted in a sentence of life imprisonment or less. The same judicial opinion that rejected the justification of "relaxation of waiver principles on direct appeal . . . on grounds of judicial economy because it reduces the number and necessity of post-conviction relief petitions" because the "efficient use of the resources of this court's resources" were frustrated by the relaxed waiver doctrine also contended that abrogation of relaxed waiver would do no harm because "[a]ny meritorious claims which escape counsel's recognition on direct appeal can then be raised on grounds of counsel's ineffectiveness."[107] But preserving judicial resources on direct appeal by limiting the scope of direct review does not serve judicial economy, the public fisc, or the interests of justice by burdening post-conviction review with claims that could have been earlier resolved, by unnecessarily burdening the post-conviction process with claims of ineffectiveness for prior counsel's failures to preserve for appeal claims that could have been decided under the relaxed waiver rule, and by keeping prisoners who have meritorious claims in death-row confinement for the extra years needed for post-conviction review and appeal. Neither judicial economy nor fairness is served when the more than 97% of cases in which death sentences are converted to life sentences or less leave death row only after post-conviction review. Finally, since the statute provides for automatic judicial review of death penalties to correct errors at trial, the judiciary

---

[102] *Commw. v. Frey*, 475 A.2d 700, 707 n.4 (Pa. 1984). The Court later described the relaxed waiver rule as discretionary, *Commw. v. Malloy*, 856 A.2d 767, 778 (Pa. 2004), but for more than twenty years, it was "this Court's practice to address all issues arising in a death penalty case irrespective of a finding of waiver." *Commw. v. Banks*, 656 A.2d 467, 470 n.7 (Pa. 1995); *Commw. v. Jermyn*, 709 A.2d 849, 856 n.20 (Pa. 1998); *Commw. v. Morales*, 701 A.2d 516, 520 n.13 (Pa. 1997); *Commw. v. Morris*, 684 A.2d 1037, 1042 n.11 (Pa. 1996). The Court said the relaxed waiver rule "requires us to examine" technically waived issues, *Commw. v. Simmons*, 662 A.2d 621, 636 (Pa. 1995), and stressed that, in a death penalty case, an issue "cannot be considered waived," *Commw. v. Baker*, 511 A.2d 777, 790 n.10 (Pa. 1986).

[103] *Commw. v. Freeman*, 827 A.2d 385, 402 (Pa. 2003).

[104] The joint trial of co-defendants Kelley O'Donnell and William Gribble illustrates this point. O'Donnell was awarded a new sentencing hearing in 1999 after being granted penalty-phase relief on a claim raised and decided under the relaxed waiver rule. *Commw. v. O'Donnell*, 740 A.2d 198 (Pa. 1999). Gribble's lawyer failed to raise the issue—equally applicable to his case—on direct appeal, and it took eight more years, including a remand by the Pennsylvania Supreme Court for further post-conviction proceedings, before Gribble's post-conviction petition was resolved.

[105] *Freeman*, 827 A.2d at 402.

[106] 42 Pa.C.S. § 9711(h).

[107] *Commw. v. Albrecht*, 720 A.2d 693, 700 (Pa. 1998).

should not insist on a timely notice of appeal to consider any claims unassociated with the statutorily-mandated review of the sufficiency of the evidence. This would be a corollary to Pennsylvania Rules of Civil Procedure that are liberally construed and applied "to secure the just, speedy and inexpensive determination of every action".[108] The imposition of capital punishment might be a penalty that is unique enough for "an appellate court" to "consider the interests of society as a whole in seeing to it that justice is done, regardless of what might otherwise be the normal procedure" by upholding "the mandates of the constitution over the countervailing considerations of normal appellate procedure", especially since the doctrine of waiver's purported "means of promoting jurisprudential efficiency by avoiding appellate court determinations of issues which the appealing party had failed to preserve" has not been realized in the capital context.[109]

> (9) **Clemency:** Whether the current clemency process has procedures in place to assure that it functions as a safety net to assure that factual and procedural errors that directly undermine the reliability and fairness of a capital sentence are remedied;[110]

The short answer is, simply, no. The Governor may exercise this authority for any reason or no reason, and this includes the circumstance where he believes the capital sentence is unreliable or unfair. However, the Governor can commute or pardon a capital sentence only upon receipt of a written and unanimous recommendation from the Board of Pardons.[111] The Board may likewise base its recommendation on any consideration, including the innocence of the convicted criminal or the unfairness of the sentence. The Board of Pardons serves as a check on any Governor that might wield the clemency power unwisely, arbitrarily or for political gain. The Board of Pardons was not established to provide a "safety net" where the criminal justice system has failed to produce an accurate and fair judgment of guilt in a capital case. Accordingly, the Board of Pardons has only limited power, *i.e.*, to make recommendations. Further, its recommendation can be ignored by the Governor.

Were the General Assembly to decide to develop a "safety net" to address unreliable or unfair capital sentences, it could amend the Post Conviction Relief Act,[112] which already "provides for an action by which persons convicted of crimes they did not commit and persons serving illegal sentences may obtain collateral relief."[113] These amendments could confer additional authority upon the judiciary, beyond that which presently exists, to order relief in a particular circumstance. The Constitution could also be amended to reduce the requirement of the board's unanimity to its majority recommendation for the Governor to consider clemency; however, the Board could still base its recommendation on any consideration and the Governor could still ignore a favorable recommendation.

---

[108] Pa. R. Civ. P. 126.
[109] *Commw. v. McKenna*, 383 A.2d 174, 180-81 (Pa. 1978).
[110] *Infra* pp. 158-60.
[111] *Id.*
[112] 42 Pa.C.S. §§ 9541-9546.
[113] *Id.* § 9542. *See also*, Pa. R. Crim. P. 900-910, which govern capital and noncapital cases under the Post Conviction Relief Act.

(10) **Penological intent:** Whether the death penalty rationally serves a legitimate penological intent such as public safety or deterrence;[114]

For the most part, the debate concerning capital punishment centers on the aims of deterrence, incapacitation and retribution—increasingly the last of these. There is a great deal of disagreement about whether the death penalty meaningfully advances the deterrence purpose; it certainly advances the aims of retribution and incapacitation, and the debate largely centers on whether it does this more effectively than alternatives. Insofar as advancing these latter two purposes, the death penalty is no more effective than life imprisonment if executions do not occur. Whether the death penalty deters first-degree murder has long been a matter of debate between proponents and opponents of the death penalty. The evidence relating to deterrence is inconclusive, and leading advocates on both sides treat this issue as one of more or less secondary importance. In a state like Pennsylvania, with a relatively large number of death sentences but almost no executions, the deterrent effect of the death penalty is attenuated, regardless of whether a more vigorously applied death penalty would have a deterrent effect.[115] A prominent research study of the death penalty's effectiveness as a deterrent reached this sound but noncommittal conclusion:

> [R]esearch to date on the effect of capital punishment on homicide is not informative about whether capital punishment decreases, increases, or has no effect on homicide rates. Therefore, . . . these studies [should] not be used to inform deliberations requiring judgments about the effect of the death penalty on homicide. Consequently, claims that research demonstrates that capital punishment decreases or increases the homicide rate by a specified amount or has no effect on the homicide rate should not influence policy judgments about capital punishment.[116]

(11) **Innocence:** Whether there is a risk of execution of an innocent person and whether there are adequate procedural protections in place to prevent an innocent person from being sentenced to death and executed;[117]

Since 1973, 162 United States' condemnees turned out to be innocent after having been exonerated *via* subsequent acquittals or dismissals of the charges of the crime for which they were originally condemned, and pardons granted for innocence.[118] The "[a]verage number of years between being sentenced to death and exoneration" is "11.3 years".[119] Six of these exonerees are from Pennsylvania, where they averaged just over nine years between being condemned and then exonerated.[120]

---

[114] *Infra* pp. 160-70.
[115] Carol S. & Jordan M. Steiker, *A Tale of Two Nations: Implementation of the Death Penalty in 'Executing' v. 'Symbolic' States in the U.S.*, 84 Tex. L. Rev. 1869, 1922 (2006).
[116] Nat'l Research Council of the Nat'l Acads., *Deterrence & the Death Penalty* 102 (Daniel S. Nagin & John V. Pepper, eds., 2012), *available at* http://www.nap.edu/download.php?record_id=13363.
[117] *Infra* pp. 171-74.
[118] Death Penalty Information Ctr., The Innocence List, https://deathpenaltyinfo.org/innocence-list-those-freed-death-row (last updated Apr. 19, 2018).
[119] *Id.*
[120] *Id.*

If the Commonwealth were executing condemnees, the possibility that one or more factually innocent persons might be condemned and executed could not be eliminated, notwithstanding procedural safeguards intended to minimize and reduce this possibility. It might be better stated that the procedural safeguards are really intended to eliminate this possibility, but an assurance of 100% effectiveness would be difficult to establish and unlikely to occur. Our Commonwealth has executed three condemnees during the last 56 years. Since all three condemnees relinquished their resistance to execution, one would presume they were factually guilty. The only certain way to eliminate the risk of condemning and executing a factually innocent person would be to eliminate the sentence and not execute any convict.

(12) **Alternatives:** Whether alternatives to the death penalty exist that would sufficiently ensure public safety and address other legitimate social and penological interests;[121]

While the topics of penological purpose are analytically distinct, to consider the penological purpose of the death penalty without regard to alternatives inserts the artificial assumption that the only alternative to the death penalty would be to set the perpetrator free. Because the severely punitive alternative of life imprisonment without parole is available, the subcommittee on policy concludes that the death penalty is unnecessary, given the many objections to its use, the number of innocent persons wrongfully convicted and sentenced to death, and the effectiveness of the alternative.

(13) **Counsel:** The quality of counsel provided to indigent capital defendants and whether such counsel and the process for providing counsel assures the reliability and fairness of capital trials;[122]

The subcommittee on procedure generally endorses a report of the task force and advisory committee on services to indigent criminal defendants[123] but focused on indigent capital defendants and limits its comments to that subset. The advisory committee that prepared that report found some indigent defense practitioners failed to meet professional standards, partially because the system delivering that service is not standardized to train or supervise statewide but does so on a county-by-county basis.[124] The Commonwealth's lack of support for these services undermines "the effectiveness of indigent defense",[125] which is borne out by successful challenges to death penalties based upon ineffective assistance of counsel. As of May 2018, 150 Pennsylvania death-row inmates sentenced to death under Pennsylvania's 1978 death-penalty statute have had their convictions or sentences overturned on the basis of ineffective assistance of counsel.[126] Death sentences in 93 of these cases were overturned because of counsel's failure to investigate and present mitigating evidence in the penalty phase.[127] The inadequate remuneration of assigned

---

[121] *Infra* pp. 174-83.

[122] *Infra* pp. 183-86.

[123] Pa. J. State Gov't Comm'n, *supra* note 19.

[124] *Id.* at 5.

[125] *Id.*

[126] Robert Brett Dunham, Pa. Capital Convictions & Death Sentences Rev'd as a Result of Ineffectiveness of Counsel (Death Penalty Information Ctr. 2018).

[127] Of these 93, 68 were reversed by state courts & 25 by federal courts. *Id.*, Pa. Capital Case Cite List of Reversals Because of Ineffective Assistance of Counsel (Death Penalty Information Ctr. 2018). Other reversals related to

counsel can "result in poor quality representation."[128] "Poor systems of defense do not make economic sense."[129]

"[T]he quality of the defense representation provided by the Commonwealth to indigent capital defendants is an issue" that Chief Justice Saylor has "written on many times in appellate decisions."[130]

> I am unable to agree with the suggestion that the presumption of effectiveness by and large reflects the actual state of capital defense representation in Pennsylvania. I would submit that, in fact, we have seen more than enough instances of deficient stewardship to raise very serious questions concerning the presumption's accuracy. It is my considered position, like that of many others, that a contributing factor may be the pervasive underfunding of indigent defense.[131]

Justice Saylor called for "a collaborative conversation among the judicial, legislative, and executive branches to institutionalize statewide remedies and facilitate ongoing improvements" and noted "[t]he importance of legislative involvement".[132] The right to counsel is grounded in both our Commonwealth's and national constitutions.[133]

The subcommittee generally endorses Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases that were published in 2003 by American Bar Association "to set forth a national standard of practice . . . to ensure high quality legal representation" within "any jurisdiction."[134]

> (14) **Secondary trauma:** The impact of the death penalty process on law enforcement, prosecutors, defense counsel, judges, jurors, correctional officers, family members and loved ones of victims and family members of the accused;[135]

To try to assess the impact of the death penalty process on judges, prosecutors, public defenders and victim advocates, surveys were distributed in nine judicial districts of varying population sizes and caseloads that had past or current capital murder cases.[136]

---

failures to investigate & present guilt-stage defenses, failures to request or object to instructions, failures to object to improper evidence or argument, failures relating to guilty pleas or trial waiver and making a deficient or affirmatively harmful argument. *Id.*

[128] Pa. J. State Gov't Comm'n, *supra* note 19, at 5, 47-48.

[129] Saylor, *supra* note 20, at 38.

[130] *Id.* at 3.

[131] *Commw. v. King*, 57 A.3d 607, 636 (Pa. 2012) (Saylor, J., concurring).

[132] *Id.* at 811 n.3.

[133] Pa. Const. art. I, § 9; U.S. Const. amend. VI.

[134] Am. Bar Ass'n, *Guidelines for the Appointment & Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 919 (2003). Am. Bar Ass'n also published *Ten Principles of a Pub. Defense Delivery Sys.* (2002), https://www.americanbar.org/content/dam/aba/administrative/legal_aid_indigent_defendants/ls_sclaid_def_tenprinciplesbooklet.authcheckdam.pdf. These principles provide a guide of "valuable measures of the prevailing professional norms of effective representation". *Padilla v. Ky.*, 599 U.S. 356, 367 (2010).

[135] *Infra* pp. 186-89.

[136] Counties of Adams, Allegheny, Berks, Dauphin, Lancaster, Montgomery, York & Westmoreland & City of Phila. Judges were surveyed in 2015. Prosecutors, public defenders and victim advocates were surveyed in 2013.

Cumulatively, more than 64% of the responses indicated that a typical, capital murder case causes more stress or anxiety than a typical, noncapital murder case. This conclusion was reached by a majority or 100% for each category of respondents except for victim service providers, more than 53% of whom indicated that a typical, capital murder case causes about the same amount of stress or anxiety.

Cumulatively, 70% of the responses indicated that a typical, capital murder case causes no difference in adverse health conditions or consequences compared to a typical, noncapital murder case. Cumulatively, more than 73% of the responses indicated that a typical, capital murder case causes no difference in consumption of alcohol and other drugs or medications, compared to a typical, noncapital murder case.

Cumulatively, more than 54% of the responses indicated that a typical, capital murder case causes no difference in adverse consequences on one's family, home or social life, compared to a typical, noncapital murder case. This conclusion was reached by a majority for each category of respondents except for public defenders, 80% of whom indicted that a typical, capital murder case cause more adverse consequences on one's family, home or social life.

Cumulatively, more than 70% of the responses indicated that a typical, capital murder case causes more emotional strain than a typical, noncapital murder case. This was a majority or 100% of responses for each category of respondents except for prosecutors, half of whom indicated that a typical, capital murder case causes more emotional strain compared to a typical, noncapital murder case and the other half indicated no difference in emotional strain between the two.

Cumulatively, more than 58% of the responses indicated that a typical, capital murder case causes no difference in religious, spiritual or moral consideration, introspection or counsel, compared to a typical, noncapital murder case.

In 2013, The Pennsylvania State University and Department of Corrections staff administered surveys to State Correctional Institution Greene correctional officers, victims' family members, and inmates' loved ones.[137] The correctional officers' hardcopy survey consisted of 35 questions designed to measure their workplace conditions, stress, anxiety and background characteristics. The victims' family member survey was administered *via* an online survey with over 80 questions covering post-traumatic stress disorder, depression, views on the death penalty and demographic/background characteristics. Survey requests were sent to 440 eligible participants with valid addresses on file at the Office of Victim Advocate. The inmates' loved ones' survey was administered *via* a hardcopy survey of 31 questions covering post-traumatic stress disorder, depression, views on the death penalty and demographic/background characteristics. Eligible participants were loved ones (one *per* inmate) who were visiting inmates. Eligible participants were provided survey packets in visitation waiting rooms by prison staff.

---

[137] There is a gap in services because convicts relatives have traditionally been disregarded. Historically, law and practice did not recognize victims of crime as victims when it came to services either. One might not be too sympathetic towards inmates' relatives; however, their children are typically adversely impacted by the incarceration of parent. Dep't of Corrections' initiatives relating to children of incarcerated parents appear at
http://www.cor.pa.gov/About%20Us/Initiatives/Pages/Children-of-Incarcerated-Parents.aspx (2018).

The survey revealed that in no instance was the capital punishment condition associated with statistically higher PTSD, depression or stress than the non-capital punishment condition. For correctional officers and victims' family members, overall reports of PTSD, depression and stress were low to moderate, suggesting that few of the respondents were suffering from mental health difficulties. This was not the case for inmates' loved ones and their children. Inmates' family members reported relatively high rates of PTSD and depression compared to national and high-risk (*e.g.*, deployed military) populations. Although the mental health challenges of inmates' families do not appear to be directly connected to capital punishment, they do warrant additional attention and point to a vulnerable population that might not be receiving adequate therapeutic services.

The relatively small sample sizes did not provide the statistical power to detect small differences between the experimental (*i.e.*, capital punishment) and control (*i.e.*, non-capital punishment) conditions. However, although the samples were relatively small, the observed differences were small enough that it is unlikely they would have reached significance even with greater numbers of respondents.

(15) **Length and conditions of confinement on death row:** Whether the conditions comply with the requirements of the United States Constitution, the Constitution of the Commonwealth of Pennsylvania and standards of international law and the impact of those conditions on correctional officers;[138]

Each facility of Department of Corrections audited to date has achieved initial accreditation or reaccreditation by American Correctional Association.[139] It is under no judicial orders or consent decrees regarding conditions of confinement in Capital Case Units, otherwise known as death row.[140] So far as the subcommittee on impact is aware, the department complies with constitutional requirements for confinement. The only way to know for certain is after an inmate has challenged the department, claiming a constitutional violation, and the judiciary rules accordingly.[141] An example of learning about a constitutional violation occurred last year, when the judiciary announced "a clearly established due process right under" U.S. Const. amend. XIV "to avoid unnecessary and unexamined solitary confinement on death row."[142] This was a recently recognized "due process right" that meant that the departmental policy of keeping an inmate in "the Capital Case unit" after being resentenced to life imprisonment while the district attorney appealed the resentencing is unconstitutional when "reflexively imposed without individualized justification."[143] The department is currently defending a class action lawsuit challenging the

---

[138] *Infra* pp. 189-99.
[139] Am. Correctional Ass'n, Accredited Facilities, http://www.aca.org/ACA_Prod_IMIS/ACA_Member/Standards_and_Accreditation/SAC_AccFacHome.aspx?Websi teKey=139f6b09-e150-4c56-9c66-284b92f21e51&hkey=f53cf206-2285-490e-98b7-66b5ecf4927a&CCO=2#CCO (last visited June 5, 2018).
[140] E-mail from Diana Woodside, Dir. of Policy, Grants & Legis. Affairs, Pa. Dep't of Corrections (June 11 & 15, 2018) (on file with Pa. J. State Gov't Comm'n).
[141] An example of how this might arise, is the mental health investigation by U.S. Dep't of Just., *infra* p. 125-26.
[142] *Williams v. Pa. Sec'y of Corrections*, 848 F.3d 549, 574 (3d Cir. 2017).
[143] *Id.* at 556-57, 572, 574. In other words, there must be "procedural protections" afforded inmates to "ensure that continuing this level of deprivation is required for penological purposes". *Id.* at 574.

conditions of confinement on death row as an unconstitutional violation of the U.S. constitutional prohibition on cruel and unusual punishment.[144]

It is more difficult to assess whether confinement on death row in Pennsylvania meets the standards of international law. The department does not officially recognize these standards and departmental staff were unable to indicate one way or the other whether the conditions of confinement on death row meet these standards. It seems as though the consensus of developed countries is that the punishment of execution should be abolished. To the extent that other countries use capital punishment, it appears that Pennsylvania largely comports with the standards of confinement conditions, other than the lengthy interval between condemnation and execution. This would be due to the presumptive stress of awaiting one's own execution; however, condemnees do not seem to be eager to advance their own executions to relieve the presumptive stress of the wait.

Correctional officers were surveyed on the impact of conditions of confinement on death row.[145]

Length of confinement varies *per* inmate, primarily due to their date of conviction. Currently, the longest serving inmate on death row resides at State Correctional Institution Greene. Inmate No. AM-5999 was sentenced to death in 1983; later this year, this inmate will have completed his thirty-fifth year on Pennsylvania's death row.[146] The average length of confinement for all inmates on death row is 17.49 years.

The general understanding of constitutional compliance is framed by a ruling applying the U.S. constitution to prison conditions.[147] The constitution "'does not mandate comfortable prisons,' but neither does it permit inhumane ones, and it is now settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment'."[148] This amendment restrains "prison officials, who may not, for example, use excessive physical force against prisoners."[149] Prison officials must supply essential items to the inmates, including food, clothing, shelter, medical care, and adequate steps to ensure those measures are met.[150]

Although the department makes no representations about conformity with international standards, several trends have emerged throughout Europe and other developed countries over the years. European Union nations have abolished capital punishment. Issues in Europe include arguments that capital punishment is torture, violating provisions against freedom from torture and inhuman and degrading treatment or punishment.[151]

---

[144] *Reid v. Wetzel*, No. 1:18-cv-00176 (M.D.Pa. 2018).
[145] *Infra* pp. 187-89.
[146] Pa. Dep't of Corrections, *supra* note 14.
[147] *Farmer v. Brennan*, 511 U.S. 825 (1994).
[148] *Id*. at 832 (citation omitted).
[149] *Id*.
[150] *Id*.
[151] Equality & Human Rights Comm'n, Art. 3, http://www.equalityhumanrights.com/about-us/our-work/human-rights/human-rights-review-2012/articles/article-3 (2012).

[I]n the Court's view, having regard to the very long period of time spent on death row in such extreme conditions, with the ever present and mounting anguish of awaiting execution of the death penalty, and to the personal circumstances of the applicant, especially his age and mental state at the time of the offence, the applicant's extradition to the United States would expose him to a real risk of treatment going beyond the threshold set by Article 3 (art. 3).[152]

Earlier this year, the department changed the operation of its capital case units by allowing capital case inmates to have the opportunity to participate in out-of-cell congregate activities for at least 20 hours *per* week. Previously, the policy only generally provided capital case inmates with the opportunity to have 10-12 hours of yard time out of cell *per* week in a setting that was less conducive to congregate activity. Capital case inmates will continue to have the opportunity to work as unit block workers, to have access to the law library, showers, telephone calls, non-contact visits and medical and mental health services in accordance with policy. Capital case inmates who have serious mental illness will continue to have enhanced opportunity to participate in out-of-cell treatment services.

(16) **Lethal injection:** Whether there are adequate procedures and protocols in place to assure that the death sentence is administered in accordance with requirements of the United States Constitution and the Constitution of the Commonwealth of Pennsylvania; and[153]

Based upon a U.S. Supreme Court ruling[154] and its application by U.S. Court of Appeals for the Third Circuit to Delaware's lethal injection procedures and protocols,[155] Pennsylvania's similar procedures and protocols appear to be constitutional. Bolstering this assessment is the U.S. District Court grant of summary judgment to Secretary Wetzel because Pennsylvania's protocol did not have identified risks "very likely to cause . . . needless suffering in violation of" U.S. Const. amend. VIII.[156]

Based upon a U.S. Court of Appeals ruling,[157] Pennsylvania's observational protocol appeared to be unconstitutional. Bolstering this assessment is the U.S. District Court's grant of a preliminary injunction forbidding the Commonwealth's secretary of corrections from obscuring parts of an execution because the plaintiff was likely to succeed on the merits of its claim of

---

[152] *Soering v. U.K.*, 11 Eur. Ct. H.R. (1989), ¶ 111, *available at*
http://www.uio.no/studier/emner/jus/jus/JUR5710/h10/undervisningsmateriale/5nov_Soering-v-UK.pdf.
[153] *Infra* pp. 199-203.
[154] *Baze v. Rees*, 553 U.S. 35 (2008). "It is not disputed that Pennsylvania uses the same three-drug protocol that Kentucky uses." *Chester v. Beard*, 657 F.Supp.2d 534, 543 n.9 (M.D.Pa. 2009). But by 2012, Department of Corrections "revised its lethal injection protocol". *Id.*, 2012 WL 4758346. (The protocol was revised in Aug. 2012. *Id.*, 2012 WL 5386129. It "supersedes all prior versions". *Id.*, 2012 WL 5389319.) This controlling opinion has subsequently been applied to a similar method of execution using a substituted drug. *Glossip v. Gross*, 135 S.Ct. 2726, 2732-34 (U.S. 2015). This subsequent ruling found that petitioners' did not prove a substantial risk posed by the substituted drug compared to available alternative methods and the district court was not clearly erroneous in its factual finding that the substituted drug would not "result in severe pain and suffering." *Id.* at 2737-38.
[155] *Jackson v. Danberg*, 594 F.3d 210, 222-23, 230 (3d Cir. 2010). Delaware's capital sentencing scheme was subsequently ruled unconstitutional on different grounds. *Rauf. v. Del.*, 145 A.3d 430 (Del. 2016).
[156] *Chester v. Wetzel*, 2015 WL 632374 at 10 (M.D.Pa. 2015).
[157] *Cal. 1st Amend. Coalition v. Woodford*, 299 F.3d 868, 875 (9th Cir. 2002).

unconstitutionality.[158] This suit was settled by the parties so that the protocol was changed. Now "witnesses would be permitted to see and hear inside the lethal injection chamber from the time the condemned inmate enters the chamber until the time he/she is pronounced dead. During the last completed execution, in the late 1990's, witnesses were only permitted to see the inmate immediately before the administration of the lethal injection. They did not see the inmate enter the chamber, they did not see the inmate strapped down, etc."[159]

Pennsylvania's constitutional prohibition against cruel punishments is co-extensive with the U.S. constitutional prohibition against cruel and unusual punishment[160] so that any distinction between the two authorities would be factual rather than legal. Factors that have not been analyzed for this are whether internal, departmental procedures suffice instead of regulations and the continued availability of the drugs in the current protocol.

The Commonwealth's lethal injection protocol is confidential so that the subcommittee on procedure is uncertain what the current protocol is. Statutory confidentiality applies to the identity of departmental employees, contractors and victims participating in the execution.[161] The protocol that the subcommittee considered was the information published in judicial opinions ruling on litigation over its constitutionality.[162] Some of these opinions are not reported but available electronically *via* a subscription to Westlaw. The protocol revealed in these judicial opinions do not violate the statute's confidentiality requirement and could be public, which the subcommittee on procedure advocates rather than a confidential one. The drugs used should appropriately be selected by qualified, professional expertise to be delivered humanely and ethically.

There are potential, practical problems with the current protocol so far as the subcommittee perceives it to be. Department of Corrections might not have or be able to obtain these drugs. Perhaps further affecting the viability of the lethal injection protocol, is the fact that numerous relevant organizations have taken positions that could hamper this method of execution.

(17) **Public opinion:** The opinions of Pennsylvania residents regarding capital punishment, including whether it is a just and appropriate punishment and, if so, under what circumstances should it be imposed;[163]

To determine Pennsylvania residents' opinions about capital punishment, six public opinion polls were analyzed about the death penalty. Two were conducted nationally: the 2016 Pew Research Center poll and the 2017 Gallup poll; and four surveyed only Pennsylvania residents: the 2013 Pennsylvania State University poll, the 2015 Public Policy Polling poll, the 2015 Office of Victim Advocate poll, and the 2016 Pennsylvania State University poll.

---

[158] *The Phila. Inquirer v. Wetzel*, 906 F.Supp.2d 362, 375 (M.D.Pa. 2012).
[159] E-mail from Andrew Barnes, Legis. Liaison, Pa. Dep't of Corrections (Nov. 13, 2013) (on file with Pa. J. State Gov't Comm'n).
[160] *Commw. v. Zettlemoyer*, 454 A.2d 937, 967 (Pa. 1982).
[161] 61 Pa.C.S. § 4305(c).
[162] *Chester v. Wetzel*, 2012 WL 5439054 (M.D.Pa. 2012), 2015 WL 632374 (M.D.Pa. 2015); *The Phila. Inquirer v. Wetzel*, 906 F.Supp.2d 362 (M.D.Pa. 2012).
[163] *Infra* pp. 203-13.

The questions in the Spring 2013 Pennsylvania State University Poll were sponsored by Joint State Government Commission as part of this study. Overall, almost three quarters of Pennsylvanians surveyed (72.3%) thought that the death penalty is a just and appropriate penalty for intentional murder in the Commonwealth. Most respondents indicated they would change their attitude towards the death penalty for those convicted of intentional murder based on how the murder was carried out (21.6%) and the reasons for the murder (18.3%). Over half of Pennsylvanians surveyed (53.5%) stated that the circumstances of an intentional murder would determine what type of sentence they would ultimately choose. Due to the fact that this poll is from 2013, it is unknown if these percentages reflect current perspectives.

Office of Victim Advocate's survey of registered crime victims whose offenders were under a sentence of death showed overwhelming support for the death penalty, but this was not a survey of the general population nor a survey of registered crime victims in first-degree murder cases in which the death penalty was sought but not returned and registered crime victims in first-degree murder cases in which the death penalty was not sought.

The Spring 2016 Pennsylvania State University Poll showed less support for the death penalty than the Spring 2013 poll; however, the questions differed. It can be difficult and imprecise to compare polling from different years, asking different questions and sampling different populations, but they could be perceived as collectively showing:

1) A majority of Pennsylvanians support the death penalty.
2) Support for the death penalty is declining.
3) A significant proportion of the population supports the idea of the death penalty but is opposed to the death penalty as a matter of public policy because more respondents favor the death penalty when asked for or against, but that percentage drops when given the option of life imprisonment or death as a penalty.

### Conclusions[164]

- **Cost:** There is a significant difference between the cost of the death penalty and the cost of life in prison without parole.

- **Bias and unfairness:** The subcommittee on policy could not answer the question relating to the selection of defendants for capital trials because the only recent study was limited to examining cases resultant in convictions for murder of the first degree.

  As for convictions of murder of the first degree, The Pennsylvania State University researchers found disparate variability within those cases based on the race of the victim, the type of the defendant's legal representation, and the variation among counties in the selection of those defendants for the death penalty. The largest and

---

[164] Material for this report was developed by the subcommittees, *infra* p. 33.

most prominent differences were those "among counties in death penalty outcomes and the effects of other variables on death penalty outcomes".[165]

- **Proportionality:** There is no process for determining whether the crimes for which defendants receive the death penalty differ from the crimes for which defendants receive life imprisonment (without parole). The statute lists aggravating circumstances, which would allow the death penalty for one convicted of murder of the first degree, but charging and plea bargaining are done at the county level.

  The only available data is from the study detailed under the issue of bias and unfairness, which was limited to those cases that had convictions for first-degree murder. Justice Center for Research might be able to follow that study with one to directly address this inquiry, but it will take years to accomplish.

- **Impact on and services for family members:** These services are paid for from a mix of public and private funding. The services are generally but not precisely uniformly available throughout the counties. When asked by staff, almost half of the advocates felt that the services were sufficient, although this group of responders often acknowledged that the loss of a family member or loved one through homicide left a hole that could never be fully filled.

  The cost of services that are currently provided to family members and loved ones of murder victims can only be provided as part of the larger picture of state and federal funding for victims within this Commonwealth. When asked if the costs were "more, less or about the same as those services that you provide to victims of other crimes", the responses categorized costs for services provided for family members and loved ones of murder victims cost as more than the services that the office provided for other types of crime or the same amount as they would cost in response to the victim of a different sort of crime, because they viewed the fixed operating costs of the office and the fixed costs of the salary to be the same regardless of the service provided.

- **Mental retardation:** It could not be determined if procedural protections are adequate to assure that people with intellectual disability are not being sentenced to death. The percentage of inmates on death row with an IQ low enough to be diagnosed as intellectually disabled is approximately the same as those serving life imprisonment for murder of the first degree, both of which are between two and three times the percentage with that low of an IQ in the general population.

- **Mental illness:** In 2018, Department of Corrections classified approximately a quarter of the inmates on death row and a similar albeit slightly higher percentage of the life prisoners for first-degree murder with an active mental disorder.[166] In 2018, the recent

---

[165] Kramer *et al.*, *supra* note 26, at 121. *E.g.,* "prosecutors in Allegheny County and Philadelphia were less likely to seek the death penalty against defendants represented by public defenders than" in the other 16 counties in the field study. *Id.* at 120-21.

[166] Buklen, *supra* note 11 (Apr. 26, 2018). The difference between the percentages from 2013 to 2018 is approximately 150% higher for the inmates on death row now classified with an active mental disorder compared to five years earlier

(albeit not current) need for mental health treatment, was approximately 43% for death row inmates and almost 30% for the life prisoners for first-degree murder.[167]  As of 2016, 4.2% of U.S. adults in the U.S. were seriously mentally ill and 18.3% had some kind of mental illness.[168]  It is believed that the proportion of inmates on death row suffering from some type of mental illness is likely greater than in the general population.

The current standard that is commonly used by practitioners to diagnose the level of mental illness is Diagnostic and Statistical Manual of Mental Disorders (DSM—5) from American Psychiatric Association.[169]

The inquiry on executing a mentally ill inmate has been partially judicially resolved.  A sentence of death may not be carried out "upon a prisoner who is insane."[170]  Even if a defendant is not legally insane, the subcommittee on policy recommends extending a version of guilty but mentally ill as a bar to imposition of the death penalty for the same reasons that legal insanity would excuse a crime or because the defendant's severe mental disorder significantly impaired his exercise of rational judgment or conformance to legal requirements.  This would allow a severely mentally ill murderer to be punished in the same way that an intellectually disabled murderer is rather than subject the former to condemnation but not the latter.[171]

- **Juries:**  "Research examining the effects of death qualification on jury composition suggests that death qualification often results in juries that are biased in ways that consistently disadvantage capital defendants."[172]  In short, "findings support the idea that the death qualification process systematically eliminates jurors who belong to certain social and demographic groups" and "can also change the way in which case facts are interpreted and discussed by a jury."[173]

The data gathered for a 2003 report did not reveal counties excluding large, distinctive from the jury pool in unconstitutional proportions but showed that "some counties could stand to improve their representation of minorities on juries."[174]  This

---

and approximately 25% higher for those serving life imprisonment for first-degree murder now classified with an active mental disorder than five years earlier.

[167] *Id.* (June 13, 2018).

[168] Nat'l Inst. of Mental Health, Mental Illness, http://www.nimh.nih.gov/health/statistics/prevalence/serious-mental-illness-smi-among-us-adults.shtml (last updated 2017).  Citing a study from 2004, Ctrs. for Disease Control & Prevention publishes an estimated 25% of adult Americans "reported having a mental illness within the previous" year.  Ctrs. for Disease Control & Prevention, CDC Mental Ilness Surveillance, https://www.cdc.gov/mentalhealthsurveillance/faqs.html (last reviewed 2013).

[169] This "authoritative volume . . . defines and classifies mental disorders in order to improve diagnoses, treatment, and research."  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* (*DSM–5*), https://www.psychiatry.org/psychiatrists/practice/dsm (2018).

[170] *Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986).

[171] All three condemnees who were executed in Pa. since 1962 voluntarily dropped their resistance to execution by relinquishing their appeals and all three had psychiatric problems.

[172] Yelderman *et al.*, *supra* note 73, at 33 (citation omitted).

[173] *Id.*

[174] *Id.* at 3, 81, 87.

analysis was not limited to juries in capital cases. Since this report was published, Pennsylvania law was amended to add exemptions from jury duty,[175] authorize expansion of the master list of prospective jurors[176] and establish a statewide jury information system.[177] This report has not been updated so that it is unknown whether and how much the statutory amendments have impacted the representation of minorities on juries, capital or otherwise.

"Prior research has repeatedly revealed that jurors (1) base their decisions on erroneous assumptions about the early release of those who are not sentenced to death, (2) prematurely decide the punishment before hearing sentencing evidence and instructions, and (3) fail to understand sentencing instructions."[178] The membership of the committee writing these suggested standard criminal jury instructions is attorneys and judges. Linguists, social scientists and psychologists are not employed to revise these standard suggested instructions. It would seem to the subcommittee on procedure that if the Commonwealth decides to assure that jurors are able to understand and apply instructions in determining guilt or innocence and the appropriate punishment in a capital case, there would need to be formal, empirical feedback on a routine basis.

- **State appeals and postconviction:** There are both adequate and inadequate procedures to assure that serious error in capital cases is identified and corrected and procedural doctrines sometimes prevent but maybe more often delay judicial review of serious constitutional claims on their merits. The procedures and procedural doctrines that are probably intended to limit judicial review for systematic efficiency and effectiveness of the death penalty likely more often generate systematic inefficiency and ineffectiveness of the death penalty. This is borne out by the fact that the Commonwealth has executed three condemnees during the last 56 years, and all three of them relinquished their appeals showing that less than 3% of condemnees who got their original death sentences judicially vacated and subsequently disposed since 1978 were resentenced to death.

- **Clemency:** The current clemency process does not have procedures in place to assure that it functions as a safety net to assure that factual and procedural errors that directly undermine the reliability and fairness of a capital sentence are remedied.

- **Penological intent:** For the most part, the debate concerning capital punishment centers on the aims of deterrence, incapacitation and retribution—increasingly the last of these. There is a great deal of disagreement about whether the death penalty meaningfully advances the deterrence purpose; it certainly advances the aims of retribution and incapacitation, and the debate largely centers on whether it does this more effectively than alternatives. Insofar as advancing these latter two, it is no more effective than life imprisonment if executions do not occur.

---

[175] 42 Pa.C.S. § 4503(a)(5)-(8).

[176] *Id.* § 4521(a)(3)(v).

[177] *Id.* § 4521.1.

[178] Foglia, *supra* note 95, at 188 (2003).

- **Innocence:** If the Commonwealth were executing condemnees, a possibility that one or more factually innocent persons might be condemned and executed could not be eliminated notwithstanding procedural safeguards intended to minimize and reduce this possibility. The only certain way to eliminate the risk of condemning and executing a factually innocent person would be to eliminate the sentence and not execute any convict.

- **Alternatives:** Because the severely punitive alternative of life imprisonment without parole is available, the subcommittee on policy concludes that an alternative to the death penalty exists that would sufficiently ensure public safety and address other legitimate social and penological interests.

- **Counsel:** The subcommittee on procedure generally endorses a report of the task force and advisory committee on services to indigent criminal defendants[179] but focused on indigent capital defendants and limits its comments to that subset. The advisory committee that prepared that report found some indigent defense practitioners failed to meet professional standards, partially because the system delivering that service is not standardized to train or supervise statewide but does so on a county-by-county basis.[180] The Commonwealth's lack of support for these services undermines "the effectiveness of indigent defense",[181] which is borne out by successful challenges to death penalties based upon ineffective assistance of counsel.

- **Secondary trauma:** To try to assess the impact of the death penalty process on judges, prosecutors, public defenders and victim advocates, surveys were distributed in nine judicial districts of varying population sizes and caseloads that had past or current capital murder cases.[182] A typical, capital murder compared to a typical, noncapital murder case resulted in cumulative supermajorities indicating more stress or anxiety and emotional strain but no difference in adverse health conditions or consequences. For the same comparison, cumulative simple majorities reported no difference in adverse consequences on one's family, home or social life nor in religious, spiritual or moral consideration, introspection or counsel.

In 2013, The Pennsylvania State University and Department of Corrections staff administered surveys to State Correctional Institution Greene correctional officers, victims' family members, and inmates' loved ones.[183] The survey revealed that in no instance was the capital punishment condition associated with statistically

---

[179] Pa. J. State Gov't Comm'n, *supra* note 19.

[180] *Id.* at 5.

[181] *Id.*

[182] Counties of Adams, Allegheny, Berks, Dauphin, Lancaster, Montgomery, York & Westmoreland & City of Phila. Judges were surveyed in 2015. Prosecutors, public defenders and victim advocates were surveyed in 2013.

[183] There is a gap in services because convicts relatives have traditionally been disregarded. Historically, law and practice did not recognize victims of crime as victims when it came to services either. One might not be too sympathetic towards inmates' relatives; however, their children are typically adversely impacted by the incarceration of parent. Dep't of Corrections' initiatives relating to children of incarcerated parents appear at http://www.cor.pa.gov/About%20Us/Initiatives/Pages/Children-of-Incarcerated-Parents.aspx (2018).

higher PTSD, depression or stress than the non-capital punishment condition. For correctional officers and victims' family members, overall reports of PTSD, depression and stress were low to moderate, suggesting that few of the respondents were suffering from mental health difficulties. This was not the case for inmates' loved ones and their children. Inmates' family members reported relatively high rates of PTSD and depression compared to national and high-risk (*e.g.*, deployed military) populations.

- **Length and conditions of confinement on death row:** Department of Corrections is under no judicial orders or consent decrees regarding conditions of confinement in Capital Case Units, otherwise known as death row.[184] So far as the subcommittee on impact is aware, the department complies with constitutional requirements for confinement. The only way to know for certain is after an inmate has challenged the department, claiming a constitutional violation, and the judiciary rules accordingly.[185]

    It is more difficult to assess whether confinement on death row in Pennsylvania meets the standards of international law. The department does not officially recognize these standards and departmental staff were unable to indicate one way or the other whether the conditions of confinement on death row meet these standards. It seems as though the consensus of developed countries is that the punishment of execution should be abolished. To the extent that other countries use capital punishment, it appears that Pennsylvania largely comports with the standards of confinement conditions, other than the lengthy interval between condemnation and execution.

    Correctional officers were surveyed on the impact of conditions of confinement on death row.[186]

    The average length of confinement for all inmates on death row is 17.49 years. Earlier this year, the department changed the operation of its capital case units by allowing capital case inmates to have the opportunity to participate in out-of-cell congregate activities for at least 20 hours *per* week. Previously, policy only generally provided capital case inmates with the opportunity to have 10-12 hours of yard time out of cell *per* week in a setting that was less conducive to congregate activity.

- **Lethal injection:** Based upon a U.S. Supreme Court ruling[187] and its application by U.S. Court of Appeals for the Third Circuit to Delaware's lethal injection procedures

---

[184] Woodside, *supra* note 140.
[185] An example of how this might arise, is the mental health investigation by U.S. Dep't of Just., *infra* pp. 125-26.
[186] *Infra* pp. 187-89.
[187] *Baze v. Rees*, 553 U.S. 35 (2008). "It is not disputed that Pennsylvania uses the same three-drug protocol that Kentucky uses." *Chester v. Beard*, 657 F.Supp.2d 534, 543 n.9 (M.D.Pa. 2009). But by 2012, Department of Corrections "revised its lethal injection protocol". *Id.*, 2012 WL 4758346. (The protocol was revised in Aug. 2012. *Id.*, 2012 WL 5386129. It "supersedes all prior versions". *Id.*, 2012 WL 5389319.) This controlling opinion has subsequently been applied to a similar method of execution using a substituted drug. *Glossip v. Gross*, 135 S.Ct. 2726, 2732-34 (2015). This subsequent ruling found that petitioners' did not prove a substantial risk posed by the substituted drug compared to available alternative methods and the dist. ct. was not clearly erroneous in its factual finding that the substituted drug would not "result in severe pain and suffering." *Id.* at 2737-38.

and protocols,[188] Pennsylvania's similar procedures and protocols appear to be constitutional. Based upon a U.S. Court of Appeals ruling,[189] Pennsylvania's observational protocol but has been changed. The Commonwealth's lethal injection protocol is confidential so that the subcommittee on procedure is uncertain what the current protocol is. There are potential, practical problems with the current protocol so far as the subcommittee perceives it to be.

- **Public opinion:** A majority of Americans and Pennsylvanians favor the death penalty. In all six polls, respondents most frequently indicated that they support or prefer the death penalty. In four of the six polls, a majority of respondents (greater than 50%) supported or preferred the death penalty. Support for the death penalty is declining. The polls presented show that support and preference for the death penalty is declining. This decline has been steady since the late 1990s, but has been more pronounced over the past few years. Support for the death penalty is higher in theory than in practice. Most of the polls discussed only provided the option to choose whether they support or oppose the death penalty. However, some polls allow respondents to select the punishment that they prefer for those convicted of murder (*e.g.* death penalty or life in prison without parole). Support for the death penalty might be higher among respondents when given the either-or option of favoring or opposing the death penalty than it is in polls where respondents are able to select their preferred punishment.

*Recommendations*[190]

- **Bias and unfairness:** The subcommittee on policy supports including a recommendation that Pennsylvania consider replicating what other states have done in this area to statutorily provide for proportionality review, which would routinely and systematically collect relevant data for review that can reveal unfair, arbitrary or discriminatory variability in outcomes.[191] This could also determine whether death sentences are excessive of out of line with sentences imposed in other cases where a sentence other than death was imposed.

- **Proportionality:** The subcommittee on policy supports including a recommendation to amend statutory aggravating and mitigating circumstances to reduce any significant difference in the crimes of those selected for the punishment of death as opposed to those who receive life in prison.[192]

- **Mental retardation:** The subcommittee on procedure recommends that the Rules of Criminal Procedure be amended to require a judge to determine intellectual disability at the pre-trial stage instead of the jury determining it post-trial. It would resolve the

---

[188] *Jackson v. Danberg*, 594 F.3d 210, 222-23, 230 (3d Cir. 2010). Delaware's capital sentencing scheme was subsequently ruled unconstitutional on different grounds. *Rauf. v. Del*., 145 A.3d 430 (Del. 2016).
[189] *Cal. 1st Amend. Coalition v. Woodford*, 299 F.3d 868, 875 (9th Cir. 2002).
[190] Material for this report was developed by the subcommittees, *infra* p. 33.
[191] *Infra* pp. 59, 90.
[192] *Infra* pp. 101-05.

issue early in the process; if the defendant is determined to be intellectually disabled pre-trial, it would save a significant amount of money and many days of court time because the case would not proceed capitally.[193]

- **Mental illness:** Even if a defendant is not legally insane, the subcommittee on policy recommends extending a version of guilty but mentally ill as a bar to imposition of the death penalty for the same reasons that legal insanity would excuse a crime, or because the defendant's severe mental disorder significantly impaired his exercise of rational judgment or conformance to legal requirements. This would allow a severely mentally ill murderer to be punished in the same way that an intellectually disabled murderer is, rather than subject the former to condemnation but not the latter.[194]

- **Juries:** One remedy supported by the subcommittee on procedure would be enactment of a Racial Justice Act to statutorily allow death sentences to be challenged on a statistical basis in addition to the purposeful discrimination.[195]

    It would seem to the subcommittee on procedure that if the Commonwealth decides to assure that jurors are able to understand and apply instructions in determining guilt or innocence and the appropriate punishment in a capital case, there would need to be formal, empirical feedback on a routine basis. If jurors are unable to understand and apply these instructions as research discussed above indicates, the subcommittee on procedure advocates that suggested standard instructions be rewritten by attorneys and judges with the assistance of linguists, social scientists and psychologists, as well as the data disclosing the misunderstanding and misapplication.[196]

- **State appeals and postconviction:** The subcommittee on procedure advocates reinstating the previous practice of relaxed waiver on direct capital appeals as it was employed in the 1980s and 1990s. Also, since the statute provides for automatic judicial review of death sentences to correct errors at trial, the judiciary should not insist on a timely notice of appeal to consider any claims unassociated with the statutorily-mandated review of the sufficiency of the evidence. Finally, the statutory trigger that mandates issuance of a warrant of execution should be amended to the more realistic, statutory timeliness mandating the warrant's issuance only following state post-conviction proceedings, if any, when the capital defendant failed to file a timely petition for writ of *habeas corpus* in the appropriate federal district court, or failed to timely appeal or petition an adverse *habeas corpus* decision to the United States Court of Appeals for the Third Circuit.[197]

- **Counsel:** The subcommittee recommends the creation of a state-funded capital defender office to represent all persons charged with or convicted of capital crimes at the trial, appellate, and state post-conviction levels. Such an office will save money

---

[193] *Infra* p. 123.
[194] *Infra* p. 143.
[195] *Infra* p. 149.
[196] *Infra* p. 152.
[197] *Infra* p. 158.

for the counties, be cost efficient by reducing the number of cases that require reversal in post-conviction proceedings at either the state or federal level, and improve the quality of representation, thereby reducing the likelihood of error at the trial level.[198]

- **Lethal injection:**  The subcommittee on procedure recommends that the lethal injection protocol:[199]

    1) Be public rather than confidential information.

    2) Use an appropriate and effective drug selected by qualified professional expertise to execute humanely and be ethically delivered.

    3) Comply with applicable statutory law.

---

[198] *Infra* p. 186.
[199] *Infra* p. 203.

After its initial conference, the advisory committee divided into subcommittees on impact, policy and procedure. Justice Center for Research at The Pennsylvania State University collaborated with the subcommittees on impact and policy; Pennsylvania Interbranch Commission for Gender, Racial and Ethnic Fairness collaborated with all three subcommittees. The advisory committee reconvened *via* teleconference shortly before reporting to the task force; however, the material for this report was developed by the subcommittees.

The advisory committee was to have reported its findings and recommendations to the Senate at end of 2013, but that was an unrealistic deadline because of the ambitious scope of the 17 interrelated but separate topics in the resolution, the funding challenges for part of the research and unanticipated delays in selected areas, most especially collecting data from the field, which was quite tedious for Justice Center for Research.[200] Collecting usable data when there is no systematic or rational collection of data statewide is a difficulty that can be insurmountable when resources are spare.

The subcommittee on impact collaboratively developed the material in this report on cost, impact on and services for family members, secondary trauma, length and conditions of confinement on death row and public opinion. From 2012-2015, it convened in person or *via* teleconference at least five times.

The subcommittee on policy collaboratively developed the material in this report on bias and unfairness, proportionality, mental illness, penological intent and alternatives. From 2012-2018, it convened in person or *via* teleconference at least 15 times.

The subcommittee on procedure collaboratively developed the material in this report on mental retardation, juries, state appeals and postconviction, clemency, innocence, counsel and lethal injection. From 2012-2018, it convened in person or *via* teleconference at least 10 times.

"Capital punishment is currently authorized in 31 states, by the federal government and the U.S. military."[201] The Commonwealth is one of these 31 states.[202]

---

[200] Appdx. L, *infra* p. 263.
[201] Nat'l Conf. of State Legiss., *supra* note 5.
[202] 42 Pa.C.S. § 9711.

## Cost

The question that serves as the basis of the study of cost to administer the death penalty in our Commonwealth is:

> Whether there is a significant difference between the cost of the death penalty from indictment to execution and the cost of life in prison without parole; in considering the overall cost of the death penalty in Pennsylvania, the cost of all the capital trials that result in life sentences as well as death sentences that are reversed on appeal must be factored into the equation;[203]

As described below, the death penalty is much more expensive than sentences of life imprisonment without parole because of the long and complex process for capital cases and the increased costs for incarceration on death row.

> Capital punishment is an inefficient, bloated program that has bogged down law enforcement, delayed justice for victims' families, and devoured millions of crime-fighting resources that could save lives and protect the public. . . . . More than a dozen states have tried to capture the cost of death penalty cases and found evidence that they are up to 10 times more expensive than other comparable cases. In California, a 2011 study showed death penalty cases are 20 times more expensive. That state has spent over $4 billion on the death penalty since 1978. . . . . Many of the extra costs are legally mandated to reduce the risk of executing an innocent person. And even these safeguards are not enough. At least 160 people have been exonerated from death row after waiting years for the truth to come out. Streamlining the process would virtually guarantee the execution of an innocent person.[204]

> The death penalty costs more than life imprisonment. With its many appeals it is an expensive way to deal with violent crime. The lengthy trial and appeal procedures and the cost of maintaining maximum security on death row have led to prohibitive expenses in an already burdened criminal justice system. The appeal process costs taxpayers millions of dollars which could be better spent on more effective crime control.[205]

---

[203] Pa. S. Res. No. 6 (Sess. of 2011); appdx. A, *infra* p. 219.

[204] Conservatives Concerned About the Death Penalty, Wasteful & Inefficient: The alarming costs of the death penalty, https://conservativesconcerned.org/why-were-concerned/cost/ (last visited May 20, 2018).

[205] Memo from Amnesty Int'l Group 39 (Pittsburgh) addressed to Members of the Commw. Capital Punishment Advisory Comm. (Apr. 15, 2013) (on file with Pa. J. State Gov't Comm'n).

The cost issue has received far more attention now than previously. The extra process constitutionally required since the 1970's has made it more expensive to pursue a death penalty case as compared to cases where the death penalty is not sought. Bifurcated trial proceedings with a focused punishment phase have become the national norm, and emerging judicial capital doctrines substantially altered "state capital practices, including *voir dire*, the use of experts, the expectations of defense counsel, and, especially the investigation and presentation of mitigating evidence. In addition, post-trial litigation costs would become vastly greater in capital cases."[206] The additional litigation further resulted in greatly extending the period between sentence and execution, bringing with it the increased expense of maintaining a large death row.[207]

> The combination of increased trial and postconviction litigation costs, and increased incarceration costs in capital cases, together with the absence of significant numbers of executions in many states, has changed the way in which the 'costs' of the death penalty are understood and discussed. The relative cost of the death penalty is no longer captured by a simple comparison of the cost of a capital trial together with the cost of carrying out an execution, on the one hand, versus the cost of a non-capital trial and the cost of a lengthy imprisonment, on the other. Rather, the relative cost of administering the death penalty . . . now often requires a comparison of the cost of *multiple* capital trials *and* the cost of lengthy, often indefinite imprisonment on death row versus the cost of a single non-capital trial and the cost of a lengthy (non-capital) imprisonment.[208]

At the same time, some costs might be avoided if the prospect of a capital sentence induces one to plead guilty to avoid that sentence.

### Cost Analyses from Elsewhere

Every published study that analyzed the cost of another state's death penalty has found it to be substantially higher when compared with non-death-prosecuted murder cases. The methodology of these studies has varied, but the results are consistent enough to persuasively establish that the cost differential is significant. The next few pages summarize the methodology and results from these other analyses.

**California.** "[I]t is impossible to ascertain the precise costs of the administration of California's death penalty law".[209] Noting "quite consistent results" from other states' comparisons of the costs of murder trials seeking the death penalty with those in which that penalty was not sought, California Commission on the Fair Administration of Justice conservatively estimated "that seeking the death penalty adds $500,000 to the cost of a murder trial".[210] At the time, spending for "post-trial review of death cases in California" was "at least" $54,400,000 *per* year to cover the Supreme Court's appointment of private lawyers, the State Public Defender for

---

[206] Carol S. & Jordan M. Steiker, *Capital Punishment: A Century of Discontinuous Debate*, 100 J. Crim. L. & Criminology 643, 669 (2010).

[207] *Id.* at 669-70.

[208] *Id.* at 670-71.

[209] Cal. Comm'n on the Fair Admin. of Just., *Final Rep.* 144 (2008).

[210] *Id.* at 144-45. "The costs of a second defense lawyer, the background investigation for the penalty phase, and the added duration and expense of the trial would easily add up to the $500,000 in most cases." *Id.* at 145.

death penalty appeals, *habeas* representation by California Habeas Corpus Resource Center and the Attorney General's criminal division devoted to capital cases.[211] The cost of confinement on California's death row was estimated by Department of Corrections to add $90,000 per year beyond the normal cost.[212] The "conservative, rough" estimate was that it was costing $137,700,000 year for its "dysfunctional system".[213] Conversely, to convert this punishment to a maximum of lifetime incarceration, the additional cost would amount to $11,500,000 per year to cover the trials, appeals and *habeas corpus* proceedings as well as confinement.[214]

A more detailed study calculated that California state and federal taxpayers spent $4,000,000,000 to administer that state's death penalty from 1978 to 2011 with an additional $619,000,000 to be spent on federal *habeas corpus* petitions, plus additional spending to house condemned inmates despite carrying "out only 13" executions during that period while housing "over 714 condemned inmates".[215] Of those whose "whose petitions for federal habeas corpus relief" had "been reviewed, nearly 70% had "been granted relief".[216]

"[O]btaining data concerning how much the administration of California's death penalty actually costs state and federal taxpayers has not been easy."[217] Amounts spent to litigate "capital habeas corpus petitions in federal court . . . are 'not made public.'"[218] California Commission on the Fair Administration of Justice confirmed "the need for more comprehensive collection of data and the continual monitoring and analysis of that data".[219] As with other jurisdictions, "[t]he categories of costs associated with California's capital punishment system can be broken down as follows: (1) pre-trial and trial costs, (2) costs related to direct appeals and state habeas corpus petitions, (3) costs related to federal habeas corpus petitions, and (4) costs of incarceration."[220] The "easily identifiable costs incurred in every death penalty trial that are not incurred in non-death penalty homicide trials" are: two rather than one "death penalty-qualified attorneys per side", multiple investigators and experts, a longer "jury selection process", the separately tried penalty phase, the certified, daily trial transcript and the length of time in the criminal court.[221]

---

[211] *Id.* at 146. For 2009-10, another source calculated this amount to be $58,543,000 with conservatively estimated annual spending on these costs associated with automatic appeals and capital state habeas proceedings at $37,000,000 during the immediately preceding quarter century. Alarcón & Mitchell, *infra* note 215, at S88.

[212] Cal. Comm'n on the Fair Admin. of Just., *supra* note 209, at 146. The amount is *per* condemnee.

[213] *Id.*

[214] *Id.* at 147. California executed 13 condemnees since 1978 with 746 other condemnees remaining on death row so that based on this 2008 calculation, the state could have spent $126,200,000 less *per* year to achieve almost the same outcome. *See* Cal. Dep't of Corrections & Rehabilitation, Capital Punishment, Inmates Executed, 1978 to Present (2017), https://www.cdcr.ca.gov/Capital_Punishment/Inmates_Executed.html; Div. of Adult Operations Death Row Tracking Sys. (2018),

https://www.cdcr.ca.gov/Capital_Punishment/docs/CondemnedInmateListSecure.pdf?pdf=Condemned-Inmates.

[215] Judge Arthur L. Alarcón & Paula M. Mitchell, *Executing the Will of the Voters?: A Roadmap to Mend or End the Cal. Legis.'s Multi-Billion-Dollar Death Penalty Debacle*, 44 Loy. L.A. L. Rev. S41, S51 n.14 (2011).

[216] *Id.* at S55. This would have been a new trial for guilt or the penalty. *Id.*

[217] *Id.* at S62.

[218] *Id.* at S63.

[219] Cal. Comm'n on the Fair Admin. of Just., *supra* note 209, at 154.

[220] Alarcón & Mitchell, *supra* note 215, at S69. The costs to litigate suits challenging the method of execution are omitted. *Id.* n.62.

[221] *Id.* at S75-S79.

"Based on the foregoing, we have calculated that an average death penalty trial consumes approximately $1 million in publically funded resources".[222]

Extrapolating from calculated, average cost estimates for "federal habeas corpus proceedings" worked out to $1,107,142.85 *per* petition in federal court.[223] "Almost . . . every capital prisoner seeks habeas corpus relief in federal court after the" state "Supreme Court has rejected his or her federal constitutional claims", which is paid "by federal . . . rather than state taxpayers."[224] When "claims of federal constitutional violations that have not yet been reviewed by the" state "Supreme Court" are discovered,[225] federal law requires the exhaustion of remedies in state court before "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court" may "be granted".[226] This typically results with the federal proceedings being "stayed while the newly discovered claims are filed in state court for exhaustion."[227] At the time of this study, the rate at which federal habeas corpus relief has been granted, was 68.25%.[228] The "full investigation into the inmate's alleged federal constitutional violations does not occur until many years after the judgment of death was imposed, when the petitioner's claims are presented in a federal habeas corpus petition."[229] Because state and local governmental entities did not provide actual cost data, estimated "costs associated with death penalty trials that took place between 1983 and 2006 averaged about $1 million more per trial than the costs of average non-death penalty homicide trials."[230] Court-appointed counsel staffing federal *habeas corpus* cases "averaged a total of $635,000 per case, including appeals."[231] A conservatively estimated cost of litigation by Federal Public Defender Capital Habeas Units in two U. S. District Courts in California averaged $1,580,000 during the corresponding period and this average amount excludes "costs to the state Attorney General's Office to respond to these challenges in federal court."[232] These "cost calculations" also exclude amounts for "death penalty law clerks, court accountants, and clerical workers."[233]

As has occurred in some other jurisdictions during recent decades, since the early 1980's, California's annual spending percentage from its general fund on its "prison system" increased from 4% to 11% while its "budget for the University of California system" decreased from 5% to 2.5%.[234] In fiscal year 2007-08, California's Department of Corrections and Rehabilitation's "average annual cost to incarcerate an adult inmate" was $49,300.[235] In 2005, a departmental spokesperson was quoted saying that "[t]he additional cost of confining an inmate to death row, as compared to the maximum security prisons where those sentenced to life without possibility of

---

[222] *Id.* at S79.
[223] *See id.* at S93.
[224] *Id.* at S89.
[225] *Id.*
[226] 28 U.S.C. § 2254(b)(1)(A).
[227] Alarcón & Mitchell, *supra* note 215, at S89-S90.
[228] *Id.* at S55 n.26.
[229] *Id.* at S89.
[230] *Id.* at S75.
[231] *Id.* at S94.
[232] *Id.* at S97-S98.
[233] *Id.* at S99.
[234] *Id.* at S99-S100.
[235] *Id.* at S103.

parole ordinarily serve their sentences, is $90,000 per year per inmate."[236]   Omitting "funds expended defending the death penalty in federal court in actions based on civil rights violations . . . challenging methods used in carrying out execution or related delays", research for 2009 estimated that "administering the death penalty in California . . . cost . . . approximately" $184,000,000 "above what taxpayers would have spent without the death penalty."[237]

A year after this study was published, California voters were offered the proposition to retain or reject the death penalty.  "The major fiscal effects of the measure" to reject the death penalty would save costs to "state and local governments" associated with murder trials, "state expenditures" associated with appellate litigation and "state prison costs".[238]  According to that state's Legislative Analyst's Office, eliminating that state's death penalty would result in net savings that "would likely be about $100 million annually in the first few years, growing to about $130 million annually thereafter."[239]  In anticipation of the voting on this proposition, the study's authors wrote more about costs of capital punishment in California, characterizing the "current death-penalty scheme" as essentially life imprisonment (without parole), "but—according to our calculations—it costs taxpayers roughly an additional" $200,000,000 "per year to maintain the illusion that California has a functioning death penalty."[240]

**Colorado.**  This analysis compared "the time required by the trials and pleas of death penalty cases to the time required for the prosecution of the most serious of the first-degree murders during the same timeframe."[241]  This comparison measured the cost figure *via* an "objectively verifiable" number of days rather than *via* "a set dollar figure".[242]  The comparison was between death penalty prosecutions resultant in either jury trials or plea bargains and first-degree murder cases with one or more aggravating circumstances that were tried resultant in convictions with nonparolable life sentences.[243]

Excluding appeals and post-conviction proceedings, death prosecutions averaged 148 days in court while the other murder cases averaged 24½ days in court, so that the death prosecutions took approximately six times longer in court days.[244]  In the last 48 years, Colorado executed one inmate; in the last four decades, the reversal or vacation of sentence rate for its death penalties is

---

[236] Cal. Comm'n on the Fair Admin. of Just., *supra* note 209, at 141, n.94.  This increased expenditure to house condemnees on death row was spent on a number of those who were not executed because "their sentences were later vacated on appeal . . . or because they died of natural causes . . . or died . . . awaiting the outcomes of their petitions for federal habeas corpus relief."  Alarcón & Mitchell, *supra* note 215, at S108.

[237] *Id.* at S109.  For this estimate and the lower estimate from Cal. Comm'n on the Fair Admin. of Just., *supra* p. 36, the highest extra cost for the death penalty in 2008-09 was attributed to incarceration; however, the biggest cumulative cost estimated for 1978-2010 was for pre-trial investigation & trial costs.  Alarcón & Mitchell, *supra* note 215, at S110.

[238] Cal. Legis. Analyst's Office, Proposition 34 (2012), http://www.lao.ca.gov/ballot/2012/34_11_2012.aspx.

[239] *Id.*

[240] Judge Arthur L. Alarcón & Paula M. Mitchell, *Costs of Capital Punishment in Cal.:  Will Voters Choose Reform this Nov.?*, 46 Loy. L.A. L. Rev. S1, S34-S35 (2012).

[241] Justin F. Marceau & Hollis A. Whitson, *The Cost of Colo.'s Death Penalty*, 3 U. Denv. Crim. L. Rev. 145, 147 (2013).  The time was the number of court days for pretrial proceedings, *voir dire*, trial and sentencing; which excluded appeals and post-conviction proceedings.  *Id.* at 151-52.

[242] *Id.* at 149.

[243] *Id.* at 150-51.

[244] *Id.* at 152-53.

75%.[245]  Colorado Department of Corrections estimates that the appeals would minimally delay an inmate's execution for a decade, during which time the inmate is housed in Administrative Segregation and incurs higher costs than inmates housed at a lower level of security.[246]

There were only a few pleas of guilty to first-degree murder in prosecutions for the death penalty, but they cost about the same as a nonparolable life sentence case "as measured in court days required."[247]  In other words, the threat of a death sentence did not induce "a swift or less expensive guilty plea to a first degree murder charge. . . . These results reveal no empirical support for the claim that the death penalty is cost-effective based on its ability to induce guilty pleas to first degree murder."[248]  Aside from the lack of empirical support for this proposition, the cost of these cases (and potential savings or not) must be considered with "the cost of maintaining the entire death penalty machinery, without which there is no . . . prerequisite to inducing the guilty plea."[249]  In Colorado's case, it saved approximately six court days by inducing guilty pleas, but these were more than offset by the hundreds of additional court days on failed death penalty prosecutions.[250]  After citing research finding no evidence in support of a deterrence thesis, the authors deem it to "be implausible that the death penalty could have any deterrent effect in a state where only one person has been executed since 1967."[251]  This study concludes that "the death penalty imposes a major cost without yielding any measurable benefits."[252]

***Connecticut.***  Because Connecticut Commission on the Death Penalty had "limited resources available" and many state agencies' record keeping was of a "limited nature", a precise comparison could not be obtained; however, "the [c]ommission solicited information from several state agencies involved in various aspects of administering the death penalty" to estimate costs compared to those incurred in "imposing a sentence of life imprisonment without release."[253]  Division of Criminal Justice did not quantify or separately track any added costs in death penalty cases but reported increased costs "spread out over several different agencies."[254]  Plus, "[p]ost-conviction review of death sentences involves additional costs that are not found in serious, non-death felony cases."[255]  Conversely, Division of Public Defender Services tracked its "cost information on an ongoing basis through its "Capital Defense and Trial Services Unit" devoted "to representing indigent defendants in capital felony cases".[256]  "[D]efense costs for capital felony

---

[245] *Id.* at 155; Colo. Dep't of Corrections, http://www.doc.state.co.us/death-row (last visited July 13, 2015).

[246] Colo. Dep't of Corrections, http://www.doc.state.co.us/death-row-faq (last visited July 13, 2015).  These inmates are in a single for 23 hours/day and are fully restrained and accompanied by at least two correctional officers when moved.  *Id.*, http://www.doc.state.co.us/daily-routine (last visited July 13, 2015).

[247] Marceau & Whitson, *supra* note 241, at 156-58.

[248] *Id.* at 158.  "[T]here is a distinct probability that the death prosecutions that result in guilty pleas would have cost the State the least to try."  *Id.*

[249] *Id.* at 159.

[250] *Id.* at 160.  These failures placed the net cost at an extra 696 days.  *Id.*  When a death penalty prosecution resulted in a plea of life without parole instead of a trial, the approximate savings was one less court day required and there were only six of these pleas.  *Id.*

[251] *Id.* at 161-62.

[252] *Id.* at 162.

[253] Conn. Comm'n on the Death Penalty, Study Pursuant to Pub.  Act No. 01-151 of the Imposition of the Death Penalty in Conn. 12 (2003), *available at*
http://www.ct.gov/redcjs/lib/redcjs/documents/commission_on_the_death_penalty_final_report_2003.pdf.

[254] *Id.* at 13.

[255] *Id.*

[256] *Id.*

cases" averaged "88% higher than the defense costs incurred for those sentenced to life imprisonment without release."[257]   The Judicial Branch could not specify cost estimates but predicted "additional costs" and acknowledged that "capital felony cases are more time-consuming than other serious felony cases".[258]  Overall, the commission found "that as a general rule, capital felony cases are more expensive to adjudicate than non-capital cases."[259]  A "more comprehensive analysis of cost factors associated with the death penalty would require" the assignment of dedicated staff "as well as improved documentation relating to cost factors".[260]

Additionally, condemnees were housed at a level five, maximum security institution in which support and sustenance of these offenders averaged approximately twice the annual expense it cost to house "offenders sentenced to life without parole . . . in less expensive facilities".[261]

**Idaho.**  "Legislators wanted to know whether costs of sentencing defendants to death could be compared with costs of sentencing them to life in prison."[262]  Because cost data was unavailable, "the total financial cost of the death penalty" could not be quantified.[263]  Since 1977, more than half of condemnees have been resentenced.[264]  This report concluded that capital cases are more expensive than noncapital ones, aligning its findings with studies nationally.[265]  "[W]e found consensus that death penalty cases are more complex and involved."[266]

In the 15-year period analyzed, less than one fifth of first-degree murder cases were capital ones.[267]  A substantially higher percentage of noncapital cases did not go to trial compared to the capital cases; however, the share was a majority for both.[268]  An overwhelming percentage of the capital cases resulted in life rather than death sentences.[269]  Most of the death sentences since 1977 have subsequently been changed to life sentences.[270]

---

[257] *Id.* at 14.

[258] *Id.*

[259] *Id.* at 16.

[260] *Id.*

[261] *Id.* at 15.  When this information was submitted to the comm'n, Dep't of Correction housed seven men on death row.  *Id.*  Subsequently, that number increased to 10.  Conn. Dep't of Correction, 2013 Annual Rep. 1, *available at* http://www.portal.ct.gov/DOC/Common-Elements/Common-Elements/Publications.  The last execution occurred in 2005.  *Id.*  Before that, the last execution in this state was 1960.  *Id.*, Annual Rep. 2002-2003 2.  In 2012, Conn. prospectively abolished its death penalty, which was judicially extended its retrospective abolition.  Conn. Gen. Stat. § 53a-46a(a); *Conn. v. Santiago*, 122 A.3d 1 (Conn. 2015).

[262] Office of Performance Evaluations, Idaho Legis., Financial Costs of the Death Penalty iii (2014), *available at* http://legislature.idaho.gov/wp-content/uploads/OPE/Reports/r1402.pdf.

[263] *Id. E.g.*, salaried staff do not track time working on types of cases.  *Id.* at iv.  Cost data is described as "minimal" or "nearly nonexistent."  *Id.*

[264] *Id.*  Idaho has nine offenders under a sentence of death, who remain in their cells 23 hours/day & are restrained when moved.  Idaho Dep't of Correction, Death Row, http://www.idoc.idaho.gov/content/prisons/death_row (last visited Apr. 6, 2018).  Since 1977, three inmates have been executed.  *Id.*  To execute a condemnee in 2011 and 2012, the department spent almost $170,000 to remodel a building and improve the ground.  Office of Performance Evaluations, *supra* note 262, at 32.  The executions themselves cost an average of $51,283.50 with approximately 80% of that amount being spent on staff overtime as well as medical supplies, training and other expenses.  *Id.* at 33.

[265] *Id.* at vi.

[266] *Id.* at 7.

[267] *Id.* at 10.

[268] *Id.*  76% for noncapital cases and 55% for capital cases.  *Id.*

[269] *Id.* at 13.

[270] *Id.* at 14.  "Four offenders originally sentenced to death have been released."  *Id.*

During the 15-year period analyzed, both the direct and post-conviction appeals for capital cases averaged more than a year longer for the State Appellate Public Defender's Office to complete than the noncapital cases.[271] During a 13-year period, this office averaged 7,918 billable hours/defendant sentenced to death and 179 hours/defendant with a life sentence.[272] "[L]aw enforcement costs do not typically differ between capital and noncapital first-degree murder cases . . . ."[273]

**Kansas.** In 2013, "the Judicial Council assigned the Death Penalty Advisory Committee to update its previous 2009 study on costs of the death penalty."[274] The committee sought additional costs incurred since 2003 for 22 cases, comparing costs then as well as surveyed the judiciary and the executive about 41 capital-eligible cases filed between 2004 and 2011.[275] Of these 63 cases, cost estimates were received from less than one third of prosecutors and police surveyed.[276] Because of dismissals and ineligibility for capital punishment due to youth, the 41 capital-eligible cases between 2004 and 2011 were reduced to 34, of which 16 were tried and 18 were pled.[277] The hours spent on the cases were "generally estimated", but "actual cost information" otherwise associated with these cases was "often provided".[278] Since these cases were selected by Kansas Board of Indigent Defense Services, the reported costs exclude those cases in which a defendant was represented by his own, private attorney.[279] Future costs were excluded from the survey because they had not yet been incurred and remained unprojected notwithstanding the likelihood of their incursion.[280] The number of cases is small, some costs were estimates and some cases were at different stages than others when the survey was done, but Board of Indigent Defense Services reported that its defense costs averaged $296,799 higher for cases in which the death penalty was sought, compared to cases in which that penalty was not sought.[281] For cases that resulted in a guilty plea, the average difference in the board's defense costs was $65,884 higher in cases in which the death penalty was sought, compared to cases in which that penalty was not sought.[282] Similarly, district court costs averaged $50,976 higher for cases in which a death penalty was sought compared to cases in which that penalty was not sought.[283] For cases that resulted in a guilty plea, the average difference in district court costs was $8,879 higher for cases in which a death penalty was sought compared to cases in which that penalty was not sought.[284]

---

[271] *Id.* at 26-27.

[272] *Id.* at 31.

[273] *Id.* at 30. Law enforcement costs refer to the cost of criminal investigation. *Id.*

[274] Kan. Jud. Council, Rep. of Death Penalty Advisory Comm. 2 (2014), *available at* http://kansasjudicialcouncil.org/Documents/Studies%20and%20Reports/2015%20Reports/death%20penalty%20cost%20report%20final.pdf.

[275] *Id.* at 3.

[276] *Id.* Office of Att'y Gen. considered cost estimates too speculative to provide; however, police indicated that homicides would be investigated similarly "regardless of whether" it would be prosecuted as a death penalty. *Id.* at 4.

[277] *Id.* at 5.

[278] *Id.*

[279] *Id.*

[280] *Id.*

[281] *Id.* at 5-7.

[282] *Id.* at 7.

[283] *Id.* at 8.

[284] *Id.*

To update the earlier audit of the other 22 cases, the advisory committee surveyed the same respondents, asking for "any additional costs incurred since January 1, 2004."[285] Board of Indigent Defense Services reported that its defense costs averaged $137,658 higher for cases in which the death penalty was sought, compared to cases in which that penalty was not sought.[286] District court costs averaged $2,885 higher for cases in which a death penalty was sought compared to cases in which that penalty was not sought.[287]

Kansas Supreme Court "estimated that justices spend approximately 20 times more hours on a death penalty case versus a non-death case when the justice is assigned to write the opinion and 5 times more hours when the justice is not writing."[288] It also has a death penalty unit with two research attorneys "who work exclusively on death penalty appeals".[289]

Comparing the number of district court days from first appearance through sentencing, cases in which the death penalty was sought averaged 23 days more than cases in which that penalty was not sought.[290] For cases that resulted in a guilty plea, the number of district court days for cases in which a death penalty was sought averaged five days more than the cases in which that penalty was not sought.[291]

Inmates sentenced to death are incarcerated in administrative segregation, which Department of Corrections calculates to cost double the average annual cost to incarcerate an inmate among the general population of prisoners.[292]

"Death penalty cases simply take more time and resources than non-death cases."[293] Based upon survey responses, the advisory committee found that costs triple or quadruple for Board of Indigent Services and district courts for cases in which the death penalty is sought compared to those in which that penalty is not sought.[294] And, in cases that resulted in a guilty plea, "costs are roughly twice as high in cases where the death penalty is sought than in cases where it is not."[295]

*Maryland.* "[T]he lifetime costs of all homicides eligible to receive the death penalty where the homicide occurred between 1978 and 1999" were studied.[296] "A capital-eligible case in which prosecutors unsuccessfully sought the death penalty . . . cost . . . $700,000 more than a comparable case in which the death penalty was not sought. . . . An average capital-eligible case

---

[285] *Id.* at 9. One of these cases involved a juvenile at the time of the crime so that the number was reduced from 22 to 21. *Id.*

[286] *Id.* at 10.

[287] *Id.*

[288] *Id.* at 11.

[289] *Id.*

[290] *Id.* at 12-13.

[291] *Id.* at 13.

[292] *Id.* at 11-12. Kan. has 10 inmates sentenced to death but has not executed anyone "since 1965." Kan. Dep't of Corrections, Annual Rep. Fiscal Yr. 2017 64, *available at* https://www.doc.ks.gov/publications/Reports/2017.

[293] *Id.* at 15.

[294] *Id.*

[295] *Id.*

[296] John Roman *et al.*, *supra* note 23, at abstract.

resulting in the death penalty . . . cost" $1,900,000 "more than a case where the death penalty was not sought."[297] These costs "were estimated for each stage of case processing."[298]

For case costs, "[a]bout 70% of the added cost of a death notice case occurs during the trial phase."[299] This difference is attributed to

a greater number of pre-trial motions, longer and more intensive voir dire, longer trials and a greater amount of general preparation time. In addition, a typical capital case involves two attorneys on each side of the aisle while a case in which a death notice is not filed usually involves a single attorney. Another systematic cost difference between capital and non-capital cases is the penalty trial.[300]

Previous "research on the costs of capital punishment in other states unambiguously finds that capital cases are more expensive to prosecute than non-capital cases."[301] The "two key costs" estimated were "1) those associated with the filing of a death notice; and 2) those associated with the imposition of a death sentence."[302]

This study did "not estimate the effects of deterrence" because "the literature gives no consensus on the effect of the death penalty on deterrence" and "research studies are unlikely to correctly estimate a deterrent effect of the death penalty".[303] From 1979-1999, "[n]early "80% of capital eligible cases" were from City of Baltimore and two counties.[304]

"Death sentence cases have a higher average number of trial days, hearing days, and overall length of phase at every stage of the trial except for post-conviction."[305] The stages of case processing in which death notice cases were "significantly more expensive" were the guilt and

---

[297] *Id.*

[298] *Id.*

[299] *Id.* at 2. "[T]he average death notice cases cost $474,000 more than no death notice cases just through the trial stage." *Id.* at 29.

[300] *Id.* at 30. "[T]he average length of voir dire for a capital case is five days and two days for a non-capital case." *Id.* at 49.

[301] *Id.* at 1. Notwithstanding the "substantial variation" in estimates from earlier studies, "the extant literature consistently finds that capital punishment adds costs to case processing when compared to capital eligible cases where the death penalty is not sought." *Id.* at 5, 8.

[302] *Id.* Estimated costs exclude "additional pre-trial costs of cases in which a death notice is filed but subsequently waived, the costs of cases tried under a death notice that resulted in a not guilty verdict, and costs of appeals to" U.S. Sup. Ct.. *Id.* at 3. Filing and withdrawing a notice of aggravating circumstances was at the State Attorney's discretion. *Id.* at 10-11.

[303] *Id.* at 9.

[304] *Id.* at 21. The two counties are Baltimore & Prince Georges. *Id.* "Twenty-three counties and Baltimore City make up the twenty-four main local jurisdictions found in Maryland." Md. Manual On-line, Local Gov't, http://msa.maryland.gov/msa/mdmanual/01glance/html/county.html (2018). Death notices and sentences were "substantially underrepresented" from City of Baltimore but "substantially overrepresented" from neighboring County of Baltimore. Roman *et al.*, *supra* note 23, at 23. This study omitted acquittals, which were 7% of the "death noticed cases". *Id.* at 31.

[305] *Id.* at 23-24.

- 44 -

penalty trials plus the state-level appellate phase.[306]  These three phases of case processing plus "the lifetime cost of prison . . . explain the majority of differences in cost."[307]

*Nebraska.*  During the 41 years between 1973 and 2014, 1.1% of "murder convictions" in Nebraska "resulted in an execution."[308]  In 2015, "Nebraska's maintenance of the death penalty cost the state . . . approximately" $14,600,000 "annually and each additional death penalty arraignment costs the state almost" $1,500,000.[309]  Goss & Associates Economic Solutions concluded that in "2012 and 2013, the average U.S. state with the" death penalty "would have saved $46,474,823 had the state eliminated the" death penalty and replaced it with life imprisonment without parole.[310]

"[N]ationally, defendants in" death penalty "states are more likely to plead guilty to longer sentences, but the rate of guilty pleas was not different."[311]  Perversely, "[p]lea bargaining combined with the use of the" death penalty "can increase the cost to the taxpayer."[312]  In one case from this state, five individuals falsely confessed to avoid a threatened death penalty, after which they and the sixth defendant, who was also convicted but did not confess, were exonerated through DNA evidence and were awarded $28,100,000 in damages.[313]  "Furthermore, past data indicate that the existence of the" death penalty "has no negative impact on state murder rates."[314]

During the 41 years between 1973 and 2014, approximately 1.8% of all murders in Nebraska resulted in a death sentence but almost half of these death sentences were judicially reduced to a lesser sentence or vacated.[315]  Other studies identified "five major factors driving the cost of the" death penalty "over and above" life imprisonment without parole:[316]

1.  Defense costs
2.  Pretrial/jury selection/trial/sentencing
3.  Court days and court costs
4.  Incarceration/prison system costs
5.  Appeals costs

---

[306] *Id.* at 24.  "Death notice cases are also more likely to incur costs during the appellate phase even where a death sentence is not handed down."  *Id.* at 30.

[307] *Id.* at 25.

[308] Goss & Assoc. Econ. Solutions, The Econ. Impact of the Death Penalty on the State of Neb.:  A Taxpayer Burden? i (2016), *available at* https://bloximages.newyork1.vip.townnews.com/omaha.com/content/tncms/assets/v3/editorial/a/6d/a6de772c-7515-11e6-8138-1f408072cffb/57d03c36d04e9.pdf.pdf.  There were three executions.  *Id.* at 2.

[309] *Id.* at 1.

[310] *Id.* at 2.  This estimate used "multivariate statistical analysis".  *Id.*

[311] *Id.* at 23.  "What this demonstrates is that using the death penalty to plea bargain does not save money since the same number of cases would be resolved through a plea bargain without the death penalty."  Alarcón & Mitchell, *supra* note 240, at S22 n.96.

[312] *Id.* at 3.

[313] *Id.*

[314] *Id.* at 24.

[315] *Id.* at 4.  Elsewhere in this rep., it says that "more than half of those death sentences" between 1973 and 2014 "were reversed".  *Id.* at 25.

[316] *Id.* at 5-8.

"[T]he length of the appeals process, pre-trial costs, and court costs . . . thwart . . . efforts" to contain costs incurred by "the capital punishment process".[317] The direct and post-conviction appeals averaged 6.76 "on behalf of Nebraska capital defendants, versus 1.64 appeals for those who received" life imprisonment without parole.[318]

*Nevada.* "[F]rom arrest through the end of incarceration," the death penalty was estimated to cost "about $532,000 more than other murder cases where the death penalty is not sought."[319] The average for trial and appellate case costs of the death penalty was triple that of non-death penalty cases.[320] Because they are housed at a higher cost facility, the death penalty is a slightly more expensive sentence than "those sentenced to life without the possibility of parole."[321] Plea bargains among those facing a sentence of death occurred "14% less often than in non-death penalty cases."[322] This audit focused on the difference of costs prosecuting a death penalty versus a non-death penalty case and "the potential savings attributable to the death penalty through plea bargaining and strategic litigation choices."[323]

Since 1977, more than a quarter of this state's death sentences were overturned with those individuals resentenced or released and more died while in prison awaiting execution than were executed.[324]

"The legal process for the death penalty differs from other types of murder . . . charges. Typical death penalty process differences include longer jury selection, bifurcated trials . . ., and a complex appeals process for both conviction and sentence. Further, two attorneys are provided" to defend "an individual facing the death penalty."[325]

This study was done using a sample of cases, and costs could not be completely accounted for because "agencies with significant roles in the death penalty process could not provide actual staff time attributable to any specific case" and were "hesitant . . . to provide estimates of time".[326] Cost information either was not accumulated or was limited for "Nevada Supreme Court, the Judicial District Courts, and county district attorneys."[327] Nonetheless, estimates of staff time were used and believed to result in an understated cost.[328] The case costs that were obtainable showed that death penalty cases averaged triple the cost of non-death penalty cases.[329]

---

[317] *Id.* at 10.
[318] *Id.* at 18. "[T]his contributes to a higher likelihood of a successful appeal". *Id.*
[319] Nev. Legis. Auditor, Perf. Audit (2014), *available at*
https://www.leg.state.nv.us/Division/Audit/Full/BE2014/Costs%20of%20Death%20Penalty,%20LA14-25,%20Full.pdf.
[320] *Id.*
[321] *Id.*
[322] Eleven of the 12 inmates executed since 1977 gave up their rights to continue their appeals.
[323] *Id.* This audit focused on death penalty and non-death penalty murder cases from the two most populous counties from 2000-2012. *Id.* at 8, 10.
[324] *Id.* at 4.
[325] *Id.* at 6.
[326] *Id.* at 8-9.
[327] *Id.* at 12.
[328] *Id.* at 9, 12.
[329] *Id.* at 12.

"Adjudicating death penalty cases takes more time and resources compared to murder cases where the death penalty sentence is not pursued as an option. These cases are more costly because there are more procedural safeguards in place to ensure the sentence is just and free from error."[330] Included in this are the appointment of two attorneys to represent indigent defendants, death qualification of the jury, separate hearings for the penalty, and an automatic appeal for review by the state Supreme Court.[331] It took almost twice as long for a decision on a direct appeal of a death sentence than for one when a death sentence wasn't sought.[332] In the cases sampled, "death penalty trials transpired over 7 to 15 days. Correspondingly, non-death penalty trials ranged from 3 to 10 days to complete."[333]

Prosecutors strongly suggested the death penalty is not used as a strategic litigation choice to reduce or avoid a trial and its associated costs through plea bargaining. Nevertheless, plea bargains are made with defendants who are facing the possibility of death; however, the rate at which this occurs is lower than for non-death penalty murder cases.[334]

When a death sentence was pursued, trial costs were "generally the same" regardless of whether death was the sentence; however, "total appeal costs" were lower between the two when the sentence was not death.[335] At the trial stage, the biggest additional cost accounted for in death penalty trials compared to non-death penalty trials was for defense and a longer detention period.[336] "Total pretrial costs were as much as nine times more when the death penalty was sought."[337] Pretrial defense costs averaged "as much as 11 times" higher for cases with a death penalty being sought and obtained compared to those with the death penalty not being sought.[338]

During the trial phase of a death penalty case whether or not that was the sentence, defense costs for experts, witnesses, investigators and other expenses cost more than the attorneys and their staff, which is the inverse of cases in which a death penalty cost was not sought.[339] The cost difference for appeals of a death penalty compared to a penalty other than death (whether sought or not) averaged "nearly triple the cost."[340]

---

[330] *Id.* at 10.

[331] *Id.* at 12. "[W]hether the cost was an estimate or based on actual verifiable data", it was higher on death penalty cases for almost every cost information accumulated. *Id.* at 16.

[332] *Id.* at 13.

[333] *Id.* at 24.

[334] Id. at 15. The rates are 53% and 67%. *Id.*

[335] *Id.* at 16-17.

[336] *Id.* at 17-18.

[337] *Id.* at 19-20. The quoted statement compares average pretrial costs for a death penalty sought but not sentenced to a death penalty not sought.

[338] *Id.* at 20-21. Due to "the limited availability of actual cost data", most "defense costs were determined based upon estimates provided by staff". *Id.* at 21.

[339] *Id.* at 25. Other costs were for travel, records & small incidentals. *Id.*

[340] *Id.* at 38. The appeals were direct and both state and federal postconviction. *Id.* The death penalty cases on direct appeal "cost about twice as much as other cases in" the sample. *Id.* at 39. "The average defense counsel cost in the direct appeal segment on death penalty cases" was about double that when no death penalty was obtained, whether sought or not. *Id.* at 41. For a death penalty, state postconviction cost for Cnty. of Washoe Dist. Att'y was estimated to be quintuple the amount when the penalty was not death. *Id.* at 47.

*New Jersey.* New Jersey Death Penalty Study Commission found the costs of the death penalty to be "greater than the costs of life in prison without parole, but it is not possible to measure these costs with any degree of precision."[341] The commission obtained "detailed cost estimates" from Office of the Public Defender and Department of Corrections but nothing from prosecutors or the judiciary.[342] If the death penalty were eliminated (in 2006), Office of Public Defender expected to save $1,460,000 *per* year.[343] Department of Corrections was spending $32,481 more *per* year for an inmate in the Capital Sentence Unit than it would have if the inmate was in the general population.[344] Administrative Office of the Courts expected savings for trial court costs and the proportionality reviews if the death penalty would be eliminated.[345] Office of Attorney General did not expect "measurable cost savings" if the death penalty were eliminated because of other prosecutions.[346] The commission noted that unmeasured cost savings would still be savings.[347]

*North Carolina.* Had the death penalty been abolished in this state approximately a decade ago, "the state would have spent almost $11 million less each year on criminal justice activities" in fiscal years 2005 and 2006.[348] Implementing special due-process protections accorded to capital defendants "is costly to the state and federal government, since in practice both sides of the adversarial process are publicly financed."[349] Abolition of the death penalty would save "cash and in-kind costs."[350] Defense attorneys' and expert fees were calculated to be $48,600 higher for a capital trial compared to a noncapital trial that could have been tried capitally.[351] "Remarkably, noncapital cases that went to trial had lower defense expenditures . . . than capital cases that were disposed of by pleas."[352] The capital cases that resulted in a guilty plea also had higher defense attorneys' and expert fees than the noncapital cases that resulted in a guilty plea.[353] Excluding "extra payments for the jury pool during *voir dire*, or the reimbursement for parking and meals", extra juror payments were estimated to be $224,640 for the almost 12 days *per* trial that capital trials averaged longer than noncapital trials.[354]

---

[341] N.J. Death Penalty Study Comm'n, Rep. 1, 31 (2007), *available at* http://www.njleg.state.nj.us/committees/dpsc_final.pdf.

[342] *Id.* at 31.

[343] *Id.* Capital murder trials cost more pretrial (preparation, investigation, motions, jury selection), for staffing (add'l & pool att'ys), penalty phase (mitigation investigation) & for appeals (transcripts, proportionality rev. & post-conviction relief). *Id.* at 31-32.

[344] *Id.* at 32. This difference in cost would amount to approximately $1,136,835 extra/inmate over a lifetime. *Id.*

[345] *Id.* "[E]ach proportionality review costs an average of $93,018 in additional salary costs for court staff." *Id.*

[346] *Id.* at 33.

[347] *Id.* Additional spending in capital cases "for pretrial investigation and preparation; . . . experts for penalty phase testimony; enhanced transcript fees and travel expenses, and additional post-conviction litigation" are borne by both prosecution and defense. *Id.*

[348] Philip J. Cook, *Potential Savings from Abolition of the Death Penalty in N.C.*, 11 Am. L. & Econ. Rev. 498 (2009). This is an estimate of "*net* savings". *Id.* at 504-05.

[349] *Id.* at 502. From 1977-2008, almost 72% of condemnees had been removed from N.C.'s death row because of successful appeals. *Id.* at 503.

[350] *Id.* at 516.

[351] *Id.* at 517. These attorneys were appointed "and financed by the Office of Indigent Defense Services". *Id.* at 511.

[352] *Id.* The defense expenditures were attorneys' and expert fees. Id. The difference was $24,600. *Id.*

[353] *Id.* The difference was $34,900. *Id.*

[354] *Id.* at 520.

North Carolina Supreme Court justices spent 10-15% of their time on capital cases.[355] Office of the Appellate Defender estimated that 10% of staff attorneys' time is spent on capital cases "after the end of the trial phase".[356]

At the time of this analysis, condemnees were held in close custody and those serving unparolable life sentences were held in close custody or "medium security, which is less costly."[357] As is true now, close custody is more costly than medium custody.[358]

Tallying the expenditures for extra defense costs for capital cases in the trial phase, extra payments to jurors, capital post-conviction costs, resentencing hearings and prison system spending, "abolition of the death penalty would have reduced state expenditures on murder cases by about $10.8 million per year" for fiscal years 2005 and 2006.[359] Uncalculated in a monetary amount, in-kind costs include "nine assistant prosecutors each year, as well as 345 days of trial court time and something like 10% of the resources of the Supreme Court and the Office of the Appellate Defender" would also have been freed up.[360] "The true cost consequences of abolition would depend on such factors as how district attorneys responded to the loss of leverage in plea bargaining, how they chose to utilize the resources freed up if no more cases were prosecuted capitally, and how potential killers would respond to the new regime . . . ."[361]

Based upon the 1,034 murder cases disposed of in fiscal years 2005 and 2006,[362] any loss of leverage in plea bargains would not seem to present much of a cost burden. Almost 61% of all the murder cases resulted in a guilty plea, with almost 72% of those pleas coming in noncapital cases obtaining pleas for murder in the first or second degree or for a lesser crime.[363] More than half of these pleas in noncapital cases were for murder of the second degree.[364] Similarly, almost 65% of the capital cases resulted in a guilty plea (*versus* 59% pleading in noncapital cases) to murder in the first or second degree or a lesser crime.[365] Also similarly, more than half of these pleas in capital cases were for murder of the second degree.[366] "The bottom line is that the death penalty is a financial burden on the state and a resource-absorbing burden on trial courts."[367]

---

[355] *Id.* at 525 n.27.

[356] *Id.* at 525.

[357] *Id.* at 524. For the fiscal yr. ending June 30, 2011, close custody cost $5,939 more/inmate annually than medium security. N.C. Dep't of Pub. Safety, http://www.doc.state.nc.us/DOP/cost/index.htm. From 1910-61, N.C. executed 362 condemnees; from 1984-2006, it executed an additional 43 condemnees. *Id.* at https://www.ncdps.gov/adult-corrections/prisons/death-penalty/list-of-persons-executed (last visited Apr. 24, 2018).

[358] N.C. has 143 condemnees on death row, which is eight less than 2004, the year used in the study. *Id.* at https://www.ncdps.gov/Index2.cfm?a=000003,002240,002327,002328 (last visited Apr. 24, 2018); Cook, *supra* note 348, at 523-24.

[359] Cook, *supra* note 348, at 525-26.

[360] *Id.* at 525.

[361] *Id.* at 526-27.

[362] *Id.* at 511.

[363] *Id.* at 513.

[364] *Id.*

[365] *Id.*

[366] *Id.*

[367] *Id.* at 528. "[T]here is no basis for predicting whether abolition of the death penalty would increase or reduce the murder rate, and good reason to believe that the effect in either direction would be small." *Id.*

***Oklahoma.*** "[C]onsistent with all previous research on death penalty costs, . . . seeking and imposing the death penalty is more expensive than not seeking it" in Oklahoma.[368] "The main objective . . . is to measure the difference in enumerated costs between first degree murder cases where the prosecutor seeks the death penalty and similar first degree murder cases in which the death penalty is not sought."[369] This study relied on "all cases in which a formal bill of particulars . . . was filed" from 2004 through 2010 and compared them to a random "sample of first degree murder cases in which the death penalty was not sought" during the same period and categorized costs for jail, defense, prosecution and appeals.[370]

"[T]he estimated average per-case difference in total costs when the death penalty is sought is approximately $110,000" with "post-conviction incarceration costs . . . about twice as much . . . on death row than off of death row."[371] A defendant spent "over one and a half times as many days in jail" between arrest and sentencing when the death penalty was sought compared to "first degree murder cases in which the death penalty was not sought".[372] Pretrial through trial defense costs were "nearly ten times more" when a formal bill of particulars was filed, compared to when it was not, and prosecution costs were triple when compared in the same context.[373] "[S]tate capital appeals . . . costs incurred by" defense "ran at an average of . . . over five times more than the non-capital appeals did."[374] Activities in each docket category "were almost three times more depending on whether there was a" formal bill of particulars filed.[375] "[A]ll case-level studies, including the present study, have shown that pursuing the death penalty costs more on average than when it is not pursued in similar cases."[376]

The authors of this study reviewed 15 past economic studies from 2001 to 2016 among 14 jurisdictions to conservatively average a $700,000 "difference in case-level costs for seeking the death penalty" or not.[377] "[O]n average, seeking the death penalty incurs significantly more time, effort, and costs, than when the death penalty is not sought in the first degree murder cases included in this study."[378]

***Oregon.*** In a comparison of death sentences to life sentences, costs associated with the former ranged "from about $800,000 to over $1,000,000 more per case" on average.[379] Since

---

[368] Okla. Death Penalty Rev. Comm'n, *supra* note 24, at 224. "It is a simple fact that seeking the death penalty is more expensive. *There is not one credible study . . . that presents evidence to the contrary.*" *Id.* at 227.

[369] *Id.* at 223.

[370] *Id.* at 224.

[371] *Id.* at 225. "[H]istorically, about half of those sentenced to death have their sentences reduced to life without parole, or . . . are acquitted." *Id.* at 226, 242, 249. The estimate is "extremely conservative" and "lacks many costs incurred by the system, especially by the courts and appeals costs linked to the prosecution." *Id.* at 228.

[372] *Id.* at 225.

[373] *Id.* at 225, 245, 253, 260.

[374] *Id.* at 225, 246. "This situation, in which the defender resources are stretched, results in spending less time on their cases than they think they should. It also results in a distorted perspective on the real costs of death penalty cases, because the amount of time the state defenders are able to spend on their case is less than it should be." *Id.* at 249.

[375] *Id.* at 225.

[376] *Id.* at 227.

[377] *Id.* at 233. The average is given in 2017 dollars. *Id.*

[378] *Id.* at 260.

[379] Aliza B. Kaplan *et al.*, Or.'s Death Penalty: A Cost Analysis iii, https://law.lclark.edu/live/files/22888-oregons-death-penalty-a-cost-analysis-2016 (2016). "The main reason cited in many . . . of the more empirically rigorous studies, relate to increased case complexity, increased time to complete all phases of the trial process including

1984, Oregon condemned 62 individuals and executed two who dropped their appeals.[380] Appeals are continuing for almost 55% of these condemnees, but approximately 35% of the condemnees have been resentenced to life imprisonment or less.[381]

The average number of hearings and court filings by defense and prosecution was more than double for aggravated murder death penalty cases compared to the aggravated murder non-death penalty cases.[382]

***Tennessee.*** Comptroller of the Treasury compared "the costs of first-degree murder cases in Tennessee" and concluded that death penalty "cases cost more than life without parole and life with the possibility of parole cases."[383] The principal reasons for this are: duration of trials, extra trial phase for sentencing in a capital trial, capital case attorneys employed to assist trial judges, privately appointed counsel, two attorneys for each capital defendant, additional peremptory challenges of jurors and more sequestration of juries.[384]

Because "incarceration costs for . . . death row inmates are the same as other maximum-security inmates", executing an inmate would save the state on correctional costs.[385] Department of Correction spent $11,668 on its most recent execution, which was by lethal injection.[386]

"Death penalty cases cost more because:

- they are more complex;
- more agencies and people are involved in the adjudication;
- both the prosecution and defense spend more time in preparation; and
- the appellate process has more steps."[387]

---

appeals, and increased effort in the form of human capital, all of which are constitutional requirements." *Id.* at 20. The data set for this study included aggravated murder cases from 2000-2013, murder cases during the same period and aggravated murder cases resultant in a death sentence from 1984-2000. *Id.* at 22.

[380] *Id.* at vi. "The last involuntary execution . . . occurred in 1962 . . . ." *Id.* at 9.

[381] *Id.* at vi. Four condemnees died naturally rather than by execution, but another two were subsequently released from prison altogether. *Id.*

[382] *Id.* at vii.

[383] Office of Research, Tenn. Comptroller of the Treasury, Tenn.'s Death Penalty: Costs & Consequences i (2004), *available at* http://www.comptroller.tn.gov/Repository/RE/deathpenalty.pdf.

[384] *Id.* at ii. Juries were present for 79% of capital cases and 74% of life without parole cases revealed in the survey. *Id.* at 20. Juries were sequestered in 70% of the sample's capital trials and 57% "of the life without parole trials". *Id.* at 21.

[385] *Id.* at iii. Since 1960, Tennessee has executed six inmates but has 67 condemnees on death row now. Tenn. Dep't of Correction, https://www.tn.gov/correction/statistics-and-information/executions/tennessee-executions.html; https://www.tn.gov/correction/statistics-and-information/death-row-facts.html (last visited Apr. 25, 2018).

[386] Office of Research, *supra* note 383, at iii. This expenditure was for "additional security, medical supplies" and personnel and chemicals plus some exterior lighting and portable toilets. *Id.* It excludes costs for the department's central office staff, Tenn. Highway Patrol, Tenn. Bureau of Investigation, Tenn. Emergency Mgmt., pub. information officers "from various state agencies", and the metropolitan police dep't. *Id.* at 38.

[387] *Id.* at 11.

Costs of a capital cases averaged $15,297 more than costs of a life without parole case, by calculating the costs of public defenders, prosecution, judges and other costs.[388] Compensation for appointed lead counsel in capital trials exceed that of lead counsel in non-capital trials.[389] In the 10-year sample of cases, judicially appointed private attorneys represented 47% of the capital defendants and 71% of the life without parole defendants.[390] Appointed counsel for direct appeals cost more for capital cases than the counsel appointed for life-without-parole cases because of the complexity of the issues, more preparation time and an additional attorney's appointment.[391] This difference per case amounted to $18,849.[392]

"Tennessee Bureau of Investigation provides more investigative services in capital cases than in other non-capital first-degree murder cases."[393]

**Washington.** "The purpose of this study was to estimate the costs associated with pursuit of the death penalty, as compared to cases where the death penalty was not sought, for aggravated first-degree murder cases in" the state.[394] The difference between the average costs for a case seeking the death penalty *versus* a case not seeking the death penalty totaled $1,152,808.[395] The costs that were more expensive pursuing the death penalty were for jail, trial level defense and prosecution costs, judicial, sheriff and miscellaneous costs, as well as personal restraint petitions and appeals.[396] "Combining all cost categories, the average total costs to the justice system related to pursuit of the death penalty are about . . . 1.5 times more expensive than" cases not seeking the death penalty.[397]

---

[388] *Id.* at 16. Other costs "includes witness fees, jury per diem, lodging, and food expenses." *Id.*

[389] *Id.* at 19. Appointed counsel, other than public defenders, are allowed up to $40/hour for trial preparation & up to $50/hour in ct. for non-capital cases. Tenn. Sup. Ct. R. 13, § 2(c)(1). The hourly rate for appointed counsel, other than pub. defenders, in capital cases is $75/hour out of ct. & $100/hour in ct.. *Id.* at § 3(k). Co-counsel and post-conviction counsel get an hourly rate of $60/out of ct. & $80/in ct. while "[c]o-counsel or associate attorneys in non-capital cases" are uncompensated. *Id.* at §§ 2(b), 3(k). Private attorneys are appointed if a public defender is unqualified or has a conflict of interest. Office of Research, *supra* note 383, at 19. Since capital cases have "much longer" records than non-capital first-degree murder cases, times are longer for these cases whether on direct or post-conviction appeal. *Id.* at 27.

[390] *Id.* at 18, 19.

[391] *Id.* at 22, 23.

[392] *Id.* at 23. The prosecution costs for the direct appeals "do not vary significantly among case types". *Id.* The reversal rate on direct appeal was 29%. *Id.*

[393] *Id.* at 38. This bureau "has the only full-service laboratory in" the state. *Id.*

[394] Peter A. Collins *et al.*, An Analysis of the Econ. Costs of Seeking the Death Penalty in Wash. State 3 (2015), *available at* http://www.law.seattleu.edu/Documents/korematsu/deathpenalty/The_Economic_Costs_of_Seeking_the_Death_Penalty_in_WA_FINAL.pdf.

[395] *Id.* at 4, 5.

[396] *Id.* at 4.

[397] *Id.* at 5. Since 1904, State of Washington executed 78 condemnees, five of whom were executed since 1963. Wash. Dep't of Corrections, http://www.doc.wa.gov/docs/publications/reports/100-SR002.pdf (2016). Three of the five condemnees executed dropped their resistance to execution by discontinuing judicial challenges. Collins *et al.*, *supra* note 394, at 71.

Three prior studies in Washington "concluded that the cost of death penalty cases is greater than those in which the prosecutor seeks a sentence of life without parole."[398]  For this analysis, costs were tied to cases "within general stages of the case process".[399]  Jail costs associated with cases seeking the death penalty were significantly higher than the same costs associated with cases not seeking the death penalty.[400]  "The median defense cost" associated with cases seeking the death penalty was "substantially higher . . . as compared to" cases not seeking the death penalty.[401]  "The median prosecution cost is about double for" cases seeking the death penalty "as compared to" cases in which the death penalty was not sought.[402]  The median cost for court, police/sheriff and miscellaneous costs for cases seeking the death penalty were almost 3½ times higher than cases in which the death penalty was not sought.[403]  The median "[c]osts associated with post-conviction personal restraint petitions and appeals" were almost eight times higher for cases seeking the death penalty "as compared to" cases in which the death penalty was not sought.[404]  Curiously, "[p]ost-sentence lifetime incarceration costs were lower on average for" cases seeking the death penalty "as compared to" cases in which the death penalty was not sought;[405] however, "there are many reasons to support a conclusion that post-sentencing incarceration costs for 'death row' inmates are greater than for non-death-sentenced inmates."[406]  Death penalty cases had "total combined costs" higher than the total associated with "cases where the death penalty was not sought."[407]

Either the conviction or the death sentence or both have been reversed in 75% "of cases involving death sentences" since 1981.[408]  This compares "to the 7.5% reversal rate of the 201 non-death penalty appeals" during the same period.[409]  The court and parties spend "substantially more time and resources . . . addressing pre-trial motions and challenges not found in non-capital cases."[410]  Jury selection for death penalty cases is "significantly prolonged and more expensive . . . than the jury selection process in a non-capital aggravated murder case."[411]  Capital trials have two phases.[412]  The state Supreme Court is "statutorily required to review four issues" on direct appeal.[413]

---

[398] *Id.* at 12.

[399] *Id.* at 28.  "These *primarily identified* stages included police response/investigation, pre-trial, trial, direct appeal, state post-conviction . . ., federal habeas, federal appeals, and clemency."  *Id.* at 35.

[400] *Id.* at 42.

[401] *Id.* at 43.

[402] *Id.* at 44.

[403] *Id.* at 45.

[404] *Id.* at 46.

[405] *Id.* at 47.  "[T]hese figures are based on a very conservative cost estimation method."  *Id.* at 51.

[406] *Id.* at 38.

[407] *Id.* at 48.

[408] *Id.* at 57, 70.  "Reversals of capital cases are predominately due to inadequate mitigation investigation."  *Id.* at 61.

[409] *Id.* at 70.

[410] *Id.* at 63.

[411] *Id.*  More summons are "mailed to prospective jurors for a capital case far" exceeding "those mailed for a non-capital aggravated murder trial."  *Id.*  The capital cases have lengthier questionnaires for jurors than the non-capital cases.  *Id.* at 64.

[412] *Id.* at 65.  The phases are for pronouncing guilt or innocence and then the penalty if the verdict is guilty.  *Id.*

[413] *Id.* at 66.  Sufficiency of the evid., prejudice in sentencing, proportionality of the sentence and whether the condemnee is intellectually disabled.  *Id.*

*Cost Analyses for Pennsylvania*

       The studies from other jurisdictions used a combination of actual cost data, actual resource data and estimates of both to compare cumulative and partial costs of the death penalty with sentences of life imprisonment without parole among the different stages of the process that results in either sentence. As is true elsewhere, no reliable data exists to comprehensively and accurately assess this difference in Pennsylvania. The process includes different levels and branches of government which are independently budgeted. It involves fixed and variable costs, and the budgeting would neither typically nor uniformly reflect different projections and allowances to pursue these two penalties among others.

       To try to assess whether there are significantly different costs between these two penalties, surveys were electronically distributed to judges, prosecutors, public defenders and victim advocates in nine Pennsylvania judicial districts of varying population sizes and caseloads that had past or current capital murder cases.[414] Cumulatively, the response rate was approximately 75%; however, not everyone answered all questions. Since the survey responses were returned anonymously, it is unknown how and whether particular recipients responded. The surveys focused on the resources required at various stages of the process.

       *Pretrial phase.* The responses from victim services staff estimated that they spent a higher number of hours, on average, working with clients on a typical, capital murder case than a typical, non-capital murder case. The responses were widely distributed but they skewed higher for the typical, capital murder case. Also skewing higher in average number of hours or days estimated for the pretrial phase of a typical, capital murder case compared to a typical, noncapital murder case were lead and additional public defense attorney, lead and additional prosecutor, and public defender and prosecution paralegal. Similarly, responding judges estimated that the average number of hours or days for the pretrial phase of a typical, capital murder case compared to a typical, non-capital murder phase skewed higher for judges, tipstaff, secretary and minute and law clerks.

       Judges, prosecutors and public defenders all replied that jury selection required more days for typical, capital murder cases compared to typical, non-capital murder cases. Prosecutors and public defenders estimated five or fewer days for a typical, non-capital murder case and almost 70% of them estimated six or more days for a typical, capital murder case.

       *Trial phase.* The responses from victim services staff estimated that they spent a higher number of hours, on average, working with clients on a typical, capital murder case than a typical, non-capital murder case. The responses skewed higher for the typical, capital murder case. Also skewing higher in average number of hours or days estimated for the trial phase of a typical, capital murder case compared to a typical, non-capital murder case were lead and additional public defense attorney, lead and additional prosecutor, and public defender and prosecution paralegal. Similarly, responding judges estimated that the average number of hours or days for the trial phase of a typical, capital murder case compared to a typical, non-capital murder phase skewed higher for judges, secretary minute clerks and deputy sheriffs (if assigned to a court room).

---

[414] Counties of Adams, Allegheny, Berks, Dauphin, Lancaster, Montgomery, York & Westmoreland & City of Phila. Judges were surveyed in 2015. Prosecutors, public defenders and victim advocates were surveyed in 2013.

Judges, prosecutors and public defenders all replied that there are more jury days for typical, capital murder cases compared to typical, non-capital murder cases. Almost two-thirds of the respondents estimated five or fewer days for a typical, non-capital murder case and more than 94% of them estimated six or more days for a typical, capital murder case.

*Penalty phase.* Since there is no separate penalty phase trial following a conviction in a non-capital, murder case, the time spent by lead and additional public defense and prosecution attorneys and their paralegals in this phase could be a significant difference in cost for a capital conviction. Even if a defendant were to be acquitted, the public defense would have already incurred the costs of preparation for a potential penalty phase that would have occurred had the capital defendant been convicted. Similarly, any hours spent by victim service staff working with clients during this phase is additional time that is not consumed in non-capital, murder trials. The same could be said for the time spent on this phase by judges, their secretaries, law and minute clerks, tipstaff and deputy sheriffs (if assigned to a court room).

More than 88% of the responding judges, prosecutors and public defenders replied that this phase typically takes one to five jury days. The remaining respondents estimated six or more jury days to be typical for this phase.

*Postconviction phase.* The differences in responses during this phase were not as pronounced as in the preceding phases, which is unexpected because capital convictions are seemingly more active during this phase than non-capital, murder convictions. For public defense, the estimated average number of hours or days skewed higher only for the additional attorneys in typical, capital murder cases than typical, non-capital murder cases. For the prosecution, the estimated average number of hours or days skewed higher for the lead and additional prosecutors in typical, capital murder cases compared to typical, non-capital murder cases. Conversely, the estimated number of hours or days skewed slightly higher for the prosecution paralegal in a typical non-capital, murder case than in a typical, capital murder case.

The estimated average number of hours or days for a typical, capital murder case compared to a typical, non-capital murder case skewed higher for judges, their secretaries, tipstaff, minute and law clerks and deputy sheriffs (if assigned to a court room). The estimates from victim service staff was about the same during this phase regardless of whether it was for a capital or non-capital murder case.

*Extra costs*. For prosecution and public defense, extra costs could be spent on consultants, experts, supplemental technology, etc..[415] In estimating extra costs for a typical, capital murder case, public defenders placed them as equal to or greater than $50,001 compared to mostly equal to or less than $10,000 for typical, non-capital murder cases. Prosecutors estimated extra costs as equal to or less than $50,000, for a typical murder case regardless of whether it is capital or non-capital, but the capital ones skew equal to or greater than $10,001 and the noncapital ones skew equal to or less than $10,000.[416]

---

[415] They could be investigatory, jury, translational, mental health, scientific, medical, pathological, technological, mitigatory, *etc.*.

[416] This survey was done in 2013. Adjusted for inflation from that time to Mar. 2018, $50,000 would amount to $53,351.55; $10,000 would amount to $10,670.31; $2,000 would amount to $2,141.46. Bureau of Labor Statistics,

Extra costs for victim advocates would be for assisting victims and exclude salaries but include, *e.g.*, travel, overtime, *etc.*. Similarly, extra costs estimated by responding victim advocates skewed equal to or greater than $2,001 for typical, capital murder cases and equal to or less than $2,000 for typical, non-capital murder cases.

**Guilty pleas.** Some speculate that the prospect of a death sentence induces some defendants to plead guilty to avoid that sentence and that this offsets the extra costs and other resources that would be otherwise incurred in seeking a death sentences. Responses varied among judges, prosecutors and public defenders, but estimates were generally higher for the percentage of typical, non-capital murder cases resultant in guilty pleas, compared with typical, capital murder cases.[417] Although answers varied widely, responding prosecutors and public defenders indicated that a higher percentage of guilty pleas skewed in the pretrial phase, regardless of whether the murder case was a typical capital or non-capital one.

**Department of Corrections.** Because of segregation and close supervision, in fiscal year 2016-17, it cost $15,010 more per year to house an inmate in the capital case unit than in general population.[418] This differential represents a 47% premium and is for the average, departmental general population inmate compared to State Correctional Institution Greene's capital case inmate cost.[419] As for the average length of stay, those sentenced to death have spent an average of 17.49 years awaiting their execution.[420] Using constant dollars, the differential amount spent per inmate in the capital case unit would total $262,524.90 *per* inmate during a period of 17.49 years. Multiplying that amount by the 150 inmates in the capital case unit would equal an aggregate difference of $39,378,735 during the same period of 17.49 years. Clearly, this is a significant difference in correctional costs.

This differential is attributed to security, food delivery, medical costs, utilities, the execution complex and transport.[421] The differential, however, has varied in recent years. The differential in fiscal year 2013-14 between a capital case inmate the average for a general population inmate was $20,103 per year.[422] The same differential for fiscal year 2011-12 was $11,796 *per* year.[423] For fiscal year 2010-11, the same differential was $10,956 per year.[424] These figures demonstrate that there is a significant difference in cost for the department's capital case unit compared to its general population.

---

U.S. Dep't of Labor, CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm (last visited May 16, 2018).

[417] One responding lead prosecutor commented that there are rarely guilty pleas to noncapital, 1st degree murder charges.

[418] Woodside, *supra* note 140 (Apr. 18, 2018). *Id.*, Capital Case Inmate Costs (Nov. 30, 2014) (on file with J. State Gov't Comm'n).

[419] *Id.*

[420] Pa. Dep't of Corrections, *supra* note 14; calculations conducted by Pa. J. State Gov't Comm'n staff.

[421] Woodside, *supra* note 418.

[422] Barnes, *supra* note 159 (July 6, 2015).

[423] Bucklen, *supra* note 11 (Feb. 11, 2013).

[424] *Id.* (Jan. 22, 2013).

Prospectively, whether this differential persists and by how much is unclear because the department is changing the housing on its capital case unit. This change is too new to determine its cost differential. Retrospectively, this has been a significant cost differential.

***Supplemental sample of costs from 1st Judicial District.***[425] For fiscal years 2012 through 2015, the subject provided the amounts of fees spent on attorneys, expert witnesses, investigators and jurors for capital and non-capital homicide cases.[426] For fiscal year 2012, these fees averaged $522.40 higher for the non-capital homicide cases than the capital homicide cases. For fiscal year 2013, these fees averaged $3,060.07 higher for the capital homicide cases than the non-capital homicide cases. For fiscal year 2014, these fees averaged $29,888.68 higher for the capital homicide cases than the non-capital homicide cases. For fiscal year 2015, these fees averaged $54,569.09 higher for the capital homicide cases than the non-capital homicide cases.

From fiscal year 2012 to fiscal year 2015, the fees spent on attorneys, expert witnesses, investigators and jurors for capital homicide cases increased from an average of $2,787 *per* case to $59,169 *per* case. During the same fiscal years, the fees spent on attorneys, expert witnesses, investigators and jurors for non-capital homicide cases ranged from an average of $3,309 *per* case to $5,177 *per* case.

In fiscal year 2012, this judicial district was paying appointed counsel $2,000 to prepare for the disposition of a homicide at trial plus *per diems* of $200 or $400 depending upon whether the trial day was three hours or less or over three hours.[427] Mitigation homicide appointment/co-counsel was paid $1,700 to prepare for the disposition of homicide at trial plus *per diems* of $100 or $200 depending upon whether the day during the mitigation trial was three hours or less or over three hours. Beginning in fiscal year 2013, this judicial district's Administrative Governing Board decided[428] to compensate the appointed counsel in capital cases a flat fee of $10,000 for lead counsel and $7,500 for penalty phase counsel regardless of the circumstances of the case's disposition and resolution plus a *per diem* payment of $400 for each day of representation at trial beyond one week.[429]

---

[425] These costs exclude the 20% of all Philadelphia homicide cases that are handled by the Defender Association. The Defender Association homicide unit staffs each case with two attorneys, a mitigation specialist and an investigator. The Defender Association homicide unit has been in existence since 1993 and has never had a client receive the death penalty.

[426] Office of Budget & Fiscal, 1st Judicial Dist. of Pa., Homicide Counsel Fees for Capital & Non–Capital Cases (on file with Pa. J. State Gov't Comm'n).

[427] C.P., 1st Judicial Dist. of Pa., Trial Div. Payment Voucher (on file with Pa. J. State Gov't Comm'n).

[428] That decision directly resulted from a legal challenge to the low fees in death penalty cases in Philadelphia that was filed in 2011. Joseph A. Slobodzian, *Petition Critical of Low Pay for Ct.-appointed Death Penalty Lawyers*, Phila. Inquirer (Apr. 7, 2011),
http://www.philly.com/philly/news/local/20110407_Petition_critical_of_low_pay_for_court-appointed_death-penalty_lawyers_1.html.

[429] Admin. Governing Bd., 1st Judicial Dist. of Pa., Admin. Order No. 01 (2013) (on file with Pa. J. State Gov't Comm'n).

***Conclusion.***  The survey sample is small, but responses seem to confirm observations from elsewhere that pretrial, trial and post-conviction phases consume more resources for typical, capital murder cases than typical, non-capital murder cases.  Plus, the capital murder cases require an additional penalty phase upon conviction.  The extra costs are also higher for typical, capital murder cases in comparison with typical, non-capital murder cases.  There is no data to conclude guilty pleas for capital murder cases offset the extra costs incurred and other resources consumed for capital cases that do not result in a guilty plea.  Responses indicate that guilty pleas are also obtained in non-capital murder cases.  Also, while efficiency in criminal justice would be preferred to inefficiency, purely financial motivation to pursue one punishment or another would be improper and can create unjust results.

Over the past 56 years, the Commonwealth has executed three condemnees.  In 2016, The Reading Eagle published its "revised analysis of the death penalty's cost" and calculated that each execution effectively cost $272,000,000 under the system since 1978.[430]  One of the advisors on this study is quoted in that newspaper article acknowledging "more costs" but disputing the extent.[431]  This analysis reported that "a death sentence adds about $2 million to a murder case", attributing "[n]early 45%" of this amount to "prison costs".[432]  Almost all of the 150 condemnees incarcerated now have judicial challenges to their death sentences pending.  The reason that only three condemnees have been executed is that more than 97% of them have been successful in getting their death sentences judicially vacated and others died in prison while awaiting execution.  The difference in costs between capital and non-capital trials becomes more significant when one considers the cumulative totals of capital trials over a period of decades and the unlikelihood of an execution.[433]  If the differential in costs for capital case unit inmates compared to general population inmates persists, Department of Corrections can expect to spend an extra $39,378,735 or more to incarcerate condemnees, who are unlikely to be executed.[434]  Most of the staffing costs for the judiciary, prosecution and defense are salaried, fixed costs; however, when staff is spending more time on particular cases, they are spending less time on other cases.  The difference in costs could be characterized as both actual, extra cost and opportunity cost.

## Bias and Unfairness

The question that serves as the basis of the study of bias and unfairness in the administration of the death penalty in our Commonwealth is:

---

[430] Nicole C. Brambila & Liam Migdail-Smith, *Executing Just.:  A Look at the Cost of Pa.'s Death Penalty*, Reading Eagle, June 19, 2016, http://www.readingeagle.com/news/article/executing-justice-a-look-at-the-cost-of-pennsylvanias-death-penalty.
[431] *Id.*  The newspaper's analysis "extrapolated from the method" in the Maryland study, which is summarized *infra* pp. 43-45.  Brambila & Migdail-Smith, *supra* note 430.
[432] *Id.*
[433] The three condemnees who were executed all dropped their resistance to imposition of the sentence so that some refer to these as volunteers.  *Supra* pp. 1-2, notes 7, 8.
[434] If the capital case unit were no longer used or if its prospective differential is lower, the Commw. could either save that money by not spending it or it could be redirected elsewhere within or without that dep't to fund unmet needs.

Whether the selection of defendants for capital trials in Pennsylvania is arbitrary, unfair or discriminatory in any way and whether there is unfair, arbitrary or discriminatory variability at any stage in the process including in the sentencing phase;[435]

The subcommittee on policy could not answer this question because the only recent study was limited to examining cases resultant in convictions for murder of the first degree. The Pennsylvania State University researchers spent approximately eight years developing, researching, accessing and collecting data, and drafting a report in which it found disparities within those cases based on the race of the victim, the type of the defendant's legal representation, and the variation among counties in the selection of those defendants for the death penalty.[436] However, there was no examination of possible bias associated with any other stage of the process, including arrest, charging and plea bargaining.[437] Justice Center for Research is seeking funding to follow that study with one to examine earlier stages of the process, but it will take years to accomplish. The advisory committee is grateful to have had the opportunity to collaborate with both the university's Justice Center for Research and Pennsylvania Interbranch Commission for Gender, Racial and Ethnic Fairness and will detail the center's research below.[438]

Regarding unfairness in general and racial or ethnic bias in particular, the subcommittee on policy supports including a recommendation that Pennsylvania consider replicating what other states have done in this area, such as Washington State, that statutorily provides for proportionality review (although the statute is limited to cases that resulted in convictions for aggravated first-degree murder), which would routinely and systematically collect and review relevant data:

In all cases in which a person is convicted of aggravated first degree murder, the trial court shall, within thirty days after the entry of the judgment and sentence, submit a report to the clerk of the supreme court of Washington, to the defendant or his or her attorney, and to the prosecuting attorney which provides the information specified under subsections (1) through (8) of this section. The report shall be in the form of a standard questionnaire prepared and supplied by the supreme court of Washington and shall include the following:

(1) Information about the defendant, including the following:
(a) Name, date of birth, gender, marital status, and race and/or ethnic origin;
(b) Number and ages of children;
(c) Whether his or her parents are living, and date of death where applicable;
(d) Number of children born to his or her parents;
(e) The defendant's educational background, intelligence level, and intelligence quotient;

---

[435] Pa. S. Res. No. 6 (Sess. of 2011); appdx. A, *infra* p. 219.
[436] Kramer *et al.*, *supra* note 26.
[437] *Id.* at ii, 114.
[438] *Infra* pp. 75-90.

(f) Whether a psychiatric evaluation was performed, and if so, whether it indicated that the defendant was:

(i) Able to distinguish right from wrong;

(ii) Able to perceive the nature and quality of his or her act; and

(iii) Able to cooperate intelligently with his or her defense;

(g) Any character or behavior disorders found or other pertinent psychiatric or psychological information;

(h) The work record of the defendant;

(i) A list of the defendant's prior convictions including the offense, date, and sentence imposed; and

(j) The length of time the defendant has resided in Washington and the county in which he or she was convicted.

(2) Information about the trial, including:

(a) The defendant's plea;

(b) Whether defendant was represented by counsel;

(c) Whether there was evidence introduced or instructions given as to defenses to aggravated first degree murder, including excusable homicide, justifiable homicide, insanity, duress, entrapment, alibi, intoxication, or other specific defense;

(d) Any other offenses charged against the defendant and tried at the same trial and whether they resulted in conviction;

(e) What aggravating circumstances were alleged against the defendant and which of these circumstances was found to have been applicable; and

(f) Names and charges filed against other defendant(s) if tried jointly and disposition of the charges.

(3) Information concerning the special sentencing proceeding, including:

(a) The date the defendant was convicted and date the special sentencing proceeding commenced;

(b) Whether the jury for the special sentencing proceeding was the same jury that returned the guilty verdict, providing an explanation if it was not;

(c) Whether there was evidence of mitigating circumstances;

(d) Whether there was, in the court's opinion, credible evidence of the mitigating circumstances as provided in RCW 10.95.070;

(e) The jury's answer to the question posed in RCW 10.95.060(4);

(f) The sentence imposed.

(4) Information about the victim, including:

(a) Whether he or she was related to the defendant by blood or marriage;

(b) The victim's occupation and whether he or she was an employer or employee of the defendant;

(c) Whether the victim was acquainted with the defendant, and if so, how well;

(d) The length of time the victim resided in Washington and the county;

(e) Whether the victim was the same race and/or ethnic origin as the defendant;

(f) Whether the victim was the same sex as the defendant;

(g) Whether the victim was held hostage during the crime and if so, how long;

(h) The nature and extent of any physical harm or torture inflicted upon the victim prior to death;

(i) The victim's age; and

(j) The type of weapon used in the crime, if any.

(5) Information about the representation of the defendant, including:

(a) Date counsel secured;

(b) Whether counsel was retained or appointed, including the reason for appointment;

(c) The length of time counsel has practiced law and nature of his or her practice; and

(d) Whether the same counsel served at both the trial and special sentencing proceeding, and if not, why not.

(6) General considerations, including:

(a) Whether the race and/or ethnic origin of the defendant, victim, or any witness was an apparent factor at trial;

(b) What percentage of the county population is the same race and/or ethnic origin of the defendant;

(c) Whether members of the defendant's or victim's race and/or ethnic origin were represented on the jury;

(d) Whether there was evidence that such members were systematically excluded from the jury;

(e) Whether the sexual orientation of the defendant, victim, or any witness was a factor in the trial;

(f) Whether any specific instruction was given to the jury to exclude race, ethnic origin, or sexual orientation as an issue;

(g) Whether there was extensive publicity concerning the case in the community;

(h) Whether the jury was instructed to disregard such publicity;

(i) Whether the jury was instructed to avoid any influence of passion, prejudice, or any other arbitrary factor when considering its verdict or its findings in the special sentencing proceeding;

(j) The nature of the evidence resulting in such instruction; and

(k) General comments of the trial judge concerning the appropriateness of the sentence considering the crime, defendant, and other relevant factors.

(7) Information about the chronology of the case, including the date that:

(a) The defendant was arrested;

(b) Trial began;

(c) The verdict was returned;

(d) Post-trial motions were ruled on;
(e) Special sentencing proceeding began;
(f) Sentence was imposed;
(g) Trial judge's report was completed; and
(h) Trial judge's report was filed.

(8) The trial judge shall sign and date the questionnaire when it is completed.[439]

Another way to address potential bias and unfairness in the administration of the death penalty would be to statutorily allow individual death sentences to be challenged on the basis of systemic bias *via* statistically-based evidence.[440]  Kentucky has this provision, but it requires the claim to be raised pre-trial and places the burden of proof on the defendant at a clear and convincing standard.[441]  Almost a decade after Kentucky enacted its provision, North Carolina enacted a more expansive version, applying it retroactively.  However, after being used successfully by defendants, the state amended the law three years after enactment before repealing it the next year.[442]

This section will focus on the central claim of unfairness lodged against the death penalty, namely, that it is administered in a manner that is biased against individuals on the basis of their race, ethnicity or socio-economic status.  It will also discuss the role of the death penalty in plea negotiations and the assertion that the prosecution has too much discretion over the selection of defendants who are charged with the death penalty.  The problems regarding ineffective representation of capital defendants will be addressed in the section relating to counsel.

The justice system demands that fairness apply to the taking of human life.  Not only must the factual guilt of the accused be established beyond a reasonable doubt, but it must be reliably determined "that death is the appropriate punishment in a specific case."[443]

### *Racial bias*

Perhaps the most prevalent charge against the death penalty is that it is unfair to African-Americans.  "Two types of discrimination plague our capital punishment system:  (1) a capital sentence influenced by the defendant's race (race-of-defendant discrimination) and (2) a death sentence impacted by the victim's race (race-of-victim discrimination)."[444]

An important, if not the major reason for the U.S. Supreme Court's intervention in death penalty cases was racial bias.  "Between 1930, when the Department of Justice started keeping

---

[439] Wash. Rev. Code § 10.95.120.
[440] An example of this type of legis. is Pa. H.R. No. 1996 (Sess. of 2009).
[441] Ky. Rev. Stat. § 532.300.  Because there are no notes of decisions published on this, it might not have been used during the 20 years in which it has been enacted.
[442] Former N.C. Gen. Stat. §§ 15A-2010, 15A-2011.
[443] *Woodson v. N.C.*, 428 U.S. 280, 305 (1976)
[444] Maxine Goodman, *A Death Penalty Wake-Up Call:  Reducing the Risk of Racial Discrimination in Capital Punishment*, 12 Berkeley J. Crim. L. 29, 32 (2007).  "Race-of-victim discrimination typically occurs when racial bias by a judge, jury, or prosecutor renders the capital defendant more likely to be sentenced to death because the defendant is a minority and the victim is white."  *Id.*

statistics, and 1972 when *Furman* was decided, 455 people were put to death for the crime of rape; 405 were African American . . . ."[445]  Unfair application of the death penalty was one of the driving forces in the Court's ruling the death penalty unconstitutional.  "[W]hatever the justices may have intended, everyone understood *Furman* as having been about race."[446]  Racial and class bias was the deciding factor for Justice William Douglas:

> In a Nation committed to equal protection of the laws there is no permissible 'caste' system of law enforcement.  Yet we know that the discretion of judges and juries in imposing the death penalty[447] enables the penalty to be selectively applied, feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect or unpopular minority, and saving those who by social position may be in a more protected position.  In ancient Hindu law a Brahman was exempt from capital punishment, and under that law '(g)enerally, in the law books, punishment increased in severity as social status diminished.'  We have, I fear, taken in practice the same position, partially as a result of making the death penalty discretionary and partially as a result of the ability of the rich to purchase the services of the most respected and most resourceful legal talent in the Nation.  . . . .

> A law that stated that anyone making more than $50,000 would be exempt from the death penalty would plainly fail, as would a law that in terms said that blacks, those who never went beyond the fifth grade in school, those who made less than $3,000 a year, or those who were unpopular or unstable should be the only people executed. A law which in the overall view reaches that result in practice has no more sanctity than a law which in terms provides the same.

> Thus, these discretionary statutes are unconstitutional in their operation.  They are pregnant with discrimination and discrimination is an ingredient not compatible with the idea of equal protection of the laws that is implicit in the ban on 'cruel and unusual' punishments.[448]

Since *Furman*, the Supreme Court's most extensive discussion of racial bias as it relates to the death penalty appears in *McCleskey v. Kemp*.[449]  The case involved a challenge to a death sentence based on a statistical study by Professor Baldus and others "that purports to show a disparity in the imposition of the death sentence in Georgia based on the race of the murder victim and, to a lesser extent, the race of the defendant."[450]  Because of this, the petitioner argued that the death sentence was invalid under the Eighth and Fourteenth Amendments.[451]  The Court rejected these claims by noting that even if the study was accepted as proof of the biases claimed, it failed to show both that the defendant himself had suffered from such bias in his own case and that such

---

[445] Stephen B. Bright, *The Role of Race, Poverty, Intellectual Disability, & Mental Illness in the Decline of the Death Penalty*, 49 U. Rich. L. Rev. 671, 678 (2015).

[446] Evan J. Mandery, *A Wild Justice:  The Death & Resurrection of Capital Punishment in Am.* 276 (2013).

[447] The statutes under review in *Furman* did not prescribe aggravating or mitigating circumstances.

[448] *Furman,* 408 U.S. 238, 255-57 (Douglas, J., concurring).

[449] 481 U.S. 279 (1987).

[450] *Id.* at 286.

[451] *Id.*

discrimination was purposeful; proof of both of these points was necessary to sustain an equal protection claim.[452]  The Court added that petitioner's position undermined the credibility of the entire criminal justice system, and that overturning his verdict on such broad grounds would require a legislative judgment by the Court.[453]  The states, however, could eliminate or modify their own death penalty laws on the basis of statistical evidence.

> McCleskey's arguments are best presented to the legislative bodies.  It is not the responsibility—or indeed even the right—of this Court to determine the appropriate punishment for particular crimes.  It is the legislatures, the elected representatives of the people, that are 'constituted to respond to the will and consequently the moral values of the people.'  Legislatures also are better qualified to weigh and 'evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts.'  Capital punishment is now the law in more than two-thirds of our States.  It is the ultimate duty of courts to determine on a case-by-case basis whether these laws are applied consistently with the Constitution.  Despite McCleskey's wide-ranging arguments that basically challenge the validity of capital punishment in our multiracial society, the only question before us is whether in his case, the law of Georgia was properly applied.[454]

The weight of this case may be diminished because after his retirement Justice Powell, who wrote the opinion for the majority of five justices, publicly repudiated the result in this case and came out against the death penalty, telling his biographer that he did not understand statistics.[455]  Justice Scalia, who joined the majority opinion, "was persuaded in the *McCleskey* case itself that Baldus had proved racial discrimination in the administration of the death penalty in Georgia" but that this did not require reversal (since it was only shown by statistical evidence).[456]

> In this case, only a minority of the Justices directly acknowledged the truth of the Baldus study, but none of them has ever tried to deny it. . . .  No single accomplishment, however impressive, does justice to a person as remarkable as David Baldus.  What Baldus achieved in *McCleskey*, however, is worth dwelling on, and not only because of its historic importance.  David Baldus forced reluctant judges to face up to facts they would have preferred to ignore.[457]

---

[452] *Id*. at 292, 298-99, 308.
[453] *Id*. at 293, 297, 311-19.
[454] *Id*. at 319 (citations omitted).
[455] Samuel R. Gross, *David Baldus & the Legacy of McCleskey v. Kemp,* 97 Iowa L. Rev. 1905, 1918-19, 1921 (2012).
[456] *Id.* at 1921.
[457] *Id.* at 1923.

***Pennsylvania Supreme Court Committee***
  ***on Racial and Gender Bias in the Justice System Report***

  *Final Report of the Pennsylvania Supreme Court Committee on Racial and Gender Bias in the Justice System*[458] (*Final Report*) stands as the most comprehensive study of bias in the administration of the justice in Pennsylvania. While acknowledging a lack of comprehensive data,[459] it concluded that the evidence suggested pervasive discrimination, particularly against African Americans:

> Based on existing data and studies, the [Supreme Court] Committee concluded that there are strong indications that Pennsylvania's capital justice system does not operate in an evenhanded manner. . . . After controlling for the seriousness of the offense and other non-racial factors, researchers [in Philadelphia] found that African American defendants were sentenced to death at a significantly higher rate than similarly situated non-African Americans; researchers further concluded that one-third of African-Americans on death row in Philadelphia . . . would have received life sentences if they were not African American. Race was also shown to be a major factor in capital jury selection, with the prosecution striking African Americans from the jury twice as often as non-African Americans, and with the defense doing just the opposite. Also, both sides routinely, but to a lesser degree, discriminate on the basis of gender, with the prosecution favoring men and the defense favoring women.[460]

  In reaching these conclusions, the Supreme Court Committee relied on a study of conducted by David C. Baldus and George Woodworth and a second study led by William Bowers, assisted in Pennsylvania by Wanda Foglia.[461]

> In testimony before the Committee, Baldus summarized four principal findings from his research in Philadelphia. First, in Philadelphia capital trials, African American defendants are at higher risk of receiving the death sentence than are similarly situated non-African American defendants. Second, in the selection of capital juries, Philadelphia prosecutors and defense counsel systematically exclude venire members on the basis of their race and gender, in spite of federal law prohibiting such discrimination. Third, this jury selection strategy skews jury sentencing decisions towards increasing the frequency of death sentences. It also enhances the level of race discrimination against African American defendants. Fourth, this skewing effect is principally the product of high prosecutorial strike rates against African American venire members that are not offset or counteracted by high defense counsel strike rates against non-African American members.[462]

---

[458] Pa. Sup. Ct. Comm. on Racial & Gender in the Just. Sys., *supra* note 16, hereinafter *Final Rep.*.

[459] *Id.* at 201, 203-04.

[460] *Id* at 201.

[461] *Id*. at 205.

[462] *Id*. The statistical support for these conclusions is described *id.*, at 206-07.

Using "standard statistical methodology . . . commonly used in employment discrimination cases," Baldus "likened the impact of being African American" in Philadelphia to having an additional aggravating circumstance on one's chances for a death sentence, that one third of Philadelphia residents on death row would not have been put there had they been white, and that juries were significantly more likely to find mitigating circumstances for white defendants than for African-American defendants.[463]

In the aforementioned *Final Report*, "the racial composition of juries" was associated with "the frequency with which death sentences were imposed" along with "the level of race-of-defendant discrimination in . . . sentencing."[464]  The report cited a complementary study by Dr. Bowers who researched "juror decision-making" as part of the Capital Jury Project.[465]  This study was based on detailed interviews with jurors who had served on death penalty cases.[466]  It found that jurors with six or more white men were more likely to hand down a death sentence; jurors prejudged the case more often if the defendant was not white; lingering doubt was more likely to factor into the sentencing if the defendant was white; and African American jurors were more likely than white jurors to find that the defendant was remorseful.[467]

The *Final Report* further cited an important national study by James S. Liebman.[468]  He looked at appellate reversals of death cases and found that 41% of death cases reviewed by state appellate courts were reversed on grounds that called into question "the reliability of the guilt finding or death sentence imposed at trial."[469]  Adding in reversals upon post-conviction review and federal *habeas corpus* review, the rate of reversal for such error was 68%.[470]  By far the predominant cause of these reversals on state post-conviction was "egregiously incompetent defense lawyering".[471]

In response to these findings, the Supreme Court Committee on Racial and Gender Bias in the Justice System recommended that the General Assembly adopt a Racial Justice Act that would in effect countermand *McCleskey v. Kemp* in Pennsylvania.  Such legislation would allow "a court to consider legitimate statistical data as evidence of racial bias in the imposition of the death sentence within a particular jurisdiction.  Upon a demonstration of such bias by the defense, the burden would [shift] to the prosecution to demonstrate that race was not a significant factor in seeking the death sentence in the specific case."[472]  Similar legislation was enacted was enacted in Kentucky in 1998 and in North Carolina in 2009 before its repeal there in 2013.  The Kentucky

---

[463] *Id.* at 206.  For a complete discussion of the findings of the Baldus study, *see* David C. Baldus  *et al.*, *Racial Discrimination & the Death Penalty in the Post-Furman Era:  An Empirical & Legal Overview, with Recent Findings from Phila.*," 83 Cornell L. Rev. 1638 (1998).
[464] *Final Rep.*, *supra* note 16, at 207.
[465] *Id.*
[466] *Id.*
[467] *Id.* at 208-09.
[468] *Id.* at 209.
[469] *Id.*
[470] *Id.*
[471] *Id.*
[472] *Id.* at 214.

statute was restricted in application and has had little impact, while the North Carolina statute had been successfully used to show racial bias, which might have contributed to its repeal.[473]

Other recommendations from the Supreme Court Committee on Racial and Gender Bias relating to sentencing disparities in the criminal justice system, indigent defense in Pennsylvania and racial and ethnic disparities in the imposition of the death penalty appear in Appendix M.[474] These recommendations were made to the judiciary, the legislature and the executive.

### Geographical bias[475]

Nationally, the use of the death penalty is highly concentrated in a "small handful of counties".[476] As of 2010, Pennsylvania had the highest intrastate disparity between population and death penalty cases of any state nationally, because Philadelphia County accounted for 106 of the 223 inmates on death row, while only eleven death row inmates were from Allegheny County, although its population was about as large as Philadelphia's.[477] (More recently, Philadelphia has cut down drastically on its use of the death penalty; *e.g.*, in 2010 there were over 100 pending capital cases in Philadelphia with that number steadily declining to 13 that were resolved pre-trial in 2017 with the number of capital trials there during the years 2011-2017 ranging from nine in 2011 to one in 2017.[478] Philadelphia has generated only three death sentences since 2010 with the last one in 2016.[479] Of those three, one was remanded on appeal and the defendant is no longer on death row.[480] Currently, of the 150 inmates on Pennsylvania's death row, 50 are from Philadelphia and nine are from County of Allegheny.[481]) Texas showed a similar pattern, with four of its 254 counties accounting for more than half of its death row, while 130 counties had not used the death penalty in 30 years.[482] Similar disparities existed between City and County of Baltimore in Maryland, New York City and upstate New York, Hamilton County (Cincinnati) and Franklin

---

[473] Rees Alexander, *A Model State Racial Just. Act:  Fighting Racial Bias without Killing the Death Penalty*, 24 Geo. Mason U. C.R. L.J. 113 (2014); Anne Blythe, *N.C. Sup. Ct. Vacates Racial Just. Act Decisions*, News & Observer, Dec. 18, 2015, http://www.newsobserver.com/news/politics-government/state-politics/article50478335.html.

[474] *Infra* pp. 265-70.

[475] Appdx. K., *infra* p. 261, shows the ratio of execution to life sentences by county based upon the 2015 inmate population.

[476] "Of the 3,143 county or county equivalents in the United States, only 16—or one half of one percent—imposed five or more death sentences between 2010 and 2015."  Fair Punishment Project, *New Rep. Finds Counties that Use Death Penalty the Most are Plagued by Prosecutorial Misconduct, Bad Lawyers, & Racial Bias*, http://fairpunishment.org/new-report-finds-counties-that-use-death-penalty-the-most-are-plagued-by-prosecutorial-misconduct-bad-lawyers-and-racial-bias/ (posted 2016).  By June 2018, the total no. of persons sentenced to execution in Pa. was 150.  Pa. Dep't of Corrections, *supra* note 14.

[477] Adam M. Gershowitz, *Statewide Capital Punishment:  The Case for Eliminating Counties' Role in the Death Penalty*, 63 Vand. L. Rev. 307, 314-15 (2010).

[478] E-mail from Atl. Ctr. for Capital Representation (May 16, 2018).

[479] *Id.* (June 5, 2018).

[480] *Id.* (May 16, 2018).

[481] Pa. Dep't of Corrections, *supra* note 14.  Phila.'s estimated population for 2016 is 1,567,872 or approximately 12¼% of the Commw.'s estimated 12,784,227 population; Cnty. of Allegheny's estimated population for 2016 is 1,225,365 of approximately 9½% of the Commw.'s estimated population; compared to their percentages on Pa.'s death row of approximately 33% for Phila. & 6% for Cnty. of Allegheny.  Further discussion of this appears *infra* p. 86.

[482] Gershowitz, *supra* note 477, at 315-16.

County (Columbus) in Ohio, and Davidson County (Nashville) and Shelby County (Memphis) in Tennessee.[483]

"[N]et of legally relevant factors," death penalty outcomes in our Commonwealth are shaped more by differences among counties, the victim's race and type of defense counsel, rather than by the defendant's race or ethnicity.[484]  The most prominent difference found in this study is the differences in death penalty outcome among the counties.[485]  Appendix F has the disposition of capital cases in the Commonwealth for the years 2011-2017.[486]  In more than half of the cases, the notice of aggravating circumstances was withdrawn; a death sentence was imposed in less than 6% of the cases.[487]

### Sexual bias

Nationally, the patterns of sentencing suggest that the death penalty regime has been considerably harsher toward men as compared to women:

> Studies of gender and the death penalty have, for the most part, focused on the gender of the defendant and have consistently found that women are sentenced to death and executed at significantly lower rates than men.  A study of the death penalty applied to women from 1973-2005 found that at every stage of the process female defendants appear to be diverted away from the death penalty at a greater rate than men.  While 10% of people arrested for murder are women, only 2% of death sentences imposed at trial are imposed upon women, and women account for only 1.1% of persons actually executed.  Men arrested for murder are six times more likely to be sentenced to death than are women arrested for murder.[488]

As of 2011, Texas had executed 464 men and only three women since the reinstatement of the death penalty, although women commit nearly ten percent of death eligible crimes.[489]  The probability of a death sentence is also higher where the murder victim is a woman than where the victim is a man.[490]

### Bias in the death penalty process

Murder differs from other crimes in important respects.  It is often more difficult to solve a capital murder than other crimes because the victim is unable to assist in the investigation, and

---

[483] *Id*. at 315-18.
[484] *Infra* pp. 76, 86-87.
[485] *Id*.  "A given defendant's chance of having the death penalty sought, retracted, or imposed depends a great deal on where that defendant is prosecuted and tried."  *Infra* p. 90.
[486] *Infra* p. 237.
[487] *Id*.
[488] Steven F. & Naomi R. Shatz, *Chivalry Is Not Dead:  Murder, Gender, & the Death Penalty*, 27 Berkeley J. Gender L. & Just. 64, 84 (2012).
[489] Jessica Salvucci, *Femininity & the Elec. Chair:  An Equal Prot. Challenge to Tex.'s Death Penalty Statute*, 31 B.C. Third World L.J. 405, 407 (2011).
[490] Shatz & Shatz, *supra* note 488, at 85-86, 107-10.

it is more likely that the perpetrator is unknown to the victim.[491] At the same time, there is more pressure from the public to clear murder cases than other crimes. Murder cases receive more attention and effort from law enforcement, which has mixed consequences for the accuracy of the investigation.[492] With more resources and staff devoted to the case, there may be more likelihood of an accurate investigation, but public pressure to solve the case may induce law enforcement to cut corners or even falsify evidence.[493] The prosecution may go to trial on a murder case with an uncertain probability of conviction, while it would drop an equally iffy armed robbery case.[494] The conviction rate for murder is about 70 percent, roughly the same as for other felonies.[495]

We turn from the types of bias that may be exercised to the process by which it may emerge. The prosecution has the most important role in selecting the murders that will be deemed death eligible.

The two most important decisions made in every death penalty case—whether to seek the death penalty, and whether to offer a plea bargain—are completely in the hands of prosecutors. They are unregulated and subject to no judicial review. There are many prosecutors who never seek the death penalty, others who seldom seek it, and others who seek it in every case in which it could be imposed. Most death penalty cases are resolved with plea bargains (depending on whether the prosecution is willing to offer it and whether the defendant is willing to accept it). Some prosecutors will offer a plea bargain allowing the defendant to plead guilty in exchange for a sentence less than death, usually life imprisonment without the possibility of parole. Mentally impaired and intellectually limited defendants may not understand their options. They may reject the plea offer and end up on death row.

A small number of aggressive prosecutors in the counties that account for so many death sentences refuse to offer plea bargains and try to obtain the death penalty at every opportunity. They are usually successful in jurisdictions in which defendants facing the death penalty receive very poor legal representation. Between 1976 and the end of 2014, 122 people sentenced to death in Harris County, which includes Houston, have been executed, more people than executed by any state except Texas itself. Harris County judges have made the job easier by appointing incompetent lawyers to represent people facing the death penalty. And, after they are sentenced to death, the condemned are assigned equally bad lawyers to represent them in post-conviction proceedings.[496]

The use of the death penalty charge to induce a murder defendant to plead guilty or waive a jury trial has come under attack in the legal academy and by other observers, largely on the ground that the threat of the death penalty is likely to coerce innocent defendants to plead guilty.

[491] Samuel R. Gross, *Lost Lives: Miscarriages of Just. in Capital Cases*, 61 Law & Contemp. Probs. 125, 127 (1998).
[492] *Id.* at 127-28.
[493] *Id.* at 135.
[494] *Id.* at 143-44.
[495] Bureau of Just. Statistics, U.S. Dep't of Just., http://www.bjs.gov/index.cfm?ty=qa&iid=403 (last visited Apr. 26, 2018).
[496] Bright, *supra* note 445, at 680-81.

At the same time, some may defend the practice on the ground that such pleas save substantial time and money for law enforcement.

The U.S. Supreme Court has conditionally authorized plea bargains, both in general and in death penalty cases. Plea bargains are analyzed as a waiver issue and pass constitutional muster if the waiver is voluntary and informed.

> That a guilty plea is a grave and solemn act to be accepted only with care and discernment has long been recognized. Central to the plea and the foundation for entering judgment against the defendant is the defendant's admission in open court that he committed the acts charged in the indictment. He thus stands as a witness against himself and he is shielded by the Fifth Amendment from being compelled to do so—hence the minimum requirement that his plea be the voluntary expression of his own choice. But the plea is more than an admission of past conduct; it is the defendant's consent that judgment of conviction may be entered without a trial—a waiver of his right to trial before a jury or a judge. Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences. . . . .
> The issue we deal with is inherent in the criminal law and its administration because guilty pleas are not constitutionally forbidden, because the criminal law characteristically extends to judge or jury a range of choice in setting the sentence in individual cases, and because both the State and the defendant often find it advantageous to preclude the possibility of the maximum penalty authorized by law. For a defendant who sees slight possibility of acquittal, the advantages of pleading guilty and limiting the probable penalty are obvious—his exposure is reduced, the correctional processes can begin immediately, and the practical burdens of a trial are eliminated. For the State there are also advantages—the more promptly imposed punishment after an admission of guilt may more effectively attain the objectives of punishment; and with the avoidance of trial, scarce judicial and prosecutorial resources are conserved for those cases in which there is a substantial issue of the defendant's guilt or in which there is substantial doubt that the State can sustain its burden of proof. It is this mutuality of advantage that perhaps explains the fact that . . . criminal convictions in this country rest on pleas of guilty, a great many of them no doubt motivated at least in part by the hope or assurance of a lesser penalty than might be imposed if there were a guilty verdict after a trial to judge or jury. [497]

As *Brady* was a death penalty case, the Court added that "a plea of guilty is not invalid merely because entered to avoid the possibility of a death penalty."[498] A guilty plea is unlikely to be invalid if the defendant was represented by competent counsel.[499]

---

[497] *Brady v. U.S.*, 397 U.S. 742, 748, 751-52 (1970).
[498] *Id.* at 755.
[499] *Mabry v. Johnson*, 467 U.S. 504, 508-11 (1984).

Pennsylvania law is similar to federal law in that a guilty plea to first-degree murder is constitutionally valid if it is "knowingly, voluntarily and intelligently entered."[500] The plea is not rendered invalid by the fact that it helps clear the way for a death sentence.[501]

It has been argued that plea bargaining with the death penalty results in a sentencing procedure that creates a substantial risk that the death penalty will be inflicted in an arbitrary and capricious manner, in violation of *Gregg v. Georgia.*[502] To critics, an accused who receives the death penalty does so as much for insisting on exercising his or her right to a jury trial as for the underlying crime. Plea bargaining a death case seems contrary to the policy underlying the penalty.

> Plea bargaining undermines the most common rationale for the death penalty. Proponents of this penalty maintain that some crimes are so horrible that they simply require it. They insist that no lesser punishment can adequately express the community's condemnation. But the actions of American prosecutors convey an entirely different message: No lesser punishment can adequately express the community's condemnation *unless* the accused pleads guilty. For defendants who agree to save the government the costs of a trial, lesser punishments are just fine. These defendants' horrible crimes do not demand death after all. In the immortal words of Gilda Radner, "Never mind." Plea bargaining devalues the death penalty. It changes what the death penalty is about.[503]

As many as one half to three-quarters of death defendants turned down a plea bargain that would have taken the death penalty out of the case.[504]

United States Attorneys are forbidden to seek or threaten to seek the death penalty "solely for the purpose of obtaining a more desirable negotiating position."[505] It would appear almost impossible to enforce this standard because an admixture of any motive, other than a purely tactical one, would render it inapplicable. A statistical study of the use of plea bargaining in murder cases concluded that "the threat of the death penalty increases the plea-bargaining rate from approximately 40% to 60%" and thus "deters roughly two out of ten death-noticed defendants from pursuing a trial."[506] Very little systematic research has been done on this issue, however.[507] Observers note that plea bargaining is pervasively central to the administration of the criminal justice system. "Ninety-seven percent of federal convictions and ninety-four percent of state convictions are the result of guilty pleas."[508]

Whether specifically intended or not, it is argued that prosecutors obtain considerable strategic advantages by charging death. They can empanel a death-qualified jury, and there is

---

[500] *Commw. v. Fears*, 836 A.2d 52, 62 (Pa. 2003).

[501] *Id.* at 62-63; 42 Pa.C.S. § 9711(b).

[502] *Gregg v. Ga.*, 428 U.S. 153, 188 (1976).

[503] Albert W. Alschuler, *Plea Bargaining & the Death Penalty*, 58 DePaul L. Rev. 671, 674 (2009).

[504] *Id.* at 671-72.

[505] U.S. Attorneys' Manual 9-10.120 (1997).

[506] Sherod Thaxton, *Leveraging Death*, 103 J. Crim. L. & Criminology 475, 483 (2013).

[507] *Id.* at 480-81.

[508] *Mo. v. Frye*, 566 U.S. 134, 143 (2012).

evidence that such juries are more likely to convict.[509]  A death case increases the burden on the defense by expanding the attorney's responsibilities and the demands on the defender's "skill set and financial resources" needed to take on the case, markedly diminishing the pool of attorneys willing to undertake the case, thereby increasing the odds for an outcome favorable to the prosecution.[510]  The chances of an acquittal diminish because defense attorneys deemphasize evidence of innocence in the guilt phase, where they are unlikely to win, in order to preserve credibility in the penalty phase; this is because juries are likely to view an aggressive defense on the facts as inconsistent with remorse.  Such a defense strategy reduces the possibility of an acquittal.[511]  If this analysis is correct, more innocent defendants are induced to plead, and those who do go to trial are more likely to be wrongfully convicted.

There are factors that can make a plea bargain more difficult to arrive at in death cases, as compared to other serious crimes.  There may be pressure from the victim's family and community to pursue the maximum penalty.  The statutory minimum for a death case in Pennsylvania is life imprisonment, so the defendant has less to lose if he goes to trial and the prosecutor has less to offer, especially because the likelihood of execution has been low during the last 56 years.  This consideration inhibits plea bargaining even where life with parole exists as an alternative.[512]  Capital defendants are likely to be more risk seeking and more skeptical of their attorney's good faith than other defendants, perhaps because of mental health issues or racial or cultural differences if the defendant is a member of a minority group and the attorney is white.[513]

Defendants who have committed crimes that have traditionally been considered deathworthy are unlikely to plead to a life sentence, except to avoid a death sentence.  If these cases go to trial, the cost is four times as high for the prosecution and ten times for the defense.  Cost considerations are particularly important in districts affected by a high crime rate (including murder), combined with severely overburdened resources.  Prosecutors consult the victim's family for their views on whether to accept a plea bargain to life imprisonment.  Some prosecutors might decide to obtain the acquiescence of the bereaved family before it proceeds with a plea bargain, and the family might prefer that the murderer suffer more severe punishment than life imprisonment affords.

### *Prosecutorial discretion*

Legal academic John Horowitz wrote that "American prosecutors have long possessed unrestrained power in the criminal process."[514]  He does not claim that an American prosecutor can simply order that the accused be shot, and he acknowledges that the Supreme Court has upheld the death penalty against arguments that it is vitiated by excessive prosecutorial discretion.[515]  Rather, he is troubled by the "essentially unrestricted" discretion of the prosecutor to charge the

---

[509] Thaxton, *supra* note 506, at 484.

[510] *Id.* at 485.

[511] *Id.* at 486.

[512] *Id.* at 489.  At least if parole is distant and parole bds. are perceived to be reluctant to release.  *Id.*

[513] *Id.* at 490.

[514] John A. Horowitz, *Prosecutorial Discretion & the Death Penalty:  Creating a Comm. to Decide Whether to Seek the Death Penalty*, 65 Fordham L. Rev. 2571, 2573 (1997).

[515] *Id.* at 2577.

defendant, which allows him or her to apply the law selectively.[516]  Horowitz emphasizes the breadth of the prosecutor's power to choose who is faced with a death charge:

> [D]espite the constitutionality of vesting the discretionary decision of whether to seek the death penalty in one person, this power subjects each defendant to the whims of local prosecutors.  Prosecutors may introduce other factors into the decision--most likely their religious, ethical, or philosophical beliefs.  Hence, whether defendants will face the death penalty may be more a result of prosecutors' belief systems than the characteristics of the criminal's conduct.  This subjective system for such a serious decision is fundamentally unfair to the defendant.[517]

"The United States Supreme Court has long been concerned about the role of discretion in the imposition of the death penalty, in particular the possibility that unchecked discretion can lead to arbitrary and inconsistent application of the penalty."[518]  Of course, after *Coker v. Georgia,* a death penalty charge cannot be filed unless the prosecutor has probable cause to charge the defendant with aggravated first-degree murder.

Prosecutors elected by individual counties may apply the law disproportionately in different parts of the state, especially because constituencies differ in their acceptance of the death penalty.[519]  The Governor of New York State has the power to supersede the District Attorney (usually for conflicts of interest, not for policy differences).[520]  This fails to solve the problem, because it merely removes the discretion from the prosecutor to the Governor.  California and Colorado also have supersedure provisions.[521]  To Horowitz, "[t]he risk of supersedure and subsequent litigation highlights the dangers of placing the decision to seek the death penalty in a single individual."[522]  Pennsylvania empowers the Attorney General to supersede the district attorney upon the latter's request or with judicial approval.[523]

Horowitz argues that the best way to control prosecutorial discretion to seek the death penalty is to create a review committee by statute in each county with power to decide whether a defendant, whom the prosecutor has charged with first-degree murder, should face the possibility of the death penalty.  United States Attorneys seeking authority to pursue a death penalty confer with a departmental Capital Review Committee, which considers material submitted by both the prosecution and defense to recommend the grant or denial of this authority.[524]  Supreme Court Committee on Racial and Gender Bias in the Justice System recommended that "[t]he Attorney General empanel a statewide committee of county district attorneys to review each decision by a

[516] *Id.*
[517] *Id.* at 2579.
[518] Amanda S. Hitchcock, *Using the Adversarial Process to Limit Arbitrariness in Capital Charging Decisions*, 85 N.C. L. Rev. 931, 932 (2007).
[519] Horowitz, *supra* note 514, at 2579-80.
[520] *Id.* at 2580-87.
[521] *Id.* at 2588-92.
[522] *Id.* at 2592.
[523] Act of Oct. 15, 1980 (P.L.950, No.164), § 205(a); 71 P.S. 732.205(a).  A dist. att'y may request to be superseded if he lacks the resources to adequately investigate or prosecute a crim. matter or envisions a potential conflict of interest; the Att'y Gen. may ask a judge to supersede if a dist. att'y abused his discretion by failing to prosecute.  *Id.*
[524] U.S. Attorneys' Manual 9-10.130 (1997).

district attorney to seek the death penalty with the goal of ensuring geographic consistency in" its application.[525]   Horowitz's plan envisions a seven-member committee, with three members appointed by the Governor, three by the district attorney, and the remaining member by the six selected as aforesaid.

> The entire process will benefit by removing the discretionary decision to seek the death penalty from an elected official and placing it with a committee. The committee will ensure a less political decision, increase the legitimacy of the system, increase the public accountability of the decision maker, and avoid discriminatory application of the death penalty.[526]

In particular, committees would reduce discriminatory use of the death penalty by making it more likely that the decision maker will reflect the diversity of the community.   Part of the information that U.S. Department of Justice's Capital Review Committee would consider includes "any allegation of individual or systemic racial bias in the Federal administration of the death penalty."[527]   Both the Governor and the district attorney will be impelled by political pressures to ensure balanced representation.[528]

Another commentator decries excessive prosecutorial discretion:

> Prosecutorial discretion plays a pervasive role in the administration of criminal justice.  Limited resources and crowded criminal dockets force prosecutors to make quasi-judicial decisions, regarding whom to charge, the severity of the charge, whether to offer a plea bargain, and whether to proceed to trial.   Prosecutors exercise this extensive power beyond public view, without objective criteria, and in an "essentially unreviewable" manner.  In fact, the presumption that prosecutors act in good faith gives prosecutors virtual impunity in their pretrial decisions.[529]

Because almost all district attorneys are white, unconscious bias can enter the system because of "the racial disparity between the prosecutors and the death row population" and "the similarity between the prosecutor and the victim populations."[530]   A statistical analysis of the respective populations shows that the racial and ethnic composition of the prosecutorial staff is much closer to the victim population.  This may help explain the racial disparities found by the Baldus study.[531]

---

[525] *Final Rep.*, *supra* note 16, at 221.
[526] Horowitz, *supra* note 514, 2605-06.
[527] U.S. Attorneys' Manual 9-10.130 (1997).
[528] Horowitz, *supra* note 514, at 2609.
[529] Jeffrey J. Pokorak, *Probing the Capital Prosecutor's Perspective:  Race of the Discretionary Actors*, 83 Cornell L. Rev. 1811, 1813 (1998).
[530] *Id.* at 1818-19.
[531] *Id.* at 1817-19.

### Unfairness of the legal system

The death penalty reflects aspects of the American legal system that can be characterized as arbitrary or unfair (if not necessarily discriminatory). These may include the dependence of the outcome on the ability and experience of the lawyers for the respective sides, disparities in resources, differences among judges, regional disparities,[532] and the application of rules of evidence. The general issues that may make the American justice system unfair are beyond the scope of this study, but those that have a particularly strong impact in the death penalty context are addressed here or elsewhere as indicated below.

### Legal representation

About 80% of capital defendants are indigent and are represented by the public defender or other free counsel.[533] Some observers have argued that many of the lawyers who represent death defendants are unqualified to meet the heavy demands of capital cases; consequently, defendants receive poor representation, resulting in reversible errors and, in some cases, the risk of convicting an innocent person.[534]

### Death qualification

Death qualification refers to the exclusion for cause of prospective jurors who indicate at the jury selection (*voir dire*) phase that because of their opposition to the death penalty, they will refuse to vote for a death verdict regardless of the evidence. This practice has been upheld by the U.S. Supreme Court, but some observers claim it predisposes the jury toward a verdict of guilt.[535]

### Justice Center for Research

Pennsylvania Interbranch Commission for Gender, Racial, and Ethnic Fairness initiated and partially funded this study by Justice Center for Research at Penn State University. Both generously collaborated with the advisory committee and task force as it considered the topics under this resolution.[536] This section summarizes its research on bias and unfairness.

"Blacks are highly disproportionately represented among those individuals who receive capital sentences in Pennsylvania, leading one to question whether this is the result of unwanted disparity in the administration of the death penalty."[537] The "primary research goal was to determine the impact . . . a defendant's or a victim's race, ethnicity, or other social characteristics has on a prosecutor's decision to seek the death penalty; to retract it if sought; and the . . . decision

---

[532] Death penalty cases vary significantly geographically.
[533] The percentage would increase to almost 100% after condemnation.
[534] *Infra* pp. 183-86.
[535] This topic is discussed in more detail, *infra* pp. 144-48.
[536] Just. Ctr. researchers were involved in several research topics from the resolution including fairness, public opinion, secondary trauma, and role of mental disorder in capital punishment. Pa. Interbranch Comm'n for Gender, Racial & Ethnic Fairness was involved in all research topics from the resolution. Pa. J. State Gov't Comm'n highly valued this collaboration and is grateful for the assistance of both.
[537] Kramer *et al.*, *supra* note 26.

to impose the death penalty."[538]  The type of the defendant's legal representation was also examined to determine its effect on "death penalty case-processing".[539]  Due to resource and time constraints, the main analysis of disparity was on cases resultant in convictions for first-degree murder.[540]

Statewide data was obtained from Administrative Office of Pennsylvania Courts, Pennsylvania Commission on Sentencing and Department of Corrections.[541]  This data was supplemented and refined by a field data collection of "offenders *convicted* of first-degree murder" in "the 18 counties with 10 or more first-degree murder convictions."[542]  In almost half of the cases in which a Notice of Aggravating Circumstances was filed by an attorney for the Commonwealth, the notice was retracted.[543]  In almost a third of the cases in which a Notice of Aggravating Circumstances was filed and unretracted, the sentence was death.[544]  Juries decided the sentencing in 70% of the death penalty trials.[545]  In City of Philadelphia, Notices of Aggravating Circumstances were retracted "far more often" and defendants in that city were also "less likely to receive the death penalty" than in the other 17 counties in this field study.[546]  "[N]et of legally relevant factors," death penalty outcomes in our Commonwealth are shaped more by differences among counties, the victim's race and type of defense counsel, rather than by the defendant's race or ethnicity.[547]  The most prominent difference found in this study is the differences in death penalty outcome among the counties.[548]

More than half of the inmates under a sentence of death in our Commonwealth are black, while almost 12% of the overall state population is black, which makes blacks "highly overrepresented on Pennsylvania's death row relative to their proportion in the state population."[549]  During the last year of data collection for this study, more than half of those arrested for murder in Pennsylvania were young, black males.[550]  "[T]he key research issue was to determine whether this disproportionality resulted from racial bias in decision-making, or whether legally relevant factors . . . accounted for this disproportionality."[551]  The legally relevant factors

---

[538] *Id.*

[539] *Id.*

[540] *Id.*  Subsequent research might analyze the arrest and charging stages for disparity.  *Id.*

[541] *Id.* at ii-iii.

[542] *Id.* at iii.  One important limitation is case selection bias because the included ones are based on *ex post* outcomes rather than *ex ante* attributes.  In other words, all cases eligible for first-degree murder were not collected because the selection point was conviction for first-degree murder.

[543] *Id.* at iv.  (The percentage is 47%.  *Id.*)  Unless the existence of aggravating circumstances is unknown to the attorney for the Commonwealth at the time of arraignment or the judiciary extends to their time to file this notice, it is required to be filed "at or before the time of arraignment".  Pa. R. Crim. P. 802.

[544] Kramer *et al.*, *supra* note 26, at iv.  (The percentage is 31%.  *Id.*)

[545] *Id.*

[546] *Id.* at v.  Similarly, "[d]efendants with public defenders were much less likely to receive the death penalty in Philadelphia, than their counterparts in the other 17 counties in the field study."  *Id.*

[547] *Id.*

[548] *Id.*  "A given defendant's chance of having the death penalty sought, retracted, or imposed depends a great deal on where that defendant is prosecuted and tried."  *Id.*

[549] *Id.* at 1.  Approximately 51% of Pennsylvania's condemnees are black.  *Infra* p. 191; U.S. Census Bureau, Dep't of Commerce, *Quick Facts Pa.*, https://www.census.gov/quickfacts/fact/table/PA,US/PST045217 (2016).

[550] Kramer *et al.*, *supra* note 26, at 3.  (92% male; 68% black; almost 52% under age 25:  *id.*)

[551] *Id.*

were accounted for and then sought to determine if they "predict the prosecutor's decision to seek death for first-degree murder charges, or . . . subsequently retract" that notification and to predict the sentencing decision if the notification was not retracted: race, ethnicity or other characteristics of the defendant and victim.[552]  Legally relevant factors were accounted for and then it was determined if outcomes differed "across counties" and "according to the type of legal representation a defendant had".[553]

**Response to Furman v. Georgia.**  In a 1972 opinion, U.S. Supreme Court ruled "that the imposition and carrying out of the death penalty in these cases constitute cruel and unusual punishment in violation of" U.S. Constitutional amendments VIII and XIV.[554]  There were five opinions supporting this judgment, including differing as well as similar rationales for the *per curium* opinion, but a key consideration is that no standards governed the selection of the penalty.[555]  This meant that the death penalty could be administered arbitrarily or discriminatorily because of its discretionary imposition.  To remedy the "[t]he basic concern of Furman" centering "on those defendants who were being condemned to death capriciously and arbitrarily", Georgia enacted procedures to "focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant."[556]  The jury's discretion "is always circumscribed by the legislative guidelines" in the form of statutory aggravating factors and mitigating circumstances.[557]

> [C]oncerns . . . that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information.[558]

The responsive "Georgia statutory scheme" provided "for automatic appeal of all death sentences to the State's Supreme Court", which was "required by statute to review each sentence of death and determine whether it was imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate compared to those sentences imposed in similar cases."[559]  Since "the statutory system under which Gregg was sentenced to death" was ruled constitutional,[560] other jurisdictions[561] seeking to enact constitutional death penalties copied

---

[552] *Id.* at 3-4.

[553] *Id.* at 4.

[554] *Furman v. Ga.*, 408 U.S. 238, 239-40 (1972).

[555] *Id.* at 253 (Douglas, J., concurring).  Three justices agreed "that the statutes then before the Court were invalid as applied" and two justices would have held capital punishment unconstitutional *per se*.  *Gregg v. Georgia*, 428 U.S. 153, 169 (1976)).

[556] *Gregg*, 428 U.S. at 206.

[557] *Id.* at 206-07.

[558] *Id.* at 195.

[559] *Id.* at 198.

[560] *Id.* at 207.

[561] Our Commw. was one of these jurisdictions.  42 Pa.C.S. § 9711.

Georgia's statutory system. "It remains unclear whether these procedures approved in Gregg v. Georgia—and used in Pennsylvania—have reduced or eliminated these unwarranted disparities."[562]

***Focal concerns theory.*** "Focal concerns theory holds that decisions regarding the processing of alleged and convicted offenders draw on three key ingredients": an assessment of the defendant's blameworthiness and dangerousness, along with "the practical implications of" criminal justice "processing decisions."[563] This "theory highlights the complexity of decision-making, in that it indicates the importance of the characteristics of the offender, the victim, and the local normative culture within which decision-makers are elected or appointed."[564]

***Prior studies.*** Prior "studies of potential death penalty cases have focused on the effect of . . . race", with one governmental review characterizing "race-of-victim" to be an "influence" on "the likelihood of being charged with capital murder or receiving a death sentence" with "[t]his finding" being "remarkably consistent across data sets, states, data collection methods, and analytic techniques."[565] As for race, "research has generally supported the notion that prosecutors are more likely to seek the death penalty in cases involving a White victim, and particularly when the defendant is Black and the victim was White."[566] In the only study located examining plea bargain acceptances, "black offenders charged with killing a white victim were much less likely to benefit from a plea in a capital case".[567] For two studies about the victim's social class, one "found that prosecutors were more likely to seek the death penalty," which "was more likely to be imposed, on defendants who were accused of killing victims of higher socio-economic status."[568] The other study similarly attributed a higher likelihood of seeking "the death penalty when the victim had higher education."[569] Another "important factor" is the "judicial district" because "prosecutorial decisions about the death penalty vary among courts and jurisdictions."[570] The type of legal representation of defendants has not generally been a research focus of prosecutorial decisions on the death penalty.[571]

"A considerable body of research has found that Black defendants who are convicted of killing White victims are the most likely to receive the death penalty."[572] Despite "concerns with the quality of legal representation in capital cases", the "research to date has generally failed to"

---

[562] Kramer *et al.*, *supra* note 26, at 5.

[563] *Id.*

[564] *Id.* at 7. "Local courts develop distinctive formal and informal case processing and sentencing norms." *Id.* at 6. "Research in social psychology and criminal justice shows that implicit racial bias can indeed operate in contemporary criminal justice decision-making, including arrests, prosecution, and sentencing." *Id.*

[565] *Id.* at 7-8. The governmental study is one by U.S. Gen. Accountability Office in 1990, noting race-of-victim to be this influence "[i]n 82% of the studies". *Id.* at 8.

[566] *Id.* at 8 (citations omitted).

[567] *Id.* at 9. This was a study in Ky., *id.*.

[568] *Id.* at 9-10.

[569] *Id.* at 10. "Studies generally conclude that female defendants are less likely to be prosecuted for the death penalty", with other studies finding "that offenses involving female victims are more likely to result in prosecution for the death penalty." *Id.* n.3.

[570] *Id.* at 10.

[571] *Id.* at 11.

[572] *Id.* Some "research has failed to find a race-of-defendant/race-of-victim effect." *Id.* at 12.

analyze this variable.[573]   A study published in 2012, "found that defendants with Philadelphia public defenders had a reduced conviction rate and significantly lower sentence severity compared with defendants represented by court-appointed attorneys."[574]   Data for this study was analyzed "using standard logistic regression" and re-analyzed "using propensity score weighting/matching" because different methods may affect the accuracy "of the relationship between variables" studied.[575]

"Prior to this study, in Pennsylvania there was only one study of decision-making in the application of the death penalty and another study consisting of interviews with jurors in capital trials."[576]   For cases with victims who were not Black, the jury was less likely to find mitigation; when the victim was from a "low socio-economic status", the prosecution was less likely to pursue the death penalty and when it did, there was a lower likelihood of the imposition of the death penalty.[577]   The study of jurors revealed that they misunderstood the "instructions regarding mitigation" and erroneously assumed that those "given a life sentence" would subsequently be released.[578]

**Murder of the first degree.**   There are three degrees of murder in our Commonwealth.[579] A "sentence of death" is only available if there is "a verdict of murder of the first degree" and one or more aggravating circumstances is proven beyond a reasonable doubt, which outweigh any mitigating circumstances.[580]

(d)  Aggravating circumstances.--Aggravating circumstances shall be limited to the following:
(1)  The victim was a firefighter, peace officer, public servant concerned in official detention, as defined in 18 Pa.C.S. § 5121 (relating to escape), judge of any court in the unified judicial system, the Attorney General of Pennsylvania, a deputy attorney general, district attorney, assistant district attorney, member of the General Assembly, Governor, Lieutenant Governor, Auditor General, State Treasurer, State law enforcement official, local law enforcement official, Federal law enforcement official or person employed to assist or assisting any law enforcement official in the performance of his duties, who was killed in the performance of his duties or as a result of his official position.
(2)  The defendant paid or was paid by another person or had contracted to pay or be paid by another person or  had conspired to pay or be paid by another person for the killing of the victim.
(3)  The victim was being held by the defendant for ransom or reward, or as a shield or hostage.

---

[573] *Id.* at 13.
[574] *Id.*
[575] *Id.* at 14.
[576] *Id.* at 15.
[577] *Id.* at 16.
[578] *Id.* at 17.
[579] 18 Pa.C.S. § 2502.  First is "an intentional killing"; second "is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony"; third is "[a]ll other kinds of murder".  *Id.*
[580] Or there are no mitigating circumstances. 42 Pa.C.S. § 9711.  If a jury does not unanimously agree "as to the sentence", the sentence is "life imprisonment."  *Id.*

(4)  The death of the victim occurred while defendant was engaged in the hijacking of an aircraft.

(5)  The victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses.

(6)  The defendant committed a killing while in the perpetration of a felony.

(7)  In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.

(8)  The offense was committed by means of torture.

(9)  The defendant has a significant history of felony convictions involving the use or threat of violence to the person.

(10)  The defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.

(11)  The defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue.

(12)  The defendant has been convicted of voluntary manslaughter, as defined in 18 Pa.C.S. § 2503 (relating to voluntary manslaughter), or a substantially equivalent crime in any other jurisdiction, committed either before or at the time of the offense at issue.

(13)  The defendant committed the killing or was an accomplice in the killing, as defined in 18 Pa.C.S. § 306(c) (relating to liability for conduct of another; complicity), while in the perpetration of a felony under the provisions of the act of April 14, 1972 (P.L.233, No.64), known as The Controlled Substance, Drug, Device and Cosmetic Act, and punishable under the provisions of 18 Pa.C.S. § 7508 (relating to drug trafficking sentencing and penalties).

(14)  At the time of the killing, the victim was or had been involved, associated or in competition with the defendant in the sale, manufacture, distribution or delivery of any controlled substance or counterfeit controlled substance in violation of The Controlled Substance, Drug, Device and Cosmetic Act or similar law of any other state, the District of Columbia or the United States, and the defendant committed the killing or was an accomplice to the killing as defined in 18 Pa.C.S. § 306(c), and the killing resulted from or was related to that association, involvement or competition to promote the defendant's activities in selling, manufacturing, distributing or delivering controlled substances or counterfeit controlled substances.

(15)  At the time of the killing, the victim was or had been a nongovernmental informant or had otherwise provided any investigative, law enforcement or police agency with information concerning criminal activity and the defendant committed the killing or was an accomplice to the killing as defined in 18 Pa.C.S. § 306(c), and the killing was in retaliation for the victim's activities as a nongovernmental informant or in providing information concerning criminal activity to an investigative, law enforcement or police agency.

(16)  The victim was a child under 12 years of age.

(17)  At the time of the killing, the victim was in her third trimester of pregnancy or the defendant had knowledge of the victim's pregnancy.

(18)  At the time of the killing the defendant was subject to a court order restricting in any way the defendant's behavior toward the victim pursuant to 23 Pa.C.S. Ch. 61 (relating to protection from abuse) or any other order of a court of common pleas or of the minor judiciary designed in whole or in part to protect the victim from the defendant.

(e)  Mitigating circumstances.--Mitigating circumstances shall include the following:

(1)  The defendant has no significant history of prior criminal convictions.

(2)  The defendant was under the influence of extreme mental or emotional disturbance.

(3)  The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

(4)  The age of the defendant at the time of the crime.

(5)  The defendant acted under extreme duress, although not such duress as to constitute a defense to prosecution under 18 Pa.C.S. § 309 (relating to duress), or acted under the substantial domination of another person.

(6)  The victim was a participant in the defendant's homicidal conduct or consented to the homicidal acts.

(7)  The defendant's participation in the homicidal act was relatively minor.

(8)  Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.[581]

The process can be divided into 10 steps:[582]

(1)  Homicide occurs;
(2)  Homicide recognized by authorities;
(3)  Investigation by law enforcement and facts discovered/generated;
(4)  Homicide suspect identified and arrested;
(5)  Prosecution charges 1st-degree murder [or criminal homicide];
(6)  Prosecution indicts [or informs] for 1st-, 2d-, or 3d-degree murder [or criminal homicide];
(7)  If indicted [or informed] for 1st-degree murder, prosecution decides whether to seek death penalty;
(8)  Prosecution and defense disagree on a plea;
(9)  Defendant is convicted of murder;
(10) If convicted of 1st-degree murder & the prosecutor pursued the death penalty, the sentencing authority considers the aggravating and mitigating circumstances for sentencing.

---

[581] *Id.*
[582] Kramer *et al.*, *supra* note 26, at 20-21, 24.

"At each stage in the process, some attrition occurs and the universe of cases that could result in a death sentence narrows" with "a . . . small fraction of the number of people who commit a homicide" sentenced to death.[583]

***Pennsylvania data.***

Data sets:  It "took several years" for the authors of this study to build this "data set".[584] An "eleven-year time frame of 2000-2010" provided "a large enough pool of death-eligible offenders to result in a strong and reliable statistical analysis.  . . . [W]e estimated that approximately 60 offenders received the death sentence during this time frame, and another 1,200 offenders received a life sentence, with the vast majority of these life sentences imposed for first-degree murder."[585]  The "source of data to identify cases entering the criminal justice system and . . . the starting point for" the study was Common Pleas Case Management System within Administrative Office of Pennsylvania Courts (AOPC), but that "data does not provide information that would have allowed" identification of "death-eligible defendants that are central to this study."[586]  To verify data from AOPC, "data for sentences imposed during the period 2000 through 2014" was obtained from Pennsylvania Commission on Sentencing.[587]  Data for "all offenders incarcerated for" murder "during the period of 2000 through" 2012 was received from Department of Corrections.[588]

Racial disproportionality of defendants:  Prosecutions can commence with a charge for criminal homicide, which is "classified as murder, voluntary manslaughter, or involuntary manslaughter."[589]  Since the death penalty is limited to murder of the first degree,[590] this study sampled "only cases with a first-degree murder *conviction*, as representative of cases that were potentially death-eligible."[591]  For "defendants prosecuted during the 2000-2010 time period," AOPC listed "1,115 docket cases with at least one first-degree murder *conviction*."[592]  Of those "charged with murder/criminal homicide", 53% of the cases involved Black defendants, "highly disproportionate to their proportion of Pennsylvania's population."[593]  An overwhelming percentage of these defendants was male.[594]

---

[583] *Id.* at 22.
[584] *Id.* at 25.  Appdx. L, *infra*  p. 263.
[585] Kramer *et al.*, *supra* note 26, at 27.  A recent period was chosen to reflect "contemporary capital sentencing practices".  *Id.*
[586] *Id.* at 27-28.  "[I]t was necessary to verify the accuracy of the information whenever possible", which originated "in each of 540 Magisterial District Courts, the Philadelphia Municipal Courts, and the 12 Pittsburgh Municipal Courts."  *Id.* at 28.
[587] *Id.* at 29.
[588] *Id.*  This data was then updated in 2014 and 2015.  *Id.* at 30.
[589] 18 Pa.C.S. § 2501.
[590] 42 Pa.C.S. § 9711.
[591] Kramer *et al.*, *supra* note 26, at 30.  This decision ignored the acceptance of "a guilty plea to a lesser offense" than "first-degree murder" and "the overlap among the statutory grades of murder", namely that murder of the second degree is ineligible for the death penalty, although a killing under the same circumstance is an aggravating circumstance for the death penalty if the conviction is for murder of the first degree.  *Id.* at 30-31.
[592] *Id.* at 31-32.
[593] *Id.* at 34.
[594] 89%, *id.*.

- 82 -

Limitations of study's scope:   After compiling data from AOPC, Pennsylvania Commission on Sentencing and Department of Corrections, coding the departmental data "and linking the three data sets", missing information was "obtained from local county files."[595]  The "data collection instrument" was tested in County of Blair and then substantially revised.[596] After estimating the workload and affordability of the data collection from counties "across the Commonwealth", the number of cases was reduced to "those who were convicted of first-degree murder."[597]  This limitation means that the influence of race or ethnicity on the decision of charging the homicide or on "whether to retract the motion to seek the death penalty in any case that did not result in a first-degree murder conviction" was not studied.[598]  The study was also limited to the "18 counties that had ten or more first-degree murder convictions" which "was more than 80% of all first-degree murder convictions in the Commonwealth in" the study's "time frame."[599]  Because "the most detailed information was likely to be found in each county's District Attorney's files", those offices were contacted, resulting in 14 of them assisting with the field sample.[600]  "The time to code . . . files varied from" 30 "minutes to several hours" after which "local news reports and appellate documents" were used "to verify and to fill-in information".[601]  Errors found in AOPC's data classification of murders was corrected based upon the field research.[602]  Data collection from the field took 31 months instead of the anticipated 18 months.[603]  Data sets from AOPC, Department of Corrections, Pennsylvania Commission on Sentencing and the field were reviewed to identify "inconsistent or missing information."[604]  It took "several months" to "gain access to . . . death certificate information" from Department of Health.[605]  The data was merged to remove duplicates "and locate and correct" missing and invalid data, after which the analysis began.[606]  The period from the development of the research design and original request for data from AOPC to the analysis of that data was approximately six years.[607]

Field data:  The field data did not allow an assessment of "the process . . . by which some criminal homicide cases that are death-eligible result in first-degree murder convictions and" others "do not."[608]  The 18 counties in this study encompassed "87% of the first-degree murder *convictions* in the . . . docket data", with "[t]he majority of cases" involving "first-degree murder

---

[595] *Id.* at 35-36.

[596] *Id.* at 37-38.

[597] *Id.*  This "reduced the number of cases to review in the field from 4,274 to 1,115. " *Id.* at 38.

[598] *Id.* at 39.

[599] These were Allegheny, Berks, Bucks, Chester, Dauphin, Del., Fayette, Lackawanna, Lancaster, Lehigh, Luzerne, Monroe, Montgomery, Northampton, Phila., Wash., Westmoreland & York.  *Id.*

[600] *Id.* at 40-41.  Offices in Chester, Westmoreland, Fayette & Northampton did not reply to the request for assistance so that information was alternatively sought, *e.g., via* the cnty. clerk, defense attorneys and local newspaper coverage. *Id.* at 41-42.  After initial rejection for assistance from Phila.'s Office of Dist. Att'y, the request was repeated with a reduction by half in the number of years sampled and the approval for data collection was obtained, but that process took 18 months.  *Id.* at 42-43.

[601] *Id.* at 44.

[602] *Id.*

[603] *Id.* at 45-46.

[604] *Id.* at 48.

[605] *Id.*

[606] *Id.* at 49.

[607] *Id.* at 50.

[608] *Id.* at 51-52.  This is potentially significant because a charge of criminal homicide could "involve first-degree murder and exposure to the possibility of the death penalty." *Id.* at 51.

conviction by juries."[609]  Most of these "cases involved an additional felony conviction".[610]  Of these first-degree murder convictions from the field data, notices of aggravating circumstances were filed to seek the death penalty in 35.5% of them but then later retracted in 46.7% of that subset.[611]  Of the remaining "cases with defendants ultimately exposed to death at sentencing," 30.5% received that sentence, with the remaining 69.5% sentenced to life imprisonment.[612] Prosecutors filed notices of aggravating circumstances, including ones for murders committed in perpetration of a felony and knowingly creating a grave risk of death each in approximately 15% of these notices.[613]  In approximately 2.5% of these cases, the judge or jury found either of these same, two aggravating circumstances or that the defendant was convicted of another murder.[614] Prosecutors filed notices of aggravating circumstances containing one circumstance in 17% of these cases.[615]  In approximately 3.5% of these cases, the judge or jury found either one or two aggravating circumstances.[616]  In approximately 24% of the death penalty trials, "not one mitigating circumstance" was "presented."[617]  The defense presented age as a mitigating circumstance in 7.4% of the cases, but the judge and jury found that to be a mitigating circumstance in only 1.8% of the cases.[618]  In almost 6% of the cases, the defense presented the mitigating circumstance of no significant history of prior crime, but the judge and jury found that to be a mitigating circumstance in only 2.5% of the cases.[619]  In 3.6% of the cases, the defense presented two mitigating circumstances, but the judge and jury found two mitigating circumstances in only 1.4% of the cases.[620]  The defense presented eight or more mitigating circumstances in 2.1% of the cases, but the judge and jury did not find that many mitigating circumstances in any of the cases.[621]  The judge and jury found one mitigating circumstance in 2.6% of the cases.[622]  The sentencing was decided by the jury in 70.1% of these cases.[623]

Type of defense counsel:  "[T]he type of defense counsel" was 'roughly evenly split among" privately-retained counsel, public defenders and judicially-appointed counsel for all of these convictions.[624]  When the death penalty was sought, defendants were represented by privately-retained counsel in 38.9% of those cases, with the public defender acting as counsel in a little over 30% of the cases and judicially-appointed counsel representing the defendant in a little under 30% of the cases.[625]  Defendants in these cases were overwhelmingly male; approximately two-thirds of the defendants were Black and almost one quarter were White.[626]  For the females

[609] Id. at 52.  The majority is 75%.  Id.
[610] 59.1%, id.
[611] Id. at 53.
[612] Id. at 53-54.  The data is limited to convictions meaning that any acquittal was not analyzed.  Id. at 53.
[613] Id. at 56.
[614] Id.
[615] Id. at 57.
[616] Id.
[617] Id.
[618] Id. at 58.
[619] Id.
[620] Id.
[621] Id.
[622] Id.
[623] Id. at 59.
[624] Id. at 59.
[625] Id.
[626] Id. at 60.  Males were defendants in 96.1% of these cases.  Id. at 61.

convicted of first-degree murder, almost a quarter of them were notified of aggravating circumstances, but they were retracted for most so that 8.8% of them remained "exposed to a death penalty trial."[627]  "[I]t appears that females are much less likely to be exposed to, or receive, the death penalty", but the "numbers of first-degree murder cases involving female defendants" was inadequate to further analyze any impact of the defendant's sex on "the processing and sentencing of" first-degree murder cases.[628]

Ethnicity:  Black defendants comprised a greater proportion of those with "a concurrent felony conviction of any kind compared to White . . . and Hispanic . . . defendants.  Also, White defendants in the field data . . . had a smaller proportion of convictions for robbery, than Black . . . or Hispanic . . . defendants."[629]

Comparatively, a "greater proportion of Hispanic defendants had the death penalty sought against them"; the death penalty was sought against Black and White defendants in "nearly equal proportions".[630]  The death penalty was retracted in a greater proportion of the cases involving "Black or Hispanic defendants, as opposed to White defendants."[631]  Among those who faced the death penalty, almost 40% of White and Hispanic defendants and 25% of Black defendants received it.[632]  While the population of first-degree murder charges and convictions are a "very racially disproportionate population", "the proportions of defendants *within race/ethnicity categories* reveal that proportionally more White defendants are exposed to and receive the death penalty, compared to the percentages of Black defendants exposed to and receiving the death penalty."[633]

Race and aggravating and mitigating circumstances:  Approximately 80% of the cases had Black defendants in which prosecutors asserted the aggravating circumstances of the victim being a peace officer, creating a grave risk of death to another and being convicted of another murder.[634]  Prosecutors listed greater numbers of aggravating circumstances *per* case against Black defendants.[635]  Because "aggravating circumstances are found far less often than they are filed", "Black defendants do not dominate the percentages for the aggravating circumstances found by the judge or jury, as much as they do for those filed by the prosecutor."[636]  The distribution of statutory mitigating circumstances "filed tended to be distributed between White, Black, and, to a lesser extent, Hispanic defendants, more equally than the aggravating circumstances filed by prosecutors" with "Black defendants" tending "to have  greater numbers of mitigating circumstances presented per case."[637]

---

[627] *Id.* at 61-62.  One of the females was sentenced to death, comprising 1.9% of the females convicted of first-degree murder.  *Id.* at 62.
[628] *Id.*
[629] *Id.* at 62-63.
[630] *Id.* at 64.
[631] *Id.* at 65.
[632] *Id.* at 66.
[633] *Id.* at 66.
[634] *Id.* at 67.
[635] *Id.* at 68.
[636] *Id.*
[637] *Id.* at 72.

Almost two-thirds of Black and Hispanic defendants "were represented by either public defenders or court-appointed attorneys", with that percentage dropping to 55% for the same representation "[a]mong White defendants".[638] A higher proportion of White defendants "facing the death penalty were sentenced by judges, compared to" Black and Hispanic defendants.[639] Most of the defendants and victims were Black males.[640] "[I]t appears that cases involving Black defendants and White victims have a greater probability of receiving the death penalty, compared to the average overall probability of receiving the death penalty for all cases."[641]

Propensity score weighting:  The Pennsylvania State University researchers used propensity score weighting to balance error variance.[642] For one thing, Black, White and Hispanic defendants are imbalanced on control variables "such as aggravating circumstances, concurrent convictions, case characteristics, etc."[643] Whether selection bias exists "affecting the likelihood of being arrested, charged, and/or convicted of first-degree murder" could not be directly assessed" so that the "weighting on the propensity score is a way to balance the comparison groups, or render them more similar and comparable, on the control variables."[644]

County variations:[645]  White defendants had "a 7% smaller probability of having a motion for the death penalty filed against them" when county differences were controlled.[646] For "each type of defendant, victim, and defendant/victim combination", the likelihood of "a motion for the death penalty filed against them in Allegheny County" was significantly less than in the other 17 judicial districts.[647] "[C]ases with Hispanic victims . . . had a 21% greater probability of having the death penalty filed."[648] White defendants were "16% less likely to have a death filing retracted" when county differences were controlled.[649] For "cases with Black defendants, Black victims, and any defendant/victim combination involving Black individuals were very highly likely to have a death filing retracted" with "cases with White defendants . . . comparatively much less likely to have a death filing retracted", making this a significant difference between Philadelphia and the other 17 counties.[650] Controlling for county differences, cases with White victims were 6% more likely to receive a death sentence, which demonstrates "clear evidence of race-of-victim effects".[651] The odds of receiving the death penalty were lower for "nearly all defendant types and defendant/victim combinations" in Philadelphia than in the other 17

---

[638] *Id.* at 74.
[639] *Id.* at 75.  These percentages are:  White-45%, Black-38%, Hispanic-29%.  *Id.*
[640] *Id.*
[641] *Id.* at 79.
[642] *Id.* at 85-86.
[643] *Id.* at 85.
[644] *Id.* at 85, 87.
[645] Appdx. K., *infra* p. 261, shows the ratio of execution to life sentences by county based upon the 2015 inmate population.
[646] Kramer *et al.*, *supra* note 26, at 92.
[647] *Id.*
[648] *Id.*
[649] *Id.* at 95.
[650] *Id.* at 96.
[651] *Id.* at 97-98.

counties.[652]  "Additionally, the death penalty was notably less likely to be imposed in cases with White victims in Allegheny County . . . than in the other 17 counties".[653]

Even for cases that are highly similar on the variables, "[p]rosecutors in Allegheny County are notably . . . less likely . . . to file motions to seek the death penalty" than in the other counties.[654] Compared to County of Allegheny and Philadelphia, defendants in the other judicial districts "have a 5% greater probability of being sentenced to death".[655]  The cases in Philadelphia had "a 31% greater probability of a death filing being retracted" than in the other judicial districts.[656]

Compared to the other 16 counties, public defenders in County of Allegheny and Philadelphia had "significantly lower odds of having the death penalty filed against their clients than public defenders" elsewhere.[657]  "[T]he odds of securing the retraction of a death penalty filing relative to the type of legal representation afforded a defendant likely varies widely among counties."[658]  Controlling for county differences, defendants represented by public defenders were "5% more likely" to receive the death penalty, but those in Philadelphia represented by public defenders had "significantly smaller odds . . . of receiving the death penalty" than in the other 17 judicial districts.[659]  Depending on the controlling for county differences, "White defendants represented by a public defender are 16% to 19% less likely to have the death penalty filed against them".[660]  Compared to defendants with other types of legal representation, "Black defendants with court-appointed attorneys had an 18% greater probability of having the death penalty filing retracted".[661]  For White defendants represented by public defenders, prosecutors sought the death penalty in 31% of those cases before dropping that penalty in 35% of those cases; of the "remaining cases with White defendants represented by public defenders, the death penalty was imposed" in 69% of them.[662]

Summary:

- The data set from 18 counties "represents 87% of all first-degree murder convictions" from 2000-2010 "in the Commonwealth."[663]

- "Black defendants are very disproportionately charged with and convicted of murder overall and first-degree murder particularly, relative to White defendants.  One of the

---

[652] *Id.* at 99.

[653] *Id.*

[654] *Id.* at 100.

[655] *Id.*

[656] *Id.*  In Phila., the motions filed for a death penalty in cases involving Black defendants, victims or both were "much more likely to be retracted than in cases involving White defendants, victims or both.  *Id.*

[657] *Id.* at 102.  Overall, "defendants represented by public defenders are 7-8% less likely to have motions for the death penalty filed against them".  *Id.*

[658] *Id.* at 104.

[659] *Id.* at 105.

[660] *Id.* at 107.

[661] *Id.* at 109.  "[T]he likelihood of retraction of a death penalty filing in cases involving Black defendants with privately-retained attorneys varies a great deal among counties."  *Id.*

[662] *Id.* at 111.

[663] *Id.* at 113.

important limitations of this study, however, is that we were not able to analyze the early stages of this process–the decision to detain, arrest, and charge a suspect."[664]

- "First-degree murder victimization was largely intra-racial."[665]

- Defendants were overwhelmingly male "especially for first-degree murder," and "[t]he large majority of defendants in first-degree murder cases do not face the death penalty."[666]

- At least one aggravating circumstance was filed in "39% of the cases" with the most common ones being creating a grave risk of death to somebody other than the victim and killing while in perpetration of a felony.[667]

- "[W]ithin racial groups, 37% of Black defendants had one or more aggravating circumstances filed, compared to 43% of White defendants."[668]

- In nearly a quarter of the cases, "no mitigating circumstances were filed by the defense" raising "questions about the effectiveness with which defense counsel pursued those cases".[669]

- A jury decided "70% of death sentencing trials" instead of the judge, and juries were "significantly more likely to impose the death penalty than judges."[670]

- The odds of eventually obtaining a guilty plea to first-degree murder is "nearly three times" higher for "cases in which the death penalty is filed".[671]

- This research did "not find an overall pattern of disparity to the disadvantage of Black or Hispanic defendants in the decision to seek the death penalty, the decision to retract the death penalty once filed, or the decision to impose the death penalty."[672] Nor did it "find disparity in these decisions to the disadvantage of defendants in cases with Black defendants and White victims."[673]

---

[664] *Id.* at 113-14. "Consequently, we cannot comment on whether disparity, discrimination or arbitrariness played any role in the disproportionately large number of Black defendants charged with murder." *Id.* at 114.
[665] *Id.*
[666] *Id.* "Prosecutors filed notices of aggravating circumstances in 39% of first-degree murder cases," but retracted them "in 47% of cases in which they were filed." *Id.* Of the remaining ones, "[a]pproximately 31% of defendants received the death penalty". *Id.*
[667] *Id.* at 115.
[668] *Id.*
[669] *Id.*
[670] *Id.* at 116. This study was unable "to examine the actual jury process and dynamics". *Id.*
[671] *Id.*
[672] *Id.* at 117.
[673] *Id.*

- In cases with Hispanic victims, the prosecutor was "21% more likely to . . . seek the death penalty."[674]

- Findings in this study contrast with Baldus's study of capital case processing in Philadelphia from 1983-1993, but this study used statewide data, more advanced data analysis, had access to district attorneys' files and prosecutorial practices might differ since then.[675]

- "Overall, we find that defendants represented by public defenders are less likely than defendants with privately-retained or court-appointed attorneys to have the death penalty filed against them, but there is no clear indication that the type of representation affects the decision to retract the motion for the death penalty."[676]

- When privately-retained attorneys represented defendants, "they were 4%-5% less likely to receive the death penalty, while defendants represented by public defenders were 5%-7% more likely to receive the death penalty. . . . On the other hand, defendants represented by public defenders in Philadelphia were much less likely to receive the death penalty than defendants represented by public defenders in the other 17" judicial districts "in the field study."[677]

- Compared to the other judicial districts, "prosecutors in Allegheny County were much less likely to seek the death penalty" and "prosecutors in Philadelphia were much more likely to retract the death penalty".[678]

- The largest and most prominent differences among the counties were "in death penalty outcomes and the effects of other variables on death penalty outcomes".[679]

- The notable differences based upon the race of the victim were "*not* in combination with the race/ethnicity of defendant."[680]

- Contrasting with the Baldus and other literature, "Black defendants with White victims were not at greater risk to receive the death penalty".[681]

---

[674] *Id.* at 118.

[675] *Id.*

[676] *Id.* at 119.

[677] *Id.* at 120.

[678] *Id.*

[679] *Id.* at 121. *E.g.,* "prosecutors in Allegheny County and Philadelphia were less likely to seek the death penalty against defendants represented by public defenders than" in the other 16 counties in the field study. *Id.* at 120-21.

[680] *Id.* at 121. Regardless of the defendant's race or ethnicity, cases with White victims were 8% more likely to receive the death penalty; conversely, cases with Black victims were 6% less likely to receive the death penalty. *Id.*

[681] *Id.* at 122.

- The likelihood of seeking the death penalty was more when there was a Hispanic victim and there was less likelihood for receiving the death penalty when the victim was Black than when the victim was White, which differences were not "attributed to the many factors measures by" the control variables listed in the study.[682]

- "[D]ifferences among counties in death penalty outcomes, and the effects of other variables on death penalty outcomes, were the largest and most prominent differences found in" the study.[683]

> *In a very real sense, a given defendant's chance of having the death penalty sought, retracted, or imposed depends on where that defendant is prosecuted and tried.* In many counties of Pennsylvania, the death penalty is simply not utilized at all. In others, it is sought frequently. If uniform prosecution and application of the death penalty under a common statewide framework of criminal law is a goal of Pennsylvania's criminal justice system, these findings raise questions about the administration of the death penalty in the Commonwealth."[684]

### Recommendation

Regarding unfairness in general and racial or ethnic bias in particular, the subcommittee on policy supports including a recommendation that Pennsylvania consider replicating what other states have done in this area, such as Washington State, that statutorily provides for proportionality review.

# Proportionality

The question that serves as the basis of the study of proportionality in the administration of the death penalty in our Commonwealth is:

> Whether there is a significant difference in the crimes of those selected for the punishment of death as opposed to those who receive life in prison and whether there is an adequate process for determining when death sentences are excessive or out of line with sentences imposed in other cases where a sentence other than death was imposed;[685]

**Whether there is a significant difference in the crimes of those selected for the punishment of death as opposed to those who receive life in prison.**

---

[682] *Id.* at 123.

[683] *Id.* at 124. Compared to defendants represented by public defenders, those represented by privately-retained counsel were "significantly less likely to receive the death penalty", but defendants represented by public defenders were "less likely to have the death penalty filed against them than other defendants". *Id.* n.33.

[684] *Id.* at 125. Appdx. K, *infra* p. 261, shows the ratio of execution to life sentences by county based on the 2015 inmate population.

[685] Pa. S. Res. No. 6 (Sess. of 2011); appdx. A, *infra* p. 219.

The subcommittee on policy could not answer this because there is no process for determining whether the crimes for which defendants receive the death penalty differ from the crimes for which defendants receive life imprisonment (without parole). The only available data is from the study detailed under the issue of bias and unfairness, which was limited to those cases that had convictions for first-degree murder. Justice Center for Research is seeking funding to follow that study with one to directly address this inquiry, but it will take years to accomplish.

***Whether there is an adequate process for determining when death sentences are excessive or out of line with sentences imposed in other cases where a sentence other than death was imposed.***

The Pennsylvania statutory provision that mandated this process was repealed in 1997.[686] Once again, the subcommittee members agreed that there is no such process for making such a determination. The Pennsylvania State University research reveals disparities among counties in seeking and obtaining the death penalty, as well as other disparities, but does not directly answer the question, and is limited to cases of defendants convicted of first-degree murder.

***Federal law.*** The U.S. Supreme Court has held "that the Eighth Amendment bars not only those punishments that are 'barbaric' but also those that are 'excessive' in relation to the crime committed."[687] The death penalty imposed "for the crime of murder, and when a life has been taken deliberately by the offender," could be proportionate under suitable circumstances of the offense, considering the character of the offender following appropriate procedures.[688] On the other hand, "with respect to rape of an adult woman, . . . a sentence of death is grossly disproportionate and excessive punishment for the crime of rape and is therefore forbidden by the Eighth Amendment as cruel and unusual punishment."[689] When this ruling was extended to find death penalty unconstitutionally excessive for the rape of a child, U.S. Supreme Court distinguished "between intentional first-degree murder . . . and nonhomicide crimes against individual persons", regarding the latter to be incomparable to murder in severity and irrevocability.[690] Ignoring crimes against the state, this ruling effectively limited the death penalty to homicide crimes against individual persons.[691] Death penalty statutes must prescribe objective factors so that they are applied non-discriminatorily to differentiate and narrow murders that are eligible for the death penalty and the murders that are not.[692] These cases assure that the death penalty is applied in at least a broadly proportional fashion; it does not apply to a selection of criminal offenses chosen at random. Indeed, the fundamental premise that should guide this aspect

---

[686] *Infra* pp. 108-11.

[687] *Coker v. Ga.*, 433 U.S. 584, 592 (1977)). "Under Gregg, a punishment is 'excessive' and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime. A punishment might fail the test on either ground." *Id.*

[688] *Gregg v. Ga.*, 428 U.S. 153, 187.

[689] *Coker*, 433 U.S. at 592. When *Coker* was decided, Ga. was "the sole jurisdiction in the United States" that authorized "a sentence of death when the rape victim is an adult woman". *Id.* at 595-96. The uniquely severe and irrevocable death penalty "is an excessive penalty for the rapist who, as such, does not take human life." *Id.* at 598.

[690] *Kennedy v. La.*, 554 U.S. 407, 438 (2008).

[691] "We do not address . . . crimes defining and punishing treason, espionage, terrorism, and drug kingpin activity, which are offenses against the State. As it relates to crimes against individuals, though, the death penalty should not be expanded to instances where the victim's life was not taken." *Id.* at 437.

[692] *Gregg*, 428 U.S. at 196-98.

of the inquiry is that the death penalty, if retained at all, should be reserved for only "the most heinous offenses and most culpable offenders."[693]

The subcommittee on policy further assumes that federal authorities will deal with extreme mass murder cases similar to those involving Timothy McVeigh (the Oklahoma City bombing) and Khalid Sheikh Mohammed (the 9/11 attack).

***Pennsylvania statutory law.*** Pennsylvania statutory law prescribes the manner in which the judicial system differentiates between murders that deserve the death penalty and other murders. The death penalty only applies to murder of the first degree,[694] defined as "[a] criminal homicide . . . committed by an intentional killing."[695] "Criminal homicide" requires that the accused cause "the death of another human being."[696] A murder is "intentional" when it is done "by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing."[697]

To qualify for the death penalty, at least one of the 18 statutory aggravating circumstances must apply, and the aggravating circumstances supporting the death penalty must outweigh the statutory mitigating circumstances cutting against the death penalty.[698] Like guilt of first-degree murder, each aggravator must be proved beyond a reasonable doubt, while mitigators need only be proved by a preponderance of the evidence.[699] Unlike other crimes, trials for first-degree murder proceedings are bifurcated, with the first proceeding addressing whether the defendant is guilty of first-degree murder and, the second, which takes place only if the defendant is convicted, addresses whether the defendant should be sentenced to death.[700] This bifurcation is intended to ensure that relevant evidence the defendant may wish to introduce in mitigation of the death penalty will not prejudice the question of his guilt.[701]

The issue of whether each death penalty case should be reviewed to determine whether the penalty is applied consistently on the particular facts of each case is discussed below under "Comparative and Specific Proportionality." There is presently no such requirement under Pennsylvania law.

***Constitutional requirements.*** In *Gregg v. Georgia*, the U.S. Supreme Court set forth the broad guidelines to determine whether a punishment violates the Cruel and Unusual Punishment Clause of the Eighth Amendment:

---

[693] The Const. Project, *Mandatory Justice: The Death Penalty Revisited*, xvii (2005), *available at* https://static.prisonpolicy.org/scans/MandatoryJusticeRevisited-2-09.pdf.

[694] 42 Pa.C.S. § 9711.

[695] 18 Pa.C.S. § 2502(a).

[696] *Id.* § 2501(a).

[697] *Id.* § 2502(d).

[698] 42 Pa.C.S. § 9711(c)(1)(iv).

[699] *Id.* § 9711(c)(1)(iii). The prosecution has the burden to prove guilt and aggravating circumstances; the defendant has the burden to prove mitigating circumstances.

[700] 42 Pa.C.S. § 9711(a)(1).

[701] *Gregg v. Ga.*, 428 U.S. 153, 191-92.

When a form of punishment in the abstract (in this case, whether capital punishment may ever be imposed as a sanction for murder) rather than in the particular (the propriety of death as a penalty to be applied to a specific defendant for a specific crime) is under consideration, the inquiry into "excessiveness" has two aspects. First, the punishment must not involve the unnecessary and wanton infliction of pain. Second, the punishment must not be grossly out of proportion to the severity of the crime.[702]

The plurality opinion held that the death penalty is not necessarily disproportionate for murder.

[W]e are concerned here only with the imposition of capital punishment for the crime of murder, and when a life has been taken deliberately by the offender, we cannot say that the punishment is invariably disproportionate to the crime. It is an extreme sanction, suitable to the most extreme of crimes.

We hold that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it.[703]

At the same time, a state death penalty statute must ensure that the verdicts rendered under it are reasonably consistent:

[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.[704]

The use of aggravating and mitigating circumstances was one of the reasons the *Gregg* Court upheld the Georgia statute under review. That statute required the jury to identify aggravating circumstances and to weigh them against mitigating circumstances. In addition, the statute required an automatic appeal to the Georgia Supreme Court and that the reviewing court ensure that the accused's death sentence was in line with sentences applied to similar crimes.

In short, Georgia's new sentencing procedures require, as a prerequisite to the imposition of the death penalty, specific jury findings as to the circumstances of the crime or the character of the defendant. Moreover, . . . the Supreme Court of Georgia compares each death sentence with the sentences imposed on similarly situated defendants to ensure that the sentence of death in a particular case is not disproportionate. On their face these procedures seem to satisfy the concerns of Furman. No longer should there be "no meaningful basis for distinguishing the few

---

[702] *Id.* at 173 (citations omitted).
[703] *Id.* at 187.
[704] *Id.* at 189.

cases in which (the death penalty) is imposed from the many cases in which it is not."[705]

. . . .

The petitioner next argues that the requirements of Furman are not met here because the jury has the power to decline to impose the death penalty even if it finds that one or more statutory aggravating circumstances are present in the case. This contention misinterprets Furman. . . . Moreover, it ignores the role of the Supreme Court of Georgia which reviews each death sentence to determine whether it is proportional to other sentences imposed for similar crimes. Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice.[706]

The use of aggravating and mitigating circumstances was thus one of the grounds on which the Supreme Court distinguished the Georgia statute that was upheld in *Gregg v. Georgia* from the Georgia statute that was struck down four years earlier in *Furman v. Georgia*. The controlling opinion in *Gregg* explained the distinction in these terms:

Furman held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards, so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.[707]

More specifically, the Court elaborated on how the statute guided the jury's discretion:

These procedures require the jury to consider the circumstances of the crime and the criminal before it recommends sentence. No longer can a Georgia jury do as Furman's jury did: reach a finding of the defendant's guilt and then, without guidance or direction, decide whether he should live or die. Instead, the jury's attention is directed to the specific circumstances of the crime: Was it committed in the course of another capital felony? Was it committed for money? Was it committed upon a peace officer or judicial officer? Was it committed in a particularly heinous way, or in a manner that endangered the lives of many persons? In addition, the jury's attention is focused on the characteristics of the person who committed the crime: Does he have a record of prior convictions of capital offenses? Are there any special facts about this defendant that mitigate against imposing capital punishment (E.g., his youth, the extent of his cooperation with the police, his emotional state at the time of the crime). As a result, while some jury discretion still exists, "the discretion to be exercised is controlled by clear and objective standards so as to produce nondiscriminatory application."[708]

---

[705] *Id.* at 198.
[706] *Id.* at 203.
[707] *Id.* at 199.
[708] *Id.* at 197-98.

The U.S. Supreme Court further refined the proportionality requirement in *Woodson v. North Carolina*[709] and *Coker v. Georgia*.[710] *"North Carolina . . . responded to the Furman decision by making death the mandatory sentence for all persons convicted of first-degree murder."*[711] U.S. Supreme Court ruled that *"North Carolina's mandatory death sentence statute violated the Eighth and Fourteenth Amendments"*.[712] Decided the same day as *Gregg v. Georgia*, *Woodson* concluded that categorical death penalty provisions are unconstitutional:

> It is now well established that the Eighth Amendment draws much of its meaning from "the evolving standards of decency that mark the progress of a maturing society." . . . . [O]ne of the most significant developments in our society's treatment of capital punishment has been the rejection of the common-law practice of inexorably imposing a death sentence upon every person convicted of a specified offense. North Carolina's mandatory death penalty statute for first-degree murder departs markedly from contemporary standards respecting the imposition of the punishment of death and thus cannot be applied consistently with the Eighth and Fourteenth Amendments' requirement that the State's power to punish "be exercised within the limits of civilized standards."[713]
> . . . .
>
> A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death. . . . . While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.[714]

In *Coker v. Georgia*, the U.S. Supreme Court mandated a significant measure of proportionality by forbidding the death penalty for rape.[715]

> Rape is without doubt deserving of serious punishment; but in terms of moral depravity and of the injury to the person and to the public, it does not compare with murder, which does involve the unjustified taking of human life. Although it may

---

[709] 428 U.S. 280 (1976).
[710] 433 U.S. 584 (1977).
[711] *Woodson v. N. C.*, 428 U.S. at 286-87.
[712] *Id.* at 305.
[713] *Id.* at 301 (citation omitted).
[714] *Id.* at 304 (citation omitted).
[715] 433 U.S. 584, 592 (1977).

be accompanied by another crime, rape by definition does not include the death of or even the serious injury to another person. The murderer kills; the rapist, if no more than that, does not. Life is over for the victim of the murderer; for the rape victim, life may not be nearly so happy as it was, but it is not over and normally is not beyond repair. We have the abiding conviction that the death penalty, which 'is unique in its severity and irrevocability,' is an excessive penalty for the rapist who, as such, does not take human life.[716]

In *Lockett v. Ohio*, the U.S. Supreme Court set forth the test for whether a death penalty statute gives the trier of fact sufficient latitude to render an individualized and proportionate sentence:

> [W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. . . . Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases. The need for treating each defendant in a capital case with that degree of respect due to the uniqueness of the individual is far more important than in noncapital cases. . . . .

> There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.[717]

Following this direction, Pennsylvania and other jurisdictions provide for individualized determinations of deathworthiness by statutorily specifying aggravating and mitigating circumstances. Appendix B shows statutory aggravating circumstances nationally.[718] The current, statutory list of the Commonwealth's aggravators reads as follows:[719]

> (d)  Aggravating circumstances.--Aggravating circumstances shall be limited to the following:
> (1)  The victim was a firefighter, peace officer, public servant concerned in official detention, as defined in 18 Pa.C.S. § 5121 (relating to escape), judge of any court in the unified judicial system, the Attorney General of Pennsylvania, a deputy attorney general, district attorney, assistant district attorney, member of the General

---

[716] *Coker*, 433 U.S. at 598 (citation omitted).
[717] 438 U.S. 586, 604-05 (1978).
[718] *Infra* pp. 223-26.
[719] 42 Pa.C.S. § 9711.

Assembly, Governor, Lieutenant Governor, Auditor General, State Treasurer, State law enforcement official, local law enforcement official, Federal law enforcement official or person employed to assist or assisting any law enforcement official in the performance of his duties, who was killed in the performance of his duties or as a result of his official position.

(2) The defendant paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim.

(3) The victim was being held by the defendant for ransom or reward, or as a shield or hostage.

(4) The death of the victim occurred while defendant was engaged in the hijacking of an aircraft.

(5) The victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses.

(6) The defendant committed a killing while in the perpetration of a felony.

(7) In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.

(8) The offense was committed by means of torture.

(9) The defendant has a significant history of felony convictions involving the use or threat of violence to the person.

(10) The defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.

(11) The defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue.

(12) The defendant has been convicted of voluntary manslaughter, as defined in 18 Pa.C.S. § 2503 (relating to voluntary manslaughter), or a substantially equivalent crime in any other jurisdiction, committed either before or at the time of the offense at issue.

(13) The defendant committed the killing or was an accomplice in the killing, as defined in 18 Pa.C.S. § 306(c) (relating to liability for conduct of another; complicity), while in the perpetration of a felony under the provisions of the act of April 14, 1972 (P.L.233, No.64), known as The Controlled Substance, Drug, Device and Cosmetic Act, and punishable under the provisions of 18 Pa.C.S. § 7508 (relating to drug trafficking sentencing and penalties).

(14) At the time of the killing, the victim was or had been involved, associated or in competition with the defendant in the sale, manufacture, distribution or delivery of any controlled substance or counterfeit controlled substance in violation of The Controlled Substance, Drug, Device and Cosmetic Act or similar law of any other state, the District of Columbia or the United States, and the defendant committed the killing or was an accomplice to the killing as defined in 18 Pa.C.S. § 306(c), and the killing resulted from or was related to that

association, involvement or competition to promote the defendant's activities in selling, manufacturing, distributing or delivering controlled substances or counterfeit controlled substances.

(15) At the time of the killing, the victim was or had been a nongovernmental informant or had otherwise provided any investigative, law enforcement or police agency with information concerning criminal activity and the defendant committed the killing or was an accomplice to the killing as defined in 18 Pa.C.S. § 306(c), and the killing was in retaliation for the victim's activities as a nongovernmental informant or in providing information concerning criminal activity to an investigative, law enforcement or police agency.

(16) The victim was a child under 12 years of age.

(17) At the time of the killing, the victim was in her third trimester of pregnancy or the defendant had knowledge of the victim's pregnancy.

(18) At the time of the killing the defendant was subject to a court order restricting in any way the defendant's behavior toward the victim pursuant to 23 Pa.C.S. Ch. 61 (relating to protection from abuse) or any other order of a court of common pleas or of the minor judiciary designed in whole or in part to protect the victim from the defendant.

**Aggravating Circumstances.** Statutory aggravating circumstances should be drafted to ensure that the death penalty is limited to a narrow class of the worst murders of the first degree. Aggravators should differentiate murders that genuinely deserve the death penalty from the majority that do not; in other words, the aggravators should distinguish "garden variety" murder from "the worst of the worst." They should identify crimes that affect the Commonwealth as a whole. At the same time, aggravators should not have a discriminatory effect against racial and ethnic minorities. Selection of the aggravating circumstances should reflect the subcommittee on policy's considered views regarding whether they identify especially heinous factors, significantly narrow eligibility for the penalty, and apply to cases that are likely to actually occur. Consideration should be given to retaining aggravating circumstances that our Commonwealth has and which have been adopted in many other jurisdictions; at the same time, aggravating circumstances that would be unique or that are used in only a few other jurisdictions should not be enacted here.

In its comprehensive, national review, The Constitution Project recommends the following, limited list:[720]

- The murder of a police officer killed in the performance of his or her official duties when done to prevent or retaliate for that performance.
- The murder of any person (including . . . inmates, staff, and visitors) occurring at a correctional facility.
- The murder of two or more persons, regardless of whether the deaths occurred as the result of the same act or . . . unrelated acts, as long as (a) the deaths were the result of an intent to kill more than one person, or (b) the defendant knew the act or acts would cause death or create a strong probability of death or great bodily harm to the murdered individual or others.

---

[720] The Const. Project, *supra* note 693, at 10.

- The intentional murder of a person involving the infliction of torture. In this context, torture means the intentional and depraved infliction of extreme physical pain for a prolonged period of time prior to the victim's death; depraved means that the defendant relished the infliction of extreme physical pain upon the victim, evidencing debasement or perversion, or that the defendant evidenced a sense of pleasure in the infliction of extreme physical pain.
- The murder by a person who is under investigation for, or has been charged with or convicted of a felony; or the murder of anyone involved in the investigation, prosecution, or defense of that crime, including . . . witnesses, jurors, judges, prosecutors, and investigators.

The Constitution Project emphasizes criminal intent and deemphasizes the result of the crime, when it may not have been intended.[721] The aggravators should target "the fewest, most heinous and shocking first degree murders, for which any lesser response would minimize the magnitude of the offense".[722] They should promote public safety by protecting law enforcement personnel and should avoid singling out murders that are likely to reveal "racial or class bias", such as gang activity.[723] California Commission on the Fair Administration Justice noted that "a narrowing of the California special circumstances to" these "five factors . . . could largely eliminate the geographic variation in use of the death penalty" in that state.[724]

A study about mistakes in death verdicts that were judicially reversed "due to serious errors" was followed by another study to address why so many mistakes were made and how to prevent them.[725] This comprehensive, statistical study observes that "expanded and indiscriminate use of the death penalty," which is often extended "to weakly aggravated cases as a way of demonstrating a firm resolve to fight crime", results in "a greatly increased risk of serious capitol mistake, reversal and costly retrials."[726] It is common to enact additional aggravating circumstances to address a crime that slips through the cracks of the preexistent ones. "New aggravating circumstances should be resisted on principle. If consideration is given to them, any change should not proceed piecemeal, but should be part of an overall revamping of the statute that removes other, less appropriate circumstances at the same time."[727] Primarily to be avoided are vague, "catch-all aggravating circumstances that . . . apply to essentially all first-degree murders . . . ;"[728] others "that simply duplicate the definition of murder . . .;"[729] and ones "that treat the same fact as two different reasons to impose death".[730]

---

[721] *Id*. at 13.
[722] *Id*. at 15.
[723] *Id*. at 14-16.
[724] Cal. Comm'n on the Fair Admin. of Just., *supra* note 209, at 140.
[725] James S. Liebman *et al.*, *A Broken System, Pt. II: Why There Is So Much Error in Capital Cases, & What Can Be Done About It*, http://www2.law.columbia.edu/brokensystem2/report.pdf (2002).
[726] *Id.* at 362.
[727] *Id.* at 420.
[728] *Id., e.g.*, atrocious, depraved, *etc.*.
[729] *Id., e.g.*, occurred in the course of a felony, *etc.*.
[730] *Id., e.g.*, a single aggravating circumstances is effectively double-counted: in the course of a robbery & for pecuniary gain.

The authors of this study advocate that the statute should require aggravating circumstances to *substantially* outweigh the mitigators. Accordingly, jurors would be required

> to impose a lesser sentence unless they are convinced that the case is so aggravated, after taking mitigating factors into account, that only the death penalty will suffice to punish the offender and protect society. By limiting the death penalty to the strongest cases for that punishment, these policies are well calculated to avoid the high rates of unreliable error that our regression analyses associate with broad death-sentencing policies.[731]

Due to the likelihood of inflated "capital-sentencing rates—and, as a result, rates of serious capital error", these authors are critical of provisions from "California and Pennsylvania" that impose the death penalty whenever:

> the aggravating circumstances outweigh the mitigating circumstances by any amount, however minor or miniscule. . . . **It is hard to imagine sentencing policies that are more likely than those of California, Pennsylvania and Arizona to inflate capital sentencing rates—and, as a result, rates of serious capital error—through imposition of death verdicts in marginal cases.**[732]

Another author divides aggravators into aggravating circumstances and aggravating motives, cautioning that these two categories overlap. He advises using the following:

- especially heinous, atrocious, or cruel killing (as in sadistic pleasure, extended pain and suffering, or torture)
- vulnerable victim due to age or mental condition
- deliberate killing of law enforcement or emergency medical personnel
- serial killer (three or more people on three or more unrelated occasions)
- mass murder (four or more victims in a single incident)
- contract killer or paid assassin, or other killing for pecuniary gain
- hate crimes (motivated by the victim's race, religion, national origin, or sexual orientation)
- killing of an unresisting robbery victim or a potential witness
- knowing endangerment of several persons[733]

This author would remove the felony murder aggravator because it "ensnares a shocking number of innocents" and because it can operate in a racially biased way.[734]

---

[731] *Id.* at 399-400.

[732] *Id.* at 400 (bolded in original). This study excludes a numerical estimate of the impact of this suggested change.

[733] Robert Blecker, *The Death of Punishment: Searching for Just. Among the Worst of the Worst* 279-80 (2013).

[734] *Id.* at 46.

***Aggravating Circumstances in Plea Bargaining.***[735]   Not only are aggravating circumstances considered for sentencing, but they are also used by prosecutors in plea bargaining. Prosecutors may pose the possibility of the death penalty to induce an accused into a guilty plea, in return for which the prosecutor removes the death penalty from the case.  The Constitution requires that a death charge should be reserved only for particularly deserving crimes, for which some would contend that plea bargaining is inappropriate.  The use of the death penalty charge as a plea bargaining tool is unfair to the accused if it used coercively.  The greater the number and more broadly worded statutory aggravating circumstances, the easier it is for a prosecutor to extract a plea.  Some of our Commonwealth's aggravating circumstances are overbroad in that they are vulnerable to the complaint that almost any murder can be charged as a capital murder; this is particularly true of the felony murder[736] and grave risk[737] aggravators.  At the same time, the statutory list does include all of the crimes that the death penalty could possibly apply to, and should not be broadened to include any crime that could not currently be charged as aggravated murder without a compelling reason.

***Suggested Reforms to Pennsylvania's Aggravating Circumstances.***  The consensus of the subcommittee on policy is that the following aggravating circumstances identify particularly deserving murders and are therefore appropriate if the death penalty is retained:  (1) murder of specified,  public officials and employees; (2)  paid murder; (3) murder of a hostage; (5) murder of a prosecution witness to prevent testimony; (8) torturous murder; (15) retaliatory murder of a nongovernmental informant; (16)  murder of a child under age 12; (17)  murder of a woman in the third trimester of pregnancy; and (18) murder of a person while violating Protection from Abuse Act.[738]

With respect to the remainder of the statutory aggravating circumstances, the subcommittee on policy recommends consideration of these possible amendments.

1. The aggravating circumstance of a murder during an (4) aircraft hijacking should be repealed because it insufficiently specifies the circumstances under which it would apply and is more appropriately within the purview of a federal prosecution.

2. The aggravating circumstance for (5) murder of a prosecution witness to prevent testimony should be clarified to apply to any person who murders a prosecution witness.  It appears to be limited to the defendant who murders a prosecution witness to prevent the witness from testifying against the defendant himself.  If that defendant induces a third party to murder a witness, this aggravating circumstance might not apply to the witness's murderer, although it does apply to the defendant against whom witness would have testified.

3. The aggravating circumstance for (6) murder in perpetration of a felony is equivalent to murder of the second degree, which carries a sentence of life imprisonment (without parole).[739]  At common law, felony murder could apply even though the offender had

---

[735] A more general discussion of plea bargaining death cases appears *supra* pp. 68-72.
[736] 42 Pa.C.S. § 9711(d)(6).
[737] *Id.* § 9711(d)(7).
[738] 42 Pa.C.S. § 9711(d).
[739] 18 Pa.C.S. §§ 1102(b), 2502(b).

no specific intent to kill, under a legal fiction known as transferred intent: the intent to commit the felony supplied the intent to commit murder. More recently, the U.S. Supreme Court narrowed felony murder to cases where the defendant either took life, attempted to take life, or intended or contemplated that a life would be taken.[740] It can also apply where the accused had a major participation in the felony and acted with reckless indifference to human life.[741] Under Pennsylvania law, this aggravating circumstance is restricted to persons who actually "'commit' the killing" and "may not be applied to an accomplice who does not".[742] However, even with these limitations, this aggravating circumstance is overbroad and should be repealed. A large proportion, or even a majority, of murders fall under this category, and the fact that the murder is committed in the perpetration of a felony does not by itself create the level of blameworthiness that is particularly deserving of the death penalty.

4. The aggravating circumstance of (7) creating a grave risk of death to another in addition to the victim is overbroad; it can apply to any murder committed in the presence of a third person and does not require that the murderer intend any death other than the victim's. However, eliminating it entirely would leave out heinous crimes, such as where the murderer kills one person and simultaneously inflicts multiple gunshots on a second person who happens to survive, often because of heroic medical care. To limit this aggravating circumstance to genuinely deathworthy offenses, it should further require that the perpetrator caused serious injury to at least two bystanders or one or more persons other than the murder victim, either intentionally, knowingly, or with extreme or depraved indifference to the value of human life.

5. The aggravating circumstance for (8) tortuous murder is rarely seen in Pennsylvania but might occur from time to time. The term is vague, but it has been judicially interpreted: "Torture is the intentional infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious or cruel manifesting exceptional depravity. There must be an indication that the killer was not satisfied with the killing alone."[743] Given this interpretation, this aggravating circumstance should be retained.

6. The aggravating circumstances set forth in paragraphs (9) through (12)[744] apply to felonies committed prior to or simultaneously with the offense at issue. Evidence of prior offenses is typically excluded at the guilt stage of a criminal trial, but may be considered at the sentencing stage and likely would be if there was evidence to present attributable to these aggravating circumstances. Juries and the public believe that prior serious offenses are important in considering the gravity of the offense, just as a clean criminal record is considered an important mitigating factor.[745]

---

[740] *Enmund v. Fla.*, 458 U.S. 782, 801 (1982).
[741] *Tison v. Ariz.*, 481 U.S. 137, 158 (1987).
[742] *Commw. v. Lassiter*, 722 A.2d 657, 662 (Pa. 1998).
[743] *Commw. v. Whitney*, 708 A.2d 471, 480 (Pa. 1998) (citations omitted).
[744] 42 Pa.C.S. § 9711(d).
[745] *Id.* § 9711(e)(1).

Paragraph (9)[746] is an aggravating circumstance applicable if "[t]he defendant has a significant history of felony convictions involving the use or threat of violence to the person." Other than the facts of the crime itself, the criminal history of a defendant is probably the most important factor in sentencing. This aggravating circumstance has been judicially construed to require at least two prior convictions within the ambit of that paragraph.[747] Subsequently, paragraphs (11) and (12) were enacted to apply the aggravating circumstance in paragraph (9) if the single prior conviction is for murder or voluntary manslaughter.[748] Thus, a previous conviction for murder would support an aggravating circumstance under paragraph (11) instead of (9). The phrase "felony convictions involving the use or threat of violence to the person" refers to the nature of the other offenses that form the basis for applying this aggravating circumstance; a conviction for "burglary has always been and continues to be viewed as a crime involving the use or threat of violence to the person" when graded "as a felony of the first degree . . . consistent with the theory that the unprivileged entries into buildings and structures where people are likely to be found is a clear threat to their safety."[749]

The subcommittee on policy recommended that paragraph (9) be redrafted to clarify and narrow its application by requiring two or more felonies of the first class, with each predicate offense involving either serious injury to an individual other than the victim of the offense at issue or an imminent threat of death or serious injury to the other individual. This change is intended to ensure that the predicate offense is sufficiently grave to constitute an appropriate ground for seeking the death penalty, as well as to remove the possibility that this aggravating circumstance would be predicated on a verbal threat.

Paragraphs (10) and (11) apply to a defendant who is under or potentially serving under a prior life or death sentence or was convicted of another murder. The significant difference between them is that paragraph (10) applies to any offense that was punishable by life imprisonment, which could be an aggravated murder of the first degree or a third crime of violence,[750] whereas paragraph (11) is limited to murder. An aggravating circumstance on a "third strike" offense, instead of murder, might be overbroad, in which case it should be restricted to murders committed before or simultaneously with the murder at issue. Since paragraph (11) states this, the subcommittee suggested that it be retained and paragraph (10) be repealed.

The subcommittee concluded that the aggravating circumstance in paragraph (12) for a prior voluntary manslaughter should be removed. Whether it involved a serious provocation resulting in a crime of passion or imperfect self-defense, voluntary manslaughter requires an intentional killing, which makes it arguably more appropriate than paragraph (9).[751] Some would favor retaining the aggravating circumstance for a prior voluntary manslaughter because it often represents a case where the prosecution unsuccessfully sought a murder conviction. Whenever a

---

[746] *Id.* § 9711(d).

[747] *Commw. v. Goins*, 495 A.2d 527, 534 (Pa. 1985).

[748] *See Commw. v. Moran*, 636 A.2d 612, 613 n.1 (Pa. 1993).

[749] *Commw. v. Rolan*, 549 A.2d 553, 559 (Pa. 1988). "What makes burglary more serious in nature is the added element of intent to commit a crime while inside the building or occupied structure." *Commw. v. Thomas*, 561 A.2d 699, 709 (Pa. 1989).

[750] 42 Pa.C.S. § 9714(a)(2).

[751] This could also be a negligent or accidental killing of somebody else instead of the intended victim. 18 Pa.C.S. § 2503.

prior conviction is proposed as an aggravating circumstance, the prosecution must bring the specific facts of the prior case before the jury, through witnesses, stipulation of counsel, or otherwise. This enables the jury to make an informed decision as to whether the prior offense is serious enough to support a death verdict. Characterizing the prior voluntary manslaughter conviction as if it were for murder would unfairly ignore the earlier verdict.

7. The aggravating circumstances dealing with drug offenses in paragraphs (13) and (14) should also be repealed. Other states do not have similar language, and the paragraphs do not seem to describe a murder so particularly deserving of the death penalty.

8. The aggravating circumstance for the retaliatory murder of an informant in paragraph (15) should be retained. Removing it may hamper murder investigations, as it is intended to be protective of both an ordinary citizen who comes forward with information and a regular, nongovernmental informant. The criminal justice system sometimes faces problematic witness resistance and intimidation. Paragraphs (5) and (15) are attempts to address this problem.

The subcommittee on policy considered several other, potential aggravating circumstances but rejected them under the general policy presumption that the number of aggravating circumstances should not be expanded absent a compelling reason.

***Mitigation.*** To narrow the application of the death penalty to the particularly deserving offenders, the statute specifies mitigating circumstances that permit the jury to consider factors that may make the death penalty inappropriate. While "[a]ggravating circumstances must be proved by the Commonwealth beyond a reasonable doubt; mitigating circumstances must be proved by the defendant by a preponderance of the evidence",[752] which is a lower burden of proof.

Appendix C shows statutory mitigating circumstances nationally.[753] The current list of mitigating circumstances under Pennsylvania law reads as follows:

(e) Mitigating circumstances.--Mitigating circumstances shall include the following:
(1) The defendant has no significant history of prior criminal convictions.
(2) The defendant was under the influence of extreme mental or emotional disturbance.
(3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
(4) The age of the defendant at the time of the crime.
(5) The defendant acted under extreme duress, although not such duress as to constitute a defense to prosecution under 18 Pa.C.S. § 309 (relating to duress), or acted under the substantial domination of another person.
(6) The victim was a participant in the defendant's homicidal conduct or consented to the homicidal acts.
(7) The defendant's participation in the homicidal act was relatively minor.

---

[752] 42 Pa.C.S. § 9711(c)(iii).
[753] *Infra* pp. 227-28.

(8)  Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.[754]

Except as noted below, the subcommittee on policy recommends that the mitigating circumstances paragraphs (1) through (7) be retained.  However, it also recommends that the words bracketed below in bold be repealed because they limit the consideration of mitigating evidence:

(2)  The defendant was under the influence of **[extreme]** mental or emotional disturbance.

(3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was **[substantially]** impaired. * * *

(5)  The defendant acted under **[extreme]** duress, although not such duress as to constitute a defense to prosecution under 18 Pa.C.S. § 309 (relating to duress) or acted under the **[substantial]** domination of another person.

These statutory modifiers do not unconstitutionally limit "the range of mitigating circumstances that the jury could consider through its use of the words *extreme* and *substantial*."[755] Nonetheless, whether they  "serve to inform, rather than hinder, the jury regarding its discretion with respect to the specific mitigating circumstances",[756] not all jurisdictions use such qualifiers, which casts some doubt on whether they are necessary.[757]

***Moral desert.***  The mitigating circumstance in paragraph (8), permits the capital case jury to consider "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of the offense."[758]  In connection with mitigation, a proposal from American Bar Association on the Pennsylvania death penalty would expand the jury's discretion to refuse the death penalty.  The subcommittee on policy recommends that the following recommendation be adopted and reflected in § 9711:

*Trial courts should instruct jurors that a juror may return a life sentence, even in the absence of any mitigating factor and even where an aggravating factor has been established beyond a reasonable doubt, if the juror does not believe that the defendant should receive the death penalty.*[759]

The principle should also apply where the jury finds that the aggravating circumstances outweigh the mitigating ones.  It is probably rare for a jury to hand down a death sentence when one or more jurors believes the sentence to be inappropriate; however, it could clear up potential juror confusion over the requirement on unanimity for a finding of an aggravating circumstance that does not apply to a finding of a mitigating circumstance.

---

[754] 42 Pa.C.S. § 9711(e).

[755] *Commw. v. Williams*, 615 A.2d 716, 723-24 (Pa. 1992), following *Blystone v. Pa.,* 494 U.S. 299, 308-09 (1990).

[756] *Id.*

[757] *E.g.*, N.C. Gen. Stat. § 15A-2000 (f)(2) (mental or emotional disturbance), (f)(5) (duress or domination), & (f)(6) (impaired capacity).

[758] 42 Pa.C.S. § 9711(e).

[759] Am. Bar Ass'n, *supra* note 17, at 218.

In prepared testimony, a professor proposed that a defendant should not be sentenced to death unless the jury "feels morally certain that he deserves to die".[760]  This criterion should apply even when "a jury may have found that aggravating circumstances outweigh mitigating circumstances . . . notwithstanding no reasonable or residual doubts of . . . guilt".[761]  In his view, moral desert is independent of the factual issue of guilt of the offense and the weighing of aggravating and mitigating circumstances.

While some members of the subcommittee on policy found his proposal persuasive, the majority rejected it because it evades the careful analysis that the current law prescribes.  Such a direct approach carries too great a risk that the jury will make a snap decision on the basis of emotion, especially because it is couched in terms of "moral certainty."

***Residual doubt.***  Doubt that may still exist, even when proof beyond a reasonable doubt is satisfied, is called "lingering" or "residual" doubt.  For instance, there might be doubt about the perpetrator's intent where it is difficult to conclude definitively.  Strictly speaking, residual doubt is a matter of the quantum of proof rather than the defendant's "character and record," but it is similar to the mitigating circumstances in that it constitutes a reasonable basis for handing down a life sentence.  Some research suggests that residual doubt is the single most common mitigating factor that leads juries to recommend a life sentence.[762]

Defense attorneys commonly argue residual doubt generally as a mitigating circumstance, and it is appropriate to do so in view of the following conclusion by U.S. Supreme Court:

> [T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.[763]

Despite this conclusion, U.S. Supreme Court "has never held that a capital defendant has a constitutional right to an instruction telling the jury to revisit the question of his identity as the murderer as a basis for mitigation", while repeating "the simple truism" that states "could allow defendants to capitalize on 'residual doubts,'" inuring to his benefit.[764]

Nevertheless, if the trier of fact is convinced that residual doubt of the defendant's guilt applies, it should either be treated as a mitigating circumstance or bar a death sentence.  Model Penal Code no longer has a section relating to capital punishment[765] but formerly recommended that the defendant be sentenced "for a felony of the first degree" where the evidence sufficed to

---

[760] Pa. H.R. Comm. on the Judiciary (June 11, 2015) (statement of Prof. Robert Blecker).

[761] *Id.*

[762] Margery Malkin Koosed, *Averting Mistaken Executions by Adopting the Model Penal Code's Exclusion of Death in the Presence of Lingering Doubt*, 21 N. Ill. U. L. Rev. 41, 54-60 (2001).  "More recent studies repeatedly confirm that jurors focus on lingering doubt during their deliberations, and that this is by far the most significant factor in their deliberations. . . . . The primacy of lingering doubt in life-sentencing decisions is universal. " *Id.* at 56, 60.

[763] *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasis in original).

[764] *Franklin v. Lynaugh*, 487 U.S. 164, 172-73 (1988).

[765] Am. Law Inst., Model Penal Code, https://www.ali.org/publications/show/model-penal-code/ (2018).

sustain the verdict but "not foreclose all doubt respecting the defendant's guilt."[766]  Use of residual doubt in either of these ways reduces the possibility of imposing a death sentence on a factually innocent defendant.  And it is consistent with the principle that "[g]iven the irrevocable nature of the penalty of death, a decision to impose the penalty requires a greater degree of reliability than is required for the imposition of other penalties."[767]

     ***Specific and Comparative Proportionality Review.***  As mentioned above, one of the bases on which the death penalty statute in *Gregg v. Georgia* was upheld was that it mandated state Supreme Court review of the death sentence to "determine whether it is imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and *whether the sentence is disproportionate compared to sentences imposed in similar cases.*"[768]  (Appellate review under the italicized standard is referred to here as "comparative proportionality review.")  These standards, along with prescribed aggravating and mitigating circumstances, assured the Court that the death penalty would not be applied in an impermissibly arbitrary and capricious manner.[769]

     Under comparative proportionality review, the state Supreme Court "compares each death sentence with the sentences imposed on similarly situated defendants to ensure that the sentence of death in a particular case is not disproportionate."[770]  In other words, the state Supreme Court must review a death verdict that meets the statutory requirements for the death penalty to determine whether it should nevertheless be overturned because it is out of line with the results in prior death penalty cases.  Using this standard, the Georgia Supreme Court invalidated death sentences in cases of rape and armed robbery when they were capital offenses on the ground that persons convicted of these crimes were almost always given lesser sentences.[771]

     In *Pulley v. Harris*, the U.S. Supreme Court held that comparative proportionality review is not necessary to make a death penalty scheme constitutional if other features were present "to promote the evenhanded, rational, and consistent imposition of death sentences."[772]  Although proportionality review is "an additional safeguard against arbitrarily imposed death sentences,"[773] constitutional checks on arbitrariness could be met by other features, such as a definition narrowing capital murder to a sub-class, prompt and automatic review by the state Supreme Court, and defined aggravating and mitigating factors (with the aggravating ones proven beyond a reasonable doubt).[774]

---

[766] *Id.*, Rep. of the Council to the Membership of the Am. Law Inst. on the Matter of the Death Penalty, Annex A (2009), *available at* https://www.ali.org/media/filer_public/3f/ae/3fae71f1-0b2b-4591-ae5c-5870ce5975c6/capital_punishment_web.pdf.

[767] The Const. Project, *supra* note 693, at 90.

[768] *Gregg v. Ga.*, 428 U.S. 153, 198 (1976), citing Ga. Stat. § 27-2537(c) (emphasis added.)

[769] *Id.* at 198.

[770] *Id.*

[771] *Id.* at 205.

[772] *Pulley v. Harris*, 465 U.S. 37, 45, 49-51 (1984).

[773] *Id.* at 50.

[774] *Id.* at 49-53.

When Pennsylvania's death penalty statute was rewritten in 1978 (in response to *Gregg v. Georgia)*, it included a provision mandating comparative proportionality review. The provision directed our Supreme Court to vacate a sentence of death if "excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant."[775] This provision was repealed in 1997[776] because it had never been used to overturn a death sentence and its existence created a concern related to a then-pending challenge to a judicial procedure applying that provision.[777] Those favoring repeal perceived this challenge as a threat to the death penalty itself; however, the judicial review found the sentence neither "excessive or disproportionate to the penalty imposed in similar cases" and the judiciary in compliance with the statutory provision.[778]

When the Commonwealth's statute required a judicial, comparative proportionality review, Pennsylvania's Supreme Court independently evaluated "all cases of murder of the first degree convictions which were prosecuted or could have been prosecuted under . . . 42 Pa.C.S.A. § 9711."[779] To be able to do this, each "President Judge of each county" was ordered

> to supply to the Administrative Office of Pennsylvania Courts (the AOPC) information pertaining to each such conviction and imposed a continuing obligation on the President Judges to update the AOPC with data pertaining to future cases. This information includes the facts and circumstances of the crimes, the aggravating and mitigating circumstances arguably presented by the evidence, the gender and race of the defendant and the victim, and other information pertaining to the conduct and prosecution of the case. The data will be compiled and monitored by the AOPC to insure that the body of 'similar cases' is complete and to expedite our proportionality review.[780]

---

[775] Former 42 Pa.C.S. § 9711(h)(3)(iii).

[776] Act of June 25, 1997 (P.L.293, No.28), § 1.

[777] *Commw. v. Gribble*, 703 A.2d 426, 440 (Pa. 1997).

[778] *Id.* at 441.

[779] *Commw. v. Frey*, 475 A.2d 700, 707 (Pa. 1984).

[780] *Id.* at 707-08.

The form that was developed to collect the data is set forth below:[781]

**ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS**
**REVIEW FORM**
**MURDER OF THE FIRST DEGREE**
**IN THE COURT OF COMMON PLEAS OF _____ COUNTY, PENNSYLVANIA**
**COMMONWEALTH OF PENNSYLVANIA : CASE NO. _____:**
**vs. : _____**

1. Defendant's: (a) date of birth: _____
      (b) race: _____
      (c) sex: _____

2. Victim's: (a) date of birth: _____
      (b) race: _____
      (c) sex: _____

3. Guilt determined by: jury ( )
      trial court ( )
      guilty plea ( )

4. Was the death penalty sought?
      Yes ( )
      No ( )

5. If No. 4 is answered yes,
      (a) sentencing disposition: death penalty ( )
         life imprisonment ( )
      (b) sentence determined by: jury ( )
         trial court ( )
      (c) List all aggravating circumstances, see 42 Pa.C.S. § 9711(d), presented at the sentencing hearing by the Commonwealth and briefly set forth the facts and evidence relevant to each such circumstance: _____
      (d) List all mitigating circumstances, see 42 Pa.C.S. § 9711(e), presented at the sentencing hearing by the defendant and briefly set forth the facts and evidence relevant to each such circumstance: _

6. List all other offenses which were tried at the same trial and indicate which offenses stemmed from or related to the charge of murder of the first degree, and whether defendant was convicted or acquitted on these other offenses: ___

---

[781] *Id.* at 711. Challenges "arguing that the AOPC's proportionality database is flawed" were "consistently rejected" by rulings "particularly noting that the data compiled by the AOPC is neither defective nor flawed." *Commw. v. Spotz*, 896 A.2d 1191, 1249 (Pa. 2006).

7. If there were any co-defendants involved in this case, complete the following:
    (a) Name: _____
            Information/Indictment No(s).: _____
            Offenses charged:
            Disposition:
            Status of case:
    (b) Name: _____
            Information/Indictment No(s).:_____
            Offenses charged:
            Disposition:
            Status of case:
    (c) Name: _____
            Information/Indictment No(s).: _____
            Offenses charged:
            Disposition:
            Status of case:

8. Status of case, including date of most recent action: _____
(E.g., verdict returned on _____ but formal sentencing delayed pending disposition of post-verdict motions; notice of appeal filed on _____; etc.)

9. If any opinions have been written in this case, attach to this Review Form. Otherwise, please forward when available.

10. If a transcript of the sentencing hearing is available in this case, attach a certified copy to the Review Form; if not immediately available, transmit a certified copy to the AOPC upon receipt.

END OF FORM

While the ruling of *Pulley v. Harris* rejected comparative proportionality review as a constitutional requirement, there remains the question of whether it should be adopted as a matter of policy. Proportionality review is used in sixteen states and was used in other states before they abolished the death penalty.[782]

**Evaluation of Proportionality Review.**  Proponents of proportionality review, such as The Constitution Project, argue that it can achieve three goals: "(1) ensure that the death penalty is being administered in a rational, non-arbitrary, and even-handed manner, (2) provide a check on broad prosecutorial discretion, and (3) prevent discrimination from playing a role in the capital decision-making process".[783]

Professor James Liebman supports the use of comparative review as an important tool to ensure that the death penalty will apply to "*core* capital murders" and will exclude "outlier" cases.[784]  This will help promote consistency while reducing the possibility of error.[785] Comparative review excludes weak cases and cases where the death verdict may be significantly affected by political pressure on prosecutors and trial judges.[786]

Professor Barry Latzer, however, regards comparative proportionality review as conceptually unsound because if a case deserves the death penalty, it does so regardless of whether it was applied in a similar case. Regarding two specific cases he comments:

> Most . . . prosecutors and jurors, and I daresay most people who are not absolutely opposed to the death penalty, would agree that a man who committed more than one murder in separate incidents is prima facie deathworthy.  The fact that other serial killers, e.g. [Defendant A], the multiple rape-murderer may have been more deathworthy is of no moment: [Defendant B] clearly meets the threshold requirement for a death sentence.[787]

A different version of proportionality review, called specific proportionality review, is proposed by Professor Evan J. Mandery.  The test is whether contemporary standards of decency permit or forbid the use of the death penalty in the case reviewed.[788]  The standard of decency can be objectively determined by examining dispositions where the same factor was present that forms the ground for the claim for relief.

---

[782] Ala. Code § 13A-5-53(b)(3), Ga. Code Ann. § 17-10-35(c)(3), Ky. Rev. Stat. Ann. § 532.075(3)(c), La. Code Crim. Proc. Ann. art. 905.9.1 § (1)(c), Miss. Code Ann. § 99-19-105(3)(c), Mo. Ann. Stat. § 565.035(3)(3), Mont. Code. Ann. § 46-18-310(1)(c), Neb. Rev. Stat. § 29-2521.03, N.H. Rev. Stat. Ann. § 630:5(XI)(c), N.C. Gen. Stat. § 15A-2000(d)(2), Ohio Rev. Code. Ann. § 2929.05(A), S.C. Code Ann. § 16-3-25(C)(3), S.D. Codified Laws § 23A-27A-12(3), Tenn. Code Ann. § 39-13-206(c)(1)(D), Wash. Rev. Code Ann. § 10.95.130(2)(b), & *Sinclair v. Fla.*, 657 So. 2d 1138, 1142 (Fla. 1995).

[783] The Const. Project, *Mandatory Justice:  Eighteen Reforms to the Death Penalty* 27 (2001), *available at* https://constitutionproject.org/wp-content/uploads/2012/08/MandatoryJustice.pdf.

[784] Liebman *supra* note 725, at 407.

[785] *Id.*

[786] *Id.*

[787] Barry Latzer, *The Failure of Comparative Proportionality Rev. of Capital Cases (w/Lessons from N.J.)*, 64 Alb. L. Rev. 1161, 1232 (2001).  Latzer thinks that comparative proportionality review creates "an unrealistic standard" because "[p]erfectly evenhanded enforcement of the death penalty is unattainable."  *Id.* at 1243-44.

[788] Evan J. Mandery, *In Defense of Specific Proportionality Rev.*, 65 Alb. L. Rev. 883, 887-88 (2002).

Unlike comparative review, . . . specific review does not concern itself with how defendants sentenced to die are treated vis à vis similar defendants given a life sentence. Rather, the question is similar to that asked under inherent review: whether death is ever appropriate for this type of criminal. But whereas, in determining appropriateness, inherent review inquires only into the nature of the offense committed, specific review considers other factors. Under inherent review, a court would ask only whether death were an appropriate punishment for murderers. Under specific review, a court would go on to ask, for example, whether death is an appropriate punishment for convicted murderers who did not pull the trigger, or for murderers who operated under a significant level of mental impairment.[789]

Opponents of proportionality review might suspect that abolitionists advance it primarily as another hurdle for a death penalty case to clear.[790] If the death penalty statute is constitutional, it would seem to provide both a reasonably consistent set of criteria for separating death eligible murderers from others and, given the opportunity to present mitigating evidence of the defendant's character and record along with the circumstances of the offense, an opportunity for the jury to examine each crime individually. Thus proportionality review, whether specific or comparative, might strike the death penalty supporter as less of an omission. A possibly genuine problem may be that the aggravators are so broad and so numerous that most murders are arguably death eligible, which thwarts consistency in sentencing.[791] Repeal of overly broad aggravating circumstances could address that concern, but so can comparative proportionality review. "Courts could mitigate the influence of race, for instance, with the application of an objective, neutral standard. Likewise, a state supreme court could eliminate the influence of geography, at least within a state, by applying a consistent statewide standard."[792]

One key argument and justification often overlooked by commenters on both sides of the issue is the usefulness of comparative proportionality review as a safeguard to prevent racial, ethnic or socio-economic unfairness. For instance, it may overturn a verdict where an African-American was given a death sentence, while a similarly-situated White defendant was given life imprisonment. In such cases, one may infer that conscious or unconscious racism played a part in the disparity. Proportionality review also encourages the collection of useful data on the circumstances of individual murder cases. On the other hand, proportionality review calls upon the judiciary to invade a province that is otherwise assigned to the jury. For all other crimes, the criminal justice system tolerates differences in outcomes arising from differences among juries, but it could be argued that in this issue, as in others, death should be treated differently.

---

[789] *Id.* at 894-95.

[790] Professor Berry forthrightly recognizes the possibility that "adopting meaningful comparative proportionality review could ultimately lead to the abolition of the death penalty." William W. Berry III, *Practicing Proportionality*, 64 Fla. L. Rev. 687, 718 (2012).

[791] *Id.* at 702, 705, 718.

[792] *Id.* at 718.

# Impact on and Services for Family Members

The question that serves as the basis of the study of impact on and services for family members in the administration of the death penalty in our Commonwealth is:

> The impact of the death penalty on family members and loved ones of murder victims and the availability and cost of services currently being provided in Pennsylvania for family members and loved ones of murder victims and whether these services are sufficient to meet the needs of surviving families;[793]

## *Services*

Services for family members and loved ones of murder victims in this Commonwealth are provided on a county-by-county basis. Predominantly, those services are provided within the county's Office of District Attorney.[794] Some counties have one or more private, not-for-profit victims' support offices that operate in conjunction with or in lieu of a victim's witness advocate working for a district attorney. These services are paid for from a mix of public and private funding.

There are a broad range of services available to family members and loved ones impacted by homicides,[795] including crisis counseling, intervention and group support, as well as referrals to on-going therapy. Advocates will also help them to understand the legal process and work with them to navigate each aspect of the criminal and juvenile justice systems. This type of assistance goes beyond explaining the system, in that they accompany victims to judicial proceedings and help them register for various notifications. The advocate will also help victims write their impact statements to clearly and appropriately state how the crime changed their and their family's life financially, physically and emotionally. Victims Compensation Assistance Program[796] will provide financial help to deal with expenses, such as funeral costs, loss of earnings and support, and medical and counseling expenses among other eligible expenses.

---

[793] Pa. S. Res. No. 6 (Sess. of 2011); appdx. A, *infra* pp. 219-20.

[794] Prosecutors have statutory responsibilities to some victims. Act of Nov. 24, 1998 (P.L.882, No.111), § 213; 18 P.S. § 11.213. "A family member of a homicide victim" is a victim. *Id.* § 103; 18 P.S. § 11.103.

[795] Pa. Office of Victim Servs., Pa. Comm'n on Crime & Delinquency, http://pcv.pccd.pa.gov/available-services/Pages/Interactive-Map.aspx#.VBB2X_ldVyx (2018); Pa. Office of Victim Advocate, Locate a Victim Serv. Agency, http://www.ova.pa.gov/Services/Resources/LocateaVictimServiceAgency/Pages/default.aspx (2018). Victims of crime have statutory rights. Act of Nov. 24, 1998 (P.L.882, No.111), § 201; 18 P.S. § 11.201.

[796] Pa. Office of Victim Servs., Victims Compensation, http://pcv.pccd.pa.gov/available-services/Pages/Victims-Compensation.aspx (2018). Act of Nov. 24, 1998 (P.L.882, No.111), §§ 701-710; 18 P.S. §§ 11.701-11.710.

The services are generally but not precisely uniformly available throughout the counties; there are reporting requirements for services receiving grants. In some cases, because of the geographical size of a county, there may be a challenge to obtain the services. In other words, it may be difficult for a family member or loved one of a homicide victim to travel to get the service. There also may be a delay in providing the services due to insufficient staffing. In some cases, where size of the county would impact availability or the infrequency of homicides means that counties do not maintain certain services on an ongoing basis, counties share or pool services to improve availability.

Staff from Joint State Government Commission spoke with staff from various advocacy offices to determine the sufficiency of the services provided. There was a wide range of responses. One third of the providers said that the services were insufficient. Some of those expounded that their services were meant to help family members navigate the criminal justice system. Others referenced family members' ongoing counseling needs as being beyond their office's scope of service. One advocate reported that her county had no support group specifically for families of murder victims. Another said that because of funding cuts over the last 15 years, there was often a delay of up to 24 hours in responding to victims' families. Funding cuts were mentioned several times as the reason that services were insufficient.[797]

Conversely, almost half of the advocates felt that the services were sufficient, although this group of responders often acknowledged that the loss of a family member or loved one through homicide left a hole that could never be fully filled. One particular advocate stated that the services were sufficient and if there was something else that was needed, she would take care of it.

*Cost of services*

The cost of services that are provided to family members and loved ones of murder victims can only be provided as part of the larger picture of state and federal funding for victims within this Commonwealth.[798] In other words, at the service provider level, the grants are not typically broken down by type of victim[799] so the funding listed below covers victims of all crimes that would be provided services through these offices.[800] Family members and loved ones of murder victims receive support services as part of a larger group of victims of violent crimes within this Commonwealth. "On average, the Victims Compensation Assistance Program receives over 8,600 new claims and pays an average $13 million per year on behalf of crime victims"[801]

---

[797] Since then, some of the funding might have rebounded a bit.

[798] Appdx. J, *infra* pp. 257-59.

[799] Pa. Comm'n on Crime & Delinquency recently awarded requested grants totaling $2,346,175 for four recipients in Phila. to serve survivors of homicide victims. Telephone interview w/Valerie Barbin McMahon, Dir., Office of Victim Servs. (Apr. 27, 2018).

[800] Beginning in 2016, VOCA recipients have been required to keep confidential records on each crime victim that receives services to report as Victim Assistance Program Performance Measures. Pt. of this data includes the total no. of survivors of homicide victims served during the reporting period, but this data is too new to develop information on it for this report.

[801] Pa. Comm'n on Crime & Delinquency, Helping Crime Victims, http://www.pccd.pa.gov/Victim-Services/Pages/Victims-Compensation-Assistance-Program-(VCAP).aspx (2018).

With some exceptions, the total amount of an award in this program is limited to $35,000.[802] Within this limitation, the maximum aggregate award for "loss of earnings or support" for a direct victim of homicide is limited to $20,000.[803] Since awards from this program are a last resort, they would be reduced by the amount received from other sources, such as restitution, insurance, other public funds, pension benefits and other legal settlements.[804] When "two or more individuals claim" an award for the death of a direct victim, the award is apportioned.[805] These awards are administered by Office of Victims' Services in Pennsylvania Commission on Crime and Delinquency.[806]

*Victims of Crime Act of 1984 (VOCA).* This is a federal grant program through U.S. Department of Justice that supports direct assistance services to victims of all types of crime.

This includes a broad array of services for victims of violence ranging from crisis intervention, shelter, counseling, and criminal justice advocacy. The Crime Victims Fund is comprised of fines, forfeitures, and penalty assessments on offenders of federally prosecuted cases. County allocations are determined by formula using the county's population (75%) and target crimes (25%). Eligible activities are those direct services which respond to the emotional and physical needs of crime victims; assist victims of crime in stabilizing their lives after a victimization; assist victims in understanding and supporting them through the criminal and juvenile justice process; or provide victims of crime with a safe and secure environment. Ineligible activities include, but are not limited to, procedural services, prosecution and law enforcement activities, fundraising, crime prevention, and lobbying and administrative advocacy. PCCD has made a policy decision to limit the use of VOCA for procedural services. Funds in 2014/15 were awarded to 103 community-based agencies and 15 system-based agencies in the 67 counties.[807]

---

[802] Act of Nov. 24, 1998 (P.L.882, No.111), § 707(b); 18 P.S. § 11.707(b). The limitation of $35,000 dates from the statute's original enactment in 1998. Exceptions were added in 2002 to cover up to either $5,000 or $10,000 in counseling, up to $1,000 for a forensic rape examination and up to $500 to clean the crime scene of a private residence. Act of June 28, 2002 (P.L.496, No.85), § 4. The schedule of reimbursement rates and compensation limits appears in 37 Pa. Code §§ 411.41-411.44.

[803] Act of Nov. 24, 1998 (P.L.882, No.111), § 707(b)(2); 18 P.S. § 11.707(b)(2).

[804] *Id.* § 707(e); 18 P.S. § 11.707(e).

[805] *Id.* § 707(d); 18 P.S. § 11.707(d).

[806] *Id.* §§ 311(a), 312(5); 18 P.S. §§ 11.311(a), 11.312(5).

[807] Pa. Comm'n on Crime & Delinquency, Rights, Servs., Technology & Training, http://www.pccd.pa.gov/Victim-Services/Pages/Victim-Services--Rights,-Services,-Technology-and-Training.aspx (2018).

| VOCA Victim Compensation Formula Awards to Pennsylvania Commission on Crime and Delinquency from Office for Victims of Crime[808] for VOCA Victim Compensation[809] | |
|---|---|
| **Fiscal Year** | **Amount** |
| 2017 | $4,152,000 |
| 2016 | $4,480,000 |
| 2015 | $4,475,000 |
| 2014 | $2,353,000 |
| 2013 | $3,564,000 |
| 2012 | $4,386,000 |
| 2011 | $4,089,000 |
| 2010 | $4,448,000 |
| 2009 | $5,885,000[810] |
| 2008 | $6,752,000 |
| 2007 | $5,083,000 |
| 2006 | $4,491,000 |
| 2005 | $3,817,000 |
| 2004 | $2,071,000 |
| 2003 | $3,863,000 |

"No more than 5 percent of each year's VOCA compensation formula grant may be used for administration and training; the rest must be used for awards of compensation to crime victims."[811]

---

[808] "[A] a component of the Office of Justice Programs, U.S. Department of Justice." Office for Victims of Crime, U.S. Dep't of Just., Grants & Funding, https://www.ovc.gov/grants/grant_award_search.html (last visited Mar. 29, 2018). "From the Fund deposits available for victim compensation grants, the Director shall make an annual grant from the Fund to an eligible crime victim compensation program of 60 percent of the amounts awarded during the preceding fiscal year (two years prior to the grant year)." *Id.*, https://ojp.gov/ovc/grants/cvfa2017.html (last visited Mar. 29, 2018).

[809] "Crime victim compensation is a direct reimbursement to or on behalf of a crime victim for the following statutorily identified crime-related expenses:" med. costs, mental health counseling, lost wages or support, *etc.*. "Although each state administers its own program independently, most programs have similar eligibility requirements and offer comparable types of benefits." *Id.*, Crime Victims Fund, https://ojp.gov/ovc/pubs/crimevictimsfundfs/intro.html#VictimAssist (last visited Apr. 6, 2018).

[810] There was an additional grant from the recovery act for this fiscal year in the amount of $1,536,233.

[811] *Id.*, Crime Victims Fund, https://ojp.gov/ovc/pubs/crimevictimsfundfs/intro.html (last visited Mar. 29, 2018).

| VOCA Victim Assistance Formula awards to Pennsylvania Commission on Crime and Delinquency from Office for Victims of Crime[812] for VOCA Victim Assistance[813] | |
| --- | --- |
| Fiscal Year | Amount |
| 2017 | $71,649,740 |
| 2016 | $86,776,184 |
| 2015 | $77,028,140 |
| 2014 | $17,604,722 |
| 2013 | $16,479,712 |
| 2012 | $14,730,846 |
| 2011 | $16,779,293 |
| 2010 | $16,086,343 |
| 2009 | $14,088,213[814] |
| 2008 | $12,048,000 |
| 2007 | $14,666,000 |
| 2006 | $15,858,000 |
| 2005 | $14,987,000 |
| 2004 | $14,364,000 |
| 2003 | $14,239,000 |

"VOCA allows state grantees to use no more than 5 percent of each year's grant for training and administering the VOCA victim assistance grant at the state grantee level with the remaining portion being used exclusively for direct service providers."[815]

---

[812] "[A] a component of the Office of Justice Programs, U.S. Department of Justice." Office for Victims of Crime, U.S. Dep't of Just., Grants & Funding, https://www.ovc.gov/grants/grant_award_search.html (last visited Mar. 29, 2018). "From the Fund deposits available for victim assistance grants, each state grantee receives a base amount of $500,000, . . . . After the victim compensation allocations are determined, the remaining Fund deposits are allocated to victim assistance grants based upon the state's population in relation to all other states, as determined by current census data." *Id.*, https://ojp.gov/ovc/grants/cvfa2017.html (last visited Apr. 6, 2018).

[813] "Victim assistance includes, but is not limited to, the following services:" crisis intervention, emergency shelter, emergency transp., counseling, crim. justice advocacy, *etc.*. "In each state and territory, VOCA assistance funds are awarded to local community-based organizations and public agencies that provide services directly to victims of crime." *Id.*, Crime Victims Fund, https://ojp.gov/ovc/pubs/crimevictimsfundfs/intro.html#VictimAssist (last visited Apr. 6, 2018).

[814] There was an additional grant from the recovery act for this fiscal year in the amount of $1,323,000.

[815] *Id.*

***Rights and Services Act (RASA).***  This is state funding that supports victim notification, accompaniment, assistance with victim impact statements and crime victims compensation assistance.

> RASA provides financial support, training and technical assistance to county-based victim service agencies to promote the rights and services under Pennsylvania's Crime Victims Act.  This funding source provides the primary financial support for the victim/witness offices within the District Attorneys' Offices.  The source of funds for RASA is the Victim/Witness Fund which is comprised of a $25 penalty assessment on convicted/diverted offenders.  County allocations are determined by a formula using the county's population (75%) and target crimes (25%).  Eligible activities support the full range of rights, services, and responsibilities within the criminal justice system outlined in the Crime Victims Act. (e.g. notification, accompaniment, assistance with victim impact statements, and crime victims compensation assistance.)  Examples of ineligible activities include, but are not limited to, counseling/therapy, community/prevention education, prosecution activities, and restitution collection.  Funds in 2005 were awarded to 56 system-based    agencies, 3 county juvenile probation offices and 2    community-based agencies in the 67 counties.[816]

***Victims of Juvenile Offenders (VOJO).***  This supports the same activities as RASA but is directed to victims of juvenile offenders.

> VOJO provides financial support, training, and technical assistance to county-based victim service agencies to promote the rights and services to victims in the juvenile justice system.  VOJO is funded by an Annual State Appropriation.  County allocations are determined by a formula using the county's juvenile population (75%) and juvenile dispositions at (25%).  Eligible activities support the the full range of rights, services, and responsibilities within the juvenile justice system outlined in the Crime Victims Act. (e.g. notification, accompaniment, assistance with victim impact statements and crime victims compensation assistance.)  Examples of ineligible activities include, but are not limited to, counseling/therapy, community/prevention education, prosecution activities, victim/offender mediation programs, and restitution collection.  Funds in 2014/15 were awarded to 42 system-based    agencies, 11    county    juvenile    probation    offices and 16 community-based agencies in 65 counties.[817]

Staff from Joint State Government Commission questioned staff from various offices of victims' witness advocates to get their opinion about the cost of these services, specifically how they were reflected in homicide cases rather than other crimes with which the office dealt.  As a follow up to the original questions, they were then asked if the costs were "more, less or about the same as those services that you provide to victims of other crimes."  The responses could be categorized into two distinct approaches of calculating or envisioning service cost.

---

[816] Pa. Comm'n on Crime & Delinquency, *supra* note 807.
[817] *Id.*

The first type of responses indicated that costs for services provided for family members and loved ones of murder victims were greater than the services that the office provided for other types of crime. The responses frequently indicated that there would naturally be more costs because there was more of everything.[818] One advocate responded:

> [W]e are often engaged with family members of homicides much longer than other crimes. It is probably fair to say that other crimes, such as robbery – they are short term. Then the next level would be sexual assault and victims of other types of crime who are engaged in the system such as juvenile justice system. But with the homicides, the investigation takes longer and the court case takes longer (both to prepare and when they are actually in a trial). The death penalty is even longer because they will have hearings around the death penalty right after the sentencing and it will be much more intense. It is long days and a lot of staff assigned to it. I would guess those cases can often cost 3 to 4 times as much staff time as other types of crime.

In the second category of responses, the advocates indicated that they believed that the services cost the same amount as they would in response to the victim of a different sort of crime, because they viewed the fixed operating costs of the office and the fixed costs of the salaries to be the same, regardless of the service provided. In one office, an advocate stated "we provide those services to every victim if it is something that they need and it is at no cost to them. It is sort of built into our costs. So – the cost is the same." Many providers stated that attributing cost by type of crime was difficult, as the following quote demonstrates: "That's hard to say because some people want nothing to do with the court system–but other people are very needy–I think they even each other out cost-wise. Somebody who had their house broken into could be more needy than a homicide victim. I can't break it out cost-wise." And from an advocate in a different county, "For my office, it doesn't cost any more than services that you provide to anybody. You could look at it that way, but cost is a hard thing to measure because I am grant funded. I can only give my staff comp time–I can't pay them more if they stay extra. I don't spend any more money because I don't have it to spend."

## Mental Retardation

The question that serves as the basis of the study of intellectual disability in the administration of the death penalty in our Commonwealth is:

> Whether, in light of the Supreme Court ruling in *Atkins v. Virginia*, there are adequate procedural protections in place to assure that people with mental retardation are not in fact being sentenced to death and executed;[819]

---

[818] Time spent in one-on-one and family contact, court hearings, accompaniments, appeals, *etc.*.
[819] Pa. S. Res. No. 6 (Sess. of 2011); appdx A, *infra* p. 220.

In 2002, U.S. Supreme Court ruled that death is an unconstitutionally excessive punishment for "a mentally retarded offender."[820]  As it did for insanity, "the task of developing appropriate ways to enforce this constitutional restriction" was left to the states.[821]  Subsequently, Pennsylvania's Supreme Court specified that intellectual disability is to be established under either a classification system from American Psychiatric Association or American Association of Mental Retardation,[822] both of which shared "three core components: (1) substantial intellectual impairment; (2) impact of that impairment on the everyday life of the individual (i.e., substantial deficits in adaptive functioning); and (3) appearance of the disability prior to age 18."[823]  At the time, American Psychiatric Association used an intelligence quotient (IQ) score "of approximately 70 or below" to signify the "subaverage intellectual functioning" for this diagnosis.[824]  American Association of Mental Retardation took into account a "standard error of measurement . . . estimated to be three to five points".[825]  Two standard deviations below the mean IQ scores would place this in the range of 65 to 75 when applying a standard error of measurement.[826]  Because "the interaction between limited intellectual functioning and deficiencies in adaptive skills . . . establish mental retardation", a "cutoff" for the IQ score was not adopted.[827]  The preponderant evidence from this early ruling in Pennsylvania, placed the appellee's IQ "between 70 and 75, or below, placing him in the mild mental retardation range."[828]

To reply to the resolution's factual inquiry on this subject, the subcommittee on procedure[829] sought readily available data, which was the IQ scores supplied by Department of Corrections for the inmates on death row and those serving life imprisonment for first-degree murder.  Notwithstanding a recognition of the standard error of measurement, some states statutorily prescribed a score for IQ and the Commonwealth would argue that the intellectual disability range is below 70.[830]  For these reasons, data obtained from Department of Corrections was initially analyzed using a score of 70 or below as an imperfect proxy for intellectual disability. Since IQ is relatively static, whether the scores closely replicated scores before age 18 are unknown but presumed.  Information on substantially deficient adaptive functioning also remains unknown, which is why using a score for IQ made this an imperfect effort.  When an IQ score of 70 or below was used to classify an inmate for possible intellectual disability, "4.1% of the death row inmates" compared to 8.7% of those serving life imprisonment for first-degree murder[831] fell within that classification.

---

[820] *Atkins v. Va.*, 326 U.S. 304, 321 (2002).

[821] *Id.* at 317 n.22.

[822] This is now Am. Ass'n on Intellectual & Dev. Disabilities.  Aaidd, About Us, https://aaidd.org/about-aaidd#.Wx_VCu4vyUk (2018).

[823] *Commw. v. Miller*, 888 A.2d 624, 627, 631 (Pa. 2005).

[824] *Id.* at 629.

[825] *Id.* at 630.

[826] *Id.*

[827] *Id.* at 631.

[828] *Id.* at 632.

[829] The data was collected and analyzed for the subcomm. by Dr. Gary Zajac & Laura Winger from The Pa. State U. Just. Cen. for Research.  Appdx. H, *infra* pp. 243-53.

[830] *E.g.*, *Commw. v. Sanchez*, 36 A.3d 24, 51 (Pa. 2011).

[831] Appdx. H, *infra* p. 245.

Although it is partially reassuring that the percentage of potentially intellectually disabled inmates[832] was lower for condemnees than for those imprisoned for life, judicial rulings after this analysis was done subsequently clarified that a score of 70 or below for this possible classification is too low. Nevertheless, the fact that as many as 4% of the death row inmates should not have been sentenced to death is concerning if they were in fact intellectually disabled retarded with the application of the other two components of the diagnosis.[833]

Approximately six months after this analysis, Florida's rigid rule that foreclosed "further exploration of intellectual disability" unless one could "show an IQ test score of 70 or below" was ruled unconstitutional by U.S. Supreme Court.[834] This is because "clinical definitions . . . take into account that IQ scores represent a range, not a fixed number, . . . [a]nd those clinical definitions have long included the" standard error of measurement.[835] A little over a year after that ruling by U.S. Supreme Court, Pennsylvania's Supreme Court reiterated that its earlier ruling in 2005 "allows an IQ score of 75 or below" and declined "the Commonwealth's request to prohibit individuals with a prior IQ score of 76 or above from asserting intellectual disability."[836] Two days after Pennsylvania Supreme Court reiterated its support of the higher score, U.S. Supreme Court accounted for the same margin of error by characterizing a "reported IQ test result of 75" as "squarely in the range of potential intellectual disability" saying that the conclusion that subaverage intelligence could not be demonstrated by a "reported score IQ of 75 . . . reflected an unreasonable determination of the facts."[837]

With further clarification from these judicial rulings, the same data was re-analyzed by The Pennsylvania State University researchers using the IQ score of 75 instead of 70.[838] The higher score more than tripled the percentage of death row inmates from 4.1% to 14% and almost doubled the percentage for those serving life imprisonment for murder of the first degree from 8.7% to 15%.[839] The troubling revelation from this inquiry is that since as many as 14% of the Commonwealth's condemnees could be constitutionally ineligible for this sentence,[840] the subcommittee on procedure could not conclude that procedural protections are adequate to ensure that people with intellectual disability are not being nor have been sentenced to death. As a comparison with the general population, it appears that an IQ score of 75 or below represents the bottom 5% of the population[841] but is approximately triple that percentage for inmates on death row or serving life imprisonment for murder of the first degree.

---

[832] The scores can only indicate potential mental retardation because the other two diagnostic criteria of early onset & deficient, adaptive functioning were neither available nor obtained.

[833] Adaptive deficits and onset prior to age 18.

[834] *Hall v. Fla.*, 134 S.Ct. 1986, 1990, 1992 (2014).

[835] *Id.* at 1999.

[836] *Commw. v. Bracey*, 117 A.3d 270, 283, 287 (Pa. 2015), *abrogated on other grounds*, *Moore v. Tex.*, 137 S.Ct. 1039 (2016). The other grounds are factors placing "undue emphasis on adaptive strengths", which are superseded standards. *Moore*, 137 S.Ct. at 1051.n.9-1053. These superseded and now disallowed standards had been discretionary in Pa..

[837] *Brumfield v. Cain*, 135 S.Ct. 2269, 2278 (U.S. 2015).

[838] Appdx. H, *infra* pp. 245-46.

[839] *Id.* at 246.

[840] The most recent data obtained places almost 13% of the death row prisoners and 12% inmates serving life imprisonment for murder of the first degree at an IQ score of 75 or below. Bucklen, *supra* note 11 (Apr. 26, 2018).

[841] Edublox Online Tutor, IQ Test Scores: The Basics of IQ Score Interpretation, https://www.edubloxtutor.com/iq-test-scores/ (last visited Apr. 15, 2018).

The earliest cases involving this issue were brought on behalf of prisoners already sentenced to death, who raised the issue by filing petitions under the Post Conviction Relief Act.[842] As usual, the hearings held in these matters were conducted before a judge sitting alone. In *Commonwealth v. Bracey,* Pennsylvania Supreme Court held that an appellant is not entitled to have a jury decide a claim of intellectual disability "presented in collateral proceedings."[843] To the surprise of many, Pennsylvania Supreme Court subsequently approved the procedure of a trial court submitting the intellectual disability "issue to the jury for a penalty phase decision" instead of having the trial court determine the claims (unless the parties "agree to waive a jury and ask the trial court to decide the . . . claim").[844] The Court also approved "the placement of the burden of proof on the defendant by a preponderance of evidence"[845] and indicated that the jury had to agree unanimously[846] that the defendant had successfully borne that burden as to each of the three factors. The Court further indicated that a defendant whose claim of intellectual disability "is rejected by the jury still has the right to present or argue the same competent evidence in mitigation at the selection phase of the trial, in conjunction with other relevant evidence of mitigation (including other evidence bearing on his mental state and condition independent of mental retardation)."[847]

This subsequent ruling that judicially established the procedure for a trial court to submit the intellectual disability issue to the jury went beyond what was necessary to rule on that case. The request for a determination of intellectual disability was not made until "the morning of the first day of trial, before jury selection began."[848] Since the judge was unable to provide the Commonwealth with expert reports until sometime during jury selection, the Commonwealth did not have sufficient time for review of the reports by its own experts.[849] Ordinarily, the issue of a defendant's intellectual disability would have been raised as soon as possible to avoid having to face a capital trial. A judge would likely then hold a hearing pre-trial and decide the issue as early as possible in the process to avoid the additional costs and additional time required for a capital trial where the defendant prevailed.

Legislation that would have effectively reversed this procedure to determine intellectual disability by moving it from the post- to pre-trial phase and having the judge determine it was not enacted.[850] Under that legislation, the defendant who lost before the judge still was free to submit the evidence to a jury at the penalty phase hearing as a mitigating circumstance. Approximately two years after Pennsylvania Supreme Court established *via* opinion the procedures for seeking to preclude imposition of a sentence of death by reason of the defendant's intellectual disability, it adopted those judicially announced procedures as Rules of Criminal Procedure.[851]

---

[842] 42 Pa.C.S. ch. 95 subch. B.

[843] 986 A.2d 128, 130, 146 (Pa. 2009).

[844] *Commw. v. Sanchez*, 36 A.3d 24, 64, 67 (Pa. 2011).

[845] *Id.* at 68, 76.

[846] *Id.* at 77.

[847] *Id.* at 79.

[848] *Id.* at 51.

[849] *Id.*

[850] Pa. S. Bill No. 937 (Sess. of 2011).

[851] Pa. R. Crim. P. ch. 8, pt. B.

Appendix G shows the procedural options in each state along with the decisional authority.[852]

### *Recommendation*

The subcommittee on procedure recommends that the adopted Rules of Criminal Procedure be amended to allow the judge to determine intellectual disability at the pre-trial phase instead of the jury determining it at the post-trial phase. This change would resolve the issue early in the process; if the defendant is determined to be intellectually disabled pre-trial, it would save a large amount of money and many days of court time because the case would not proceed capitally. A decision on this issue made pre-trial by a judge is likely to be more fair and just than a decision made on this issue by a jury that has just found the defendant guilty of first-degree murder. It would put this important decision in the hands of a qualified, experienced judge rather than leaving it to a group of people who may never have been exposed to anything like the complicated issues involved in determining intellectual disability. Civil cases often have juries deciding cases that are factually very complicated, but these cases never involve the question of whether one of the parties to the suit is qualified for execution. Jury verdicts in civil cases are usually simplified by the judge *via* submission of a series of interrogatories to the jury, but this is not the practice in criminal cases. Moreover, judges' determinations of intellectual disability would be detailed in writing explaining why the determination was made and be subject to appeal by either side. A jury decision cannot be questioned this way.[853]

# Mental Illness

The question that serves as the basis of the study of mental illness in the administration of the death penalty in our Commonwealth is:

> Whether persons suffering from mental illness constitute a disproportionate number of those on death row, what criteria should be used in judging the level of mental illness involved and whether people with mental illness who are convicted of murder should be executed;[854]

---

[852] *Infra* pp. 239-41.
[853] For an example of the detailed considerations that go into such a decision, read the opinion: *Commw. v. Williams*, 61 A.3d 979 (Pa. 2013).
[854] Pa. S. Res. No. 6 (Sess. of 2011); appdx. A, *infra* p. 220.

***Whether persons suffering from mental illness constitute a disproportionate number of those on death row.***

     This inquiry does not specify with whom the number of inmates on death row should be compared: the general population, those inmates serving life imprisonment without parole sentences or some other group. To reply to this factual inquiry, the subcommittee on policy sought readily available data,[855] which was the mental health status supplied by Department of Corrections for the inmates on death row and those serving life imprisonment for first-degree murder.[856] Inmates' mental health was assessed and classified into four categories, two of which reflected either no current mental health issues or need to be medicated and two of which reflected a current need for active treatment or close psychiatric monitoring for serious mental health issues. Mental health is more dynamic than intelligence so that this data and classification would be expected to be more variable than scores for IQ. In making its assessments, it is understood that Department of Corrections used *Diagnostic and Statistical Manual of Mental Disorders*, a *"*handbook used by health care professionals in the United States . . . as the authoritative guide to the diagnosis of mental disorders" that "has been periodically reviewed and revised since it was first published in 1952."[857]

     In *Ford v. Wainwright*, U.S. Supreme Court ruled that a sentence of death may not be carried out "upon a prisoner who is insane."[858] The data from Department of Corrections is too temporal to determine how many inmates are insane; however, these two groups were selected to try to reply to the inquiry about the disproportionality of mental illness on death row. In 2013, Department of Corrections classified almost 10% of those on death row with an active mental disorder and the proportion was double that for those serving life imprisonment for first-degree murder.[859] Due to the diagnostic categories used, at least for 2013, the percentages might be understated.[860] Another big difference in this data then is that more than 50% of death row inmates had a recent (albeit not current) need for mental health treatment while approximately 30% of the prisoners serving a life sentence for first-degree murder had such a need.[861] When this data was updated in 2018, the department classified approximately 25% of the inmates on death row and a similar albeit slightly higher percentage of those serving life imprisonment with an active mental disorder.[862] When checked in 2018, the recent (albeit not current) need for mental health treatment,

---

[855] The data was collected and analyzed for the subcomm. by Dr. Gary Zajac & Laura Winger from The Pa. State U. Just. Ctr. for Research. Appdx. H, *infra* pp. 243-53.

[856] *Id.*

[857] Am. Psychiatric Ass'n, *DSM–5*: Frequently Asked Questions, https://www.psychiatry.org/psychiatrists/practice/dsm/feedback-and-questions/frequently-asked-questions (2018).

[858] *Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986).

[859] Appdx. H, *infra* p. 246.

[860] Pa. J. State Gov't Comm'n, *Mental Health Servs. & the Crim. Just. Sys. in Pa.* 4, 35 (2014), http://jsg.legis.state.pa.us/resources/documents/ftp/publications/2014-370-Final%20HR226%20Mental%20Health%20Services%20Report%20May%2016%202014%20updated%207.30.15%204pm.pdf.

[861] Appdx. H, *infra* p. 246.

[862] Buklen, *supra* note 11 (Apr. 26, 2018). The difference between the percentages from 2013 to 2018 is that approximately 150% higher for the inmates on death row are now classified with an active mental disorder compared to five yrs. earlier & approximately 25% higher for those serving life imprisonment for first-degree murder are now classified with an active mental disorder than five years earlier.

was below half for death row inmates and almost the same 30% for the life prisoners for first-degree murder.[863]

"This begs the question of how the inmates in these two groups compare to the overall human population with respect to prevalence of mental disorder.  It is reasonably well established that prison inmates in general have higher levels of many mental disorders than is the case for the general human population (Fazel and Danesh, 2002)."[864]  As of 2016, 4.2% of U.S. adults in the U.S. were seriously mentally ill and 18.3% had some type of mental illness.[865]  The subcommittee on policy agreed that the proportion of inmates on death row suffering from some type of mental illness is likely much greater than in the general population.  There are various studies on this matter, but one from approximately a dozen years ago estimated that "more than half of all prison and jail inmates had a mental health problem", defined as "a recent history or symptoms of a mental health problem", compared to "[a]n estimated 11% of the U.S. population" of adults in general.[866]

> Among prisoners sentenced to life or death, there was little variation in sentence length by mental health status . . . .  About 8% of State prisoners who had a mental health problem and 9% of those without were sentenced to life or death.  Among Federal prisoners, 3% of both those who had a mental health problem and those without were sentenced to life or death.[867]

In 2015, Pennlive estimated that nearly a third of Pennsylvania's inmates were mentally ill "on an average day", and a third of those seriously.[868]

Assuming that the comparable group was meant to be those serving life imprisonment without parole sentences, subcommittee members discussed the results of a study on this issue that was conducted for the subcommittee, which was based exclusively on data received from Department of Corrections comprised of the numbers of inmates who had been assigned to groups based upon their perceived degree of mental illness.  Before, during and after the study was concluded, the department's diagnoses, assignment and treatment of its mentally ill inmates was challenged by two entities as under-representative of the true number of inmates suffering from serious mental illness.[869]  The department ultimately settled the lawsuit, agreeing to address its problematic handling of inmates with mental illness, making the data used in the study too

---

[863] *Id.* (June 13, 2018).

[864] Appdx. H, *infra* p. 247.

[865] Nat'l Inst. of Mental Health, Mental Illness, http://www.nimh.nih.gov/health/statistics/prevalence/serious-mental-illness-smi-among-us-adults.shtml (last updated 2017).  Citing a study from 2004, Ctrs. for Disease Control & Prevention publishes an estimated 25% of adult Ams. "reported having a mental illness within the previous" yr..  Ctrs. for Disease Control & Prevention, CDC Mental Illness Surveillance,
https://www.cdc.gov/mentalhealthsurveillance/faqs.html (last reviewed 2013).

[866] Bureau of Just. Statistics, U.S. Dep't of Just., Mental Health Problems of Prison & Jail Inmates 1, 3 (2006), *available at* https://www.bjs.gov/content/pub/pdf/mhppji.pdf.

[867] *Id.* at 8.  These findings were based upon a survey of inmates.  *Id.* at 11.

[868] Daniel Simmons-Ritchie, *Why are so many mentally ill people imprisoned in Pa.?*, Pennlive, July 21, 2015, http://www.pennlive.com/midstate/index.ssf/2015/07/post_764.html#incart_m-rpt-2**.**

[869] U.S. Dep't of Just. investigated the "prison system's mental health services for seriously mentally ill inmates" beginning in 2013.  Pa. Dep't of Corrections, News Release (Feb. 24, 2014).

questionable to be reliable.[870]  After finding that Department of Corrections violated prisoners' constitutional and statutory rights by subjecting those with serious mental illness and intellectual disability to solitary confinement, U.S. Department of Justice's Civil Rights Division closed its investigation based upon improvements and planned reform.[871]  Additionally, mental health problems can vary for each individual over time.  For the reasons stated above, the subcommittee cannot answer this part of the question.

### What criteria should be used in judging the level of mental illness involved?

Because the question also requires a certain level of psychiatric expertise to answer, the subcommittee on policy cannot authoritatively comment on the requested criteria.  However, the subcommittee determined that the current standard that is commonly used by practitioners to diagnose the level of mental illness is Diagnostic and Statistical Manual of Mental Disorders (DSM—5) from American Psychiatric Association.[872]  This standard is one that the American Bar Association has included in a resolution it produced on the issue of determining the level of mental illness of criminal defendants and inmates.  The American Bar Association's resolution also raises a related question regarding of the application of the death penalty to defendants whose mental illness reduces their culpability for the crime.  They pointed to the reasoning of the Supreme Court in its line of juvenile life imprisonment without parole cases, in which the justices determined that the underdevelopment of the juvenile brain renders the juveniles less culpable for crimes they have committed, specifically murder.  Subcommittee members concluded that the requirement that the death penalty be reserved for the worst of the worst cases should operate as a type of exemption for mentally ill defendants, whose illness prevents them from being among the most culpable defendants and deserving of the death penalty.  The subcommittee also noted that currently, "extreme mental disability" can be raised as a mitigating circumstance in capital cases.

### Whether people with mental illness who are convicted of murder should be executed.

The subcommittee on policy noted that the use of the word, should, makes this a policy question, albeit one that has been partially judicially resolved by U.S. Supreme Court's ruling that

---

[870] *Disability Rights Network v. Wetzel* (M.D.Pa. 2015), Settlement Agreement & Gen. Release, http://www.cor.pa.gov/About%20Us/Newsroom/Documents/2015%20Press%20Releases/DOC-DRN%20Agreement%2001-05-2015.pdf.  This settlement agreed on screening & dev. of an individual recovery plan @ Diagnostic & Classification Cen. reception, hous. of inmates w/serious mental illness, residential treatment units, secure residential treatment units, diversionary treatment units, disciplinary process for inmates w/serious mental illness, placement of inmates w/serious mental illness in disciplinary or admin. custody status during the transition period, evaluation of inmates who have not been identified as having serious mental illness in a housed in a restricted hous. unit in either admin. or disciplinary custody status, suicide prevention & use of psychiatric observation cells, use of force & restraints, training, staffing, designation of a tech. compliance consultant, & independent assessment & reporting.  Compliance Rep. 1 (2016) is *available at* http://www.cor.pa.gov/About%20Us/Newsroom/Documents/2016%20Press%20Releases/DRN%20of%20PA%20vs%20John%20Wetzel%20-%20Compliance%20Report%201%20-%20January%2025,%202016.pdf.
[871] Letter from Civ. Rights Div., U.S. Dep't of Just., to Governor Wolf (Apr. 14, 2016), *available at* http://www.cor.pa.gov/General%20Information/Documents/Mental%20Health%20Services/DOJ%20Letter%20to%20Governor%20Wolf%20April%2014%202016%20-%20closing%20DOC%20investigation.pdf.
[872] This "authoritative volume . . . defines and classifies mental disorders in order to improve diagnoses, treatment, and research."  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* (*DSM–5*), https://www.psychiatry.org/psychiatrists/practice/dsm (2018).

a sentence of death may not be carried out "upon a prisoner who is insane."[873]  A defendant who was legally insane at the time of the crime may use that as a valid defense to the charge.[874]  If the defendant was not legally insane at the time of the crime but becomes unable "to comprehend the nature of the penalty" and "the reasons for" it "or its implications", he could not then be executed.[875]  In their study detailed in this report under the section on bias and unfairness, The Pennsylvania State University researchers found that in 35 cases in which defendants presented evidence of a serious mental illness at trial, the jury accepted only 11 of these arguments.  But many capital cases have been overturned on appeal for inadequate representation due to defense counsel not raising mental health issues at trial.

**Mentally disabled and juveniles.**  "[I]n conjunction with the American Psychiatric Association, American Psychological Association and National Alliance on Mental Illness", American Bar Association "adopted a policy opposing the death penalty for individuals with severe mental disorders or disabilities present at the time a crime is committed".[876]  This position must be seen in light of key U.S. Supreme Court rulings defining categories of persons who are constitutionally exempt from the death penalty.  Thus, in *Atkins v. Virginia,*[877] the Court forbid condemning the intellectually disabled, and, in *Roper v. Simmons,*[878] the Court similarly exempted juveniles under the age of 18.

In *Atkins*, the U.S. Supreme Court held that the Eighth Amendment precludes the execution of the "intellectually disabled," formerly referred to as the "mentally retarded."  The Court reasoned that the application of the death penalty to such defendants fails to advance the penalty's rational purposes.  Unless the imposition of the death penalty measurably contributes to the valid goals of retribution or deterrence, "it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment."[879]  As explained below, mental disability reduces the murderer's degree of guilt.

> [C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that become manifest before age 18.  Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial.  Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others.  There is no evidence that they are more likely to engage in criminal conduct than

---

[873] *Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986).

[874] 18 Pa.C.S. § 315.  To be excused for the crime due to legal insanity, it would mean that at the time of the offense, the defendant did not "know the nature and quality of the act he was doing or, if the actor did know the quality of the act, that he did not know that what he was doing was wrong."  *Id.*

[875] *Ford*, 477 U.S. at 417.

[876] Am. Bar Ass'n, Severe Mental Illness & the Death Penalty 1 (2016), *available at* https://www.americanbar.org/content/dam/aba/images/crsj/DPDPRP/SevereMentalIllnessandtheDeathPenalty_WhitePaper.pdf.  Mental Health Am. subsequently adopted a similar policy.  *Id.*

[877] 536 U.S. 304 (2002).

[878] 543 U.S. 551 (2005).

[879] *Atkins*, 536 U.S. at 319.

others, but there is abundant evidence that they often act on impulse rather than a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.[880]

"With respect to retribution," the Court has "consistently confined the imposition of the death penalty to a narrow category of the most serious crimes."[881]

If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution. Thus, pursuant to our narrowing jurisprudence, which seeks to ensure that only the most deserving of execution are put to death, an exclusion for the mentally retarded is appropriate.[882]

With respect to deterrence, the Court observed that this purpose assumes that the would-be murderer is capable of planning his actions in advance, but the mentally disabled largely lack this capability.

The theory of deterrence in capital sentencing is predicated upon the notion that the increased severity of the punishment will inhibit criminal actors from carrying out murderous conduct. Yet it is the same cognitive and behavioral impairments that make these defendants less morally culpable—for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses—that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information.[883]

The Court added that exempting the intellectually disabled will not diminish deterrence for those of normal intelligence because they "are unprotected by the exemption and will continue to face the threat of execution."[884] The Court concluded that maintaining death penalty eligibility for the retarded, therefore, does not advance the aim of deterrence.[885]

The Court further noted that the intellectually disabled are impaired in their ability to resist inducements to make a false confession and to assist in their own defense, to give testimony in court, and to express remorse.[886] For these reasons, they are at greater risk for wrongful execution.[887] Along with the reasons based on the purposes of the death penalty, the Court concluded that a constitutional rule, deeming the mentally disabled as unsuited for the death penalty, is justified.[888]

---

[880] *Id.* at 318.
[881] *Id*. at 319.
[882] *Id.*
[883] *Id.* at 320.
[884] *Id.*
[885] *Id.*
[886] *Id.* at 320-21.
[887] *Id.* at 321.
[888] *Id.* at 321.

Decided three years after *Atkins*, *Roper v. Simmons* also established a bright-line rule, exempting juveniles under the age of 18 (when their crimes were committed) from eligibility for the death penalty.[889]  In doing so, the Court extended the exemption it had already established for persons under the age of 16 in *Thompson v. Oklahoma*.[890]  The *Roper* Court also emphasized "that juvenile offenders cannot with reliability be classified among the worst offenders."[891]  The culpability of juveniles is diminished by three factors: their natural "lack of maturity and . . . underdeveloped sense of responsibility" with resultant "impetuous and ill-considered actions and decisions"; their greater susceptibility to "negative influences and outside pressures, including peer pressure"; and the fact that their character "is not as well formed as that of an adult" being "more transitory, less fixed."[892]  Therefore, juveniles are not among the worst offenders.

Using reasoning similar to *Atkins*, the Court argued that the diminished culpability of the juvenile undermines the pertinence of retribution.

> Whether viewed as an attempt to express the community's moral outrage or as an attempt to right the balance for the wrong to the victim, the case for retribution is not as strong with a minor as with an adult. Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity. . . . .

> [T]he absence of evidence of deterrent effect is of special concern because the same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence.  In particular . . . '[t]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent.'  To the extent the juvenile death penalty might have residual deterrent effect, it is worth noting that the punishment of life imprisonment without the possibility of parole is itself a severe sanction, in particular for a young person.[893]

***Severe mental illness.***  Although the Court has never held that severe mental illness renders a death penalty condemnee ineligible for the death penalty,[894] parallels exist between intellectual disability and the diminished capacity of juveniles and the effects of severe mental illnesses:

---

[889] 543 U.S. at 575, 578.
[890] 487 U.S. 815, 838 (1988).
[891] *Roper*, 543 U.S. at 569.
[892] *Id.* at 569-70.
[893] *Id.* at 571-72.
[894] A sentence of death may not be carried out "upon a prisoner who is insane."  *Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986).  If the defendant was not legally insane at the time of the crime but becomes unable "to comprehend the nature of the penalty" and "the reasons for" it "or its implications", he could not then be executed.  *Ford*, 477 U.S. at 417.  A defendant who was legally insane at the time of the crime may use that as a valid defense to the charge.  18 Pa.C.S. § 315.  To be excused for the crime due to legal insanity, it would mean that at the time of the offense, the defendant did not "know the nature and quality of the act he was doing or, if the actor did know the quality of the act, that he did not know that what he was doing was wrong."  *Id.*

[A]lthough the Court has construed the Eighth Amendment to protect from execution teenagers, mentally retarded offenders, and persons deemed "insane" at the time of their execution, the Eighth Amendment currently does not protect all or even a substantial majority of severely mentally ill capital defendants. Yet, such severely mentally ill prisoners, those suffering from psychosis or schizophrenia, possess many of the same attributes, including diminished culpability and blameworthiness, as others who have been exempted from the death penalty. For example, schizophrenia is defined by the National Institute of Mental Health as "a chronic, severe, and disabling brain disorder." Individuals diagnosed with schizophrenia suffer from hallucinations, delusions, thought disorders, movement disorders, with hearing voices being the most common hallucination. Moreover, cognitive symptoms that can accompany this disability include a "poor . . . ability to understand information and use it to make decisions," "[t]rouble focusing or paying attention," and "[p]roblems with . . . the ability to use information immediately after learning it." Often individuals with schizophrenia display a lack of understanding of the consequence of their actions, particularly when the individual suffers from delusions or hallucinations, and a lack or limited control of impulses, which can arise from the limits the illness imposes on the individual's ability to process and use information or to control behavior, particularly behavior resulting from delusions caused by their mental illness. These attributes are not unlike the limited judgment, reasoning and impulse control of mentally retarded and juvenile offenders. Moreover, these qualities provide strong evidence of diminished culpability or blameworthiness, which should place those who suffer these illnesses outside the category of the worst of the worst.

Further, the defendant who suffers from severe mental illness may be at greater risk of an unfair trial or inadequate defense. For example, a jury may very well view the defendant's mental illness as an aggravating factor, which could increase the risk that a jury would impose an excessive or inappropriate sentence. Likewise, a defendant who suffers from severe mental illness may lack or have a limited ability to assist in his defense, make rational legal decisions, or adequately advise his lawyer about meaningful defenses. Particularly during the capital sentencing phase of trial, a severely mentally ill defendant may be unable to meaningfully assist his lawyer in developing and presenting mitigating evidence to the jury. These same concerns also plagued the sentencing process of juvenile and mentally retarded offenders.[895]

Death penalty defendants who are competent to stand trial but become "insane" thereafter are exempt from execution, as will be further discussed below.

*American Bar Association Proposal to Exempt the Seriously Mentally Ill from the Death Penalty.* American Bar Association, American Psychiatric Association, American Psychological Association, and National Alliance on Mental Illness all oppose "the death penalty for individuals

---

[895] Lyn Entzeroth, *The Challenge & Dilemma of Charting a Course to Constitutionally Protect the Severely Mentally Ill Capital Defendant from the Death Penalty*, 44 Akron L. Rev. 529, 557-59 (2011).

with severe mental disorders or disabilities present at the time a crime is committed".[896] In 2006, American Bar Association adopted a resolution that couples that exemption with a proposal for defining the mental disorder's significant impairment.[897] The linchpin of the argument for exempting the mentally ill is the analogy between their condition and that of juveniles and especially the intellectually disabled.[898] "This approach rests on the traditional understanding that significant cognitive or volitional impairment attributable to a severe disorder or disability often renders the death penalty disproportionate to the defendant's culpability, even though the offender may still be held accountable for the crime."[899]

The American Bar Association's resolution will be taken as representative of the approach favored by those who support this exemption. It reads as follows:

> RESOLVED, That the American Bar Association, without taking a position supporting or opposing the death penalty, urges each jurisdiction that imposes capital punishment to implement the following policies and procedures:
> 1. Defendants should not be executed or sentenced to death if, at the time of the offense, they had significant limitations in both their intellectual functioning and adaptive behavior, as expressed in conceptual, social, and practical adaptive skills, resulting from mental retardation, dementia, or a traumatic brain injury.
> 2. Defendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences, or wrongfulness of their conduct; (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law. A disorder manifested primarily by repeated criminal conduct or attributable solely to the acute effects of voluntary use of alcohol or other drugs does not, standing alone, constitute a mental disorder or disability for purposes of this provision.
> 3. Mental Disorder or Disability after Sentencing
> (a) *Grounds for Precluding Execution*. A sentence of death should not be carried out if the prisoner has a mental disorder or disability that significantly impairs his or her capacity (i) to make a rational decision to forgo or terminate post-conviction proceedings available to challenge the validity of the conviction or sentence; (ii) to understand or communicate pertinent information, or otherwise assist counsel, in relation to specific claims bearing on the validity of the conviction or sentence that cannot be fairly resolved without the prisoner's participation; or (iii) to understand the nature and purpose of the punishment, or to appreciate the reason for its imposition in the prisoner's own case. Procedures to be followed in each of these categories of cases are specified in (b) through (d) below.
> (b) *Procedure in Cases Involving Prisoners Seeking to Forgo or Terminate Post-Conviction Proceedings*. If a court finds that a prisoner under sentence of death

---

[896] Am. Bar Ass'n, *supra* note 876, at 1.

[897] *Id.*, Recommendation 122A, 1 (2006), https://www.americanbar.org/content/dam/aba/migrated/2011_build/death_penalty_moratorium/mental_illness_policies.authcheckdam.pdf.

[898] In *Atkins v. Va.*, the Court uses the term, mentally retarded, for those who suffer from abnormally low intelligence. The term currently used by mental health professionals is intellectually disabled.

[899] Am. Bar Ass'n, *supra* note 897, at 10.

who wishes to forgo or terminate post-conviction proceedings has a mental disorder or disability that significantly impairs his or her capacity to make a rational decision, the court should permit a next friend acting on the prisoner's behalf to initiate or pursue available remedies to set aside the conviction or death sentence.

(c) *Procedure in Cases Involving Prisoners Unable to Assist Counsel in Post-Conviction Proceedings*. If a court finds at any time that a prisoner under sentence of death has a mental disorder or disability that significantly impairs his or her capacity to understand or communicate pertinent information, or otherwise to assist counsel, in connection with post-conviction proceedings, and that the prisoner's participation is necessary for a fair resolution of specific claims bearing on the validity of the conviction or death sentence, the court should suspend the proceedings. If the court finds that there is no significant likelihood of restoring the prisoner's capacity to participate in post-conviction proceedings in the foreseeable future, it should reduce the prisoner's sentence to the sentence imposed in capital cases when execution is not an option.

(d) *Procedure in Cases Involving Prisoners Unable to Understand the Punishment or its Purpose*. If, after challenges to the validity of the conviction and death sentence have been exhausted and execution has been scheduled, a court finds that a prisoner has a mental disorder or disability that significantly impairs his or her capacity to understand the nature and purpose of the punishment, or to appreciate the reason for its imposition in the prisoner's own case, the sentence of death should be reduced to the sentence imposed in capital cases when execution is not an option.[900]

A report was published with these recommendations.[901] The report points out that the exemption requires a "severe" disorder or disability, such as

schizophrenia and other psychotic disorders, mania, major depressive disorder, and dissociative disorders — with schizophrenia being by far the most common disorder seen in capital defendants. In their acute state, all of these disorders are typically associated with delusions (fixed, clearly false beliefs), hallucinations (clearly erroneous perceptions of reality), extremely disorganized thinking, or very significant disruption of consciousness, memory, and perception of the environment.[902]

The disorder must "significantly impair cognitive or volitional functioning at the time of the offense."[903] Unlike mental disability, the exemption should apply on a case-by-case basis, "because the symptoms of these disorders are much more variable than those associated with retardation or other disabilities".[904]

---

[900] *Id.* at 1-2.
[901] *Id.* at 3-18.
[902] *Id.* at 6.
[903] *Id.* at 7.
[904] *Id.*

The report explains the carve-out for offenses due "'solely to the acute effects of alcohol or other drugs.'"[905] Voluntary intoxication may be taken into account to reduce the grade of the offense or in mitigation of a potential capital sentence.

However, in light of the wide variability in the effects of alcohol and other drugs on mental and emotional functioning, voluntary intoxication alone does not warrant an automatic exclusion from the death penalty. At the same time, this recommendation is not meant to prevent exemption from the death penalty for those offenders whose substance abuse has caused organic brain disorders or who have other serious disorders that, in combination with the acute effects of substance abuse, significantly impaired appreciation or control at the time of the offense.[906]

The report adds that the proposal contemplates a categorical exclusion for defendants whose impairment meets the description included therein.[907] The jury may exclude defendants with less severe impairments through mitigation.[908]

"Numerous studies document" that juries harbor negative attitudes toward the mentally ill and that they are prone to treating mental illness as an aggravating rather than a mitigating factor, partly because they erroneously view mentally ill defendants as more dangerous than other defendants.[909] The American Bar Association recommendation would "ensure that . . . the most severe types of mental disorder" are treated as a disability and could only be considered as a mitigating circumstance when they are not an exemption.[910]

***Defenses based on mental illness.*** Pennsylvania law does not categorically exempt the severely mentally ill from the death penalty, but there are several possible grounds whereby a murder defendant can respond to a death charge by claiming that he or she is suffering from a mental illness: the insanity defense, a defense of guilty but mentally ill (GBMI), a defense of diminished capacity, and mitigation. Despite these defenses, Pennsylvania Supreme Court Justice Debra Todd's concurring opinion noted the similarities between the severely mentally ill and the categories of persons recently exempted under the Eighth Amendment and called on the General Assembly to reexamine this issue.[911] When Connecticut still had capital punishment, it exempted the severely mentally ill from the death penalty with the statutory test that "the defendant's mental capacity was significantly impaired or the defendant's ability to conform the defendant's conduct to the requirements of law was significantly impaired but not so impaired in either case as to constitute a defense to prosecution[.]"[912]

---

[905] *Id.* at 9.
[906] *Id.* at 9-10.
[907] *Id.* at 10.
[908] *Id.* at 10-11.
[909] Christopher Slobogin, *Mental Disorder as an Exemption from the Death Penalty: The ABA-IRR Task Force Recommendations*, 54 Cath. U. L. Rev. 1133, 1150-51 (2005).
[910] *Id.* at 1150-52.
[911] *Commw v. Baumhammers*, 960 A.2d 59, 102-08 (Pa. 2008).
[912] Former Conn. Gen. Stat. § 53a-46a(3).

***The Insanity Defense and Guilty but Mentally Ill.*** In Pennsylvania, the statutory provisions for the insanity defense[913] and for a verdict of guilty but mentally ill[914] may apply in some cases to exempt a severely mentally ill defendant from the death penalty. The provision regarding the insanity defense reads as follows:

§ 315. Insanity.

(a) General rule.--The mental soundness of an actor engaged in conduct charged to constitute an offense shall only be a defense to the charged offense when the actor proves by a preponderance of evidence that the actor was legally insane at the time of the commission of the offense.

(b) Definition.--For purposes of this section, the phrase "legally insane" means that, at the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if the actor did know the quality of the act, that he did not know that what he was doing was wrong.

The provision for a verdict of "guilty but mentally ill" could apply to a defendant who is mentally ill instead of legally insane:

§ 314. Guilty but mentally ill.

(a) General rule.--A person who timely offers a defense of insanity in accordance with the Rules of Criminal Procedure may be found "guilty but mentally ill" at trial if the trier of facts finds, beyond a reasonable doubt, that the person is guilty of an offense, was mentally ill at the time of the commission of the offense and was not legally insane at the time of the commission of the offense.

(b) Plea of guilty but mentally ill.--A person who waives his right to trial may plead guilty but mentally ill. No plea of guilty but mentally ill may be accepted by the trial judge until he has examined all reports prepared pursuant to the Rules of Criminal Procedure, has held a hearing on the sole issue of the defendant's mental illness at which either party may present evidence and is satisfied that the defendant was mentally ill at the time of the offense to which the plea is entered. If the trial judge refuses to accept a plea of guilty but mentally ill, the defendant shall be permitted to withdraw his plea. A defendant whose plea is not accepted by the court shall be entitled to a jury trial, except that if a defendant subsequently waives his right to a jury trial, the judge who presided at the hearing on mental illness shall not preside at the trial.

(c) Definitions.--For the purposes of this section and 42 Pa.C.S. § 9727 (relating to disposition of persons found guilty but mentally ill):

(1) "Mentally ill." One who as a result of mental disease or defect, lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

(2) "Legal insanity." At the time of the commission of the act, the defendant was laboring under such a defect of reason, from disease of the mind, as not to

---

[913] 18 Pa.C.S. § 315. The common law *M'Naghten*'s Rule is preserved by § 314(d), which is the definition for legally insane. *Commw. v. Woodhouse*, 164 A.2d 98, 103 (Pa. 1960).

[914] *Id.* § 314.

know the nature and quality of the act he was doing or, if he did know it, that he did not know he was doing what was wrong.

(d) Common law M'Naghten's Rule preserved.--Nothing in this section shall be deemed to repeal or otherwise abrogate the common law defense of insanity (M'Naghten's Rule) in effect in this Commonwealth on the effective date of this section.

The verdict of GBMI applies if the defendant's proffered insanity defense fails the necessary *M'Naghten* standard but meets the definition for mentally ill. "In a capital case, evidence tending to show a defendant was 'guilty but mentally ill' is properly admitted only at the penalty phase—not the guilt phase."[915] Thus, a criminal trial where an insanity defense is proffered has four possible verdicts: guilty, GBMI, not guilty by reason of insanity, or not guilty.[916] In a murder trial, the jury must first consider whether defendant commotted the acts charged; if not, the defendant is acquitted. The next issue is whether the defendant is insane. If he is, the verdict is not guilty by reason of insanity. If not, the defendant may still be found GBMI or guilty.

> The verdict of not guilty by reason of legal insanity labels a defendant as sick rather than bad. It signifies that in the eyes of the law the person, because of mental abnormality at the time of the crime, does not deserve to be blamed and treated as a criminal for what he or she did. The verdict of guilty but mentally ill labels a defendant as both bad and sick. It means that in the law's eyes that person, at the time of the crime, was not so mentally abnormal as to be relieved from blame and criminal punishment for what he or she did, but that the defendant was abnormal enough to make him or her a likely candidate for special therapeutic treatment.[917]

*Commonwealth v. Trill*[918] includes a thorough discussion of the background and theory of GBMI legislation in Pennsylvania. The addition of the verdict of GBMI arose because of the desire to include a disposition responsive to cases where the defendant is mentally ill, but his impairment is not the complete cognitive breakdown described in § 315. The first state to adopt GBMI was Michigan, after its Supreme Court held that automatic commitment of defendants who were acquitted by reason of insanity was unconstitutional.[919] It was feared that defendants acquitted under an insanity excuse would be freed and endanger the community.[920] The acquittal of John Hinckley by reason of insanity for the attempted assassination of then-President Reagan spurred nationwide interest in the passage of GBMI legislation, including Pennsylvania's enactment of section 315.[921] There was a public demand for a sentence for persons whose offenses arose in part from mental illness, but were considered, nevertheless, in some degree responsible for their actions. There was also a perception that the insanity defense was being raised too broadly, and that offenders who should have been severely punished were walking away after a brief and undemanding period in therapy. GBMI also seemed the appropriate disposition for defendants who merited some punishment but also needed psychiatric treatment.

---

[915] *Commw. v. Faulkner*, 595 A.2d 28, 36 (Pa. 1991).
[916] *Commw. v. Andre*, 17 A.3d 951, 962 (Pa. Super. Ct. 2011).
[917] Pa. Suggested Standard Crim. Jury Instructions 5.01A(1) (2016).
[918] *Commw. v. Trill*, 543 A.2d 1106 (Pa. Super. Ct. 1988).
[919] *Id.* at 1116.
[920] *Id.* at 1116-17.
[921] *Id.* at 1117, 1120.

Under the provision that governs the sentencing of persons found to be GBMI, the defendant "may have any sentence imposed on him which may lawfully be imposed on any defendant convicted of the same offense."[922] With respect to sentencing, the only advantage to the defendant over a verdict of guilty is that before the sentencing, the court is directed to "hear testimony and make a finding on the issue of whether the defendant at the time of sentencing is severely mentally disabled and in need of treatment pursuant to the . . . 'Mental Health Procedures Act'."[923] If he is, the court is directed to order treatment "consistent with available resources."[924] The treatment may be provided by Departments of Corrections or Human Services or the county, in accordance with that act.[925] Since a verdict of GBMI necessarily implies that mental illness was a partial cause in fact of the crime, it would seem that such a defendant would not be appropriate for the death penalty, as he would not be among the worst of the worst.

***Diminished capacity.*** "Diminished capacity is an extremely limited defense, which requires extensive psychiatric testimony establishing a defendant suffered from one or more mental disorders which prevented him from formulating the specific intent to kill."[926] If successful, diminished capacity reduces the crime from first-degree to third-degree murder, thereby negating the applicability of the death penalty.[927] It is sometimes asserted that "[a] defense of diminished capacity is only available to a defendant who admits criminal liability but contests the degree of guilt";[928] however, "a defendant, merely by introducing expert testimony of diminished capacity or by requesting a diminished capacity charge, does not automatically and inevitably (i) admit that he or she killed the victim, (ii) admit that he or she committed third-degree murder, or (iii) waive other possible defenses."[929]

***Mitigation.*** Pennsylvania's statutory mitigating circumstances include as grounds for mitigation that "the defendant is under the influence of extreme mental and emotional disturbance"[930] and substantial impairment of the defendant's "capacity . . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of law".[931] This is similar to the American Bar Association resolution that would exempt a defendant from a death sentence if the defendant's "severe mental disorder . . . significantly impaired" the defendant's "capacity (a) to appreciate the nature, consequences, or wrongfulness of their conduct; (b) to exercise rational judgment in relation to conduct; or (c) to conform their conduct to the requirements of the law."[932]

---

[922] 42 Pa.C.S. § 9727(a).
[923] *Id.*
[924] *Id.* § 9727(b)(1).
[925] *Id.*
[926] *Commw. v. Cuevas*, 832 A.2d 388, 393 (Pa. 2003).
[927] *Commw. v. Faulkner*, 595 A.2d 28, 35 n.4 (Pa. 1991).
[928] *Commw. v. Laird*, 726 A.2d 346, 353 (Pa. 1999).
[929] Pa. Suggested Standard Crim. Jury Instructions 5.01B, subcomm. n. (2016).
[930] 42 Pa.C.S. § 9711(e)(2).
[931] *Id.* § 9711(e)(3).
[932] Am. Bar Ass'n, *supra* note 897, at 1.

*Proposed Procedure under the American Bar Association's Resolution*.  Procedurally, the American Bar Association's resolution divides the consideration of severe mental illness into three stages of competency to:  1) waive appeals from the death sentence; 2) assist in the condemned's defense; and 3) understand the reason why he is being executed.[933]

*Competency to waive appeals.*  A competent defendant can refuse legal assistance and permit the execution to take place, as did all three of the condemned inmates in Pennsylvania who were executed since the ruling in *Gregg v. Georgia* did; however, all three had psychiatric problems.[934]  Commentators have identified two issues in these voluntary cases:  determining that the condemned's waiver of defense is knowing, intelligent, and voluntary and is not primarily the product of mental illness; and assuring that the condemned genuinely deserves the death penalty.

The American Bar Association's resolution applies when the condemned "wishes to forgo or terminate post-conviction proceedings."[935]  This language implies that the condemned is not permitted to waive the trial and the appeal.  The reason for this limitation is that if such waivers are permitted, there is no judicial determination regarding the facts of the case; it is never decided that the defendant is actually guilty and that death is the appropriate penalty.[936]  One commentator argues that the volunteer situation entails the balancing of the state's interest in fair and reliable use of the death penalty against the defendant's interest in autonomy and free choice.[937]  This balance shifts from the state to the individual defendant as the proceeding moves from the earlier to the later stages.[938]  According to this view, the condemned should not be permitted to waive trial and presentation of mitigating evidence but should be able to waive post-conviction review.[939]

"[T]he appropriate standard for assessing . . . competency to proceed with collateral review . . . would be whether the defendant is able to understand the nature of the proceedings and able to communicate with and assist his counsel".[940]  The American Bar Association's standard for a next friend to substitute for an incompetent prisoner would be if the "mental disorder . . . significantly impairs" the prisoner's "capacity to make a rational decision,"[941] which would supplement the current, appropriate standard.

*Competency to assist defense.*  The strong possibility that a severely mentally ill defendant is incapable of assisting in his or her own defense was advanced as a reason for exempting the "insane" from capital punishment as far back as Blackstone's *Commentaries* in the 17th century.[942]  Since the reliability of capital convictions has come under stricter scrutiny, the possibility of the execution of a defendant who was unable to recognize or communicate a defense because of mental

---

[933] *Id.* at 1-2.

[934] *Supra* pp. 1-2, notes 7, 8.

[935] Am. Bar Ass'n, *supra* note 897, at 1-2.

[936] *See* Stephen Skaff, *Chapman v. Commw.:  Death Row Volunteers, Competency, & "Suicide by Court"*, 53 St. Louis U. L.J. 1353, 1365-66 (2009).

[937] Anthony J. Casey, *Maintaining the Integrity of Death:  An Argument for Restricting a Defendant's Right to Volunteer for Execution at Certain Stages in Capital Proceedings*, 30 Am. J. Crim. L. 75, 76 (2002).

[938] *Id.* at 77.

[939] *Id.* at 105-06.

[940] *Commw. v. Zook*, 887 A.2d 1218, 1225 (Pa. 2005).

[941] Am. Bar Ass'n, *supra* note 897, at 1.

[942] *Ford v. Wainwright*, 477 U.S. 399, 406-07 (1986).

illness has become more widely recognized. Due Process does not exempt such defendants from the death penalty, but in the subcommittee on policy's view, it arguably should, both on human dignity and reliability grounds.[943]

The American Bar Association's proposal includes a procedure specifically applicable to capital defendants who have "a mental disorder or disability that significantly impairs his or her capacity to understand or communicate pertinent information, or otherwise to assist counsel, in connection with post-conviction proceedings" where "the prisoner's participation is necessary for a fair resolution of specific claims bearing on the validity of the conviction or death sentence".[944] In such cases, the court is directed to "suspend the proceedings" and reduce the punishment to the alternative sentence "when execution is not an option" upon a finding "that there is no significant likelihood of restoring the prisoner's capacity to participate in post-conviction proceedings in the foreseeable future."[945]

This proposed procedure has a standard similar to the Commonwealth's;[946] however, instead of reducing the punishment, the Commonwealth would likely permit a next friend and counsel to represent the incompetent prisoner[947] or compel the involuntary administration of antipsychotic medication to render the appellee competent.[948]

**Competency to be executed.** In some cases, the defendant manifests serious mental illness after the initial murder conviction, or the mental illness has been found by the trier of fact to be insufficiently mitigating, and the defendant advances mental illness as grounds for exemption, often years after conviction. While exemption can in the first instance be decided as part of the sentencing phase of the trial, the same issue after the trial raises the thorny question of what additional proceedings are necessary to decide the issue. The American Bar Association resolution identifies the most important issues and suggests how to resolve them.[949]

Competency for execution was addressed by the Supreme Court in *Ford v. Wainwright*[950] and *Panetti v. Quarterman*,[951] where the Court held that the Eighth Amendment forbids execution of a person who is "insane" at the time he or she is scheduled to be executed.[952] In *Ford*, the four justice plurality opinion noted that no state permits the execution of the insane and that the prohibition of such executions under various rationales goes back to common law.[953] Such executions go against contemporary penal theory as well. "[T]oday, no less than before, we may seriously question the retributive value of executing a person who has no comprehension of why

---

[943] Christopher Seeds, *The Afterlife of Ford & Panetti: Execution Competence & the Capacity to Assist Counsel*, 53 St. Louis U. L.J. 309, 343-48 (2009).
[944] Am. Bar Ass'n, *supra* note 897, at 2.
[945] *Id.*
[946] *Commw. v. Zook*, 887 A.2d 1218, 1225 (Pa. 2005).
[947] *Commw. v. Haag*, 809 A.2d 271, 278, 284-85 (Pa. 2002). "[A] putative next friend must demonstrate that the prisoner is incompetent" to rationally decide "whether to pursue PCRA relief." *Id.* at 280.
[948] *Commw. v. Sam*, 952 A.2d 565, 588-89 (Pa. 2008).
[949] Am. Bar Ass'n, *supra* note 897, at 1-2.
[950] 477 U.S. 399 (1986).
[951] 551 U.S. 930 (2007)
[952] *Ford,* 477 U.S. at 409-10.
[953] *Id.* at 408-09.

he has been singled out and stripped of his fundamental right to life."[954]  The plurality opinion did not address the test for insanity in this context, holding that the state procedure under review did not satisfy due process.[955]  The narrower and therefore controlling opinion by Justice Lewis Powell alone, proposed that "the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it."[956]  *Panetti* applied or extended the *Ford* exclusion to persons who lack a rational understanding of the connection between the offense and the punishment by execution due to a severe mental illness, as in *Panetti*'s case, paranoid schizophrenia.[957]  Both cases emphasize that once the condemned makes a sufficient showing of incompetence to be executed, a full and fair judicial hearing must be afforded.

In the plurality opinion in *Ford*, Justice Marshall insisted that the death penalty context called for a stringent application of due process.[958]  The procedure under review in *Ford* fell short because it failed "to include the prisoner in the truth-seeking process" in that it did "not permit any material relevant to the ultimate decision to be submitted on behalf of the prisoner facing execution."[959]  The condemned must have the opportunity to present psychiatric evidence.

> We recently had occasion to underscore the value to be derived from a factfinder's consideration of differing psychiatric opinions when resolving contested issues of mental state.  In *Ake v. Oklahoma,* 470 U.S. 68 . . . (1985), we recognized that, because 'psychiatrists disagree widely and frequently on what constitutes mental illness [and] on the appropriate diagnosis to be attached to given behavior and symptoms,' the factfinder must resolve differences in opinion within the psychiatric profession 'on the basis of the evidence offered by each party' when a defendant's sanity is at issue in a criminal trial.  The same holds true after conviction; without any adversarial assistance from the prisoner's representative—especially when the psychiatric opinion he proffers is based on much more extensive evaluation than that of the state-appointed commission—the factfinder loses the substantial benefit of potentially probative information.  The result is a much greater likelihood of an erroneous decision.[960]

For the same reason, the failure of the state to permit the condemned to cross-examine the state's psychiatrist denied him due process.[961]

> Even more damaging was the assignment of the determination to the executive branch:

> Under this procedure, the person who appoints the experts and ultimately decides whether the State will be able to carry out the sentence that it has long sought is the Governor, whose subordinates have been responsible for initiating every stage of the prosecution of the condemned from arrest through sentencing.  The commander

---

[954] *Id.* at 409.
[955] *Id.* at 413-18.
[956] *Id.* at 422 (Powell, J., concurring).
[957] *Panetti*, 551 U.S. at 954-56.
[958] *Ford*, 477 U.S. at 411-12.
[959] *Id.* at 413.
[960] *Id.* at 414.
[961] *Id.* at 415.

of the State's corps of prosecutors cannot be said to have the neutrality that is necessary for reliability in the factfinding proceeding.

Historically, delay of execution on account of insanity was not a matter of executive clemency . . . or judicial discretion . . .; rather, it was required by law . . . . Thus, history affords no better basis than does logic for placing the final determination of a fact, critical to the trigger of a constitutional limitation upon the State's power, in the hands of the State's own chief executive. In no other circumstance of which we are aware is the vindication of a constitutional right entrusted to the unreviewable discretion of an administrative tribunal.[962]

Justice Powell's concurring opinion in *Ford* agreed with Justice Marshall that competency must be determined by a judge after a fair hearing.[963] The determination under review fell short of the applicable requirement of a "full and fair hearing," as it was made by the Governor on the basis of examination and reports by state-appointed psychiatrists.[964] But Powell stopped short of requiring a "full-scale 'sanity trial.'"[965] He noted that due process is a flexible concept that depends on the situation addressed by the case and that the issue in a competency hearing "is not *whether*, but *when* [the] execution may take place."[966] A post-trial competency hearing must have grounds to overturn the determination at the trial that the condemned was competent, so that the state could presume competency and require "a substantial threshold showing of insanity merely to trigger the hearing process."[967] Finally, the issue of "sanity calls for a basically subjective judgment" in which the procedures of an adversarial hearing "are not necessarily the best means of arriving at sound, consistent judgments as to a defendant's sanity."[968]

We need not determine the precise limits that due process imposes in this area. In general, however, my view is that a constitutionally acceptable procedure may be far less formal than a trial. The State should provide an impartial officer or board that can receive evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination. Beyond these basic requirements, the States should have substantial leeway to determine what process best balances the various interests at stake. As long as basic fairness is observed, I would find due process satisfied, and would apply the presumption of correctness of [28 U.S.C.] § 2254(d) on federal habeas corpus.[969]

Beyond the invalidity of executing the severely mentally ill and locating the responsibility for the decision in the judicial branch, many issues were not addressed or left unclear by *Ford* and *Panetti*, and implicitly left to the states to resolve, including the following:

---

[962] *Id.* at 416 (citations omitted).
[963] *Id.* at 423 (Powell, J., concurring).
[964] *Id.* at 423-24.
[965] *Id.* at 425.
[966] *Id.*
[967] *Id.* at 426.
[968] *Id.*
[969] *Id.* at 427.

The criteria for insanity or mental illness in this context
Who may initiate an inquiry into competency for execution
The evidence needed to initiate a competency proceeding
Who decides whether there should be a competency hearing and on what standard
Right to appeal a decision granting or denying a competency hearing
Nature of the competency hearing
- o   Burden of proof
- o   Right to counsel
- o   Live testimony
- o   Expert testimony (including designation of impartial experts)
- o   Cross-examination
- o   Oral argument
- o   Standard of review

Appeal from decision
Renewal of proceedings upon alleged change in competency status
Disposition of defendant upon determination of incompetency[970]

A description of an execution competency procedure that is thoroughly protective of the rights of the condemned has been developed.[971] "Procedurally, states must, at a minimum, provide an impartial decision maker regarding the competency determination who can receive evidence and argument presented on behalf of the offender, including expert mental health evidence."[972] States are free to provide more ample protections.[973]

The determination of competency should take place after the execution date has been set and after the other appeals and the initial collateral review challenges have been exhausted.[974] Multiple parties should be allowed to raise the competency issue, including correctional officers, family members, the condemned himself or his attorney, or the court on its own motion.[975] To avoid frivolous or repetitive claims, the defendant must make a showing of reasonable cause by a verified petition accompanied by supporting documentary evidence.[976] There should then be a preliminary hearing before the sentencing judge or a trial judge of the county where the prison housing capital defendants is located to determine whether a formal competency hearing is justified; the judge may hold a hearing or decide the threshold question on the pleadings.[977] If the judge denies a competency hearing, the defendant should get an expedited appeal.[978] The determination should be upheld unless clearly erroneous or against the overwhelming weight of the evidence.[979]

[970] Peggy M. Tobolowsky, *To Panetti & Beyond--Defining & Identifying Capital Offenders Who Are Too "Insane" to Be Executed*, 34 Am. J. Crim. L. 369, 417-28 (2007).
[971] *Id*. at 420-28.
[972] *Id*. at 428.
[973] *Id*. at 417.
[974] *Id*. at 421.
[975] *Id*. at 421-22.
[976] *Id*. at 422.
[977] *Id*. at 423.
[978] *Id*.
[979] *Id*.

If a competency hearing is granted, it should be an adversarial process including live testimony, cross-examination, and oral argument.[980]  The defendant should be afforded counsel, and if the defendant is not represented, an attorney should be appointed for him or her as soon as possible.[981]  Both sides should be able to present expert testimony, and there should be at least one state-appointed independent expert to examine the defendant and testify.[982]  The defendant should have the burden of proving incompetence by a preponderance of the evidence.[983]  The judge should make written findings.[984]  Either side should have the right to an expedited appeal.[985]  On appeal, the determination should be upheld unless clearly erroneous or against the overwhelming weight of the evidence.[986]  If the condemned is found competent, a further appeal on competency must include a showing of changed circumstances.[987]

If the defendant is found incompetent for execution, he should be transferred to a prison or state mental health facility.[988]  "The chief mental health officer of the facility . . . should provide an annual status report" on his mental condition to the judge and counsel for both sides.[989]  If the officer finds that the defendant has become competent to be executed, he should report this finding to the judge and counsel.[990]  Another evidentiary hearing should be held, with the state bearing the burden of proof of competency by preponderance of the evidence.[991]  The losing side should have the right to an expedited appeal.[992]  If the defendant remains incompetent after two status reports, the judge should hold a hearing on whether he or she will remain incompetent for the foreseeable future, with the burden of proof on the state.[993]  If the judge finds there is no reasonable probability of restored competence, the defendant should be given the strictest sentence other than death.[994]  If the court rules otherwise, the defendant would retain his current status and the process would be repeated at two-year intervals, with the loser having the right of expedited appeal.[995]

Finally, there is the difficult issue of medical intervention to restore the condemned to competency in order to permit him to be executed:

> An additional concern surfaces when the state seeks to execute the severely mentally ill.  . . . Ford and Panetti give constitutional effect to the long-standing common law prohibition of the execution of the insane.  This exemption, however, raises the specter of the government forcibly medicating the condemned prisoner with anti-psychotic drugs to render the "insane" capital defendant "sane" enough

---

[980] *Id.* at 424.
[981] *Id.*
[982] *Id.* at 424-25.
[983] *Id.* at 425-26.
[984] *Id.* at 426.
[985] *Id.*
[986] *Id.*
[987] *Id.*
[988] *Id.* at 427.
[989] *Id.*
[990] *Id.*
[991] *Id.*
[992] *Id.*
[993] *Id.* at 427-28.
[994] *Id.* at 428.
[995] *Id.*

to execute. Because anti-psychotic drugs exist to treat mental illness such as schizophrenia, a defendant, who otherwise is exempt from execution under Ford and Panetti, may be forced to take medication for the sole purpose of rendering him ready for execution. Further adding to the moral dilemmas created by this macabre situation, a capital defendant may actually forgo medically appropriate and humane treatment for his mental illness to avoid execution.[996]

In Pennsylvania, execution of the insane was held unconstitutional in *Commonwealth v. Moon*[997] and reaffirmed in *Commonwealth v. Jermyn*.[998] There is no procedure in place regarding the determination of whether a condemned prisoner must be exempted from the death penalty on the grounds of mental illness.

### *Recommendation*

The subcommittee on policy recommends treating what would approximate a guilty but mentally ill situation in a noncapital trial as a disqualification for capital punishment rather than as a mitigating circumstance. This is what is recommended by American Bar Association, American Psychiatric Association, American Psychological Association and National Alliance on Mental Illness. It is based upon the same or similar judicial rationale that exempt juvenile and intellectually disabled murderers from the death penalty. Instead of relying upon insanity as a disqualification for the penalty, it would extend the disqualification to one whose severe mental illness significantly impaired his capacity to: (i) appreciate the nature, consequences, or wrongfulness of his conduct in the criminal offense; (ii) exercise rational judgment in relation to the criminal offense; or (iii) conform the person's conduct to the requirements of the law in connection with the crime.

# Juries

The question that serves as the basis of the study of the selection of juries in the administration of the death penalty in our Commonwealth is:

The impact on the reliability and fairness of capital trials of death qualifying jurors and the impact of this practice on the ability of women, people of color and people of faith to serve on capital juries; whether there are adequate procedural protections and remedies in place to make sure that women and African Americans are not excluded from serving as jurors in capital cases; and whether there are adequate procedural protections in place to assure that jurors are able to understand and apply instructions in determining guilt or innocence and the appropriate punishment in a capital case;[999]

---

[996] Entzeroth, *supra* note 895, at 559.
[997] 117 A.2d 96, 100-01 (1955).
[998] 652 A.2d 821, 822-23 (1995).
[999] Pa. S. Res. No. 6 (Sess. of 2011); appdx. A, *infra* p. 220.

***The impact on the reliability and fairness of capital trials of death qualifying jurors and the
impact of this practice on the ability of women, people of color and people of faith to serve on
capital juries***

      If there is "a verdict of murder of the first degree" recorded from a jury in a trial in which
the Commonwealth is pursuing the death penalty, the jury then determines whether the defendant
is "sentenced to death or life imprisonment."[1000]  The criminally accused enjoy a constitutional
right to be tried by an impartial jury.[1001]  "[L]arge, distinctive groups" may not be "excluded from
the pool" of jurors.[1002]  These large groups are distinguished "on the basis of some immutable
characteristic such as race, gender, or ethnic background" as opposed to "any other group defined
solely in terms of shared attitudes".[1003]  To clarify, "petit juries, as opposed to jury panels or
venires," are not required "to reflect the composition of the community at large" because that
would be "unworkable and unsound".[1004]  A "group defined solely in terms of shared attitudes that
render members of the group unable to serve as jurors in a particular case, may be excluded from
jury service without contravening any of the basic objectives of the fair-cross-section
requirement", which means that "those who cannot and will not conscientiously obey the law with
respect to one of the issues in a capital case," are not unfairly or unconstitutionally prohibited from
serving as a juror on a capital case.[1005]  "The essence of a 'fair-cross-section' claim is the
systematic exclusion of "a 'distinctive' group in the community."[1006]  At *voir dire*, removal for
cause of "prospective jurors who stated that they could not under any circumstances vote for the
imposition of the death penalty . . . hardly can be said to create an 'appearance of unfairness'" and
excludes a fair-cross-section claim from this type of death qualification.[1007]

      "The process of death qualification is considered to be a necessary component in capital
trials because it minimizes the possibility that a jury would consist of individuals who are unable
to evaluate evidence appropriately and impartially; however, research suggests that the process
itself might bias various aspects of the trial."[1008]

        Exclusion of jurors opposed to capital punishment began with a recognition that
        certain of those jurors might frustrate the State's legitimate interest in administering
        constitutional capital sentencing schemes by not following their oaths. . . . . [T]he

---

[1000] 42 Pa.C.S. § 9711(a).

[1001] U.S. Const. amend. VI; Pa. Const. art. I, § 9.  The U.S. Const. amend. VI provision is extended to state criminal
cases *via* amend. XIV.  *Duncan v. La.*, 391 U.S. 145, 149 (1968).

[1002] *Taylor v. La.*, 419 U.S. 522, 530 (1975).  In this case, the group was women.  *Id.* at 525.  Most simply stated, this
requirement forbids systematically excluding large, distinctive groups from the jury pool so that the pool reasonably
represents the community; however, chosen *petit* juries do not have to be a particular composition.  *Id.* at 538.  Stated
another way, a jury must be "drawn from a fair cross section of the community".  *Id.* at 535-37.

[1003] *Lockhart v. McCree*, 476 U.S. 162, 175-76 (1986).

[1004] *Id.* at 173-74.

[1005] *Id.* at 173-76.  "The Sixth Amendment requirement of a fair cross section on the venire is a means of assuring, not
a *representative* jury (which the Constitution does not demand), but an *impartial* one (which it does)."  *Holland v. Ill.*,
493 U.S. 474, 480 (1990).

[1006] *Lockhart*, 476 U.S. at 174.

[1007] *Id.* at 166-74.  "We simply cannot conclude . . . that the exclusion of jurors opposed to capital punishment results
in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction."  *Witherspoon v. Ill.,*
391 U.S. 510, 517-18 (1968).

[1008] Yelderman *et al.*, *supra* note 73, at 27, 30.

proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'[1009]

Assuming that social science studies "are both methodologically valid and adequate to establish that 'death qualification' in fact produces juries somewhat more 'conviction-prone' than 'non-death-qualified' juries", U. S. Supreme Court ruled "that the Constitution does not prohibit the States from 'death qualifying' juries in capital cases."[1010]  It would also seem that those potential jurors who would automatically vote either for or against the death penalty would be removable for cause because "such jurors-whether they be unalterably in favor of, or opposed to, the death penalty in every case-by definition are ones who cannot perform their duties in accordance with law, their protestations to the contrary notwithstanding."[1011]

Capital defendants have the right to be sentenced by an impartial jury. The State may not infringe this right by eliminating from the venire those whose scruples against the death penalty would not substantially impair the performance of their duties. Courts reviewing claims of *Witherspoon–Witt* error, however, especially federal courts considering habeas petitions, owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror.[1012]

The concern in the question was the same raised in these cases, namely "that the death qualification process potentially results in biased juries"[1013] because of their resultant composition. There is no limitation to challenging jurors for cause, but peremptory challenges "[i]n trials involving a capital felony . . . when there is only one defendant" are limited to 20 *per* side.[1014]  A challenge for cause occurs when a juror demonstrates bias by his responses to questioning or when he says something that indicates that he will not follow instructions or be impartial.  A peremptory challenge is used to exclude a juror because of a suspected or presumed bias instead of an expressed one.[1015]   Peremptory challenges are restricted on race because "the Equal Protection Clause forbids a party to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."[1016]  In the exercise of peremptory challenges, "gender, like race, is an unconstitutional proxy for juror competence and impartiality."[1017]

[1009] *Wainwright v. Witt*, 469 U.S. 412, 423 (1985).
[1010] *Lockhart*, 476 U.S. at 173.  This assumption was made after the court pointed out "several serious flaws in the evidence" introduced *via* the social science studies.  *Id.* at 168-73.
[1011] *Morgan v. Ill.*, 504 U.S. 719, 735 (1992).
[1012] *Uttecht v. Brown*, 551 U.S. 1, 22 (2007).
[1013] Yelderman *et al.*, *supra* note 73, at 32.
[1014] Pa. R. Crim. P. 634(A)(3).  For alternate jurors, each side has one peremptory challenge for every two alternate jurors selected.  *Id.* 633(B).
[1015] Yelderman *et al.*, *supra* note 73, at 32.
[1016] *Batson v. Ky.*, 476 U.S. 79, 89 (1986).
[1017] *J.E.B. v. Ala. rel. T.B.*, 511 U.S. 127, 129 (1994).  "[T]he Equal Protection Clause forbids peremptory challenges on the basis of gender as well as on the basis of race."  *Id.* at 130.

Research examining the effects of death qualification on jury composition suggests that death qualification often results in juries that are biased in ways that consistently disadvantage capital defendants. It is possible to argue that as long as those who are extremely against *and* extremely for the death penalty are excluded, that risk would be minimal. However, this is not necessarily true because . . . the process likely excludes those who strongly oppose the death penalty at a higher rate than those who strongly support the death penalty.[1018]

This is because it is procedurally easier to ask for a yes/no response to disqualify a potential juror as death qualified while harder to elicit a disqualifying response from a potential juror who says he would consider life imprisonment without parole while harboring "attitudes and beliefs" leading him "to always vote for the death penalty if a defendant was found guilty of a capital crime"[1019] Because of General Social Survey and other social science research, "research suggests that death qualification is more likely to eliminate members of some groups than others."[1020] Systematic exclusion of specific social groups could occur because some groups might be "consistently more in favor of the death penalty than another", who then could be excluded by "prosecutors who know such statistics".[1021] As noted elsewhere in the report, some religions have official stances on the death penalty which might impact "jury selection practices".[1022] In short, "findings support the idea that the death qualification process systematically eliminates jurors who belong to certain social and demographic groups" and "can also change the way in which case facts are interpreted and discussed by a jury."[1023]

If death qualification can affect the composition of a jury, the same effect "likely shapes the ways in which jurors view and evaluate aggravating and mitigating circumstances".[1024] If death qualification increases both negative perceptions of the defendant and positive perceptions of the victim as some research suggests, it could result in jurors being more accepting of aggravating circumstances and less accepting of mitigating evidence.[1025] Some research also found that "death-qualification resulted in retaining jurors who tended to process information . . . using less systematic and analytical cognitive strategies when compared to excludables".[1026] There is some relatively recent social science research "that death-qualified individuals . . . perceive *individuals* differently in death penalty trials" and "perceive and process the *evidence* differently."[1027]

---

[1018] Yelderman *et al.*, *supra* note 73, at 33 (citation omitted).
[1019] *Id.* at 34. A co-author of this source observed that "it took much longer to identify and exclude jurors who were extremely in favor of the death penalty" than those "who were against the death penalty" during the *voir dire* phase. *Id.*
[1020] *Id.* at 35-36.
[1021] *Id.* at 35.
[1022] *Id.* at 36. A sample of some religious stances appears *infra* pp. 212-13.
[1023] Yelderman *et al.*, *supra* note 73, at 36.
[1024] *Id.* at 38.
[1025] *Id.* Pretrial publicity might similarly bias jurors. *Id.* at 40.
[1026] *Id.* at 39.
[1027] *Id.* at 40.

Some of this research reveals that "the death qualification process is a suggestive and influential process that leads to conviction prone juries by creating juries that are less likely to share attitudes in opposition of giving a death penalty and reaffirming jurors' willingness and expectations to convict the defendant and sentence him to death."[1028] The contention is that systematically excluding "jurors who are considered unable to be impartial" uses a process that reinforces jurors' "willingness to give the death penalty" and leads to "increased receptivity to guilt confirming evidence and aggravating factors while simultaneously rejecting innocence confirming evidence and mitigating factors."[1029]

To exclude potential jurors, attorneys, who know statistical research on demographics and attitudes, might rely on that knowledge to "exclude potential jurors . . . to increase the possibility of creating a jury that will decide in their favor."[1030] Maybe more often, "attorneys are likely to base their exclusions on intuitions related to certain attitudes and beliefs associated with individuals and their group statuses."[1031] The concern "related to death-qualified jurors is that the death qualification process itself influences jurors such that jurors who experience the death qualification process hold more pro-prosecution or anti-defendant perceptions of the trial information than jurors who do not experience death qualification."[1032] Repeatedly asking jurors "whether they are able to give the death penalty, *assuming* the defendant is *guilty* . . . reiterates the statement that the defendant is guilty."[1033] Some research reveals that "[d]eath qualification might exclude jurors who naturally process information more rationally, resulting in a jury that process information more experientially."[1034]

This research suggests that "the death qualification process facilitates convictions and death sentences" because the potentially more punitive individuals would be selected for capital juries, whose interpretation of trial information differs compared to the excluded ones, and "the process of death qualification and the individual traits of those selected through death qualification both relate to higher rates of convictions and death sentences."[1035] This research has not yet been judicially accepted so that futures studies might "need to use actual trials, trial videos, or reenactments . . . to increase the realism related to participating in a capital trial."[1036] It would also help to study deliberations between jurors that are death-qualified and those that are not.[1037]

Ironically, instead of death qualification resulting in a "jury absent any extreme death penalty biases, it might instead . . . perpetuate such biases."[1038] If "specific social groups and individuals with shared attitudes or beliefs that are thought of as prejudicial" are excluded, the "death-qualified juries . . . might actually be more susceptible to systemic biases".[1039] Effects of

---

[1028] *Id.* at 41.
[1029] *Id.* at 42.
[1030] *Id.* at 43.
[1031] *Id.* "Specifically, attorneys might try to identify and exclude jurors who would vote against their side." *Id.*
[1032] *Id.* at 43-44.
[1033] *Id.* at 44. If so, "death-qualified jurors enter the trial with a *biased* presumption of innocence instead of a complete presumption of innocence." *Id.* at 46.
[1034] *Id.* at 45.
[1035] *Id.* at 47.
[1036] *Id.* at 48.
[1037] *Id.*
[1038] *Id.* at 49.
[1039] *Id.*

death qualification "on juries and trial outcomes . . . should continue to be studied", especially because of "findings that demonstrate that the death qualification process produces conviction prone juries".[1040]

**_Whether there are adequate procedural protections and remedies in place to make sure that women and African Americans are not excluded from serving as jurors in capital cases_**

The Commonwealth's declared policy is that:[1041]

(1) All persons entitled to a jury trial in a . . . criminal proceeding . . . have the right to jurors selected at random from a representative cross section of the eligible population of the county.
(2) All qualified citizens . . . have the opportunity to be considered for service as jurors in the courts of this Commonwealth and . . . have an obligation to serve as jurors when summoned for that purpose.
(3) A citizen shall not be excluded from service as a juror on the basis of race, color, religion, sex, national origin or economic status.

In 2003, Joint State Government Commission published _Minority Representation in the Jury Selection Process in Pennsylvania_.[1042]  The data gathered for this report did not reveal counties excluding large, distinctive from the jury pool in unconstitutional proportions but showed that "some counties could stand to improve their representation of minorities on juries."[1043]  This analysis was not limited to juries in capital cases.  Since this report was published, Pennsylvania law was amended to add exemptions from jury duty,[1044] authorize expansion of the master list of prospective jurors[1045] and establish a statewide jury information system.[1046]  Because this report has not been updated, it is unknown whether and to what extent much the statutory amendments have impacted the representation of minorities on juries, capital or otherwise.  One of the recommendations in the report is for "[t]he judicial system" to

voluntarily, routinely monitor itself to determine if it is fulfilling its constitutional obligation to draw jurors from a cross section of the community.  . . . . As the constitutional obligation to draw jurors from a representative cross section of the community is an essential component of a right to a jury trial, it would seem that the judicial system itself could and should make it easier for parties to learn relevant numerical information specifying demographic data about whom courts summon rather than leave it up to aggrieved individuals or classes to try to calculate information the court could easily collect.[1047]

---

[1040] _Id._
[1041] 42 Pa.C.S. § 4501.
[1042] Pa. J. State Gov't Comm'n, http://jsg.legis.state.pa.us/resources/documents/ftp/publications/2003-52-JURY.PDF.
[1043] _Id._ at 3, 81, 87.
[1044] 42 Pa.C.S. § 4503(a)(5)-(8).
[1045] _Id._ § 4521(a)(3)(v).
[1046] _Id._ § 4521.1.
[1047] Pa. J. State Gov't Comm'n, _supra_ note 1042, at 3, 87.  Presumably, this would be done by court administrators.  _Id._

*Recommendation*

One remedy supported by the subcommittee on procedure would be enactment of a Racial Justice Act to statutorily allow death sentences to be challenged on a statistical basis, in addition to purposeful discrimination.

***Whether there are adequate procedural protections in place to assure that jurors are able to understand and apply instructions in determining guilt or innocence and the appropriate punishment in a capital case***

"Prior research has repeatedly revealed that jurors (1) base their decisions on erroneous assumptions about the early release of those who are not sentenced to death, (2) prematurely decide the punishment before hearing sentencing evidence and instructions, and (3) fail to understand sentencing instructions."[1048]   The Commonwealth "is one of only two states with life" imprisonment "without parole . . . that does not require that juries be told in every capital case that there is no possibility of parole".[1049]

To determine whether jurors understand instructions, previous studies used both mock jurors and interviewed actual jurors from capital cases.[1050]  National Science Foundation sponsored Capital Jury Project, in which jurors from capital cases in 14 states were interviewed afterwards.[1051]  As part of this project, a professor and trained graduate students interviewed scores of jurors from 27 capital cases in Pennsylvania.[1052]  These jurors were asked:[1053]

(1) to estimate the duration of a life sentence;
(2) to indicate which punishment was considered at four different stages[1054] and how and when that was decided;
(3) to answer three questions each about aggravating and mitigating circumstances to reveal if jurors understood the instructions; and
(4) the acceptability of death for nine crimes.

Almost 75% of the jurors estimated that life-sentenced prisoners would be paroled or otherwise released.[1055]  Most jurors discussed, considered, were concerned about and agreed that convicted murderers who were not sentenced to death would be a societal danger and are released too soon.[1056]   Most discussed punishment and future dangerousness of the accused while

---

[1048] Foglia, *supra* note 95, at 188.
[1049] *Id.*
[1050] *Id.* at 193.
[1051] *Id.* at 194.  The interviews occurred one to two years after trial but the results were consistent with responses from mock juries who were tested immediately after being instructed.  *Id.* at 206.
[1052] *Id.*
[1053] *Id.* at 195-96.
[1054] "(1) after the guilt phase but before the sentencing phase, (2) after they were given sentencing instructions but before the deliberations, (3) at the first vote, and (4) at the final vote."  *Id.* at 195.
[1055] *Id.* at 196.
[1056] *Id.* at 197.

deliberating guilt.[1057]  An overwhelming percentage believed that the crime, rather than the kind of person the convict is, should determine the punishment.[1058]

Moreover, most jurors in the study incorrectly thought that a mitigating circumstance required unanimity to consider.[1059]  For aggravating circumstances, most jurors correctly answered the query on the burden of proof and requisite unanimity.[1060]  Of the 70 questioned, "[t]he one juror who got all the answers correct on the questions related to sentencing instructions did not believe that a life sentence really meant life in prison."[1061]  Most jurors disbelieved that life in prison really means life, decided the punishment before beginning the sentencing phase and incorrectly answered more than half of the questions about the sentencing instructions.[1062]  The more accurate the responses were to the estimates for life sentences and the lower prematurity of decision corresponded to a higher the likelihood that the juror voted for life instead of death.[1063]  More than twice as many respondents estimating life sentences to be 15 or fewer years considered death the only acceptable punishment for most of the crimes asked about (in comparison to those estimating longer periods for a life sentence).[1064]

This research has been partially updated since then, both in Pennsylvania and elsewhere. The results were that "the percentages getting things wrong was remarkably similar to what" was "found in the original study. . . . . The only improvement was that the median estimate for how long someone usually spends in prison if they don't get death went from 15 years to 25 years, but 25 years is still underestimating the reality."[1065]

> [T]he law that should be guiding jurors' discretion and eliminating arbitrary decisions often does not work.  The underestimates of life sentences, premature decision making, and failure to understand sentencing instructions found in Pennsylvania are the same problems that were found in the national CJP data, interviews with capital jurors reported for other individual states, and prior research using different methodologies discussed in the literature review. . . . . Nearly half had at least one of these problems, and over 40% revealed multiple problems to a prejudicial or extreme level.  . . . . The finding that considering death the only acceptable punishment was more strongly related to estimates of life sentences and a premature stance than to the final vote support this interpretation of how the process works. . . . . [I]f jurors tried to follow the law, they would have difficulty because many fail to understand the guidelines.[1066]

---

[1057] *Id.* at 198.
[1058] *Id.*
[1059] *Id.* at 200.
[1060] *Id.*
[1061] *Id.* at 199.
[1062] *Id.* at 201.
[1063] *Id.* at 202.
[1064] *Id.* at 203.
[1065] Foglia, *supra* note 97.
[1066] *Id.* at 204-05.

carry no official imprimatur of the Supreme Court of Pennsylvania. The goal of the committee is to have these instructions accurately reflect the law of Pennsylvania and provide meaningful guidance to courts in the critical task of instructing jurors in the performance of their constitutional duty. Trial judges, . . . maintain the final responsibility to craft accurate instructions and may certainly invite suggestions from the advocates to make sure that clear and accurate instructions are provided to the trial jury.[1067]

Pennsylvania Supreme Court appoints the leadership of Committee for Proposed Standard Jury Instructions, with a subcommittee for civil and another for criminal.[1068] "Each subcommittee ensures that a proper statement of law is conveyed to jurors in language that is understandable. Committees update the instructions every 18 to 24 months."[1069] Presumably, this committee of experts accurately incorporate statutory and case law in its proposed standard jury instructions, but those are just suggestions to the trial judges, who exercise the final authority to instruct the jury as suggested or otherwise. Pointedly, the relevant subcommittee strives to suggest standardized jury instructions to properly reflect the law of Pennsylvania in a way that would be understandable to jurors in both the guilt and penalty phases of a death penalty prosecution. In a given case, trial judges must modify or replace these suggested instructions to provide greater guidance where the trial court believes it is necessary to ensure that the jurors are properly advised in the critical determinations the law requires them to make.

The subcommittee on criminal jury instruction works with Pennsylvania Bar Institute, which publishes these suggested standard criminal jury instructions. Historically, the subcommittee has not studied jurors' responses to their instructions by use of empirical surveys or other formal, scientific, analytical techniques. That subcommittee always invites feedback on the accuracy and efficacy of the suggested instructions from the bench and the bar, but neither that subcommittee nor The Unified Judicial System of Pennsylvania formally survey jurors.

The membership of the subcommittee drafting these suggested standard instructions organization is comprised of attorneys and judges. Linguists, social scientists and psychologists have not been employed to revise these standard suggested instructions.

The criminal jury instruction subcommittee is starting to explore opportunities for studying jurors' interactions with all of the suggested standard instructions. The Director of the Center for Jury Studies at the National Center for State Courts addressed the subcommittee last year on the topic of juror use and comprehension of jury instructions. Recently, the subcommittee has contacted other jury scholars with the goal of developing a durable framework of jury research in Pennsylvania that will inform the drafting of the suggested standard instructions.

---

[1067] Pa. Suggested Standard Crim. Jury Instructions, Introduction to 3d Ed. (2016).

[1068] Unified Judicial Sys. of Pa., Comm. for Proposed Standard Jury Instructions, http://www.pacourts.us/courts/supreme-court/committees/supreme-court-boards/committee-for-proposed-standard-jury-instructions (2018).

[1069] *Id.*

*Recommendation*

It would seem to the subcommittee on procedure that if the Commonwealth decides to assure that jurors are able to understand and apply instructions in determining guilt or innocence and the appropriate punishment in a capital case, there would need to be formal, empirical feedback on a routine basis. If jurors are unable to understand and apply these instructions as research discussed above indicates, it is possible that standard suggested instructions would need to be rewritten by attorneys and judges with the assistance of linguists, social scientists and psychologists and the data disclosing the misunderstanding and misapplication. To that end, the subcommittee on procedure supports the nascent efforts of the criminal subcommittee of the Committee for Proposed Standard Jury Instructions to partner with jury researchers as it drafts and revises the suggested standard jury instructions.

# State Appeals and Postconviction

The question that serves as the basis of the study of state appeals and postconviction in the administration of the death penalty in our Commonwealth is:

> Whether there are adequate procedures in place to assure that serious error in capital cases is identified and corrected and to what extent procedural doctrines, such as waiver or forfeiture, operate to prevent judicial review of serious constitutional claims on the merits;[1070]

### *Whether there are adequate procedures in place to assure that serious error in capital cases is identified and corrected*

Data was obtained summarizing capital post-conviction reversals and subsequent dispositions on all post-conviction reversals of convictions or death sentences or both imposed under the contemporary death-penalty statute dating from 1978, with the first of those post-conviction reversals coming in 1988.[1071] For post-conviction reversals in state court during this period, 116 death-row prisoners have obtained post-conviction relief from their convictions or death sentences—and, in some instances, both—in Pennsylvania state courts. Of these, new trials were granted for 18 post-conviction petitioners and 91 were granted new sentencing hearings. In 17 cases, petitioners were declared ineligible for the death penalty, 15 as a result of intellectual disability and two because they were younger than age 18 at the time of the offense.[1072] For post-conviction reversals in federal court during the same period, 58 death-row prisoners have obtained relief from their capital convictions or death sentences or both in federal habeas corpus proceedings, with the federal courts granting new trials in 24 cases and overturning death sentences in 44 cases. Three death-row prisoners who were granted penalty-phase relief in state court later had their convictions overturned in federal court. One prisoner who was granted a new penalty-

---

[1070] Pa. S. Res. No. 6 (Sess. of 2011); appdx. A., *infra* p. 220-21.
[1071] Dunham, *supra* note 12.
[1072] Multiple trials and multiple reversals are counted as cases separately from counting the same defendant so a defendant who was tried twice and obtained two reversals would count twice instead of once.

phase trial by the federal courts also had his conviction overturned after the case was remanded back to the state courts. Collectively, 170 Pennsylvania death-row prisoners have had either their convictions or death sentences overturned in state or federal post-conviction proceedings.

For subsequent dispositions from capital post-conviction reversals of either the conviction, death sentence or both in both state and federal court dating from 1978, with the first of those dispositions coming in 1996, 137 of the 170 cases reached a subsequent disposition. Almost all-- 133 of the cases--resulted in a sentence of life or less or an exoneration. Of these 133 defendants, two were exonerated, 13 pled guilty to third-degree murder, eight of whom have been released or completed their sentence, and the remainder were re-sentenced to life imprisonment. For subsequent dispositions from capital post-conviction reversals in state court since 1995, six defendants were resentenced to death, two of whom then had their death sentences reversed again and are serving life imprisonment so that four of these six remain sentenced to death. In sum, 97.1% of these dispositions following post-conviction reversals resulted in a sentence of life imprisonment or less. Specifically, approximately 86% were resentenced to life imprisonment and almost 11% received less than that with two completely exonerated. Thus, the percentage of those who were resentenced to death following post-conviction reversals is less than 3%.

There are both adequate and inadequate procedures to assure that serious error in capital cases is identified and corrected and procedural doctrines sometimes prevent, but perhaps more often, delay judicial review of serious constitutional claims on their merits. Similarly, the procedures and procedural doctrines that appear to be intended to limit judicial review for systematic efficiency and effectiveness of the death penalty often generate systematic inefficiency and ineffectiveness of the death penalty. This is borne out by the fact that the Commonwealth has executed only three condemnees during the last 56 years, and all three had psychiatric problems and relinquished their appeals,[1073] demonstrating that less than 3% of condemnees who had their original death sentences judicially vacated and then subsequently disposed were resentenced to death.

---

[1073] "Zettlemoyer was taking an anti-depressant/anti-psychotic drug when he testified before the district court and when he wrote a letter on March 28, 1995, indicating that he wanted no further appeals. . . . . [T]he record is clear that Zettlemoyer voluntarily took the medication as part of a course of treatment for his medical problems. He testified before the district court that 'I have a number of health problems, and the psychiatrist and the psychologist at the SCI Pittsburgh Institution have recommended a variety of medications for me to take. . . . . [S]o I always take it.'" *In re Zettlemoyer*, 53 F.3d 24, 28-29 (3d Cir. 1995). "Throughout the proceedings, Leon Moser maintained that he wanted to die. From all indications, he still does. . . . . Moser had been hospitalized . . . for depression . . .; and . . . takes a common anti-depressant, Imipramine." *In re Moser*, 69 F.3d 691, 693-94 (3d Cir. 1995) (Nygaard, J., dissenting). "Moser . . . underwent psychiatric treatment while in prison". Associated Press, *Killer of His Ex-Wife & 2 Daughters Is Executed, N.Y. Times (Aug. 17, 1995)*, https://www.nytimes.com/1995/08/17/us/killer-of-his-ex-wife-and-2-daughters-is-executed.html. "Dr. Bernstein stated that it was his opinion within a reasonable degree of medical certainty that Heidnik suffered from paranoid schizophrenia, and described him as a seriously disturbed, cognitively impaired, psychotic individual. . . . . Dr. McKenzie opined with a reasonable degree of medical certainty that Heidnik suffers from schizophrenia, is actively psychotic, and is not in contact with reality. . . . . Heidnik indicated in response to questioning . . . that he did not wish the attorneys to appeal. . . . . The court stated that Heidnik's paranoid schizophrenia does not substantially affect his capacity to appreciate his position and make a rational choice with respect to continuing or abandoning habeas corpus proceedings in federal court." *In re Heidnik*, 720 A.2d, 1016, 1024-26 (Pa. 1998).

The subcommittee on procedure advocates reinstating the previous practice of relaxed waiver on direct capital appeals as it was employed in the 1980s and 1990s. During that period, Pennsylvania's Supreme Court had a "duty to transcend procedural rules" in capital cases,[1074] and to "address and, if possible from the record, resolve all significant issues perceived by this Court or raised by the parties", irrespective of waiver.[1075] Generally, "on capital direct appeals, claims that were not properly raised and preserved in the trial court are waived and unreviewable" but "may be pursued under the" Post Conviction Relief Act "as claims sounding in trial counsel's ineffectiveness or, if applicable, a statutory exception to the" act's "waiver provision."[1076]

These are several problems with not having relaxed waiver in effect any more. When a potentially dispositive issue could have been resolved on the record on direct appeal, delaying its review until the petitioner reaches post-conviction proceedings is inefficient for the judiciary and everyone else involved in the proceedings.[1077] Although Post Conviction Relief Act "is not intended to . . . provide a means for raising issues waived in prior proceedings", it specifically provides otherwise[1078] if "the failure to litigate the issue prior to or during trial, during unitary review or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel."[1079] Nonetheless, "an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding."[1080] When Pennsylvania's Supreme Court dropped the relaxed waiver practice, it did "not foreclose the possibility that a capital appellant may be able to describe why a particular waived claim is of such primary constitutional magnitude that it should be reached on appeal."[1081] By dropping the relaxed waiver rule in a self-contradictory manner to rely on a self-contradictory Post Conviction Relief Act, one does not arrive at judicial efficiency.

Recognizing "the undeniable fact that a death penalty appeal is different in quality and kind because of the final and irrevocable nature of the penalty," Pennsylvania's Supreme Court claimed that "our abrogation of relaxed waiver does not eliminate or diminish other substantial safeguards, . . . not available in other criminal matters," serving

---

[1074] *Commw v. McKenna*, 383 A.2d 174, 181 (Pa. 1978).

[1075] *Commw. v. Frey*, 475 A.2d 700, 707 n.4 (Pa. 1984). The Court later described the relaxed waiver rule as discretionary, *Commw. v. Malloy*, 856 A.2d 767, 778 (Pa. 2004), but for more than twenty years, it was "this Court's practice to address all issues arising in a death penalty case irrespective of a finding of waiver." *Commw. v. Banks*, 656 A.2d 467, 470 n.7 (Pa. 1995); *Commw. v. Jermyn*, 709 A.2d 849, 856 n.20 (Pa. 1998); *Commw. v. Morales*, 701 A.2d 516, 520 n.13 (Pa. 1997); *Commw. v. Morris*, 684 A.2d 1037, 1042 n.11 (Pa. 1996). The Court stated that the relaxed waiver rule "requires us to examine" technically waived issues, *Commw. v. Simmons*, 662 A.2d 621, 636 (Pa. 1995), and stressed that, in a death penalty case, an issue "cannot be considered waived," *Commw. v. Baker*, 511 A.2d 777, 790 n.10 (Pa. 1986).

[1076] *Commw. v. Freeman*, 827 A.2d 385, 402 (Pa. 2003).

[1077] The joint trial of co-defendants K. O'Donnell and W. Gribble illustrates this point. O'Donnell was awarded a new sentencing hearing in 1999 after being granted penalty-phase relief on a claim raised and decided under the relaxed waiver rule. *Commw. v. O'Donnell*, 740 A.2d 198, 201, 204, 214 (Pa. 1999). Gribble's lawyer failed to raise the issue—equally applicable to his case—on direct appeal, and it took eight more years, including a remand by the Pa. Sup. Ct. for further post-conviction proceedings, before Gribble's post-conviction petition was resolved.

[1078] 42 Pa.C.S. § 9542.

[1079] *Id.* § 9543. This is true unless the delay in filing the petition prejudices the Commonwealth. *Id.*

[1080] *Id.* § 9544(b).

[1081] *Freeman*, 827 A.2d at 402.

a function similar to the relaxed waiver rule. First, this Court performs a self-imposed duty to review the sufficiency of the evidence underlying the first-degree murder conviction in all capital direct appeals, regardless of whether the appellant has raised the issue. The Court is also required to conduct a statutory review of the death sentence itself to determine whether it was the product of passion, prejudice or any other arbitrary factor, and to determine whether the evidence adduced at trial was sufficient to support the aggravating circumstance(s) found by the jury. . . . In addition to these special protections afforded capital appellants, the

Post Conviction Relief Act "exists for them, as for other criminal defendants, as a vehicle for a full and fair, counseled proceeding through which they may challenge the stewardship of trial counsel and pursue other appropriate collateral claims."[1082]

But this explanation belies the reality of the Court's current interpretation of its duty to review the record under 42 Pa. C.S. § 9711(h)(3) and unpersuasively prioritizes a strict, contemporaneous objection rule as a form over the substance of a life at stake. In the 1980s, "passion, prejudice or any other arbitrary factor" under 42 Pa. C.S. § 9711(h)(3)(i) was "quite broad and [went] beyond the normal constraints of an adversary system."[1083] At that time, the Court understood this provision as an "explicit requirement that an automatic, searching and independent review of all death sentences would be available in this Court on a mandatory basis."[1084] It believed at that time that it was required to review the entire record for constitutional error[1085] and to *sua sponte* address all constitutional issues it perceived as present, even if they had not been raised by the defendant[1086] and even if the defendant brought no appeal at all.[1087] However, following the legislative repeal of proportionality review and its own abrogation of the relaxed waiver rule, the Court, also on its own, severely curtailed the scope of its independent review of the record. In 2009, in *Commonwealth v. VanDivner*,[1088] it wrote that section 9711(h)(3) only authorized the Court "to identify and raise claims . . . in narrow circumstances where it appears that the sentence of death is a 'product of passion, prejudice or an arbitrary factor.' Not all claims of error, or even all claims of constitutional error," it wrote, "implicate passion, prejudice, or arbitrariness."[1089] Two years later, the Court ironically told the same litigant, whom it had previously said was entitled to "an automatic, searching and independent review" of his death

---

[1082] *Id.* at 402-03 (citations omitted).
[1083] *Commw. v. Holcomb*, 498 A.2d 833, 837 n.6 (Pa. 1985).
[1084] *Commw. v. Lesko*, 501 A.2d 200, 204 (Pa. 1985).
[1085] *E.g.*, *Commw. v. Szuchon*, 484 A.2d 1365, 1381-82 (Pa. 1984; *see also Commw. v. Breakiron*, 571 A.2d 1035, 1046 (Pa. 1990) (Nix, C.J., with Zappala, J., dissenting) ("It is understood we are to examine the total record for constitutional compliance.").
[1086] *Commw. v. Zettlemoyer*, 454 A.2d 937, 955 n.19 (Pa. 1982); *Commw. v. Stoyko*, 475 A.2d 714, 720-21 (Pa. 1984); *Commw. v. Beasley*, 475 A.2d 730, 742 n.1 (Pa. 1984); *see also Commw. v. Williams*, 615 A.2d 716, 729-30 (Pa. 1992) (Nix, C.J., dissenting) (would have granted relief for ineffectiveness of counsel's sentencing-stage closing argument, not raised by the appellant).
[1087] *Commw. v. Appel*, 539 A.2d 780, 781, 784 (Pa. 1988) (the court "conducted an independent review of the entire record in the present case and considered all possible bases for overturning the conviction or the sentence"); *Commw. v. Michael*, 674 A.2d 1044, 1046-47 (Pa. 1997); *Commw v. Graham*, 661 A.2d 1367, 1369 (Pa. 1995); *Commw. v. Heidnik*, 587 A.2d 687, 689 (Pa. 1991).
[1088] 983 A.2d 1199 (Pa. 2009).
[1089] *Id*. at 1203.

sentence, that he "fails to recognize the very limited purpose of review pursuant to Section 9711(h)(3)(i)."[1090]

Moreover, the Court's justification for abrogating relaxed waiver overlooks the statutory authority it has "to correct errors at trial", regardless of waiver, when it automatically reviews death sentences.[1091] It also completely overlooks the practical reality that more than 97% of post conviction reversals disposing of death sentences in Pennsylvania since 1978 have subsequently resulted in a sentence of life imprisonment or less. The same judicial opinion that rejected the justification of "relaxation of waiver principles on direct appeal . . . on grounds of judicial economy because it reduces the number and necessity of post-conviction relief petitions" because the "efficient use of" this court's resources were frustrated by the relaxed waiver doctrine also contended that abrogation of relaxed waiver would do no harm since "[a]ny meritorious claims which escape counsel's recognition on direct appeal can then be raised on grounds of counsel's ineffectiveness."[1092] But preserving judicial resources on direct appeal by limiting the scope of direct review does not serve judicial economy, the public fisc, or the interests of justice by burdening post-conviction review with claims that could have been earlier resolved, by unnecessarily burdening the post-conviction process with claims of ineffectiveness for prior counsel's failures to preserve for appeal claims that could have been decided under the relaxed waiver rule, and by keeping prisoners who have meritorious claims in death-row confinement for the extra years needed for post-conviction review and appeal. Neither judicial economy nor fairness is served when the more than 97% of cases in which death sentences are converted to life sentences or less leave death row only after post conviction disposition.

Finally, since the statute provides for automatic judicial review of death sentences to correct errors at trial, the judiciary should not insist on a timely notice of appeal to consider any claims unassociated with the statutorily-mandated review of the sufficiency of the evidence. This would be a corollary to Pennsylvania Rules of Civil Procedure that are liberally construed and applied "to secure the just, speedy and inexpensive determination of every action".[1093] The imposition of capital punishment might be a penalty that is unique enough for "an appellate court" to "consider the interests of society as a whole in seeing to it that justice is done, regardless of what might otherwise be the normal procedure" by upholding "the mandates of the constitution over the countervailing considerations of normal appellate procedure", especially since the doctrine of waiver's purported "means of promoting jurisprudential efficiency by avoiding appellate court determinations of issues which the appealing party had failed to preserve" has not been realized in the capital context.[1094]

***61 Pa.C.S. § 4302.*** From 1985 through April 2018, 466 warrants specifying a day for execution have been signed by the Commonwealth's executive.[1095] Those 466 warrants resulted in three executions occurred, representing .006% of them. During this period, the largest number of warrants signed by an executive were the 220 warrants signed by Governor Ridge. He was also

---

[1090] *Commw. v. Lesko*, 15 A.3d 345, 411 (Pa. 2011).

[1091] 42 Pa.C.S. § 9711(h).

[1092] *Commw. v. Albrecht*, 720 A.2d 693, 700 (Pa. 1998).

[1093] Pa. R. Civ. P. 126.

[1094] *Commw. v. McKenna*, 383 A.2d 174, 180-81 (Pa. 1978).

[1095] Pa. Dep't of Corrections, *supra* note 7.

the only governor in this period whose signed warrants resulted in executions. Three executions out of 220 warrants represents .014%. Thus, all the other governors executed nobody from the other 246 warrants of execution they signed. It took a total of six warrants of execution to execute the three condemnees during Governor Ridge's tenure. Under the current administration, 28 of the 32 warrants of execution signed by Secretary Wetzel have been judicially stayed, which amounts to almost 88% of them; this percentage was 100 for some other administrations.[1096] This indicates that the statutory time to issue these warrants is unrealistically premature and ineffective.[1097]

The statute requires the executive to issue a warrant specifying a day for execution "within 90 days" after receiving "a full and complete record of the trial, sentencing hearing, imposition of sentence, opinion and order by the Supreme Court"[1098] or "within 30 days" of being notified of termination of a judicial stay of execution.[1099] Rather than making the procedure for an execution more effective, the statute is systematically causing serious inefficiencies. The problem with this statutory trigger's ineffectiveness is that it disregards Post Conviction Relief Act and federal *habeas* litigation and appeals, which can each have multiple rounds of review. Registered survivors of homicide victims are notified when a warrant of execution is signed and stayed, which itself can be a roller coaster of emotions for them. Statutorily mistimed warrants of execution help neither survivors of homicide victims nor victim advocates. The following outline demonstrates that the statute typically mandates at least two, mistimed or almost certainly premature warrants of execution.

1. Conviction
2. Automatic appeal to Supreme Court of Pennsylvania
3. Supreme Court affirms
4. Petition for *Certiorari* in the Supreme Court of the United States
5. U.S. Supreme Court denies
6. Death Warrant issued
7. PCRA and Death Warrant stayed
8. PCRA petition denied
9. PCRA appealed to Supreme Court of Pennsylvania
10. Supreme Court affirms
11. Petition for *Certiorari* in the Supreme Court of the United States
12. U.S. Supreme Court denies
13. Death Warrant issued
14. Federal *habeas* petition and Death Warrant stayed
15. Federal *habeas* denied
16. Federal *habeas* appealed to Third Circuit
17. Third Circuit affirms denial
18. Petition for *Certiorari* in the Supreme Court of the United States
19. U.S. Supreme Court denies
20. Death Warrant issued

---

[1096] *Id.*
[1097] 61 Pa.C.S. § 4302(a). The day specified for the execution must be within 60 days of the warrant's signing. *Id.*
[1098] 42 Pa.C.S. § 9711(i).
[1099] 61 Pa.C.S. § 4302(a). The day specified for the execution must be within 60 days of the warrant's reissuance *Id.*

A more realistic, statutory trigger that mandates issuance of a warrant of execution would not occur until one year after the date a judgment becomes final because post-conviction relief remains statutorily available until then.[1100]  Even that timing would be a premature, statutory trigger because the more realistic, statutory timeliness mandating issuance of a warrant of execution still would not occur at that point but only following state post conviction proceedings, if any, when the capital defendant failed to file a timely petition for writ of *habeas corpus* in the appropriate federal district court, or failed to timely appeal or petition an adverse *habeas corpus* decision to the United States Court of Appeals for the Third Circuit or the United States Supreme Court.  One condemnee has had six warrants of execution judicially stayed, and the overwhelming percentage of judicial stays of warrants of execution for the other condemnees indicates that the statutory time to issue a warrant of execution should be more realistically based.

### *Recommendation*

The subcommittee on procedure advocates reinstating the previous practice of relaxed waiver on direct capital appeals as it was employed in the 1980s and 1990s.  Also, since the statute provides for automatic judicial review of death sentences to correct errors at trial, the judiciary should not insist on a timely notice of appeal to consider any claims unassociated with the statutorily-mandated review of the sufficiency of the evidence. Finally, the statutory trigger that mandates issuance of a warrant of execution should be amended to the more realistic, statutory timeliness mandating the warrant's issuance only following state post-conviction proceedings, if any, when the capital defendant failed to file a timely petition for writ of *habeas corpus* in the appropriate federal district court, or failed to timely appeal or petition an adverse *habeas corpus* decision to the United States Court of Appeals for the Third Circuit.

# Clemency

The question that serves as the basis of the study of clemency in the administration of the death penalty in our Commonwealth is:

> Whether the current clemency process has procedures in place to assure that it functions as a safety net to assure that factual and procedural errors that directly undermine the reliability and fairness of a capital sentence are remedied;[1101]

The short answer is, simply, no.  The Pennsylvania Constitution has vested exclusive authority in the Governor to grant reprieves, commutations and pardons.[1102]  The Governor may exercise this authority for any reason or no reason, and this includes the circumstance where he believes the capital sentence is unreliable or unfair.  However, the Governor can commute or pardon a capital sentence only upon receipt of a written and unanimous recommendation from the

---

[1100] 42 Pa.C.S. § 9545(b)(1).

[1101] Pa. S. Res. No. 6 (Sess. of 2011); appdx. A, *infra* p. 221.

[1102] Pa. Const. art. IV, § 9(a) (Governor has "power to . . . grant reprieves, commutation of sentences and pardons.").

Board of Pardons.[1103]  Likewise, the Board may base its recommendation on any consideration, including the innocence of the convicted criminal or the unfairness of the sentence.

The composition of the Board of Pardons is a matter of constitutional law.[1104]  It consists of the Attorney General; the Lieutenant Governor and three persons appointed by the Governor, with the approval of the Senate.  One appointee "shall be a crime victim, one a corrections expert and the third a doctor of medicine, psychiatrist or psychologist."[1105]  The Administrative Code of 1929 implements Article IV, Section 9.[1106]  This statute places some limits on the Board, such as requiring it to notify crime victims of any clemency application and to give victims an opportunity to comment.  The statute also authorizes the Board of Pardons to promulgate regulations.  The Board's regulations focus on the application process by which a criminal defendant may seek clemency; they do not articulate the standards by which the Board will exercise its discretion to recommend that the Governor grant a pardon or commutation of any criminal sentence, capital or otherwise.

The Board of Pardons serves as a check on any Governor who might wield the clemency power unwisely, arbitrarily or for political gain.  The Board also functions as a clearing house for clemency applications.  The Board of Pardons was not established to provide a "safety net" where the criminal justice system has failed to produce an accurate and fair judgment of guilt in a capital case.  Accordingly, the Board of Pardons has only limited power, *i.e.*, to make recommendations.  Further, its recommendation can be ignored by the Governor.

The General Assembly could amend the Administrative Code of 1929 to require the Board of Pardons to consider the reliability or unfairness of a capital sentence in its review of a clemency application.  This would have little efficacy in changing the current state of the clemency process.  First, the recommendation for clemency must be unanimous.  Given the diversity in the composition of the Board, this will be difficult to achieve in any but the most compelling of circumstances.  This is particularly true where the applicant asserts that the capital sentence is legally invalid because only one Board member, the Attorney General, is required to have legal training.  Second, the Pennsylvania Constitution limits the power of the Board of Pardons.  It lacks the capacity to issue orders; it can only make recommendations.  The Board's governmental power lies in its ability to prevent the Governor from exercising his clemency power.  Third, even if the Board of Pardons developed specific processes to address unfair and unreliable capital sentences, and somehow all five members agreed on this point, its clemency recommendation can be rejected by the Governor, for any reason or no reason.

Were the General Assembly to decide to develop a "safety net" to address unreliable or unfair capital sentences, it could amend the Post Conviction Relief Act,[1107] which already "provides for an action by which persons convicted of crimes they did not commit and persons

---

[1103] *Id.*
[1104] *Id.* § 9(b).
[1105] *Id.*
[1106] *See* the acts of Apr. 9, 1929 (P.L.177, No.175), §§ 403, 909, & of Apr. 24, 1931 (P.L.71, No.53) § 1; 71 P.S. §§ 113, 299 & 299a.
[1107] 42 Pa.C.S. §§ 9541-9546.

serving illegal sentences may obtain collateral relief."[1108]  These amendments could confer additional authority upon the judiciary, beyond that which presently exists, to order relief in a particular circumstance.  Notably, the Governor does not need a recommendation from the Board of Pardons to grant a reprieve.[1109]  The Governor's reprieve power functions as a short-term safety net to prevent the injustice of an execution of a person whose capital sentence has been entered improperly.  To vest the Board of Pardons with authority to grant pardons or commutation would require substantial amendments to Article IV, Section 9, of the Pennsylvania Constitution and to The Administrative Code of 1929.

"Prior to November 4, 1997," this constitutional provision required a majority instead of a unanimous recommendation of the Board before the Governor could pardon or commute the sentence of an individual sentenced in a criminal case to death or life imprisonment.[1110]  Its membership also had an attorney instead of a crime victim and a penologist instead of a corrections expert as board members.[1111]  To reduce the number of votes needed to support the Board's recommendation to the Governor that a life sentence or condemnation be commuted or pardoned would require another amendment.  If amended accordingly, which the subcommittee supports, the Governor would remain free to accept or reject the recommendation for any reason or no reason.

Appendix D shows the clemency options in each state along with the decisional authority.[1112]

# Penological Intent

The question that serves as the basis of the study of penological intent in the administration of the death penalty in our Commonwealth is:

Whether the death penalty rationally serves a legitimate penological intent such as public safety or deterrence;[1113]

Four of the generally accepted purposes of criminal punishment include retribution, deterrence, rehabilitation, and incapacitation.[1114]  Retribution is based on the premise that "society has an interest in imposing merited suffering upon offenders proportional to the harm that their crime caused society."[1115]  Deterrence "justifies punishment as a means to prevent future

---

[1108] *Id.* § 9542.  *See also*, Pa. R. Crim. P. 900-910, which govern capital and noncapital cases under the Post Conviction Relief Act.

[1109] Pa. Const. art. IV, § 9(a).

[1110] *Pa. Prison Soc'y v. Cortes*, 622 F.3d 215, 220-21 (3d Cir. 2010).

[1111] *Id.* at 221.

[1112] *Infra* pp.  229-34.

[1113] Pa. S. Res. No. 6 (Sess. of 2011); appdx. A, *infra* p. 221.

[1114] "A sentence can have a variety of justifications, such as incapacitation, deterrence, retribution, or rehabilitation." *Ewing v. Cal.*, 538 U.S. 11, 25 (2003).

[1115] Stephen M. LeBlanc, *Cruelty to the Mentally Ill:  An Eighth Amend. Challenge to the Abolition of the Insanity Defense*, 56 Am. U. L. Rev. 1281, 1314 (2007).

crimes."[1116]   "Rehabilitation is the interest in preventing recidivism through assisting and facilitating the offender's transition to a lawful lifestyle"[1117] and therefore is obviously not a justification for the death penalty.  Incapacitation justifies punishment "to protect the rest of society from the danger [criminal offenders] pose."[1118]

For the most part, the debate concerning capital punishment centers on the aims of deterrence, incapacitation and retribution—increasingly the last of these.  There is a great deal of disagreement about whether the death penalty meaningfully advances the deterrence purpose; it certainly does advance the aims of retribution and incapacitation, and the debate largely centers on whether it does this more effectively than alternatives.  (The death penalty obviously does not advance the aim of rehabilitation; by definition, it eliminates any possibility that the condemned person will be rehabilitated.)

Another possible purpose for the death penalty is labeled denunciation, which pronounces society's condemnation of the accused for committing a terrible crime.  The subcommittee on policy found little material on this purpose as it applies to the death penalty.  In a straightforward sense, to give the supreme penalty for an offense undoubtedly denounces it in the strongest possible terms.  But death penalty opponents are quick to point out that execution sends a mixed message by replicating the very act that is the classic—and virtually the only—capital crime.

### Uniqueness of the Death Penalty

The U.S. Supreme Court has emphasized that the death penalty is a uniquely severe punishment, qualitatively different from all other criminal sanctions.  The classic articulation of the "Death Is Different" principle is Justice William J. Brennan's concurring opinion in *Furman v. Georgia*.

> Death is today an unusually severe punishment, unusual in its pain, in its finality, and in its enormity.  No other existing punishment is comparable to death in terms of physical and mental suffering.  Although our information is not conclusive, it appears that there is no method available that guarantees an immediate and painless death.  Since the discontinuance of flogging as a constitutionally permissible punishment, death remains as the only punishment that may involve the conscious infliction of physical pain.  In addition, we know that mental pain is an inseparable part of our practice of punishing criminals by death, for the prospect of pending execution exacts a frightful toll during the inevitable long wait between the imposition of sentence and the actual infliction of death. . . . .

> Death is truly an awesome punishment.  The calculated killing of a human being by the State involves, by its very nature, a denial of the executed person's humanity. The contrast with the plight of a person punished by imprisonment is evident.  An individual in prison does not lose 'the right to have rights.'  A prisoner retains, for example, the constitutional rights to the free exercise of religion, to be free of cruel

---

[1116] *Id.* at 1317.
[1117] *Id.* at 1319.
[1118] *Id.* at 1321.

and unusual punishments, and to treatment as a 'person' for purposes of due process of law and the equal protection of the laws.  A prisoner remains a member of the human family.  Moreover, he retains the right of access to the courts.   His punishment is not irrevocable. Apart from the common charge, grounded upon the recognition of human fallibility, that the punishment of death must inevitably be inflicted upon innocent men, we know that death has been the lot of men whose convictions were unconstitutionally secured in view of later, retroactively applied, holdings of this Court.  The punishment itself may have been unconstitutionally inflicted, yet the finality of death precludes relief.  An executed person has indeed 'lost the right to have rights.'[1119]

The logical conclusion of this premise, and the one Justice Brennan supported, is that the death penalty is a "cruel and unusual punishment" prohibited by the Eighth Amendment.  Short of that, the uniqueness of death is recognized by a number of procedural distinctions between it and any other criminal punishment in Pennsylvania and most other states that use the death penalty, including special qualifications for legal representation,[1120] bifurcation of the guilt and punishment stages,[1121] and automatic appeal to the state Supreme Court.[1122]   In several states, the supreme court must conduct a proportionality review to ensure that the death sentence in a case under review is consistent with sentences in similar cases—a review not mandated for sentences from other criminal convictions.  Acceptance of the principle does not necessarily mandate that a distinction between death and other sentences must be made regarding every issue, but it does tend in that direction.  In concert with the consensus of the commentators on the death penalty within the legal academy,[1123] this report adopts Justice Brennan's Death Is Different principle.

### Retribution

Louis P. Pojman provides the following summary of the retributivist view:   "The retributivist holds three propositions: (1) that all of the guilty deserve to be punished; (2) that only the guilty deserve to be punished; and (3) that the guilty deserve to be punished in proportion to the severity of the crime."[1124]   He distinguishes retribution from impermissible vengeance: "Vengeance signifies inflicting harm on the offender out of anger at what he has done.  Retribution is the rationally supported theory that the criminal deserves a punishment fitting the gravity of the crime."[1125]

---

[1119] 408 U.S. 238, 287-88, 290 (1972) (citations omitted).

[1120] Pa. R. Crim. P. 801.

[1121] 42 Pa.C.S. § 9711(a)(1).

[1122] *Id.* § 9711(h)(1).

[1123] *See* Jeffrey L. Kirchmeier, *Aggravating & Mitigating Factors:  The Paradox of Today's Arbitrary & Mandatory Capital Punishment Scheme*, 6 Wm. & Mary Bill Rts. J. 345, 457-59 (1998); Jeffrey Abramson, *Death-Is-Different Jurisprudence & the Role of the Capital Jury*, 2 Ohio St. J. Crim. L. 117, 164 (2004); Dr. Saby Ghoshray, *Tracing the Moral Contours of the Evolving Standards of Decency:  The Sup. Ct.'s Capital Jurisprudence Post-Roper,* 45 J. Cath. Leg. Stud. 561, 627-29 (2006); William W. Berry III, *Repudiating Death*, 101 J. of Crim. L. & Criminology 441, 492 (2011).

[1124] Louis P. Pojman, *Why the Death Penalty Is Morally Permissible*, in *Debating the Death Penalty* 56 (Hugo Bedau & Paul Cassell eds., 2004).

[1125] *Id.* at 57.

A recent book by Professor Thane Rosenbaum argues that a reasonable measure of vengeance is an essential element of justice:

The call for justice is always a call for revenge. Despite all the wordplay and mind games, there is no difference between justice and vengeance. They are one and the same no matter how much we run away from revenge while falling into the arms of justice. There is no justice if wrongdoers go unpunished and victims do not feel avenged; and revenge—restoring honor, evening the score, ensuring that wrongdoers receive their just deserts—is inseparably linked to living in a just society, one that is honest about what must be done to those who do harm, and the opportunity that must be given to individuals to redress the indignity caused by another. . . . .

[An] objection to revenge and its relationship to capital punishment is the idea that revenge forces the avenger to stoop to the same level as the wrongdoer. But it's really the other way around. It is the wrongdoer's act that has devalued the victim, making him low. Vengeance merely brings him back to where he was before the injury led to his descent. Suggesting that vengeance brings the avenger down to the same level of the wrongdoer misses the point entirely. The victim is already in the gutter. Vengeance is the elevator that restores him to his former stature. Revenge is an action of upward mobility with the avowed purpose of making things even again. The avenger is neither debased nor dehumanized; there is nothing downgrading about settling the score. Vengeance is restorative, not diminishing.[1126]

The late Hugo Adam Bedau, a leading opponent of the death penalty, explained his rejection of retribution as a proper aim of the criminal justice system. His view of justice centered on the Minimum Invasion Principle, which he described as follows:

Given a compelling state interest in some goal or purpose, the government in a constitutional democracy built on the principle of equal freedom and human rights for all must use the least restrictive means sufficient to achieve that goal or purpose. More expansively, the principle . . . holds that if individual privacy, liberty, and autonomy (or other fundamental values) are to be invaded and deliberately violated, it must be because the end to be achieved is of undeniable importance to society, and no less severe interference will suffice.[1127]

In Bedau's view, this principle requires the abolition of the death penalty because "[l]ong-term imprisonment is sufficient as an invasion of individual liberty, privacy, and autonomy (and other fundamental values) to achieve valid social goals."[1128]

---

[1126] Thane Rosenbaum, *Payback: The Case for Revenge* 27, 200 (2013). Rosenbaum uses "vengeance" in a different sense from Pojman, perhaps as punishment motivated by the anger of the survivors, but regulated by law.
[1127] Hugo Bedau, *An Abolitionist's Survey of the Death Penalty in Am. Today*, in Bedau & Cassell, *supra* note 1124, at 32.
[1128] *Id.* at 33.

Considering the goal of retribution within this conceptual framework, he first argues that retribution is supplied by the application of the punitive measure specifically to the guilty person:

> [P]unishment . . . is a retributive act, insofar as the only persons deemed eligible for punishment are persons judged to be guilty of a crime and thought to be deserving of punishment because of their guilt. A system of inflicting deprivations on persons in the name of punishment that lacked this retributive element would be a danger to us all.
>
> Second, I do not believe it is rational to assign as one of the legitimate goals of a system of punishment the exaction of retribution in some special fashion or further degree that goes beyond the inherently retributive nature of any system of punishment, as described above. Thus life imprisonment for murder is every bit as retributive as the death penalty for murder, even if it is less severe.[1129]

Bedau argues that the principles relied on by retributivists lend no substantial support to the death penalty:

> I will not quarrel with appeal to a general principle of desert: "Wrongdoers deserve to be punished." But by itself, this principle provides no defense of the death penalty; it is fully satisfied by a lesser punishment, such as imprisonment. The proposition that "murderers deserve to die" obviously does support the death penalty, but it does so by essentially begging the question. Why do murderers deserve to die when rapists do not deserve to be raped (or do they? and by whom?)? . . . Retributive considerations rightly tell us *who* deserves to be punished—it is the guilty. But it does not tell us *what* the punishment ought to be. Relying on some version of *lex talionis* is of no help in building a systematic and comprehensive schedule of punishments for crimes. . . . .
>
> A similar conclusion is reached if we invoke another retributive principle: "The graver the crime, the greater the punishment deserved." No doubt some such principle of proportionality will be incorporated into any reasonable theory of punishment. By itself, however, this principle does not defend the death penalty. If murder is the gravest crime, then under this principle it warrants the severest punishment. But that punishment could surely be (as it is in the typical abolition jurisdiction) some form of long-term imprisonment.[1130]

Bedau does not deny that the death penalty advances the aim of retribution as he defines it: execution meets his test by identifying the perpetrator for special punitive treatment. He objects to the death penalty because it violates the Minimal Invasion Principle. Long-term imprisonment also singles out the guilty for substantial punishment and does so in a less severe, and therefore, a less invasive manner than the death penalty.

---

[1129] *Id.* at 41.
[1130] *Id.* at 41-42.

Like other opponents of the death penalty, Justice Thurgood Marshall argued that retribution, as Rosenbaum defines it, is not a proper purpose for a contemporary penal system. In his dissenting opinion in *Gregg v. Georgia*, he identified four meanings of retribution. The first is similar to Bedau's in that it requires that punishment be directed against the perpetrator.[1131] Secondly, retribution satisfies the instinctive need to punish one who has committed a serious crime, and the punishment must be severe enough to satisfy the public that the murderer has received the punishment he deserves.[1132] Marshall denied this justified the death penalty: "It simply defies belief that the death penalty is necessary to prevent the American people from taking the law into their own hands."[1133] Thirdly, retribution expresses society's moral outrage and demonstrates to the public that the perpetrator's crime is wrong (similar to the concept of denunciation).[1134] Again, for Marshall, this theory lends no support for the death penalty: "It is inconceivable that any individual concerned about conforming his conduct to what society says is 'right' would fail to realize that murder is 'wrong' if the penalty were simply life imprisonment."[1135]

Most disturbing to Justice Marshall were the indications from some members of the *Gregg* Court that they accepted the fourth view of retribution: the "purely retributive justification for the death penalty that the death penalty is appropriate, not because of its beneficial effect on society, but because the taking of the murderer's life is in itself morally good."[1136] Marshall considered this idea to be "fundamentally at odds with the Eighth Amendment."[1137]

> To be sustained under the Eighth Amendment, the death penalty must 'compor(t) with the basic concept of human dignity at the core of the Amendment,' the objective in imposing it must be '(consistent) with our respect for the dignity of (other) men.' Under these standards, the taking of life 'because the wrongdoer deserves it' surely must fall, for such a punishment has as its very basis the total denial of the wrong-doer's dignity and worth.[1138]

Underlying Marshall's view is the Court's seminal statement in *Trop v. Dulles*[1139] that the Eighth "Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."[1140]

The death penalty advances the purpose of retribution, but, as we shall see, life imprisonment without parole does this sufficiently to obviate the need for the death penalty.

---

[1131] *Gregg v. Georgia*, 428 U.S. 153, 237 (1976) (Marshall, J., dissenting).
[1132] *Id.* at 238.
[1133] *Id.*
[1134] *Id.*
[1135] *Id.*
[1136] *Id.* at 239.
[1137] *Id.* at 240.
[1138] *Id.* at 240-41 (citations omitted).
[1139] 356 U.S. 86 (1958).
[1140] *Id.* at 101.

*Deterrence*

Whether the death penalty deters first-degree murder has long been a matter of debate between proponents and opponents of the death penalty. The evidence relating to deterrence is inconclusive, and leading advocates on both sides treat this issue as one of more or less secondary importance. In a state like Pennsylvania with a relatively large number of death sentences but almost no executions, the deterrent effect of the death penalty is attenuated, regardless of whether a more vigorously applied death penalty would have a deterrent effect.[1141]

A prominent research study of the death penalty's effectiveness as a deterrent reached this noncommittal conclusion:

> [R]esearch to date on the effect of capital punishment on homicide is not informative about whether capital punishment decreases, increases, or has no effect on homicide rates. Therefore, . . . these studies [should] not be used to inform deliberations requiring judgments about the effect of the death penalty on homicide. Consequently, claims that research demonstrates that capital punishment decreases or increases the homicide rate by a specified amount or has no effect on the homicide rate should not influence policy judgments about capital punishment.[1142]

This study identified three flaws that characterize the research into this issue:

- The studies do not factor in the effects of noncapital punishments that may also be imposed.

- They use incomplete or implausible models of potential murderers' perceptions of and response to the use of capital punishment, such as the assumption that would-be murderers accurately perceive the likelihood of execution.

- Estimates of the effect of capital punishment are based on statistical models that make assumptions that are not credible, such as the assumption that the effect of capital punishment is the same regardless of place and time.[1143]

An opinion survey of criminal law scholars conducted late in the 1990s concluded that "there is a wide consensus among America's top criminologists that scholarly research has demonstrated that the death penalty does, and can do, little to reduce rates of criminal violence."[1144] A more recent analysis of the research on the causes of the decline in the crime rates concluded that "the death penalty does not have an effect on bringing down crime."[1145]

---

[1141] Steiker & Steiker, *supra* note 115, at 1922.

[1142] Nat'l Research Council of the Nat'l Acads., *supra* note 116, at 102.

[1143] *Id.* at 101-02.

[1144] Michael L. Radelet & Ronald L. Akers, *Deterrence & the Death Penalty: The Views of the Experts,* 87 J. Crim. L. & Criminology 1, 10 (1996).

[1145] Dr. Oliver Roeder *et al.*, What Caused the Crime Decline? 43 (2015), *available at* https://www.brennancenter.org/sites/default/files/analysis/What_Caused_The_Crime_Decline.pdf. "The findings show a very weak negative relationship between the use of the death penalty and crime that is essentially zero. The same is true for the effect of the use of the death penalty on homicides specifically." *Id.* at 45.

A meticulous examination of the various studies on the deterrent effect of the death penalty by John B. Donahue and Justin Wolfers, scholars affiliated with Yale Law School and the Wharton School respectively, also concluded that the evidence is inconclusive:

> We find that the existing evidence for deterrence is surprisingly fragile, and even small changes in specifications yield dramatically different results. Our key insight is that the death penalty—at least as it has been implemented in the United States since *Gregg* ended the moratorium on executions—is applied so rarely that the number of homicides it can plausibly have caused or deterred cannot be reliably disentangled from the large year-to-year changes in the homicide rate caused by other factors. Our estimates suggest not just "reasonable doubt" about whether there is any deterrent effect of the death penalty, but profound uncertainty. We are confident that the effects are not large, but we remain unsure even of whether they are positive or negative. The difficulty is not just one of statistical significance: whether one measures positive or negative effects of the death penalty is extremely sensitive to very small changes in econometric specifications. Moreover, we are pessimistic that existing data can resolve this uncertainty.[1146]

This study is very critical of studies that purport to show a substantial deterrent effect for the death penalty.[1147]

One opposing point of view is offered by Kent Scheidegger of the Criminal Justice Legal Foundation, one of the Nation's leading proponents of the death penalty, who claims that the Donahue and Wolfers study was published in a law review, not a social science journal, and thus, he claims, avoided peer review by scholars with the relevant expertise.[1148] Scheidegger claims that most of the studies support a deterrence effect, and his foundation has posted a purportedly complete list of all the relevant studies and their conclusions on its website.[1149]

Another related argument made by opponents of the death penalty is that there is no proof that the death penalty is a better deterrent than life imprisonment without parole. If this is the case, then the Minimum Invasion Principle, or any other principle that forbids the infliction of unnecessary harm, mandates the use of life imprisonment without parole in all cases in preference to the death penalty. One such opponent was Hugo Bedau:

> [F]or the sake of argument, let us suppose that the death penalty as currently employed does have a marginally superior deterrent effect. Such an effect is of little use in defending the death penalty because the supposed benefit is obtained at an unacceptable cost. . . . [T]he more a jurisdiction uses the death penalty, the

---

[1146] John J. Donahue & Justin Wolfers, *Uses & Abuses of Empirical Evidence in the Death Penalty Debate*, 58 Stan. L. Rev. 791, 794 (2006).

[1147] *Id*. at 842-43.

[1148] Kent Scheidegger, Legal Director, Crim. Just. Legal Found., Statement to the Cal. Comm'n on the Fair Admin. of Just. 2 (Apr. 11, 2008), *available at* http://www.cjlf.org/deathpenalty/ScheideggerCCFAJStatement.pdf. (The real or apparent knowledge of statistical method displayed in the article at issue was sufficient to impress J. State Gov't Comm'n staff.)

[1149] Crim. Just. Legal Found., Tally of Death Penalty Deterrence Studies, http://www.cjlf.org/deathpenalty/dpdeterrence.htm (last visited May 13, 2018).

greater the likelihood it will make mistakes—notably, the mistake of convicting the innocent or the mistake of sentencing to death offenders whose crimes should not have made them death-eligible.[1150]

The subcommittee on policy agrees with this analysis.

Conversely, Paul Cassell vigorously defends the deterrent effect of capital punishment on a slightly different basis.[1151] He appeals to common sense, anecdotal evidence and social science studies in concluding that the death penalty may deter at least those who carefully calculate the homicidal act.[1152] (Even Bedau concedes that the death penalty can have some deterrent effect: "Common sense assures us that punishments generally serve to deter some persons from some crimes on some occasions. There is no reason to think that the death penalty is an exception."[1153]) In particular, Cassell emphasizes the importance of the death penalty for deterring murder by prisoners serving life imprisonment without parole since they have a "'license to kill' if there is no death penalty."[1154]

In further support of his argument, former Judge Cassell cites statistical comparisons that may show a deterrent effect for the death penalty. Because of the many factors that affect the murder rate in different states, the lack of a difference between death and non-death states does not settle the issue. Comparing murder rates for 1968 through 1976 (when there were no executions) with 1995-2002, there was a decline in the murder rate that was largest in the states that used the death penalty most vigorously. Several other studies found that the death penalty may deter five to 18 murders *per* execution.[1155] At the same time, conservative death penalty supporter Jonah Goldberg observes: "Deterrence may have some validity, but it cannot alone justify the death penalty. It is wrong to kill a man just to send a message to others."[1156]

The consensus of the subcommittee on policy is that there is no definitive proof whether capital punishment deters murder. Because of this, there is no substantial evidence that the death penalty significantly advances the deterrence purpose. Plenty of murderers fail to fully calculate the consequences of their actions. Many of them offer mitigating circumstances, such factors as poverty, low intelligence, child abuse or neglect by their parents, mental illness, or brain damage. Consequently, they act out of impulse, or, if the crime is planned in advance, they delude themselves that they are unlikely to be caught. When they are formulating the intent to murder, they do not fully take account of consequences. In particular, it is unlikely that any difference in deterrent effect between life imprisonment without parole and the death penalty will dissuade a significant proportion of would-be murderers from carrying out the act.

---

[1150] Hugo Bedau, *supra* note 1124, at 39. Bedau relies for his factual premise on research by James S. Liebman.
[1151] Hon. Paul G. Cassell, *In Defense of the Death Penalty* in Bedau & Cassell, *supra* note 1124, 189-97.
[1152] Hon. Paul G. Cassell, *In Defense of the Death Penalty*, IAJC J. 14, 17 (Summer 2008).
[1153] Bedau, *supra* note 1124, at 39.
[1154] Cassell, *supra* note 1124, at 190-92.
[1155] *Id.* at 192-97.
[1156] Jonah Goldberg, *In Defense of Capital Punishment*, Nat'l Rev. (May 7, 2014), http://www.nationalreview.com/article/377351/defense-capital-punishment-jonah-goldberg.

To know the effectiveness of deterrence, one would need to understand "how potential murderers perceive sanction regimes."[1157] The perception of the risk of these regimes is "subjective, but researchers have no direct measurements of the perceptions of potential murderers."[1158] Instead, researchers "use publicly available statistical data on homicides and executions to construct statistics that purport to measure the objective risk of execution" and "then assume that potential murderers . . . carefully assess the risk of execution."[1159] This assumption "has no empirical foundation. Indeed, it hardly seems credible."[1160] Keep in mind that a relatively small percentage of condemnees are executed and a larger percentage of death sentences are vacated.[1161] The availability of plea bargains, instability of a state's sanction regimes and geographical variability within a state further complicate any purported or assumed perceptions of potential murderers.[1162]

### Incapacitation and Public Safety

A classic aim of criminal justice is to ensure that a person who has committed a crime is rendered powerless to do further injury to the public for the duration of the sentence. An execution assures that the person executed will never harm anyone else. However, life imprisonment without parole also provides a substantial assurance for the general public and even for prison inmates and the correctional personnel who supervise them.

There is a considerable consensus among observers that, in most cases, convicts potentially subject to the death penalty pose little threat to other inmates and are model, or at least manageable, prisoners.[1163] "As a general matter . . . self-interest guides lifers to avoid trouble because trouble jeopardizes the few privileges they can secure in the prison world and, moreover, can land them in very grim living environments."[1164]

However, others point out that a minority of life imprisoned without parole inmates are extremely dangerous: they have murdered prison guards, fellow inmates, and (through associates) witnesses.

> [P]rison murders, escapes, and retaliation murders illustrate the difficulty in segregating and controlling all of the violent offenders who will kill even with limited resources. Because they have little to lose, the control of an inmate serving life without parole is a formidable challenge. Life without parole is simply no panacea.[1165]

---

[1157] Nat'l Research Council of the Nat'l Acads., *supra* note 116, at 105.

[1158] *Id.* at 106.

[1159] *Id.*

[1160] *Id.*

[1161] *Id.*

[1162] *Id.* at 104, 106. States' sanction regimes can be unstable due, *e.g.*, to legal decision; geographical variability within a state refers the variance of "prosecutorial vigor in the use of the death penalty". *Id.* at 106.

[1163] Robert Blecker, *supra* note 733, at 94; Robert Johnson & Sandra McGunigall-Smith, *Life without Parole, Am.'s Other Death Penalty: Notes on Life under Sentence of Death by Incarceration*, 88 Prison J. 328, 329 (2008).

[1164] Johnson & McGunigall-Smith, *supra* note 1163, at 331.

[1165] Richard B. Roper, *The Death Penalty at the Intersection of Reality & Just.*, 41 Tex. Tech L. Rev. 15, 25 (2008).

Life imprisonment without parole represents a compromise between the death penalty and life with parole:

> In the future, wrongful convictions in death penalty cases should be even more remote. With most states and the federal government adding life without parole, death penalty prosecutions in which guilt/innocence is a genuine issue should diminish. From my observations, when parole is available to defendants who receive a "life" sentence, many prosecutors more aggressively pursue capital charges in an effort to guarantee that the defendant does not return to society. The fear of paroling brutal murderers gives prosecutors a greater incentive to pursue capital charges where proof, although sufficient to convict, is less than overwhelming. Conversely, life without parole provides an option for prosecutors who wish to avoid the rigors of a death penalty trial but, at the same time, provide some measure of protection to society outside of prison.[1166]

The subcommittee on policy concludes that while the death penalty clearly advances the aim of incapacitation, it is little better in that regard than life imprisonment without parole.

| Legitimate Penological Intent of Death Penalty | |
| --- | --- |
| *Penological intent* | *Rationally serve* |
| Retribution | yes[1167] |
| Deterrence (pub. safety) | Specific--yes[1168] |
| | Gen.--possibly[1169] |
| Incapacitation | Yes[1170] |
| Denunciation | Yes[1171] |
| Restoration | No[1172] |
| Rehabilitation | No[1173] |

---

[1166] *Id.* at 27-28. The author served as U.S. Att'y (N.D.Tex. 2004-2008).

[1167] *Supra* pp. 162-65.

[1168] *Supra* pp. 166-69. Specific deterrence applies to the person sentenced. "Perhaps the most straightforward argument for the death penalty is that it saves innocent lives by preventing convicted murderers from killing again." Cassell, *supra* note 1152, at 16.

[1169] *Supra* pp. 166-69. General deterrence applies to potential murderers among the general public.

[1170] *Supra* p. 169-70.

[1171] *Supra* p. 161. This is public censure, which condemnation would exemplify in the strongest of terms.

[1172] "[R]estorative justice processes ideally allow for a voluntary, face-to-face dialogue between the person who committed the harm, the victim, and community members supporting the person who harmed and the victim. This dialogue is intended for the victim to identify his needs, and for the person who harmed to take accountability for her actions and to come up with ways in which she can meet the victim's needs. Restorative justice does not seek to alienate or isolate people who commit crimes, but instead to offer community support that will allow the person who harmed to successfully meet her obligations to the victim. Restorative justice is not punitive." Nat'l Council on Crime & Delinquency, What Is—and Is Not—Restorative Justice? (Aug. 20, 2013), https://www.nccdglobal.org/newsroom/nccd-blog/what-and-not-restorative-justice.

[1173] *Supra* pp. 160-61.

# Innocence

The question that serves as the basis of the study of innocence in the administration of the death penalty in our Commonwealth is:

> Whether there is a risk of execution of an innocent person and whether there are adequate procedural protections in place to prevent an innocent person from being sentenced to death and executed;[1174]

It is not possible to put adequate procedural protections in place to prevent the execution of an innocent person. There is a conceivable possibility that the Commonwealth could execute an innocent person.

Since 1973, 162 inmates sentenced to death in the United States have been exonerated of their charges.[1175] These inmates spent an average of 11.3 years on death row before their exonerations.[1176] The six Pennsylvania exonerees -- Neil Ferber, Jay Smith, William Nieves, Thomas Kimbell, Nicholas Yarris, and Harold Wilson -- spent, on average, nine years on death row before being exonerated.[1177] There have been 20 exonerations in the U.S. based on DNA evidence, including Nicholas Yarris, who spent 21 years on Pennsylvania's death row.[1178]

Whether or not the Commonwealth may execute an innocent person is a two-prong question:

1) Is it possible for adequate procedural protections to be put in place so as to make executing an innocent person impossible?
2) If these protections are not possible, is there a *foreseeable* risk that the Commonwealth could execute an innocent person, or is it a theoretical one-in-a-million possibility?

There is no way to put procedural safeguards in place that will guarantee with 100% certainty that the Commonwealth will not execute an innocent person. Following the U.S. Supreme Court's decision in *Gregg v. Georgia*, the resumption of executions was predicated on the fact that the Court believed that states were able to build capital punishment systems that would be applied fairly and in accordance with the Eighth Amendment of the U.S. Constitution.[1179] Most modern capital cases, including those in the Commonwealth, require a unanimous jury verdict for

---

[1174] Pa. S. Res. No. 6 (Sess. of 2011); appdx. A., *infra* p. 221.

[1175] Death Penalty Information Ctr., The Innocence List, https://deathpenaltyinfo.org/innocence-list-those-freed-death-row (last updated Apr. 19, 2018). This number includes those who were "acquitted of all charges related to the crime that placed them on death row, or . . . [h]ad all charges related to the crime that placed them on death row dismissed by the prosecution or the courts, or" were pardoned "based on evidence of innocence." *Id.* For the Commonwealth's six, four of them were acquitted and the charges were dismissed for the remaining two.

[1176] *Id.*

[1177] *Id.*

[1178] *Id.*

[1179] 428 U.S. 153, 195.

both conviction of the crime and the sentence of death,[1180] in which the jurors must weigh aggravating and mitigating factors.[1181] Despite these safeguards, the 162 national exonerations, including the six Pennsylvania exonerations, show that states have been unsuccessful in their efforts to create capital punishment systems capable of guaranteeing with 100% certainty that an innocent person will not be sentenced to death.

Whether or not wrongful death sentences translate into wrongful executions is a more controversial question. Procedural safeguards built into the appeals process were able to prevent the wrongful executions of the 162 exonerees, although it averaged more than a decade for these individuals to be exonerated. However, several executions have been carried out in the U.S. despite significant evidence of innocence. For example, Cameron Todd Willingham was convicted and sentenced to death in Texas based on debunked forensic arson evidence.[1182] He was executed in 2004.[1183] Carlos DeLuna was executed in Texas in 1989.[1184] Evidence emerged that the actual killer was Carlos Hernandez, and that official misconduct allowed Texas to execute "the other Carlos".[1185]

These cases, along with the number of exonerations, shows that states have failed to put into place procedural safeguards that can guarantee with 100% certainty that innocent individuals will not be sentenced to death and executed. It is important to note that Pennsylvania has not recently had the type of controversial execution seen in the Willingham or DeLuna cases. All three individuals executed by the Commonwealth in the modern death penalty era were only executed after foregoing further appeals.[1186] There is no reason to believe that the absence of controversial executions in the Commonwealth is the result of its systematic superiority. An unavoidable fact of capital punishment is that as long as it exists, it remains possible that an innocent person will be executed. Pennsylvania is not exempt from this.

The prevalence of capital exonerations and controversial executions shows that the chance of executing an innocent person is a conceivable possibility. Further evidence of this possibility is found in studies of wrongful convictions. In 2014, a report published in the Proceedings of the National Academy of Sciences concluded that 4.1% of individuals convicted and sentenced to death in the U.S. were wrongfully convicted during the time period from 1973-2004.[1187] The authors note that this is a "conservative estimate" of the proportion of wrongful capital convictions, and that the real proportion may be higher.[1188]

---

[1180] Death Penalty Information Ctr., State by State Database, https://deathpenaltyinfo.org/state_by_state (2018).

[1181] Appdcs. B, C, *infra* pp. 223-28.

[1182] Steve Mills & Maurice Possley, *Man Executed on Disproved Forensics*, Chicago Tribune (Dec. 9, 2004), http://www.chicagotribune.com/news/nationworld/chi-0412090169dec09-story.html.

[1183] *Id.*

[1184] Death Penalty Information Ctr., Executed but Possibly Innocent, https://deathpenaltyinfo.org/executed-possibly-innocent#carlos (2018).

[1185] *Id.*

[1186] Death Penalty Information Ctr., Pa., https://deathpenaltyinfo.org/pennsylvania-1 (2018). "The three prisoners executed since 1978 have all been volunteers with serious mental health issues, whom courts found to have waived their rights to an appeals process." *Id.*, *supra* notes 7, 8.

[1187] Samuel R. Gross *et al.*, *Rate of False Conviction of Crim. Defendants Who Are Sentenced to Death*, PNAS 7230, 7231, 7234 (May 20, 2014), available at http://www.pnas.org/content/pnas/111/20/7230.full.pdf.

[1188] *Id* at 7230, 7234.

The implications of this study are sobering.  Over the time period analyzed in the study, 1.6% of death row inmates were exonerated of their charges.[1189]  This suggests that 2.5% of death row inmates were wrongfully convicted but not exonerated.  According to the study's lead author, University of Michigan Law School professor Samuel Gross, "[t]here are a large number of people who are sentenced to death, and despite our best efforts some of them have undoubtedly been executed."[1190]

Applied to Pennsylvania, this analysis suggests that there are wrongfully convicted inmates on the Commonwealth's death row.  In 2004, the last year covered in the study, Pennsylvania had 225 inmates on its death row.[1191]  Assuming the rate of wrongful capital convictions is 4.1%, Pennsylvania would have had approximately 9.2 wrongfully convicted inmates on its death row.  Yet since 2004, we have only had one death row exoneration, that of Harold Wilson in 2005.[1192]  If the proportion of wrongful convictions held true over time, then there would be an estimated seven wrongfully convicted inmates on Pennsylvania's death row in 2017.[1193]

It is important to note that the estimate of 4.1% of wrongfully convicted death row inmates assumes that "all death-sentenced defendants remained under sentence of death indefinitely".[1194]  Death row inmates have far more resources at their disposal to fight their convictions than those not under a sentence of death.[1195]  As a result, a disproportionate number of U.S. exonerations come from death row.[1196]

> Death sentences represent less than one-tenth of 1% of prison sentences in the United States, but they accounted for about 12% of known exonerations of innocent defendants from 1989 through early 2012, a disproportion of more than 130 to 1. A major reason for this extraordinary exoneration rate is that far more attention and resources are devoted to death penalty cases than to other criminal prosecutions, before and after conviction.[1197]

"Death sentences are different", and therefore are subject to additional judicial scrutiny.[1198]  Death sentences frequently do not meet the standards of this scrutiny and are overturned, with inmates being re-sentenced to a different disposition.  From 1973-2013, there were 188 overturned death sentences in the Commonwealth,[1199] or about 45% of all death sentences imposed during

---

[1189] *Id* at 7231.
[1190] Ed Pilkington, *US Death Row Study:  4% of Defendants Sentenced to Die are Innocent*, Guardian (Apr. 28, 2014), https://www.theguardian.com/world/2014/apr/28/death-penalty-study-4-percent-defendants-innocent.
[1191] Appdx. I, *infra* p. 255.
[1192] "Wilson was convicted of triple homicide in 1989 and sentenced to death.  He was thereafter granted a new trial and ultimately acquitted after spending approximately fifteen years in prison."  *Wilson v. City of Phila.*, 415 Fed. Appx. 434, 435 (3d Cir. 2011) (citation omitted).
[1193] Based on 169 death row inmates.  Death Penalty Information Center, The Death Penalty in 2017:  Yr. End Rep. 3, https://deathpenaltyinfo.org/documents/2017YrEnd.pdf.
[1194] Gross *et al.*, *supra* note 1187, at 7230.
[1195] *Id.*
[1196] *Id.* at 7231.
[1197] *Id*. at 7230.
[1198] *Id*.
[1199] Bureau of Just. Statistics, U.S. Dep't of Just., *Capital Punishment, 2013-Statistical Tables* 20, https://www.bjs.gov/content/pub/pdf/cp13st.pdf (last revised Dec. 19, 2014).

this time period.[1200]   Once individuals are no longer "under threat of execution", it is less likely that they will be exonerated because their cases are no longer subject to the judicial scrutiny and legal resources of a capital case.[1201]   There is a strong possibility that wrongfully convicted death row inmates have had their death sentences overturned but have not been exonerated: "the great majority of innocent defendants who are convicted of capital murder in the United States are neither executed nor exonerated.   They are sentenced, or resentenced to prison for life, and then forgotten".[1202]   Given the high number of overturned death sentences in the Commonwealth, it is likely true that wrongfully convicted individuals sentenced to death have been re-sentenced to a term of incarceration.   While these individuals are no longer at risk of being wrongfully executed, they are wrongfully imprisoned by Pennsylvania's capital punishment system.

"[T]he most fundamental principle of American jurisprudence" is "that an innocent man not be punished for the crimes of another."[1203]   The subcommittee on procedure generally endorses Report of the Advisory Committee on Wrongful Convictions and particularly points to its proposals as a roadmap to justice.[1204]   These proposals have received legislative consideration since publication of this report but have not been enacted.   If implemented, they would operate both as a prophylaxis to prevent wrongful convictions and also enhance the ability of an innocent convict to obtain relief if the prophylaxis was not in place or failed.[1205]   "[I]n the first instance, it is law enforcement—not the courts—that can best ensure against an undue risk of convicting the innocent"; however, "the integrity of the criminal justice system demands that we do better",[1206] which requires continuing reconsideration of the adequacy procedural protections by all branches of government.   "The source of public confidence in our criminal justice system resides in its ability to separate those who are guilty from those who are not."[1207]

## Alternatives

The question that serves as the basis of the study of alternatives in the administration of the death penalty in our Commonwealth is:

---

[1200] Based on 417 total death sentences from 1973-2013.  *Id.*

[1201] Gross *et al.*, *supra* note 1187, at 7231.

[1202] *Id.* at 7235.

[1203] *Commw. v. Conway*, 14 A.3d, 101, 114 (Pa. Super. Ct. 2011).

[1204] Pa. J. State Gov't Comm'n, *supra* note 18, at 167-207.

[1205] Pa. Dist. Att'y Ass'n has an *ad hoc* comm. on best practices "to identify best practices, research, and legal methods to assist in the proper and just evolution of the criminal justice system.  Created in 2014, the committee formalized PDAA's long history of identifying and promoting reforms and efficiencies in order to protect the innocent, convict the guilty, and ensure justice for the victims of crime."  Pa. Dist. Att'y Ass'n, Pa. Dist. Att'ys Issue Best Practices on Body-Worn Cameras (May 23, 2018), http://www.pdaa.org/pennsylvania-district-attorneys-issue-best-practices-on-body-worn-cameras/#.  These practices, however, are not binding.

[1206] *Dennis v. Pa. Sec'y of Corrections*, 834 F.3d 343-44 (3d Cir. 2016) (McKee, C.J., concurring).

[1207] Pa. J. State Gov't Comm'n, *supra* note 18, at 1.

Whether alternatives to the death penalty exist that would sufficiently ensure public safety and address other legitimate social and penological interests;[1208]

While the topics of penological purpose are analytically distinct, to consider the penological purpose of the death penalty without regard to alternatives inserts the artificial assumption that the only alternative to the death penalty would be to set the perpetrator free. Because the severely punitive alternative of life imprisonment without parole is available, the subcommittee on policy concludes that the death penalty is unnecessary, given the many objections to its use and the effectiveness of the alternative.

Since our judicial system does not tolerate severe corporal punishment (other than the death penalty), the only serious alternative to the death penalty is a lengthy term of imprisonment. Under current Pennsylvania law, the penalty for aggravated first-degree murder is either death or life imprisonment.[1209] There are alternative sentences, such as a very lengthy prison term (*e.g.*, 30 or 40 years) or life with the possibility of parole, but the subcommittee on policy views a sentence less harsh than life imprisonment as probably insufficiently severe for a crime that could qualify for the death penalty.

### *Constitutional Standard for Conditions of Incarceration*

The leading case on the Eighth Amendment standard applied to imprisonment is *Farmer v. Brennan*.[1210] A transsexual prisoner was attacked by another inmate in a federal prison.[1211] He sued the prison administration for damages under 42 Pa.C.S. § 1983, which makes a state liable when it denies a citizen his or her constitutional rights, in this case, the right to be free from cruel and unusual punishment. The Supreme Court applied the Cruel and Unusual Punishment Clause to prison conditions in these terms:

> The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." In its prohibition of "cruel and unusual punishments," the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners. The Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of the inmates."
>
> In particular, as the lower courts have uniformly held, and as we have assumed, "prison officials have a duty to . . . protect prisoners from violence at the hands of other prisoners." . . . .

---

[1208] Pa. S. Res. No. 6 (Sess. of 2011); appdx. A, *infra* p. 221.
[1209] 42 Pa.C.S. § 9711.
[1210] 511 U.S. 825 (1994).
[1211] *Id.* at 829-30.

The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind." In prison-conditions cases that state of mind is one of "deliberate indifference" to inmate health or safety. . . .

[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.[1212]

In propounding these principles, the Court balanced the Constitution's prohibition of brutal and inhumane conditions against the interest of the State and its citizens in maintaining the penological purposes of punishing the offense and deterring would-be offenders from committing similar crimes. Prison conditions may be punitive, but they are forbidden to be abusive.

### Life Imprisonment without Parole

In the U.S. penal system, life imprisonment without parole is the most severe sentence short of the death penalty. In *Graham v. Florida*, the U.S. Supreme Court compared these sentences:

[L]ife without parole is "the second most severe penalty permitted by law." It is true that the death penalty is "unique in its severity and irrevocability," yet life without parole sentences share some characteristics with death sentences that are shared by no other sentences. The State does not execute the offender sentenced to life without parole, but the sentence alters the offender's life by a forfeiture that is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration, except by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence. As one court observed . . ., this sentence means "denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days."[1213]

---

[1212] *Id.* at 832-33, 834, 837-38 (citations omitted).
[1213] 560 U.S. 48, 69-70 (2010) (citations omitted).

When poll respondents who support the death penalty are told that life imprisonment without parole can be an alternative, support for capital punishment drops below 50%. Because of the problems associated with the death penalty, life imprisonment without parole is gaining more attention and support:

> As a practical matter, it is life without parole that is the sure and swift penalty, not the death penalty. Moreover, life without parole is increasingly popular with the public—more popular in recent years than the death penalty. Support for the death penalty drops dramatically when the sanction of life without parole is an option. The popularity of life without parole appears to reflect the belief that this sanction may be a better deterrent than the death penalty (because it is more certain) and, moreover, that life without parole is a penalty that spares us the risk of executing an innocent man or woman. There is also the belief held by many that a life sentence without the possibility of parole guarantees that the offender will suffer greatly for the remaining days of his or her life.[1214]

The late James Q. Wilson, a prominent sociologists and supporter of the death penalty, advocated that capital juries be given the alternative of life imprisonment without parole, so that jurors could "hedge their bets" if they had "some doubts about the strength of the evidence or some other plausible worry."[1215] Former judge and director of Federal Bureau of Investigation William Sessions advocated a sentence short of death that jurors believed was sufficiently protective of society.[1216] James Liebman proposed that life imprisonment without parole should be clearly presented to capital juries as an alternative.

> Providing support for [Wilson's and Sessions's] views, analyses show that (1) jurors are capable of identifying offenders for whom the death penalty is not warranted as long as there are strong assurances that the offender will remain in prison until he is no longer a threat to society, but that (2) jurors usually will *not* impose life verdicts in such cases—even though they believe the death penalty is not required—unless they are assured by the trial judge that the defendant will not be eligible for parole.[1217]

Life imprisonment without parole is not a lenient punishment. For almost all inmates, the permanent or extended deprivation of liberty is undoubtedly a severe hardship.

Offenders sentenced to death by incarceration suffer "a civil death." Their freedom—the essential feature of our civil society—has come to a permanent end. These prisoners are physically alive, of course, but they live only in prison. It might be better to say they "exist" in prison, as prison life is but a pale shadow of life in the free world. Their lives are steeped in suffering. The prison is their cemetery, a cell their tomb.[1218]

---

[1214] Johnson & McGunigall-Smith, *supra* note 1163, at 332.
[1215] Liebman *et al.*, *supra* note 725, at 404.
[1216] *Id.*
[1217] *Id.*
[1218] Johnson & McGunigall-Smith, *supra* note 1163, at 329.

Certainly it is irrational to believe that LWOP is too commodious for inmates. For many inmates, the pains of imprisonment—whether those contemplated by law—like loss of freedom and loss of outside relationships, or illegitimate ones such as predation by other inmates—make prison such a painful experience that whatever minimal pleasures are available effectively make no dent in the prisoner's misery. For these inmates, prison is an earthly "hell" that is highly retributive. (It bears emphasizing that to the extent the pain is imposed by other inmates rather than official policy, such retribution is illegitimate.)[1219]

### Prison Conditions in the U.S.

The soundness of the claim that life imprisonment without parole supplies the deterrence and retribution purposes of criminal justice depends in large part on whether prison conditions reasonably satisfy those purposes.

In maximum security prisons in the U.S., the freedoms that ordinary citizens take for granted are severely curtailed. The cells are tiny and are usually shared with another inmate, who may pose a constant, physical threat. Personal effects are restricted and subject to frequent, unannounced searches for weapons, drugs, alcohol, and other contraband. Convicted murderers are often housed in units that are more restrictive than those applicable to the general inmate population. Contact with family members and other outside persons is limited and strictly controlled. There is a constant cat-and-mouse game between the prison administration and the inmates for control, in which the prison administration is hampered by overcrowding and understaffing. Conflict can involve rivalries between prison gangs whose membership breaks down according to racial or ethnic identity.

The following account comparing prison conditions with life in the outside world is representative of the literature:

Many Americans want prison to be a miserable experience for inmates, even if it conflicts with rehabilitation efforts. They think prison life is not all bad, that prisoners have it too easy. This is based largely upon the old public perception of a few federal prisons. The public does not view the insides of state penitentiaries much. Many bad things happen in state prisons and local jails that are never reported to the outside world. Out of sight, out of mind. Television coverage of crime skews the public's perception. Crime is decreasing nationwide, yet a large percent of the public believe it is on the increase. Probation and parole are considered slaps on the wrist. Public anger rises when a probationer or parolee commits a serious crime.

Reality differs from public perception. Most members of the public will never visit a prison or talk to anyone who has experienced life behind bars. Prison takes offenders away from their families, marriages, jobs, friends, communities, and churches and puts them in an extremely bad moral environment for years at a time. Social organization in prison revolves around vicious prison gangs, motivated by

---

[1219] David McCord, *Imagining a Retributivist Alternative to Capital Punishment*, 50 Fla. L. Rev. 1, 80 (1998).

racism, hate, satanic influences and violence. Life among these mostly uneducated felons, including opposing gang members, the insane and the diseased, is generally unpleasant. Overcrowding makes it all worse in most prisons today. Many prisoners are beaten, raped, brutalized or live in fear. Deviant and forced sex increases because members of the opposite sex are unavailable. Guards can be unpleasant and brutal. Annoying noises and bad odors are everywhere; sunlight and fresh air are limited. In most prisons today, overcrowding makes everything worse. Bland and unappealing food, clothing and extremely confining shelter are the norm. Freedom is gone. Some 16% of prisoners are mentally ill, and high percentages suffer from communicable diseases, including HIV-AIDS, hepatitis C, staph infections and tuberculosis. Families and friends often stop communicating with incarcerated family members. Boredom and inactivity take their toll. Depression is common. Suicide is 5 to 15 times greater than in the U.S. generally.[1220]

Without undertaking a detailed study of prison conditions for inmates serving life imprisonment without parole, which is beyond the scope of this resolution, it is presumed that this description applies to them. Life in prison is "not a walk in the park."

### Prison Conditions in Pennsylvania

**General Population.** Unlike death row inmates, all life-sentenced prisoners are eligible to be housed in the general population units. Department of Corrections operates under the theory that incarceration constitutes the legal punishment, and it is not the proper purpose of correctional staff to punish the prisoners beyond what is necessary to administer the sentence. Prison management determines the privileges granted or denied inmates on the basis of their behavior in the institution and not the nature of the offense they committed. The department does not make conditions unnecessarily punitive because making life miserable for the inmates makes the prison more dangerous for both the inmates and correctional staff.

General population inmates have the following privileges:[1221]

- Three meals a day, two of them hot
- Purchase of goods from the commissary, including TV and radio
- Access to a law library
- Purchase of books and magazines
- Visitation, including limited contact visitation
- Telephone
- Recreation and yard

---

[1220] John Dewar Gleissner, corrections.com, The Myth That Prisoners Have It Easy (May 23, 2011), http://www.corrections.com/news/article/28634-the-myth-that-prisoners-have-it-easy.
[1221] Pa. Dep't of Corrections, Inmate Handbook 12, 15, 16, 19, 25, 29, 42 (2017), http://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/2017%20DOC%20Inmate%20Handbook.pdf.

The granting and withholding of privileges is a useful means by which correctional staff can maintain control over the inmates. Inmates who violate prison rules may be reassigned to a restricted housing unit under disciplinary or administrative custody status.[1222] The inmate is given a hearing before a hearing examiner or through a prison administrative committee through which he or she may contest the transfer.[1223] Prisoners in general population have more freedom of movement than inmates in the capital case unit (CCU). General population prisoners are usually housed with a cellmate. They are served their meals in the cafeteria,[1224] while CCU inmates receive their meals in the CCU, either in or out of their cell for specified meals. There are more jobs available to general population inmates because they can work anywhere on the prison grounds.[1225] They earn[1226] 19 to 45 cents *per* hour.[1227] If an inmate owes unpaid court costs, 20% of the earnings are applied to defray those costs.[1228] Earnings may be used to purchase items from the commissary.[1229] Most inmates rely on money deposited into their accounts by family members.[1230] Personal property, such as a TV set, is subject to confiscation for certain types of misbehavior.

To be sure, incarceration in general population constitutes a far more restrictive environment than life outside prison. Inmates spend much of their time in a cell, which they share with another inmate, who is chosen for him or her by correctional staff.[1231] Except for group movements, such as meals, recreation, or work lines, inmates must have a signed pass to go from one part of the facility to another.[1232] Inmates are restricted regarding how much and what kinds of personal property they may own.[1233] Their personal effects are frequently searched for contraband.[1234] Any unauthorized goods are seized by the staff, and possession of contraband is grounds for disciplinary action. Some ordinary items are deemed contraband because they can be converted into weapons or can otherwise raise security concerns.[1235]

In the last five years (2013 to 2017), there have been six inmates who have killed another inmate (so roughly about one *per* year), and there have been two breach or walkaway escapes from a State Correctional Institution.[1236] Seven departmental or Bureau of Corrections employees were killed in the line of duty since the establishment of the Bureau of Corrections in 1952; the first such death since 1979 occurred earlier this year. Since the enactment of the federal Prison Rape

---

[1222] *Id.* at 33.

[1223] *Id.* at 33-34.

[1224] *Id.* at 12-13.

[1225] *Id.* at 47.

[1226] *Id.* at 47-48.

[1227]Pa. Dep't of Corrections, Policy Statement, Attach. 1-B (2012), http://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/816%20Inmate%20Compensation.pdf.

[1228] Pa. Dep't of Corrections, *supra* note 1221, at 3; 42 Pa.C.S. § 6602(c).

[1229] Pa. Dep't of Corrections, *supra* note 1221, at 29.

[1230] *Id.* at 1.

[1231] *Id.* at 11.

[1232] *Id.* at 4.

[1233] *Id.* at 28-29.

[1234] *Id.* at 4-6.

[1235] *Id.* at 30.

[1236] Bucklen, *supra* note 11 (June 13, 2018).

Elimination Act, there have been increasing efforts by Pennsylvania and other states to cut down on prison rape.[1237]

John Shaffer, a former official at the Department of Corrections and a member of the advisory committee, summarizes the basic conditions for Pennsylvania inmates serving life imprisonment without parole as follows:

> [M]urderers, rapists, and lifers (in non-capital cases) are permitted to engage in vocational, educational, recreational, and therapeutic activities in prison unless their institutional conduct warrants placement in the restricted housing unit. They can purchase TVs, radios, and commissary items at their own expense.[1238]

Conditions for death row inmates are described in the section on that subject.[1239] In both the general population and the CCU, prison management complies with constitutional and statutory law, such as the Prison Rape Elimination Act of 2003.[1240]

Conceivably, aggravated murderers could be housed in conditions that duplicate or closely resemble those of the current death row, with its greater isolation and more limited privileges. But the subcommittee on policy finds that life imprisonment without parole in general population constitutes, in and of itself, appropriate punishment for murder because it entails the loss of freedom for the remainder of the offender's entire life.[1241] There is no need to institute a harsher regime.

### Death in Prison

One commentator has suggested a variant of life imprisonment without parole, called "death in prison" as a suitable alternative to the death penalty because it furthers the aims of deterrence, retribution and protection of the public without incurring the severe disadvantages that accompany the death penalty. Under this proposal, the jury in the penalty phase would choose between a lengthy term of years and life imprisonment without parole. By renaming life

---

[1237] E-mails from Pa. Dep't of Corrections (Feb. 11, 2015 & July 14, 2014). The Department's audit reps. under PREA are available at

http://www.cor.pa.gov/Facilities/Prison_Rape_Elimination_Act/Pages/DOC-Audits.aspx.

[1238] E-mail from John S. Shaffer (Mar. 27, 2014). Dr. Shaffer was Executive Deputy Secretary of the department.

[1239] *Infra* pp. 197-99.

[1240] 34 U.S.C.A. §§ 30301-30309.

[1241] Life imprisonment without parole means that the inmate may not be paroled. The only ways to be released from this sentence would be by a subsequent judicial ruling vacating the sentence or the conviction, clemency or a transfer if the inmate needs med. treatment. 42 Pa.C.S. § 9777. Statutory authority for this med. transfer is ltd. to a temporary period & subject to approval from the sentencing court. To qualify, the inmate could not be ambulatory, must suffer from a terminal illness & likely be near death. The medical propriety of the transfer, the life expectancy of the inmate & the notification to the gov't & registered crime victim along with their opportunity to be heard must be established by clear & convincing evidence. The Commw., registered crime victim & correctional facility would be notified of a petition for this transfer & allowed to be heard. After the grant of a transfer, the prosecuting att'y or Dep't of Corrections could request recommittal if circumstances change. At any time, the sentencing court could also terminate its earlier grant of the transfer's life expectancy would be one year or less. Dep't of Corrections "only have about 2 to 3 such transfers for medical treatment per year" and had "10 over that four year timeframe from 2014 to 2017." Bucklen, *supra* note 11 (June 12, 2018) (on file with Pa. J. State Gov't Comm'n).

imprisonment without parole as death in prison, the state would emphasize that its maximum penalty is equivalent to a death sentence, although the death sentence would be abolished because the state would take no action to bring about the condemned murderer's death.

> Death-in-prison . . . would not suffer [the defects of the death penalty]. Far more defendants could be sentenced to death-in-prison. Indeed, most of the large number of capital defendants who currently receive LWOP could be sentenced to death-in-prison with no impact on the current allocation of prison resources. This would ensure that all persons who commit capital murder could be sentenced comparably. By adopting death-in-prison as a jurisdiction's highest penalty, the arbitrary selection of a small handful of unlucky defendants for execution would come to an end. Rather than sentence a few defendants to death and most others to LWOP, both groups of defendants could be sentenced to death-in-prison upon an adequate showing of desert. Exercise of the state's highest penalty would then look less like a lottery and more like a predictable, and fairly distributed, penal sanction. This would not only improve the proportionality of punishment, it would enhance deterrence by clearly communicating to the entire class of would-be offenders that the state's ultimate punishment will be imposed with certainty.[1242]

The substitution of life imprisonment without parole (or death in prison) for the death penalty, theoretically culminating in execution, eliminates the possibility than an innocent defendant will be executed. Because of that, most of the exacting due process requirements imposed under existent law, and the excruciatingly protracted and expensive litigation required to implement them, will become unnecessary. The focus of the penalty phase will shift to the more substantive, if less melodramatic, issue of whether the case calls for the permanent separation of the condemned murderer from society. The victim's survivors will receive the closure they are almost always denied under the current procedure.[1243]

| Alternatives to the Death Penalty | | | |
|---|---|---|---|
| Imprisonment | Sufficient for Public Safety | Addresses Legitimate Social Interests | Addresses Other Legitimate Penological Interests |
| Life *sans* parole[1244] | Yes | Public opinion--possibly | Retribution—yes<br>Deterrence—specific, yes; gen. possibly<br>Incapacitation—yes<br>Denunciation—yes<br>Restoration—no<br>Rehabilitation--no |

---

[1242] Russell D. Covey, *Death in Prison: The Right Death Penalty Compromise*, 28 Ga. St. U. L. Rev. 1085, 1093 (2012).

[1243] *Id.* at 1099-1101.

[1244] *Supra* pp. 176-78, 181-82.

| Alternatives to the Death Penalty | | | |
|---|---|---|---|
| Imprisonment | Sufficient for Public Safety | Addresses Legitimate Social Interests | Addresses Other Legitimate Penological Interests |
| Life w/possible parole | Possibly | Public opinion--possibly | Retribution—yes<br>Deterrence—specific, yes; gen. possibly<br>Incapacitation—yes<br>Denunciation—yes<br>Restoration—no<br>Rehabilitation--possibly |
| Term of years | Possibly | Public opinion--possibly | Retribution—yes<br>Deterrence—specific, yes; gen. possibly<br>Incapacitation—yes<br>Denunciation—yes<br>Restoration—no<br>Rehabilitation--no |

# Counsel

The question that serves as the basis of the study of counsel in the administration of the death penalty in our Commonwealth is:

The quality of counsel provided to indigent capital defendants and whether such counsel and the process for providing counsel assures the reliability and fairness of capital trials;[1245]

The subcommittee on procedure generally endorses a report of the task force and advisory committee on services to indigent criminal defendants[1246] but focused on indigent capital defendants and limits its comments to that subset. The advisory committee that prepared that report found some indigent defense practitioners failed to meet professional standards, partially because the system delivering that service is not standardized to train or supervise statewide but does so on a county-by-county basis.[1247] The Commonwealth's lack of support for these services undermines "the effectiveness of indigent defense",[1248] which is borne out by successful challenges to death penalties based upon ineffective assistance of counsel. As of May 2018, 150 Pennsylvania death-row inmates sentenced to death under Pennsylvania's 1978 death-penalty statute have had their convictions or sentences overturned on the basis of ineffective assistance of counsel.[1249]

---

[1245] Pa. S. Res. No. 6 (Sess. of 2011); appdx. A, *infra* p. 221.

[1246] Pa. J. State Gov't Comm'n, *supra* note 19.

[1247] *Id.* at 5.

[1248] *Id.*

[1249] Robert Brett Dunham, Pa. Capital Convictions & Death Sentences Rev'd as a Result of Ineffectiveness of Counsel (Death Penalty Information Ctr. 2018).

Death sentences in 93 of these cases were overturned because of counsel's failure to investigate and present mitigating evidence in the penalty phase.[1250] The inadequate remuneration of assigned counsel can "result in poor quality representation."[1251] Two years ago, Pennsylvania Supreme Court ruled that "a cause of action exists entitling a class of indigent criminal defendants to allege prospective, systemic violations of the right to counsel due to underfunding, and to seek and obtain an injunction forcing a county to provide adequate funding to a public defender's office."[1252] To avoid justice by geography, "a predominance of state funding is necessary to a successful system."[1253] There is no data to use to systematically evaluate the delivery of these services.[1254] The cost of retrials and inappropriate or unjust sentences could presumably be partially offset by more effective representation more consistently delivered *ab initio*.[1255] "Poor systems of defense do not make economic sense."[1256]

"[T]he quality of the defense representation provided by the Commonwealth to indigent capital defendants is an issue" that Chief Justice Saylor has "written on many times in appellate decisions."[1257]

> I am unable to agree with the suggestion that the presumption of effectiveness by and large reflects the actual state of capital defense representation in Pennsylvania. I would submit that, in fact, we have seen more than enough instances of deficient stewardship to raise very serious questions concerning the presumption's accuracy. It is my considered position, like that of many others, that a contributing factor may be the pervasive underfunding of indigent defense.[1258]

> Significantly, Pennsylvania has long been on notice that leaders of national, state, and local bar associations do not believe that capital litigation is being conducted fairly and evenhandedly in the Commonwealth, not the least because of the *ad hoc* fashion by which indigent defense services are funded from the local government level. Such concerns are consistent with vast compilations of literature containing evidence of long-standing, chronic underfunding of public defense systems in the United States. . . . Nevertheless, this Court seems unable to attend to the apparent systemic difficulties in individual capital cases considered on appeal, as, doctrinally, the adjudicatory focus is on the facts at hand relative to an array of widely disparate claims of deficient stewardship.[1259]

---

[1250] Of these 93, 68 were reversed by state courts & 25 by federal cts.. Robert Brett Dunham, Pa. Capital Case Cite List of Reversals Because of Ineffective Assistance of Counsel (Death Penalty Information Ctr. 2018). Other reversals related to failures to investigate & present guilt-stage defenses, failures to request or object to instructions, failures to object to improper evidence or argument, failures relating to guilty pleas or trial waiver and making a deficient or affirmatively harmful argument. *Id.*

[1251] Pa. J. State Gov't Comm'n, *supra* note 19, at 5, 47-48.

[1252] *Kuren v. Luzerne Cnty.*, 146 A.3d 715, 718 (Pa. 2016).

[1253] Pa. J. State Gov't Comm'n, *supra* note 19, at 59-60.

[1254] *Id.* at 47-48.

[1255] *Id.* at 6.

[1256] Saylor, *supra* note 20, at 38.

[1257] *Id.* at 3.

[1258] *Commw. v. King*, 57 A.3d 607, 636 (Pa. 2012) (Saylor, J., concurring).

[1259] *Commw. v. McGarrell*, 87 A.3d 809, 810-11 (Pa. 2014) (Saylor, J., dissenting) (citations and footnotes omitted).

Justice Saylor called for "a collaborative conversation among the judicial, legislative, and executive branches to institutionalize statewide remedies and facilitate ongoing improvements" and noted "[t]he importance of legislative involvement".[1260] While delivering the 2013 Widener Law and Government Institute Jurist in Residence Lecture, Justice Saylor focused on mitigation because he thought that it "yields the most vivid example of a debilitating deficiency in the death-penalty regime, which remains in sore need of improvement for the system to work properly."[1261]

The right to counsel is grounded in both our Commonwealth's and national constitutions.[1262] To avoid "judicial murder", counsel would be appointed in a capital case under the due process clause applying U.S. Const. amend. VI's assistance of counsel for one's defense.[1263] This guarantee of counsel was extended to indigent defendants facing felonies when it was recognized as a fundamental safeguard "of liberty . . . protected against state invasion by the Due Process Clause of the Fourteenth Amendment."[1264] The assistance of counsel requires adequate legal assistance, which is considered to be effective.[1265] Defective assistance of counsel requires "reversal of a conviction or death sentence".[1266]

Each county has a public defender appointed by its Board of County Commissioners.[1267] Within the Commonwealth's 67 counties, 23 of them have no attorneys who have "met the CLE qualifying standards for appointment as capital defense counsel as detailed in" Pa. R. Crim. P. 801.[1268] "In all cases in which the attorney for the Commonwealth has filed a Notice of Aggravating Circumstances pursuant to Rule 802, before an attorney may participate in any stage of the case either as retained or appointed counsel, the attorney must meet the educational and experiential criteria set forth in this rule."[1269]

The subcommittee generally endorses Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases that were published in 2003 by American Bar Association "to set forth a national standard of practice . . . to ensure high quality legal representation" within "any jurisdiction."[1270] One of its guidelines is that "[e]ach jurisdiction . . . adopt and implement a plan formalizing the means by which high quality legal representation in death penalty cases is to

---

[1260] *Id.* at 811 n.3.

[1261] Saylor, *supra* note 20, at 4.

[1262] Pa. Const. art. I, § 9; U.S. Const. amend. VI.

[1263] *Powell v. Ala.*, 287 U.S. 45, 63, 65 (1932). "[T]he right to counsel, as guaranteed by" Pa. Const. art. I, § 9 "is coterminous with the Sixth Amendment right to counsel for purposes of determining when the right attaches." *Commw. v. Arroyo*, 723 A.2d 162, 170 (Pa. 1999).

[1264] *Gideon v. Wainwright*, 372 U.S. 335, 336, 340-41 (1963).

[1265] *Strickland v. Wash.*, 466 U.S. 668, 686 (1984).

[1266] *Id.* at 687.

[1267] Act of Dec. 2, 1968 (P.L.1144, No.358), §§ 3, 4: 16 P.S. §§ 9960.3, 9960.4.

[1268] Pa. Sup. Ct. Continuing Legal Educ. Bd., Capital Counsel CLE, https://www.pacle.org/services/cap_counsel.asp (last visited June 11, 2018). Armstrong, Cameron, Carbon, Clarion, Clearfield, Clinton, Crawford, Elk, Forest, Fulton, Greene, Huntingdon, Juniata, Mifflin, Potter, Snyder, Sullivan, Susquehanna, Tioga, Venango, Warren, Wayne & Wyo.. *Id.*

[1269] Pa. R. Crim. P. 801.

[1270] Am. Bar Ass'n, *Guidelines for the Appointment & Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 919 (2003). Am. Bar Ass'n also published *Ten Principles of a Pub. Defense Delivery Sys.* (2002), https://www.americanbar.org/content/dam/aba/administrative/legal_aid_indigent_defendants/ls_sclaid_def_tenprinci plesbooklet.authcheckdam.pdf. These principles provide a guide of "valuable measures of the prevailing professional norms of effective representation". *Padilla v. Ky.*, 599 U.S. 356, 367 (2010).

be provided in accordance with these Guidelines . . . ."[1271]  Another guideline is that "lawyers for specific cases" should be selected by a defender organization or independent authority rather than "the judiciary or elected officials".[1272]  Another guideline sets the minimum of two, qualified attorneys, "an investigator, and a mitigation specialist."[1273]  Workload needs to be "maintained at a level that enables counsel to provide each client with high quality legal representation".[1274]  Funds should provide for comprehensive and "effective training, professional development, and continuing education of all members of the defense team."[1275]

*Recommendation*

The subcommittee recommends the creation of a state-funded capital defender office to represent all persons charged with or convicted of capital crimes at the trial, appellate, and state post-conviction levels.  Such an office will save money for the counties, be cost efficient by reducing the number of cases that require reversal in post-conviction proceedings at either the state or federal level, and improve the quality of representation, thereby reducing the likelihood of error at the trial level.  An alternative option to this would be to have a state-funded capital defender office leaving Defender Association of Philadelphia to continue to represent indigent, capital defendants; however, the association there now represents only 20% of those cases now.[1276]

# Secondary Trauma

The question that serves as the basis of the study of secondary trauma in the administration of the death penalty in our Commonwealth is:

The impact of the death penalty process on law enforcement, prosecutors, defense counsel, judges, jurors, correctional officers, family members and loved ones of victims and family members of the accused;[1277]

*Judges, prosecutors, public defenders and victim advocates*

To try to assess the impact of the death penalty process on judges, prosecutors, public defenders and victim advocates, surveys were distributed in nine judicial districts of varying population sizes and caseloads that had past or current capital murder cases.[1278]  Cumulatively, the response rate was approximately 75%; however, not everyone answered all questions.  The survey

---

[1271] Am. Bar Ass'n *Guidelines*, *supra* note 1270, at 939.
[1272] *Id.* at 944-45.
[1273] *Id.* at 952.
[1274] *Id.* at 965.
[1275] *Id.* at 976.  Funding should also extend to "outside experts selected by counsel."  *Id.* at 981.
[1276] Pa. J. State Gov't Comm'n, *supra* note 19, at 64.
[1277] Pa. S. Res. No. 6 (Sess. of 2011); appdx. A., *infra* p. 221.
[1278] Counties of Adams, Allegheny, Berks, Dauphin, Lancaster, Montgomery, York & Westmoreland & City of Phila. Judges were surveyed in 2015. Prosecutors, public defenders and victim advocates were surveyed in 2013.

responses were returned anonymously, so it is unknown how and whether particular recipients responded. The surveys focused on the resources required at various stages of the process.

Cumulatively, more than 64% of the responses indicated that a typical, capital murder case causes more stress or anxiety than a typical, noncapital murder case. This conclusion was reached by a majority or 100% for each category of respondents except for victim service providers, more than 53% of whom indicated that a typical, capital murder case causes about the same amount of stress or anxiety.

Cumulatively, 70% of the responses indicated that a typical, capital murder case causes no difference in adverse health conditions or consequences compared to a typical, noncapital murder case. This conclusion was reached by half or more for each category of respondents except for public defenders, 60% of whom indicated that a typical, capital murder case causes more adverse health conditions or consequences than a typical, noncapital murder case.

Cumulatively, more than 73% of the responses indicated that a typical, capital murder case causes no difference in consumption of alcohol and other drugs or medications, compared to a typical, noncapital murder case.

Cumulatively, more than 54% of the responses indicated that a typical, capital murder case causes no difference in adverse consequences on one's family, home or social life, compared to a typical, noncapital murder case. This conclusion was reached by a majority for each category of respondents except for public defenders, 80% of whom indicted that a typical, capital murder case cause more adverse consequences on one's family, home or social life.

Cumulatively, more than 70% of the responses indicated that a typical, capital murder case causes more emotional strain than a typical, noncapital murder case. This was a majority or 100% of responses for each category of respondents except for prosecutors, half of whom indicated that a typical, capital murder case causes more emotional strain compared to a typical, noncapital murder case and the other half indicated no difference in emotional strain between the two.

Cumulatively, more than 58% of the responses indicated that a typical, capital murder case causes no difference in religious, spiritual or moral consideration, introspection or counsel, compared to a typical, noncapital murder case.

### Correctional officers, victim family members and inmate loved ones

In 2013, The Pennsylvania State University and Department of Corrections staff administered surveys to State Correctional Institution Greene correctional officers, victims' family members, and inmates' loved ones.[1279]

---

[1279] There is a gap in services because convicts' relatives have traditionally been disregarded. Historically, law and practice did not recognize victims of crime as victims when it came to services either. One might not be too sympathetic towards inmates' relatives; however, their children are typically adversely impacted by the incarceration of parent. Dep't of Corrections' initiatives relating to children of incarcerated parents appear at http://www.cor.pa.gov/About%20Us/Initiatives/Pages/Children-of-Incarcerated-Parents.aspx (2018).

The correctional officers' hardcopy survey was delivered to their institutional mailboxes. The hardcopy survey consisted of 35 questions designed to measure their workplace conditions, stress, anxiety and background characteristics. The response rate was 56%. Of these respondents, 39% were from the capital unit, 44% were from the maximum security unit, 12% were from the L2/L3 units/pods, and 5% did not report their unit assignment.[1280]

The victims' family member survey was administered *via* an online survey with over 80 questions covering post-traumatic stress disorder, depression, views on the death penalty and demographic/background characteristics. Survey requests were sent to 440 eligible participants with valid addresses on file at the Office of Victim Advocate. The response rate was 29%.

The inmates' loved ones' survey was administered *via* a hardcopy survey of 31 questions covering post-traumatic stress disorder, depression, views on the death penalty and demographic/background characteristics. Eligible participants were loved ones (one *per* inmate) who were visiting inmates. Eligible participants were provided survey packets in visitation waiting rooms by prison staff. During the survey administration period, 72 surveys were provided to eligible respondents in inmate-visitation waiting areas. The response rate was 33%.

Analyses compared self-reported post-traumatic stress disorder (PTSD) and depression symptoms from those respondents associated with capital punishment and those associated with non-capital cases. For correctional officers, additional variables, including occupational stress, emotional exhaustion, work-family conflict, and perceived job dangerousness were also analyzed.

The primary hypotheses were as follows:

- Correctional officers working in a prison's capital case unit would have greater psychological trauma (*i.e.*, PTSD, depression, work-related stress) than working in a prison's general population or maximum security units.

- Victims' family members with the murderer sentenced to capital punishment would have greater psychological trauma (*i.e.*, PTSD, stress, and/or depression) than those where the murderer was sentenced to life imprisonment.

- Inmates' loved ones who had a loved one sentenced to capital punishment would have greater psychological trauma (*i.e.*, PTSD, anxiety, and/or depression) than those having a loved one sentenced to life imprisonment for murder.

The survey revealed that in no instance was the capital punishment condition associated with statistically higher PTSD, depression or stress than the non-capital punishment condition. For correctional officers and victims' family members, overall reports of PTSD, depression and stress were low to moderate, suggesting that few of the respondents were suffering from mental health difficulties. This was not the case for inmates' loved ones and their children.

---

[1280] The total exceeds 100% because the percentage is rounded.

Inmates' family members reported relatively high rates of PTSD and depression compared to national and high-risk (*e.g.*, deployed military) populations. Although the mental health challenges of inmates' families do not appear to be directly connected to capital punishment, they do warrant additional attention and point to a vulnerable population that might not be receiving adequate therapeutic services.

Limitations of the study include the following:

- The relatively small sample sizes did not provide the statistical power to detect small differences between the experimental (*i.e.*, capital punishment) and control (*i.e.*, non-capital punishment) conditions.
- There is a potential bias resulting from non-representative samples.
- There is potential response bias associated with the sensitive items in the self-report surveys.
- The study focused on only three categories listed in the resolution (correctional officers, family members and loved ones of victims, and family members of the accused); although these groups are arguably the most impacted by capital punishment over time, other research would be required to assess the potential secondary trauma experienced by law enforcement, prosecutors, defense counsel, judges, and jurors resulting from Pennsylvania's capital punishment laws.

However, although the samples were relatively small, the observed differences were small enough that it is unlikely they would have reached significance even with greater numbers of respondents.

## Length and Conditions of Confinement on Death Row

The question that serves as the basis of the study of length and conditions of confinement on death row in the administration of the death penalty in our Commonwealth is:

Whether the conditions comply with the requirements of the United States Constitution, the Constitution of the Commonwealth of Pennsylvania and standards of international law and the impact of those conditions on correctional officers;[1281]

Each facility of Department of Corrections audited to date has achieved initial accreditation or reaccreditation by American Correctional Association.[1282] It is under no judicial orders or consent decrees regarding conditions of confinement in Capital Case Units, otherwise known as death row.[1283] So far as the subcommittee on impact is aware, the department complies with

[1281] Pa. S. Res. No. 6 (Sess. of 2011); appdx. A, *infra* pp. 221-22.
[1282] Am. Correctional Ass'n, Accredited Facilities,
http://www.aca.org/ACA_Prod_IMIS/ACA_Member/Standards_and_Accreditation/SAC_AccFacHome.aspx?Website Key=139f6b09-e150-4c56-9c66-284b92f21e51&hkey=f53cf206-2285-490e-98b7-66b5ecf4927a&CCO=2#CCO (last visited June 5, 2018).
[1283] Woodside, *supra* note 140.

constitutional requirements for confinement. The only way to know for certain is after an inmate has challenged the department, claiming a constitutional violation, and the judiciary rules accordingly.[1284] An example of learning about a constitutional violation occurred last year, when the judiciary announced "a clearly established due process right under" U.S. Const. amend. XIV "to avoid unnecessary and unexamined solitary confinement on death row."[1285] This was a recently recognized "due process right" that meant that the departmental policy of keeping an inmate in "the Capital Case unit" after being resentenced to life imprisonment while the district attorney appealed the resentencing is unconstitutional when "reflexively imposed without individualized justification."[1286] The department is currently defending a class action lawsuit challenging the conditions of confinement on death row as an unconstitutional violation of the U.S. constitutional prohibition on cruel and unusual punishment.[1287]

It is more difficult to assess whether confinement on death row in Pennsylvania meets the standards of international law. The department does not officially recognize these standards and departmental staff were unable to indicate one way or the other whether the conditions of confinement on death row meet these standards. It seems as though the consensus of developed countries is that the punishment of execution should be abolished. To the extent that other countries use capital punishment, it appears that Pennsylvania largely comports with the standards of confinement conditions, other than the lengthy interval between condemnation and execution. This would be due to the presumptive stress of awaiting one's own execution; however, condemnees do not seem to be eager to advance their own executions to relieve the presumptive stress of the wait.

Correctional officers were surveyed on the impact of conditions of confinement on death row.[1288]

### Length of Confinement on Death Row

Length of confinement varies *per* inmate, primarily due to their date of conviction. Currently, the longest serving inmate on death row resides at State Correctional Institution Greene. Inmate No. AM-5999 was sentenced to death in 1983; later this year, this inmate will have completed his thirty-fifth year on Pennsylvania's death row.[1289]

Using information compiled by Department of Corrections, quantitative data for specific variables of inmates currently on death row was analyzed as of June 1, 2018.[1290] Pennsylvania's death row was comprised of 150 total inmates, of which 76 (51 percent) are Black, 57 (38 percent) are White, 14 (9.3 percent) are Hispanic and 3 (2 percent) are Asian. No women were on death row at the time of the latest available DOC data profile.

---

[1284] An example of how this might arise, is the mental health investigation by U.S. Dep't of Just., *supra* pp. 125-26.
[1285] *Williams v. Pa. Sec'y of Corrections*, 848 F.3d 549, 574 (3d Cir. 2017).
[1286] *Id.* at 556-57, 572, 574. In other words, there must be "procedural protections" afforded inmates to "ensure that continuing this level of deprivation is required for penological purposes". *Id.* at 574.
[1287] *Reid v. Wetzel*, No. 1:18-cv-00176 (M.D.Pa. 2018).
[1288] *Supra* pp. 187-89.
[1289] Pa. Dep't of Corrections, *supra* note 14.
[1290] *Id.*

| Death Row Inmates By Race Pennsylvania June 2018 | | |
|---|---|---|
| *Race* | *Number of Inmates* | *Percent* |
| Asian | 3 | 2.0 |
| Black | 76 | 50.7 |
| Hispanic | 14 | 9.3 |
| White | 57 | 38.0 |
| Total | 150 | 100.0 |

Source: Pennsylvania Department of Corrections, "Persons Sentenced to Execution as of June 1, 2018," www.cor.pa.gov/Initiatives/Documents/Death%20Penalty/Current%20Execution%20list.pdf. Accessed June 14, 2018.

The average length of confinement for all inmates on death row is 17.49 years. Average length of confinement, analyzed by race, showed the Black inmate population having a slightly higher average length of stay on death row at 18.57 years, compared to 16.6 for White, 16.86 for Hispanic, and 10.0 for Asian. SPSS was used to compute a One-Way ANOVA to compare the different races' average years spent on death row. The results show no statistically significant differences and, therefore, the June 1, 2018 data do not provide evidence that can be used to make broader inferences about race and average time spend on death row.

| Average Years on Death Row by Race Pennsylvania June 2018 | | | |
|---|---|---|---|
| *Race* | *Number of inmates* | *Mean* | *Std. Deviation* |
| Asian | 3 | 10.00 | 13.892 |
| Black | 76 | 18.57 | 8.698 |
| Hispanic | 14 | 16.86 | 6.724 |
| White | 57 | 16.60 | 8.668 |
| Total | 150 | 17.49 | 8.656 |

Source: Pennsylvania Department of Corrections, "Persons Sentenced to Execution as of June 1, 2018," www.cor.pa.gov/Initiatives/Documents/Death%20Penalty/Current%20Execution%20list.pdf. Accessed June 14, 2018.

The average age of individuals residing on death row was 50, with the average age at conviction being 32 years old.

| Inmates Current Age, Age At Conviction, Average Years Spent on Death Row Pennsylvania June 2018 | | | | |
|---|---|---|---|---|
| Period | Minimum | Maximum | Mean | Std. Deviation |
| Current age | 25 | 75 | 49.55 | 10.310 |
| Age at conviction | 19 | 52 | 31.53 | 7.823 |
| Average years on death row | < 1 | 34 | 17.49 | 8.656 |

Source: Pennsylvania Department of Corrections, "Persons Sentenced to Execution as of June 1, 2018," www.cor.pa.gov/Initiatives/Documents/Death%20Penalty/Current%20Execution%20list.pdf. Accessed June 14, 2018.

## *Conditions of Confinement on Death Row*

Conditions of confinement must satisfy U.S. Const. amend. VIII and Pa. Const. art. I, § 13, which prohibit cruel and unusual punishments.[1291]  Department of Corrections policies and mission statement specify the guiding principles for inmates and facility staff alike, including conditions within the facility.  These policies cover reasonable accommodations for inmates with disabilities, use of force, food service, inmate discipline, administrative custody, inmate grooming, access to health care and mental health care, and other relevant provisions.[1292]  The departmental mission statement reflects the importance of public safety.[1293]  Facility staff must also adhere to a Code of Ethics, with violators subject to immediate disciplinary action.[1294]

## *Constitutional requirements*

The general understanding of compliance is framed by a ruling applying the federal constitution to prison conditions.[1295]  The constitution "'does not mandate comfortable prisons,' but neither does it permit inhumane ones, and it is now settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment'."[1296]  This amendment restrains "prison officials, who may not, for example, use excessive physical force against prisoners."[1297]  Prison officials must supply essential items to the inmates, including food, clothing, shelter, medical care, and adequate steps to ensure those measures are met.[1298]

---

[1291] The Pa. constitutional provision is interpreted as "coextensive" with the U.S. one.  *Commw. v. Yasipour*, 957 A.2d 734, 742-43 (Pa. Super. Ct. 2008).
[1292] Pa. Dep't of Corrections, Policies, http://www.cor.pa.gov/About%20Us/Pages/DOC-Policies.aspx (2018).
[1293] *Id*., Mission Statement, http://www.cor.pa.gov/About%20Us/Pages/Mission-Statement.aspx (2018).
[1294] *Id*., Code of Ethics, http://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/Code%20of%20Ethics.pdf (last visited June 7, 2018).
[1295] *Farmer v. Brennan*, 511 U.S. 825 (1994).
[1296] *Id*. at 832 (citation omitted).
[1297] *Id*.
[1298] *Id*.

*Standards of International Law*

Although the department makes no representations about conformity with international standards, several trends have emerged throughout Europe and other developed countries over the years. European Union nations have abolished capital punishment. Issues in Europe include arguments that capital punishment is torture, violating provisions against freedom from torture and inhuman and degrading treatment or punishment.[1299] United Kingdom of Great Britain and Northern Ireland's abolished the death penalty in 1965 with the passage of the Murder (abolition of Death Penalty) Act of 1965 and other European nations followed suit.[1300] In the United Kingdom, the Equality and Human Rights Commission is a non-departmental public body established by the Equality Act of 2006.[1301] The commission's work includes international and domestic based advocacy against current and future use of the capital punishment.[1302]

A leading case elaborating on the United Kingdom's current international viewpoint on capital punishment is *Soering v. United Kingdom*, which addresses "death row phenomena" or the results of waiting on death row.[1303] In *Soering*, the European Court of Human Rights was asked to determine whether the applicant, a West German national, should be extradited to the United States to stand trial on a charge of capital murder in Virginia pending possible violation of Article 3 of the United Kingdom's Human Rights Act of 1998 if the Commonwealth of Virginia implemented the death penalty.[1304]

The Human Rights Act of 1998 outlines the rights and freedoms to which citizens of the United Kingdom are entitled.[1305] Article 2 details a basic right to life protected by law, while Article 3 provides for the prohibition of torture or inhumane or degrading treatment or punishment.[1306] Basing its decision on Article 3 of the Human Rights Act, the court ruled that, if capital punishment were to be implemented, extraditing the applicant to Virginia to face capital murder charges would result in the so-called "death row phenomenon" and thereby violate this article.

> [I]n the Court's view, having regard to the very long period of time spent on death row in such extreme conditions, with the ever present and mounting anguish of awaiting execution of the death penalty, and to the personal circumstances of the applicant, especially his age and mental state at the time of the offence, the applicant's extradition to the United States would expose him to a real risk of treatment going beyond the threshold set by Article 3 (art. 3).[1307]

---

[1299] Equality & Human Rights Comm'n, Art. 3, http://www.equalityhumanrights.com/about-us/our-work/human-rights/human-rights-review-2012/articles/article-3 (2012).

[1300] Murder (Abolition of Death Penalty) Act 1965, available at http://www.legislation.gov.uk/ukpga/1965/71/contents (last visited July 7, 2015).

[1301] Equality & Human Rights Comm'n, *supra* note 1299, at 7.

[1302] *Id.*

[1303] *Soering v. U.K.*, 11 Eur. Ct. H.R. (1989)

[1304] *Id.*

[1305] Equality & Human Rights Comm'n, The Human Rights Act, https://www.equalityhumanrights.com/en/human-rights/human-rights-act (last updated Jan. 29, 2018).

[1306] *Id.*

[1307] *Soering*, at ¶ 111, *available at*

*Soering* further set forth a framework for countries that have abolished capital punishment, while still exercising valid extradition treaties, to retain individuals within their borders in accordance with their laws.

> In the case of a fugitive requested by the United States who faces a charge carrying the death penalty, if is the Secretary of State's practice, pursuant to Article IV of the United Kingdom-United States Extradition Treaty, to accept an assurance from the prosecuting authorities of the relevant State that a representation will be made to the judge at the time of sentencing that is it the wish of the United Kingdom that the death penalty should be neither imposed no carried out.[1308]

The Court then added clarification from a parliamentary debate, citing David Mellor, then Minister of State at the Home Office:

> The written undertakings about the death penalty that the Secretary of State obtains from the Federal authorities amount to an undertaking that the views of the United Kingdom will be represented to the judge. At the time of sentencing he will be informed that the United Kingdom does not wish the death penalty to be imposed or carried out. That means the United Kingdom authorities render up a fugitive or are prepared to send a citizen to face an American court on the clear understanding that the death penalty will not be carried out – it has never been carried out in such cases. It would be a fundamental blow to the extraditions arrangements between our two countries if the death penalty were carried out on an individual who has been returned under those circumstances.[1309]

The Court then concluded that any extradition to the United States would, in this circumstance, violate Article 3 of the Human Rights Act.[1310] Furthermore, the practice of extradition(s) only on the assurances the death penalty will not be pursued is not uncommon for countries that have abolished the death penalty and have extradition treaties with the United States.

> For any prisoner condemned to death, some element of delay between imposition and execution of the sentence and the experience of severe stress in conditions necessary for strict incarceration are inevitable. The democratic character of the Virginia legal system in general and the positive features of Virginia trial, sentencing and appeal procedures in particular are beyond doubt. The Court agrees with the Commission that the machinery of justice to which the applicant would be subject to in the United States is in itself neither arbitrary nor unreasonable, but, rather, respects the rule of law and affords not inconsiderable procedural safeguards to the defendant in a capital trial. Facilities are available on death row for the assistance of inmates, notably through provision of psychological and psychiatric services.

---

http://www.uio.no/studier/emner/jus/jus/JUR5710/h10/undervisningsmateriale/5nov_Soering-v-UK.pdf.
[1308] *Id.* ¶ 37.
[1309] *Id*.
[1310] *Id.* ¶ 111.

However, in the Court's view, having regard to the very long period of time spent on death row in such extreme conditions, with the ever present and mounting anguish of awaiting execution of the death penalty, and to the personal circumstances of the applicant, . . . the applicant's extradition to the United States would expose him to a real risk of treatment going beyond the threshold set by Article 3.[1311]

### *International Perspective: Conditions on Death Row*

There are roughly 10,100,000 people imprisoned worldwide, an untold number of whom have been sentenced to death.[1312]  In 2012, U.S. Department of State reported on international prison conditions.[1313]  Conditions on death row vary among the countries that have not abolished this punishment.  Unlike the practice of segregating death row inmates in the U.S., inmates sentenced to death in many countries are exposed to the same environment as the general prison population.[1314]  In many countries, prolonged pretrial detention exacerbates prison overcrowding, prisons are understaffed, and death row inmates are reportedly undertreated or treatment is delayed when sick while waiting their pending death sentence.[1315]  Torture on death row has been reported in several countries, with corruption of prison officials widespread in many countries.[1316]

Prison conditions in many countries lack adequate safeguards and policies have not been implemented to protect incarcerated individuals from cruel, inhumane or degrading treatment or punishment.  In 1955, the First United Nations (UN) Congress on the Prevention of Crime and the Treatment of Offenders, held in Geneva, adopted the Standard Minimum Rules for the Treatment of Prisoners.[1317] The following illustrates the purpose of these rules:

The following rules are not intended to describe in detail a model system of penal instructions. They seek only, on the basis of the general consensus of contemporary thought and the essential elements of the most adequate system of today, to set out what is generally accepted as being good principle and practice in the treatment of prisoners and the management of institutions.[1318]

Set forth under Part 1, the General Rules of Application, an underlying principle for these rules is an anti-discriminatory, impartially implemented penal system:

---

[1311]*Id.* (reference omitted).

[1312] Bureau of Democracy, Human Rights & Labor, U.S. Dep't of State, *Rep. on Int'l Prison Conditions* 1, *available at*  http://www.state.gov/documents/organization/210160.pdf (last visited June 12, 2018).

[1313] *Id.*

[1314] Cornell L. Sch. Ctr. on the Death Penalty Worldwide, Death Row Conditions, http://www.deathpenaltyworldwide.org/death-row-conditions.cfm, (last updated Sept. 4, 2012).

[1315] *Id.*

[1316] *Id.*

[1317] 1ˢᵗ U. Nations Congress on the Prevention of Crime & the Treatment of Offenders, Standard Min. Rules for the Treatment of Prisoners, http://www.ohchr.org/Documents/ProfessionalInterest/treatmentprisoners.pdf (last visited June 11, 2018).

[1318] *Id.* at 1.

The following rules shall be applied impartially. There shall be no discrimination on the grounds of race, color, sex, language, religion, political or other opinion, national or social origin, property, birth or other status. . . . On the other hand, it is necessary to respect the religious beliefs and moral precepts of the group to which a prisoner belongs.[1319]

The Standard Minimum Rules for the Treatment of Prisoners outlines key categories for the care of prisoners, including: accommodation, personal hygiene, clothing and bedding, food, exercise and sport, medical services, discipline and punishment, instruments of restraint, information to and complaints by prisoners, contact with the outside world, books, religion, retention of prisoners' property, notification of death or illness, removal of prisoners, institutional personnel, and inspections.[1320] Further, there are rules for special categories, which include: guiding principles, treatment, classification and individualization, privileges, work, education and recreation, social relations and after-care, insane and mentally abnormal prisoners, prisoners under arrest or awaiting trial, civil prisoners and persons arrested or detained without charge.[1321]

For example, the rules for sleeping accommodation call for one inmate per cell, stating it is not desirable to have two prisoners in a cell or room, and sets basic expectations for air flow, light, heating and ventilation, and minimum floor space provided to inmates.[1322] The rules for food call for proper nutritional value with drinking water available to every inmate whenever the need arises.[1323] In regard to discipline and punishment, the rules state:

> Discipline and order shall be maintained with firmness, but with no more restriction than is necessary for safe custody and well-ordered community life. . . . . Corporal punishment, punishment by placing in a dark cell, and all cruel, inhumane or degrading punishments shall be completely prohibited as punishments for disciplinary offences. . . . Punishments by close confinement or reduction of diet shall never be inflicted unless the medical officers has examined the prisoner and certified in writing that he is fit to sustain it. . . . The same shall apply to any other punishment that may be prejudicial to the physical or mental health of a prisoner. . . . . The medical officer shall . . . shall advise the director if he considers the termination or alteration of the punishment necessary on grounds of physical or mental health.[1324]

The UN Office of the High Commissioner for Human Rights, acknowledged the growing number of Member States abolishing the death penalty, stating the action "undermines human dignity and that its abolition, or a moratorium of its use, contributes to the enhancement and progressive development of human rights."[1325] More than 160 Member States have either abolished or do not practice the death penalty; the office further argues that individuals have a

---

[1319] *Id*.
[1320] *Id*. at 2-9.
[1321] *Id*. at 9-14.
[1322] *Id*. at 2-3.
[1323] *Id*. at 3.
[1324] *Id*. at 4-5.
[1325] U. Nations Office of the High Commissioner for Human Rights, Human Rights: Death Penalty, http://www.ohchr.org/EN/Issues/DeathPenalty/Pages/DPIndex.aspx, (last visited June 12, 2018).

fundamental right to life, there is great risk to executing innocent people, and cites "absence of proof that the death penalty" deters crime.[1326]

From the early 1960s, drafters of the International Covenant on Civil and Political Rights (ICCPR) had begun their movement to abolish the death penalty in international law. Interestingly, however, Article 6 of the ICCPR states every human being has an inherent right to life but permits the use of the death penalty in limited circumstances.[1327] In the years following, many resolutions and protocols were adopted to limit the use of the death penalty in international law. In 1984, the UN Economic and Social Council adopted Safeguards guaranteeing protection of the rights of those facing the death penalty, followed in 1989 by the adoption of the Second Optional Protocol to the ICCPR.[1328] Most recently the council adopted four resolutions urging states to respect international standards protecting the rights of those sentenced to death and progressively reduce the number of death eligible crimes within Member States.

### Prison Conditions in Pennsylvania

To obtain an account of prison conditions in Pennsylvania, Commission staff interviewed staff of Department of Corrections regarding conditions for death row inmates (Capital Case Unit) as compared with general population inmates, which includes all other inmates sentenced to life without parole. The Capital Case Unit described below will increase the opportunities for inmates to participate in out-of-cell congregate activities. Instead of being out of the cell for one or two hours a day, the capital case inmates will be out a minimum of 20 hours weekly. The inmates at State Correctional Institution Graterford will be relocated the institution replacing it next door that is identified as Phoenix and is opening this season. The new Capital Case Unit is too new to estimate its effect on the cost differential between housing inmates in this unit compared to the general population.

*Capital Case Unit.* At this time, most capital case inmates (129) are housed at State Correctional Institution Greene, and most of the remainder (20) are at State Correctional Institution Graterford.[1329] The Capital Case Unit or "death row" is separate from the rest of the prison. The unit is not solitary confinement because, as stated above, death row inmates have the opportunity to participate in a minimum of twenty hours per week of congregate, out-of-cell activity. Activities include indoor or outdoor yard or recreation, meals and limited programs. Capital case inmates also have the opportunity to work as unit block workers, to have access to the law library, showers, telephone calls, non-contact visits and medical and mental health services in accordance with policy. Capital case inmates who have serious mental illness will continue to have enhanced opportunity to participate in out-of-cell treatment services. The increased out-of-cell opportunities may be restricted for individual inmates for disciplinary or administrative reasons.

---

[1326] *Id.*

[1327] *Id.*, Int'l Covenant on Civ. & Political Rights, http://www.ohchr.org/en/professionalinterest/pages/ccpr.aspx (1966).

[1328] *Id.*, 2d Optional Protocol to the Int'l Covenant on Civ. & Political Rights https://www.ohchr.org/EN/ProfessionalInterest/Pages/2ndOPCCPR.aspx (1989).

[1329] Pa. Dep't of Corrections, *supra* note 14. The Graterford ones are expected to be moved next door to Phoenix.

Death row inmates are housed in close proximity to each other. There is one inmate per cell. Contact between inmates is restricted. The walls are constructed so that almost no sound can travel from one cell to the next. Passing of materials from cell to cell is prohibited. Prisoners must present themselves for counting four times *per* day. It costs $15,010 more *per* year to house an inmate in the capital case unit than in general population.[1330]

All of an inmate's personal property must fit within two record boxes and a footlocker that fits under the bed. Any item an inmate receives must be handed back to the guard. For instance, the inmate can brush his teeth only with a toothbrush supplied by a correctional officer. When the inmate finishes, he must hand the brush to the correctional officer for inspection. This is to prevent an inmate from making the toothbrush into a weapon by, for example, sawing the handle into a point. Shaving razors must be closely inspected because inmates remove razor blades to make shanks. Inmates are permitted to shower three times *per* week.

Inmates are given three meals *per* day. Specific opportunities exist for inmates to have congregate meals on the unit. All other meals are provided to the inmates in their cells. As with general population inmates, there is one menu item available for each course. They may also have one piece of fruit in the cell.

The exercise periods are two hours *per* day. The floor of the exercise area is entirely concrete. Recreational equipment includes tennis balls, basketballs, playing cards and board games. There is also an In-Cell Art Program.

Three phone calls *per* week are permitted and must be requested from staff at least one day in advance of the call. Inmates are permitted one non-contact visit *per* week. Phone calls between the inmate and his lawyer do not count against the weekly quota, but they must be arranged in advance between the inmate and the lawyer at a specific time.

Much of the activity on death row is related to each inmate's legal cases. There is a law library within the unit, and inmates may visit the library in two-hour increments. They are permitted to bring along only their legal materials, and inspections ensure compliance with this rule. Mail related to legal work is inspected in the presence of the inmate to ensure that no contraband is being smuggled in and to prevent the staff from reading confidential communications.

If the death penalty was abolished and no statutory provision was included regarding the disposition of death row inmates, death row would be abolished as well, and the inmates would be merged into the general prison population. Departmental staff would evaluate each of the inmate's behavioral and mental health to determine their respective housing arrangements. Most would likely be housed in one or more arrangements that are less restrictive than death row, but more restrictive than general population, and if the inmate adjusted to the intermediate environment, he would be merged into the general population. Only prisoners whose record indicated major behavioral problems would continue under conditions similar to those that now obtain on death row.

---

[1330] Woodside, *supra* note 418.

The foregoing description of description of the Capital Case Unit was obtained in 2014 but is consistent with a description from a judicial ruling last year.[1331]

> The record establishes that, unlike those confined on death row, inmates in the general population have: Access to open air activities without strip searches; regular access to windows and natural light; daily access to showers; and the right to more frequent visits where contact is permitted. General population inmates also have access to group religious services, while death row inmates are limited to religious tapes. A variety of jobs and vocational programs—including clothing factory jobs, culinary training, and barbershop training—are limited to inmates in the general population. Likewise, group sport activities are reserved for the general population. General population inmates can make phone calls as frequently as their funds allow. On death row, outside of attorney calls, only three fifteen minute calls are allowed per week.[1332]

In March of 2018, the department changed the operation of its capital case units that allow capital case inmates to have the opportunity to participate in out-of-cell congregate activities for at least twenty (20) hours per week. The foregoing description includes these changes. Previously, the policy only generally provided capital case inmates with the opportunity to have 10-12 hours of yard time out of cell per week in a setting that was less conducive to congregate activity. Capital case inmates who have serious mental illness will continue to have enhanced opportunity to participate in out-of-cell treatment services. The capital case inmates remain separate from the remainder of the inmate population.

# Lethal Injection

The question that serves as the basis of the study of lethal injection in the administration of the death penalty in our Commonwealth is:

> Whether there are adequate procedures and protocols in place to assure that the death sentence is administered in accordance with requirements of the United States Constitution and the Constitution of the Commonwealth of Pennsylvania;[1333]

---

[1331] *Williams v. Pa. Sec'y of Corrections*, 848 F.3d 549, 554-55, 563 (3d. Cir. 2017)
[1332] *Id.* at 563.
[1333] Pa. S. Res. No. 6 (Sess. of 2011); appdx. A, *infra* p. 222.

Based upon a U.S. Supreme Court ruling[1334] and its application by U.S. Court of Appeals for the Third Circuit to Delaware's lethal injection procedures and protocols,[1335] Pennsylvania's similar procedures and protocols appear to be constitutional. Bolstering this assessment is the U.S. District Court grant of summary judgment to Secretary Wetzel because Pennsylvania's protocol did not have identified risks "very likely to cause . . . needless suffering in violation of" U.S. Const. amend. VIII.[1336]

These rulings are based upon particular facts related to the identification of the drugs used and the qualifications of those who administer the drugs. Although factual findings for Pennsylvania could differ from those found for Delaware and Kentucky, there is no obvious reason to expect them to. *E.g.*, one of the drugs used by Pennsylvania is commonly used to euthanize terminally ill patients. The staff volunteering to execute condemnees routinely inject prisoners intravenously with other controlled substances and would seemingly have the training and qualification to similarly inject a lethal dosage of the prescribed agent.[1337]

Based upon a U.S. Court of Appeals ruling,[1338] Pennsylvania's observational protocol appeared to be unconstitutional. Bolstering this assessment is the U.S. District Court's grant of a preliminary injunction forbidding the Commonwealth's secretary of corrections from obscuring parts of an execution because the plaintiff was likely to succeed on the merits of its claim of unconstitutionality.[1339] The recent protocol opens and closes curtains throughout the procedure so that observers would have only seen the condemnee strapped to a gurney and would never have seen any interaction between the condemnee and the executioners.[1340] This suit was settled by the parties so that the protocol was changed. Now "witnesses would be permitted to see and hear inside the lethal injection chamber from the time the condemned inmate enters the chamber until the time he/she is pronounced dead. During the last completed execution, in the late 1990's, witnesses were only permitted to see the inmate immediately before the administration of the lethal injection. They did not see the inmate enter the chamber, they did not see the inmate strapped down, etc."[1341]

---

[1334] *Baze v. Rees*, 553 U.S. 35 (2008). "It is not disputed that Pennsylvania uses the same three-drug protocol that Kentucky uses." *Chester v. Beard*, 657 F.Supp.2d 534, 543 n.9 (M.D.Pa. 2009). But by 2012, Department of Corrections "revised its lethal injection protocol". *Id.*, 2012 WL 4758346. (The protocol was revised in Aug. 2012. *Id.*, 2012 WL 5386129. It "supersedes all prior versions". *Id.*, 2012 WL 5389319.) This controlling opinion has subsequently been applied to a similar method of execution using a substituted drug. *Glossip v. Gross*, 135 S.Ct. 2726, 2732-34 (2015). This subsequent ruling found that petitioners' did not prove a substantial risk posed by the substituted drug compared to available alternative methods and the dist. ct. was not clearly erroneous in its factual finding that the substituted drug would not "result in severe pain and suffering." *Id.* at 2737-38.

[1335] *Jackson v. Danberg*, 594 F.3d 210, 222-23, 230 (3d Cir. 2010). Delaware's capital sentencing scheme was subsequently ruled unconstitutional on different grounds. *Rauf. v. Del*., 145 A.3d 430 (Del. 2016).

[1336] *Chester v. Wetzel*, 2015 WL 632374 at 10 (M.D.Pa. 2015).

[1337] *Id.*, 2012 WL 5439054 at 12 (M.D.Pa. 2012).

[1338] *Cal. 1st Amend. Coalition v. Woodford*, 299 F.3d 868, 875 (9th Cir. 2002).

[1339] *The Phila. Inquirer v. Wetzel*, 906 F.Supp.2d 362, 375 (M.D.Pa. 2012).

[1340] *Id.* at 364-65.

[1341] Barnes, *supra* note 159.

Pennsylvania's constitutional prohibition against cruel punishments is co-extensive with the U.S. constitutional prohibition against cruel and unusual punishment[1342] so that any distinction between the two authorities would be factual rather than legal. Factors that have not been analyzed for this are whether internal, departmental procedures suffice instead of regulations and the continued availability of the drugs.

A judicial challenge to the killing components of Pennsylvania's execution procedures and protocols is continuing in Commonwealth Court under a statutory rather than constitutional challenge; however, the subcommittee is unaware of any facts that would lead us it conclude that either ruling[1343] on either constitutional challenge is incorrect.

The Commonwealth's lethal injection protocol is confidential so that the subcommittee on procedure is uncertain what the current protocol is. Statutory confidentiality applies to the identity of departmental employees, contractors and victims participating in the execution.[1344] The protocol the subcommittee considered was the information published in judicial opinions ruling on litigation over its constitutionality.[1345] Some of these opinions are not reported but available electronically *via* a subscription to Westlaw. The protocol revealed in these judicial opinions do not violate the statute's confidentiality requirement and could be public, which the subcommittee on procedure advocates rather than a confidential one. The drugs used should appropriately be selected by qualified, professional expertise to be delivered humanely and ethically.

There are potential, practical problems with the current protocol so far as the subcommittee perceives it to be. The statute specifies "an ultrashort-acting barbiturate in combination with chemical paralytic agents".[1346] Sodium thiopental is an ultrashort-acting barbiturate[1347] but unavailable.[1348] The alternative, pentobarbital, is a short-acting barbiturate.[1349] Pancurium bromide is a chemical paralytic agent,[1350] but potassium chloride does not seem to be either an ultrashort-acting barbiturate or a chemical paralytic agent.[1351] These are the three drugs that might remain in the confidential protocol.[1352]

Department of Corrections might not have or be able to obtain these drugs. In September 2014, Governor Corbett issued a reprieve for Hubert Michael because the department did not have

---

[1342] *Commw. v. Zettlemoyer*, 454 A.2d 937, 967 (Pa. 1982).

[1343] The summary judgment for the execution; the other granting an injunction to expand the observational component.

[1344] 61 Pa.C.S. § 4305(c).

[1345] *Chester v. Wetzel*, 2012 WL 5439054 (M.D.Pa. 2012), 2015 WL 632374 (M.D.Pa. 2015); *The Phila. Inquirer v. Wetzel*, 906 F.Supp.2d 362 (M.D.Pa. 2012).

[1346] 61 Pa.C.S. § 4304(a)(1).

[1347] U.S. Nat'l Library of Med., Nat. Insts. of Health, PubChem, https://pubchem.ncbi.nlm.nih.gov/compound/thiopental (last visited June 12, 2018).

[1348] Am. Soc'y of Anesthesiologists, ASA Statement on Sodium Thiopental's Removal From the Market (Jan. 21, 2011).

[1349] U.S. Nat'l Library of Med., *supra* note 1300, https://pubchem.ncbi.nlm.nih.gov/compound/pentobarbital (last visited June 12, 2018).

[1350] *Id.*, https://pubchem.ncbi.nlm.nih.gov/compound/pancuronium_bromide#section=Top (last visited June 12, 2018).

[1351] *Id.*, https://pubchem.ncbi.nlm.nih.gov/compound/potassium_chloride (last visited June 12, 2018).

[1352] *Chester v. Wetzel*, 2015 WL 632374, at 2 (M.D.Pa. 2015).

the drugs to execute him.[1353]  Hampering the availability of lethal injection drugs for correctional departments is the denial of importation of misbranded and unapproved drugs.[1354]

Perhaps further affecting the viability of the lethal injection protocol, is the fact that numerous relevant organizations have taken positions that could hamper this method of execution.

- International Academy of Compounding Pharmacists "discourages its members from participating in the preparation, dispensing, or distribution of compounded medications for use in legally authorized executions."[1355]
- "The American Pharmacists Association discourages pharmacist participation in executions on the basis that such activities are fundamentally contrary to the role of pharmacists as providers of health care."[1356]
- "No physician should be compelled to participate in the process of establishing a prisoner's competence or be involved with treatment of an incompetent, condemned prisoner if such activity is contrary to the physician's personal beliefs."[1357]
- "[I]t is the ABA's position that an anesthesiologist should not participate in an execution by lethal injection and that violation of this policy is inconsistent with the Professional Standing criteria required for ABA Certification and Maintenance of Certification in Anesthesiology or any of its subspecialties.  As a consequence, ABA certificates may be revoked if the ABA determines that a diplomate participates in an execution by lethal injection."[1358]
- "The American Nurses Association . . . opposes both capital punishment and nurse participation in capital punishment."[1359]
- "NAEMT is strongly opposed to participation in capital punishment by an EMT, paramedic or other emergency medical practitioners.  Participation in executions is viewed as contrary to the fundamental goals and ethical obligations of emergency medical services."[1360]

---

[1353] Pa. Dep't of Corrections, *supra* note 7; Mark Berman, *Pa.  Execution Delayed Because the State Doesn't Have Lethal Injection Drugs*, Wash. Post, Sept. 12, 2014, https://www.washingtonpost.com/news/post-nation/wp/2014/09/12/pennsylvania-execution-delayed-because-the-state-doesnt-have-lethal-injection-drugs/?noredirect=on&utm_term=.b1f41438a977.

[1354] *Cook v. Food & Drug Admin.*, 733 F.3d 1, 10, 12 (D.C.Cir. 2013).

[1355] Int'l Acad. of Compounding Pharmacists, IADC Adopts Position on Compounding of Lethal Injection Drugs (Mar. 24, 2015),

https://c.ymcdn.com/sites/www.iacprx.org/resource/resmgr/Media/Press_Release_Compounding_fo.pdf.

[1356] APhA, APhA House of Delegates Adopts Policy Discouraging Pharmacist Participation in Execution (Mar. 30, 2015), https://www.pharmacist.com/press-release/apha-house-delegates-adopts-policy-discouraging-pharmacist-participation-execution.

[1357] Am. Med. Ass'n, Code of Med. Ethics Opinion 9.7.3, https://www.ama-assn.org/delivering-care/capital-punishment (last visited June 13, 2018).

[1358] The Am. Bd. of Anesthesiology, Inc., Anesthesiologists & Capital Punishment Commentary (2014), http://www.theaba.org/PDFs/BOI/CapitalPunishmentCommentary.

[1359] Am. Nurses Ass'n, Capital Punishment & Nurses' Participation in Capital Punishment Position Statement (2016), https://www.nursingworld.org/~4af078/globalassets/docs/ana/ethics/capital-punishment-position-statement_2017.pdf.

[1360] NAEMT, NAEMT Position Statement:  EMT or Paramedic Participation in Capital Punishment (Jan. 26, 2010), http://www.naemt.org/docs/default-source/advocacy-documents/positions/1-26-10_EMT_or_Paramedic_Participation_in_Capital_Punishment.pdf?sfvrsn=3718628f_0.

- "Because of ancient and modern principles of medical ethics, legal execution should not necessitate participation by an anesthesiologist or any other physician. . . . ASA continues to agree with the position of the American Medical Association on physician involvement in capital punishment. ASA strongly discourages participation by anesthesiologists in executions."[1361]
- "The correctional health professional should: . . . [n]ot be involved in any aspect of execution of the death penalty."[1362]

Apparently, the protocol requires all members of the lethal injection team to "be trained health care professionals", and Department of Corrections obtains drugs from a compounding pharmacy if they are unavailable from a pharmaceutical factory.[1363]

### Recommendation

The subcommittee on procedure recommends that the lethal injection protocol:

1) Be public rather than confidential information.
2) Use an appropriate and effective drug selected by qualified professional expertise to execute humanely and be ethically delivered.
3) Comply with applicable statutory law.

# Public Opinion

The question that serves as the basis of the study of public opinion in the administration of the death penalty in our Commonwealth is:

The opinions of Pennsylvania residents regarding capital punishment, including whether it is a just and appropriate punishment and, if so, under what circumstances should it be imposed;[1364]

To determine Pennsylvania residents' opinions about capital punishment, six public opinion polls were analyzed about the death penalty. Two were conducted nationally: the 2016 Pew Research Center poll and the 2017 Gallup poll; and four surveyed only Pennsylvania residents: the 2013 Pennsylvania State University poll, the 2015 Public Policy Polling poll, the 2015 Office of Victim Advocate poll, and the 2016 Pennsylvania State University poll. Below is a detailed breakdown of the findings of all six of these polls.

---

[1361] Am. Soc'y of Anesthesiologists, Statement on Physician Nonparticipation in Legally Authorized Executions (last amended Oct. 26, 2016), http://www.asahq.org/quality-and-practice-management/standards-guidelines-and-related-resources/statement-on-physician-nonparticipation-in-legally-authorized-executions.
[1362] Am. Correctional Health Servs. Ass'n, Mission & Ethics Statement, http://www.achsa.org/mission-ethics-statement/ (last visited June 14, 2018).
[1363] *Chester v. Wetzel*, 2015 WL 632374, at 1, 2 (M.D.Pa. 2015).
[1364] Pa. S. Res. No. 6 (Sess. of 2011); appdx. A, *infra* p. 222.

It can be difficult and imprecise to compare polling from different years, asking different questions and sampling different populations, but they could be perceived as collectively showing:

1) A majority of Pennsylvanians support the death penalty.
2) Support for the death penalty is declining.
3) A significant proportion of the population supports the idea of the death penalty but is opposed to the death penalty as a matter of public policy because more respondents favor the death penalty when asked for or against, but that percentage drops when given the option of life imprisonment or death as a penalty.

### National polls

***2016 Pew Research Center Poll.*** Pew Research Center has conducted a national poll on the death penalty periodically since 1996, with the most recent edition of the poll conducted in 2016.[1365] The poll asks respondents "Do you strongly favor, favor, oppose or strongly oppose the death penalty for persons convicted of murder?"[1366] The 2016 edition of the survey was conducted by random telephone interviews of "1,201 adults . . . living in all 50 U.S. states and the District of Columbia".[1367] The poll had a margin of error of 3.2%.[1368]

The 2016 edition of the poll found that 49% of respondents favored the death penalty, and 42% of respondents opposed it.[1369] This was the lowest level of support and highest level of opposition for the death penalty in any edition of the poll.[1370] It was also the first edition where a majority of respondents did not indicate that they support the death penalty.[1371] Comparing the 2016 edition of the poll to the 2011 edition shows that support for the death penalty declined 13% and opposition for the death penalty increased by 11% over this time period.[1372]

Other findings from the survey include:

- The most common response given by respondents was that they "oppose" the death penalty (28%), followed closely by "favor" (27%), "strongly favor" (21%), and "strongly oppose" (14%).[1373]

- Men (55%) were more likely to favor the death penalty than women (43%).[1374]

---

[1365] Pew Research Ctr., Late Aug. 2016 RDD Nonresponse Survey: Final Topline, http://assets.pewresearch.org/wp-content/uploads/sites/12/2016/09/Death-penalty-topline-for-release.pdf.
[1366] *Id.*
[1367] *Id.*, Methodology (2016), http://assets.pewresearch.org/wp-content/uploads/sites/12/2016/09/Death-penalty-methodology.pdf.
[1368] *Id* at 2.
[1369] *Id.*, *Support for the Death Penalty Lowest in More than Four Decades* (Sept. 29, 2016), http://www.pewresearch.org/fact-tank/2016/09/29/support-for-death-penalty-lowest-in-more-than-four-decades/.
[1370] *Id.*, *supra* note 1365, at 1.
[1371] *Id.*
[1372] *Id.*
[1373] *Id.*
[1374] *Id.*, *supra* note 1369.

- White respondents were most likely to favor the death penalty (57%), followed by Hispanic respondents (36%) and Black respondents (29%).[1375]

- Respondents age 50-64 were most likely to favor the death penalty (54%). Respondents age 18-29 were least likely to support the death penalty (42%). Fifty percent of respondents both age 30-49 and 65 or older favored the death penalty.[1376]

- College graduates were less likely to favor the death penalty (42%) than respondents with a high school degree or less (51%) or some college experience but no degree (52%).[1377]

- Republicans were most likely to favor the death penalty (72%), followed by Independents (44%) and Democrats (34%).[1378]  However, the percentage of respondents who favor the death penalty has decreased for all three political affiliations. The percentage of respondents who favor the death penalty in the 2016 edition of the poll was 15 percentage points lower for Republicans, 35 percentage points lower for Independents, and 37 percentage points lower for Democrats.[1379]

- Respondents who indicated that they are Catholic were more likely to oppose the death penalty (46%) than favor it (43%).[1380]  Respondents identifying as white Evangelicals were more likely to favor the death penalty (69%) than respondents identifying themselves as white mainline Christians (60%).[1381]

*2017 Gallup Poll.*  Gallup has conducted a national poll on the death penalty periodically since 1937, and at least once per year since 1999.[1382]  The poll asks respondents "Are you in favor of the death penalty for a person convicted of murder?"[1383]  The 2017 edition of the poll was conducted by random telephone interviews of 1,028 "adults . . . living in all 50 U.S. states and the District of Columbia."[1384] The poll had a margin of error of 4.0%.[1385]

The 2017 edition of the poll found that a majority (55%) of respondents favor the death penalty.[1386]  However, this is lowest level of support in any edition of the poll since 1972.[1387] There have been 35 editions of the poll since the two in 1972.[1388]  The percentage of respondents indicating that they support the death penalty has steadily declined since 1994, when 80% of

---

[1375] *Id.*

[1376] *Id.*

[1377] *Id.*

[1378] *Id.*

[1379] *Id.*

[1380] *Id.*

[1381] *Id.*

[1382] Gallup, The Death Penalty, http://news.gallup.com/poll/1606/Death-Penalty.aspx (last visited June 11, 2018).

[1383] *Id.*

[1384] *Id.*, *U.S. Death Penalty Support Lowest Since 1972*, Gallup, (Oct. 26, 2017), http://news.gallup.com/poll/221030/death-penalty-support-lowest-1972.aspx.

[1385] *Id.*

[1386] *Id.*

[1387] *Id.*

[1388] Gallup, *supra* note 1382.

respondents indicated that they support the death penalty.[1389] The majority of this decline has occurred over the last ten years.[1390]

Additional findings of the 2017 edition of the poll include:

- A slight majority (51%) of respondents believe that the death penalty is being applied fairly, with 43% of respondents believing that it is being applied unfairly.[1391]

- When asked about the frequency with which the death penalty is being imposed, 39% of respondents said that it is being imposed "not enough." The same proportion of respondents (26%) indicated that it is being imposed "too often" or the "right amount".[1392]

- Respondents indicating that they were Republicans were most likely to support the death penalty (72%), followed by Independents (58%) and Democrats (39%).[1393]

*State polls*

**2015 Public Policy Polling (PPP) Poll.** The 2015 PPP poll was commissioned by Eric Ling, Associate Professor of Criminal Justice at York College of Pennsylvania.[1394] A total of 632 Pennsylvanians were surveyed by telephone.[1395] The poll had a margin of error of 4.2%.[1396]

Respondents were asked "Which punishment do you prefer for people convicted of murder: life in prison with no possibility of parole, life in prison with a chance of parole after at least 40 years, life in prison with a chance of parole after at least 20 years, or the death penalty?"[1397] The death penalty received the most responses (42%).[1398] However, the majority of respondents (54%) indicated that they would prefer a sentence other than the death penalty: 32% prefer life in prison with no possibility of parole, 13% prefer life in prison with a chance of parole after at least 40 years, and 9% prefer life in prison with a chance of parole after at least 20 years.[1399]

---

[1389] *Id.*

[1390] *Id.*

[1391] *Id.*

[1392] *Id.*

[1393] Gallup, *supra* note 1384.

[1394] Jan Murphy, *Death Penalty Losing Public Support in Pa., Poll Shows*, PennLive, (Mar. 25, 2015), http://www.pennlive.com/politics/index.ssf/2015/03/life_in_prison_preferred_over.html.

[1395] *Id.*

[1396] *Id.*

[1397] Pub. Policy Polling, Pa. Results, at 1, https://www.scribd.com/document/259858723/Pennsylvania-Death-Penalty-Results-3-23-15.

[1398] *Id.*

[1399] *Id.*

Other findings of the study include:

- The majority of respondents (70%) believed that the death penalty was cheaper than life in prison without parole.[1400] As discussed in this report, the evidence suggests that the death penalty is in fact more expensive than life in prison without parole.[1401]

- More than three-quarters of respondents (78%) indicated that they would be "very likely" or "somewhat likely" to support a candidate for political office if they disagreed with the candidate's position on the death penalty, provided that the respondent and candidate agreed on most other issues and were members of the same political party.[1402] Only 4% of respondents indicated that they would be "very unlikely" to support a candidate under these parameters.[1403]

- Men (48%) were more likely to prefer the death penalty than women (37%).[1404]

- Republicans (56%) were most likely to prefer the death penalty, followed by Independents (41%) and Democrats (30%).[1405]

- Republicans (80%) were more likely than Democrats (65%) to believe that the death penalty costs taxpayers more than life in prison without parole.[1406]

- More than twice as many white respondents (45%) prefered the death penalty than did African American respondents (22%).[1407]

- Respondents identifying as age "18-45" were most likely to prefer the death penalty (46%). Respondents identifying as "older than 65" were least likely to prefer the death penalty (36%).[1408]

- When broken down into demographic groups by sex, age, race, and political affiliation, Republicans were the only demographic group with a majority of respondents indicating that they prefer the death penalty (56%).[1409]

*The Spring 2016 Pennsylvania State University Poll.* The Spring 2016 Pennsylvania State University Poll randomly surveyed 600 adult Pennsylvania residents, generating 517 unique responses to two questions: 1. "Do you favor o[r] oppose the death penalty for persons convicted

---

[1400] *Id.*
[1401] *Supra* pp. 35-58.
[1402] Pub. Policy Polling, *supra* note 1397.
[1403] *Id.*
[1404] *Id.* at 3.
[1405] *Id.* at 4.
[1406] *Id.*
[1407] *Id.* at 5.
[1408] *Id.* at 6.
[1409] *Id.* at 1-6.

of murder?", and 2. "What is the main reason or reasons for your position on the death penalty?"[1410] The poll was conducted by telephone and had a margin of error of 4.0%.[1411]

The majority of respondents (58%) indicated that they favored the death penalty for persons convicted of murder.[1412] Nearly one-third (31%) of respondents indicated that they opposed the death penalty, and 11% of respondents neither favored nor opposed the death penalty.[1413] Among respondents who favored the death penalty, the majority (57%) indicated that "crime severity, deterrence, and/or revenge" was the reason for their position.[1414] Among respondents who opposed the death penalty, the majority (54%) indicated that "religion and/or what they considered to be moral" was the reason for their position.[1415] Justice and cost were cited by both those who supported the death penalty (25%) and those who opposed it (29%) as reasons for their position.[1416]

***The Spring 2013 Pennsylvania State University Poll.*** The Spring 2013 Pennsylvania State University Poll (Poll) was conducted by the Center for Survey Research (CSR) at The Pennsylvania State University Harrisburg.[1417] A total of 604 adult Pennsylvanians were interviewed by telephone.[1418] To ensure that the results of the Poll were not biased toward any demographic group, the results of the survey were checked against the known occurrences of the demographic characteristics of the population using data from the U.S. Bureau of the Census.[1419]

The questions in this poll were sponsored by Joint State Government Commission as part of this study. The first question asked, "Do you think the death penalty is ever just and appropriate as the penalty for intentional murder in Pennsylvania?"[1420] This question was based upon the question in the resolution but inserted the word, ever, to try to reflect the current practice of its relatively rare use. Whether and how much this extra word impacted the results is unknown. The second question asked, "Does your attitude towards the death penalty for persons convicted of intentional murder depend on any of the following circumstances?"[1421] The circumstances offered were the characteristics of the victim and the murderer as well as the reasons for the murder and how it was carried out.[1422] The final question asked, "If a person is convicted of intentional murder, which sentence would you choose?"[1423] The sentencing options were life imprisonment with no chance of parole, the death penalty and it depends on the circumstances.[1424] Before the questions were asked, intentional murder was explained.[1425]

---

[1410] Pa. State Harrisburg, *Pennsylvanians Perspectives on Capital Punishment* 1,

https://csr.hbg.psu.edu/Portals/44/Research%20Brief_Capital%20Punishment_2017.pdf (last visited June 12, 2018).

[1411] *Id* at 3.

[1412] *Id* at 1.

[1413] *Id*

[1414] *Id* at 2.

[1415] *Id*.

[1416] *Id*.

[1417] Ctr. for Survey Research, Pa. State Harrisburg, *Spring 2013 Pa. State Poll: Rep. of Findings & Methodology* 1 (2013) (on file with Pa. J. State Gov't Comm'n).

[1418] *Id.*

[1419] *Id.* at 12-14.

[1420] *Id.* at 18.

[1421] *Id.*

[1422] *Id.*

[1423] *Id.*

[1424] *Id.*

[1425] *Id.* at 17.

Overall, "almost three quarters of Pennsylvanians surveyed (72.3%)" thought that

the death penalty is a just and appropriate penalty for intentional murder in the
Commonwealth. Most respondents indicated they would change their attitude
towards the death penalty for those convicted of intentional murder based on how
the murder was carried out (21.6%) and the reasons for the murder (18.3%). Over
half of Pennsylvanians surveyed (53.5%) stated that the circumstances of an
intentional murder would determine what type of sentence they would ultimately
choose.[1426]

Other findings of the survey include the following:[1427]

- Men (77.9%) were more likely than women (67.0%) to support the death penalty for
  intentional murder.

- Regardless of age, most respondents felt the death penalty was an appropriate penalty
  for intentional murder. Respondents age 45-54 had the highest proportion of support
  for the death penalty for intentional murder (79.3%).

- White respondents (75.2%) were more likely to support the death penalty for
  intentional murder than African American respondents (51.9%). However, African
  American respondents stated that their attitude toward the death penalty would change
  based on how the murder was carried out (45.3%).

- Non-Hispanic respondents (73.1%) were much more likely to support the death penalty
  for intentional murder than Hispanic respondents (37.0%). However, Hispanic
  respondents stated that their attitude toward the death penalty would change based on
  the characteristics of the victim (32.0%).

- Respondents who resided in households with a higher annual income were more likely
  to support the death penalty for intentional murder. Respondents with a household
  income of $75,000 to $99,999 annually had the highest proportion of support for the
  death penalty for intentional murder (87.9%).

- Respondents with less education were more likely to support the death penalty for
  intentional murder. Over three quarters of respondents with a high school diploma or
  GED (82.8%) supported the death penalty for intentional murder. Only 61.6% of
  respondents with graduate level education felt the same way.

- Respondents in northern Pennsylvania (regions 3 (91.6%) and 6 (79.8%)) were most
  likely to support the death penalty for intentional murder.

---

[1426] *Id.* at 2.
[1427] *Id.*

***Office of Victim Advocate.*** In spring 2015, Office of Victim Advocate sent surveys to 418 registered crime victims whose offenders were under a sentence of death. The response rate was approximately 40%.[1428] This poll had overwhelming support for the death penalty, but this was not a survey of the general population nor a survey of registered crime victims in first-degree murder cases in which the death penalty was sought but not returned and registered crime victims in first-degree murder cases in which the death penalty was not sought.

| Survey Statement | Response Rates |
|---|---|
| I support the death penalty. | 80.1% Strongly Agree<br>91% Strongly Agree or Agree<br>5.1% Disagree or Strongly Disagree |
| I feel the sentence imposed by the courts in my case should be carried out. | 87.2% Strongly Agree<br>93.6% Strongly Agree or Agree<br>3.8% Disagree or Strongly Disagree |
| I had the opportunity to voice my wishes during the sentencing phase of my trial regarding the execution of the offender. | 60.7% Strongly Agree or Agree<br>23.6% Disagree or Strongly Disagree |
| I would support abolishing the death penalty if it means the offender would remain separate from general population (i.e., a version of death row would remain), and that the offender would receive a life sentence without the possibility of parole. | 63.2% Disagree or Strongly Disagree<br>28.4% Strongly Agree or Agree |
| There should be specific timeframe on the appeals process for death penalty cases. | 91.6% Strongly Agree or Agree<br>3.9% Disagree or Strongly Disagree |

*Conclusions*

1. <u>A majority of Americans and Pennsylvanians favor the death penalty</u>. In all six polls, respondents most frequently indicated that they support or prefer the death penalty. In four of the six polls, a majority of respondents (greater than 50%) supported or preferred the death penalty.

2. <u>Support for the death penalty is declining</u>. The polls presented show that support and preference for the death penalty is declining. This decline has been steady since the

---

[1428] The Office of Victim Advocate Testimony, Pa. H.R. Comm. on the Judiciary (June 11, 2015), http://www.legis.state.pa.us/WU01/LI/TR/Transcripts/2015_0113_0006_TSTMNY.pdf.

late 1990s, but has been more pronounced over the past few years. Between 2014 and 2017, respondents who "favor" the death penalty in Gallup's poll declined by 8 percentage points.[1429] Between 2011 and 2016, the percentage of respondents who favor the death penalty in Pew Research Center's poll declined by 13 percentage points.[1430] The decline in support for the death penalty seen in the last two editions of both the Gallup and Pew Research Center poll is particularly steep. The percentage of respondents who favored the death penalty was 5 percentage points lower in the 2017 Gallup poll than it was in the 2016 edition.[1431] Support for the death penalty was 7 percentage points lower in the 2016 Pew Research Center poll than it was in the 2015 edition.[1432]

The decline in support for the death penalty is most obvious in the Pennsylvania State University poll. In the 2016 edition of the poll, support for the death penalty among Pennsylvanians was 14 percentage points lower than it had been in the 2013 edition of the poll, but the questions differed.

3. <u>Support for the death penalty is higher in theory than in practice</u>. Most of the polls discussed only provided the option to choose whether they support or oppose the death penalty. However, some polls allow respondents to select the punishment that they prefer for those convicted of murder (*e.g.* death penalty or life in prison without parole). Support for the death penalty might be higher among respondents when given the either-or option of favoring or opposing the death penalty than it is in polls where respondents are able to select their preferred punishment. The 2015 Public Policy Poll offered respondents the ability to select a preferred punishment and showed significantly lower support for the death penalty than did the other polls examined.

This difference persists in the different editions of the Gallup poll. In some years the Gallup poll asked respondents to indicate if they prefer the death penalty or life in prison without parole as a punishment for murder. The most recent instance was in 2014, but it goes back to 1985.[1433] In that edition, the percentage of respondents who said they "favor" the death penalty (63%) was 13 percentage points higher than the percentage of respondents who said that they preferred the death penalty when given the option to choose the death penalty or life in prison without parole (50%).[1434]

This suggests that a significant proportion of the population might favor the idea of the death penalty as a punishment for murder, but does not support it as a matter of public policy. Evidence from the 2015 Public Policy Polling poll and the 2014 Gallup poll, combined with the recent decline in support for the death penalty found across some polls in the last few years, indicate a growing preference among some for a punishment other than death for murder.

---

[1429] Gallup, *supra* note 1382.
[1430] Pew Research Ctr., *supra* note 1365.
[1431] Gallup, *supra* note 1382.
[1432] Pew Research Center, *supra* note 1365.
[1433] Gallup, *supra* note 1382.
[1434] *Id*.

*A Sample of Religious Positions on the Death Penalty*

The subcommittee on impact is including a sample of the religious perspective of different faiths and denominations to supplement the including polling data to further reflect the opinions of Pennsylvania residents.  It is also partially informative of and responsive to the resolution's inquiry relating to the death qualification of jurors at capital trials "and the impact of this practice on the ability of . . . people of faith to serve on capital juries".[1435]

- **Reform Judaism:**  "Since 1959, the Central Conference of American Rabbis . . . and the Union for Reform Judaism . . . have formally opposed the death penalty."[1436]

- **Pennsylvania Catholic Conference:**  "We oppose capital punishment not just for what it does to those guilty of horrible crimes but for what it does to all of us as a society.  Increasing reliance on the death penalty diminishes all of us and is a sign of growing disrespect for human life."[1437]

- **American Baptist Churches:**  "[T]he General Board of the American Baptist Churches recommends the abolition of capital punishment in those states which still practice it and urges churches and members of our American Baptist constituency to support groups and agencies working for the abolition of capital punishment in those governmental jurisdictions of the U.S. where it is still authorized by law."[1438]

- "**The Church of Jesus Christ of Latter-day Saints** regards the question of whether and in what circumstances the state should impose capital punishment as a matter to be decided solely by the prescribed processes of civil law.  We neither promote nor oppose capital punishment."[1439]

- **Episcopal Church**:  "*Resolved*, That this 70th General Convention of the Episcopal Church urge the provinces, dioceses, parishes, missions, and individual members of this Church to engage in serious study on the subject of capital punishment and work actively to abolish the death penalty in their states."[1440]

---

[1435] Pa. S. Res. No. 6 (Sess. of 2011); appdx. A, *infra* p. 220.  *Supra* pp. 11, 146.

[1436] Religious Action Ctr. of Reform Judaism, Position of the Reform Movement on the Death Penalty (2018), https://rac.org/position-reform-movement-death-penalty.

[1437] Pa. Catholic Conf., Death Penalty: Choose Life (2017), https://www.pacatholic.org/bishops-statements/death-penalty-choose-life/.

[1438] Am. Baptist Resolution on Capital Punishment (last modified Sept. 2000), http://www.abc-usa.org/wp-content/uploads/2012/06/Capital-Punishment.pdf.

[1439] The Church of Jesus Christ of Latter-day Saints, Newsroom: Capital Punishment (2018), https://www.mormonnewsroom.org/official-statement/capital-punishment.

[1440] The Archives of the Episcopal Church, The Acts of Convention (1991), https://episcopalarchives.org/cgi-bin/acts/acts_resolution.pl?resolution=1991-D056.

- **Evangelical Lutheran Church of America:** *"The Death Penalty* stands in the Lutheran tradition recognizing that God entrusts the state with the power to take human life when failure to do so constitutes a clear danger to the common good. Never-the-less, it expresses ELCA opposition to the use of the death penalty, one that grows out of ministry with and to people affected by violent crime.

  The statement acknowledges the existence of different points of view within the church and society on this question and the need for continued deliberation, but it objects to the use of the death penalty because it is not used fairly and has failed to make society safer."[1441]

- **Religious Society of Friends:** *"*The Friends Committee on National Legislation seeks abolition of the death penalty because we believe that state-sanctioned killing denies the sacredness of human life and violates our belief in the human capacity for change."[1442]

- **The United Methodist Church:** "We believe the death penalty denies the power of Christ to redeem, restore and transform all human beings. . . . . For this reason, we oppose the death penalty . . . and urge its elimination from all criminal codes."[1443]

---

[1441] Evangelical Lutheran Church in Am., Death Penalty (adopted 1991), http://www.elca.org/Faith/Faith-and-Society/Social-Statements/Death-Penalty?_ga=2.54176872.196555638.1529000761-89576762.1529000761.

[1442] Friends Comm. on Nat'l Legis., Moral & Practical Reasons to End the Death Penalty (2018), https://www.fcnl.org/updates/moral-and-practical-reasons-to-end-the-death-penalty-114.

[1443] The U. Methodist Church, Social Principles: The Political Community (2018), http://www.umc.org/what-we-believe/political-community.

**Appendix A:**
    Senate Resolution No. 6 ................................................................. 217
**Appendix B:**
    State-By-State Survey of Aggravating Circumstances for Capital Punishment .......... 223
**Appendix C:**
    State-By-State Survey of Mitigating Circumstances for Capital Punishment ............ 227
**Appendix D:**
    State-By-State Survey of State Clemency Process
        in Death Penalty Sentences .................................................... 229
**Appendix E:**
    State-By-State Survey of Clemency Actions – Commutation
        in Capital Cases During The Time Period 1977-2018 ........................... 235
**Appendix F:**
    Pennsylvania Capital Cases .................................................... 237
**Appendix G:**
    State-By-State Survey of Prohibition Against Capital Punishment
        for Defendants With Intellectual Disabilities .......................... 239
**Appendix H:**
    Zajac and Winger Report ....................................................... 243
**Appendix I:**
    Profile of Pennsylvania Inmates Under Death Sentence ........................... 255
**Appendix J:**
    Amounts Appropriated to Supplement the Sum Appropriated
        for Pa. Commission on Crime & Delinquency ....................... 257
**Appendix K:**
    Ratio of Execution to Life Sentences by Pa. County .................................. 261
**Appendix L:**
    Timeline of Capital Punishment Study by Justice Center for Research ..................... 263
**Appendix M:**
    Pa. Sup. Ct. Comm. on Racial & Gender Bias
        in the Justice System, Selected Recommendations ................................. 265

**THE GENERAL ASSEMBLY OF PENNSYLVANIA**

# SENATE RESOLUTION

## No. 6     Session of 2011

INTRODUCED BY GREENLEAF, ERICKSON, PIPPY, D. WHITE, LEACH,
FERLO, WASHINGTON, WILLIAMS AND WOZNIAK, JANUARY 12, 2011

SENATOR GREENLEAF, JUDICIARY, AS AMENDED, DECEMBER 6, 2011

A RESOLUTION

1  Directing the Joint State Government Commission to establish a
2     bipartisan task force and an advisory committee to conduct a
3     study of capital punishment in this Commonwealth and to
4     report their findings and recommendations.

5     WHEREAS, In 1972, the Pennsylvania Supreme Court declared

6  Pennsylvania's capital sentencing procedure unconstitutional

7  based on the United States Supreme Court's *Furman v. Georgia*

8  decision; and

9     WHEREAS, In 1978, the Pennsylvania General Assembly responded

10 by reinstating capital punishment in compliance with United

11 States and Pennsylvania Supreme Court rulings; and

12    WHEREAS, Since 1978, 352 people have been sentenced to death

13 in Pennsylvania but only three people have been executed; and

14    WHEREAS, Each of the three people executed waived the right

15 to appeal; and

16    WHEREAS, There are more than 220 existing capital sentences;

17 and

18    WHEREAS, Questions are frequently raised regarding the costs,

19 deterrent effect and appropriateness of capital punishment; and

1    WHEREAS, The American Bar Association has identified several
2  areas in which Pennsylvania's death penalty system falters in
3  guaranteeing each capital defendant fairness and accuracy in all
4  proceedings; and

5    WHEREAS, The Pennsylvania Supreme Court Committee on Racial
6  and Gender Bias in the Justice System has determined that
7  racial, ethnic and gender biases exist and that those biases
8  significantly affect the way parties, witnesses, litigants,
9  lawyers, court employees and potential jurors are treated; and

10    WHEREAS, THE JUSTICE CENTER FOR RESEARCH AT THE PENNSYLVANIA    ←
11  STATE UNIVERSITY, IN CONJUNCTION WITH THE PENNSYLVANIA
12  INTERBRANCH COMMISSION ON GENDER, RACIAL AND ETHNIC FAIRNESS, IS
13  CONDUCTING A STUDY OF THE ADMINISTRATION OF THE DEATH PENALTY IN
14  PENNSYLVANIA AND HAS EXPRESSED INTEREST IN COLLABORATING WITH
15  THE TASK FORCE AND ADVISORY COMMITTEE ESTABLISHED BY THIS
16  RESOLUTION; AND

17    WHEREAS, Postconviction DNA testing has shown that there are
18  wrongful convictions, even in capital cases; therefore be it

19    RESOLVED, That the Senate direct the Joint State Government
20  Commission to establish a bipartisan task force of four members
21  of the Senate to conduct a study of capital punishment in this
22  Commonwealth; and be it further

23    RESOLVED, That the President pro tempore of the Senate
24  appoint two members of the task force and the Minority Leader of
25  the Senate appoint two members of the task force; and be it
26  further

27    RESOLVED, That the Joint State Government Commission oversee
28  the creation of an advisory committee to assist the task force
29  in conducting the study and making recommendations; the advisory
30  committee to have approximately 30 members and be comprised of

representatives from those groups most likely to make useful and
insightful contributions, such as representatives of the
judiciary, prosecution, defense, law enforcement, corrections,
victim assistance organizations and also representatives of
academia, the faith community, private and public organizations
involved in criminal justice issues and other criminal justice
experts; and be it further

RESOLVED, That the task force, with the assistance of the
advisory committee, conduct a study of the following subjects
including:

(1)  Cost: Whether there is a significant difference
between the cost of the death penalty from indictment to
execution and the cost of life in prison without parole; in
considering the overall cost of the death penalty in
Pennsylvania, the cost of all the capital trials that result
in life sentences as well as death sentences that are
reversed on appeal must be factored into the equation;

(2)  Bias and unfairness: Whether the selection of
defendants for capital trials in Pennsylvania is arbitrary,
unfair or discriminatory in any way and whether there is
unfair, arbitrary or discriminatory variability at any stage
in the process including in the sentencing phase;

(3)  Proportionality: Whether there is a significant
difference in the crimes of those selected for the punishment
of death as opposed to those who receive life in prison and
whether there is an adequate process for determining when
death sentences are excessive or out of line with sentences
imposed in other cases where a sentence other than death was
imposed;

(4)  Impact on and services for family members: The

1    impact of the death penalty on family members and loved ones

2    of murder victims and the availability and cost of services

3    currently being provided in Pennsylvania for family members

4    and loved ones of murder victims and whether these services

5    are sufficient to meet the needs of surviving families;

6        (5)  Mental retardation: Whether, in light of the Supreme

7    Court ruling in *Atkins v. Virginia*, there are adequate

8    procedural protections in place to assure that people with

9    mental retardation are not in fact being sentenced to death

10   and executed;

11       (6)  Mental illness: Whether persons suffering from

12   mental illness constitute a disproportionate number of those

13   on death row, what criteria should be used in judging the

14   level of mental illness involved and whether people with

15   mental illness who are convicted of murder should be

16   executed;

17       (7)  Juries: The impact on the reliability and fairness

18   of capital trials of death qualifying jurors and the impact

19   of this practice on the ability of women, people of color and

20   people of faith to serve on capital juries; whether there are

21   adequate procedural protections and remedies in place to make

22   sure that women and African Americans are not excluded from

23   serving as jurors in capital cases; and whether there are

24   adequate procedural protections in place to assure that

25   jurors are able to understand and apply instructions in

26   determining guilt or innocence and the appropriate punishment

27   in a capital case;

28       (8)  State appeals and postconviction: Whether there are

29   adequate procedures in place to assure that serious error in

30   capital cases is identified and corrected and to what extent

1 procedural doctrines, such as waiver or forfeiture, operate
2 to prevent judicial review of serious constitutional claims
3 on the merits;

4     (9)  Clemency: Whether the current clemency process has
5 procedures in place to assure that it functions as a safety
6 net to assure that factual and procedural errors that
7 directly undermine the reliability and fairness of a capital
8 sentence are remedied;

9     (10)  Penological intent: Whether the death penalty
10 rationally serves a legitimate penological intent such as
11 public safety or deterrence;

12     (11)  Innocence: Whether there is a risk of execution of
13 an innocent person and whether there are adequate procedural
14 protections in place to prevent an innocent person from being
15 sentenced to death and executed;

16     (12)  Alternatives: Whether alternatives to the death
17 penalty exist that would sufficiently ensure public safety
18 and address other legitimate social and penological
19 interests;

20     (13)  Counsel: The quality of counsel provided to
21 indigent capital defendants and whether such counsel and the
22 process for providing counsel assures the reliability and
23 fairness of capital trials;

24     (14)  Secondary trauma: The impact of the death penalty
25 process on law enforcement, prosecutors, defense counsel,
26 judges, jurors, correctional officers, family members and
27 loved ones of victims and family members of the accused;

28     (15)  Length and conditions of confinement on death row:
29 Whether the conditions comply with the requirements of the
30 United States Constitution, the Constitution of the

1 Commonwealth of Pennsylvania and standards of international
2 law and the impact of those conditions on correctional
3 officers;

4    (16)  Lethal injection: Whether there are adequate
5 procedures and protocols in place to assure that the death
6 sentence is administered in accordance with requirements of
7 the United States Constitution and the Constitution of the
8 Commonwealth of Pennsylvania; and

9    (17)  Public opinion: The opinions of Pennsylvania
10 residents regarding capital punishment, including whether it
11 is a just and appropriate punishment and, if so, under what
12 circumstances should it be imposed;

13 and be it further

14    RESOLVED, THAT THE TASK FORCE AND ADVISORY COMMITTEE    ←
15 COLLABORATE WITH THE JUSTICE CENTER FOR RESEARCH AT THE
16 PENNSYLVANIA STATE UNIVERSITY IN CONDUCTING A STUDY OF THE
17 ADMINISTRATION OF THE DEATH PENALTY IN THIS COMMONWEALTH; AND BE
18 IT FURTHER

19    RESOLVED, THAT THE COLLABORATION BETWEEN THE TASK FORCE AND
20 ADVISORY COMMITTEE AND THE JUSTICE CENTER BE FORMALIZED THROUGH
21 A MEMORANDUM OF UNDERSTANDING SPECIFYING WHAT EACH ORGANIZATION
22 WILL PROVIDE TO THE OTHER IN CONDUCTING THIS STUDY; AND BE IT
23 FURTHER

24    RESOLVED, That the task force and advisory committee hold
25 public hearings as necessary to receive testimony about any of
26 the subjects of study enumerated in this resolution; and be it
27 further

28    RESOLVED, That the task force and advisory committee report
29 their findings and recommendations to the Senate no later than
30 two years after the date this resolution is adopted.

| State-by-State Survey of Aggravating Circumstances for Capital Punishment May 2018 | |
| --- | --- |
| **Circumstances** | **States** |
| Prisoners: incarcerated, in custody, or on probation | Ala., Ariz., Ark., Colo., Fla., Ga., Ind., Kan., Ky., La., Miss., Mo., Mont., Nev., N.C., Ohio, Okla., **Pa.**, Tenn., Tex., Utah, Wash., Wyo. |
| Previous conviction of a capital offense or other violent crime | Ala., Ariz., Ark., Cal., Fla., Ga., Idaho, Ind., Kan., Ky., La., Miss., Mo., Mont., Nev., N.H., N.C., Ohio, Okla., **Pa.**, S.C., S.D., Tenn., Utah, Wyo. |
| Avoiding arrest or escaping from custody; escaped felon | Ala., Ark., Cal., Colo., Fla., Ga., Kan., Miss., Mo., Nev., N.H., N.C., Ohio, Okla., S.D., Tenn., Tex., Utah, Wash., Wyo. |
| Offense is felony murder[1444] | Ala., Cal., Colo., Fla., Ga., Idaho, Ind., Ky., La., Miss., Nev., N.H., N.C., Ohio, **Pa.**, S.C., Tenn., Tex., Utah, Wash., Wyo. |
| Knowingly created a risk of death to many others/more than one person – adjectives include great or grave; frequently includes "by means of a destructive device" | Ala., Ariz., Ark., Colo., Fla., Ga., Idaho, Kan., La., Miss., Mo., Nev., N.H., N.C., Okla., **Pa.**, S.C., S.D., Tenn., Utah, Wyo. |
| For pecuniary gain | Ala., Ariz., Ark., Cal., Colo., Fla., Ga., Idaho, Ind., Kan., Ky., La., Miss., Mo., Nev., N.H., N.C., Ohio, Okla., **Pa.**, S.C., S.D., Tenn., Tex., Utah, Wash., Wyo. |
| Contract killing: defendant engaged a third person to murder the victim | Ariz., Colo., Idaho, Ga., Ind., Kan. , Ky., La., Mo., Okla., **Pa.**, S.C., S.D., Tenn., Tex., Utah |
| Disrupt or hinder governmental function, political function or enforcement of law | Ala., Ark., Fla., Miss., N.C., Utah |
| Murder was especially reprehensible: brutal, heinous, atrocious, cruel,[1445] depraved, outrageous, wantonly vile, horrible, inhuman, manifesting exceptional depravity, dismemberment; in a cold, calculated manner without pretense of moral or legal justification; premeditated; utter disregard for human life; evidences a sense of pleasure in the murder; torture; at random and without apparent motive; unreasonable response to the provocation | Ala., Ariz., Ark., Cal., Colo., Fla., Ga., Idaho, Ind., Kan., La., Miss., Mo., Mont., Nev., N.H., N.C., Okla., Ore., **Pa.**, S.D., Tenn., Utah, Va., Wyo. |
| Multiple murders in the same occurrence; series of intentional killings; act in a course of violent conduct; mass murder | Ala., Ariz., Ark., Cal., Colo., Idaho, Ky., La., Mo., Mont.[1446], Nev., N.C. **Pa.**, S.C., Tenn., Tex., Utah, Wash. |
| Defendant will constitute a continuing threat to society | Idaho, Okla., Ore., Tex., Va., Wyo. |
| Victim was held as hostage | Colo, **Pa.**, Utah |

---

[1444] Defendant was engaged in or was an accomplice in the commission of, or attempt to commit or flight after committing, or attempting to commit statutorily enumerated felonies.

[1445] "Heinous, atrocious and cruel" has been found to be unconstitutionally vague in Okla. and Cal..

[1446] Part of a scheme or operation that if completed would result in multiple deaths.

| **State-by-State Survey of**<br>**Aggravating Circumstances for Capital Punishment**<br>**May 2018** ||
|---|---|
| **Circumstances** | **States** |
| Felonious possession of the weapon used to commit the offense | Colo. |
| Defendant committed another murder at any time, whether convicted or not | Ind. |
| Ritualistic mutilation, dismemberment, or torture of a human as part of a ceremony, rite, initiation, observance, performance, or practice | La. |
| Incident to desecration of a dead human body | Utah |

| Vulnerable victims | Children and youth[1447] | Ala., Ariz., Ark., Colo., Fla., Ind., La., Nev., N.H., Ohio, **Pa.**, S.C., S.D., Tenn., Tex., Utah, Wyo. |
|---|---|---|
| | Unborn child | Ariz., Ind. |
| | Severe intellectual, mental or physical disability | Ark., Fla., N.H., Tenn., Wyo. |
| | Elderly person[1448] | Ariz., Fla., La., N.H., Tenn., Wyo. |
| | Pregnant woman | Colo., Ind., **Pa.**, Tenn. |
| | Victim covered by a protective order | Fla., Ky., **Pa.**, Wash. |
| | Familial or custodial authority over victim; family or household members | Fla., Wash. |

| Official victims[1449] | Law enforcement officer or official[1450] | Ariz., Cal., Colo., Fla., Ga., Idaho, Ind., Ky., La., Mo., Mont., Nev., N.C., Ohio, Okla., **Pa.**, S.C., S.D., Tenn., Tex., Utah, Wash. |
|---|---|---|
| | Murder of a family member of a law enforcement officer or official, a judicial officer or a fireman | S.C. |
| | Corrections official or employee[1451] | Ga., Ind., Ky., La., Mo., Nev., N.C., Okla., **Pa.**, S.C., S.D., Tenn., Tex., Utah, Wash. |
| | Firefighter, fire marshal, fire police | Cal., Colo., Ga., Ind., La., Mo., Nev., N.C., **Pa.**, S.C., S.D., Tenn., Tex., Utah, Wash. |
| | Paramedic, EMT[1452] | Colo., Tenn., Utah |
| | Judicial officer: judge, prosecutor, Attorney General, special investigator | Cal., Colo., Idaho, Ga., Ind., Mo., N.C., **Pa.**, S.C., S.D., Tenn., Tex., Utah, Wash., Wyo. |
| | Juror | Cal., N.C., Utah, Wash., Wyo. |
| | Government official | Cal., Colo., Fla., Idaho, Ky., Mo., **Pa.**, Tenn., Utah |
| | Witnesses: to prevent testimony or retaliate for the same[1453] | Ariz., Cal., Colo., Idaho, Ind., Kan., La., Mo., N.C., Ohio, **Pa.**, S.C., Utah, Wyo. |

[1447] Under age 15 (Ariz.); under age 13 (Ark., Ohio, S.D.); under age 12 (Colo., Fla., Ind., La., Pa.); under age 14 (Ala., Nev., Utah); under 11 years of age (S.C.); child less than 12 years of age/defendant at least 18 (Tenn.); child under age 10 (Tex.); under age 17 (Wyo.); if a child under 14 is present when his/her parent or guardian is murdered (Ala.).

[1448] 70 years of age or older (Ariz., Tenn.); 65 years of age or older (La.); older than 65 years of age (Wyo.).

[1449] Victim was engaged in official duties when killed.

[1450] Any peace officer and security officers (Utah, eff. July 1, 2019).

[1451] If murderer was a prisoner (Ky., Tex.).

[1452] Includes ambulance personnel, and search and rescue personnel (Utah, eff. July 1, 2019).

[1453] Includes an informant (Pa.).

| | Circumstances | States |
|---|---|---|
| | Victim was a news reporter | Wash. |
| Specific weapons | Remote stun gun | Ariz. |
| | Destructive or explosive device[1454] | Ark., Cal., Colo., Ind., Ky., Miss., N.C., Tenn., Utah, Wyo. |
| | Chemical, biological or radiological weapon | Colo. |
| | Poison | Cal., S.C., Utah |
| Specific locations | School or secondary educational institution[1455] | Ind., Nev. |
| | Place of worship | Ind. |
| Specific crimes | Victim had been kidnapped for ransom or reward | Colo., Mont., N.C., **Pa.**, Utah |
| | Hate crimes: race; color; religion; ancestry; nationality; country of origin | Cal., Colo., Miss.[1456], Nev.[1457] |
| | Sexual predator; infamous crime against nature, lewd and lascivious behavior, sexual abuse of a child; during nonconsensual sexual penetration | Fla., Idaho, Mont., Nev., S.C. |
| | Organized crime: Criminal street gang or criminal syndicate promotion or initiation | Ariz., Cal., Fla., Ind., Mo., Wash. |
| | Defendant was lying in wait or ambushed the victim | Cal., Colo., Mont. |
| | Drive-by shooting or discharging firearm into inhabited dwelling | Cal., Ind., Wash. |
| | During a hijacking | Mo., N.C., **Pa.**, Tenn., Utah, Wyo. |
| | As part of an act of terrorism | Ga. (domestic terrorism), Nev., Ohio, Utah[1458] |
| | Assassination of political leader or candidate | Ohio |
| | Crime involved controlled substances[1459] | La., N.H., **Pa.**, S.C., S.D. |

**State-by-State Survey of
Aggravating Circumstances for Capital Punishment
May 2018**

---

[1454] Weapons of mass destruction (Ky., Utah).
[1455] On a school bus (Nev.).
[1456] To intimidate or coerce a civilian population.
[1457] Physical or mental disability or sexual orientation or gender identity or expression.
[1458] "Targeting a law enforcement officer"--to intimidate or coerce a civilian population for political or social purposes.
[1459] During a drug deal (La.); prior drug convictions (N.H.); drug trafficking (S.C.).

**Citations:**

Alabama: Ala. Code § 13A-5-49
Arizona: Ariz. Rev. Stat. §13-751(F)
Arkansas:  Ark. Code § 5-4-604
California:  Cal. Penal Code § 190.2
Colorado: Colo. Rev. Stat. § 18-1.3-1201(5)
Florida:  Fla. Stat. § 921.141(5)
Georgia:  Ga. Code 17-10-30(b)
Idaho:  Idaho Code § 19-2515(9)
Indiana:  Ind. Code § 35-50-2-9(b)
Kansas:  Kan. Stat. § 21-6624
Kentucky:  Ky. Rev. Stat. § 532.025(2)(a)
Louisiana:  La. C. Crim. Proc. § art. 905.4
Mississippi:  Miss. Code § 99-19-101(5)
Missouri:  Mo. Rev. Stat. § 565.032(2)
Montana:  Mont. Code § 46-18-303
Nebraska: Death penalty repealed in 2015, reinstated by reference in 2016;    no statutory provisions enacted
Nevada:  Nev. Rev. Stat. § 200.033
New Hampshire: N.H. Rev. Stat. § 630:5(VII)
North Carolina:  N.C. Gen. Stat. §15A-2000(e)
Ohio:  Ohio Rev. Code § 2929.04(A)
Oklahoma:  Okla. Stat. §21-701.12
Oregon:  Ore. Rev. Stat. § 163.150(1)(b)
Pennsylvania:  42 Pa.C.S. § 9711(d)
South Carolina:  S.C. Code § 16-3-20(C)(a)
South Dakota: S.D. Codified Laws § 23a-27a-1
Tennessee: Tenn. Code § 39-13-204(1)
Texas:  Tex. Penal Code § 19.03; Tex. C. Crim. Proc. Art. 37.071 Sec. 2 (b)(1)
Utah: Utah Code §§ 76-30207(3); 76-5-202(1) & (2); 76-5-210
Virginia: Va.Code §§ 19.2-264.2 & 19.2-264.4(C)
Washington:  Wash. Rev. Code § 10.95.020
Wyoming:  Wyo. Stat. § 6-2-102(h)

| State-by-State Survey of Mitigating Circumstances for Capital Punishment May 2018 | |
|---|---|
| **Specific Circumstances** | **States** |
| No significant history of prior criminal activity | Ala., Ark., Colo., Fla., Ind., Kan., Ky., La., Miss., Mo., Mont., Nev., N.H., N.C., Ohio, Okla., Ore., **Pa.**, S.C., Tenn., Va., Wash., Wyo. |
| Under influence of extreme mental or emotional disturbance at time offense committed | Ala., Ark., Cal., Colo., Fla., Ind., Kan., Ky., La., Miss., Mo., Mont., Nev., N.H., N.C., Okla., Ore., **Pa.**, S.C., Tenn., Va., Wash., Wyo. |
| Accomplice with relatively minor participation | Ala., Ariz., Ark., Cal., Colo., Fla., Ind., Kan., Ky., La., Miss., Mo., Mont., Nev., N.H., N.C., Ohio, **Pa.**, S.C., Tenn., Wash., Wyo. |
| Under extreme duress or substantial domination of another person; unusual or substantial duress | Ala., Ariz., Ark., Cal., Colo., Fla., Ind., Kan., Ky., La., Miss., Mo., Mont., Nev., N.H., N.C., Ohio, Okla., **Pa.**, S.C., Tenn., Wash. |
| Capacity to appreciate the criminality of the conduct or to conform conduct to the law was substantially impaired[1460] | Ala., Ariz., Ark., Cal., Colo., Fla., Ind., Kan., Ky., La., Miss., Mo., Mont., Nev., N.H., N.C., Ohio, Okla., **Pa.**, S.C., Va., Wash., Wyo. |
| Age of defendant at time of offense[1461] | Ala., Ariz., Ark., Cal., Colo., Fla., Ind., Kan., Ky., La., Miss., Mo., Mont., Nev., N.H., N.C., Ohio, Okla., Ore., **Pa.**, S.C., Tenn., Va., Wash., Wyo. |
| Victim a participant in defendant's conduct or consented to it | Ala., Cal., Fla., Ind., Kan., Ky., Miss., Mo., Mont., Nev., N.H., N.C., Ohio, Okla., **Pa.**, S.C., Tenn., Va., Wash., Wyo. |
| Defendant reasonably believed conduct was morally justified; believed in good faith | Cal., Colo., Ky., La., Okla., Tenn. |
| Defendant's propensity to violence; record of violent behavior | Ariz., Cal. |
| Cooperation with law enforcement and prosecutors | Colo., N.C., Okla. |
| Evidence of mental retardation or subaverage intellectual functioning | Okla., S.C., Va. |
| Could not reasonably have foreseen that conduct would cause or create a grave risk of causing death | Ariz., Colo. |
| Defendant provoked | Ohio, S.C. |
| At the time of the offense, defendant was suffering from post-traumatic stress syndrome caused by violence or abuse by the victim | Kan. |
| Other equally culpable defendants will not be punished by death | N.H. |
| Personal moral culpability of the defendant | Tex. |

---

[1460] As a result of mental disease or defect, intoxication or drug abuse (Ark.); mental disease or defect or intoxication (Cal., Ind., La., Tenn.); influence of drugs or alcohol (Colo.); mental illness, intellectual disability or intoxication (Ky.); mental disease or defect (Ohio, Wash.).

[1461] Defendant was under age 18 at the time offense committed (Ind., Mont., S.C.); defendant was youthful, but not under the age of 18 (N.H.); youth or advanced age (Tenn.).

| State-by-State Survey of Mitigating Circumstances for Capital Punishment May 2018 | |
|---|---|
| **General Circumstances** | **States** |
| Defendant's character, background, history | Ariz., Cal., Fla., N.H., Ohio, Okla., **Pa.**, Tex., Utah, Va., Wyo. |
| Nature and circumstances of the offense | Ariz., Cal., Ohio, **Pa.**, Tex., Utah, Va., Wyo. |
| Defendant's mental or physical condition | Cal., S.C., Utah |
| Defendant not a continuing threat to society[1462] | Colo., Okla., Wash. |
| Any other mitigating circumstances | Cal., Colo., Ind., La., Mont., Nev., N.C., Ohio, Okla., Ore., Tenn., Utah |
| General proviso for any mitigating circumstances | Ga., Idaho, S.D. |

**Citations**:

Alabama: Ala. Code § 13A-5-51
Arizona: Ariz. Rev. Stat. §13-751(G)
Arkansas: Ark. Code § 5-4-605
California: Cal. Penal Code § 190.3
Colorado: Colo. Rev. Stat. § 18-1.3-1201(4)
Florida: Fla. Stat. § 921.141(7)
Georgia: Ga. Code 17-10-30(b)
Idaho: Idaho Code § 19-2515(3)
Indiana: Ind. Code § 35-50-2-9(c)
Kansas: Kan. Stat. § 21-6625
Kentucky: Ky. Rev. Stat. § 532.025(2)(b)
Louisiana: La. C. Crim. Proc. § art. 905.5
Mississippi: Miss. Code § 99-19-101(6)
Missouri: Mo. Rev. Stat. § 565.032(3)
Montana: Mont. Code § 46-18-304
Nebraska: Death penalty repealed in 2015; reinstated by referendum; statute not amended to reflect mitigating circumstances
Nevada: Nev. Rev. Stat. § 200.035
New Hampshire: N.H. Rev. Stat. § 630:5(VI)
North Carolina: N.C. Gen. Stat. §15A-2000(f)
Ohio: Ohio Rev. Code § 2929.04(B)
Oklahoma: Okla. Uniform Jury Instructions: OUJI- CR 4-79

Oregon: Ore. Rev. Stat. § 163.150(1)(c)
Pennsylvania: 42 Pa.C.S. § 9711(e)
South Carolina: S.C. Code § 16-3-20(C)(b)
South Dakota: S.D. Codified Laws § 23a-27a-1
Tennessee: Tenn. Code § 39-13-204(j)
Texas: Tex. C. Crim. Proc. Art. 37.071
  Sec. 2 (a)(1), (d)(1) and (e)(1)
Utah: Utah Code §§ 76-3-207(2)
Virginia: Va. Code § 19.2-264.4(B)
Washington: Wash. Rev. Code § 10.95.070
Wyoming: Wyo. Stat. § 6-2-102(j)

---

[1462] Defendant likely to be rehabilitated (Okla.).

# APPENDIX D

| State-by-State Survey of<br>State Clemency Process in Death Penalty Sentences<br>April 2018 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **State** | **Citation** | **Clemency Options Available** | | | **Decision-Maker** | | |
| | | **Pardon** | **Com-mutation** | **Reprieve** | **Pardon** | **Commutation** | **Reprieve** |
| Alabama | Ala. Const. art. V, § 124; Ala. Code §§ 15-22-27(a) and 15-22-36(a) | X | X | X | Board of Pardons and Paroles, if Governor has commuted the death penalty sentence, person has proven innocence, Board unanimously votes for pardon, and Governor concurs | Governor | Governor |
| Arizona | Ariz. Const. art. V, § 5; Ariz. Rev. Stat. §§ 31-402, 31-443 | X | X | X | Board of Executive Clemency makes affirmative recommendation to the Governor | Board of Executive Clemency makes affirmative recommendation to the Governor; unanimous vote for commutation not signed by Governor within 90 days' is automatically effective | Board of Executive Clemency make affirmative recommendation to the Governor |
| Arkansas | Ark. Const. art. VI, § 18; Ark. Code § 16-93-204 | X | X | X | Governor; Parole Board may make nonbinding recommendations | Governor; Parole Board may make nonbinding recommendations | Governor; Parole Board may make nonbinding recommendations |
| California | Cal. Const. art. V, § 8; Cal. Penal Code § 4800 | X | X | X | Governor; Board of Parole Hearings may make recommendations | Governor; Board of Parole Hearings may make recommendations | Governor; Board of Parole Hearings may make recommendations |
| Colorado | Colo. Const. art. IV, § 7; Col. Rev. Stat. § 16-17-101 | X | X | X | Governor | Governor | Governor |

| State | Citation | Clemency Options Available | | | Decision-Maker | | |
|-------|----------|--------|-----------|----------|--------|------------|---------|
| | | Pardon | Com-mutation | Reprieve | Pardon | Commutation | Reprieve |
| Connecticut* | Conn. Const. art. 4, § 13; Conn. Gen. Stat. § 54-130a | | | X | Board of Pardons and Paroles | Board of Pardons and Paroles | Governor |
| Delaware** | Del. Const. art. VII § 1 | X | X | X | Board of Pardons makes affirmative recommendation to Governor | Board of Pardons makes affirmative recommendation to Governor | Board of Pardons makes affirmative recommendation to Governor |
| Florida | Fla. Const. art. IV § 8; Fla. Stat. § 940.01 | X | X | X | Board of Executive Clemency (Governor and two Cabinet members) | Board of Executive Clemency (Governor and two Cabinet members) | Governor |
| Georgia | Ga. Const. art. IV, § 2, ¶ 2; Ga. Code § 42-9-1 *et seq.* | X | X | X | State Board of Pardons and Paroles | State Board of Pardons and Paroles | State Board of Pardons and Paroles |
| Idaho | Idaho Const. art. IV § 7; Idaho Code §§ 20-210 and 20-240 | X | X | X | Commission for Pardons and Paroles recommends to Governor | Commission for Pardons and Paroles recommends to Governor; if not approved within 30 days, deemed denied | Governor, until next session of Commission for Pardons and Paroles |
| Indiana | Ind. Const. art. V § 17; Ind. Code §§ 11-9-1-2 and 11-9-2-1 *et seq.* | X | X | X | Governor; Parole Board receives applications and makes advisory recommendations | Governor; Parole Board receives applications and makes advisory recommendations | Governor; Parole Board receives applications and makes advisory recommendations |
| Kansas | Kan. Const. art. I § 7; Kan. Stat. §§ 22-3701 and 22-3704 | X | X | | Governor; must consult with Prisoner Review Board but not bound by its advice | Governor; must consult with Prisoner Review Board but not bound by its advice | Governor may postpone execution for a limited time |
| Kentucky | Ky. Const. § 77; Ky. Rev. Stat. § 439.450 | X | X | X | Governor; may consult Parole Board | Governor; may consult Parole Board | Governor; may consult Parole Board |

| State-by-State Survey of State Clemency Process in Death Penalty Sentences April 2018 | | | | | | |
|---|---|---|---|---|---|---|
| State | Citation | Clemency Options Available | | | Decision-Maker | | |
| | | Pardon | Com-mutation | Reprieve | Pardon | Commutation | Reprieve |
| Louisiana | La. Const. art. IV § 5; La. Rev. Stat. § 15:572 *et seq.* | X | X | X | Board of Pardons recommends to Governor | Board of Pardons recommends to Governor | Governor |
| Mississippi | Miss. Const. art. V § 124; Miss. Code § 47-7-5(3) | X | | X | Governor; State Parole Board may investigate clemency recommendations upon request of Governor | -- | Governor; State Parole Board may investigate clemency recommendations upon request of Governor |
| Missouri | Mo. Const. art. IV § 7; Mo. Rev. Stat. § 217.800.1 | X | X | X | Governor; Board of Probation and Parole receives and investigates applications; makes non-binding recommendations | Governor; Board of Probation and Parole receives and investigates applications; makes non-binding recommendations | Governor; Board of Probation and Parole receives and investigates applications; makes non-binding recommendations |
| Montana | Mont. Const. art. VI § 12; Mont. Code § 46-23-301 | X | X | X | Governor; applications made to Board of Pardons and Paroles, board makes non-binding recommendations | Governor; applications made to Board of Pardons and Paroles, board makes non-binding recommendations | Governor; applications made to Board of Pardons and Paroles, board makes non-binding recommendations |
| Nebraska | Neb. Const. art. IV, § 13 | X | X | X | Governor, Attorney General and Secretary of State, sitting as a board; Board of Parole may give non-binding advice | Governor, Attorney General and Secretary of State, sitting as a board; Board of Parole may give non-binding advice | Governor, Attorney General and Secretary of State, sitting as a board; Board of Parole may give non-binding advice |
| Nevada | Nev. Const. art. V § 13; Nev. Rev. Stat. § 213.010 *et seq.* | X | X | X | State Board of Pardons Commissioners (Governor, justices of the Supreme Court and Attorney General) | State Board of Pardons Commissioners (Governor, justices of the Supreme Court and Attorney General) | State Board of Pardons Commissioners (Governor, justices of the Supreme Court and Attorney General) |

| State | Citation | Clemency Options Available | | | Decision-Maker | | |
|---|---|---|---|---|---|---|---|
| | | **Pardon** | **Com-mutation** | **Reprieve** | **Pardon** | **Commutation** | **Reprieve** |
| New Hampshire | N.H. Const. Part 2nd arts. 52, 60; N.H. Rev. Stat. § 4:21 *et seq.* | X | X | X | Governor with advice of Executive Council (five-person elected body) | Governor with advice of Executive Council (five-person elected body) | Governor with advice of Executive Council (five-person elected body) |
| New Mexico*** | N.M. Const. art. V § 6; N.M. Stat. § 31-21-17 | X | X | X | Governor; Governor may consult Parole Board | Governor; Governor may consult Parole Board | Governor; Governor may consult Parole Board |
| North Carolina | N.C. Const. art. III § 5; N.C. Gen. Stat. § 143B-720 | X | X | X | Governor; Post-Release Supervision and Parole Commission may assist Governor | Governor; Post-Release Supervision and Parole Commission may assist Governor | Governor; Post-Release Supervision and Parole Commission may assist Governor |
| Ohio | Ohio Const. § 3.11; Ohio Rev. Code §§ 2967.01 *et seq.*, 5149.10 | X | X | X | Governor; Adult Parole Authority/Parole Board may make recommendations | Governor; Adult Parole Authority/Parole Board may make recommendations | Governor; Adult Parole Authority/Parole Board may make recommendations |
| Oklahoma | Ok. Const. § VI-10; Okla. Stat. § 57-332 | X | X | X | Pardon and Parole Board makes affirmative recommendation to Governor | Pardon and Parole Board makes affirmative recommendation to Governor | Pardon and Parole Board makes affirmative recommendation to Governor |
| Oregon | Or. Const. art. V § 14; Or. Rev. Stat. §§ 144.649 to 144.670 | X | X | X | Governor | Governor | Governor |
| Pennsylvania | Pa. Const. art. IV § 9; Administrative Code of 1929, §§ 403 and 909 (71 P.S. §§ 113 and 299) | X | X | X | Board of Pardons makes recommendations to Governor | Board of Pardons makes recommendations to Governor | Board of Pardons makes recommendations to Governor |

<table>
<tr><td colspan="8" align="center"><b>State-by-State Survey of<br>State Clemency Process in Death Penalty Sentences<br>April 2018</b></td></tr>
</table>

| State | Citation | Clemency Options Available | | | Decision-Maker | | |
|-------|----------|--------|------------|----------|--------|-------------|---------|
|       |          | Pardon | Com-mutation | Reprieve | Pardon | Commutation | Reprieve |
| South Carolina | S.C. Const. art. IV, § 14; S.C. Code §§ 24-21-910 *et seq.* | X | X | X | Board of Probation, Parole and Pardon Services by 2/3rds vote | Governor; Board of Probation, Parole and Pardon Services may make non-binding recommendations | Governor; Board of Probation, Parole and Pardon Services may make non-binding recommendations |
| South Dakota | S.D. Const. art. 4 § 3; S.D. Codified Laws Ch. 24-14-1 *et seq.* | X | X | X | Governor; Governor may ask Board of Pardons and Paroles to review applications and make non-binding recommendations | Governor; Governor may ask Board of Pardons and Paroles to review applications and make non-binding recommendations | Governor; Governor may ask Board of Pardons and Paroles to review applications and make non-binding recommendations |
| Tennessee | Tenn. Const. art. III § 6; Tenn. Code § 40-27-101 *et seq.*; § 40-28-104 | X | X | X | Governor; Board of Parole may make nonbinding recommendations upon the request of the Governor | Governor –on his own or upon certificate from the Supreme Court re extenuating circumstances; Board of Parole may make nonbinding recommendations upon the request of the Governor | Governor; Board of Parole may make nonbinding recommendations upon the request of the Governor |
| Texas | Tex. Const. art. 4 § 11; Tex. Code Crim. Proc. art. 48.01 *et seq.* | X | X | X | Boards of Pardons and Paroles makes affirmative recommendation to Governor | Boards of Pardons and Paroles makes affirmative recommendation to Governor | Boards of Pardons and Paroles makes affirmative recommendation to Governor; one 30-day reprieve permitted |
| Utah | Utah Const. art. VII § 12; Utah Code § 77-27-1 *et seq.* | X | X | X | Board of Pardons and Parole | Board of Pardons and Parole | Governor; reprieves may not extend beyond the next session of the Board of Pardons and Parole |
| Virginia | Va. Const. art. V § 12; Va. Code §§ | X | X | X | Governor; Parole Board may be consulted | Governor; Parole Board may be consulted | Governor; Parole Board may be consulted |

| State-by-State Survey of<br>State Clemency Process in Death Penalty Sentences<br>April 2018 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **State** | **Citation** | **Clemency Options Available** | | | **Decision-Maker** | | |
| | | **Pardon** | **Com-mutation** | **Reprieve** | **Pardon** | **Commutation** | **Reprieve** |
| | 53.1-229 to 53.1-231 | | | | | | |
| Washington | Wash. Const. art. III § 9; Wash. Rev. Code §§ 9.94a.885 and 10.01.120 | X | X | X | Governor; Clemency and Pardons Board to review petitions and make recommendations | Governor; Clemency and Pardons Board to review petitions and make recommendations | Governor |
| Wyoming | Wyo. Const. art. 3 §53 and Art. 4 § 5; Wyo. Stat. § 7-13-801 et seq. | X | X | X | Governor | Governor; death penalty may be commuted to life imprisonment without parole, but LWOP cannot be further commuted | Governor |

* *Connecticut:* "[F]ollowing its prospective abolition, this state's death penalty no longer comports with contemporary standards of decency and no longer serves any legitimate penological purpose. For these reasons, execution of those offenders who committed capital felonies prior to April 25, 2012, would violate the state constitutional prohibition against cruel and unusual punishment." *Conn. v. Santiago*, 122 A.3d 1, 10 (Conn. 2015).

** *Delaware:* The Delaware Supreme Court declared the state death penalty statute unconstitutional. *Rauf v. Del.*, 145 A.3d 430 (Del. 2016). Legislators in Delaware are attempting to amend the death penalty statute to meet constitutional muster. House Bill 125 (2017) passed the House of Representatives by a vote of 24-16 on May 9, 2017 and was referred to the Senate Judiciary and Community Affairs Committee on May 10, 2017.

*** *New Mexico:* Death penalty repealed prospectively only, leaving two inmates on death row (eff. 7.1.2009; 2009 H.B. 285). The New Mexico Supreme Court heard oral arguments on April 10, 2018 on the men's petitions for *habeas corpus*. *Fry v. Lopez* (N.M. S-1-SC-34372, filed Oct. 22, 2013) and *Allen v. LeMaster* (N.M. S-1-SC-34386, filed Oct. 28, 2013).

Note: Nebraska abolished the death penalty in 2015, but it was reinstated following a statewide referendum in 2016. A lawsuit challenging the referendum was dismissed in 2018.

| Grounds | AL | AR | DE | FL | GA | ID | IL | IN | KY | LA | MD | MO | MT | NV | NJ | NM | NC | OH | OK | TN | TX | VA | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **State-by-State Survey of Clemency Actions - Commutation in Capital Cases During the Time Period 1977-2018 April 2018** | | | | | | | | | | | | | | | | | | | | | | | |
| Possible innocence/doubt about guilt | | | | 2 | | 1 | 4 | 2 | | 1 | 2 | 1 | | | | | 2 | 5 | 1 | | 1 | 4 | **24** |
| Disproportionate sentence | | 1 | | 4 | 3 | | 1 | | | | | | | | | | | | | | 2 | 1 | **12** |
| Governor's position on death penalty | | | | | | | | | | | | | | | | 5 | | | | | | | **5** |
| Inmate illness | | | | | | | | | | | | | 1 | | | | | | | | | | **1** |
| Inmate rehabilitation | | | | | 1 | | | | | | | | | | | | | | | | | 1 | **2** |
| Inmate mental illness | | | | | 1 | | | 1 | | | | | | | | | | | | | | 3 | **4** |
| Inmate intellectual disability | | | | | | | | | | | | 1 | | 1 | | | | 1 | | | | | **3** |
| Death penalty abolished | | | | | | | 15 | | | | 4 | | | | 8 | | | | | | | | **27** |
| Ineffective counsel | | | | | | | | | 1 | | | | | | | | | | 1 | 1 | 1 | | **4** |
| Flawed process | | | | | | | 167 | | | | | | | | | | 1 | 1 | | | | | **169** |
| No reason given | 1 | | | | 2 | | | | | | | 1 | | | | | | | | | | | **4** |
| Other | | 1 | 1 | | 2 | | | | 1 | | | 1 | | | | | 3 | 12 | 1 | | | 1 | **23** |
| **Total*** | **1** | **2** | **1** | **6** | **9** | **1** | **187** | **3** | **2** | **1** | **6** | **4** | **1** | **1** | **8** | **5** | **6** | **20** | **4** | **3** | **3** | **10** | **284** |

Source:  Death Penalty Information Center, "Clemency."  www.deathpenaltyinfo.org/clemency.
* Excludes three persons on federal or military death row whose sentences were commuted.

| Pennsylvania Capital Cases | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Year | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **total** | **%** |
| Total Resolved Annually (no. of defendants) | 107 | 94 | 64 | 54 | 48 | 35 | 28 | 430 | 100 |
| Notice of Aggravating Circumstances withdrawn | 63 | 56 | 29 | 27 | 26 | 17 | 20 | 238 | 55.3 |
| Pled Guilty to 1st Degree Murder | 11 | 11 | 8 | 8 | 8 | 7 | 3 | 56 | 13 |
| Pled Guilty to < 1st Degree Murder | 9 | 13 | 12 | 11 | 7 | 5 | 1 | 58 | 13.5 |
| Capitally tried | 18 | 6 | 11 | 4 | 5 | 5 | 2 | 51 | 11.9 |
| Other Non-Capital Disposition | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 3 | 0.7 |
| Death Sentence | 4 | 7 | 4 | 4 | 2 | 1 | 2 | 24 | 5.6 |
| Source:  Atl. Ctr. for Capital Representation | | | | | | | | | |

| | State-by-State Survey of Prohibition against Capital Punishment for Defendants with Intellectual Disabilities | | | | |
|---|---|---|---|---|---|
| **State** | **Citation** | **Primary Fact Finder** | **Timing of Determination** | **Burden of Proof** | **Evidentiary Standard** |
| Alabama | *Morrow v. State,* 928 So.2d 315, 322-24 (Ala. Crim. App. 2004); Ala. R. Crim. P. 32; Ala. Code § 15-24-1 to -24-7 | Trial judge | At any time during trial; preference for pre-trial hearing | Defendant | Preponderance |
| Arizona | Ariz. Rev. Stat. § 13-753 | Trial judge | Pre-trial* | Defendant | Clear and convincing; IQ of 75 or lower gets expert exam; 65 or lower creates rebuttable presumption of ID |
| Arkansas | Ark. Code § 5-4-618 | Trial judge | Pre-trial* | Defendant | Preponderance; IQ of 65 or lower creates rebuttable presumption of ID |
| California | Cal. Penal Code § 1376 | Trial judge or jury | At Defendant's option, pre-trial by judge, post-trial by jury | Defendant | Preponderance |
| Colorado | Colo. Rev. Stat. § 18-1.3-1101 to -1.3-1105 | Trial judge | Pre-trial | Defendant | Clear and convincing |
| Florida | Fla. Stat. § 921.137 | Trial judge | Post-trial | Defendant | Clear and convincing |
| Georgia | Ga. Code § 17-7-131 | Trial judge or jury | Verdict of "guilty but w/intellectual disability" | Not stated | Beyond a reasonable doubt |
| Idaho | Idaho Code § 19-2515A | Trial judge | Pre-trial | Defendant | Preponderance |
| Indiana | Ind. Code §§ 35-36-9-1 to -36-9-7 | Trial judge | Pre-trial | Defendant | Preponderance[1463] |
| Kansas | Kan. Stat. § 21-6622 | Trial judge | Post-trial | Not stated | Not stated |

---

[1463] The statute says, clear & convincing; however, the judiciary concluded "as a matter of federal constitutional law . . . that the state may not require proof of mental retardation by clear and convincing evidence." *Pruitt v. Ind.*, 834 N.E.2d 90, 103 (Ind. 2005).

**State-by-State Survey of**
**Prohibition against Capital Punishment for Defendants with Intellectual Disabilities**

| State | Citation | Primary Fact Finder | Timing of Determination | Burden of Proof | Evidentiary Standard |
|---|---|---|---|---|---|
| Kentucky | Ky. Rev. Stat. §§ 532.135, 532.140 | Trial judge | Pre-trial | Not stated | Not stated |
| Louisiana | La. Code Crim. Proc. art. 905.5.1 | Trial judge or jury | Pre-trial (judge) or during sentencing hearing (jury) | Defendant | Preponderance |
| Mississippi | *Chase v. Miss.*, 873 So.2d 1013, 1029-30 (Miss. 2004) | Trial judge | Pre-trial | Defendant | Preponderance |
| Missouri | Mo. Rev. Stat. § 565.030 | Trial judge or jury | Sentencing phase; may be pre-trial upon agreement of parties and court | Not stated | Preponderance |
| Montana | No specific statute or case found | -- | -- | -- | -- |
| Nebraska | No specific statute or case found | -- | -- | -- | -- |
| Nevada | Nev. Rev. Stat. § 174.098 | Trial judge | Pre-trial | Defendant | Preponderance |
| New Hampshire | No specific statute or case found | -- | -- | -- | -- |
| North Carolina | N.C. Gen. Stat. § 15A-2005 | Trial judge or jury | Pre-trial by court, if court does not find pre-trial, can be decided by jury during sentencing | Defendant | If judge, clear and convincing; if jury, preponderance |
| Ohio | *Ohio v. Lott,* 779 N.E.2d 1011, 1014-15 (Ohio 2002) | Trial judge | Pre-trial | Defendant | Preponderance |
| Oklahoma | Okla. Stat. tit. 21, § 701.10b | Trial judge or jury | Pre-trial by court, if court does not find pre-trial, can be decided by jury during sentencing | Defendant | If judge, clear and convincing; if jury, preponderance |
| Oregon | *Or. v. Agee*, 364 P.3d 971, 982-83, 996 n.28 (Or. 2015) | Trial judge or jury | Pre-trial by court or post-trial by jury | Defendant | Preponderance |
| Pennsylvania | Pa. R. Crim. P. 840-845 | Jury or judge | During sentencing unless parties agree to pre-trial w/the latter being decided by the judge | Defendant | Preponderance |

# State-by-State Survey of
# Prohibition against Capital Punishment for Defendants with Intellectual Disabilities

| State | Citation | Primary Fact Finder | Timing of Determination | Burden of Proof | Evidentiary Standard |
|---|---|---|---|---|---|
| South Carolina | *Franklin v Maynard*, 588 S.E.2d 604, 606 (S.C. 2003) | Trial judge | Pre-trial[1464] | Defendant | Preponderance |
| South Dakota | S.D. Codified Laws §§ 23A-27A-26.1 to 23A-27A-26.5 | Trial judge | Pre-trial | Defendant | Preponderance |
| Tennessee | Tenn. Code § 39-13-203 | Trial judge | Pre-trial (or trial) | Defendant | Preponderance |
| Texas | *Ex parte Briseno*, 135 S.W.3d 1, 12 (Tex. Crim. App. 2004);[1465] *Neal v. Tex.*, 256 S.W.3d 264, 272 (Tex. Crim. App. 2008) | Trial judge or jury[1466] | During sentencing | Defendant | Preponderance |
| Utah | Utah Code §§ 77-15a-101 to -15a-106 | Trial judge | Pre-trial on defendant's motion; any time by court order | Proponent of defense (usually defendant) | Preponderance |
| Virginia | Va. Code § 19.2-264.3:1.1 | Trier of fact | During sentencing | Defendant | Preponderance |
| Washington | Wash. Rev. Code § 10.95.030 | Trial judge | During sentencing | Defendant | Preponderance |
| Wyoming | No specific statute or case found | -- | -- | -- | -- |

\* Defendant may raise the issue *de novo* to the jury during sentencing

---

[1464] "If, however, the judge finds the defendant is *not* mentally retarded and the jury finds the defendant guilty of the capital charge, the defendant may still present mitigating evidence that he or she had mental retardation at the time of the crime. If the jury finds this mitigating circumstance, then a death sentence will not be imposed." *Franklin v Maynard*, 588 S.E.2d 604, 606 (S.C. 2003) (citation omitted).

[1465] *Abrogated on other grounds*, *Moore v. Tex.*, 137 S.Ct. 1039 (U.S. 2017).

[1466] *Gallo v. Tex.*, 239 S.W.3d 757, 770 (Tex. Crim. App. 2007).

**Report to the Joint State Government Commission**
**Pursuant to Pennsylvania Senate Resolution 6 (SR6), Session of 2011**

**By Gary Zajac, Ph.D. and Laura Winger, M.S.**

The Pennsylvania State University
Justice Center for Research
The 329 Building, Suite 222
University Park, PA  16802
http://justicecenter.psu.edu//

December 2013

## Introduction

The following report is prepared in response to the Pennsylvania Senate Resolution 6 (SR6), Session of 2011, pertaining to a study of capital punishment in Pennsylvania.  SR6 calls for research on 17 topics related to the death penalty.  The following report addresses Topics 5 and 6 from SR6:

(5)  Mental retardation: Whether, in light of the Supreme Court ruling in *Atkins v. Virginia*, there are adequate procedural protections in place to assure that people with mental retardation are not in fact being sentenced to death and executed;

(6)  Mental illness: Whether persons suffering from mental illness constitute a disproportionate number of those on death row, what criteria should be used in judging the level of mental illness involved and whether people with mental illness who are convicted of murder should be executed;

Before presenting the findings from our investigation of these two topics, several methodological caveats, limitations and conditions must be noted.  The data used in this analysis consisted of the mental health and mental retardation status of all Pennsylvania state inmates serving a death sentence or a term of life imprisonment without parole for a conviction of Murder 1 as of February 2013.  This data was supplied to us by the Bureau of Planning, Research and Statistics of the Pennsylvania Department of Corrections (PADOC).  No personal/individual identifiers for the inmates in this sample were included in this dataset, and were not needed for our analysis in any event.

Page 1 of 11

The death row group consisted of all 195 inmates (192 males; 3 females) who were on death row in February of 2013. More than half of the sample was Black (55.4%), while 34.4% was White. The Murder 1 Life Without Parole (M1 LWOP) group consisted of all 3396 inmates serving under this status in February 2013. This group was also predominantly male (96%), 63.7% were Black, 26.7% White, and 8.3% Hispanic. Other races reported included Asian, Indian, and "other." The M1 LWOP group serves as a rough comparison group for the death row inmates, to address issues of disproportionality surfaced in Question 6. The M1 LWOP likely present the most comparable offense types and sentencing circumstances to the death row inmates. We should note that we made no attempt to statistically match the two groups; instead we simply report population means and distributions on the variables discussed below.

Mental retardation status was inferred from the IQ score provided in the PADOC dataset. This score represents the inmate's status at the time of commitment to the PADOC, and not at the time of his/her crime or trial. IQ is a reasonably static individual characteristic and thus the score generated on the inmate within the PADOC should be representative of the inmate's level of cognitive functioning at the time of the crime and trial. The primary caveat here is that mental retardation is a mental disorder codified by the Diagnostic and Statistical Manual of Mental Disorders (Version IV was controlling as of the time of this analysis). IQ level is one criteria for mental retardation within the DSM-IV, but IQ level itself is not sufficient to support a diagnosis of mental retardation. Various other factors, including level of adaptive social functioning, also contribute to a final diagnosis of mental retardation. But, IQ score was readily available to us from the PADOC. Thus, IQ serves here as the best proxy for mental retardation. The IQ cut-off for mental retardation in the DSM-IV is somewhat imprecise, indicating a threshold IQ of *approximately* 70 or below. Thus, we used a score of 70 or lower in our analyses.

Turning to mental illness, the PADOC conducts a thorough mental health screening and assessment of inmates beginning with initial intake to the prison system. Initial screening on the first day of intake is done by psychiatric nurses, using key indicators of mental health need such as history of mental health problems and treatment (based upon both self-reports and official records transmitted from the courts), medication use, as well as observations of behaviors demonstrated by inmates during intake (signs and symptoms). This screening directs a given inmate as needed to further assessment by staff psychologists (under the direction of a licensed psychologist manager), as well as psychiatrists. If the inmate is on psychiatric medications, a referral is immediately made to a staff psychiatrist for additional specialized assessment. Standardized tools used as part of this assessment include the *Personality Assessment Inventory* (Morey, 1991), and all clinical assessment and treatment activities follow DSM-IV and ICD9 standards. Based upon these assessments, an inmate's mental health status is coded as: (A) no current mental health issues and no treatment history for the past 5 years; (B) no current need for treatment, but with some indication of recent need; (C) active mental health needs with treatment indicated; (D) serious mental health issues requiring close monitoring by Psychiatric Review Team. The A and B categories represent the less serious cases, presenting fewer symptoms and requiring less monitoring.

The C and D categories represent the more serious cases, presenting more significant symptoms and requiring closer monitoring. Inmates falling into category C are placed on the institutional Mental Health Roster, and their treatment plans are reviewed quarterly. Inmates in category D are reviewed monthly or more often as needed and are closely followed by staff psychiatrists. Inmates can move between codes during their incarceration (esp. codes B, C & D) and reassessments are done as needed. As with the IQ data discussed above, the data used here on mental health status reflects the assessment done by the PADOC at the time of commitment to prison. Given that mental health status is a more dynamic variable than IQ, the mental health status reflected in the PADOC data may or may not be representative of the inmates' mental health status at the time of the crime and/or trial. Again, the PADOC data was the best source of information available to us about the mental health status of these two populations.

## Question 5: Mental Retardation

The core issue raised in Question 5 – whether there are adequate procedural protections in place to assure that people with mental retardation are not in fact being sentenced to death and executed – is one that can be answered only imperfectly with the data presented here. Ultimately, adequate procedural protections are a matter of law. But, the analysis presented below does indicate that very few mentally retarded inmates seem to be present in either of the groups explored here.

The average IQ score for the death row inmates was 89 (*Standard Deviation* = 16). Only 4.1% of the death row inmates had an IQ of 70 or lower, classifying them as potentially mentally retarded. Given a total population of 195 inmates, this translates to 8 inmates on death row who may be potentially mentally retarded (recall the caveat noted earlier about the diagnostic criteria for mental retardation requiring more than a simple IQ score of 70 or below). Of these 8, 5 had scores of either 70 or 69, thus just barely meeting the IQ cutoff for potential retardation.

The average IQ score for the M1 LWOP group was 90 (*Standard Deviation* = 16). In this group, 8.7% had an IQ of 70 or lower, classifying them as potentially mentally retarded.

Thus, mean IQ for both groups of inmates is about 10 points below the normatively established "average" IQ of 100 for the general human population. The proportion of inmates in both groups with IQ's that meet the diagnostic criteria for mental retardation (70 and below) is very low, but considerably lower in the death row group. A chi square test revealed that the proportion of inmates in the death row group with an IQ of 70 and lower is significantly less than the proportion of inmates in the M1 LWOP group with an IQ of 70 and lower, $X^2$ (1, N = 3578) = 4.90, $p$ = .03.

ADDENDUM – JULY 2015: Subsequent to the preparation of this original report, both the United States Supreme Court and the Pennsylvania Supreme Court issued rulings that would seem to allow a higher IQ threshold (75) to be set for the diagnosis of intellectual disability. The links below direct the reader to the relevant cases:

http://www.supremecourt.gov/opinions/14pdf/13-1433_bpm1.pdf

http://www.pacourts.us/assets/opinions/Supreme/out/J-108-2014mo%20-%201022524584896858.pdf?cb=1

Considering this, we re-analyzed the data discussed above to determine what impact a cut off of 75 might have on the findings. Using a cut off score of 75, 14% of the death row group and 15% of the M1 LWOP group would fall into the category of mental retardation/intellectual disability. This difference is not significant. So, even with relaxing the IQ cut off to 75, we find little practical difference between the two groups, and in both sets of analyses, the death row group nominally has a lower proportion of individuals who could potentially be diagnosed with intellectual disability. We include both sets of analyses here to illustrate the evolving standards for the assessment of intellectual disability. We also reiterate the strong caveats from the DSM-IV as discussed above, and reinforced through the recently released DSM-V, that intellectual disability is <u>not</u> diagnosed solely by means of IQ score. This diagnosis is driven much more by a broader and more comprehensive assessment of adaptive and social functioning that is beyond the dataset available to the analysis conducted here. This is to say that IQ score can be *suggestive* of potential intellectual disability, but is by no means definitive.

## Question 6: Mental Health

Question 6 regarding the mental health status of death row inmates actually includes several sub questions, some of which cannot be answered empirically. First, Question 6 asks what criteria should be used in judging the level of mental illness involved. The point of this question is somewhat unclear, but as noted above, the standard source of diagnostic criteria for mental disorders is the DSM-IV, which guides most mental health assessments in the U.S., including those done within the PADOC. It is not our purpose to reinvent this wheel here. Next, Question 6 asks whether people with mental illness who are convicted of murder <u>should</u> be executed. This is much more a moral/normative than empirical question, and is beyond the scope of the analysis presented here. The primary concern of Question 6 for the purposes of this report is the issue of whether persons suffering from mental illness constitute a <u>disproportionate</u> number of those on death row. Of course, "disproportionate" is itself a normative term and we do not attempt to define it here. But, the analysis presented below does offer insight into <u>differences</u> in the numbers of mentally ill inmates on death row versus M1 LWOP, from which the reader may draw their own conclusions about disproportionality.

In the death row group, 38.5% of the inmates had a mental health status of "A," 52.3% were classified as "B," and only 9.2% of the sample were identified as having a "C" status. There were no inmates classified as "D", the most serious mental health status. Thus, fewer than 10% of the death row group was classified as having any sort of current and active mental disorder. The slight majority of the overall death row group was assessed as having had some sort of mental health issue in the past, but with no current treatable needs.

In the M1 LWOP group, 50.4% were rated as "A," 30.0% as "B," 17.1% as "C," and 2.5% as "D." Thus, nearly 20% of this group was classified as having any sort of current and active mental disorder, double the proportion for the death row group. The slight majority of the M1 LWOP group was assessed as having no current or recent mental health issues.

The data is mixed on whether the death row group is disproportionately mentally ill, compared to the M1 LWOP group. On the one hand, a far smaller percentage of the death row group is assessed as having an active, current mental disorder. At the same time, considerably fewer of the death row group are assessed as having no current or recent mental health issues at all. The primary difference between the two groups lies in their past mental health issues (Category B). One possible conclusion is that the death row inmates have a higher lifetime prevalence of some sort of mental disorder, but a lower point prevalence than the M1 LWOP group.

This begs the question of how the inmates in these two groups compare to the overall human population with respect to prevalence of mental disorder. It is reasonably well established that prison inmates in general have higher levels of many mental disorders than is the case for the general human population (Fazel and Danesh, 2002). A recent study estimated that approximately half of the American population will manifest some sort of mental disorder during their lifetime, although much more research is needed on this issue (Kessler, et al, 2005). Recall that we found that among the M1 LWOP group, about half were coded as "A" (no current or recent mental health issues), with the other half having some indication of current or recent mental health problem. Thus, the M1 LWOP group would seem to roughly mirror the overall American population with respect to lifetime prevalence of mental disorders. Conversely, the lifetime prevalence of mental disorder for the death row group (c. 60%) would seem to be somewhat higher than for the overall American population. We urge caution with these comparisons, though, in that the M1 LWOP and death row inmates are not necessarily representative of the overall PADOC inmate population (both groups combined represent only about 7% of the total PADOC population), nor of the overall general population of Americans.

The following five tables present some additional analysis of the mental health status of the death row and M1 LWOP groups.

To test whether there were significant differences in the proportions of individuals in each mental health status category based on their death row status, we conducted a chi square analysis. There was a significant relationship between death row status and mental health status, $\chi^2$ (3, $N = 3590$) $= 46.38$, $p < .001$. Further significance testing revealed that the observed frequency for death row inmates classified as mental health status "B" was significantly higher than expected, $z = 5.30$, $p < .001$. Again, this would support a conclusion of a higher lifetime (but not necessarily current) prevalence of mental illness for the death row group.



**Death Row Status by Mental Health Status**

Within the death row group, we examined the distribution of race by mental health status. Under the category of "A," 68.0% of subjects were Black and 22.7% were White. This distribution was more even under the mental health status category of "B" with 49.0% of the group identifying as Black and 39.2% as White. Finally, in the "C" category, 38.9% were Black and 55.6% were White.



Within the M1 LWOP group, there was a similar racial pattern for the mental health statuses of "A" and "B." Under the category of "A," 71.7% were Black and 19.7% were White. In Category B, 59.2% were Black and 29.9% were White. For status "C," 49.0% were Black and 40.5% where White. Finally, in Category D, 57.0% of subjects were Black and 36.0% were White.



The following graphs show the distribution of the various mental health status for Black and White inmates in the two groups.





**M1 LWOP - Mental Health Distribution By Race**

The data presented in these tables is mixed, but on the whole this analysis suggests that the white inmates in both groups have a higher rate of current or recent mental health problems than do the black inmates. This corresponds to research on the overall American population (offender and non-offender), which finds higher rates of lifetime prevalence of many mental disorders for whites than for blacks (Kessler, et al, 2005).

## Conclusion

This report examined the rates of mental retardation and mental disorder among two groups of inmates within the Pennsylvania Department of Corrections – those on death row and those serving a sentence of Life without Parole for Murder 1, both groups as of February 2013. There is no difference in average IQ score between the death row inmates and the M1 LWOP inmates. For both groups, a small percentage of inmates met the IQ cutoff of 70 or below that is associated with a diagnosis of mental retardation. But, the death row group has a statistically significant <u>lower</u> proportion of inmates in this category than does the M1 LWOP group. With respect to mental illness, a far greater proportion of the inmates in the M1 LWOP group have a current mental health diagnosis, but a larger proportion of the death penalty group have had an indication of mental illness at some point in their lifetimes. Results by race are mixed, but on balance white inmates in both groups seem to report a somewhat higher rate of current or recent mental disorder. Lifetime prevalence rates of mental disorder for the M1 LWOP group seem to mirror rates for the overall American population, while the rate for the death row group seems to be somewhat higher than for the overall American population. The reader is again cautioned to consider the caveats and limitations to this data noted earlier.

## References

American Psychiatric Association. (2000). *Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, Text Revision (DSM-IV-TR).*

Fazel, Seena and John Danesh. (2002). "Serious Mental Disorder in 23,000 Prisoners: A Systematic Review of 62 Surveys." *The Lancet*, 359, 545-550.

Kessler, Ronald C., Patricia Berglund, Olga Demler, Robert Jin, Kathleen R. Merikangas and Ellen E. Walters. (2005). "Lifetime Prevalence and Age-of-Onset Distributions of DSM-IV Disorders in the National Comorbidity Survey Replication." *Archives of General Psychiatry*, 62, 593-602.

Morey, Leslie. (1991). *The Personality Assessment Inventory.* Odessa, FL: Psychological Assessment Resources, Inc.

## Profile of Pennsylvania Inmates Under Death Sentence

| Year | \multicolumn Number and Percentage by Race | | | | | | | | Grand Total | Number by Age* | | | | Average | Number by Gender | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | White | % total | Black | % total | Hispanic | % total | Asian | % total | | 18-29 | 30-39 | 40-49 | 50+ | | Male | % total | Female | % total |
| **1990** | 44 | 37.0% | 74 | 62.2% | 0 | 0.0% | 1 | 1.0% | **119** | 34 | 53 | 27 | 5 | **34.6** | 118 | 99.2% | 1 | 0.8% |
| **1991** | 53 | 38.7% | 82 | 59.8% | 0 | 0.0% | 2 | 1.5% | **137** | 33 | 61 | 35 | 7 | **35.2** | 136 | 99.3% | 1 | 0.7% |
| **1992** | n.d. | - | n.d. | - | n.d. | - | n.d. | - | **151** | n.d. | n.d. | n.d. | n.d. | - | n.d. | - | n.d. | - |
| **1993** | 60 | 35.5% | 103 | 60.9% | 4 | 2.0% | 2 | 1.2% | **169** | 39 | 77 | 37 | 16 | **35.8** | 166 | 98.2% | 3 | 1.8% |
| **1994** | 60 | 33.5% | 109 | 60.9% | 8 | 4.5% | 2 | 1.1% | **179** | 40 | 81 | 42 | 16 | **38.2** | 176 | 98.3% | 3 | 1.7% |
| **1995** | 65 | 33.0% | 122 | 61.9% | 8 | 4.1% | 2 | 1.0% | **197** | 44 | 89 | 47 | 17 | **38.5** | 193 | 98.0% | 4 | 2.0% |
| **1996** | 65 | 31.7% | 128 | 62.4% | 10 | 4.9% | 2 | 1.0% | **205** | 51 | 95 | 44 | 17 | **37.5** | 201 | 98.0% | 4 | 2.0% |
| **1997** | 70 | 32.9% | 131 | 61.5% | 10 | 4.7% | 2 | 1.0% | **213** | 41 | 95 | 55 | 24 | **38.5** | 209 | 98.1% | 4 | 1.9% |
| **1998** | 73 | 32.4% | 137 | 60.9% | 13 | 5.8% | 2 | 1.0% | **225** | 39 | 93 | 65 | 28 | **38.8** | 221 | 98.2% | 4 | 1.8% |
| **1999** | 70 | 30.4% | 144 | 62.6% | 14 | 6.1% | 2 | 1.0% | **230** | 38 | 91 | 69 | 32 | **39.1** | 227 | 98.7% | 3 | 1.3% |
| **2000** | 72 | 30.1% | 150 | 62.8% | 15 | 6.3% | 2 | 1.0% | **239** | 27 | 93 | 81 | 38 | **38.4** | 235 | 98.3% | 4 | 1.7% |
| **2001** | 74 | 30.6% | 150 | 62.0% | 16 | 6.6% | 2 | 1.0% | **242** | 30 | 89 | 85 | 38 | **39.0** | 238 | 98.3% | 4 | 1.7% |
| **2002** | 74 | 30.5% | 151 | 62.1% | 16 | 6.6% | 2 | 1.0% | **243** | 26 | 89 | 85 | 45 | **40.0** | 238 | 97.9% | 5 | 2.1% |
| **2003** | 69 | 30.1% | 139 | 60.7% | 19 | 8.3% | 2 | 1.0% | **229** | 15 | 57 | 74 | 83 | **41.7** | 224 | 97.8% | 5 | 2.2% |
| **2004** | 68 | 30.2% | 137 | 60.9% | 18 | 8.0% | 2 | 1.0% | **225** | 25 | 70 | 85 | 45 | **41.6** | 220 | 97.8% | 5 | 2.2% |
| **2005** | 70 | 31.3% | 134 | 59.8% | 18 | 8.0% | 2 | 1.0% | **224** | 25 | 62 | 87 | 50 | **41.6** | 219 | 97.8% | 5 | 2.2% |
| **2006** | 70 | 31.4% | 133 | 59.6% | 18 | 8.1% | 2 | 1.0% | **223** | 20 | 62 | 86 | 55 | **43.1** | 218 | 97.8% | 5 | 2.2% |
| **2007** | 73 | 32.2% | 134 | 59.0% | 18 | 7.9% | 2 | 1.0% | **227** | 16 | 60 | 91 | 60 | **44.0** | 222 | 97.8% | 5 | 2.2% |
| **2008** | 72 | 32.0% | 133 | 59.1% | 18 | 8.0% | 2 | 1.0% | **225** | 17 | 52 | 87 | 69 | **44.0** | 220 | 97.8% | 5 | 2.2% |
| **2009** | 71 | 32.3% | 129 | 58.6% | 18 | 8.2% | 2 | 1.0% | **220** | 13 | 52 | 82 | 73 | **45.0** | 216 | 98.2% | 4 | 1.8% |
| **2010** | 69 | 31.4% | 127 | 57.7% | 18 | 8.2% | 2 | 1.0% | **216** | 13 | 44 | 82 | 77 | **45.8** | 213 | 98.8% | 3 | 1.4% |
| **2011** | 67 | 32.7% | 117 | 57.1% | 19 | 9.3% | 2 | 1.0% | **205** | 10 | 44 | 75 | 76 | **46.0** | 202 | 98.5% | 3 | 1.5% |
| **2012** | 68 | 34.5% | 109 | 55.3% | 18 | 9.1% | 2 | 1.0% | **197** | 10 | 42 | 74 | 71 | **46.0** | 194 | 98.5% | 3 | 1.5% |
| **2013** | 68 | 34.5% | 103 | 52.3% | 18 | 9.1% | 1 | 1.0% | **190** | 9 | 40 | 62 | 79 | **47.0** | 187 | 98.4% | 3 | 1.6% |
| **2014** | 68 | 36.6% | 98 | 52.7% | 18 | 9.7% | 2 | 1.1% | **186** | 9 | 39 | 57 | 81 | **47.0** | 183 | 98.4% | 3 | 1.6% |
| **2015** | 66 | 36.5% | 95 | 52.5% | 18 | 9.9% | 2 | 1.1% | **181** | 9 | 37 | 51 | 84 | **48.0** | 179 | 98.9% | 2 | 1.1% |
| **2016** | 64 | 36.8% | 90 | 51.7% | 17 | 9.8% | 3 | 1.7% | **174** | 5 | 33 | 51 | 85 | **49.0** | 173 | 99.4% | 1 | 0.6% |
| **Average** | 67 | 32.9% | 122 | 59.4% | 14 | 6.5% | 2 | 1.0% | **204** | 25 | 67 | 67 | 47 | **41.7** | 201 | 98.3% | 4 | 1.7% |

Information compiled from Pennsylvania Department of Corrections Annual Statistical Reports from years 1990-2016.

http://www.cor.pa.gov/About%20Us/Statistics/Pages/Reports.aspx

| Amounts appropriated to supplement the sum appropriated for Pa. Commission on Crime & Delinquency | | |
|---|---|---|
| **Fiscal Year** | **Fed. funding** | **Commw. appropriation** |
| 2017-18[1467] | $8,500,000 (crime victims' compensation servs.) $85,000,000 (crime victims' assist.) $4,000,000 (VOCA admin./ops.) $900,000 (VOCA training) | $1,300,000 (victims of juvenile offenders) $500,000 (victim servs.) |
| 2016-17[1468] | $8,500,000 (crime victims' compensation servs.) $80,000,000 (crime victims' assist.) $4,000,000 (VOCA admin./ops.) | $1,300,000 (victims of juvenile offenders) $1,000,000 (victim servs.) |
| 2015-16[1469] | $8,500,000 (crime victims' compensation servs.) $40,000,000 (crime victims' assist.) $2,000,000 (VOCA admin./ops.) | $1,300,000 (victims of juvenile offenders) $1,000,000 (victim servs.) |
| 2014-15[1470] | $8,500,000 (crime victims' compensation servs.) $20,000,000 (crime victims' assist.) $1,400,000 (VOCA admin./ops.) $500,000 (Statewide automated victim info) | $1,300,000 (victims of juvenile offenders) |
| 2013-14[1471] | $7,500,000 (crime victims' compensation servs.) $20,000,000 (crime victims' assist.) $1,300,000 (VOCA admin./ops.) $1,000,000 (Statewide automated victim info) $250,000 (crime victims' compensation initiative) $375,000 (Pa. capital litigation training program) | $1,300,000 (victims of juvenile offenders) |

---

[1467] Act of July 11, 2017 (P.L.   , No.1A), §§ 202, 1801-D.
[1468] Act of July 12, 2016 (P.L.1577, No.16A), §§ 202, 1801-D.
[1469] Act of Dec. 29, 2015 (P.L.621, No.10A), §§ 202, 1801-D.
[1470] Act of July 10, 2014 (P.L.3051, No.1A), § 202.
[1471] Act of June 30, 2013 (P.L.1277, No.1A), § 202.

| | **Amounts appropriated to supplement the sum appropriated for Pa. Commission on Crime & Delinquency** | |
|---|---|---|
| **Fiscal Year** | **Fed. funding** | **Commw. appropriation** |
| 2012-13[1472] | $7,500,000 (crime victims' compensation servs.)<br>$20,000,000 (crime victims' assist.)<br>$100,000 (ARRA-crime victims' assist.)<br>$1,300,000 (VOCA admin./ops.)<br>$1,000,000 (Statewide automated victim info)<br>$250,000 (crime victims' compensation iniative)<br>$375,000 (Pa. capital litigation training program) | $1,300,000 (victims of juvenile offenders) |
| 2011-12[1473] | $7,500,000 (crime victims' compensation servs.)<br>$75,000 (ARRA- crime victims' compensation servs.)<br>$100,000 (ARRA- crime victims'compensation servs. admin.)<br>$20,000,000 (crime victims' assist.)<br>$600,000 (ARRA-crime victims' assist.)<br>$1,300,000 (VOCA admin./ops.)<br>$1,500,000 (Statewide automated victim info) | -- |
| 2010-11[1474] | $7,500,000 (crime victims' compensation servs.)<br>$100,000 (ARRA- crime victims' compensation servs.)<br>$100,000 (ARRA- crime victims' compensation servs. admin.)<br>$20,000,000 (crime victims' assist.)<br>$1,400,000 (ARRA-crime victims' assist.)<br>$1,094,000 (VOCA admin./ops.)<br>$2,000,000 (Statewide automated victim info) | $718,000 (victims of juvenile crime) |
| 2009-10[1475] | $5,073,000 (crime victims' compensation servs.)<br>$2,000,000 (ARRA- crime victims'compensation servs.)<br>$100,000 (ARRA- crime victims' compensation servs. admin.)<br>$20,000,000 (crime victims' assist.)<br>$2,000,000 (ARRA-crime victims' assist.)<br>$1,094,000 (VOCA admin./ops.)<br>$100,000 (ARRA-crime victims' assist. admin.)<br>$2,000,000 (Statewide automated victim info)<br>$200,000 (victims' rights compliance project) | $1,798,000 (victims of juvenile crime) |
| 2008-09[1476] | $5,134,000 (crime victims' compensation servs.)<br>$20,000,000 (crime victims' assist.)<br>$1,094,000 (VOCA admin./ops.)<br>$2,000,000 (Statewide automated victim info)<br>$200,000 (victims' rights compliance project) | $3,389,000 (victims of juvenile crime) |

[1472] Act of June 30, 2012 (P.L.1740, No.9A), § 202.

[1473] Act of June 30, 2011 (P.L.633, No.1A), § 202.  ARRA is Am. Recovery & Reinvestment Act.

[1474] Act of July 6, 2010 (P.L.1367, No.1A), § 202.  ARRA is Am. Recovery & Reinvestment Act.

[1475] Act of Aug. 5, 2009 (P.L.607, No.1A), § 202; Act of Oct. 9, 2009 (P.L.779, No.10A), § 202.  ARRA is Am. Recovery & Reinvestment Act.

[1476] Act of July 4, 2008 (P.L.1735, No.38A), § 202.

<table>
<tr><td colspan="3"><strong>Amounts appropriated to supplement the sum appropriated for<br>Pa. Commission on Crime & Delinquency</strong></td></tr>
<tr><td><strong>Fiscal Year</strong></td><td><strong>Fed. funding</strong></td><td><strong>Commw.<br>appropriation</strong></td></tr>
<tr><td>2007-08[1477]</td><td>$4,628,000 (crime victims' compensation servs.)<br>$18,000,000 (crime victims' assist.)<br>$1,148,000 (VOCA admin./ops.)<br>$1,500,000 (Statewide automated victim info)<br>$175,000 (victims' rights compliance project)</td><td>$3,462,000 (victims of juvenile crime)</td></tr>
<tr><td>2006-07[1478]</td><td>$6,101,000 (crime victims' compensation servs.)<br>$18,000,000 (crime victims' assist.)<br>$1,148,000 (VOCA admin./ops.)<br>$1,250,000 (Statewide automated victim info)<br>$100,000 (victims' rights compliance project)</td><td>$3,450,000 (victims of juvenile crime)</td></tr>
<tr><td>2005-06[1479]</td><td>$8,053,000 (crime victims' compensation servs.)<br>$18,000,000 (crime victims' assist.)<br>$1,148,000 (VOCA admin./ops.)<br>$75,000 (victims' rights compliance project)</td><td>$3,450,000 (victims of juvenile crime)</td></tr>
<tr><td>2004-05[1480]</td><td>$6,000,000 (crime victims' compensation servs.)<br>$18,000,000 (crime victims' assist.)<br>$1,148,000 & $888,000 (VOCA admin./ops.)<br>$60,000 (victim assist. training acad.)</td><td>$3,668,000 (victims of juvenile crime)</td></tr>
<tr><td>2003-04[1481]</td><td>$4,000,000 (crime victims' compensation servs.)<br>$18,000,000 (crime victims' assist.)<br>$600,000 (VOCA admin./ops.)<br>$1,200,000 (victim assist. training acad.)</td><td>$3,647,000 (victims of juvenile crime)</td></tr>
<tr><td>2002-03[1482]</td><td>$5,000,000 & $3,144,000 (crime victims'compensation servs.)<br>$18,000,000 & $15,600,000 (crime victims' assist.)<br>$600,000 (VOCA admin./ops.)<br>$120,000 (victim assist. training acad.)</td><td>$3,760,000 (victims of juvenile crime)</td></tr>
</table>

---

[1477] Act of July 17, 2007 (P.L.499, No.8A), § 202.
[1478] Act of July 2, 2006 (P.L.1640, No.2A), § 202.
[1479] Act of July 7, 2005 (P.L.487, No.1A), § 202.
[1480] Act of July 4, 2004 (P.L.1837, No.7A), §§ 202, 1811.
[1481] Act of Mar. 20, 2003 (P.L.463, No.1A), § 202.
[1482] Act of June 29, 2002 (P.L.2106, No.7A), §§ 202, 1811.



## Ratio of Execution to Life Sentences by County
### Based on May 2015 Inmate Population

**1 : 77** Erie Ex: 1 L: 77

Warren Ex: 0 L: 6

McKean Ex: 0 L: 8

Potter Ex: 0 L: 5

Tioga Ex: 0 L: 10

**1 : 4** Bradford Ex: 3 L: 11

Susquehanna Ex: 0 L: 2

**1 : 10** Wayne Ex: 1 L: 10

Crawford Ex: 0 L: 20

Forest Ex: 0 L: 4

Elk Ex: 0 L: 3

Cameron Ex: 0 L: 0

Lycoming Ex: 0 L: 17

Sullivan Ex: 0 L: 1

Wyoming Ex: 0 L: 4

**1 : 18** Lackawanna Ex: 2 L: 37

Pike Ex: 0 L: 9

Venango Ex: 0 L: 9

Mercer Ex: 0 L: 21

Clarion Ex: 0 L: 4

**1 : 9** Jefferson Ex: 1 L: 9

**1 : 17** Clearfield Ex: 1 L: 17

Centre Ex: 0 L: 14

**1 : 4** Clinton Ex: 1 L: 4

**1 : 2** Columbia Ex: 2 L: 4

**1 : 33** Luzerne Ex: 2 L: 66

**1 : 11** Monroe Ex: 3 L: 33

Lawrence Ex: 0 L: 13

**1 : 10** Butler Ex: 2 L: 19

Armstrong Ex: 0 L: 6

Union Ex: 0 L: 2

Montour Ex: 0 L: 1

**1 : 6** Northumberland Ex: 3 L: 17

Carbon Ex: 0 L: 11

**1 : 66** Northampton Ex: 1 L: 66

Beaver Ex: 0 L: 33

Indiana Ex: 0 L: 15

Snyder Ex: 0 L: 3

**1 : 13** Schuylkill Ex: 2 L: 26

**1 : 15** Lehigh Ex: 6 L: 90

**1 : 60** Allegheny Ex: 9 L: 542

**1 : 15** Cambria Ex: 1 L: 15

**1 : 8** Blair Ex: 3 L: 23

Mifflin Ex: 0 L: 2

Juniata Ex: 0 L: 6

**1 : 56** Dauphin Ex: 3 L: 169

**1 : 10** Berks Ex: 11 L: 114

**1 : 18** Bucks Ex: 6 L: 106

**1 : 11** Westmoreland Ex: 5 L: 54

Huntingdon Ex: 0 L: 10

Perry Ex: 0 L: 7

Lebanon Ex: 0 L: 29

**1 : 21** Montgomery Ex: 6 L: 126

**1 : 18** Washington Ex: 2 L: 37

**1 : 11** Fayette Ex: 4 L: 44

Somerset Ex: 0 L: 6

Bedford Ex: 0 L: 5

Fulton Ex: 0 L: 0

**1 : 8** Cumberland Ex: 4 L: 33

**1 : 40** Philadelphia Ex: 69 L: 2766

**1 : 8** Greene Ex: 1 L: 8

**1 : 12** Franklin Ex: 2 L: 25

**1 : 14** Adams Ex: 1 L: 14

**1 : 9** York Ex: 12 L: 109

**1 : 20** Lancaster Ex: 6 L: 120

**1 : 20** Chester Ex: 4 L: 81

**1 : 188** Delaware Ex: 1 L: 188



## Percentage of Execution to Life Sentences

No Execution Sentences  Less than 5%  5-10%  10-20%  Over 20%

DOC/PRS - jvt

6/23/2015

**2009**
- Lisette McCormick asks Penn State to study whether there is disparity in the admin. of the death penalty

**2010**
- Development of a research design & proposal
- Initial partial funding from Interbranch Commission on Gender, Racial & Ethnic Fairness
- Request OBTS data on cases from 1998-2010 from AOPC (10/10)

**2011**
- Recieve AOPC data (5/11)
- Work with AOPC data to identify potential sample & finalize research design based on AOPC data

**2012**
- Obtain PA Commission on Sentencing data & match with AOPC cases. (10/12-3/13)
- Obtain & code PA Dept. of Corrections data on cases identified in AOPC for homicide. (2400 cases coded)

**2013**
- Identify counties for field sample
- Prepare field data coding forms
- Pretest field data forms in Blair County (3/13)
- Prepare letters to sample counties district attorneys requesting research access to files
- Pre-test field data coding forms in Dauphin County
- Revise form
- Begin contacting counties to request data
- Begin field data collection in July continuing through 2013

**2014**
- Request access to Philadelphia files
- Negotiate access to reduced number of files in DA's office
- Locate other Philadelphia sources including the Public Defender's Office and Clerk of Court's files (collection in these two sites occurred during summer of 2014)
- Granted limited access to Philadelphia District Attorney's files November 2014 but actual access did not start until January 2015

**2015**
- Philadelphia collection through May
- Cleaning cases for other counties during the summer/fall of 2015 (checking newspapers, re-contacting judges, district attorneys, and appellate files)

**2016**
- Department of Health data on victim information for cases not available in the field files
- Update Department of Corrections information for cases not available during first collection in 2013 (cases that were part of sample but not yet received in DOC)
- Data Analysis of AOPC data and field data
- Preparing final report draft

**2017**
- Complete draft final report and request reviews by three experts in the field and who are familiar with propensity score matching/weighting

Chapters 4, 5 and 6 recommendations of the Final Report of the Pennsylvania Supreme Court Committee on Racial and Gender Bias in the Justice System.

# RECOMMENDATIONS

## TO THE SUPREME COURT OF PENNSYLVANIA

The Committee recommends that the Court:

1.  Include programs on the impact of race, ethnicity, and gender bias in sentencing at judicial training sessions.[86]

2.  Include in such judicial training sessions, education on how the use of specific offender characteristics, such as employment, family responsibilities, and role in the offense, can potentially contribute to unwarranted racial, ethnic, and gender disparities in sentencing.[87]

3.  Strengthen the formal standards of accountability to which sentencing judges are held through adoption of a broader standard of appellate review for sentencing decisions.

4.  Strengthen and expand the collection of data on sentencing decisions.[88]

## TO DISTRICT ATTORNEYS

The Committee recommends that district attorney's offices:

1.  Institute training programs for prosecuting attorneys on the influence of race, ethnicity, and gender bias on charging and plea bargaining decisions.[89]

# RECOMMENDATIONS

## TO THE SUPREME COURT OF PENNSYLVANIA

The Committee recommends that the Court:

1. Develop uniform binding indigent defense standards to meet indigent defense quality concerns regarding conflicts of interest, contracting for services, attorney eligibility, training, and workload.[55]

2. Direct court administrators to explore innovative programs that seek to resolve cases earlier or to divert non-violent defendants into counseling or other alternative programs instead of the court system.

## TO TRIAL COURTS

The Committee recommends that the trial courts:

1. Refrain from moving cases through the system at the expense of proper legal defense for indigent persons.[56]

## TO THE LEGISLATURE

The Committee recommends that the Legislature:

1. Establish an independent Indigent Defense Commission to oversee services throughout the Commonwealth and to promulgate uniform, effective minimum standards. The Commission should report to the Court one year from the date of appointment.[57]

2. Appropriate funding for indigent defense services from Commonwealth funds and adopt adequate uniform attorney compensation standards.[58]

## TO COUNTY PUBLIC DEFENDER OFFICES

The Committee recommends that the public defender offices:

1. Increase diversity of staff, particularly attorneys, and establish clear anti-bias policies for personnel.[59]

2. Develop relationships with local law schools and initiate cooperative arrangements to attract law students to public defense work early in their careers.[60]

3. Along with the Pennsylvania Defenders Association, investigate whether applicable student loan programs, including the Perkins program, permitting student loan forgiveness for prosecutors, can be extended to public defenders.

# RECOMMENDATIONS

## TO THE SUPREME COURT OF PENNSYLVANIA

The Committee recommends that the Court:

1. Pursuant to its inherent power to issue temporary stays of execution, declare a moratorium on the imposition of the death penalty in any case where the defendant's direct appeal has resulted in affirmation by the Supreme Court of Pennsylvania, pending the completion of a study investigating the impact of the race of the defendant and of the victim in prosecutorial decisions to seek the death penalty and in death sentencing outcomes. The moratorium should continue until policies and procedures intended to ensure that the death penalty is administered fairly and impartially are implemented.

2. Empanel a special commission to study the impact of the race of the defendant and of the victim in prosecutorial decisions to seek the death penalty and in death sentencing outcomes.

3. Direct the AOPC, or alternatively appoint a master, to undertake a comprehensive data collection effort covering all stages of capital litigation, including responsibility for completing the data collection instruments and maintaining the database and all supporting documentation. The Court should direct the AOPC, or master, to retain a principal investigator to review data collection efforts undertaken in other states and develop a research design and a plan to implement data collection. The cases to be reviewed should include those in which the death penalty was sought or could have been sought in all cases where the defendant was held for court on first-degree murder or murder generally.

4. Amend Rule 801 (former Rule 352) to require that a copy of the prosecutor's notice of intention to seek death be filed with the AOPC as well as the trial court to facilitate tracking of death-noticed cases.

5. Amend Rule 632 (former Rule 1107) to require retention of the jury questionnaire utilized at trial, which indicates the race and gender of the jurors, for the duration of the defendant's incarceration.

6. Mandate statewide standards for an independent appointment process of selecting capital counsel for all stages of the prosecution, including trial, appeal, and post-conviction hearings. The standards, at a minimum, should incorporate those recommended by the American Bar Association in its *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases.*

7. Require that all capital counsel successfully complete, at a minimum, an annual continuing legal educational component specifically focusing on capital representation.

8. Promulgate reasonable minimum compensation standards for capital counsel throughout Pennsylvania and ensure that sufficient resources for experts and investigators are made available to counsel.

9. Require trial courts during *voir dire* in capital cases to explore fully, when requested by either party, views about race held by prospective jurors.

10. Promulgate a rule that allows for reasonable latitude by defense counsel and the Commonwealth to explore all potential sources of racial bias in *voir dire* of prospective capital jurors.

11. Require trial courts to charge capital juries, when requested by either party, that they may not consider the race of the defendant or victim in determining the appropriate sentence for the defendant.

12. Promulgate a rule that should a *prima facie* case of discrimination in the use of peremptory challenges be established, reasons invoked for the exclusion of the juror that do not substantially relate to his or her qualifications, fitness, or bias shall be viewed as presumptively pretextual.

13. Reduce the number of peremptory strikes in capital cases.

14. Promulgate a jury instruction stating "life means life with no possibility of parole" and require that it be given in all capital cases.

## TO THE LEGISLATURE

The Committee recommends that the Legislature:

1. Enact a Racial Justice Act, like that of other states, that allows for the admission of evidence of a pattern and practice of disparate treatment in both the prosecutorial decision to seek the death penalty and in sentencing outcomes.

2. Enact a proportionality provision requiring the Supreme Court to review death sentences for proportionality.

3. Create and adequately fund a statewide independent Capital Resource Center, or its equivalent, to assist in, and where local resources are inadequate, undertake the representation of, capitally charged defendants and those currently under sentence of death. The assistance and/or representation should extend from arrest through trial and, if the defendant is sentenced to death, through the state and federal appeal and post-conviction process. The Capital Resource Center also should be charged with the responsibility of maintaining court

appointment lists of qualified capital counsel and of overseeing ongoing training programs for capital counsel.

4. Appropriate adequate funds to the Supreme Court for the administration of a comprehensive data collection effort covering all stages of capital litigation.

5. Enact legislation declaring a moratorium on the death penalty until such time as policies and procedures are implemented to ensure that the death penalty is being administered fairly and impartially throughout the Commonwealth.

221

## TO THE ATTORNEY GENERAL AND DISTRICT ATTORNEYS

The Committee recommends that:

1. District attorney's offices adopt written standards and procedures for making decisions about whether to seek the death penalty.

2. The Attorney General empanel a statewide committee of county district attorneys to review each decision by a district attorney to seek the death penalty with the goal of ensuring geographic consistency in the application of the death penalty. The committee's review should commence as soon as possible after each filing of a notice of intention to seek the death penalty, and the result of its review should not be binding. The review committee should include, at a minimum, the Attorney General, the district attorneys of Philadelphia and Allegheny counties and the current president of the Pennsylvania District Attorneys Association, but otherwise be geographically representative of the Commonwealth.

## TO THE GOVERNOR OF PENNSYLVANIA

The Committee recommends that the Governor of Pennsylvania:

1. Pursuant to his constitutional authority to grant temporary reprieves, declare a moratorium on the imposition of the death penalty in any case where the defendant's direct appeal has resulted in affirmation by the Supreme Court of Pennsylvania, pending the completion of a study investigating the impact of the race of the defendant, and of the victim, in prosecutorial decisions to seek the death penalty and in death sentencing outcomes. The moratorium should continue until policies and procedures intended to ensure that the death penalty is administered fairly and impartially are implemented.

2. Empanel a special commission to study the impact of the race of the defendant and the victim in prosecutorial decisions to seek the death penalty and in death sentencing outcomes.